No. 23-12737

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

YIFAN SHEN, et al.,

*Plaintiffs–Appellants,*

v.

WILTON SIMPSON, in his official capacity as
Florida Commissioner of Agriculture, et al.,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:23-cv-208 (Winsor, A.)

### PLAINTIFFS–APPELLANTS' PRINCIPAL BRIEF

Ashley Gorski
Patrick Toomey
Shaiba Rather
Omar Jadwat
Sidra Mahfooz
Noor Zafar
**AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org


*Counsel list continued on the
following page.*

Keliang (Clay) Zhu
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Derek L. Shaffer
**QUINN EMANUEL URQUHART &
   SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

Cody Wofsy
**AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
cwofsy@aclu.org

Daniel B. Tilley
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Bethany Y. Li
Elizabeth Koo
Razeen Zaman
**ASIAN AMERICAN LEGAL
   DEFENSE AND EDUCATION
   FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org

Nicholas L.V. Warren
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

*Attorneys for Plaintiffs–Appellants*

Case No.: 23-12737                                    *Shen, et al., v. Simpson, et al.*

## <u>AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiffs–Appellants certify that the following individuals and entities may have an interest in the outcome of this case or appeal; individuals and entities listed in this disclosure for the first time are in bold font below:

1. American Civil Liberties Union Foundation, *Attorney for Plaintiffs– Appellants*

2. American Civil Liberties Union Foundation of Florida, *Attorney for Plaintiffs–Appellants*

3. Anti-Racism Center of LMU Loyola Law School, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

4. Aoki Center for Critical Race and Nation Studies at UC Davis School of Law, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

5. Arkansas, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

Case No.: 23-12737                               *Shen, et al., v. Simpson, et al.*

6. Asian Americans Advancing Justice – Asian Law Caucus, *Amicus Curiae,
   Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional
   Associations, and Civil Rights Advocacy Organizations*

7. Asian Americans Advancing Justice Atlanta, *Amicus Curiae, Amici Curiae
   Brief of Racial Justice Centers, Affinity Bar and Professional Associations,
   and Civil Rights Advocacy Organizations*

8. Asian American Legal Defense & Education Fund, *Attorney for Plaintiffs–
   Appellants*

9. Asian American Women's Political Initiative, *Amicus Curiae, Amici Curiae
   Brief of Racial Justice Centers, Affinity Bar and Professional Associations,
   and Civil Rights Advocacy Organizations*

10. Asian Law Alliance, *Amicus Curiae, Amici Curiae Brief of Racial Justice
    Centers, Affinity Bar and Professional Associations, and Civil Rights
    Advocacy Organizations*

11. Asian Pacific American Bar Association of Tampa, *Amicus Curiae, Amici
    Curiae Brief of Racial Justice Centers, Affinity Bar and Professional
    Associations, and Civil Rights Advocacy Organizations*

12. Bailey, Andrew, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et
    al.*

13. Bell, Daniel William, *Attorney for Defendants–Appellees*

Case No.: 23-12737                                  *Shen, et al., v. Simpson, et al.*

14. Boston University Center for Antiracist Research, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

15. Butler, Steve, *Attorney for U.S. Department of Justice, United States' Statement of Interest*

16. Carr, Christopher M., *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

17. Center for Civil Rights and Racial Justice at the University Pittsburgh School of Law, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*[1]

18. Center for Immigration Law, Policy, and Justice at Rutgers Law School, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

19. **Center for Race, Inequality, and the Law at New York University School of Law, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations***

---

[1] This entity was mistakenly listed twice in Plaintiffs–Appellants' last disclosure.

Case No.: 23-12737                                          *Shen, et al., v. Simpson, et al.*

20. Chang, Robert Seungchul, *Attorney for Amici Curiae Brief of Racial Justice*
    *Centers, Affinity Bar and Professional Associations, and Civil Rights*
    *Advocacy Organizations*

21. Chin, Gabriel J., *Attorney for Amici Curiae Brief of Racial Justice Centers,*
    *Affinity Bar and Professional Associations, and Civil Rights Advocacy*
    *Organizations*

22. Chinese for Affirmative Action, *Amicus Curiae, Amici Curiae Brief of*
    *Racial Justice Centers, Affinity Bar and Professional Associations, and Civil*
    *Rights Advocacy Organizations*

23. Clarke, Kristen, *Attorney for U.S. Department of Justice, United States'*
    *Statement of Interest*

24. Conference of Asian Pacific American Law Faculty, *Amicus Curiae, Amici*
    *Curiae Brief of Racial Justice Centers, Affinity Bar and Professional*
    *Associations, and Civil Rights Advocacy Organizations*

25. Coody, Jason R, *Attorney for U.S. Department of Justice, United States'*
    *Statement of Interest*

26. Costello, David M., *Attorney for Defendants–Appellees*

27. Cuison-Villazor, Rose, *Attorney for Amici Curiae Brief of Racial Justice*
    *Centers, Affinity Bar and Professional Associations, and Civil Rights*
    *Advocacy Organizations*

Case No.: 23-12737                                    *Shen, et al., v. Simpson, et al.*

28. DeHeng Law Offices, PC, *Attorney for Plaintiffs–Appellants*

29. Fitch, Lynn, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

30. Fitzgerald, Patricia, *Defendant–Appellee*

31. **Fitzpatrick, Martin A.,** ***Magistrate Judge for the Northern District of Florida***

32. Florida Attorney General's Office, *Attorney for Defendants–Appellee*

33. Florida Office of the Solicitor General, *Attorney for Defendants–Appellee*

34. Formello, John M., *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

35. Forrester, Nathan Andrew, *Attorney for Defendants–Appellee*

36. Fred T. Korematsu Center for Law and Equality at Seattle University School of Law, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

37. Georgia, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho*

38. Gorski, Ashley Marie, *Attorney for Plaintiffs–Appellants*

39. Griffin, Tim, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

40. Handberg, Roger B., *Attorney for U.S. Department of Justice, United States' Statement of Interest*

41. Harwell Jr., Lacy R., *Attorney for U.S. Department of Justice, United States' Statement of Interest*

42. Hispanic National Bar Association, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

43. Idaho, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

44. Indiana, State of, *Amici Curiae Brief of the State of Idaho, et al.,*

45. Jackley, Marty J., *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

46. **Jacobs, Arthur I.,** *Attorney for State Attorney Defendants in proceedings below*

47. **Jadwat, Omar,** *Attorney for Plaintiffs–Appellants*

48. Japanese American Citizens League, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

49. Jarwala, Alisha, *Attorney for U.S. Department of Justice, United States' Statement of Interest*

50. Kelly, J. Alex, *Defendant–Appellee*

Case No.: 23-12737                           *Shen, et al., v. Simpson, et al.*

51. Knudsen, Austin, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

52. Koo, Elizabeth L., *Attorney for Plaintiffs–Appellants*

53. Labrador, Raul R., *Attorney for Amici Curiae Brief of the State of Idaho, et al.*

54. Lapointe, Markenzy, *Attorney for U.S. Department of Justice, United States' Statement of Interest*

55. Larizza, R.J., *Defendant*

56. Latino Justice PRLDEF, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

57. Lee, Dexter, *Attorney for U.S. Department of Justice, United States' Statement of Interest*

58. Li, Bethany Yue-Ping, *Attorney for Plaintiffs–Appellants*

59. Liu, Yongxin, *Plaintiff–Appellant*

60. Longfield, Timothy J., *Attorney for Amici Curiae Brief of the State of Idaho, et al.*

61. Maurer, Michael S., *Attorney for U.S. Department of Justice, United States' Statement of Interest*

62. **Mahfooz, Sidra**, ***Attorney for Plaintiffs–Appellants***

*Shen, et al., v. Simpson, et al.*

63. Mississippi, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

64. Missouri, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

65. Montana, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

66. Moody, Ashley, *Attorney for Defendants–Appellees*

67. Multi-Choice Realty, LLC, *Plaintiff–Appellant*

68. National Asian Pacific American Bar Association, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

69. New Hampshire, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

70. Nordby, Daniel E., *Attorney for Defendants–Appellees*

71. North Dakota, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

72. Pagnucco, Carrie, *Attorney for U.S. Department of Justice, United States' Statement of Interest*

73. Quinn Emanuel Urquhart & Sullivan, LLP, *Attorney for Plaintiffs– Appellants*

74. **Rather, Shaiba**, *Attorney for Plaintiffs–Appellants*

75. Reyes, Sean, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

76. Rodriguez, Madeleine Kristine, *Attorney for Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

77. Rokita, Theodore E., *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

78. Rundle, Katherine Fernandez, *Defendant*

79. Sayler, Erik Louis, *Attorney for Defendants–Appellees*

80. Schenck, Robert Scott, *Attorney for Defendants–Appellees*

81. Shaffer, Derek Lawrence, *Attorney for Plaintiffs–Appellants*

82. Shen, Yifan, *Plaintiff–Appellant*

83. Shutts & Bowern, LLP, *Attorney for Defendants–Appellees*

84. Simpson, Wilton, *Defendant–Appellee*

85. **Song, Jian, *Owner of Plaintiff Multi-Choice Realty, LLC***

86. South Asian Bar Association of North America, *Amicus Curiae, Amici Curiae Brief of Racial Justice Centers, Affinity Bar and Professional Associations, and Civil Rights Advocacy Organizations*

87. South Carolina, State of, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

*Shen, et al., v. Simpson, et al.*

88. South Dakota, State of, *Amicus Curiae, Amicus Curiae Brief of the State of Idaho, et al.*

89. Taitz, Sarah Michelle, *Former Attorney for Plaintiffs–Appellants*

90. Tang, Haiyan, *Attorney for Plaintiffs–Appellants*

91. Tilley, Daniel Boaz, *Attorney for Plaintiffs–Appellants*

92. Toomey, Patrick Christopher, *Attorney for Plaintiffs–Appellants*

93. Turner, Joshua Nathaniel, *Attorney for Amici Curiae Brief of the State of Idaho, et al.*

94. U.S. Department of Justice, *United States' Statement of Interest*

95. Utah, State of, *Amici Curiae Brief of the State of Idaho, et al.*

96. Wang, Xinxi, *Plaintiff–Appellant*

97. Warren, Nicholas, *Attorney for Plaintiffs–Appellants*

98. Whitaker, Henry Charles, *Attorney for Defendants–Appellees*

99. Wilson, Alan, *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

100. Winsor, Hon. Allen, *District Court Judge for the Northern District of Florida and District Court Judge in proceedings below*

101. Wofsy, Cody H., *Attorney for Plaintiffs–Appellants*

102. Wold, Theodore J., *Attorney for Amicus Curiae Brief of the State of Idaho, et al.*

Case No.: 23-12737                                  *Shen, et al., v. Simpson, et al.*

103. Worrell, Monique H., *Defendant*

104. Wrigley, Drew H., *Amicus Curiae, Amici Curiae Brief of the State of Idaho, et al.*

105. Xu, Zhiming, *Plaintiff–Appellant*

106. **Zafar, Noor, Attorney for Plaintiffs–Appellants**

107. Zaman, Razeen J., *Attorney for Plaintiffs–Appellants*

108. Zhu, Keliang, *Attorney for Plaintiffs–Appellants*

Plaintiffs–Appellants further state that no publicly traded company or corporation has an interest in the outcome of the case or appeal. Plaintiffs–Appellants certify that Multi-Choice Realty, LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock. The remaining Plaintiffs–Appellants are individual persons.

Dated: October 2, 2023                    /s/ Ashley Gorski
                                          Ashley Gorski
                                          American Civil Liberties Union
                                             Foundation

                                          *Attorney for Plaintiffs–Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs–Appellants respectfully request oral argument. This appeal concerns important constitutional and statutory issues raised by Florida Senate Bill 264, which restricts the ability of people whose "domicile" is in China to purchase homes in the state. Plaintiffs–Appellants believe that oral argument would assist the Court in deciding these matters.

**TABLE OF CONTENTS**

AMENDED CERTIFICATE OF INTERESTED PERSONS &
   CORPORATE DISCLOSURE STATEMENT ..........................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CONTENTS..........................................................................................ii

TABLE OF AUTHORITIES .................................................................................iv

JURISDICTIONAL STATEMENT ........................................................................1

INTRODUCTION .....................................................................................................1

STATEMENT OF THE ISSUES..............................................................................3

STATEMENT OF THE CASE..................................................................................4

I.      Statement of Facts.........................................................................................4

II.     Prior Proceedings..........................................................................................8

STANDARD OF REVIEW .......................................................................................9

SUMMARY OF THE ARGUMENT ........................................................................9

ARGUMENT ..........................................................................................................11

I.      Plaintiffs are likely to succeed on the merits.................................................11

        A.      SB 264 violates the Fair Housing Act...............................................12

                1.   Statutory background ...............................................................12

                2.   SB 264 facially discriminates based on national origin.................14

                3.   SB 264 intentionally discriminates based on national origin. .......17

                4.   SB 264 has a disparate impact based on national origin and
                     race. ..........................................................................................21

B.   SB 264 violates the Equal Protection Clause. ......................................23

C.   SB 264 intrudes on the federal government's foreign affairs powers and is preempted. ......................................30

1.   FIRRMA strikes a balance involving weighty foreign policy and national security considerations. ......................................31

2.   SB 264 invades the federal foreign policy domain. ......................................33

3.   SB 264 sweeps aside FIRRMA's nuances and imposes draconian penalties. ......................................41

D.   SB 264 is unconstitutionally vague. ......................................46

II.   Plaintiffs are suffering irreparable harm and the equities weigh strongly in their favor. ......................................52

CONCLUSION ......................................55

CERTIFICATE OF COMPLIANCE ......................................57

CERTIFICATE OF SERVICE ......................................57

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)...........................................................................39

*Ambach v. Norwick*,
    441 U.S. 68 (1979)............................................................................26

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................... 35, 36

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189 (2017)..........................................................................14

*Bankshot Billiards, Inc. v. City of Ocala*,
    634 F.3d 1340 (11th Cir. 2011) .........................................................52

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
    425 F.3d 964 (11th Cir. 2005) ...........................................................53

*\*Bernal v. Fainter*,
    467 U.S. 216 (1984)........................................................ 23, 24, 25, 28

*Bolden-Hardge v. Off. of Cal. State Controller*,
    63 F.4th 1215 (9th Cir. 2023) ............................................................22

*City of Carrollton Branch of the NAACP v. Stallings*,
    829 F.2d 1547 (11th Cir. 1987) .........................................................30

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)..........................................................................23

*Club Madonna Inc. v. City of Miami Beach*,
    42 F.4th 1231 (11th Cir. 2022) ..................................................... 40, 41

*Colautti v. Franklin*,
    439 U.S. 379 (1979)..........................................................................47

*Cooper v. Harris*,
    581 U.S. 285 (2017)..........................................................................30

iv

*Crosby v. Nat'l Foreign Trade Council,
    530 U.S. 363 (2000) ................................................................ passim

Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.,
    304 F.3d 1167 (11th Cir. 2002) ...................................................9

Davis v. Commonwealth Elec. Comm'n,
    844 F.3d 1087 (9th Cir. 2016) ............................................. 16, 17

Davis v. Guam,
    932 F.3d 822 (9th Cir. 2019) ......................................................16

Democratic Exec. Comm. of Fla. v. Lee,
    915 F.3d 1312 (11th Cir. 2019) ..................................................55

Dimanche v. Brown,
    783 F.3d 1204 (11th Cir. 2015) ..................................................15

Dobbs v. Jackson Women's Health Org.,
    142 S. Ct. 2228 (2022) ...............................................................47

Doe v. Snyder,
    101 F. Supp. 3d 672 (E.D. Mich. 2015) .....................................50

Ebsco Gulf Coast Dev., Inc. v. Salas,
    No. 15-cv-586, 2016 WL 11189984 (N.D. Fla. Sept. 29, 2016) ....................53

Espinoza v. Farah Mfg. Co.,
    414 U.S. 86 (1973) .....................................................................14

Fac. Sen. of Fla. Int'l Univ. v. Winn,
    616 F.3d 1206 (11th Cir. 2010) ............................................. 38, 39

Fla. Action Comm., Inc. v. Seminole Cnty.,
    212 F. Supp. 3d 1213 (M.D. Fla. 2016)........................................47

Frick v. Webb,
    263 U.S. 326 (1923)....................................................................25

Fujii v. State,
    38 Cal. 2d 718 (1952) .................................................................26

v

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) ............................................................44

*\*Graham v. Richardson*,
   403 U.S. 365 (1971).......................................................... 23, 24, 25, 26

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
   992 F.3d 1299 (11th Cir. 2021) ..........................................................28

*Gresham v. Windrush Partners, Ltd.*,
   730 F.2d 1417 (11th Cir. 1984) ..........................................................54

*Guinn v. United States*,
   238 U.S. 347 (1915)............................................................................16

*Harris v. Mexican Specialty Foods, Inc.*,
   564 F.3d 1301 (11th Cir. 2009) ..........................................................47

*High Ol' Times, Inc. v. Busbee*,
   673 F.2d 1225 (11th Cir. 1982) ..........................................................47

*Hill v. Colorado*,
   530 U.S. 703 (2000)..................................................................... 47, 50

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)........................................................................ 35, 42

*Hisp. Int. Coal. of Ala. v. Governor of Ala.*,
   691 F.3d 1236 (11th Cir. 2012) ............................................................9

*Holden v. Hardy*,
   169 U.S. 366 (1898)............................................................................52

*Horizon House Developmental Servs., Inc. v. Twp. of Upper
   Southampton*,
   804 F. Supp. 683 (E.D. Pa. 1992) ......................................................16

*Jackson v. Okaloosa County*,
   21 F.3d 1531 (11th Cir. 1994) ............................................................17

*Jefferson County v. Acker*,
  210 F.3d 1317 (11th Cir. 2000) ..........................................................26

*Johnson v. U.S. Dep't of Agric.*,
  734 F.2d 774 (11th Cir. 1984) ............................................................53

*Juarrero v. McNayr*,
  157 So. 2d 79 (Fla. 1963) ..................................................................49

*Larkin v. State of Mich. Dep't of Soc. Servs.*,
  89 F.3d 285 (6th Cir. 1996) ...............................................................17

*Louisiana v. NAACP*,
  366 U.S. 293 (1961)...........................................................................50

*McWright v. Alexander*
  982 F.2d 222 (7th Cir. 1992) .............................................................16

*Minick v. Minick*,
  149 So. 483 (Fla. 1933) .....................................................................49

*Mock v. Bell Helicopter Textron, Inc.*,
  373 F. App'x 989 (11th Cir. 2010) .....................................................23

*N.C. State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) .............................................................18

*Namba v. McCourt*,
  185 Or. 579 (1949)....................................................................... 26, 27

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999)................................................................45

*\*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) .................................................. *passim*

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ...........................................................15

*Perez v. Perez*,
  164 So. 2d 561 (Fla. 3d DCA 1964)...................................................49

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) ..................................................... 33, 36

*Resendiz v. Exxon Mobil Corp.*,
  72 F.4th 623 (4th Cir. 2023) ...............................................................16

*Rice v. Cayetano*,
  528 U.S. 495 (2000) .................................................................. 15, 16

*Sailboat Bend Sober Living, LLC v. City of Ft. Lauderdale*,
  46 F.4th 1268 (11th Cir. 2022) .................................................. 18, 21

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
  938 F.3d 1259 (11th Cir. 2019) ..........................................................21

*Sec'y, U.S. Dep't of Hous. & Urb. Dev. v. Blackwell*,
  908 F.2d 864 (11th Cir. 1990) .............................................................17

*Shaw v. Reno*,
  509 U.S. 630 (1993) ............................................................................25

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ...........................................................11

*State v. Oakland*,
  129 Mont. 347 (1955) .........................................................................26

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ...........................................................54

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ............................................................................26

*Terrace v. Thompson*,
  263 U.S. 197 (1923) ..................................................................... 25, 26

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015) ................................................... 12, 17, 21, 22

*Town of Huntington v. Huntington Branch, NAACP*,
  488 U.S. 15 (1988) ..............................................................................12

*Trafficante v. Metro. Life Ins. Co.*,
409 U.S. 205 (1972)......................................................................12

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .............................................. 35, 41

*United States v. Petrillo*,
332 U.S. 1 (1947).........................................................................52

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ........................................... 18, 19, 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Co.*,
429 U.S. 252 (1977).............................................................. 18, 29

*Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*,
455 U.S. 489 (1982).....................................................................48

*Wollschlaeger v. Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017) ...................................................47

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)............................................................. 23, 52

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................................................................40

*Zschernig v. Miller*,
389 U.S. 429 (1968)............................................................. 38, 39

## Statutes

Fla. Stat. § 48.193 .......................................................................50

Fla. Stat. § 692.201 ............................................................ *passim*

Fla. Stat. § 692.203 ............................................................ *passim*

Fla. Stat. § 692.204 ............................................................ *passim*

Fla. Stat. § 775.082 .......................................................................6

Fla. Stat. § 775.083 ...................................................................6

Foreign Investment Risk Review Modernization Act of 2018, Pub. L.
115-232, 132 Stat. 1636................................................ 32, 33

42 U.S.C. § 3602...................................................................13

42 U.S.C. § 3604............................................................ 12, 13

42 U.S.C. § 3605............................................................ 12, 13

42 U.S.C. § 3613.............................................................. 1, 13

42 U.S.C. § 3615...................................................................12

50 U.S.C. § 4565 ......................................................... *passim*

**Regulations**

31 C.F.R. § 802 ............................................................ 32, 51

31 C.F.R. § 802.601 ...............................................................43

31 C.F.R. § 802.901 ...............................................................44

88 Fed. Reg. 19450 (May 1, 2023) .........................................22

**Other Sources**

Amicus Br. of Racial Just. Ctrs., Affinity Bar & Pro. Assocs., & Civil
Rts. Advoc. Orgs., *Shen v. Simpson*, No. 4:23-cv-00208-AW,
ECF No. 43 .....................................................................19

CIA World Factbook, https://www.cia.gov/the-world-
factbook/countries/china/#people-and-society ..................29

Fallon, Jr., Richard H., *Strict Judicial Scrutiny*,
54 UCLA L. Rev. 1267 (2007).........................................25

Florida House Session Part 2, The Florida Channel (May 3, 2023),
https://thefloridachannel.org/videos/5-3-23-house-session-part-2 ....................20

Governor DeSantis (@GovRonDeSantis), Twitter
(Aug. 17, 2023, 5:57 PM),
https://twitter.com/GovRonDeSantis/status/1692294605352415425 ...............20

Hatzipanagos, Rachel, *Laws Banning Chinese from Buying Property
Dredge Up Old History*, Wash. Post (Aug. 21, 2023),
https://www.washingtonpost.com/nation/2023/08/18/florida-
chinese-land-laws....................................................................................................37

Lin, Anthony, *Can China Change CFIUS?*, Am. Lawyer (May 6, 2023),
https://www.law.com/americanlawyer/almID/1202598860305.........................37

Pet'rs' Br., *Natsios v. Nat'l Foreign Trade Council,*
2000 WL 35850 (U.S. Jan. 12, 2000) ..................................................................45

Rappeport, Alan, *Spreading State Restrictions on China Show Depths
of Distrust in the U.S.*, N.Y. Times (Aug. 21, 2023),
https://www.nytimes.com/2023/08/21/us/politics/china-
restrictions-distrust.html ....................................................................................37

Ritchie, Bruce, *Chinese Citizens Seek to Block Florida's Law Banning
Them from Owning Property*, Politico (June 7, 2023),
https://www.politico.com/news/2023/06/07/chinese-citizens-ask-
federal-court-to-delay-land-ownership-bill-00100809.......................................20

United Nations Statistics Division, UNData, China, Social Indicators
Concerning "International migrant stock,"
https://data.un.org/en/iso/cn.html ......................................................................14

## JURISDICTIONAL STATEMENT

This matter involves an appeal from the district court's denial of Plaintiffs' motion for a preliminary injunction in *Shen v. Simpson*, No. 4:23-cv-208-AW-MAF (N.D. Fla. Aug. 17, 2023), ECF No. 69. The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §§ 1983, 3613. Plaintiffs timely filed a notice of appeal on August 21, 2023. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1).

## INTRODUCTION

A new Florida law, Senate Bill 264, forbids people who are "domiciled" in China from purchasing homes in the state, with only extremely narrow exceptions. It is currently wreaking havoc on the lives and plans of Plaintiffs, four Chinese citizens who reside in Florida and a real estate brokerage firm that principally serves Chinese and Chinese American clients. The law is disrupting the individual Plaintiffs' purchases of homes, devastating Multi-Choice Realty's business, and roiling Florida's real estate market, with some lenders now refusing to deal with any Chinese national in Florida.

SB 264 mandates egregious national-origin discrimination, in violation of the Fair Housing Act ("FHA") and Equal Protection Clause. It singles out Chinese people for extraordinary restrictions on the ability to buy a home, even though Congress enacted the FHA to eradicate discriminatory policies in housing. SB 264's

reference to "domicile" in China is an obvious proxy for national origin; virtually everyone domiciled in China is of Chinese national origin. Yet the district court concluded that SB 264 is *neutral* as to national origin, ignoring common sense and longstanding precedent that forbids the use of proxies to discriminate against protected classes.

Moreover, Florida's law squarely conflicts with the federal statutes governing national-security review of real estate transactions, and it interferes with the federal foreign-affairs power in precisely the way this Court has already held impermissible. SB 264 has selected a foreign country on which it "ha[s] declared, in effect, some kind of economic war." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp*., 715 F.3d 1268, 1287 (11th Cir. 2013).

In addition to the harms to Plaintiffs described above, SB 264 requires all purchasers to attest under penalty of perjury that they are not domiciled in China or that they otherwise comply with the law's vague terms—deterring lawful purchases and casting suspicion over any prospective purchaser of Asian descent. The statute also recapitulates the errors and harms of similar state "alien land laws" from more than a century ago that restricted Asians' rights to hold land in America. Their purpose was to discourage and prevent "non-desirable" Asian immigrants from settling permanently in the United States and its territories, and their prohibitions are part of a long history of racial discrimination against Asian Americans across the

United States. Over time, however, the U.S. Supreme Court's equal protection doctrine evolved, and these laws targeting Asian immigrants were repealed or struck down by state courts as unconstitutional. Not only does SB 264 harken back to this racist chapter in American history, but it perpetuates odious stereotypes by treating Chinese people as mere instruments of the Chinese government.

The balance of the equities weighs decisively in Plaintiffs' favor, particularly because Plaintiffs seek a limited injunction that applies only to residential real estate. The State has no legitimate (let alone compelling) justification for restricting purchases of homes by Plaintiffs or others who live in Florida, and the United States has supported an injunction while noting that SB 264 "will not advance the State's purported goal of increasing public safety." *See* U.S. Statement of Interest in Supp. of Pls.' Mot. for Prelim. Inj., App.287.

To preserve the pre-SB 264 status quo, and to prevent irreparable harms, this Court should preliminarily enjoin the challenged provisions of the law.[2]

### STATEMENT OF THE ISSUES

1. Whether Plaintiffs are likely to succeed on claims that:

---

[2] Plaintiffs seek to preliminarily enjoin the following portions of SB 264, codified at Florida Statutes §§ 692.201, 692.203-204: in Section 692.204(1)(a), only the provisions applying to individuals "domiciled" in China under subsections (1)(a)(4), (1)(a)(5); in Section 692.201(4), only the provisions applying to individuals "domiciled" in China under subsections (4)(d), (4)(e); and Sections 692.201, 692.203-204 insofar as they apply to residential real estate. References to "SB 264" are to these provisions only.

a. SB 264 violates the Fair Housing Act by discriminating based on national origin and race;

b. SB 264 violates the Equal Protection Clause by discriminating based on national origin, alienage, race, and ethnicity;

c. SB 264 is preempted by federal law; and

d. SB 264 is unconstitutionally vague;

2. Whether SB 264 causes Plaintiffs irreparable harm; and

3. Whether the balance of equities favors a preliminary injunction.

## STATEMENT OF THE CASE

### I.   Statement of Facts

SB 264 took effect on July 1, 2023. The law creates two separate sets of restrictions on land ownership in Florida:

The first set of prohibitions bars "foreign principals"[3] from seven "foreign countries of concern,"[4] including China, from owning or acquiring real property

---

[3] SB 264 defines "foreign principals" as including "[a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States." Fla. Stat. § 692.201(4)(d).

[4] The "foreign countries of concern" are "the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolas Maduro, or the Syrian Arab Republic[.]" *Id.* § 692.201(3).

within ten miles of a military installation or a critical infrastructure facility. Fla. Stat. § 692.203.

Most relevant here is the second set of prohibitions, which targets Chinese people for even more sweeping restrictions and severe penalties. The statute bars "[a]ny person who is domiciled in the People's Republic of China and who is not a citizen or lawful permanent resident of the United States" from purchasing or owning *any* real property in the state. *Id.* § 692.204(1)(a)(4). The sole exception is that people with a valid non-tourist visa or who have been granted asylum are permitted to purchase one residential property—but only if the property is less than two acres and not within five miles of a military installation. *Id.* § 692.204(2). There are more than 20 military bases in Florida, many of them within five miles of city centers like Orlando, Tampa, Jacksonville, Pensacola, Panama City, and Key West, and there are many other sites across the state that may qualify as "military installations." *See* App.100-01. The law also requires people who are "domiciled" in China and who are not citizens or lawful permanent residents of the United States to register their existing property with the State, with civil penalty and forfeiture consequences for failure to comply. Fla. Stat. § 692.204(4).

People "domiciled" in China who purchase property in violation of the statute, as well as those who sell to them, are subject to significant criminal penalties. *Id.*

§ 692.204(8)-(9).[5] Notably, these penalties are more severe than those applicable to people from other "countries of concern" who violate the law. *Id.* § 692.203(8)-(9). For purchasers, the law's criminal penalties have no mens rea requirement. *Id.* §§ 692.204(8), .203(8).

Plaintiffs include four individuals of Chinese descent who live in Florida. *See* App.99, 118, 143, 149. The individual Plaintiffs are not citizens or permanent residents of the United States, and all are at substantial risk of being deemed "domiciled" in China under SB 264. Three of the individual Plaintiffs reside in Florida on time-limited, nonimmigrant visas, and the fourth is seeking political asylum. *See* App.99, 118-19, 143, 149. Plaintiff Multi-Choice Realty is a Florida-based real estate business, and its customer base includes many Chinese people who are subject to SB 264's restrictions and precluded from purchasing real property in Florida. App.155-57, 310-11.

SB 264 is already causing and will continue to cause Plaintiffs irreparable harm. For example, in early 2023, before SB 264 was enacted, Plaintiff Zhiming Xu signed a contract to buy a second home near Orlando. App.119. However, Mr. Xu is already a homeowner, and thus he does not qualify for SB 264's narrow exception for the purchase of a single property. His closing date was originally scheduled for

---

[5] People domiciled in China who purchase land in violation of the law are subject to a third-degree felony, *id.* § 692.204(8), punishable by up to five years in jail and a maximum of $5,000 fine, *id.* §§ 775.082(3)(e), .083(2)(c).

September 2023, but the transaction has not been able to move forward in light of SB 264. App.118. Absent relief, Mr. Xu will be forced to cancel the contract for the purchase of this new home, and will lose both the enjoyment of the home and all or part of his $31,250 deposit. App.120.

Similarly, in April 2023, Plaintiff Yifan Shen signed a contract to buy a home in Orlando. App.100. The property appears to be located within five miles of multiple military sites that may qualify as "military installations" under SB 264's broad definition. App.100-01. Absent relief, she will be forced to cancel the contract for her new home. *Id*. Ms. Shen will lose both the enjoyment of the home and all or part of her $25,000 deposit. *Id*.

In addition, Plaintiff Yongxin Liu owns a home near Daytona Beach, which is his primary residence. Mr. Liu had plans to purchase a vacation home for himself and his parents, but because of the new law, he is prohibited from purchasing an additional property. App.150-52.

Several of the Plaintiffs also face discriminatory registration requirements for their existing properties, under threat of severe penalties. App.119, 144, 150. These plaintiffs must register their property with the State by December 31, 2023. Fla. Stat §§ 692.203(3)(b), 692.204(4)(b).

Plaintiff Multi-Choice Realty stands to lose significant business because of the new law. App.155-57, 310-11. Many of Multi-Choice Realty's customers, both

7

existing and potential, are "domiciled" in China and prohibited from acquiring new property in Florida. *Id.* As a result, Multi-Choice Realty will lose an estimated one-quarter of its business. *Id.*

SB 264 imposes far-reaching discriminatory and stigmatizing effects on Plaintiffs and other people of Chinese and Asian descent. Plaintiffs reasonably fear that the registration process will be used to monitor them, App.120, 144, 150; that potential buyers of their properties will view them with suspicion, App.120; and that sellers of real estate will discriminate against them, App.100-01, 121, 145, 152. Indeed, some lenders are now refusing to do business with any Chinese national who seeks to purchase real estate in Florida. App.310-11.

## II.    Prior Proceedings

Plaintiffs filed their complaint on May 22, 2023, App.10, and filed an amended complaint on June 5, 2023, App.52. On June 6, Plaintiffs moved for a preliminary injunction. App.3. The district court denied the motion on August 17, App.321-72, and Plaintiffs timely filed a notice of appeal on August 21, App.8. Plaintiffs moved in the district court for an injunction pending appeal that same day, App.8, and the court denied that motion on August 23. App.373-75. On August 25 and 26, Plaintiffs moved in this Court for an injunction pending appeal and expedited appeal, and to expand the word limit for that combined motion. Those motions remain pending.

## STANDARD OF REVIEW

The district court's denial of a preliminary injunction is reviewed for abuse of discretion, with legal determinations reviewed de novo and any factual determinations reviewed for clear error. *Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1242 (11th Cir. 2012). Legal errors constitute an abuse of discretion and warrant "plenary review" of the entire order. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1172 (11th Cir. 2002). Here, the district court's denial of Plaintiffs' motion was based on legal determinations and is therefore reviewed de novo. *See* App.325.

## SUMMARY OF THE ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims. First, SB 264 violates the FHA, which prohibits national-origin and race discrimination in housing. SB 264's restrictions based on Chinese "domicile" are in fact restrictions based on national origin, because 99.9% of people domiciled in China are of Chinese origin. Longstanding precedent prohibits the use of such proxies to discriminate against protected classes. In addition to expressly and intentionally discriminating based on national origin, the statute also has a disparate impact based on national origin and race.

Second, SB 264 violates the Equal Protection Clause. It discriminates based on national origin and alienage, and the State has conceded that the law cannot

survive strict scrutiny. The 100-year-old precedents on which the district court relied have been superseded by developments in equal protection doctrine. They are also factually distinguishable, because unlike the statutes in those cases, SB 264 expressly singles out and harshly punishes people from particular countries (as opposed to noncitizens in general).

Third, SB 264 is preempted. Congress has established an extensive and carefully calibrated system of national security review over real estate purchases by foreign nationals. SB 264's categorical prohibitions and stiff penalties are entirely at odds with this regime, and in particular, with Congress's choice to permit all single-residence purchases. Florida has unilaterally declared its own economic and foreign policy vis-à-vis China, in contravention of this Court's and the Supreme Court's precedents. The State's unlawful displacement of the federal regime with a far more draconian system "weakens the President's ability 'to speak for the Nation with one voice in dealing with' China and other nations." *Odebrecht*, 715 F.3d at 1272 (citation omitted).

Fourth, SB 264 violates the Due Process Clause. It subjects purchasers in Florida to severe criminal punishment even though individuals cannot reasonably determine who is subject to the law or what properties it covers. The district court and the State could not agree on the meaning of "domicile" or where Plaintiffs are domiciled for purposes of SB 264, and the statute's definitions of "military

10

installation" and "critical infrastructure facility" are impermissibly vague. In addition, SB 264 imposes *strict* criminal liability, so that even an honest mistake could result in prosecution. This combination of vague terms, harsh criminal penalties, and strict liability is fatal as a matter of due process.

Plaintiffs are suffering irreparable harm from SB 264, and the equities all weigh in Plaintiffs' favor. Without relief, Plaintiffs Xu and Shen will lose out on unique, irreplaceable properties, and Plaintiff Multi-Choice Realty is already losing customers. Because of SB 264, Plaintiffs are experiencing constitutional injuries, unwarranted stigma, and significant financial harms. There is no public interest in the enforcement of a likely unconstitutional statute, and there is no evidence that home purchases by Plaintiffs or people like them endanger national or state security. Florida faces no injury from a preliminary injunction that simply delays enforcement of SB 264, pending the resolution of important constitutional and statutory matters.

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits.

The Court may grant injunctive relief if the moving party shows that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel*

*v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Here, Plaintiffs have satisfied all four conditions.

The district court's denial of Plaintiffs' motion for a preliminary injunction was based entirely on its erroneous conclusion that Plaintiffs are unlikely to succeed on the merits; the court did not address the other preliminary-injunction factors. *See* App.372. In holding that Plaintiffs are unlikely to prevail on any of their four claims, the court legally erred, and each of those errors warrants reversal.

## A.    SB 264 violates the Fair Housing Act.

### 1.    Statutory background

The FHA prohibits housing practices that discriminate based on national origin and race, 42 U.S.C. §§ 3604, 3605, and declares that "any law of a State . . . that purports to require or permit any . . . discriminatory housing practice under [the FHA] shall to that extent be invalid," *id.* § 3615. The FHA's "central purpose" is to "eradicate discriminatory policies" in housing, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539 (2015), an objective "of the highest priority" to Congress, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972). Because SB 264 is itself a discriminatory housing practice and "require[s] . . . a discriminatory housing practice," it is "invalid" and cannot be enforced. *See* 42 U.S.C. § 3615; *see also, e.g.*, *Town of Huntington v. Huntington*

*Branch, NAACP*, 488 U.S. 15, 18 (1988) (affirming decision to strike down portion of ordinance for violating the FHA); U.S. Statement of Interest, App.292-301.

Section 3604(a) of the FHA makes it unlawful to "refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin."[6] Section 3605(a), which applies to Plaintiff Multi-Choice, makes it unlawful for any business engaged in "residential real estate-related transactions to discriminate against any person . . . because of race, color . . . or national origin." SB 264 blatantly violates these provisions of the FHA in several respects, discussed below.

The FHA grants Plaintiffs a cause of action because they are "aggrieved persons" under the statute, *see* 42 U.S.C. §§ 3602(i), 3613(a). Under the FHA, the individual Plaintiffs are aggrieved persons because they will be forced to cancel purchases of new homes and/or register their existing properties under threat of severe penalties. *See* App.101-02, 119-20, 144, 150. Plaintiff Multi-Choice Realty is also an aggrieved person with respect to both 42 U.S.C. §§ 3604(a) and 3605

---

[6] The FHA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b).

because it cannot facilitate residential transactions that are now barred by SB 264's discriminatory prohibitions. *See* App.155-57, 310-11. The Supreme Court "has repeatedly written that the FHA's definition of person 'aggrieved' reflects a congressional intent to confer standing broadly," *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197-98 (2017) (citing examples), and the district court declined to accept the State's arguments to the contrary. *See* App.356-58. Brokers that lose income because of a discriminatory housing policy are covered under this broad definition. *See, e.g.*, *Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1102 (N.D. Ohio 1987).

### 2.    SB 264 facially discriminates based on national origin.

SB 264 violates the FHA because it facially discriminates based on national origin, *i.e.*, the country where a person was born or from which his ancestors came. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). SB 264 singles out people who are "domiciled" in China, and for the purposes of the FHA analysis, this is the same as singling out people who were born in China. Typically, the vast majority of individuals "domiciled" in a country were born there, and that is certainly true of China. It cannot reasonably be disputed that China's population is overwhelmingly of Chinese origin—99.9%, according to the United Nations.[7] Thus, contrary to the

---

[7] United Nations Statistics Division, UNData, China, Social Indicators Concerning "International migrant stock," https://data.un.org/en/iso/cn.html; *see*

district court's conclusion, SB 264 "is effectively a birthplace classification" with respect to China. App.339.

In holding that SB 264 is facially neutral as to national origin, *see id.*, the district court erred. Its analysis was at odds with longstanding case law forbidding the use of fig leaves, or "proxies," to discriminate against protected classes. *See, e.g.*, *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) ("Proxy discrimination is a form of facial discrimination."). If proxy discrimination were permissible, anti-discrimination laws could easily be evaded by creative drafting. Here, "domicile" is no more than camouflage for regulating Chinese people—and notably, the State has advanced no rationale for the law's peculiar use of "domicile" as a trigger for its prohibitions.

The district court further erred by reasoning that "domicile" could function as an impermissible proxy only if it is "practically indistinguishable" from national origin. App.339. Although the two categories are, in fact, practically indistinguishable in this context, that is not the relevant legal test. *See Rice v. Cayetano*, 528 U.S. 495, 514, 516-17 (2000) (holding "ancestry" requirement an impermissible proxy for "race," even though the two categories were not

---

*Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports." (citation omitted)).

coextensive); *Resendiz v. Exxon Mobil Corp.*, 72 F.4th 623, 628 (4th Cir. 2023) (requiring mere "overlap"). Almost every proxy is under- and over-inclusive to some degree. Thus, it does not matter that some people of Chinese origin are not domiciled in China. *Rice*, 528 U.S. at 516-17. Likewise, it does not matter that an exceedingly small number of people domiciled in China are not of Chinese origin. *See, e.g.*, *Guinn v. United States*, 238 U.S. 347, 364-65 (1915) (striking down "grandfather clause" in which ancestry functioned as an proxy for race, even though some African Americans' ancestors were eligible to vote in various northern states, as explained in *Davis v. Guam*, 932 F.3d 822, 841-42 (9th Cir. 2019)); *Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 694 (E.D. Pa. 1992), *aff'd*, 995 F.2d 217 (3d Cir. 1993). Just as discrimination based on grey hair is a proxy for age, despite the occasional grey youth, here the rare exception proves the rule. *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992).

*Davis v. Commonwealth Election Commission*, 844 F.3d 1087 (9th Cir. 2016), rejected similar claims that "domicile" is a neutral classification. There, the court considered a Fifteenth Amendment challenge to a law in the Northern Mariana Islands that limited voting rights to people who were "born or domiciled in the Northern Mariana Islands by 1950" and their descendants. *Id.* at 1093. Although "some persons who were not of Chamorro or Carolinian ancestry lived on the islands in 1950," the court nevertheless held that the law impermissibly favored persons of

Chammoro or Carolinian ancestry. *Id.* (citing *Rice*, 528 U.S. at 516). In reaching this conclusion, the court rejected the Commonwealth's argument that the law's use of "domicile" was race-neutral. *Id*. Here, however, the district court wrongly treated "domicile" as national-origin-neutral, and wrongly required Plaintiffs to establish that the proxy category and the protected category are coextensive.

If the district court's analysis is allowed to stand, it risks eviscerating the FHA's protections. It would allow state and local governments—and any property owner—to freely discriminate based on national origin, simply by labeling it "domicile"-based discrimination. Congress's efforts to "eradicate discriminatory policies" in housing, *Inclusive Cmtys.*, 576 U.S. at 539, cannot be so easily evaded. Because SB 264 facially discriminates against people of Chinese origin, using only the thinnest fig leaf, it violates the FHA.[8]

### 3. SB 264 intentionally discriminates based on national origin.

SB 264 also violates the FHA because federal law prohibits housing practices that intentionally discriminate based on protected characteristics. *See, e.g.*, *Jackson v. Okaloosa County*, 21 F.3d 1531, 1542 (11th Cir. 1994); *Sec'y, U.S. Dep't of Hous.*

---

[8] Although some circuits have held that facial discrimination based on disability may be permitted under the FHA in extremely narrow circumstances, *see, e.g.*, *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996), those circumstances are not present here, and Plaintiffs are aware of no FHA case permitting facial discrimination based on national origin.

*& Urb. Dev. v. Blackwell*, 908 F.2d 864, 871 (11th Cir. 1990). Regardless of whether the Court analyzes the proxy issue under the rubric of facial or intentional discrimination, the answer is the same: SB 264 discriminates on the basis of national origin.

To prevail on a claim of intentional discrimination, *i.e.*, disparate treatment, Plaintiffs need not show that "any member of the [legislature] harbored racial hatred or animosity toward any minority group," *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016); rather, Plaintiffs need only establish that protected traits played "some role" in SB 264's enactment, *Sailboat Bend Sober Living, LLC v. City of Ft. Lauderdale*, 46 F.4th 1268, 1281 (11th Cir. 2022). Plaintiffs have made this showing through both direct and circumstantial evidence. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 236-37 (5th Cir. 2016) (en banc); *Vill. of Arlington Heights v. Metro. Hous. Dev. Co.*, 429 U.S. 252, 265-66 (1977).

First, the text of the statute itself is direct evidence of legislative intent to disproportionately impact Chinese people. It was undoubtedly known and foreseeable to Florida legislators and Governor DeSantis that Section 692.204 would overwhelmingly, if not exclusively, bar people of Chinese ancestry from purchasing homes. *See, e.g.*, App.190 (Governor DeSantis press release explaining that the legislation "limit[s] Chinese purchases" of land); App.194, 204, 208, 217, 227, 231, 240, 250, 254, 263, 273, 278 (staff bill analyses explaining that prohibitions apply

to "persons domiciled in China"); *Veasey*, 830 F.3d at 236 (finding discriminatory intent where legislators "were aware of the likely disproportionate effect of the law on minorities").

Second, the disconnect between SB 264's reach and its stated purpose is further evidence of discriminatory intent. Because the statute's sweeping impact on ordinary Chinese people is not even "tenuously related to the legislature's stated purpose," *id.* at 237, the natural conclusion is that the statute's proponents sought to discriminate against purchasers based on their country of origin. Florida legislators and the governor understood that the statute stretched far beyond the Chinese government and its agents, yet they never offered a justification for casting such a wide net. Rather, their stated justification has focused entirely on the Chinese *government*. *See, e.g.*, App.190 (Governor DeSantis describing the legislation as action "against the United States' greatest geopolitical threat—the Chinese Communist Party").

Third, Governor DeSantis, legislators, and the statute itself have relied on pernicious stereotypes to wrongfully conflate people merely domiciled in China with their government—treating Chinese people as inherently suspicious and as mere instruments of the CCP. *See, e.g.*, App.190 (Governor DeSantis stated: "I'm proud to sign this legislation to stop the purchase of our farmland and land near our military basis and critical infrastructure by Chinese agents."); Amicus Br. of Racial Just.

19

Ctrs., Affinity Bar & Pro. Assocs., & Civil Rts. Advoc. Orgs., at 12-13, ECF No. 43. Following the district court's ruling, Governor DeSantis tweeted that the U.S. Department of Justice had "sided with Communist China against Florida's law prohibiting CCP-tied entities from buying land in Florida," even though Plaintiffs reside in Florida and are neither members of the Chinese government nor members of the CCP.[9]

Fourth, narrower alternatives were available to the state. Although the district court claimed that Plaintiffs cited no such alternatives, App.352, that is incorrect. *E.g.*, Pls. Reply 9, ECF No. 65 (explaining that the legislature "easily could have limited the law to foreign powers and their agents"). Indeed, Florida House Minority Leader Fentrice Driskell and Rep. Robin Bartleman argued that SB 264 should be narrowed to minimize its discriminatory impact.[10] Instead, Governor DeSantis and legislators specifically chose to sweep in countless ordinary Chinese people—

---

[9] Governor DeSantis (@GovRonDeSantis), Twitter (Aug. 17, 2023, 5:57 PM), https://twitter.com/GovRonDeSantis/status/1692294605352415425; *see also, e.g.*, Bruce Ritchie, *Chinese Citizens Seek to Block Florida's Law Banning Them from Owning Property*, Politico (June 7, 2023), https://www.politico.com/news/2023/06/07/chinese-citizens-ask-federal-court-to-delay-land-ownership-bill-00100809 ("'We have a lot—a big increase in the number of people who are Chinese nationals coming,' DeSantis said Wednesday during an event in Arizona. 'Clearly the CCP is a major threat to this country and we need to make sure we are recognizing that.'").

[10] *See* Florida House Session Part 2, The Florida Channel, at 3:35, 18:55 (May 3, 2023), https://thefloridachannel.org/videos/5-3-23-house-session-part-2.

discriminating against them "because of," not "in spite of," where they come from. *Contra* App.352. *See Veasey*, 830 F.3d at 236 (finding discriminatory intent where legislature was aware of likely disproportionate impact on minorities and "nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact"); *see also infra* Section I.B (discussing additional *Arlington Heights* factors).

Plaintiffs have shown that, at a minimum, it is substantially likely that national origin "played some role" in the State's choice to frame this statute so broadly, establishing an FHA violation. *Sailboat Bend*, 46 F.4th at 1281.

### 4.    SB 264 has a disparate impact based on national origin and race.

Regardless of intent, SB 264 violates the FHA because it has a disparate impact on people whose national origin is Chinese and who are Asian, and the law is not necessary to achieve a substantial valid interest. *See Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1274 (11th Cir. 2019) (plaintiff can demonstrate a discriminatory effect by showing that a policy "makes housing options significantly more restrictive for members of a protected group"); *Inclusive Cmtys.*, 576 U.S. at 527, 539-40. Although the district court faulted Plaintiffs for failing to provide statistics about the disparate impact of the law, App.357, statistics are not required—particularly because, at this stage, Plaintiffs need only establish a likelihood of success. It is inevitable that a law discriminating against people

21

domiciled in China has a disparate impact on Chinese people such as Plaintiffs. *See Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023) ("[S]tatistics are not strictly necessary . . . where a disparate impact is obvious.").

The district court further erred in holding that Plaintiffs had failed to show that SB 264 is an "artificial, arbitrary, and unnecessary barrier" to housing. App.358. This is not Plaintiffs' burden under the FHA; instead, the *State* must establish that its law is "necessary" to advance a legitimate interest, and it has failed to do so. *See Inclusive Cmtys.*, 576 U.S. at 541 (defendants may be allowed to "maintain a policy [with disparate impact] if they can prove it is necessary to achieve a valid interest"); 88 Fed. Reg. 19450, 19462 (May 1, 2023) (Department of Housing and Urban Development rule implementing FHA and discussing plaintiff's burden). In any event, Plaintiffs have explained that SB 264 does not advance public safety or any other legitimate interest, *see also* U.S. Statement of Interest, App.287, 305, and that alternatives would have less disparate impact—such as a law limited to foreign powers that does not restrict the availability of housing for ordinary Florida residents like Plaintiffs.

Finally, the court was wrong to fault Plaintiffs for initially raising the disparate-impact argument in a footnote. App.357. Plaintiffs' opening brief below repeatedly referred to discriminatory impact, *see* Pls. Br. 21-23, ECF No. 23; the footnote was substantial and included case citations, *see id.* at 26-27 n.9; and

Plaintiffs elaborated on this argument in their reply, *see* Pls. Reply 13, ECF No. 65. *Cf. Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989, 992 (11th Cir. 2010) (argument waived where raised "in passing in a footnote only and [appellant] does not elaborate on it in any further detail in either one of its briefs").

### B.     SB 264 violates the Equal Protection Clause.

The Fourteenth Amendment "entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971); *see also, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (the Fourteenth Amendment's provisions "are universal in their application, to all persons within the territorial jurisdiction" of a state). SB 264 violates the Equal Protection Clause because it discriminates on the basis of protected characteristics—national origin, alienage, race, and ethnicity—and it fails strict scrutiny, which requires the state to show that the legislation is narrowly tailored to serve a compelling state interest. *See, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 219-22 & n.5 (1984) (discussing protected traits); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985) (same). Indeed, the State has conceded that SB 264 would fail strict scrutiny, *see* App.338—for good reason. The statute's limitations on the individual Plaintiffs' home purchases and its registration requirements do not advance a legitimate (let alone compelling) state interest, and Florida simply cannot

23

show that these measures are *necessary* to protect military installations and critical infrastructure.

SB 264 violates the individual Plaintiffs' right to equal protection in three independent respects.

**First**, SB 264 expressly discriminates based on national origin, as discussed *supra*. Section 692.204 discriminates by singling out people who are "domiciled" in China for severe restrictions and penalties, and the statute's use of "domicile" is merely a proxy for "national origin." Accordingly, strict scrutiny applies, and the statute fails that test.

**Second**, the statute expressly discriminates based on alienage, as the district court recognized. App.340. As one example: Plaintiff Xinxi Wang resides in Florida on a nonimmigrant F-1 visa, which means her "domicile" is in her country of origin, China. Section 692.201(4) therefore categorizes her as a "foreign principal," and she is subject to the prohibitions and registration requirements in Section 692.204. However, if Ms. Wang were a U.S. citizen whose "domicile" is in China, she would not qualify as a "foreign principal," and would not be subject to Section 692.204. Thus, because the law discriminates based on alienage, strict scrutiny applies. *See Bernal*, 467 U.S. at 219-22 (strict scrutiny generally applies to state laws that discriminate based on alienage); *Graham*, 403 U.S. at 372 ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject

24

to close judicial scrutiny."); *see also Shaw v. Reno*, 509 U.S. 630, 642 (1993) (express discrimination triggers strict scrutiny without an extrinsic showing of discriminatory intent).

The district court erred in relying on a set of 100-year-old Supreme Court cases to hold this discrimination constitutionally permissible. *See* App.340-46 (citing *Terrace v. Thompson*, 263 U.S. 197 (1923)). *Terrace* and its companion cases upheld state "alien land laws" that discriminated against "aliens not eligible to become citizens," applying a standard less demanding than strict scrutiny. *See, e.g.*, *Terrace*, 263 U.S. at 219-20; *Frick v. Webb*, 263 U.S. 326, 333 (1923). But those cases do not govern here. They predated several critical developments in equal protection law, including: (1) the Court's modern articulation and application of the strict scrutiny test to laws that discriminate based on national origin, race, or ethnicity, *see* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1297 (2007) (modern strict scrutiny test did not emerge until the mid-twentieth century); and (2) the Court's explicit adoption of strict scrutiny for state laws discriminating on the basis of alienage, *see Bernal*, 467 U.S. at 219; *Graham*, 403 U.S. at 371-72.

As the Supreme Court explained in *Graham*, "[i]t is true that this Court on occasion has upheld state statutes that treat citizens and noncitizens differently, the ground for distinction having been that such laws were necessary to protect special

interests of the State or its citizens." 403 U.S. at 372. This "special public interest doctrine," which animated *Terrace* and its companion cases, was predicated on the idea that "'(w)hatever is a privilege, rather than a right, may be made dependent upon citizenship.'" *Id.* at 374. However, in subsequent years, the Supreme Court rejected this distinction between constitutional rights and privileges—vitiating the theory behind *Terrace*. *See id.* (citing, *inter alia*, *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)); *see also Ambach v. Norwick*, 441 U.S. 68, 73 (1979) (observing that "our more recent decisions have departed substantially from the public-interest doctrine").

Even by the 1950s, several state supreme courts had struck down their state alien land laws as violating the Fourteenth Amendment, recognizing that *Terrace* and similar cases had been superseded by developments in equal protection law. *See Fujii v. State*, 38 Cal. 2d 718, 725-38, 242 P.2d 617, 622-30 (1952); *Namba v. McCourt*, 185 Or. 579, 610-12, 204 P.2d 569, 581-82 (1949); *State v. Oakland*, 129 Mont. 347, 352, 287 P.2d 39, 42 (1955).

But critically, even if *Terrace* were still valid, it would not "directly control" here because it involved a very different type of law. *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320-21 (11th Cir. 2000). Unlike the law in *Terrace*, which the Supreme Court characterized as "applying alike and equally to all aliens," and not based on "race and color," 263 U.S. at 218, 220, SB 264 expressly singles out people

domiciled in particular countries and applies uniquely harsh restrictions and penalties on people domiciled in a single country. In *Namba*, for example, the Oregon Supreme Court held that the Equal Protection Clause would no longer permit an alien land law primarily affecting Japanese people, and it distinguished *Terrace* as permitting only even-handed discrimination against all noncitizens. *See Namba*, 204 P.2d at 582.

This Court has made clear that there is "a difference between following a precedent and extending a precedent," and lower courts are under no obligation to extend a discredited Supreme Court case "by even a micron." *Acker*, 210 F.3d at 1320-21. Yet the district court extended *Terrace* by miles—applying it to a novel statute that expressly discriminates against noncitizens domiciled in China. The statute's explicit focus on China and other specific countries takes it far outside of *Terrace*'s ambit.

But even if the Court were to conclude that *Terrace* directly controls here, SB 264 would still fail because its classifications are "arbitrary" and "unreasonable." *Cf.* App.342. The statute does not advance public safety. As the federal government explained below, "Florida cannot show that restricting or prohibiting individuals, particularly those who may have no connection whatsoever with the Chinese government or the Chinese Communist Party, from purchasing real estate contributes to public safety." U.S. Statement of Interest, App.305. Moreover, the

State has provided no justification for restrictions on Florida residents "domiciled" in China. It has presented no evidence—none—of a nexus between ownership of homes by Chinese people in Florida and purported harm to national or state security.

Finally, the district court was wrong to hold that because the law exempts noncitizens who are lawful permanent residents, heightened scrutiny does not apply. App.349. *Bernal* and *Graham* applied strict scrutiny to laws discriminating against all noncitizens residing in the United States, and nothing in their analysis suggests that heightened scrutiny applies *only* to laws discriminating against lawful permanent residents. *See, e.g.*, *Bernal*, 467 U.S. at 219 n.5 (characterizing "aliens as a class" as a discrete and insular minority).

**Third**, SB 264 violates equal protection because of its discriminatory intent and effects based on national origin, alienage, race, and ethnicity. *See supra* Section I.A.3 (discussing direct and circumstantial evidence of such intent). Discrimination against Chinese people was, at a minimum, a "motivating factor" driving the law's breadth. *Arlington Heights*, 429 U.S. at 265-66. Under *Arlington Heights*, courts examine the historical background of the government action, contemporary statements of legislators, the impact of the challenged law, foreseeability of disparate impact, knowledge of impact, and availability of less discriminatory alternatives. *See Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1322-

28

23 (11th Cir. 2021). These factors weigh heavily toward a finding of discriminatory intent.

The historical background of SB 264 includes increased geopolitical tension between the United States and China, and politicians seeking to foment and capitalize on anti-China sentiment. *See, e.g.*, App.188 (State Senator Jay Collins, who introduced the bill, tweeted: "We are protecting our families, businesses, and land from bad actors like China[.]"); App.181 (Governor DeSantis's press release, stating that he "proposed" the legislation, titled: "Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida through New Action").

With respect to discriminatory impact based on national origin and race, SB 264's harms are far-reaching. Florida residents who are "domiciled" in China are broadly prohibited from purchasing property in the state, will be forced to cancel purchases of new homes, and will be required to register their existing properties with the state under threat of severe penalties. *See, e.g.*, App.101, 119-20, 144, 150. The statute is already having a discriminatory impact along racial and ethnic lines, as China is populated almost entirely by people who are Asian.[11] The law also

---

[11]    *See* CIA World Factbook, https://www.cia.gov/the-world-factbook/countries/china/#people-and-society.

stigmatizes Plaintiffs as Chinese people, and it casts suspicion over anyone of Asian descent who seeks to buy property in Florida.

These impacts were foreseeable and known to Florida legislators and Governor DeSantis, given the nature of the restrictions, and as evidenced by the bill analyses prepared by the Florida Senate professional staff. *See, e.g.*, App.190, 194. The district court erred by minimizing the statements of the bill's proponents and by disregarding these reports, reasoning that they do not show "awareness of consequences for those of Chinese descent or those born in China." App.352-53. But the court's formalistic analysis is at odds with common sense, given the enormous overlap between Chinese domicile and national origin, race, and ethnicity. The court further erred in suggesting that statements of individual legislators are not meaningful evidence of discriminatory intent. App.353-54. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 299-300 (2017); *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1552-53 (11th Cir. 1987). Finally, as discussed *supra*, far less discriminatory alternatives were available to the State. Accordingly, under *Arlington Heights*, SB 264 violates the Equal Protection Clause.

## C.    SB 264 intrudes on the federal government's foreign affairs powers and is preempted.

Congress has established a calibrated system of national security review over real estate purchases by foreign nationals. In doing so, Congress balanced various competing considerations, including concerns about foreign espionage, impacts on

the economy, and the inevitable implications for U.S. foreign relations. It crafted limitations on and exceptions to this system, and it gave the President ultimate discretion over whether to block any particular covered purchases. In creating the federal system, Congress also categorically determined that single-residence purchases did not warrant national security review, let alone prohibition.

Florida has displaced this federal regime with its own draconian system of prohibitions and prison terms. SB 264 addresses the very same concerns—national security and foreign policy—with a diametrically opposed, blunt-force approach. Rejecting Congress's careful scheme and the President's authority in this arena, Florida has barred most Chinese nationals from *any* real estate purchases, "unilaterally select[ing] by name a foreign country" for a declaration of "economic war." *Odebrecht*, 715 F.3d at 1287 (holding such a state policy preempted). Because Florida's statute "weakens the President's ability 'to speak for the Nation with one voice in dealing' with" China and other nations, "differs dramatically from the federal regime" in the purchases it regulates and "the penalties imposed," and "overrides the nuances of the federal law," it is preempted. *Id.* at 1272 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000)).

### 1.    FIRRMA strikes a balance involving weighty foreign policy and national security considerations.

Under federal law, certain real estate purchases by foreign nationals are subject to national security review by the Committee for Foreign Investment in the

United States ("CFIUS"). *See* 50 U.S.C. § 4565; 31 C.F.R. § 802. CFIUS was first established by executive order in 1975 and later codified into statute. App.366 (describing history). In 2018, Congress enacted and President Trump signed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. 115-232, 132 Stat. 1636, which expanded CFIUS's national-security review authority to include real estate purchases.

In crafting this system, Congress was careful to balance countervailing considerations. On one hand, Congress was concerned with the potential for real estate purchases to pose national security and espionage threats. FIRRMA thus subjected to review the purchase of property within "an air or maritime port"; "in close proximity to" a military or otherwise sensitive facility; or which could provide "the ability to collect intelligence" or conduct "foreign surveillance" of such installations. 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(aa), (bb). On the other hand, Congress recognized that over-restriction could have harmful consequences, emphasizing for example that "foreign investment provides substantial economic benefits to the United States," thus "*enhancing* national security." FIRRMA § 1702(b)(1) (emphasis added). Accordingly, Congress limited the scope of the real estate restrictions in various ways, including by exempting *all* transactions involving a single housing unit from CFIUS review. 50 U.S.C. § 4565(a)(4)(C)(i).

Moreover, Congress did not prohibit any transactions outright. Rather, it left that judgment to the discretion of the President with the advice of CFIUS. That ultimate deference to the President reflects the potential foreign policy consequences of blocking any particular purchase—to say nothing of blanket restrictions on people from particular countries. As the D.C. Circuit explained, such decisions involve "judgment in the realm of foreign policy and national security." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314 (D.C. Cir. 2014).

### 2.    SB 264 invades the federal foreign policy domain.

SB 264 conflicts with federal law by usurping the President's authority over matters of foreign affairs. Under Congress's scheme, the President and CFIUS evaluate transactions on a case-by-case basis and determine how best to balance sensitive questions of national security and foreign affairs. But Florida's statute sweeps that process aside: because *Florida* has concluded that nearly all real estate purchases by Chinese citizens pose a national security threat, it does not matter whether the *President* disagrees. Those purchases are barred—regardless of any foreign policy consequences.

This Court, and the Supreme Court, have rejected similar claims of state supremacy in matters implicating foreign relations. *See Odebrecht*, 715 F.3d at 1272; *Crosby*, 530 U.S. at 377. Like the unlawful state statutes in *Odebrecht* and *Crosby*, SB 264 "undermines the substantial discretion Congress has afforded the President"

33

in addressing the national security and foreign policy implications of real estate purchases, thereby "weaken[ing] the President's ability to speak for the Nation with one voice in dealing with" China and other nations. *Odebrecht*, 715 F.3d at 1272, 1281 (cleaned up). "Choosing 'the right degree of pressure to employ'" in addressing potential national security concerns "is a 'federal decision,' not a decision for the State of Florida." *Id.* at 1284 (quoting *Crosby*, 530 U.S. at 380) (citation omitted).

Acknowledging the force of this argument, the district court deemed Plaintiffs' preemption claim the "close[st]" in the case. App.362; *see Crosby*, 530 U.S. at 368 (describing foreign relations as a "uniquely federal area of regulation"). Ultimately, though, the court distinguished *Odebrecht* and *Crosby* on plainly unsustainable grounds. The statutes at issue in those cases, the court reasoned, were "designed to put economic pressure on foreign nations." App.367. By contrast, the court concluded, FIRRMA "address[es] principally security issues," App.368, and thus did not seriously implicate foreign affairs in the court's view. That was error for several reasons.

First, the uniquely federal interest in foreign relations has never been limited to situations in which Congress seeks to "exert diplomatic pressure on foreign nations." App.369. Immigration policy, for example, is not focused on exerting pressure, nor is it a matter dealing "principally with international diplomacy." App.368. Yet this Court and the Supreme Court have repeatedly emphasized the

potential foreign relations *consequences* of immigration policies. *See United States v. Alabama*, 691 F.3d 1269, 1295 n.20 (11th Cir. 2012) ("Any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." (cleaned up)); *Arizona v. United States*, 567 U.S. 387, 395 (2012) ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.").

Indeed, the treatment of foreign nationals in the United States—whether by the federal government or states—can have dramatic consequences on the world stage. "Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941); *Arizona*, 567 U.S. at 395 (similar). The singling out of particular nationalities for ownership restrictions carries similarly grave foreign policy implications and brings this case squarely within the rule of *Odebrecht* and *Crosby.*

Second, the district court was wrong to downplay the role of foreign affairs in the CFIUS regime. Congress expressly contemplated that foreign affairs would factor into the President's ultimate decision whether to block transactions. 50 U.S.C. § 4565(f)(9)(A)-(B), (11) (directing consideration of the "relationship of such

35

country with the United States" and "such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation"). Moreover, Congress specifically included in CFIUS's membership officials "with foreign policy . . . responsibilities," *Ralls Corp.*, 758 F.3d at 302. And insofar as CFIUS is focused on "security issues," App.369, those are *national* security threats posed by *foreign powers* and their nationals. Whether and how to limit foreign economic activity on national security grounds necessarily involves careful consideration of the foreign policy implications. *Cf. Crosby*, 530 U.S. at 376 n.10 ("We find it unlikely that Congress intended both to enable the President to protect national security by giving him the flexibility to suspend or terminate federal sanctions and simultaneously to allow Massachusetts to act at odds with the President's judgment of what national security requires.").

After all, such decisions will frequently have repercussions in the realm of foreign policy. *Cf. Arizona*, 567 U.S. at 395. If the President were to consider sweeping prohibitions on property ownership by Chinese nationals, he would have to weigh the possible effects on other national interests. Would China retaliate with economic restrictions of its own? Could the threat of such action serve as leverage to encourage China's cooperation on matters of international security, diplomacy, or other issues of major national interest? All these questions would doubtless weigh

36

in the balance, along with any security benefits such a policy might have, and the costs of the policy to the U.S. economy.[12] Allowing SB 264 to stand intrudes on the judgment of the President and Congress about how to properly weigh such foreign policy considerations.[13]

As if to highlight SB 264's interference with the Nation's foreign policy, the statute itself and various statements made by its sponsors expressly tie it to foreign policy goals, namely "taking action to stand against the United States' greatest geopolitical threat—the Chinese Communist Party," and "following through on our commitment to crack down on Communist China." App.190 (remarks of Governor DeSantis). This is not a state "security" regulation that operates in a general and even-handed way; it is instead a measure that singles out particular countries and

---

[12] *See, e.g.*, Anthony Lin, *Can China Change CFIUS?*, Am. Lawyer (May 6, 2023), https://www.law.com/americanlawyer/almID/1202598860305 (Chinese leaders "have hinted that the U.S. will pay an economic price for CFIUS" actions).

[13] Contrary to the district court's suggestion that there have been no diplomatic complaints about SB 264, App.370, the Chinese Embassy has issued multiple statements objecting to the statute for politicizing trade and investment issues and fueling anti-Asian hatred in the United States. *See, e.g.*, Rachel Hatzipanagos, *Laws Banning Chinese from Buying Property Dredge Up Old History*, Wash. Post (Aug. 21, 2023), https://www.washingtonpost.com/nation/2023/08/18/florida-chinese-land-laws; *see also* Alan Rappeport, *Spreading State Restrictions on China Show Depths of Distrust in the U.S.*, N.Y. Times (Aug. 21, 2023), https://www.nytimes.com/2023/08/21/us/politics/china-restrictions-distrust.html ("The Chinese government is especially concerned about a proliferation of state-level restrictions," which "is likely to complicate diplomacy with China and could draw retaliation.").

nationalities in a manner calculated to infringe on the federal government's foreign affairs powers. *Cf. Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968) (state practices that "impair the effective exercise of the Nation's foreign policy" are preempted even if they fall within areas of traditional state regulation). The district court's focus on whether the statute was intended to "exert diplomatic pressure," App.369, thus misses the point.

In reaching a contrary conclusion, the district court relied on *Faculty Senate of Florida International University v. Winn*, 616 F.3d 1206 (11th Cir. 2010). But that case, if anything, underscores why SB 264 is preempted. There, Florida restricted the use of state funds for university travel to certain countries. But the list of countries was "determined by the federal government (not especially selected by Florida)." *Id.* at 1210-11. As *Odebrecht* subsequently explained, the State in *Faculty Senate* "did not unilaterally select by name a foreign country on which it had declared, in effect, some kind of economic war." 715 F.3d at 1287 (cleaned up). By contrast, the statutes in *Odebrecht* and *Crosby* did—as does SB 264. *See id.* Moreover, the statute in *Faculty Senate* "did 'not attempt to prohibit, or even to obstruct, trading broadly by anyone with anyone,'" and its "economic impact was likely minimal." *Id.* (quoting *Faculty Senate*, 616 F.3d at 1210). By contrast, SB 264 prohibits a wide swath of transactions, under criminal penalties, and its economic impact has already been substantial as it roils Florida's real estate market. As a result,

38

this case—like *Odebrecht* and *Crosby*, and unlike *Faculty Senate*—involves substantially "more than a minor or incidental brush with federal law." *Odebrecht*, 715 F.3d at 1287.

Third, the district court erred in reasoning that SB 264 escapes preemption because the "thrust of the federal regime" is not foreign policy. App.369. In our constitutional structure, foreign affairs is a uniquely federal realm, such that state action can be preempted even absent any action from Congress. *See Zschernig*, 389 U.S. at 441; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (noting "the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place") (cleaned up); *Odebrecht*, 715 F.3d at 1285 (in "the 'vast external realm' of foreign affairs, 'with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation'"). Because state statutes can interfere with that federal authority even if Congress has not yet spoken, the "thrust" of Congress's enactments cannot carry dispositive weight.

Here, moreover, Congress *has* stepped in to expressly grant authority implicating foreign affairs to the President—making the exclusive federal interest even clearer. *See Odebrecht*, 715 F.3d at 1285 (where "the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum,

for it includes all that he possesses in his own right plus all that Congress can delegate") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). In the district court's view, FIRRMA ultimately counted for little because it was "principally" concerned with "security," and less with foreign policy. But that reasoning would permit states to undermine federal foreign policy merely because Congress enacted a law that, while doubtless involving major foreign policy considerations, is not *solely* concerned with such matters. Such a rule would dramatically interfere with the federal government's constitutionally exclusive powers.

Ultimately, the district court's claim that real estate transactions "represent only one small part of the broader CFIUS regime," App.370, is of no consequence. Congress did choose to regulate real estate purchases; did delegate the ultimate decision regarding such purchases to the President; and did choose to exempt residences. CFIUS's coverage of other kinds of transactions does not allow Florida to reject and undo Congress's considered judgments as to real estate. *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1255 n.6 (11th Cir. 2022) (rejecting argument that local ordinance survived preemption merely because it

regulated only one particular business—a very small part of the overall field regulated by the federal law).[14]

### 3. SB 264 sweeps aside FIRRMA's nuances and imposes draconian penalties.

Even beyond SB 264's interference with foreign policy, the law conflicts with FIRRMA in multiple respects—by sweeping far beyond the scope of the federal statute, overriding its exceptions, and imposing far more severe penalties. The district court did not meaningfully address any of these conflicts.

Consider Congress's decision to specifically exempt *all* transactions involving a single housing unit from CFIUS review. 50 U.S.C. § 4565(a)(4)(C)(i). That "deliberate choice," *Club Madonna*, 42 F.4th at 1254, is striking. The real estate provisions of FIRRMA apply to property Congress deemed sensitive, such as property "in close proximity to," or which might facilitate "foreign surveillance" of, a military installation. 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(aa), (bb). Yet Congress exempted individual residences *even if* they fall within those categories. That careful carveout reflects the reality that regulating such transactions would risk major

---

[14] While the district court noted that a presumption against preemption sometimes applies to "a field which the States have traditionally occupied," App.364 (cleaned up), the court did not hold that the presumption applies here—and for good reason. SB 264 "impinge[s] on an area of core federal concern": foreign policy and national security. *Alabama*, 691 F.3d at 1296 (rejecting presumption against preemption in immigration context). Even if a presumption applied, "the state Act presents a sufficient obstacle" to trigger preemption. *Crosby*, 530 U.S. at 374 n.8.

economic and foreign policy harms and invite discrimination. *Cf. Crosby*, 530 U.S. at 377-78 ("These detailed provisions show that Congress's calibrated Burma policy is a deliberate effort to steer a middle path."); *Hines*, 312 U.S. at 73 (similar).

Yet Florida's law *entirely* bans purchases of homes for most Chinese nationals. Fla. Stat. § 692.204(1)(a)(4); (2)(B). While Congress made the judgment that all Chinese individuals (and people of other nationalities) may purchase a residence consistent with national security, even in sensitive locations, Florida has reached the opposite conclusion, banning most Chinese people from buying a home anywhere in the state.

Because Florida's law "does not countenance . . . the federal regime's exceptions"—including, most notably for this case, its exception for purchases of residences—it "squarely conflicts with the more nuanced federal regime." *Odebrecht*, 715 F.3d at 1282. In *Odebrecht*, this Court considered a similar state attempt to "override[] the nuances of the federal law." *Id*. at 1272. There, Congress took care to exempt from its Cuba sanctions certain transactions "designed to support the Cuban people," including export of medical, agricultural, and informational materials. *Id*. at 1282. In contrast, Florida's statute barred state and local contracts to companies that engaged in *any* commerce in Cuba, without exception. *Id*. The State law thus "squarely conflict[ed] with the more nuanced federal regime." *Id*. So too here. Congress's regulations of real estate purchases were "drawn not only to bar

what they prohibit but to allow what they permit." *Id.* at 1282-83 (quoting *Crosby*, 530 U.S. at 380). Florida does not have authority to wipe the federal exceptions off the books.

SB 264 represents a rejection of Congress's approach in still other ways. As part of its careful balancing of interests, Congress established an individualized process for reviewing particular transactions and purchasers to assess whether they pose any national security threat. *See* 50 U.S.C. § 4565(d)(4). That process allows purchases and sellers to meet with CFIUS to discuss a transaction under review, 31 C.F.R. § 802.601(b), and it empowers CFIUS to negotiate agreements with the parties to covered transactions "to mitigate any risk to the national security" through imposition of adequate safeguards. 50 U.S.C. § 4565(l)(3)(A). Yet SB 264 affords no opportunity to address any particularized national security concerns because the law's premise is that *everyone* from China is a security threat. In this respect, too, Florida's law resembles the statute invalidated in *Odebrecht*. There, federal law permitted the Treasury Secretary to issue licenses permitting otherwise barred transactions with Cuba. 715 F.3d at 1277. The State law covered all transactions, with "no calibrated licensing system." *Id.* at 1282. Here, as in *Odebrecht*, the State's elimination of such procedural nuances "squarely conflicts" with federal law. *Id.*

The same is true of the State's extreme criminal enforcement scheme, which "imposes additional penalties above and beyond the federal regime." *Id.* at 1283.

Indeed, the mismatch here is far more extreme than in *Odebrecht*. FIRRMA imposes no penalty at all for engaging in a covered transaction; rather, it simply authorizes the President to prohibit or suspend that transaction if necessary.[15] By contrast, under SB 264, the same purchase is categorically prohibited and punishable by a lengthy prison sentence. The careful "congressional calibration of force" is replaced with a broad regime of strict liability. *Crosby*, 530 U.S. at 380. The conflict between these schemes is direct and impermissible: "[A] conflict between federal and state law is imminent when two separate remedies are brought to bear on the same activity." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1267 (11th Cir. 2012) (internal quotation marks omitted). Thus, this Court has struck down an immigration provision as preempted where it "layer[ed] additional penalties atop federal law in direct opposition to the Court's direction in *Crosby*." *Id*. SB 264 does the same.

Finally, the district court also pointed to the "history of state regulation of alien landownership," suggesting there was "no similar history of states using economic leverage to affect foreign policy" as in *Odebrecht* and *Crosby*. App.370. It concluded that this difference "counsels against" finding preemption here absent an express congressional statement. App.370-71. That is doubly wrong. First, in *Crosby*, Massachusetts pointed to the long history of state sanctions regimes—to no

---

[15] Under the federal scheme, criminal liability attaches only where a person has made false statements to CFIUS; violations of the terms of any mitigation agreement are punishable only by civil penalties. 31 C.F.R. § 802.901(a)-(c), (g).

avail. *See* Pet'rs' Br. at *10, 2000 WL 35850 (Jan. 12, 2000) (citing "more than two hundred years" of state boycott statutes to promote human rights "around the world," "selective purchasing laws enacted by state and local governments in the 1980s concerning South Africa," and "many [similar] recent state and local laws and resolutions"). *Crosby* acknowledged this historical backdrop but rejected the very conclusion the district court drew in this case: that Congress's "failure to enact express preemption implies approval." 530 U.S. at 387. Second, the court's suggestion that earlier land laws mean SB 264 should survive preemption is particularly unwarranted because other state limitations on noncitizens' ability to purchase property bear little resemblance to Florida's. For example, whatever impact the CFIUS regime might have on even-handed state regulation of agricultural land is simply not presented here. Florida's far more extreme statute, which singles out nationals of a particular "adversary" country and entirely bars home purchases by most of those individuals, tramples on the federal foreign affairs authority and directly contradicts the specific judgments codified in FIRRMA.[16]

---

[16] The district court noted that the federal government had weighed in on the FHA and equal protection claims, but did not "take a position at this time" on preemption or due process. App.371. No inference can fairly be drawn from that fact. This litigation has proceeded quickly, and the Statement of Interest was filed by a Justice Department section with specific expertise on fair housing. It may take longer for the government to opine on issues of foreign policy implicating multiple agencies. In *Crosby*, for example, the federal government took no position in the lower courts, *see Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 54 n.9 (1st Cir. 1999), but

### D.    SB 264 is unconstitutionally vague.

SB 264 subjects purchasers in Florida to severe criminal punishment even though individuals cannot reasonably determine who is subject to the law or what properties it covers. Especially significant, the law imposes *strict* criminal liability on homebuyers, meaning even an honest mistake could result in prosecution. This combination of vague terms, harsh criminal penalties, and strict liability is fatal as a matter of due process. SB 264 does not define where individuals are "domiciled"— a term subject to conflicting interpretations under Florida law. As a result, foreign citizens who reside in Florida cannot reliably determine whether they are subject to the statute's prohibitions. Moreover, the law does not adequately define or identify "military installations" and "critical infrastructure facilities," making it impossible for a person of ordinary intelligence to know where Florida's new exclusion zones begin and end. Together, these ambiguities fail to provide the notice that due process requires, and they invite arbitrary and discriminatory enforcement across the state.

Courts have long recognized that, under the right to due process, statutes are "void for vagueness" when their prohibitions "are not clearly defined." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319-20 (11th Cir. 2017) (en banc) (citation omitted). A law "can be impermissibly vague for either of two independent

---

later weighed in at the Supreme Court in opposition to the Massachusetts sanctions regime, 530 U.S. at 384 n.22.

reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A statute that either forbids or requires an action "in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310-11 (11th Cir. 2009) (cleaned up).

Due process requirements are heightened when a vague law imposes criminal penalties—and especially when it subjects individuals to strict criminal liability. "When a criminal statute is involved, no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228-29 (11th Cir. 1982) (cleaned up). Criminal statutes that are vague and lack a mens rea requirement are routinely deemed unconstitutional. *See, e.g.*, *Fla. Action Comm., Inc. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1225 (M.D. Fla. 2016) (ordinance that proscribed sex offenders from traveling through certain exclusion zones around schools, parks, and playgrounds was unconstitutionally vague; *Colautti v. Franklin*, 439 U.S. 379, 395 (1979), *abrogated on other grounds*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ("This Court has

long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*").

Here, the district court entirely ignored the heightened due process standards that apply to statutes imposing strict liability. *Compare* App.359-362, *with Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498-99 (1982) (threat of criminal penalties reduces "[t]he degree of vagueness that the Constitution tolerates."). Because SB 264 lacks clear standards and is too vague to put people on fair notice of the conduct it proscribes, it violates due process.[17]

To start, the district court and the State could not even agree on the meaning of "domicile" as it applies to Plaintiffs, *see* App.331-35, yet the district court found its meaning clear enough here to satisfy due process. That was wrong. Although SB 264 makes no attempt to define "domicile," the district court held that because "domicile" is used in many other areas of the law without raising vagueness problems, its meaning must be sufficiently clear here. App.361-62. But that ignores two factors that together make this statute different.

---

[17] In the motion for a preliminary injunction, the individual Plaintiffs raised an as-applied challenge with respect to people like them (1) who reside in the United States but are not U.S. citizens or lawful permanent residents; (2) whose country of origin is a "country of concern" under SB 264; and (3) who own or seek to purchase real property in Florida. Thus, for example, their as-applied claim does not encompass prospective buyers who reside in China. The district court claimed that Plaintiffs did not provide "concrete" facts to support their as-applied challenge, App.360, but their declarations plainly establish these facts and more as to each of them, App.99-102, 118-21, 143-46, 149-52.

First, the meaning of "domicile" is especially unsettled under Florida law as it applies to visa-holders and asylum applicants—two central groups of homebuyers who must now contend with SB 264. *Compare*, *e.g.*, *Juarrero v. McNayr*, 157 So. 2d 79, 80 (Fla. 1963) (nonimmigrant visa-holder could not establish permanent home in Florida), *with Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964) (refugee with temporary immigration status could establish domicile). The State claimed below that the individual Plaintiffs all intended to remain in Florida "indefinitely," and therefore that all of them were domiciled in Florida. Gov't Opp. 8-10, ECF No. 56. But none of the individual Plaintiffs have been granted permission to remain in the United States "permanently"; for example, Ms. Wang, Ms. Shen, and Mr. Liu reside in Florida on time-limited, nonimmigrant visas. *See, e.g.*, *Juarrero*, 157 So. 2d at 80; *Minick v. Minick*, 149 So. 483, 487-88 (Fla. 1933) (domicile is a "permanent" home).[18] Neither SB 264 nor Florida's common law provides sufficient clarity for Plaintiffs, and the State's non-binding arguments in this litigation only underscore the problem.

---

[18] The district court held that Ms. Shen, Ms. Wang, and Mr. Liu are "arguably domiciled" in China and thus have standing to challenge SB 264; it did not squarely address Mr. Xu's standing, other than to say it was "conceivabl[e]" that Mr. Xu would be present in Florida indefinitely. App.331-35. Because Mr. Xu, an asylum-seeker, is also at substantial risk of being deemed domiciled in China, he too has standing.

Second, SB 264 imposes strict criminal liability on homebuyers who reach the wrong conclusion about their domicile, even inadvertently. *Compare, e.g.*, Fla. Stat. § 48.193 (long-arm statute relying on "domicile" for certain types of personal jurisdiction). Due process does not tolerate a law that requires individuals to guess about their "domicile" to avoid prison. *See Louisiana v. NAACP*, 366 U.S. 293, 295 (1961) ("It is not consonant with due process to require a person to swear to a fact that he cannot be expected to know or alternatively to refrain from a wholly lawful activity.").

The district court's error was compounded by its refusal to recognize how SB 264 fails to put individuals on adequate notice of what properties are covered. In practice, the definitions of "military installation" and "critical infrastructure facility" are impermissibly vague and do not allow individuals to determine whether a given property falls within one of the 5- and 10-mile exclusion zones created by the law. A law must "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732. But instead, homebuyers in Florida must turn to Google Maps or the like, with no assurance that it provides a complete or accurate catalog of covered sites and their legal boundaries. *Cf. Doe v. Snyder*, 101 F. Supp. 3d 672, 684 (E.D. Mich. 2015) (rejecting argument that Google Maps could cure vagueness in statutory exclusion zones because it does not "clearly mark property lines" or provide "the necessary detail"). For example,

the law defines "military installation" as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." Fla. Stat. § 692.201(5). People seeking to buy a home face extraordinary difficulty: identifying every potential military site in the vicinity, determining the acreage of each, and then identifying the exact boundaries of those sites to assess which properties fall within the exclusion zone. The problem is even worse when it comes to the range of sites—water treatment facilities, chemical plants, electrical power plants, refineries, seaports, and others— that qualify as critical infrastructure. *Cf.* 31 C.F.R. § 802 app. (specifically identifying all relevant sites for purposes of FIRRMA restrictions).

The district court suggested that because the law attempts to define "military installation" and "critical infrastructure facility," that was enough to satisfy due process regardless of the practical difficulties homebuyers face. App.360-62. But ordinary people must be on notice of what the law prohibits in the real world, not simply in the abstract—especially where strict liability means they risk prosecution. *See United States v. Petrillo*, 332 U.S. 1, 8 (1947) (statute must convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices").[19]

---

[19] The district court stated that "[t]here is no constitutionally protected activity here" to support a pre-enforcement vagueness challenge, App.359, but an

II.    **Plaintiffs are suffering irreparable harm and the equities weigh strongly in their favor.**

Plaintiffs are suffering and will suffer irreparable harm from SB 264. Plaintiffs are ordinary people going about their lives in Florida, whose plans for the future and financial arrangements are being upended by this law for no discernable reason. The State, for its part, does not even argue that home purchases by Plaintiffs or other Florida residents like them pose a risk to security. Given the law's significant criminal and civil penalties, and the other irreparable harms Plaintiffs face, only a preliminary injunction from this Court can provide the binding protection they need as this case moves forward.

Plaintiff Xu was scheduled to close on a new home in September 2023. Although his contract has not yet been terminated, he will be forced to cancel that contract absent relief. App.118-20. Similarly, Plaintiff Shen's closing for her new home is scheduled for December 2023, and she will likewise be forced to cancel her contract absent relief. App.99-101. "Because real property is considered unique, money damages to a contract purchaser of real property is an inadequate remedy at

---

individual's right to acquire property is a fundamental constitutional right. *See, e.g.*, *Holden v. Hardy*, 169 U.S. 366, 390-91 (1898); *Yick Wo*, 118 U.S. at 367-68. The State did not contest this below. Although the district court relied on *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340 (11th Cir. 2011), *see* App.359, that case is not to the contrary, as it involved a business asserting a general "right to operate under clear laws."

law." *Ebsco Gulf Coast Dev., Inc. v. Salas*, No. 3:15-cv-586-MCR, 2016 WL 11189984, at *4 (N.D. Fla. Sept. 29, 2016); *see Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 788 (11th Cir. 1984) (similar). By forcing the plaintiffs to cancel their contracts and by depriving them of these particular properties, SB 264 will cause them irreparable harm.

Plaintiff Multi-Choice Realty is already losing customers whose transactions are prohibited under the law, and it is suffering damage to its goodwill. *See* App.156-57, 310-11. This "loss of customers and goodwill is an irreparable injury." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005).

SB 264 also imposes discriminatory registration and affidavit requirements. It mandates that Plaintiffs and any other would-be buyer attest under penalty of perjury to their compliance, on pain of third-degree felony charges, up to five years' imprisonment, heavy fines, and property forfeitures. Fla. Stat. § 692.204(8). Given the statute's vagueness, even would-be purchasers who believe themselves permitted to purchase (or incorrectly believe themselves barred) will be deterred and deprived of unique, irreplaceable properties.

More broadly, SB 264 is wreaking havoc for Chinese people throughout the state, given its stigmatizing effects and resulting discrimination in the housing market. Under Eleventh Circuit precedent, irreparable injury should be presumed

from these harms. *See Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("when housing discrimination is shown it is reasonable to presume that irreparable injury flows from the discrimination"). The law's discriminatory prohibitions and requirements stigmatize Plaintiffs simply because they are Chinese and damage their status in their communities. SB 264 is explicitly based upon and perpetuates a malignant stereotype: that Chinese nationals are fundamentally un-American and untrustworthy, and thus are appropriately excluded from being able to purchase their home of choice in America. The law also sows widespread housing discrimination because it threatens sellers with criminal penalties for transacting with Chinese persons like the individual Plaintiffs. *See* Fla. Stat. §§ 692.203(9), 692.204(9). Because of SB 264, lenders have stated that they are cutting off business with *all* Chinese citizens in Florida. App.310-11. Only an injunction can prevent these multiple dimensions of irreparable injury from dramatically harming the public interest.

Finally, the balance of equities and the public interest weigh heavily in favor of preliminary enjoining SB 264. Where, as here, the government is the party opposing the preliminary injunction, these two factors merge into a single analysis. *See Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

Plaintiffs are experiencing the loss of unique property, constitutional injury, unwarranted stigma, and significant financial harms due to SB 264. Nothing

appreciable weighs on the State's side of the scale. There is no public interest "in the enforcement of what is very likely an unconstitutional statute," *Odebrecht*, 715 F.3d at 1290; rather, "the public interest is served when constitutional rights are protected," *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Moreover, the State's position—rejected by the district court as to standing— is that the individual Plaintiffs are not covered by the statute, so an injunction as to them and people like them could not possibly harm the State. The State offered no evidence that real estate purchases by Florida residents like Plaintiffs pose any threat to state security, and the United States has supported an injunction while noting that SB 264 "will not advance the State's purported goal of increasing public safety." App.287. The equities weigh decisively in favor of an injunction preliminarily halting this discriminatory, unconstitutional law.

## CONCLUSION

Plaintiffs respectfully request that the Court reverse and remand with instructions to preliminarily enjoin the challenged provisions of SB 264.

Dated: October 2, 2023                    Respectfully submitted,

*/s/ Ashley Gorski*

Keliang (Clay) Zhu                        Ashley Gorski
**DEHENG LAW OFFICES PC**                 Patrick Toomey
7901 Stoneridge Drive, Suite 208          Shaiba Rather
Pleasanton, CA 94588                      Omar Jadwat

(925) 399-5856
czhu@dehengsv.com

Derek L. Shaffer
**QUINN EMANUEL URQUHART &**
   **SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com
Bethany Y. Li
Elizabeth Koo
Razeen Zaman
**ASIAN AMERICAN LEGAL**
   **DEFENSE AND EDUCATION**
   **FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org

Nicholas L.V. Warren
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Sidra Mahfooz
Noor Zafar
**AMERICAN CIVIL LIBERTIES**
   **UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org

Cody Wofsy
**AMERICAN CIVIL LIBERTIES**
   **UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
cwofsy@aclu.org

Daniel B. Tilley
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

*Attorneys for Plaintiffs–Appellants*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies as follows:

1.    This brief contains 12,992 words, excluding the parts of the document exempted by Rule 32(f), in accordance with Rule 32(a)(7)(B).

2.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6).


Dated: October 2, 2023                    */s/ Ashley Gorski*_____
                                          Ashley Gorski
                                          American Civil Liberties Union
                                             Foundation

                                          *Attorney for Plaintiffs–Appellants*


**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2023, the foregoing was filed electronically with the Clerk of Court through the appellate CM/ECF system. I further certify that all parties required to be served have been served.


Dated: October 2, 2023                    */s/ Ashley Gorski*_____
                                          Ashley Gorski
                                          American Civil Liberties Union
                                             Foundation

                                          *Attorney for Plaintiffs–Appellants*