No. 23-12737

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

YIFAN SHEN, et al.,

*Plaintiffs–Appellants,*

v.

WILTON SIMPSON, in his official capacity as
Florida Commissioner of Agriculture, et al.,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:23-cv-208 (Winsor, A.)

## APPENDIX TO PLAINTIFFS–APPELLANTS' PRINCIPAL BRIEF,
## VOLUME I

Ashley Gorski
Patrick Toomey
Shaiba Rather
Omar Jadwat
Sidra Mahfooz
Noor Zafar
**AMERICAN CIVIL LIBERTIES**
**UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org

*Counsel list continued on the*
*following page.*

Keliang (Clay) Zhu
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Derek L. Shaffer
**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

Cody Wofsy
**AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
cwofsy@aclu.org

Daniel B. Tilley
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Bethany Y. Li
Elizabeth Koo
Razeen Zaman
**ASIAN AMERICAN LEGAL
    DEFENSE AND EDUCATION
    FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org

Nicholas L.V. Warren
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

*Attorneys for Plaintiffs–Appellants*

**No. 23-12737**
*Shen, et al. v. Simpson, et al.*
**United States Court of Appeals for the Eleventh Circuit**

## TABLE OF CONTENTS

### APPENDIX VOL. I

| Docket/ Tab No. | Document Title | Page(s) |
|---|---|---|
| A | Docket Sheet, U.S. District Court for the Northern District of Florida, Case No. 4:23-cv-00208-AW-MAF | A1 |
| 1 | Plaintiffs' Complaint (May 22, 2023) | A10 |
| 17 | Plaintiffs' First Amended Complaint (June 5, 2023) | A52 |
| 21-2 | Declaration of Plaintiff Yifan Shen (June 6, 2023) | A97 |
| 21-3 | Declaration of Plaintiff Zhiming Xu (June 6, 2023) | A116 |
| 21-4 | Declaration of Plaintiff Xinxi Wang (June 6, 2023) | A141 |
| 21-5 | Declaration of Plaintiff Yongxin Liu (June 6, 2023) | A147 |
| 21-6 | Declaration of Jian Song, Owner of Plaintiff Multi-Choice Realty, LLC (June 6, 2023) | A153 |

### APPENDIX VOL. II

| Docket/ Tab No. | Document Title | Page(s) |
|---|---|---|
| 21-7[1] | Declaration of Keliang Zhu, Counsel of Record for Plaintiffs, Attorney at DeHeng Law Offices PC (June 6, 2023), Exhibit Nos. 1, 8, 18, 21, 32, 36, 38, 41 | A159 |

---

[1] Includes an abridged selection of the exhibits originally attached to the declaration.

| 54 | Statement of Interest of the United States in Support of Plaintiffs' Motion for Preliminary Injunction (June 27, 2023) | A285 |
| 65-1 | Supplemental Declaration of Jian Song, Owner of Plaintiff Multi-Choice Realty, LLC (July 11, 2023) | A308 |
| 69 | U.S. District Court for the Northern District of Florida, District Court Order Denying Plaintiffs' Emergency Motion for a Preliminary Injunction (Aug 17, 2023) | A321 |
| 72 | U.S. District Court for the Northern District of Florida, District Court Order Denying Plaintiffs' Emergency Motion for an Injunction Pending Appeal (Aug 23, 2023) | A373 |

Tab A

STAYED,APPEAL

# U.S. District Court
## Northern District of Florida (Tallahassee)
## CIVIL DOCKET FOR CASE #: 4:23–cv–00208–AW–MAF

SHEN et al v. SIMPSON et al
Assigned to: JUDGE ALLEN C WINSOR
Referred to: MAGISTRATE JUDGE MARTIN A
FITZPATRICK
Case in other court:  USCA, 23–12737
Cause: 42:1983 Civil Rights Act

Date Filed: 05/22/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 05/22/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC–7879853.), filed by XINXI WANG, ZHIMING XU, YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC. (Attachments: # 1 Summons – Simpson, # 2 Summons – Ivey, # 3 Summons – Fitzgerald) (WARREN, NICHOLAS) (Entered: 05/22/2023) |
| 05/22/2023 | 2 | CIVIL COVER SHEET. (WARREN, NICHOLAS) (Entered: 05/22/2023) |
| 05/22/2023 | 3 | Corporate Disclosure Statement/Certificate of Interested Persons by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (WARREN, NICHOLAS) (Entered: 05/22/2023) |
| 05/23/2023 | 4 | Summons Issued as to All Defendants. (Attachments: # 1 Chair, # 2 Acting Secretary) (bkp) (Entered: 05/23/2023) |
| 05/23/2023 | 5 | SUMMONS Returned Executed by XINXI WANG, ZHIMING XU, YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC. WILTON SIMPSON served on 5/23/2023, answer due 6/13/2023. (WARREN, NICHOLAS) (Entered: 05/23/2023) |
| 05/23/2023 | 6 | SUMMONS Returned Executed by XINXI WANG, ZHIMING XU, YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC. MEREDITH IVEY served on 5/23/2023, answer due 6/13/2023. (WARREN, NICHOLAS) (Entered: 05/23/2023) |
| 05/24/2023 | 7 | MOTION to Appear Pro Hac Vice by Ashley Gorski.( Filing fee $ 208 receipt number AFLNDC–7886489.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Exhibit A: Certificate of Good Standing) (GORSKI, ASHLEY) (Entered: 05/24/2023) |
| 05/24/2023 | 8 | MOTION to Appear Pro Hac Vice by Patrick Toomey.( Filing fee $ 208 receipt number AFLNDC–7886497.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Exhibit A: Certificate of Good Standing) (TOOMEY, PATRICK) (Entered: 05/24/2023) |
| 05/24/2023 | 9 | MOTION to Appear Pro Hac Vice by Sarah Taitz.( Filing fee $ 208 receipt number AFLNDC–7886506.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Exhibit A: Certificate of Good Standing) (TAITZ, SARAH) (Entered: 05/24/2023) |
| 05/25/2023 |  | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 8 MOTION to Appear Pro Hac Vice by Patrick Toomey.( Filing fee $ 208 receipt number AFLNDC–7886497.), 7 MOTION to Appear Pro Hac Vice by Ashley Gorski.( Filing fee $ 208 receipt number AFLNDC–7886489.), 9 MOTION to Appear Pro Hac Vice by Sarah Taitz.( Filing fee $ 208 receipt number AFLNDC–7886506.). Referred to MARTIN A FITZPATRICK. (rcb) (Entered: 05/25/2023) |
| 05/26/2023 | 10 | ORDER. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 7 , is GRANTED. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 8 , is GRANTED. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 9 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 05/26/2023. (rcb) (Entered: 05/26/2023) |

**A2**

| 05/31/2023 | 11 | NOTICE of Appearance by ROBERT SCOTT SCHENCK on behalf of All Defendants (SCHENCK, ROBERT) (Entered: 05/31/2023) |
|---|---|---|
| 06/01/2023 | 12 | SUMMONS Returned Executed by XINXI WANG, ZHIMING XU, YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC. PATRICIA FITZGERALD served on 5/23/2023, answer due 6/13/2023. (WARREN, NICHOLAS) (Entered: 06/01/2023) |
| 06/02/2023 | 13 | MOTION to Appear Pro Hac Vice by Keliang Zhu.( Filing fee $ 208 receipt number AFLNDC–7900984.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Exhibit 1) (ZHU, KELIANG) (Entered: 06/02/2023) |
| 06/03/2023 | 14 | MOTION to Appear Pro Hac Vice by Cody Wofsy.( Filing fee $ 208 receipt number AFLNDC–7902088.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Certificate of Good Standing) (WOFSY, CODY) (Entered: 06/03/2023) |
| 06/05/2023 | 15 | Consent MOTION for Leave to File a *Memorandum that Exceeds the Word Limit* by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (WARREN, NICHOLAS) (Entered: 06/05/2023) |
| 06/05/2023 | 16 | MOTION to Appear Pro Hac Vice by Derek L. Shaffer.( Filing fee $ 208 receipt number AFLNDC–7903752.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (SHAFFER, DEREK) (Entered: 06/05/2023) |
| 06/05/2023 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 13 MOTION to Appear Pro Hac Vice by Keliang Zhu.( Filing fee $ 208 receipt number AFLNDC–7900984.), 14 MOTION to Appear Pro Hac Vice by Cody Wofsy.( Filing fee $ 208 receipt number AFLNDC–7902088.), 16 MOTION to Appear Pro Hac Vice by Derek L. Shaffer.( Filing fee $ 208 receipt number AFLNDC–7903752.), 12 Summons Returned Executed. Referred to MARTIN A FITZPATRICK. (bkp) (Entered: 06/05/2023) |
| 06/05/2023 | 17 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by XINXI WANG, ZHIMING XU, YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC. (Attachments: # 1 Summons – Larizza, # 2 Summons – Worrell, # 3 Summons – Rundle) (WARREN, NICHOLAS) (Entered: 06/05/2023) |
| 06/05/2023 | 18 | ORDER GRANTING 15 MOTION FOR EXPANDED WORD LIMIT. Signed by JUDGE ALLEN C WINSOR on 6/5/2023. (atm) (Entered: 06/05/2023) |
| 06/05/2023 | 19 | MOTION to Appear Pro Hac Vice by Elizabeth Koo.( Filing fee $ 208 receipt number AFLNDC–7905249.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (KOO, ELIZABETH) (Entered: 06/05/2023) |
| 06/05/2023 | 20 | MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7905269.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (LI, BETHANY) (Entered: 06/05/2023) |
| 06/06/2023 | 21 | Emergency MOTION for Preliminary Injunction by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Proposed Order, # 2 Shen Declaration, # 3 Xu Declaration, # 4 Wang Declaration, # 5 Liu Declaration, # 6 Song Declaration, # 7 Zhu Declaration, # 8 Ex. 1 to Zhu Decl., # 9 Ex. 2 to Zhu Decl., # 10 Ex. 3 to Zhu Decl., # 11 Ex. 4 to Zhu Decl., # 12 Ex. 5 to Zhu Decl., # 13 Ex. 6 to Zhu Decl., # 14 Ex. 7 to Zhu Decl., # 15 Ex. 8 to Zhu Decl., # 16 Ex. 9 to Zhu Decl., # 17 Ex. 10 to Zhu Decl., # 18 Ex. 11 to Zhu Decl., # 19 Ex. 12 to Zhu Decl., # 20 Ex. 13 to Zhu Decl., # 21 Ex. 14 to Zhu Decl., # 22 Ex. 15 to Zhu Decl., # 23 Ex. 16 to Zhu Decl., # 24 Ex. 17 to Zhu Decl., # 25 Ex. 18 to Zhu Decl., # 26 Ex. 19 to Zhu Decl., # 27 Ex. 20 to Zhu Decl., # 28 Ex. 21 to Zhu Decl., # 29 Ex. 22 to Zhu Decl., # 30 Ex. 23 to Zhu Decl., # 31 Ex. 24 to Zhu Decl., # 32 Ex. 25 to Zhu Decl., # 33 Ex. 26 to Zhu Decl., # 34 Ex. 27 to Zhu Decl., # 35 Ex. 28 to Zhu Decl., # 36 Ex. 29 to Zhu Decl., # 37 Ex. 30 to Zhu Decl., # 38 Ex. 31 to Zhu Decl., # 39 Ex. 32 to Zhu Decl., # 40 Ex. 33 to Zhu Decl., # 41 Ex. 34 to Zhu Decl., # 42 Ex. 35 to Zhu Decl., # 43 Ex. 36 to Zhu Decl., # 44 Ex. 37 to Zhu Decl., # 45 Ex. 38 to Zhu Decl., # 46 Ex. 39 to Zhu Decl., # 47 Ex. 40 to Zhu Decl., # 48 Ex. 41 to Zhu Decl., # 49 Ex. 42 to Zhu Decl., # 50 Ex. 43 to Zhu Decl., # |

A3

| | | |
|---|---|---|
| | | 51 Ex. 44 to Zhu Decl., # 52 Ex. 45 to Zhu Decl., # 53 Ex. 46 to Zhu Decl., # 54 Ex. 47 to Zhu Decl., # 55 Ex. 48 to Zhu Decl., # 56 Ex. 49 to Zhu Decl., # 57 Ex. 50 to Zhu Decl., # 58 Ex. 51 to Zhu Decl., # 59 Ex. 52 to Zhu Decl., # 60 Ex. 53 to Zhu Decl., # 61 Ex. 54 to Zhu Decl., # 62 Ex. 55 to Zhu Decl., # 63 Ex. 56 to Zhu Decl., # 64 Ex. 57 to Zhu Decl.) (WARREN, NICHOLAS) (Entered: 06/06/2023) |
| 06/06/2023 | 22 | MOTION for Expedited Briefing and Hearing Schedule re 21 Emergency MOTION for Preliminary Injunction by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (WARREN, NICHOLAS) (Entered: 06/06/2023) |
| 06/07/2023 | 23 | Amended MOTION for Preliminary Injunction *to correct typographical error* by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (GORSKI, ASHLEY) (Entered: 06/07/2023) |
| 06/07/2023 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 19 MOTION to Appear Pro Hac Vice by Elizabeth Koo.( Filing fee $ 208 receipt number AFLNDC–7905249.), 20 MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7905269.). Referred to MARTIN A FITZPATRICK. (rcb) (Entered: 06/07/2023) |
| 06/07/2023 | 24 | ORDER SETTING HEARING signed by JUDGE ALLEN C WINSOR on 6/7/23. The clerk will set a telephonic scheduling conference for June 9 at 11:00 a.m. The purpose of the hearing will be to address timing and procedure, not the substance of Plaintiffs 21 request for an injunction. If the parties all agree, the clerk will reset the hearing for any other time available on the courts calendar. (tss) (Entered: 06/07/2023) |
| 06/07/2023 | 25 | NOTICE OF TELEPHONIC HEARING

Telephonic Hearing set for **6/9/2023 at 11:00 AM Eastern Time** before JUDGE ALLEN C WINSOR.

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the call up to five minutes before start time. Call in number: 877 873 8018 When prompted for an access code, enter: 6109198# If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: 7020# Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. The Court also asks that counsel try NOT use cell phones or speaker phones during the call as the quality of the audioconnection is compromised by these devices.

*Note: If you or any party, witness or attorney in this matter has a disability that requires special accommodations, such as a hearing impairment that requires a sign–language interpreter or a wheelchair restriction that requires ramp access, please contact the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.*

*s/TiAnn Stark*
Courtroom Deputy Clerk (tss) (Entered: 06/07/2023) |
| 06/07/2023 | 26 | ORDER. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 13 , is GRANTED. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 14 , is GRANTED. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 16 , is GRANTED. The motion for leave to appear pro hac vice for Plaintiffs, ECF No. 19 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 6/7/2023. (rcb) (Entered: 06/07/2023) |
| 06/07/2023 | 27 | MOTION to Appear Pro Hac Vice by Haiyan Tang.( Filing fee $ 208 receipt number AFLNDC–7909234.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (TANG, HAIYAN) (Entered: 06/07/2023) |

| 06/08/2023 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 27 MOTION to Appear Pro Hac Vice by Haiyan Tang.( Filing fee $ 208 receipt number AFLNDC–7909234.). Referred to MARTIN A FITZPATRICK. (rcb) (Entered: 06/08/2023) |
|---|---|---|
| 06/08/2023 | 28 | NOTICE of Appearance by DANIEL ELDEN NORDBY on behalf of WILTON SIMPSON (NORDBY, DANIEL) (Entered: 06/08/2023) |
| 06/08/2023 | 30 | ORDER. Accordingly, it is ORDERED that the motion for leave to appear pro hac vice for Plaintiffs, ECF No. 27 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 06/08/2023. (rcb) (Entered: 06/09/2023) |
| 06/09/2023 | 29 | Summons Issued as to R J LARIZZA, KATHERINE FERNANDEZ RUNDLE, MONIQUE H WORRELL. (Attachments: # 1 sm worrell, # 2 sm rundle) (atm) (Entered: 06/09/2023) |
| 06/09/2023 | 31 | NOTICE of Appearance by DANIEL BOAZ TILLEY on behalf of YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU (TILLEY, DANIEL) (Entered: 06/09/2023) |
| 06/09/2023 | 32 | SUMMONS Returned Executed by XINXI WANG, ZHIMING XU, YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC. KATHERINE FERNANDEZ RUNDLE served on 6/9/2023, answer due 6/30/2023. (WARREN, NICHOLAS) (Entered: 06/09/2023) |
| 06/09/2023 | 34 | Minute Entry for proceedings held before JUDGE ALLEN C WINSOR:Telephonic Hearing held on 6/9/2023. (Court Reporter Lisa Snyder (USDC–Tallahassee)) (tss) (Entered: 06/13/2023) |
| 06/13/2023 | 33 | First MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7918978.) by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (ZAMAN, RAZEEN) (Entered: 06/13/2023) |
| 06/13/2023 | 35 | AFFIDAVIT of Service for Summons in a Civil Action, First Amended Complaint, Plaintiff's Corrected Emergency Motion For Preliminary Injunction, Order Setting Hearing, Plaintiff's Motion For Expedited Briefing & Hearing On Plaintiff's Motion For Preliminary Injunction, Plaintiff's Rule 7.1 Corporate Disclosure Statement, Civil Cover Sheet, Plaintiff's Emergency Motion For Preliminary Injunction, Proposed Order Granting Plaintiff's Motion For Preliminary Injunction, Declaration Of Zhiming XU, Exhibit "I", Declaration Of Yifan Shen, Exhibit "1", Declaration Of XinXi Wang, Declaration Of Yongxin Liu, Declaration Of Jian Song, Declaration Of Keliang Zhu and Exhibits served on MONIQUE WORRELL on 06/13/2023, filed by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (TOOMEY, PATRICK) Modified on 6/15/2023 using correct docketing event (atm). (Entered: 06/13/2023) |
| 06/13/2023 | 36 | MOTION to File Amicus Brief by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY AT SEATTLE UNIVERSITY SCHOOL OF LAW, CENTER FOR IMMIGRATION LAW, POLICY, AND JUSTICE AT RUTGERS LAW SCHOOL, AOKI CENTER FOR CRITICAL RACE AND NATION STUDIES AT UC DAVIS SCHOOL OF LAW, LLS ANTI–RACISM CENTER OF LMU LOYOLA LAW SCHOOL, CENTER ON RACE, INEQUALITY, AND THE LAW AT NEW YORK UNIVERSITY SCHOOL OF LAW, BOSTON UNIVERSITY CENTER FOR ANTIRACIST RESEARCH, CENTER FOR CIVIL RIGHTS AND RACIAL JUSTICE AT THE UNIVERSITY OF PITTSBURGH SCHOOL OF LAW, ASIAN PACIFIC AMERICAN BAR ASSOCIATION OF TAMPA BAY, CONFERENCE OF ASIAN PACIFIC AMERICAN LAW FACULTY, HISPANIC NATIONAL BAR ASSOCIATION, NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION, SOUTH ASIAN BAR ASSOCIATION OF NORTH AMERICA, ASIAN AMERICANS ADVANCING JUSTICE – ASIAN LAW CAUCUS, ASIAN AMERICANS ADVANCING JUSTICE ATLANTA, ASIAN AMERICAN WOMENS POLITICAL INITIATIVE, ASIAN LAW ALLIANCE, CHINESE FOR AFFIRMATIVE ACTION, JAPANESE AMERICAN CITIZENS LEAGUE, LATINOJUSTICE PRLDEF. (Internal deadline for referral to judge if response not filed earlier: **6/27/2023**). (Attachments: # 1 Exhibit A – Proposed Amici Curiae Brief for Racial Justice Centers, Affinity Bar and Professional Associations, and Civil |

**A5**

| | | |
|---|---|---|
| | | Rights Advocacy Organizations, # 2 Exhibit B – Corporate Disclosures) (RODRIGUEZ, MADELEINE) (Entered: 06/13/2023) |
| 06/13/2023 | 37 | MOTION to Appear Pro Hac Vice by Rose C. Cuison–Villazor.( Filing fee $ 208 receipt number AFLNDC–7919581.) by CENTER FOR IMMIGRATION LAW, POLICY, AND JUSTICE AT RUTGERS LAW SCHOOL. (Attachments: # 1 Exhibit A – Certificate of Good Standing) (CUISON–VILLAZOR, ROSE) (Entered: 06/13/2023) |
| 06/13/2023 | 38 | MOTION to Appear Pro Hac Vice by Robert S. Chang.( Filing fee $ 208 receipt number AFLNDC–7919584.) by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY AT SEATTLE UNIVERSITY SCHOOL OF LAW. (Attachments: # 1 Exhibit A – Certificate of Good Standing) (CHANG, ROBERT) (Entered: 06/13/2023) |
| 06/13/2023 | 39 | MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7919596.) by AOKI CENTER FOR CRITICAL RACE AND NATION STUDIES AT UC DAVIS SCHOOL OF LAW. (CHIN, GABRIEL) (Entered: 06/13/2023) |
| 06/13/2023 | 40 | STATUS REPORT *re Service of Process* by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (TOOMEY, PATRICK) (Entered: 06/13/2023) |
| 06/13/2023 | 46 | SUMMONS Returned Executed on 6/13/2023 on Monique Worrell (see pdf 35 .) (atm) (Entered: 06/15/2023) |
| 06/14/2023 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 38 MOTION to Appear Pro Hac Vice by Robert S. Chang.( Filing fee $ 208 receipt number AFLNDC–7919584.), 39 MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7919596.), 37 MOTION to Appear Pro Hac Vice by Rose C. Cuison–Villazor.( Filing fee $ 208 receipt number AFLNDC–7919581.), 33 First MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7918978.). Referred to MARTIN A FITZPATRICK. (rcb) (Entered: 06/14/2023) |
| 06/14/2023 | 41 | SUMMONS Returned Executed by ZHIMING XU, YIFAN SHEN, XINXI WANG, YONGXIN LIU, MULTI–CHOICE REALTY LLC. MONIQUE H WORRELL served on 6/13/2023, answer due 7/5/2023. (TOOMEY, PATRICK) (Entered: 06/14/2023) |
| 06/14/2023 | 42 | ORDER GRANTING 36 LEAVE TO FILE AMICUS BRIEF – The amicus brief (ECF No. 36–1) is accepted and deemed properly filed. Signed by JUDGE ALLEN C WINSOR on 6/14/2023. (erl) (Entered: 06/14/2023) |
| 06/14/2023 | 43 | AMICUS BRIEF OF RACIAL JUSTICE CENTERS, AFFINITY BAR AND PROFESSIONAL ASSOCIATIONS, AND CIVIL RIGHTS ADVOCACY ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. (erl) (Entered: 06/14/2023) |
| 06/14/2023 | 44 | ORDER REGARDING SCHEDULE – The deadline for all Defendants to respond to the preliminary injunction motion is **7/3/2023**. Plaintiffs may file a reply by **7/11/2023**. The court will hold a hearing on the motion on **7/18/2023 01:30 PM** at the United States Courthouse, Tallahassee. The motion to expedite (ECF No. 22 ) is GRANTED in part, to the extent set out above. Signed by JUDGE ALLEN C WINSOR on 6/14/2023. (erl) (Entered: 06/14/2023) |
| 06/14/2023 | 45 | Joint MOTION to Stay *Deadlines* by PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON. (BELL, DANIEL) (Entered: 06/14/2023) |
| 06/15/2023 | 47 | CERTIFICATE OF SERVICE by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU re 44 Order,, Set Deadlines/Hearings, (WARREN, NICHOLAS) (Entered: 06/15/2023) |
| 06/15/2023 | 48 | ORDER GRANTING MOITON TO STAY re: 45 Joint MOTION to Stay Deadlines. All deadlines (other than those related to the preliminary injunctions briefing) are STAYED signed by JUDGE ALLEN C WINSOR on 6/15/23. (bkp) (Entered: |

| | | |
|---|---|---|
| | | 06/15/2023) |
| 06/21/2023 | 49 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Telephonic Proceedings held on 6/9/2023, before Judge Allen Winsor. Court Reporter/Transcriber Lisa Snyder, Telephone number 850–567–1374.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>Redaction Request due **6/28/2023**. Release of Transcript Restriction set for **9/26/2023**. (ls) (Entered: 06/21/2023) |
| 06/21/2023 | 50 | SUMMONS Returned Executed by ZHIMING XU, YIFAN SHEN, XINXI WANG, YONGXIN LIU, MULTI–CHOICE REALTY LLC. R J LARIZZA served on 6/14/2023, answer due 7/5/2023. (TOOMEY, PATRICK) (Entered: 06/21/2023) |
| 06/27/2023 | 51 | ORDER. Accordingly, it is ORDERED that the motions for leave to appear pro hac vice for Plaintiffs, ECF No. 33 , 37 – 39 , are GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 06/27/2023. (rcb) (Entered: 06/27/2023) |
| 06/27/2023 | 52 | NOTICE of Appearance by ERIK LOUIS SAYLER on behalf of PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON (SAYLER, ERIK) (Entered: 06/27/2023) |
| 06/27/2023 | 53 | NOTICE of Appearance by ALISHA JARWALA on behalf of UNITED STATES OF AMERICA (JARWALA, ALISHA) (Entered: 06/27/2023) |
| 06/27/2023 | 54 | AMICUS CURIAE BRIEF by UNITED STATES OF AMERICA *28 U.S.C. § 517 Statement of Interest*. (JARWALA, ALISHA) (Entered: 06/27/2023) |
| 06/30/2023 | 55 | STIPULATION AMD JOINT MOTION OF PLAINTIFFS AND DEFENDANT STATE ATTORNEYS FOR STAY by R J LARIZZA, KATHERINE FERNANDEZ RUNDLE. (JACOBS, ARTHUR) Modified on 7/3/2023 to clarify title (tss). (Entered: 06/30/2023) |
| 07/03/2023 | 56 | \*\*\*ACCEPTED AS FILED PER 58 ORDER GRANTING 57 MOTION FOR EXPANDED WORD LIMIT\*\*\* ––– RESPONSE in Opposition re 23 Amended MOTION for Preliminary Injunction *to correct typographical error* filed by PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON. (FORRESTER, NATHAN) Modified on 7/5/2023 to add text (kdm). (Entered: 07/03/2023) |
| 07/03/2023 | 57 | MOTION for Leave to File Excess Pages by PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON. (FORRESTER, NATHAN) (Entered: 07/03/2023) |
| 07/05/2023 | 58 | ORDER GRANTING 57 MOTION FOR EXPANDED WORD LIMIT. Signed by JUDGE ALLEN C WINSOR on 7/5/2023. Defendants response (ECF No. 56 ) is accepted as filed. (kdm) (Entered: 07/05/2023) |
| 07/05/2023 | 59 | ORDER GRANTING 55 MOTION TO STAY. Signed by JUDGE ALLEN C WINSOR on 7/5/2023. All deadlines are stayed as to the Defendant State Attorneys. (kdm) (Entered: 07/05/2023) |
| 07/05/2023 | 60 | MEMORANDUM in Opposition re 23 Amended MOTION for Preliminary Injunction *to correct typographical error* filed by PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON. (FORRESTER, NATHAN) (Entered: 07/05/2023) |
| 07/05/2023 | 61 | Consent MOTION to Amend/Correct 60 Memorandum in Opposition to Motion *for Preliminary Injunction* by PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON. (FORRESTER, NATHAN) (Entered: 07/05/2023) |
| 07/05/2023 | 62 | ORDER GRANTING 61 MOTION FOR LEAVE TO FILE CORRECTED MEMORANDUM signed by JUDGE ALLEN C WINSOR on 7/5/23. The 60 amended document is accepted as a substitute for the original filing (ECF No. 56 ). (tss) (Entered: 07/05/2023) |

| | | |
|---|---|---|
| 07/06/2023 | 63 | NOTICE of Appearance by JOSHUA NATHANIEL TURNER on behalf of STATE OF IDAHO (TURNER, JOSHUA) (Entered: 07/06/2023) |
| 07/07/2023 | 64 | AMICUS CURIAE BRIEF by STATE OF IDAHO *Arkansas, Georgia, Indiana, Mississippi, Missouri, Montana, New Hampshire, North Dakota, South Carolina, South Dakota and Utah*. (TURNER, JOSHUA) (Entered: 07/07/2023) |
| 07/11/2023 | 65 | REPLY to Response to Motion re 23 Amended MOTION for Preliminary Injunction *to correct typographical error* filed by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (Attachments: # 1 Affidavit Supplemental Declaration of Jian Song) (GORSKI, ASHLEY) (Entered: 07/11/2023) |
| 07/17/2023 | 66 | ORDER REGARDING HEARING. Signed by JUDGE ALLEN C WINSOR on 7/17/2023. (vkm) (Entered: 07/17/2023) |
| 07/18/2023 | 67 | Minute Entry for proceedings held before JUDGE ALLEN C WINSOR: Motion Hearing held on 7/18/2023 re 21 Emergency MOTION for Preliminary Injunction and 22 MOTION for Expedited Briefing and Hearing Schedule re 21 Emergency MOTION for Preliminary Injunction – written order to follow (Court Reporter Lisa Snyder (USDC–Tallahassee)) (tss) (Entered: 07/18/2023) |
| 07/20/2023 | 68 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction Hearing Proceedings held on 7/18/2023, before Judge Allen Winsor. Court Reporter/Transcriber Lisa Snyder, Telephone number 850–567–1374.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>Redaction Request due **7/27/2023**. Release of Transcript Restriction set for **10/25/2023**. (ls) (Entered: 07/20/2023) |
| 08/17/2023 | 69 | ORDER DENYING 23 PRELIMINARY INJUNCTION MOTION. Within 21 days, the parties must confer and submit a joint report stating their positions on whether the stay should continue, see ECF No. 48 . Signed by JUDGE ALLEN C WINSOR on 8/17/2023. (atm) (Entered: 08/17/2023) |
| 08/21/2023 | 70 | NOTICE OF APPEAL as to 69 Order,, Set Deadlines/Hearings, by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. ( Filing fee $505 Receipt Number AFLNDC–8077186.) (GORSKI, ASHLEY) (Entered: 08/21/2023) |
| 08/21/2023 | 71 | Emergency MOTION for injunction pending appeal by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (GORSKI, ASHLEY) (Entered: 08/21/2023) |
| 08/23/2023 | 72 | ORDER DENYING MOTION FOR INJUNCTION PENDING APPEAL re 71 Emergency MOTION for injunction pending appeal re: 23 Amended MOTION for Preliminary Injunction *to correct typographical error* filed by YONGXIN LIU, YIFAN SHEN, MULTI–CHOICE REALTY LLC, ZHIMING XU, XINXI WANG. The parties must confer and submit a joint report signed by JUDGE ALLEN C WINSOR on 8/23/23. (Joint Report due by **9/18/2023**.) (bkp) Modified on 8/23/2023 (bkp). (Entered: 08/23/2023) |
| 08/23/2023 | 73 | Appeal Instructions re: 70 Notice of Appeal : The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh–circuit–transcript–information–form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **9/6/2023**. (bkp) (Entered: 08/23/2023) |
| 08/23/2023 | 74 | USDC transmittal of document to USCA re: (Attachments: # 1 Ntc appeal, # 2 amd motion, # 3 o re: amd order, # 4 motion, # 5 o re: motion, # 6 docket) (bkp) (Entered: 08/23/2023) |

A8

| 08/25/2023 | 75 | USCA Case Number 23–12737 for 70 NOTICE OF APPEAL as to 69 Order by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (atm) (Entered: 08/29/2023) |
|---|---|---|
| 09/01/2023 | 76 | TRANSCRIPT REQUEST by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU for proceedings held on July 18, 2023 before Judge Allen C. Winsor, (ZHU, KELIANG) (Entered: 09/01/2023) |
| 09/07/2023 | 77 | STATUS REPORT *Concerning Stay* by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (GORSKI, ASHLEY) (Entered: 09/07/2023) |
| 09/08/2023 | 78 | NOTICE of Appearance by ARTHUR IVAN JACOBS on behalf of R J LARIZZA, KATHERINE FERNANDEZ RUNDLE, MONIQUE H WORRELL (JACOBS, ARTHUR) (Entered: 09/08/2023) |
| 09/08/2023 | 79 | ORDER STAYING CASE. Having considered the parties' joint status report (ECF No. 78 ), the court now orders that this case is STAYED on the terms outlined in the status report. Any party may move to lift the stay at any time. Signed by JUDGE ALLEN C WINSOR on 9/8/2023. Deadline for clerk to check status of stay by **12/8/2023**. (atm) (Entered: 09/08/2023) |
| 09/15/2023 | 80 | MOTION to Withdraw as Attorney by YONGXIN LIU, MULTI–CHOICE REALTY LLC, YIFAN SHEN, XINXI WANG, ZHIMING XU. (TAITZ, SARAH) (Entered: 09/15/2023) |
| 09/15/2023 | 81 | ORDER GRANTING 80 LEAVE TO WITHDRAW. Attorney Sarah Taitz is relieved of further responsibility in this case. The clerk will remove her from the CM/ECF distribution list. Signed by JUDGE ALLEN C WINSOR on 9/15/2023. (atm) (Entered: 09/15/2023) |
| 09/15/2023 | 82 | MOTION to Withdraw as Attorney by PATRICIA FITZGERALD, MEREDITH IVEY, WILTON SIMPSON. (SAYLER, ERIK) (Entered: 09/15/2023) |

A9

# Tab 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, ZHIMING XU, XINXI
WANG, YONGXIN LIU, and MULTI-
CHOICE REALTY, LLC,

     *Plaintiffs*,

v.

WILTON SIMPSON, in his official
capacity as Florida Commissioner of
Agriculture, MEREDITH IVEY, in her
official capacity as Acting Florida
Secretary of Economic Opportunity,
PATRICIA FITZGERALD, in her
official capacity as Chair of the Florida
Real Estate Commission,

     *Defendants*.

Case No. 4:23-cv-208

## **COMPLAINT**

## I.  INTRODUCTION

1.     This lawsuit challenges a new Florida law, SB 264, that imposes

discriminatory prohibitions on the ownership and purchase of real property based

on race, ethnicity, alienage, and national origin—and imposes especially draconian

restrictions on people from China. *See* Laws of Fla. ch. 2023-33, §§ 3–8, at 5–15

(CS for CS for SB 264) (to be codified at Fla. Stat. §§ 692.201–.205). Plaintiffs—

four individual Chinese citizens who reside in Florida, and a real estate brokerage

firm that principally serves Chinese and Chinese American clients—are subject to

A11

the law's restrictions and its broad effects. They will be forced to cancel purchases of new homes, register their existing properties with the State under threat of severe penalties, and face the loss of significant business. The law stigmatizes them and their communities, and casts a cloud of suspicion over anyone of Chinese descent who seeks to buy property in Florida.

2.      Under this discriminatory new law, people who are not U.S. citizens or permanent residents, and whose "domicile" is in China, will be prohibited from purchasing property in Florida. A similar but less restrictive rule will apply to people whose permanent home is in Cuba, Venezuela, or other "countries of concern." The sole exception to these prohibitions is incredibly narrow: people with non-tourist visas or who have been granted asylum may purchase one residential property under two acres that is not within five miles of any military installation in the state. Notably, there are more than a dozen military installations in Florida, many of them within five miles of city centers like Orlando, Tampa, Jacksonville, Pensacola, Panama City, and Key West. Florida's new law will also impose requirements on people from China and other "foreign countries of concern" to register properties they currently own, at the risk of civil penalties and civil forfeiture. People who own or acquire property in violation of the law are subject to criminal charges, imprisonment, and fines.

3.      This law is unconstitutional. It violates the equal protection and due

process guarantees under the U.S. Constitution; it intrudes on the federal government's power to superintend foreign affairs, foreign investment, and national security; and it recalls the wrongful animus of similar state laws from decades past—laws that were eventually struck down by courts or repealed by legislatures.

4.      In May 1882, more than one hundred and forty years ago, the United States passed the Chinese Exclusion Act, banning all Chinese laborers from immigrating to the country for ten years. The primary reasons for the law's enactment included unwanted ethnic economic competition and the racialized theory that Chinese people were unassimilable pagans. It was the first and only major U.S. law ever implemented to prevent all members of a specific racial group from immigrating to the United States. The law remained in force until 1943, when China became a wartime ally of the United States against Japan.

5.      In May 1913, one hundred and ten years ago, California enacted the "Alien Land Law," barring Asian immigrants from owning land. More than a dozen states, including Florida, followed suit, adopting similar Alien Land Laws restricting Asians' rights to hold land in America. The purpose was to discourage and prevent "non-desirable" Asian immigrants from settling permanently in the United States and its territories.

6.      In 1948, the U.S. Supreme Court held that the 14th Amendment rights

of Fred Oyama, a U.S. citizen and the son of Japanese immigrants, had been violated when the State of California moved to repossess land purchased by Oyama's non-citizen father in Oyama's name while the family was incarcerated in an internment camp. *Oyama v. California*, 332 U.S. 633 (1948).

7.    As a result of the *Oyama* decision and other developments in equal protection case law, most of the country's Alien Land Laws were repealed or struck down in the 1950s. However, Florida's state constitution was the last to contain an alien land law provision until 2018, when voters passed a ballot measure to repeal it.

8.    Through this action, Plaintiffs seek a declaratory judgment that Florida's new discriminatory property law (hereinafter, "Florida's New Alien Land Law") violates the U.S. Constitution and federal statutory law, and an injunction to stop the enforcement of the law against Plaintiffs.

## II.  PARTIES

9.    Plaintiff Yifan Shen is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

10.    Plaintiff Zhiming Xu is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

11.    Plaintiff Xinxi Wang is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

12.     Plaintiff Yongxin Liu is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

13.     Plaintiff Multi-Choice Realty, LLC is a limited liability corporation organized under Florida law, with its principal place of business in Florida.

14.     Defendant Wilton Simpson is the Florida Commissioner of Agriculture and heads the Florida Department of Agriculture and Consumer Services ("FDACS"). Fla. Stat. §§ 20.14(1), 570.01. FDACS is one of the agencies charged with implementing and enforcing Florida's New Alien Land Law. *Id.* § 692.202(3)(a), (6)(b), (9).[1]

15.     Defendant Meredith Ivey is Acting Florida Secretary Economic Opportunity and heads the Florida Department of Economic Opportunity ("DEO"). *Id.* § 20.60(2). DEO is one of the agencies charged with implementing and enforcing Florida's New Alien Land Law. *Id.* §§ 692.203(3)(a), (10), .204(7)(b), (10).

16.     Defendant Patricia Fitzgerald is Chair of the Florida Real Estate Commission ("FREC"). In that role, she may exercise all of FREC's powers, except disciplinary and rulemaking powers. *Id.* § 475.03. FREC is one of the agencies charged with implementing Florida's New Alien Land Law. *Id.* §§ 692.202(5)(c), .203(6)(c), .204(6)(c).

---

[1]   Citations to the provisions of SB 264 are to the statutory sections where it is to be codified.

**A15**

### III.  JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action pursuant to: 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law; 28 U.S.C. § 1343 and 42 U.S.C. § 1983 because this action seeks to redress the deprivation of and infringement upon, under color of state law, rights, privileges, and immunities secured by the U.S. Constitution or federal law providing for the equal rights of all persons within the jurisdiction of the United States; and 42 U.S.C. § 3613 because this action is based upon a violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, which prohibits discrimination in real estate transactions.

18.     There is an actual, present, justiciable controversy between the parties within the meaning of Article III of the U.S. Constitution, as the recent enactment of Florida's New Alien Land Law constitutes a present and continuing infringement of Plaintiffs' federal constitutional and civil rights.

19.     This Court has authority to grant declaratory relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as well as 28 U.S.C. § 1343, 42 U.S.C. §§ 1983 and 3613, and Rule 57 of the Federal Rules of Civil Procedure.

20.     In addition, this Court has authority to grant injunctive relief in this action under the All Writs Act, 28 U.S.C. § 1651, as well as 28 U.S.C. § 1343,

42 U.S.C. §§ 1983 and 3613, and Rule 65 of the Federal Rules of Civil Procedure.

21.     This Court has personal jurisdiction over Defendants, all of whom are either elected or appointed Florida state officials, working or residing in Florida. The Court's exercise of jurisdiction over Defendants in their official capacities as Florida state government officials is appropriate pursuant to *Ex Parte Young*, 209 U.S. 123 (1909).

22.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because one or more defendants reside in the judicial district in which this Court is based and a substantial part of the events or omissions giving rise to the claims herein occurred in the judicial district in which this Court is based.

### IV. STATEMENT OF FACTS

### A.   The Enactment of Florida's Alien Land Law and Its Background

23.     Florida's New Alien Land Law was enacted as part of a larger law, Senate Bill 264. This lawsuit raises claims with respect to the portions of SB 264 establishing prohibitions on landownership based on race, ethnicity, color, alienage, and national origin, which are to be codified as Part III of Chapter 692 of the Florida Statutes at Sections 692.201 through 692.205, formally titled, "Conveyances to Foreign Entities."

24.     SB 264 and its companion measure, HB 1355, were introduced in the Florida Senate and House on March 2, 2023. After several amendments in both

A17

chambers, the Legislature passed SB 264 on May 4, 2023.

25.    On May 8, SB 264 was presented in its final form to Governor Ron DeSantis. Within hours, Governor DeSantis signed it into law, along with two other pieces of legislation, SB 258 and SB 846, all of which are focused on restricting the rights of Chinese people based on race, ethnicity, color, alienage, and national origin. Laws of Fla. chs. 2023-32 (CS for CS for SB 258), 2023-34 (CS for CS for SB 846). According to Governor DeSantis, all three bills are purportedly meant to "counteract the malign influence of the Chinese Communist Party in the state of Florida."[2]

26.    That same day, Governor DeSantis held a press conference titled "Stop CCP Influence." At the press conference, Governor DeSantis stated:

> Florida is taking action to stand against the United States' greatest geopolitical threat—the Chinese Communist Party. I'm proud to sign this legislation to stop the purchase of our farmland and land near our military bases and critical infrastructure by Chinese agents, to stop sensitive digital data from being stored in China, and to stop CCP influence in our education system from grade school to grad school. We are following through on our commitment to crack down on Communist China.[3]

27.    Despite the rhetoric, in 2022, Chinese buyers were involved in only 0.1 percent of all real estate purchases in Florida—they purchased only one out of

_____

[2]   Press Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.
[3]   *Id.*

every 1,000 residential properties sold in the state. Chinese buyers did not even crack the top-ten list of foreign buyers by country in 2022, with Chinese buyers constituting no more than two percent of all foreign buyers.[4]

28.    At his press conference, Governor DeSantis presented no evidence that Chinese buyers of property in Florida are agents of the Chinese Communist Party or have caused harm to national security. Indeed, the State of Florida has failed to identify any nexus between real estate ownership by Chinese citizens in general and purported harm to national security.

29.    Florida's New Alien Land Law severely restricts ownership of real estate by Chinese buyers. Not only are there strict prohibitions regarding foreign ownership and purchases of agricultural land and real property within ten miles of a military installation or critical infrastructure facility, but the new law goes so far as to categorically ban Chinese people from owning and acquiring any kind of real property in Florida, with only narrow exceptions.

30.    The new landownership restrictions will take effect in Florida on July 1, 2023. Laws of Fla. ch. 2023-33 § 12, at 18.

---

[4]    Florida Realtors, *2022 Profile of International Residential Transactions in Florida* at 6–8, https://www.floridarealtors.org/sites/default/files/basic-page/attachments/2023-04/2022%20Profile%20of%20International%20Residential%20Transactions%20in%20Florida.pdf (last accessed May 22, 2023). In 2022, the largest share of foreign buyers in Florida were buyers from Latin America and the Caribbean (45 percent), followed by buyers from North America (21 percent), Europe (18 percent), Asia and Oceania (7 percent), and Africa (1 percent). *Id.* at 7.

A19

**B.    The Statutory Scheme for Implementing and Enforcing Florida's New Alien Land Law**

31.    Florida's New Alien Land Law establishes, *inter alia*, prohibitions on landownership in the state based on race, ethnicity, color, alienage, and national origin.

32.    There are two main categories of landownership prohibitions under Florida's New Alien Land Law. The first category applies to certain people from "foreign countries of concern," including China, and prohibits them from owning or acquiring any agricultural land and real property within ten miles of a military installation or critical infrastructure facility, subject to narrow exceptions. The second category of prohibitions is even more restrictive: it applies specifically to certain people from China, singling them out based on race, ethnicity, color, alienage, and national origin and prohibiting them from owning or acquiring any real property in the State of Florida, subject to narrow exceptions.

### i.    *Provisions Targeting "Foreign Principals" from Seven Specific "Foreign Countries of Concern"*

33.    Sections 692.202 and 692.203 of the Florida Statutes prohibit "foreign principals" from specific "foreign countries of concern" from acquiring certain kinds of land in the State of Florida. Specifically, the prohibitions extend to two kinds of land: (i) agricultural land, Fla. Stat. § 692.202(1), and (ii) real property on or within ten miles of any military installation or critical infrastructure facility, *Id.*

- 10 -

§ 692.203(1).

34.     However, "critical infrastructure facility"[5] and "military installation"[6] are so broadly defined under Florida's New Alien Land Law that they bar affected individuals from being able to purchase property across much of the state.

35.     With respect to real estate in both contexts, the law defines the term "foreign country of concern" as: "the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolas Maduro, or the Syrian Arab Republic, including any agency of or any other entity of significant control of such foreign country of concern." *Id.* § 692.201(3).

36.     For each "foreign country of concern," the law prohibits certain persons, called "foreign principals," from landownership. The term "foreign principal" includes "[a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States," *Id.* § 692.201(4)(d), and "[a] partnership, association, corporation, organization, or

---

[5]    "Critical infrastructure facility" is defined as "any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons: (a) A chemical manufacturing facility[;] (b) A refinery[;] (c) An electrical power plant as defined in s. 403.031(2)[;] (d) A water treatment facility or waste water treatment plant[;] (e) A liquid natural gas terminal[;] (f) A telecommunications central switching office[;] (g) A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas[;] (h) A seaport as listed in s. 311.09[;] (i) A space port territory defined in s. 331.303(18)[;] (j) An airport as defined in s. 333.01." Fla. Stat. § 692.201(2).
[6]    "Military installation" is defined as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." Fla. Stat. § 692.201(5).

other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity," *Id.* § 692.201(4)(c).

37. Florida's New Alien Land Law prohibits "foreign principals" from each "foreign country of concern" from "directly or indirectly own[ing], having a controlling interest in, acquir[ing] by purchase, grant, devise, or descent" any agricultural land or real property within ten miles of any military installation or critical infrastructure facility, or any interest therein, "except a de minimus [*sic*] indirect interest." *Id.* §§ 692.202(1), .203(1). The law requires FDACS to adopt rules implementing its provisions regulating agricultural land, *id.* § 692.202(9), and requires DEO to adopt rules implementing the provisions of the law regulating real property on or within ten miles of any military installation or critical infrastructure facility, *id.* § 692.202(10).

38. Exceptions to Florida's New Alien Land Law are limited.

39. Although "foreign principals" may continue to own property subject to the law's restrictions if they acquired it before July 1, 2023, they are prohibited from purchasing any additional agricultural land or real property within ten miles of a military installation or critical infrastructure facility. *Id.* §§ 692.202(2), .203(2).

40. Further, "foreign principals" who owned such property before July 1,

2023, must register their properties. Agricultural property holdings must be registered with FDACS, *id.* § 692.202(3)(a), and real property on or within ten miles of any military installation or critical infrastructure facility must be registered with DEO, *id.* § 692.203(3)(a). Failure to file a timely registration is subject to a civil penalty of $1,000 for each day the registration is late and may result in a lien being placed on the real property for unpaid penalties. *Id.* §§ 692.202(3)(b), .203(3)(b).

41.    Under Florida's New Alien Land Law, if a "foreign principal" acquires agricultural land or real property within ten miles of a military installation or critical infrastructure facility on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, the "foreign principal" must sell, transfer, or otherwise divest itself of such land within three years after acquiring the property. *Id.* §§ 692.202(4), .203(5).

42.    Beyond this, the new law contains only a narrow exception allowing a "foreign principal" who is a natural person with a valid non-tourist visa or who has been granted asylum to purchase one residential real property—and *only if* the property is less than two acres and is not within five miles of a military installation. *Id.* § 692.203(4). There is no exception for purchases of agricultural land.

43.    "Foreign principals" owning or acquiring property in violation of the foregoing prohibitions are subject to civil forfeiture of their property. *Id.*

§§ 692.202(6)(a), .203(7)(a). Under the new law, FDACS is the state agency authorized to initiate a civil action for the forfeiture of agricultural land, *id.* § 692.202(6)(b), and DEO is authorized to initiate a civil action for the forfeiture of real property on or within ten miles of any military installation or critical infrastructure facility, *id.* § 692.203(7)(b).

44.   The law also creates criminal penalties for "foreign principals" who purchase or acquire agricultural land or real property on or within ten miles of any military installation or critical infrastructure facility in violation of the foregoing prohibitions. Such a violation constitutes a second-degree misdemeanor. *Id.* §§ 692.202(7), .203(8).

45.   Likewise, a person who knowingly sells these prohibited kinds of real property or interests therein to "foreign principals" in violation of the new prohibitions commits a second-degree misdemeanor. *Id.* §§ 692.202(8), .203(9).

46.   Second-degree misdemeanors are punishable by up to 60 days' imprisonment and a fine of $500. *Id.* §§ 775.082(4)(b), .083(1)(e).

47.   Finally, the law also imposes new requirements on *all* buyers within the state. At the time of purchase, buyers of agricultural land or real property on or within ten miles of any military installation of critical infrastructure facility are now required to provide an affidavit signed under penalty of perjury attesting, *inter alia*, that the buyer is not a "foreign principal" from a prohibited "foreign country

- 14 -

**A24**

of concern." *Id.* §§ 692.202(5)(a), .203(6)(a). The law delegates the responsibility for adopting rules to implement this provision to FREC, including rules establishing the form for the affidavit. *Id.* §§ 692.202(5)(c), .203(6)(c).

> ## ii.  *Provisions Targeting Chinese Persons Based on Their Race, Ethnicity, Color, Alienage, and National Origin*

48.    While sections 692.202 and 692.203 prohibit persons from multiple countries, including China, from owning and acquiring certain lands, section 692.204 singles out people from China and imposes even more restrictive limitations on their ownership and acquisition of real property in Florida. Glaringly, section 692.204 imposes significantly harsher criminal punishments do 692.202 and 692.203.

49.    The central feature of the new law is that it broadly prohibits Chinese persons from purchasing or acquiring *any* real property, or interests in real property, within Florida based on their race, ethnicity, color, alienage, and national origin. *See* Fla. Stat. §§ 692.201(6) (defining real property as "land, buildings, fixtures, and all other improvements to land"), .204(1)(a) (imposing a categorical prohibition regarding "real property in this state").

50.    In addition, section 692.204 imposes harsh criminal sanctions on Chinese people who purchase properties in violations of the law—sanctions that are much harsher than those imposed on violators of sections 692.202 and 692.203.

51.    The prohibition applies to any "[a]ny person who is domiciled in the

People's Republic of China and who is not a citizen or lawful permanent resident of the United States." *Id.* § 692.204(1)(a)(4). Under the new law, DEO is responsible for adopting rules to implement this prohibition. *Id.* § 692.204(10).

52.    Like sections 692.202 and 692.203, section 692.204 prohibits these Chinese persons from directly or indirectly owning or having any controlling interest in any real property within the state, "except for a de minimus [*sic*] indirect interest." *Id.* § 692.204(1)(a).

53.    Section 692.204's other provisions—those relating to exceptions to the new law, civil forfeiture proceedings, registration requirements, civil penalties, criminal sanctions, and purchaser disclosure requirements—all mirror those of sections 692.202 and 692.203. The only relevant difference is that the criminal penalties for violating section 692.204 are ***much more severe*** than for violating 692.202 and 692.203.

54.    Violations of the new law by Chinese persons is a third-degree felony, *id.* § 692.204(8), punishable by up to five years' imprisonment and a fine of up to $5,000, *id.* §§ 775.082(3)(e), .083(1)(c).

55.    The sale of real property to a Chinese person in violation of the new law constitutes a first-degree misdemeanor, *id.* § 692.204(9), punishable by up to one year imprisonment and a fine of $1,000, *id.* §§ 775.082(4)(a), .083(1)(d).

**C.     The Impact of Florida's New Alien Land Law and the Harm It Is Causing Chinese People in Florida**

56.     Plaintiffs in this action are people living in Florida and a Florida-based real estate company who are currently suffering, or imminently will suffer, the direct impact of Florida's New Alien Land Law.

57.     As detailed below, the individual plaintiffs in this case lawfully reside in Florida but may be considered domiciled in China due to their nonimmigrant visa status under U.S. immigration law.

58.     The term "domicile" is not defined in Florida's New Alien Land Law, but the term typically refers to a person's true, principal, and permanent home. The nature of a nonimmigrant visa, however, is a temporary one and not intended to be a mechanism by which a foreign citizen establishes permanent residency in the United States.[7]

59.     Thus, Plaintiffs, by virtue of having nonimmigrant visas, cannot be said to have established permanent residency in the United States, and therefore it is substantially likely that the State of Florida will deem them to be domiciled in their country of origin, China.

---

[7]   The U.S. Department of Homeland Security states: "A nonimmigrant visa (NIV) is issued to a person with permanent residence outside the United States but wishes to be in the United States on a temporary basis for tourism, medical treatment, business, temporary work, or study, as examples." U.S. Customs and Border Protection, *What is the Difference Between an Immigrant Visa vs. Nonimmigrant Visa?*, https://help.cbp.gov/s/article/Article-72 (last accessed May 22, 2023).

60.    Plaintiff Yifan Shen is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid H-1B visa, which is a nonimmigrant worker visa. Ms. Shen has lived in the United States for seven years and has lived in Florida for the past four years. She is not a member of the Chinese government or of the Chinese Communist Party. She has a master's degree in science and is working as a registered dietitian in Florida. In April 2023, Ms. Shen signed a contract to buy a single-family home in Orlando to serve as her primary residence. The property, which is a new construction, appears to be located within ten miles of a critical infrastructure facility and within five miles of a military installation. The estimated closing date for Ms. Shen's new property is in December 2023. Because Ms. Shen's closing date is after July 1, 2023, Florida's New Alien Land Law will prevent Ms. Shen from acquiring her new home, specifically, by forcing her to cancel the contract for the purchase and construction of her new property. Fla Stat. §§ 692.203(1), .204(1). Ms. Shen stands to lose all or part of her $25,000 deposit if the law goes into effect and she is forced to cancel the real estate contract.

61.    Plaintiff Zhiming Xu is neither a citizen nor a permanent resident of the United States but has temporary permission to stay and live in the United States as a political asylee. Prior to coming to the United States, Mr. Xu was persecuted by the Chinese government and had to flee to the United States, where he has

applied for political asylum. He is not a member of the Chinese government or of the Chinese Communist Party. He has a bachelor's degree and is managing and repairing short-term rental properties in Florida. Mr. Xu has lived in the United States and Florida for the past four years. In early 2023, Mr. Xu signed a contract to buy a single-family home near Orlando. The property appears to be located within ten miles of a critical infrastructure facility. The estimated closing date for Mr. Xu's property is in September 2023. Because Mr. Xu's closing date is after July 1, 2023, Florida's New Alien Land Law will prevent Mr. Xu from acquiring his new home—specifically, by forcing him to cancel the contract for the purchase of his new property. Mr. Xu stands to lose all or part of his $31,250 deposit if the law goes into effect and he is forced to cancel the real estate contract.

62.    Plaintiff Xinxi Wang is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid F-1 visa, which is a nonimmigrant visa for international students. Ms. Wang has lived in the United States and in Florida for the past five years. She is not a member of the Chinese government or of the Chinese Communist Party. She is currently pursuing her Ph.D. degree in earth systems science at a Florida university. Ms. Wang owns a home in Miami, which is her primary residence. Ms. Wang is also devoted Christian who worships with a congregation in the Miami area, about ten minutes from her home. As an owner of real property in Florida,

Ms. Wang will be required to register her property with DEO under Florida's New Alien Land Law. Fla. Stat. § 692.204(4). In addition, because Ms. Wang's property appears to be located within ten miles of a critical infrastructure facility, Ms. Wang is further subject to the law's registration requirement. *Id.* § 692.203(3). This registration requirement is burdensome, discriminatory, and stigmatizing to Ms. Wang.

63.     Plaintiff Yongxin Liu is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid H-1B visa, which is a nonimmigrant worker visa. Mr. Liu has lived in the United States for five years and in Florida for four years. He is not a member of the Chinese government or of the Chinese Communist Party. He is an assistant professor at a Florida university in the field of data science. He owns a property close to Daytona Beach, which is his primary residence. As an owner of real property in Florida, Mr. Liu will be required under Florida's New Alien Land Law to register his property with DEO. Fla. Stat. § 692.204(4). In addition, because Mr. Liu's property appears to be located within ten miles of a critical infrastructure facility, Mr. Liu is further subject to the law's registration requirement. *Id.* § 692.203(3). This registration requirement is burdensome, discriminatory, and stigmatizing to Mr. Liu.

64.     Mr. Liu also has plans to purchase a second property in the vicinity of

Pelican Bay, Florida, for his and his parents' use as a vacation home. However, Mr. Liu will be prohibited from purchasing a second property under  the new law. *Id.* § 692.204(1), (3). Furthermore, there is a substantial likelihood that the second property would be within ten miles of a military installation or critical infrastructure facility, resulting in an additional prohibition on the purchase under the new law. *Id.* § 692.203(1), (2).

65.     Due to Florida's New Alien Land Law, Mr. Liu reasonably fears that real estate agents will refuse to represent him because he is Chinese, that he will be disadvantaged when bidding on property because he is Chinese, and that his search for real estate will be more costly, time-consuming, and burdensome as a result. *See id.* §§ 692.203(8), .204(9).

66.     Plaintiff Multi-Choice Realty, LLC is a real estate brokerage firm that primarily serves Chinese-speaking clients in the United States and China. Multi-Choice Realty is not owned or controlled by the Chinese government or the Chinese Communist Party. In 2022, Multi-Choice Realty was involved in 74 property acquisitions, the vast majority of which were for clients who were Chinese or Chinese Americans. Most of Multi-Choice Realty's existing customers and potential customers will be directly impacted by Florida's New Alien Land Law by being required to register their properties and by being prohibited from acquiring new properties. As a result, Multi-Choice Realty stands to lose more than

one-third of its business due to Florida's New Alien Land Law, which targets Multi-Choice Realty's customer base and prohibits much of its clientele from engaging in further real estate purchases with Multi-Choice Realty.

67.   The swathes of land now off-limits to Chinese persons under Florida's New Alien Land Law are extensive. The prohibitions on property purchases within ten miles of a "critical infrastructure facility" or a "military installation"—both of which are broadly and vaguely defined—will have the net effect of creating "Chinese exclusion zones" that will cover immense portions of Florida, including many of the state's most densely populated and developed areas.

68.   As a result of Florida's New Alien Land Law, there is a substantial likelihood that sellers of real estate will discriminate against Plaintiffs and other people of Chinese descent even for transactions that are permitted, as sellers will seek to broadly avoid Chinese buyers given the criminal penalties imposed for selling property in violation of the new law.

69.   Finally, Florida's New Alien Land Law is having and will have far-reaching stigmatizing effects among people of Chinese and Asian descent in Florida, including Plaintiffs, as Florida law deems them a danger to the United States. This impact is exactly what laws like the Chinese Exclusion Act of 1882 and the California Alien Land Law of 1913 did more than a hundred years ago.

**D.     The Federal Government's Role in Foreign Affairs, Foreign Investment, and National Security**

70.     The federal government manages foreign affairs, foreign investment, and national security in the United States, including through two federal regimes: (i) the Committee on Foreign Investment in the United States ("CFIUS"), which has been empowered to review foreign investment transactions, and (ii) the Office of Foreign Assets Control ("OFAC") within the U.S. Treasury Department, which administers and enforces economic regulations and trade sanctions.

### *i.     History of CFUIS*

71.     CFIUS was established on May 7, 1975 by President Ford through an executive order. E.O. 11858, 40 F.R. 20263. Upon its establishment, CFUIS became the interagency body of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment, including real estate transactions. CFUIS was directed to, *inter alia*, monitor trends and developments in foreign investment in the United States, prepare guidance for foreign governments and consult regarding prospective major foreign governmental investments in the United States, review foreign investments that could have major implications for the national security interests of the United States, and consider proposals for new legislation or regulations relating to foreign investment as necessary.

72.     Later, Congress enacted the Exon-Florio amendment to the Defense

Production Act, included in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425–26. It established a mechanism for the federal executive branch to engage in a retrospective review of foreign investments. On December 27, 1988, President Reagan then delegated that power to CFIUS by executive order, empowering it to conduct reviews, undertake investigations, and make recommendations with respect to foreign investment data and policies. E.O. 12661, 54 F.R. 779. By 1991, the Department of the Treasury promulgated federal regulations implementing the Exon-Florio amendment, which were codified at 31 C.F.R. Part 800.

73.     The next year, Congress amended the Exon-Florio provision with the Byrd Amendment to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 837, 106 Stat. 2315, 2463–65 (1992). The Byrd Amendment broadened CFIUS's duties to investigate certain foreign investments, in particular, those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce within the United States that could affect national security.

74.     Eventually, Congress passed, and President Bush signed, the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight of CFIUS. FINSA also expanded the

national security prerogatives within CFIUS's purview and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also concretized CFIUS's position as a permanent federal agency by codifying it and granting it statutory authority, including certifying to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings, as well as annual classified and unclassified reports.

75.    Most recently, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. No. 115-232, §§ 1701–28, 132 Stat. 2174–2207, which President Trump signed into law. The impetus for FIRRMA was the concern by many members of Congress over Chinese companies' growing investment in the United States. In response, Congress significantly expanded CFIUS's authority to investigate and review foreign investments. Most notably, CFIUS was granted jurisdiction to review certain real estate transactions by foreign persons, specifically, those in close proximity to a military installation, or to a U.S. government facility or property sensitive to national security. Congress also empowered CFIUS to review changes in foreign investor rights regarding U.S. businesses, as well as transactions in which a foreign government has a direct or indirect substantial interest. FIRRMA further authorized CFIUS to designate some countries as "countries of special concern" based on CFIUS's assessment as to whether that country has demonstrated or

declared a strategic goal of acquiring a type of critical technology or critical infrastructure that would affect U.S. national security interests. In that regard, FIRRMA also formalized CFUIS's use of risk-based assessments to determine whether certain transactions pose threats to national security.

### ii.    History of OFAC

76.    In addition to the CFIUS regime, the U.S. Treasury Department, through OFAC, is heavily involved with administering and enforcing economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the President pursuant to the International Emergency Economic Powers Act of 1977 ("IEEPA"), Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29. The Division of Foreign Assets Control, OFAC's immediate predecessor, was established under the Treasury Department in 1950. OFAC derives its authority from a variety of federal laws regarding economic sanctions and embargoes, particularly IEEPA.

77.    One of OFAC's primary duties is to prevent "prohibited transactions," which it defines as "trade or financial transactions and other dealings in which U.S. persons may not engage unless authorized by OFAC or expressly exempted by statute." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals. It

maintains and regularly updates several sanction lists identifying countries, entities, and individuals considered to be threats to national security.

78. In sum, the federal government—through statutes, executive orders, executive agencies, and inherent powers—occupies the fields of foreign affairs, foreign investment, national security, and the intersection thereof.

## COUNT ONE

**Violation of the Right to Equal Protection
Under the 14th Amendment and 42 U.S.C. § 1983
(By All Individual Plaintiffs Against All Defendants)**

79. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

80. The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

81. The Equal Protection Clause protects all persons in the United States, regardless of their race, ethnicity, color, alienage, or national origin, including Plaintiffs.

82. The Equal Protection Clause prohibits the States from denying any person equal protection of the laws based on the person's race, ethnicity, color, alienage, or national origin. This includes laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or

**A37**

disparate treatment due to race, ethnicity, color, alienage, or national origin.

83.    The new prohibitions on landownership target Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

84.    Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to all real property and interests therein.

85.    The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under Florida's New Alien Land Law are based on Plaintiffs' race, ethnicity, color, alienage, and national origin.

86.    Florida's New Alien Land Law violates the Equal Protection Clause on the following grounds:

>    a.    The law was enacted with the purpose and intent to discriminate against persons based on race, ethnicity, color, alienage, and national origin, in particular, Chinese persons.
>
>    b.    The law makes impermissible classifications based on race, ethnicity,

color, alienage, and national origin that are not justified by a compelling state interest.

c.  The law is not narrowly tailored to meet a compelling state interest.

d.  The law invidiously targets persons based on their race, ethnicity, color, alienage, and national origin, particularly Chinese persons, resulting in discriminatory practices and disparate treatment.

e.  The law deprives Chinese persons from equal protection of the laws, including laws relating to their fundamental rights.

87.  The enactment and imminent enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, ethnicity, color, alienage, and national origin simply because they are Chinese persons within the meaning of the new law.

88.  In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges and immunities granted under the U.S. Constitution and federal law.

## COUNT TWO

**Violation of the Right to Procedural Due Process
Under the 14th Amendment and 42 U.S.C. § 1983
(By All Individual Plaintiffs Against All Defendants)**

89.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

90.    The Due Process Clause of the 14th Amendment provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"

91.    The protections of the Due Process Clause apply to all persons in the United States, regardless of their race, ethnicity, color, alienage, and national origin, including Plaintiffs.

92.    The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. This entails the right to procedural due process, which consists, at a minimum, of fair notice and an opportunity to be heard.

93.    The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of

**A40**

concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

94.   Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to real property and interests therein.

95.   Florida's New Alien Land Law violates the Due Process Clause under the 14th Amendment to the U.S. Constitution on the following grounds:

    a.  The law is impermissibly vague, indefinite, and ambiguous because it fails to clearly define "critical infrastructure facility," "military installation," and "domicile," and therefore fails to provide sufficient notice about which properties and persons are subject to its classifications, prohibitions, penalties, and requirements.

    b.  The law is impermissibly vague, indefinite, and ambiguous because it fails to provide sufficient notice as to where the ten-mile and five-mile exclusion zones tied to the covered critical infrastructure facilities and military installations begin and end.

96.   The enactment and enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will

continue to cause ongoing and irreparable harm to Plaintiffs.

97.    In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

**COUNT THREE**

**Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.***
**(By All Plaintiffs Against All Defendants)**

98.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

99.    The Fair Housing Act establishes that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing through the United States." 42 U.S.C. § 3601.

100.    The Fair Housing Act applies to all "dwellings," which are defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof." *Id.* § 3602(b).

101.    The protection of the Fair Housing Act extends to all persons in the United States, including Plaintiffs. Specifically, the Fair Housing Act defines "person" as including "one or more individuals, corporations, partnerships,

- 32 -

**A42**

associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11, receivers, and fiduciaries." *Id.* § 3602(d).

102.   The Fair Housing Act empowers any person who is aggrieved under the law to make a claim. *Id.* § 3613(a). The definition of "aggrieved person" includes any person who either "claims to have been injured by a discriminatory housing practice[,] or believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(i).

103.   Under the Fair Housing Act, 42 U.S.C. § 3604, it is an unlawful discriminatory housing practice:

> (a) To refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, . . . or national origin.

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale . . . of a dwelling that indicates any preference, limitation, or discrimination based on race, color, . . . or national origin, or an intention to make any such preference, limitation, or discrimination.

> (d) To represent to any person because of race, color, . . . or national origin that any dwelling is not available for

- 33 -

**A43**

. . . sale . . . when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell . . . any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, . . . or national origin.

104.   The Fair Housing Act also makes it "unlawful for any person . . . whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms of conditions of such a transaction, because of race, color, . . . or national origin." *Id.* § 3605(a). This provision relating to "residential real estate-related transaction[s]" includes "[t]he making or purchasing of loans or providing other financial assistance . . . [and] [t]he selling, brokering, or appraising of residential real property."

105.   The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

106.   Similarly, the State of Florida appears to classify Plaintiffs as

prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to real property and interests therein.

107.   The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under Florida's New Alien Land Law are based on Plaintiffs' race, color, and national origin.

108.   Due to Florida's New Alien Land Law, Plaintiff Multi-Choice Realty is and will be unable to facilitate real estate transactions that would close after July 1, 2023, and that are barred by the law's discriminatory classifications, prohibitions, and penalties.

109.   Florida's New Alien Land Law violates the Fair Housing Act on the following grounds:

  a.  The law establishes a discriminatory housing practice that purports to require or permit action that would violate the Fair Housing Act, and therefore, is presumptively invalid as a matter of law.

  b.  The law discriminates against persons based on their race, color, and national origin, particularly Chinese persons, with respect to dwellings and residential real estate-related transactions.

  c.  The law invidiously targets persons based on their race, color, and national origin, particularly Chinese persons, resulting in discriminatory practices and disparate treatment with respect to

dwellings and residential real estate-related transactions.

110.    The enactment and enforcement of the new prohibitions on landownership in Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, color, and national origin simply because they are Chinese persons within the meaning of the new law.

### **COUNT FOUR**

**Violation of the Supremacy Clause of the U.S. Constitution
Preemption by Federal Regimes Governing
Foreign Affairs, Foreign Investment, and National Security
(By All Plaintiffs Against All Defendants)**

111.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully set forth herein.

112.    The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Para. 2.

113.    The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which

Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives.

114.   Pursuant to the Supremacy Clause, Florida's New Alien Land Law is preempted by federal regimes governing foreign affairs, foreign investment, and national security, including CFIUS and OFAC within the U.S. Treasury Department. Under federal law, CFIUS is authorized, *inter alia*, to review foreign investment transactions with respect to national security concerns, as well as to review real estate transactions by foreign persons, specifically, those pertaining to properties in close proximity to military installations, U.S. government facilities, or properties of national security sensitivity. OFAC is responsible for administering and enforcing economic regulations.

115.   It is unquestionable that foreign relations, the power to deal with national security threats posed by foreign countries, and foreign commerce are the exclusive powers of the federal government. Indeed, the U.S. Constitution vests the federal government the primary powers to manage foreign affairs and to regulate foreign commerce. *See, e.g.*, U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (commerce with foreign nations).

116.   The federal government has long occupied the fields of foreign affairs, foreign investment, national security, and the intersection thereof,

especially with respect to foreign relations with China.

117.   All in all, given the comprehensiveness of federal schemes and the creation of multiple federal agencies to administer the schemes, federal law has "occupied" the entire field, thus precluding any state regulation even if state law is nonconflicting.

118.   The State of Florida explicitly stated its intent to regulate in these areas of foreign affairs and foreign investment, as they bear on national security, when enacting Florida's New Alien Land Law. The governor and legislators have repeatedly emphasized the need to take action "to stand against the United States' greatest geopolitical threat—the Chinese Communist Party."[8] Accordingly, the law violates the Supremacy Clause because it regulates a field exclusively occupied by the federal government, specifically, the intersection between foreign affairs, national security, and foreign investment, including foreign real estate acquisitions. In so doing, the new landownership prohibitions usurp the power vested by the Constitution and by Congress in the federal government to investigate, review, and take actions with respect to foreign investments, including real estate transactions, that raise issues of national security.

119.   In addition, the new landownership prohibitions intrude upon the

---

[8]   Press Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.

**A48**

federal government's power to govern foreign affairs, generally. By characterizing several countries as "foreign countries of concern," and by expressly singling out Chinese people, Florida's New Alien Land Law unconstitutionally seeks to establish its own foreign policy, thereby intruding upon the federal government's exclusive power to govern foreign affairs. *See, e.g.*, *Zschering v. Miller*, 389 U.S. 429 (1968).

120.   The new landownership prohibitions also intrude upon the federal government's power to govern foreign commerce, generally. By prohibiting "foreign principals" from specific "foreign countries of concern" from owning and acquiring land in Florida, the law discriminates against out-of-state individuals and entities based on race, ethnicity, color, alienage, and national origin, in particular, Chinese persons. The new law therefore unduly burdens international commerce, especially with respect to foreign investment.

121.   The enactment and pending enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause Plaintiffs ongoing and irreparable harm.

122.   In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.     Declare Florida's New Alien Land Law unconstitutional under the 14th Amendment to the U.S. Constitution because it violates Plaintiffs' rights to equal protection.

B.     Declare Florida's New Alien Land Law unconstitutional under the 14th Amendment to the U.S. Constitution because it violates Plaintiffs' rights to procedural due process.

C.     Declare that Florida's New Alien Land Law violates Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.

D.     Declare Florida's New Alien Land Law unconstitutional under the Supremacy Clause of the U.S. Constitution and preempted by federal law.

E.     Preliminarily and permanently enjoin Defendants from implementing and enforcing Florida's New Alien Land Law against Plaintiffs.

F.     Award Plaintiffs reasonable attorneys' fees and their costs of suit.

G.     Grant any other relief this Court deems just and proper.

Respectfully submitted this 22nd day of May, 2023,

 /s/ Nicholas L.V. Warren

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Ashley Gorski*
Patrick Toomey*
Sarah Taitz*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org
ptoomey@aclu.org
staitz@aclu.org

Keliang (Clay) Zhu*
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Bethany Y. Li*
Elizabeth Koo*
**ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org
ekoo@aaldef.org

Cody Wofsy*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Email: cwofsy@aclu.org

*Attorneys for Plaintiffs*

*\* Motion for leave to appear pro hac vice forthcoming*

# Tab 17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, ZHIMING XU, XINXI
WANG, YONGXIN LIU, and MULTI-
CHOICE REALTY, LLC,

     *Plaintiffs*,

v.

WILTON SIMPSON, in his official
capacity as Florida Commissioner of
Agriculture, MEREDITH IVEY, in her
official capacity as Acting Florida
Secretary of Economic Opportunity,
PATRICIA FITZGERALD, in her official
capacity as Chair of the Florida Real
Estate Commission, R.J. LARIZZA, in
his official capacity as State Attorney for
the 7th Judicial Circuit, MONIQUE
WORRELL, in her official capacity as
State Attorney for the 9th Judicial Circuit,
and KATHERINE FERNANDEZ
RUNDLE, in her official capacity as State
Attorney for the 11th Judicial Circuit,

     *Defendants*.

Case No. 4:23-cv-208-AW-MAF

## FIRST AMENDED COMPLAINT

### I.  INTRODUCTION

    1.   This lawsuit challenges a new Florida law, SB 264, that imposes

discriminatory prohibitions on the ownership and purchase of real property based on

race, ethnicity, alienage, and national origin—and imposes especially draconian

restrictions on people from China. *See* Laws of Fla. ch. 2023-33, §§ 3–8, at 5–15 (CS for CS for SB 264) (to be codified at Fla. Stat. §§ 692.201–.205). Plaintiffs— four individual Chinese citizens who reside in Florida, and a real estate brokerage firm that principally serves Chinese and Chinese American clients—are subject to the law's restrictions and its broad effects. They will be forced to cancel purchases of new homes, register their existing properties with the State under threat of severe penalties, and face the loss of significant business. The law stigmatizes them and their communities, and casts a cloud of suspicion over anyone of Chinese descent who seeks to buy property in Florida.

2.     Under this discriminatory new law, people who are not U.S. citizens or permanent residents, and whose "domicile" is in China, will be prohibited from purchasing property in Florida. A similar but less restrictive rule will apply to people whose permanent home is in Cuba, Venezuela, or other "countries of concern." The sole exception to these prohibitions is incredibly narrow: people with non-tourist visas or who have been granted asylum may purchase one residential property under two acres that is not within five miles of any "military installation" in the state. Notably, there are more than 20 military bases in Florida, many of them within five miles of city centers like Orlando, Tampa, Jacksonville, Pensacola, Panama City, and Key West, and there are many other military sites across the state that may qualify as military installations. Florida's new law will also impose requirements on people

**A54**

from China and other "foreign countries of concern" to register properties they currently own, at the risk of civil penalties and civil forfeiture. People who own or acquire property in violation of the law are subject to criminal charges, imprisonment, and fines.

3.    This law is unconstitutional. It violates the equal protection and due process guarantees under the U.S. Constitution; it intrudes on the federal government's power to superintend foreign affairs, foreign investment, and national security; and it recalls the wrongful animus of similar state laws from decades past—laws that were eventually struck down by courts or repealed by legislatures.

4.    In May 1882, more than one hundred and forty years ago, the United States passed the Chinese Exclusion Act, banning all Chinese laborers from immigrating to the country for ten years. The primary reasons for the law's enactment included unwanted ethnic economic competition and the racialized theory that Chinese people were unassimilable pagans. It was the first and only major U.S. law ever implemented to prevent all members of a specific racial group from immigrating to the United States. The law remained in force until 1943, when China became a wartime ally of the United States against Japan.

5.    In May 1913, one hundred and ten years ago, California enacted the "Alien Land Law," barring Asian immigrants from owning land. More than a dozen states, including Florida, followed suit, adopting similar Alien Land Laws restricting

**A55**

Asians' rights to hold land in America. The purpose was to discourage and prevent "non-desirable" Asian immigrants from settling permanently in the United States and its territories.

6.      In 1948, the U.S. Supreme Court held that the 14th Amendment rights of Fred Oyama, a U.S. citizen and the son of Japanese immigrants, had been violated when the State of California moved to repossess land purchased by Oyama's non-citizen father in Oyama's name while the family was incarcerated in an internment camp. *Oyama v. California*, 332 U.S. 633 (1948).

7.      As a result of the *Oyama* decision and other developments in equal protection case law, most of the country's Alien Land Laws were repealed or struck down in the 1950s. Florida's state constitution was the last to contain an alien land law provision until 2018, when voters passed a ballot measure to repeal it.

8.      Through this action, Plaintiffs seek a declaratory judgment that Florida's new discriminatory property law (hereinafter, "Florida's New Alien Land Law") violates the U.S. Constitution and federal statutory law, and an injunction to stop the enforcement of the law against Plaintiffs.

## II.  PARTIES

9.      Plaintiff Yifan Shen is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

10.     Plaintiff Zhiming Xu is an individual and natural person, as well as a

citizen of the People's Republic of China, lawfully residing in Florida.

11.     Plaintiff Xinxi Wang is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

12.     Plaintiff Yongxin Liu is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

13.     Plaintiff Multi-Choice Realty, LLC is a limited liability corporation organized under Florida law, with its principal place of business in Florida.

14.     Defendant Wilton Simpson is the Florida Commissioner of Agriculture and heads the Florida Department of Agriculture and Consumer Services ("FDACS"). Fla. Stat. §§ 20.14(1), 570.01. FDACS is one of the agencies charged with implementing and enforcing Florida's New Alien Land Law. *Id.* § 692.202(3)(a), (6)(b), (9).[1]

15.     Defendant Meredith Ivey is Acting Florida Secretary Economic Opportunity and heads the Florida Department of Economic Opportunity ("DEO"). *Id.* § 20.60(2).[2] DEO is one of the agencies charged with implementing and enforcing Florida's New Alien Land Law. *Id.* §§ 692.203(3)(a), (10), .204(7)(b), (10).

---

[1]   Citations to the provisions of SB 264 are to the statutory sections where it is to be codified.
[2]   The Department of Economic Opportunity will be renamed as the "Department of Commerce" effective July 1, 2023, and the Interim Secretary of Economic Opportunity will be succeeded by the Secretary of Commerce. Laws of Fla. ch. 2023-173, § 10, at 8.

A57

16.    Defendant Patricia Fitzgerald is Chair of the Florida Real Estate Commission ("FREC"). In that role, she may exercise all of FREC's powers, except disciplinary and rulemaking powers. *Id.* § 475.03. FREC is one of the agencies charged with implementing Florida's New Alien Land Law. *Id.* §§ 692.202(5)(c), .203(6)(c), .204(6)(c).

17.    Defendant R.J. Larizza is the State Attorney for Florida's 7th Judicial Circuit, where Plaintiff Yongxin Liu currently resides. In that role, he is responsible for investigating and bringing criminal charges against Plaintiff Yongxin Liu or other similarly situated people under Florida's New Alien Land Law. *Id.* §§ 692.202(7)–(8), .203(8)–(9), .204(8)–(9).

18.    Defendant Monique Worrell is the State Attorney for Florida's 9th Judicial Circuit, where Plaintiffs Yifan Shen, Zhiming Xu, reside and where Multi-Choice Realty, LLC resides and conducts much of its business. In that role, she is responsible for investigating and bringing criminal charges against these Plaintiffs or other similarly situated people under Florida's New Alien Land Law. *Id.* §§ 692.202(7)–(8), .203(8)–(9), .204(8)–(9).

19.    Defendant Katherine Fernandez Rundle is the State Attorney for Florida's 11th Judicial Circuit, where Plaintiff Xinxi Wang resides. In that role, she is responsible for investigating and bringing criminal charges against Plaintiff Xinxi Wang or other similarly situated people under Florida's New Alien Land Law. *Id.*

§§ 692.202(7)–(8), .203(8)–(9), .204(8)–(9).

### III.  JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over this action pursuant to:

28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal

law; 28 U.S.C. § 1343 and 42 U.S.C. § 1983 because this action seeks to redress the

deprivation of and infringement upon, under color of state law, rights, privileges,

and immunities secured by the U.S. Constitution or federal law providing for the

equal rights of all persons within the jurisdiction of the United States; and 42 U.S.C.

§ 3613 because this action is based upon a violation of the Fair Housing Act, 42

U.S.C. § 3601 *et seq.*, which prohibits discrimination in real estate transactions.

21.     There is an actual, present, justiciable controversy between the parties

within the meaning of Article III of the U.S. Constitution, as the recent enactment of

Florida's New Alien Land Law constitutes a present and continuing infringement of

Plaintiffs' federal constitutional and civil rights.

22.     This Court has authority to grant declaratory relief in this action

pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as well as

28 U.S.C. § 1343, 42 U.S.C. §§ 1983 and 3613, and Rule 57 of the Federal Rules of

Civil Procedure.

23.     In addition, this Court has authority to grant injunctive relief in this

action under the All Writs Act, 28 U.S.C. § 1651, as well as 28 U.S.C. § 1343,

**A59**

42 U.S.C. §§ 1983 and 3613, and Rule 65 of the Federal Rules of Civil Procedure.

24.     This Court has personal jurisdiction over Defendants, all of whom are either elected or appointed Florida state officials, working or residing in Florida. The Court's exercise of jurisdiction over Defendants in their official capacities as Florida state government officials is appropriate pursuant to *Ex Parte Young*, 209 U.S. 123 (1909).

25.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because one or more defendants reside in the judicial district in which this Court is based and a substantial part of the events or omissions giving rise to the claims herein occurred in the judicial district in which this Court is based.

## IV.  STATEMENT OF FACTS

### A.     The Enactment of Florida's Alien Land Law and Its Background

26.     Florida's New Alien Land Law was enacted as part of a larger law, Senate Bill 264. This lawsuit raises claims with respect to the portions of SB 264 establishing prohibitions on landownership based on race, ethnicity, color, alienage, and national origin, which are to be codified as Part III of Chapter 692 of the Florida Statutes at Sections 692.201 through 692.205, formally titled, "Conveyances to Foreign Entities."

27.     SB 264 and its companion measure, HB 1355, were introduced in the Florida Senate and House on March 2, 2023. After several amendments in both

chambers, the Legislature passed SB 264 on May 4, 2023.

28.     On May 8, SB 264 was presented in its final form to Governor Ron DeSantis. Within hours, Governor DeSantis signed it into law, along with two other pieces of legislation, SB 258 and SB 846, all of which are focused on restricting the rights of Chinese people based on race, ethnicity, color, alienage, and national origin. Laws of Fla. chs. 2023-32 (CS for CS for SB 258), 2023-34 (CS for CS for SB 846). According to Governor DeSantis, all three bills are purportedly meant to "counteract the malign influence of the Chinese Communist Party in the state of Florida."[3]

29.     That same day, Governor DeSantis issued a press release, titled "Governor Ron DeSantis Cracks Down on Communist China." In the press release, Governor DeSantis stated:

> Florida is taking action to stand against the United States' greatest geopolitical threat—the Chinese Communist Party. I'm proud to sign this legislation to stop the purchase of our farmland and land near our military bases and critical infrastructure by Chinese agents, to stop sensitive digital data from being stored in China, and to stop CCP influence in our education system from grade school to grad school. We are following through on our commitment to crack down on Communist China.[4]

30.     Despite the rhetoric, in 2022, Chinese buyers were involved in only 0.1 percent of all real estate purchases in Florida—they purchased only one out of every

---

[3]   Press Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.
[4]   *Id.*

1,000 residential properties sold in the state. Chinese buyers did not even crack the top-ten list of foreign buyers by country in 2022, with Chinese buyers constituting no more than two percent of all foreign buyers.[5]

31.    In his statements about the new law, Governor DeSantis presented no evidence that Chinese buyers of property in Florida are agents of the Chinese Communist Party or have caused harm to national security. Indeed, the State of Florida has failed to identify any nexus between real estate ownership by Chinese citizens in general and purported harm to national security.

32.    Florida's New Alien Land Law severely restricts ownership of real estate by Chinese buyers. Not only are there strict prohibitions regarding foreign ownership and purchases of agricultural land and real property within ten miles of a military installation or critical infrastructure facility, but the new law goes so far as to categorically ban Chinese people from owning and acquiring any kind of real property in Florida, with only narrow exceptions.

33.    The new landownership restrictions will take effect in Florida on July 1, 2023. Laws of Fla. ch. 2023-33 § 12, at 18.

---

[5]    Florida Realtors, *2022 Profile of International Residential Transactions in Florida* at 6–8, https://www.floridarealtors.org/sites/default/files/basic-page/attachments/2023-04/2022%20Profile%20of%20International%20Residential%20Transactions%20in%20Florida.pdf (last accessed May 22, 2023). In 2022, the largest share of foreign buyers in Florida were buyers from Latin America and the Caribbean (45 percent), followed by buyers from North America (21 percent), Europe (18 percent), Asia and Oceania (7 percent), and Africa (1 percent). *Id.* at 7.

**B.**    **The Statutory Scheme for Implementing and Enforcing Florida's New Alien Land Law**

34.    Florida's New Alien Land Law establishes, *inter alia*, prohibitions on landownership in the state based on race, ethnicity, color, alienage, and national origin.

35.    There are two main categories of landownership prohibitions under Florida's New Alien Land Law. The first category applies to certain people from "foreign countries of concern," including China, and prohibits them from owning or acquiring any agricultural land and real property within ten miles of a military installation or critical infrastructure facility, subject to narrow exceptions. The second category of prohibitions is even more restrictive: it applies specifically to certain people from China, singling them out based on race, ethnicity, color, alienage, and national origin, and prohibiting them from owning or acquiring any real property in the State of Florida, subject to narrow exceptions.

### i.    *Provisions Targeting "Foreign Principals" from Seven Specific "Foreign Countries of Concern"*

36.    Sections 692.202 and 692.203 of the Florida Statutes prohibit "foreign principals" from specific "foreign countries of concern" from acquiring certain kinds of land in the State of Florida. Specifically, the prohibitions extend to two kinds of land: (i) agricultural land, Fla. Stat. § 692.202(1), and (ii) real property on or within ten miles of any military installation or critical infrastructure facility, *id.*

- 11 -

§ 692.203(1).

37.     However, "critical infrastructure facility"[6] and "military installation"[7] are so broadly defined under Florida's New Alien Land Law that they bar affected individuals from being able to purchase property across much of the state.

38.     With respect to real estate in both contexts, the law defines the term "foreign country of concern" as: "the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolas Maduro, or the Syrian Arab Republic, including any agency of or any other entity of significant control of such foreign country of concern." *Id.* § 692.201(3).

39.     For each "foreign country of concern," the law prohibits certain persons, called "foreign principals," from landownership. The term "foreign principal" includes "[a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States," *id.*

---

[6]     "Critical infrastructure facility" is defined as "any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons: (a) A chemical manufacturing facility[;] (b) A refinery[;] (c) An electrical power plant as defined in s. 403.031(2)[;] (d) A water treatment facility or waste water treatment plant[;] (e) A liquid natural gas terminal[;] (f) A telecommunications central switching office[;] (g) A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas[;] (h) A seaport as listed in s. 311.09[;] (i) A space port territory defined in s. 331.303(18)[;] (j) An airport as defined in s. 333.01." Fla. Stat. § 692.201(2).

[7]     "Military installation" is defined as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." Fla. Stat. § 692.201(5).

§ 692.201(4)(d), and "[a] partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity," *id.* § 692.201(4)(c).

40.     Florida's New Alien Land Law prohibits "foreign principals" from each "foreign country of concern" from "directly or indirectly own[ing], having a controlling interest in, acquir[ing] by purchase, grant, devise, or descent" any agricultural land or real property within ten miles of any military installation or critical infrastructure facility, or any interest therein, "except a de minimus [*sic*] indirect interest." *Id.* §§ 692.202(1), .203(1). The law requires FDACS to adopt rules implementing its provisions regulating agricultural land, *id.* § 692.202(9), and requires DEO to adopt rules implementing the provisions of the law regulating real property on or within ten miles of any military installation or critical infrastructure facility, *id.* § 692.202(10).

41.     Exceptions to Florida's New Alien Land Law are limited.

42.     Although "foreign principals" may continue to own property subject to the law's restrictions if they acquired it before July 1, 2023, they are prohibited from purchasing any additional agricultural land or real property within ten miles of a military installation or critical infrastructure facility. *Id.* §§ 692.202(2), .203(2).

43.     Further, "foreign principals" who owned such property before July 1,

2023, must register their properties. Agricultural property holdings must be registered with FDACS, *id.* § 692.202(3)(a), and real property on or within ten miles of any military installation or critical infrastructure facility must be registered with DEO, *id.* § 692.203(3)(a). Failure to file a timely registration is subject to a civil penalty of $1,000 for each day the registration is late and may result in a lien being placed on the real property for unpaid penalties. *Id.* §§ 692.202(3)(b), .203(3)(b).

44.     Under Florida's New Alien Land Law, if a "foreign principal" acquires agricultural land or real property within ten miles of a military installation or critical infrastructure facility on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, the "foreign principal" must sell, transfer, or otherwise divest itself of such land within three years after acquiring the property. *Id.* §§ 692.202(4), .203(5).

45.     Beyond this, the new law contains only a narrow exception allowing a "foreign principal" who is a natural person with a valid non-tourist visa or who has been granted asylum to purchase one residential real property—and *only if* the property is less than two acres and is not within five miles of a military installation. *Id.* § 692.203(4). There is no exception for purchases of agricultural land.

46.     "Foreign principals" owning or acquiring property in violation of the foregoing prohibitions are subject to civil forfeiture of their property. *Id.* §§ 692.202(6)(a), .203(7)(a). Under the new law, FDACS is the state agency

- 14 -

authorized to initiate a civil action for the forfeiture of agricultural land, *id.* § 692.202(6)(b), and DEO is authorized to initiate a civil action for the forfeiture of real property on or within ten miles of any military installation or critical infrastructure facility, *id.* § 692.203(7)(b).

47.    The law also creates criminal penalties for "foreign principals" who purchase or acquire agricultural land or real property on or within ten miles of any military installation or critical infrastructure facility in violation of the foregoing prohibitions. Such a violation constitutes a second-degree misdemeanor. *Id.* §§ 692.202(7), .203(8).

48.    Likewise, a person who knowingly sells these prohibited kinds of real property or interests therein to "foreign principals" in violation of the new prohibitions commits a second-degree misdemeanor. *Id.* §§ 692.202(8), .203(9).

49.    Second-degree misdemeanors are punishable by up to 60 days' imprisonment and a fine of $500. *Id.* §§ 775.082(4)(b), .083(1)(e).

50.    Finally, the law also imposes new requirements on *all* buyers within the state. At the time of purchase, buyers of agricultural land or real property on or within ten miles of any military installation of critical infrastructure facility are now required to provide an affidavit signed under penalty of perjury attesting, *inter alia*, that the buyer is not a "foreign principal" from a prohibited "foreign country of concern." *Id.* §§ 692.202(5)(a), .203(6)(a). The law delegates the responsibility for

adopting rules to implement this provision to FREC, including rules establishing the form for the affidavit. *Id.* §§ 692.202(5)(c), .203(6)(c).

### ii.   *Provisions Targeting Chinese Persons Based on Their Race, Ethnicity, Color, Alienage, and National Origin*

51.     While sections 692.202 and 692.203 prohibit persons from multiple countries, including China, from owning and acquiring certain lands, section 692.204 singles out people from China and imposes even more restrictive limitations on their ownership and acquisition of real property in Florida. Glaringly, section 692.204 also imposes significantly harsher criminal punishments than do 692.202 and 692.203.

52.     The central feature of the new law is that it broadly prohibits Chinese persons from purchasing or acquiring *any* real property, or interests in real property, within Florida based on their race, ethnicity, color, alienage, and national origin. *See* Fla. Stat. §§ 692.201(6) (defining real property as "land, buildings, fixtures, and all other improvements to land"), .204(1)(a) (imposing a categorical prohibition regarding "real property in this state").

53.     In addition, section 692.204 imposes harsh criminal sanctions on Chinese people who purchase properties in violations of the law—sanctions that are much harsher than those imposed on violators of sections 692.202 and 692.203.

54.     The prohibition applies to any "[a]ny person who is domiciled in the People's Republic of China and who is not a citizen or lawful permanent resident of

the United States." *Id.* § 692.204(1)(a)(4). Under the new law, DEO is responsible for adopting rules to implement this prohibition. *Id.* § 692.204(10).

55.     Like sections 692.202 and 692.203, section 692.204 prohibits these Chinese persons from directly or indirectly owning or having any controlling interest in any real property within the state, "except for a de minimus [*sic*] indirect interest." *Id.* § 692.204(1)(a).

56.     Section 692.204's other provisions—those relating to exceptions to the new law, civil forfeiture proceedings, registration requirements, civil penalties, criminal sanctions, and purchaser disclosure requirements—all mirror those of sections 692.202 and 692.203. The only relevant difference is that the criminal penalties for violating section 692.204 are ***much more severe*** than for violating 692.202 and 692.203.

57.     Violations of the new law by Chinese persons are third-degree felonies, *id.* § 692.204(8), punishable by up to five years' imprisonment and a fine of up to $5,000, *id.* §§ 775.082(3)(e), .083(1)(c).

58.     The sale of real property to a Chinese person in violation of the new law constitutes a first-degree misdemeanor, *id.* § 692.204(9), punishable by up to one year imprisonment and a fine of $1,000, *id.* §§ 775.082(4)(a), .083(1)(d).

**C.    The Impact of Florida's New Alien Land Law and the Harm It Is Causing Chinese People in Florida**

59.     Plaintiffs in this action are people living in Florida and a Florida-based

real estate company who are currently suffering, or imminently will suffer, the direct impact of Florida's New Alien Land Law.

60.     As detailed below, the individual plaintiffs in this case lawfully reside in Florida but may be considered domiciled in China due to their nonimmigrant visa status under U.S. immigration law.

61.     The term "domicile" is not defined in Florida's New Alien Land Law, but the term typically refers to a person's true, principal, and permanent home. The nature of a nonimmigrant visa, however, is a temporary one and not intended to be a mechanism by which a foreign citizen establishes permanent residency in the United States.[8]

62.     Thus, Plaintiffs, by virtue of having nonimmigrant visas, cannot be said to have established permanent residency in the United States, and therefore it is substantially likely that the State of Florida will deem them to be domiciled in their country of origin, China.

63.     Plaintiff Yifan Shen is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder

---

[8]   The U.S. Department of Homeland Security states: "A nonimmigrant visa (NIV) is issued to a person with permanent residence outside the United States but wishes to be in the United States on a temporary basis for tourism, medical treatment, business, temporary work, or study, as examples." U.S. Customs and Border Protection, *What is the Difference Between an Immigrant Visa vs. Nonimmigrant Visa?*, https://help.cbp.gov/s/article/Article-72 (last accessed May 22, 2023).

**A70**

of a valid H-1B visa, which is a nonimmigrant worker visa. Ms. Shen has lived in the United States for seven years and has lived in Florida for the past four years. She is not a member of the Chinese government or of the Chinese Communist Party. She has a master's degree in science and is working as a registered dietitian in Florida.

64.     In April 2023, Ms. Shen signed a contract to buy a single-family home in Orlando to serve as her primary residence. The property, which is a new construction, appears to be located within ten miles of a critical infrastructure facility. Based on searches on Google Maps, the home also appears to be within five miles of multiple military sites, including one identified as "Orange County U.S. Army Recruiting Center Orlando" / "DEERS (Army Facility)," and one identified as "Florida Army National Guard (Army Facility)"; however, because Ms. Shen does not know the acreage of these sites, whether they qualify as a base, camp, post, yard, or center, and whether they are operated under the jurisdiction of the Department of Defense or its affiliates, it is extremely difficult to know whether they qualify as "military installations" under Florida's New Alien Land Law.

65.     The estimated closing date for Ms. Shen's new property is in December 2023. Given the severe criminal and civil penalties for violating Florida's New Alien Land Law, given that her closing date is after July 1, 2023, and given the uncertainty about whether her new property is within five miles of multiple "military installations" under the law's vague definitions, she will be forced to cancel the

**A71**

contract for the purchase and construction of her new home. Fla Stat. §§ 692.203(1),

.204(1). Ms. Shen stands to lose all or part of her $25,000 deposit upon cancelling

her contract if the law goes into effect.

66.    If the law goes into effect and Ms. Shen cancels her contract, she is at

substantial risk of being discriminated against by sellers and real estate agents in her

future search for real estate because of the penalties imposed by the law and because

Ms. Shen is Chinese. Ms. Shen's future search for real estate will be more costly,

time-consuming, and burdensome under the new law because she is Chinese.

67.    Even if, under Florida's New Alien Land Law, Ms. Shen is eventually

able to purchase a property in Florida, she will have to register that property with the

DEO. Fla. Stat. § 692.204(4). This registration requirement is burdensome,

discriminatory, and stigmatizing to her.

68.    Plaintiff Zhiming Xu is neither a citizen nor a permanent resident of the

United States but has temporary permission to stay and live in the United States as

a political asylee. Prior to coming to the United States, Mr. Xu was persecuted by

the Chinese government and had to flee to the United States. Mr. Xu entered the

United States on a tourist visa, and he has applied for political asylum. He is awaiting

a decision. He is not a member of the Chinese government or of the Chinese

Communist Party. He has a bachelor's degree and is managing and repairing short-

term rental properties in Florida. Mr. Xu has lived in the United States and Florida

for the past four years. Mr. Xu already owns a residential property in Florida.

69.     In early 2023, Mr. Xu signed a contract to buy a second residential property near Orlando. The property appears to be located within ten miles of a critical infrastructure facility. The estimated closing date for Mr. Xu's property is in September 2023. Because Mr. Xu's closing date is after July 1, 2023, and because Mr. Xu already owns property in Florida, Florida's New Alien Land Law will prevent Mr. Xu from acquiring his new home—specifically, by forcing him to cancel the contract for the purchase of his new property. Fla. Stat. §§ 692.203(1), .204(1), .204(3). Mr. Xu stands to lose all or part of his $31,250 deposit if the law goes into effect and he is forced to cancel the real estate contract.

70.     Florida's New Alien Land Law will also require Mr. Xu to register the property he already owns with the DEO. Fla. Stat. § 692.204(4). This registration requirement is burdensome, discriminatory, and stigmatizing to him.

71.     Plaintiff Xinxi Wang is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid F-1 visa, which is a nonimmigrant visa for international students. Ms. Wang has lived in the United States and in Florida for the past five years. She is not a member of the Chinese government or of the Chinese Communist Party. She is currently pursuing her Ph.D. degree in earth systems science at a Florida university. Ms. Wang owns a home in Miami, which is her primary residence. As an owner of

real property in Florida, Ms. Wang will be required to register her property with DEO under Florida's New Alien Land Law. Fla. Stat. § 692.204(4). In addition, because Ms. Wang's property appears to be located within ten miles of a critical infrastructure facility, Ms. Wang is further subject to the law's registration requirement. *Id.* § 692.203(3). This registration requirement is burdensome, discriminatory, and stigmatizing to Ms. Wang.

72.    Plaintiff Yongxin Liu is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid H-1B visa, which is a nonimmigrant worker visa. Mr. Liu has lived in the United States for five years and in Florida for four years. He is not a member of the Chinese government or of the Chinese Communist Party. He is an assistant professor at a Florida university in the field of data science. He owns a property close to Daytona Beach, which is his primary residence. As an owner of real property in Florida, Mr. Liu will be required under Florida's New Alien Land Law to register his property with DEO. Fla. Stat. § 692.204(4). In addition, because Mr. Liu's property appears to be located within ten miles of a critical infrastructure facility, Mr. Liu is further subject to the law's registration requirement. *Id.* § 692.203(3). This registration requirement is burdensome, discriminatory, and stigmatizing to Mr. Liu.

73.    Mr. Liu also has plans to purchase a second property in the vicinity of Pelican Bay, Florida, for his and his parents' use as a vacation home. However, Mr.

Liu will be prohibited from purchasing a second property under the new law. *Id.* § 692.204(1), (3). Furthermore, there is a substantial likelihood that the second property would be within ten miles of a military installation or critical infrastructure facility, resulting in an additional prohibition on the purchase under the new law. *Id.* § 692.203(1), (2).

74.    Due to Florida's New Alien Land Law, Mr. Liu reasonably fears that if he sells his current property and seeks to purchase another home, real estate agents will refuse to represent him because he is Chinese, that he will be disadvantaged when bidding on property because he is Chinese, and that his search for real estate will be more costly, time-consuming, and burdensome as a result. *See id.* §§ 692.203(8), .204(9).

75.    Plaintiff Multi-Choice Realty, LLC is a real estate brokerage firm that primarily serves Chinese-speaking clients in the United States, China, and Canada. Multi-Choice Realty is not owned or controlled by the Chinese government or the Chinese Communist Party. In 2022, Multi-Choice Realty was involved in 74 property acquisitions, the vast majority of which were for clients who were Chinese or Chinese Americans. Many of Multi-Choice Realty's existing customers and potential customers will be directly impacted by Florida's New Alien Land Law by being required to register their properties and by being prohibited from acquiring new properties. As a result, Multi-Choice Realty stands to lose about one-quarter of

- 23 -

**A75**

its business due to Florida's New Alien Land Law, which targets Multi-Choice Realty's customer base and prohibits much of its clientele from engaging in further real estate purchases with Multi-Choice Realty.

76.    The swathes of land now off-limits to Chinese persons under Florida's New Alien Land Law are extensive, due to the law's blanket prohibition and the narrowness of its exception for certain homestead purchases that are not within five miles of a "military installation"—a broadly and vaguely defined term. The law will have the net effect of creating "Chinese exclusion zones" that will cover immense portions of Florida, including many of the state's most densely populated and developed areas.

77.    As a result of Florida's New Alien Land Law, there is a substantial likelihood that sellers of real estate will discriminate against Plaintiffs and other people of Chinese descent even for transactions that are permitted, as sellers will seek to broadly avoid Chinese buyers given the criminal penalties imposed for selling property in violation of the new law.

78.    Finally, Florida's New Alien Land Law is having and will have far-reaching stigmatizing effects among people of Chinese and Asian descent in Florida, including Plaintiffs, as Florida law deems them a danger to the United States. This impact is exactly what laws like the Chinese Exclusion Act of 1882 and the California Alien Land Law of 1913 did more than a hundred years ago.

**D.    The Federal Government's Role in Foreign Affairs, Foreign Investment, and National Security**

79.    The federal government manages foreign affairs, foreign investment, and national security in the United States, including through two federal regimes: (i) the Committee on Foreign Investment in the United States ("CFIUS"), which has been empowered to review foreign investment transactions, and (ii) the Office of Foreign Assets Control ("OFAC") within the U.S. Treasury Department, which administers and enforces economic regulations and trade sanctions.

*i.    History of CFUIS*

80.    CFIUS was established on May 7, 1975, by President Ford through an executive order. E.O. 11858, 40 F.R. 20263. Upon its establishment, CFUIS became the interagency body of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment, including real estate transactions. CFUIS was directed to, *inter alia*, monitor trends and developments in foreign investment in the United States, prepare guidance for foreign governments and consult regarding prospective major foreign governmental investments in the United States, review foreign investments that could have major implications for the national security interests of the United States, and consider proposals for new legislation or regulations relating to foreign investment as necessary.

81.    Later, Congress enacted the Exon-Florio amendment to the Defense

Production Act, included in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425–26. It established a mechanism for the federal executive branch to engage in a retrospective review of foreign investments. On December 27, 1988, President Reagan then delegated that power to CFIUS by executive order, empowering it to conduct reviews, undertake investigations, and make recommendations with respect to foreign investment data and policies. E.O. 12661, 54 F.R. 779. By 1991, the Department of the Treasury promulgated federal regulations implementing the Exon-Florio amendment, which were codified at 31 C.F.R. Part 800.

82.    The next year, Congress amended the Exon-Florio provision with the Byrd Amendment to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 837, 106 Stat. 2315, 2463–65 (1992). The Byrd Amendment broadened CFIUS's duties to investigate certain foreign investments, in particular, those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce within the United States that could affect national security.

83.    Eventually, Congress passed, and President Bush signed, the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight of CFIUS. FINSA also expanded the

**A78**

national security prerogatives within CFIUS's purview and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also concretized CFIUS's position as a permanent federal agency by codifying it and granting it statutory authority, including certifying to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings, as well as annual classified and unclassified reports.

84.    Most recently, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. No. 115-232, §§ 1701–28, 132 Stat. 2174–2207, which President Trump signed into law. The impetus for FIRRMA was the concern by many members of Congress over Chinese companies' growing investment in the United States. In response, Congress significantly expanded CFIUS's authority to investigate and review foreign investments. Most notably, CFIUS was granted jurisdiction to review certain real estate transactions by foreign persons, specifically, those in close proximity to a military installation, or to a U.S. government facility or property sensitive to national security. Congress also empowered CFIUS to review changes in foreign investor rights regarding U.S. businesses, as well as transactions in which a foreign government has a direct or indirect substantial interest. FIRRMA further authorized CFIUS to designate some countries as "countries of special concern" based on CFIUS's assessment as to whether that country has demonstrated or declared a strategic goal of acquiring a

type of critical technology or critical infrastructure that would affect U.S. national security interests. In that regard, FIRRMA also formalized CFUIS's use of risk-based assessments to determine whether certain transactions pose threats to national security.

85.     At the same time, Congress took several deliberate measures to calibrate the regulation of real estate purchases. For example, Congress specifically constrained the President's power to prohibit transactions by exempting those involving only "a single 'housing unit'"—a house, an apartment, etc. 50 U.S.C. § 4565(a)(4)(C)(i); *see* 31 C.F.R. §§ 802.223 (defining term), 802.216 (includes "adjacent land" incidental to use as housing unit). That express statutory exception reflects the marginal national security implications of such transactions and the outsized economic, personal, and foreign policy implications of policing the purchases of foreign nationals' homes. In addition, the federal process is individualized, with the government reviewing *particular* transactions and purchasers to assess whether they pose any national security threat. *See* 50 U.S.C. § 4565(d)(4). And penalties for violations of the rules are carefully calibrated. Criminal liability attaches only where a person has made false statements to CFIUS. 31 C.F.R. § 802.901(a)–(c), (g).

### ii.     *History of OFAC*

86.     In addition to the CFIUS regime, the U.S. Treasury Department,

through OFAC, is heavily involved with administering and enforcing economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the President pursuant to the International Emergency Economic Powers Act of 1977 ("IEEPA"), Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29. The Division of Foreign Assets Control, OFAC's immediate predecessor, was established under the Treasury Department in 1950. OFAC derives its authority from a variety of federal laws regarding economic sanctions and embargoes, particularly IEEPA.

87.   One of OFAC's primary duties is to prevent "prohibited transactions," which it defines as "trade or financial transactions and other dealings in which U.S. persons may not engage unless authorized by OFAC or expressly exempted by statute." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals. It maintains and regularly updates several sanction lists identifying countries, entities, and individuals considered to be threats to national security.

88.   In sum, the federal government—through statutes, executive orders, executive agencies, and inherent powers—occupies the fields of foreign affairs, foreign investment, national security, and the intersection thereof, and Florida's New Alien Land Law conflicts with the deliberate, delicate balance that the federal

government has struck with respect to these matters.

## COUNT ONE

**Violation of the Right to Equal Protection
Under the 14th Amendment and 42 U.S.C. § 1983
(By All Individual Plaintiffs Against All Defendants)**

89.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully set forth herein.

90.    The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

91.    The Equal Protection Clause protects all persons in the United States, regardless of their race, ethnicity, color, alienage, or national origin, including Plaintiffs.

92.    The Equal Protection Clause prohibits the States from denying any person equal protection of the laws based on the person's race, ethnicity, color, alienage, or national origin. This includes laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or disparate treatment due to race, ethnicity, color, alienage, or national origin.

93.    The new prohibitions on landownership target Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to

- 30 -

section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

94.    Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to all real property and interests therein.

95.    The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under Florida's New Alien Land Law are based on Plaintiffs' race, ethnicity, color, alienage, and national origin.

96.    Florida's New Alien Land Law violates the Equal Protection Clause on the following grounds:

    a.  The law was enacted with the purpose and intent to discriminate against persons based on race, ethnicity, color, alienage, and national origin, in particular, Chinese persons.

    b.  The law makes impermissible classifications based on race, ethnicity, color, alienage, and national origin that are not justified by a compelling state interest.

    c.  The law is not narrowly tailored to meet a compelling state interest.

    d.  The law invidiously targets persons based on their race, ethnicity, color, alienage, and national origin, particularly Chinese persons, resulting in

A83

discriminatory practices and disparate treatment.

    e.  The law deprives Chinese persons from equal protection of the laws, including laws relating to their fundamental rights.

97.    The enactment and imminent enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, ethnicity, color, alienage, and national origin simply because they are Chinese persons within the meaning of the new law.

98.    In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges and immunities granted under the U.S. Constitution and federal law.

## COUNT TWO

**Violation of the Right to Procedural Due Process
Under the 14th Amendment and 42 U.S.C. § 1983
(By All Individual Plaintiffs Against All Defendants)**

99.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully set forth herein.

100.    The Due Process Clause of the 14th Amendment provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of

**A84**

law[.]"

101. The protections of the Due Process Clause apply to all persons in the United States, regardless of their race, ethnicity, color, alienage, and national origin, including Plaintiffs.

102. The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. This entails the right to procedural due process, which consists, at a minimum, of fair notice and an opportunity to be heard.

103. The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

104. Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to real property and interests therein.

105. Florida's New Alien Land Law violates the Due Process Clause under the 14th Amendment to the U.S. Constitution, both on its face and as applied to

**A85**

Plaintiffs, on the following grounds:

    a.  The law is impermissibly vague, indefinite, and ambiguous because it fails to clearly define "critical infrastructure facility," "military installation," and "domicile," and therefore fails to provide sufficient notice about which properties and persons are subject to its classifications, prohibitions, penalties, and requirements.

    b.  The law is impermissibly vague, indefinite, and ambiguous because it fails to provide sufficient notice as to where the ten-mile and five-mile exclusion zones surrounding the covered critical infrastructure facilities and military installations begin and end.

106.  The law's vagueness and lack of adequate guidelines authorizes and encourages arbitrary and discriminatory enforcement across the state, including with respect to Plaintiffs.

107.  The enactment and enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs.

108.  In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## <u>COUNT THREE</u>

### Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*
### (By All Plaintiffs Against All Defendants)

109.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully set forth herein.

110.   The Fair Housing Act establishes that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing through the United States." 42 U.S.C. § 3601.

111.   The Fair Housing Act applies to all "dwellings," which are defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof." *Id.* § 3602(b).

112.   The protection of the Fair Housing Act extends to all persons in the United States, including Plaintiffs. Specifically, the Fair Housing Act defines "person" as including "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11, receivers, and fiduciaries." *Id.* § 3602(d).

113.   The Fair Housing Act empowers any person who is aggrieved under the law to make a claim. *Id.* § 3613(a). The definition of "aggrieved person" includes

any person who either "claims to have been injured by a discriminatory housing practice[,] or believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(i).

114.   Under the Fair Housing Act, 42 U.S.C. § 3604, it is an unlawful discriminatory housing practice:

> (a) To refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, . . . or national origin.

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale . . . of a dwelling that indicates any preference, limitation, or discrimination based on race, color, . . . or national origin, or an intention to make any such preference, limitation, or discrimination.

> (d) To represent to any person because of race, color, . . . or national origin that any dwelling is not available for . . . sale . . . when such dwelling is in fact so available.

> (e) For profit, to induce or attempt to induce any person to sell . . . any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, . . . or national origin.

115.   The Fair Housing Act also makes it "unlawful for any person . . . whose business includes engaging in residential real estate-related transactions to

**A88**

discriminate against any person in making available such a transaction, or in the terms of conditions of such a transaction, because of race, color, . . . or national origin." *Id.* § 3605(a). This provision relating to "residential real estate-related transaction[s]" includes "[t]he making or purchasing of loans or providing other financial assistance . . . [and] [t]he selling, brokering, or appraising of residential real property."

116.    The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

117.    Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to real property and interests therein.

118.    The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under Florida's New Alien Land Law are based on Plaintiffs' race, color, and national origin.

119.    Due to Florida's New Alien Land Law, Plaintiff Multi-Choice Realty is and will be unable to facilitate real estate transactions that would close after July 1,

**A89**

2023, and that are barred by the law's discriminatory classifications, prohibitions, and penalties.

120. Florida's New Alien Land Law violates the Fair Housing Act on the following grounds:

    a. The law establishes a discriminatory housing practice that purports to require or permit action that would violate the Fair Housing Act, and therefore, is presumptively invalid as a matter of law.

    b. The law discriminates against persons based on their race, color, and national origin, particularly Chinese persons, with respect to dwellings and residential real estate-related transactions.

    c. The law invidiously targets persons based on their race, color, and national origin, particularly Chinese persons, resulting in discriminatory practices and disparate treatment with respect to dwellings and residential real estate-related transactions.

121. The enactment and enforcement of the new prohibions on landownership in Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, color, and national origin simply because they are Chinese persons within the meaning of the new law.

## COUNT FOUR

**Violation of the Supremacy Clause of the U.S. Constitution
Preemption by Federal Regimes Governing
Foreign Affairs, Foreign Investment, and National Security
(By All Plaintiffs Against All Defendants)**

122.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 88 as though fully set forth herein.

123.   The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Para. 2.

124.   The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives.

125.   Pursuant to the Supremacy Clause, Florida's New Alien Land Law is preempted by federal regimes governing foreign affairs, foreign investment, and national security, including CFIUS and OFAC within the U.S. Treasury Department. Under federal law, CFIUS is authorized, *inter alia*, to review foreign investment

**A91**

transactions with respect to national security concerns, as well as to review real estate transactions by foreign persons, specifically, those pertaining to properties in close proximity to military installations, U.S. government facilities, or properties of national security sensitivity. OFAC is responsible for administering and enforcing economic regulations.

126.   It is unquestionable that foreign relations, the power to deal with national security threats posed by foreign countries, and foreign commerce are the exclusive powers of the federal government. Indeed, the U.S. Constitution vests the federal government the primary powers to manage foreign affairs and to regulate foreign commerce. *See, e.g.*, U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (commerce with foreign nations).

127.   The federal government has long occupied the fields of foreign affairs, foreign investment, national security, and the intersection thereof, especially with respect to foreign relations with China.

128.   All in all, given the comprehensiveness of federal schemes and the creation of multiple federal agencies to administer the schemes, federal law has "occupied" the entire field, thus precluding any state regulation.

129.   The State of Florida explicitly stated its intent to regulate in these areas of foreign affairs and foreign investment, as they bear on national security, when enacting Florida's New Alien Land Law. The governor and legislators have

A92

repeatedly emphasized the need to take action "to stand against the United States' greatest geopolitical threat—the Chinese Communist Party."[9] Accordingly, the law violates the Supremacy Clause because it regulates a field exclusively occupied by the federal government, specifically, the intersection between foreign affairs, national security, and foreign investment, including foreign real estate acquisitions. In so doing, the new landownership prohibitions usurp the power vested by the Constitution and by Congress in the federal government to investigate, review, and take actions with respect to foreign investments, including real estate transactions, that raise issues of national security.

130.   In addition, the new landownership prohibitions intrude upon the federal government's power to govern foreign affairs, generally. By characterizing several countries as "foreign countries of concern," and by expressly singling out Chinese people, Florida's New Alien Land Law unconstitutionally seeks to establish its own foreign policy, thereby intruding upon the federal government's exclusive power to govern foreign affairs. *See, e.g.*, *Zschering v. Miller*, 389 U.S. 429 (1968).

131.   The new landownership prohibitions also intrude upon the federal government's power to govern foreign commerce, generally. By prohibiting "foreign principals" from specific "foreign countries of concern" from owning and acquiring

---

[9]   Press Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.

land in Florida, the law discriminates against out-of-state individuals and entities based on race, ethnicity, color, alienage, and national origin, in particular, Chinese persons. The new law therefore unduly burdens international commerce, especially with respect to foreign investment.

132.   Florida's New Alien Land Law conflicts with the deliberate, delicate balance that the federal government has struck with respect to these matters, and accordingly, the statute is preempted by federal law.

133.   The enactment and pending enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause Plaintiffs ongoing and irreparable harm.

134.   In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.   Declare Florida's New Alien Land Law unconstitutional under the 14th Amendment to the U.S. Constitution because it violates Plaintiffs' rights to equal protection.

A94

B.      Declare Florida's New Alien Land Law unconstitutional under the 14th Amendment to the U.S. Constitution, both on its face and as applied, because it violates the rights of Plaintiffs and others to procedural due process.

C.      Declare that Florida's New Alien Land Law violates Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

D.      Declare Florida's New Alien Land Law unconstitutional under the Supremacy Clause of the U.S. Constitution and preempted by federal law.

E.      Preliminarily and permanently enjoin Defendants from implementing and enforcing Florida's New Alien Land Law against Plaintiffs.

F.      Order Defendants to expunge any and all records concerning Plaintiffs, including affidavits and registrations, that Defendants acquire pursuant to Florida's New Alien Land Law.

G.      Award Plaintiffs reasonable attorneys' fees and their costs of suit.

H.      Grant any other relief this Court deems just and proper.


Respectfully submitted this 5th day of June, 2023,

 */s/ Nicholas L.V. Warren*

Daniel B. Tilley (FBN 102882)            Keliang (Clay) Zhu**
**ACLU FOUNDATION OF FLORIDA**       **DEHENG LAW OFFICES PC**
4343 West Flagler Street, Suite 400      7901 Stoneridge Drive, Suite 208
Miami, FL 33134                          Pleasanton, CA 94588
(786) 363-2707                           (925) 399-5856
dtilley@aclufl.org                       czhu@dehengsv.com

**A95**

Nicholas L.V. Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Ashley Gorski*
Patrick Toomey*
Sarah Taitz*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org
ptoomey@aclu.org
staitz@aclu.org

Cody Wofsy**
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Email: cwofsy@aclu.org

Derek L. Shaffer**
William A. Burck[†]
Haiyan Tang[†]
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com
williamburck@quinnemanuel.com
haiyantang@quinnemanuel.com

Bethany Y. Li[†]
Elizabeth Koo[†]
**ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org
ekoo@aaldef.org

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice*

*\*\* Motion for leave to appear pro hac vice pending*

*[†] Motion for leave to appear pro hac vice forthcoming*

Tab 21-2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| YIFAN SHEN, an individual, ZHIMING XU, an individual, XINXI WANG, an individual, YONGXIN LIU, an individual, and MULTI-CHOICE REALTY LLC, a limited liability corporation,<br><br>      *Plaintiffs*,<br><br>v.<br><br>ASHLEY MOODY, in her official capacity as Attorney General of the State of Florida, WILTON SIMPSON, in his official capacity as Commissioner of Agriculture for the Florida Department of Agriculture and Consumer Affairs, MEREDITH IVEY, in her official capacity as Acting Secretary of the Florida Department of Economic Opportunity, PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission, R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit, KATHERINE RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit,<br><br>      *Defendants*. | Case No. 4:23-cv-208-AW-MAF |

**A98**

## DECLARATION OF YIFAN SHEN

I, Yifan Shen, hereby declare as follows:

1.     I am a plaintiff in the above-captioned action, and I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

### A.     Personal Background

2.     I am a 28-year-old woman of Asian descent and Chinese ethnicity.

3.     I am a native-born citizen of the People's Republic of China.

4.     I am neither a member of the Chinese government nor a member of the Chinese Communist Party.

5.     I have lived in the United States since 2016.

6.     I am neither a United States citizen nor a permanent resident of the United States.

7.     I currently have permission to stay and live in the United States as a holder of a valid H-1B visa, which is a nonimmigrant worker visa.

8.     I have not yet applied for permanent residency status in the United States, but my employer has begun the process of permanent labor certification and I plan to apply for permanent residency in the United States.

9.     I have lived in Florida since 2019. Except for some recreational travel, I have continuously lived in Florida for the past four years.

10.     I have a master's degree in science, and I am a dietitian, duly registered by the Florida Commission on Dietetic Registration. One of the joys of being a registered dietitian is that my work allows me to do my part to help keep the next generation of Floridians healthy. In particular, my work focuses on providing nutritional support and care to the pediatric population in Florida.

## B.   Property Interests in Florida

11.   I am a renter who has lived at my current residence in Orlando, Florida for about two and a half years. My current lease ends in January 2024.

12.   In April 2023, I signed a contract to buy a single-family home in Orlando, Florida, which I intend to be my primary residence. A true copy of the contract with private information redacted is attached as Exhibit 1.

13.   The property is a new home construction and is currently in the process of being built. The nearest intersection is Heather Road and N. Forsyth Road, Orlando.

14.   The estimated closing date for my new property is December 2023.

15.   I have placed a deposit on the purchase and construction of my new property in the amount of $25,000.

16.   I intend to move into my new property as soon as possible after the estimated closing date of December 2023, especially considering that my current lease ends in January 2024.

## C.   Irreparable Harm Caused by Florida's New Alien Land Law

17.   I am aware that Senate Bill 264 (hereinafter, "Florida's New Alien Land Law") was recently passed in Florida and signed into law on May 8, 2023, which is the subject of this lawsuit. I learned about the new law from people I know, as well as from news and media reports. I have read the new law, read articles about it, and discussed it with others to try to understand what it means.

18.   The home I am in contract to purchase is located in an area called Azalea Park in eastern Orlando. Based on searches on Google Maps, the home appears to be within five miles of multiple military sites, including one identified as "Orange County U.S. Army Recruiting Center Orlando" / "DEERS (Army Facility)" and one identified as "Florida Army National Guard (Army Facility)." Because I do not know the acreage of these sites, whether each qualifies as a base, camp, post, station, yard, or center, and whether they are operated under the

jurisdiction of the Department of Defense or its affiliates, it is extremely difficult to know whether they qualify as "military installations" under Florida's New Alien Land Law.

19.     The home I am in contract to purchase also appears to be within ten miles of a critical infrastructure facility.

20.     Given the severe criminal and civil penalties for violating Florida's New Alien Land Law, given that my closing date is after July 1, 2023, and given the uncertainty about whether my new property is within five miles of multiple "military installations" under the law's vague definitions, I will be forced to cancel the contract for the purchase and construction of my new home. I stand to lose all or part of my $25,000 deposit upon cancelling my contract.

21.     I am extremely distressed at the prospect of not being able to acquire my new home and having no place to go when my lease ends. I am also extremely distressed at the prospect of losing my deposit, which would be a severe financial burden.

22.     I am also very worried about my future ability to purchase a home in Florida. Although I am aware of an exception to Florida's New Alien Land Law allowing me to purchase one residential property up to two acres in size and not within five miles of a military installation, the new law is very unclear about the areas where I can safely purchase a home in Florida without risking criminal prosecution. I am very fearful that I could inadvertently purchase a home that violates the law and could be arrested and charged with a felony. If I were convicted, I could face up to five years in prison and a fine of $5,000, plus immigration consequences. On top of that, the property could be forfeited.

23.     Relatedly, I am also very worried that I will be discriminated against by sellers and real estate agents in my future search for real estate because of their fear of the risk of violating the law and because I am Chinese. I believe that my search for real estate will be more costly, time-consuming, and burdensome under

**A101**

the new law because I am Chinese. The new law will cast a cloud of suspicion over me as a Chinese person.

24.     With respect to the possible criminal sanctions for violating the law, even inadvertently, I am very worried about the impact that being incarcerated could have on my life. Not only would being incarcerated deprive me of my freedom and basic liberties, but it would interrupt my income, destroy my career, and possibly result in me losing my ability to remain a registered dietitian.

25.     Even if, under the new law, I am eventually able to purchase a property in Florida, I will have to register that property with the State. These registration requirements are burdensome, discriminatory, and stigmatizing to me. I am very worried that this registration will be used to target me, discriminate against me, monitor me, and generally harass me as a Chinese homeowner.

26.     I feel that as a Chinese person, I have been singled out and targeted by the law simply because of where I came from, my ancestry, and my alienage status. The law stigmatizes me and wrongly treats me as suspicious because I am Chinese.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this _5th___ day of June, 2023.

Yifan Shen



EXHIBIT 1

DocuSign Envelope ID: 9BA74AB9-CAB6-43A6-8A46-EDA8AC6871FB

# BLUE DIAMOND
# PURCHASE CONTRACT

This Purchase Contract (the "Contract") is made by and between NEW EARTH PROPERTIES LLLP, a Florida Corporation ("SELLER"), whose address is ███████████████ Orlando, Florida 32801, and

BUYER 1: YIFAN SHEN

| Home Phone: ████████ | Work Phone: |
|---|---|
| Email Address: ███████████ @GMAIL.COM | |
| Mailing Address: ████████████████ ORLANDO, FL 32814 | |

BUYER 2:

| Home Phone: | Work Phone: |
|---|---|
| Email Address: | |
| Mailing Address: | |

**ORAL REPRESENTATIONS CANNOT BE RELIED ON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT.**

1. **DESCRIPTION OF PROPERTY.** Subject to the terms and conditions of this Contract and for the consideration set forth herein, BUYER hereby agrees to purchase and SELLER hereby agrees to sell and convey to BUYER all of that certain parcel of real property being situated in Orange County, State of Florida, known and designated as **LOT No.** ██, (the "LOT") of BLUE DIAMOND, whose **STREET ADDRESS** is ---██ ████████ DR, ORLANDO, FL 32807--------------------------------------------------------------------, together with all appurtenances thereto, as the same are contained and defined in the plat for BLUE DIAMOND, recorded in the Public Records of Orange County, Florida, Plat book 108, Pages 106-111.

As part of the consideration for this transaction, SELLER hereby agrees to equip and furnish the Unit with the Standard Features set forth on the attached Exhibit "A." BUYER hereby is notified that the models that will be shown by SELLER may contain equipment and furnishings that may be different from the equipment and furnishings to be placed in the Unit by SELLER under this Contract, and BUYER hereby agrees that the only equipment and furnishings to be placed in the Unit by SELLER are as stated above. The cost of any additional equipment and furnishings shall be borne solely by BUYER.

2. **PURCHASE PRICE AND METHOD OF PAYMENT.** BUYER agrees to pay the Total Purchase Price of $ 484,900 to SELLER as follows:

Purchase Price:

| | |
|---|---|
| a. Base Purchase Price of Unit | $479,900 |
| b. PLUS: Extra/Options (if any, as listed in Addendum "A") | $ 5,000 |
| c. LESS: Credits (if any) | $ |
| d. TOTAL PURCHASE PRICE | $ 484,900 |

A104

DocuSign Envelope ID: 9BA74AB9-CAB6-43A6-8A46-EDA8AC6871FB

<u>Method of Payment:</u>

|   |   |   |
|---|---|---|
| a. | Initial Cash Deposit made as of the date of this Contract | $ 5,000 |
| b. | LESS:  Additional deposit(s) due on or before as set forth below: <br> DUE BY        MAY 15TH, 2023 | $ 19,245 |
| c. | Balance due at Closing (Subject to adjustments and prorations provided for herein such as closing costs and prepaids. | $ 460,655 |

3.  **<u>FINANCING.</u>**  If BUYER elects to obtain mortgage financing, BUYER shall assume responsibility and expense for obtaining such financing. BUYER acknowledges and agrees that this Contract shall not be conditioned on BUYER qualifying for mortgage financing from any lender or on any lender funding at closing. Notwithstanding the foregoing, if BUYER elects to obtain mortgage financing, BUYER hereby agrees to make a loan application within five (5) days from the effective date of this Contract.  The failure of BUYER to make a loan application within the above time frame shall constitute a default hereunder and may be actionable by SELLER in accordance with the terms of this Contract, and such default may be cured only on the express written statement by SELLER indicating that the default is deemed to be cured.  Loan approval by the lending institution must be issued within thirty (30) days following BUYER's loan application, unless otherwise agreed to in writing by SELLER and BUYER.  The failure of BUYER to secure loan approval within the thirty (30) day time frame shall not be grounds for BUYER to avoid BUYER's obligations under this Contract.  Loan approval shall mean a loan commitment from an institutional lender.

<u>If BUYER complies with all of the above requirements and is unable to procure a loan commitment within thirty (30) days of the date of application, SELLER shall have the option of  refunding BUYER's deposits to BUYER and terminating this Contract, at any point after expiration of said 30 day period.</u>

However, if BUYER fails to comply with any of the above requirements, BUYER will not be entitled to terminate this Contract and this Contract will be deemed a cash sale, or at SELLER's option, SELLER may declare BUYER in default.  If BUYER is unable to obtain mortgage approval due to an adverse change in BUYER's personal or financial condition occurring after BUYER first applies for a mortgage, or if the lender withdraws BUYER's approval after approving BUYER, BUYER will not be entitled to terminate this Contract and this will be deemed a cash sale or SELLER may, at its option, terminate this Contract and refund BUYER's deposits to BUYER.   If BUYER's approval is subject to any contingencies or conditions of any nature, to include but not limited to, credit updates, proof of funds available, proof of employment and income, insurance or any other requirements to be furnished or performed by the BUYER, or the approval is called preliminary or conditional, in such case, that approval shall constitute the approval required under this Contract, and BUYER shall be fully responsible and required to satisfy all conditions or contingencies to the satisfaction of the lender prior to the closing.  In the event BUYER does not satisfy the lender and the lender withdraws such preliminary, conditional or contingent approval, it shall be deemed a default on the part of the BUYER and this transaction shall be deemed a cash sale or, at SELLER's sole option, this Contract may be terminated and the BUYER's deposit refunded.

In addition, any other contingencies, conditions or requirements of BUYER that become effective upon mortgage approval shall be satisfied at the time designated regardless of the conditions or type of approval obtained. If BUYER's loan approval is withdrawn by the lender for any reason, this becomes a cash sale, and BUYER's deposits will be forfeited in the event that BUYER does not close on the transaction.

**A105**

DocuSign Envelope ID: 9BA74AB9-CAB6-43A6-8A46-EDA8AC6871FB

The initial deposit of $5000 in paragraph 2a above is payable to the Escrow Agent Title Team, however, after 30 days, this deposit is forwarded to the Seller by Title Team and becomes non- refundable.  Buyer acknowledges and consents to this transfer of the initial deposit by signing this contract.  The additional deposit is paid directly to the Seller and is Non Refundable upon payment.

4.  **SELECTION PERIOD**.  BUYER agrees to meet with SELLER's designated representative to complete the selection and all decisions required to be made regarding colors and whether to accept the standard features which are included in the base sales price for the Unit or select and agree to pay any increase in the Purchase Price for any option or upgrades in the Unit.  BUYER hereby acknowledges receipt and understanding of the standard features list for this development.  The selection process shall be completed within SEVEN (7) days of SELLER's oral or written request that BUYER make such selections ("Selection Period"), unless an extension is agreed to in writing by both parties. BUYER understands that after the Selection Period elapses further selections and changes to prior selections will not be allowed.

5.  **CONSTRUCTION**.     The temporary or permanent certificate of occupancy from the applicable governmental authority shall be final with respect to completion and compliance.  The estimated date of completion of construction of the Unit is  12-28-23.  SELLER agrees that it will use its best efforts to complete construction by said date.  BUYER acknowledges and agrees that said completion date is not guaranteed and is not the essence of this Contract.  Under no circumstances shall SELLER be liable for any damages or inconvenience caused to BUYER because of the failure to complete construction by said date, regardless of the cause for the delay.  Notwithstanding anything contained herein to the contrary, SELLER unconditionally agrees to complete the Unit within a period of two (2) years from the date of this Contract.  Such two (2) year period, however, may be extended due to acts of God, inability to obtain materials, or any other event constituting an impossibility of performance under Florida law.  With respect to SELLER's two-year completion obligation, nothing contained herein shall restrict BUYER's right to seek specific performance or any other remedy if BUYER is entitled to such remedies by operation of law.

Certain items displayed in the models (if one is to be built), and/or outside the models such as decorator items, and any other items displayed for merchandising purposes are not standard construction items and are therefore not included in the Agreement.  In the event of any conflict between SELLER's models or marketing materials and the plans and specifications for the Unit, the plans and specifications shall control.  Identification of such items should be obtained from SELLER's sales representatives.

The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor plan of the applicable model as shown on sales and promotional material of the SELLER or as shown on an existing model of the Unit.  BUYER agrees to accept the Unit as sited by SELLER and as constructed according to a standard or reverse floor plan.

SELLER reserves the right to make minor architectural, structural, or design modifications or changes in the Unit as it deems necessary or desirable, and BUYER agrees to close on the purchase of the Unit notwithstanding such modifications and changes, as long as the modifications and changes do not alter the overall  integrity of the Unit and any changes are such that the materials are at least of equal quality.  The square footage numbers advertised in sales materials are approximate and may vary.  SELLER may have to install chases for mechanical equipment or other reasons that may not appear in marketing or building plans.  Location of chases may vary and it will be at the option of the SELLER.

In the event the Unit purchased herein has been constructed as of the date of this Contract, then BUYER acknowledges that BUYER has inspected the Unit and approves and accepts the Unit, as it now exists.

The Purchaser of a one or two story residential unit has the right to have all deposit funds (up to ten (10) percent of the purchase price) deposited in an interest-bearing escrow account.  The Purchaser may waive this right in writing.  The interest if any, accrued on said escrow account shall be paid to SELLER at closing, unless previously disbursed in accordance with the provision of Florida Statutes at section 501.1375.  Deposit(s) made by BUYER hereunder shall be held in a non-interest bearing account.  If BUYER terminates this Contract

**A106**

DocuSign Envelope ID: 9BA74AB9-CAB6-43A6-8A46-EDA8AC6871FB

without defaulting, SELLER shall refund all deposits.  If BUYER defaults, SELLER shall be entitled to retain all deposits.  BUYER will be required to authorize disbursement of any escrowed funds by the Escrow Agent to SELLER at closing. Title Team shall act as an escrow agent.  The escrow agent is located at 300 S Orange Ave, suite 1000, Orlando, FL  32801.  PH: 407-591-3726.   BUYER, by signing this contract, waves his/her right to have the deposit placed in an interest bearing account and allows the SELLER to use the whole deposit for construction.  Once total of 5% deposit is paid by BUYER, the deposit shall become non-refundable.
In the event wood cabinets are installed, BUYER acknowledges that wood grain patterns on various segments of the cabinets may not match.  SELLER will not replace cabinets due to color or such variations.

Ceramic Tiles may contain slightly different shades on some individual tiles.  BUYER acknowledges and agrees that SELLER will not be obligated to replace individual tiles due to such differences.

6. **TITLE OF BUYER**.  At closing, SELLER will transfer title to the Unit to BUYER by Warranty Deed, subject only to the following exceptions:

   a.  The provisions of the Declaration of Covenants and all exhibits thereto.

   b.  Taxes and assessments for the year of closing and subsequent years.

   c.  Restrictions, reservations, conditions, agreements, limitations, and easements of record before closing or imposed by governmental authorities having jurisdiction or control over the subject property; provided, however, none of the foregoing shall prevent the use of the property for residential purposes.

   d.  Zoning or building code ordinances, regulations, rights, or interests vested in the United States or the State of Florida.

   e.  Matters of survey.

   f.  BUYER's mortgage, if any.

   g.  Any other items that BUYER has approved through the title insurance commitment approval process as discussed below.

The foregoing shall be considered to be the "Permitted Exceptions."

At closing, SELLER will deliver to BUYER a title insurance commitment issued by a title insurance company authorized to do business in the State of Florida, agreeing to issue to BUYER a policy of title insurance for the Unit.  BUYER may then examine the same and notify SELLER of any objections to matters of title other than the Permitted Exceptions and matters to be satisfied at closing.  If BUYER does not object to any other matters shown on the title insurance commitment, the other matters shall also automatically be considered to be included within the Permitted Exceptions.  SELLER shall have 120 days after receiving BUYER's written notice of any objections to title to correct any defects in title that would render title unmarketable, but SELLER is not obligated to do so.  If SELLER cannot or elects not to correct the title defects, BUYER shall have two options: (1) BUYER can accept title on the condition offered (with defects) and pay the full purchase price for the Unit and BUYER will not make any claims against SELLER because of the defects; or (2) BUYER can cancel this Contract and receive a full refund of BUYER's deposit(s), in which event SELLER shall be relieved of all obligations under this Contract when SELLER refunds BUYER's deposit(s).

7. **CLOSING**.  Based on projected schedules for completion of construction of the Unit, SELLER shall notify BUYER seven (7) days in advance of the scheduled closing date for the purchase of the Unit by BUYER. Funds to be paid at closing shall be in current local funds paid by bank wire transfer.  BUYER shall be expected to close on the date indicated in the notice, once the date is established.  The notice also shall state the place and time of closing as designated by SELLER.  If, after SELLER notifies BUYER of the time and place for closing, BUYER fails to close for any reason at that time and pay the balance of the full purchase price and all other amounts that are owed under this Contract, at SELLER's sole discretion, SELLER may either

   a.  Treat BUYER's failure to close as a default, in which case SELLER shall have the rights set forth

**A107**

in paragraph 10 of this Contract; or

    b.   Agree to set another date for closing. In such a case, BUYER will be required to pay SELLER at closing $200.00 per day due at closing based on the number of days between the date originally set for closing and the date the closing actually occurs.

8.   **WARRANTIES**. Express and implied warranties by SELLER and other warranties are hereby specifically disclaimed.  The unit shall be transferred subject only to the implied warranties of fitness and merchantability set forth in Florida Statutes and to a one (1) year builder's warranty.  Said warranty shall be available for review at the SELLER's sales office.   No other warranties, express or implied, are made.

9.   **INSPECTION** .   BUYER shall not enter into possession of the Unit or come on the construction site until the transaction has been fully closed except for the purpose of inspection as set forth herein.  BUYER's failure to adhere to this provision will constitute default.  BUYER will have no right of possession or use of the residence until closing.  BUYER will be given an opportunity prior to closing, at a date and time scheduled by SELLER to inspect the residence with an authorized representative of SELLER ("Preclosing Final Walkthrough").  At that time, BUYER agrees to sign an inspection form listing any defect(s) or alleged defect(s) in workmanship or materials BUYER discovers.  Any defect(s) or alleged defect(s) not so specified in the inspection form at the Preclosing Final Walkthrough shall be deemed to have occurred after said date, and SELLER shall have no responsibility for such defect(s) or alleged defect(s).  SELLER is not required to make repairs of a cosmetic nature unless caused by a defect SELLER is responsible to repair or replace.  Once the preclosing Final Walk Through items are corrected at SELLER's discretion and SELLER's best ability, BUYER shall proceed to close at a time and date set by SELLER.  REFUSAL TO DO SO WILL CONSTITUTE A DEFAULT, IN WHICH CASE SELLER SHALL HAVE THE RIGHTS SET FORTH IN PARAGRAPH 10 OF THIS CONTRACT.

BUYER acknowledges that, BUYER may only conduct "one walk through" prior to closing.  SELLER is only required to correct the items in the original walk through.  SELLER has no obligation to correct items that BUYER may generate as a result of a second inspection.  In the event individuals other than BUYERS accompany the BUYER during the walk through, such individuals are required to present proper insurance to SELLER.  Otherwise at the request of the SELLER, such individuals may not be allowed to accompany BUYER during the walk through.

10.  **DEFAULT**.  In the event BUYER is in default of any provisions of this agreement, at SELLER's option, SELLER has the right to cancel this agreement unilaterally in which case BUYER forfeits his/her deposit in full.  At SELLER's discretion SELLER has the option to allow BUYER to cure a default resulting from failure to close on the date set under Section 7 or 9 herein, in this case BUYER shall pay to SELLER a charge of $ 200.00 per day for each day of delay following said date of closing.  SELLER may also sue BUYER for specific performance of this Contract.  If, for any reason other than failure of SELLER to make SELLER's title marketable after diligent effort, SELLER fails, neglects, or refuses to perform this Agreement, the BUYER may seek specific performance or elect to receive the return of BUYER's deposit.   In the event BUYER issues a check that does not clear the bank due to funds not being available, it shall constitute a default under the terms of this contract.  The SELLER may then cancel the contract.

11.  **CLOSING COSTS**. BUYER shall pay the following costs at closing: a.    Fees for recording the deed;

    b.   Any attorney's fees incurred by BUYER;

    c.   All costs and fees payable in connection with any mortgage that BUYER may obtain on the Unit;

    d.   Costs for documentary stamps on the deed conveying title and the owner's title insurance policy;

    e.   A one-time $300 fee payable to the Association.

**A108**

      f.  Any other document preparation and closing costs.

SELLER will contribute a total of $5,000 toward closing costs if BUYER uses SELLER's preferred lender, Contemporary Mortgage Services, Inc. Corky Howland:  407-834-3377 or Caliber Home Loans, Francheska Rodriguez:  407-719-0216.  Movement Mortgage, Diana Arango:  407-852-6717.

12.  **PRORATIONS**.  The following items shall be prorated between SELLER and BUYER as of the date of closing;

    a.  Monthly Common Expense Assessment for the Unit owed to the Association for the remainder of the applicable payment period (be it monthly, quarterly, or annually) presently set at $600 per year.

    b.  General real estate taxes for the year of closing.

13. **DOCUMENTS EXECUTED BY SELLER**.  SELLER will execute and deliver to BUYER a Warranty Deed and an Affidavit of No Liens with respect to the Unit conveyed.

14. **OCCUPANCY AND DISBURSEMENT**.  Occupancy shall be delivered to BUYER at closing. The granting by SELLER of any limited right of possession or access to the Unit to BUYER before closing shall not constitute a waiver by SELLER of any of BUYER's obligations under this Contract.  Any such limited right of possession or access in favor of BUYER shall be strictly subject to the consent of SELLER and shall not be a right of BUYER.

15. **RECORDING; ENTIRE CONTRACT; MODIFICATION; SURVIVAL; NOTICES; EFFECTIVE DATE; INSURANCE; AND TIME IS OF THE ESSENCE**.  Neither this Contract nor any notice or memorandum hereof may be recorded in the Public Records of Orange County, Florida.   This Contract contains the entire understanding between BUYER and SELLER, and BUYER hereby warrants that BUYER has not relied on any verbal representations, advertising, portrayals, or promises other than as contained herein.  This Contract may not be modified, amended, or rescinded except by a written agreement signed by both BUYER and SELLER.  The provisions and disclaimers in this Contract that is intended to have effect after closing will survive closing and delivery of the Warranty Deed.  Unless otherwise notified in writing, notices shall be deemed duly sent if mailed or emailed, to either SELLER's or BUYER's respective address as listed on the first page of this Contract. This Contract shall become effective on the date when the last one of BUYER and SELLER has signed this Contract. BUYER shall have an affirmative duty to obtain and keep in good standing a hazard insurance policy on the Owner's Dwelling Unit in an amount not less than the replacement value thereof and naming the Association as a coinsured thereunder. Each Owner shall deliver a copy of said policy to the Association on the closing date on which an Owner obtains title to a Dwelling Unit and shall deliver evidence of the continued good standing of said policy annually thereafter.

16. **GOVERNING LAW; PARTIES BOUND AND PRIOR OCCUPANCY**.  This contract shall be construed in accordance with the laws of the State of Florida, and shall, except as otherwise expressly provided herein, bind and inure to the benefit of the heirs, personal representatives, successors, and assigns of BUYER and SELLER.  As used in this Contract, the word "BUYER" shall mean all BUYERS, jointly and severally, if there be more than one.  The Unit that is the subject of this Contract has not been occupied previously.

17. **ASSIGNABILITY**.  This Contract is not assignable by BUYER.  SELLER shall have the right to assign its right under this Contract to a mortgage lender as additional security, and there shall be no restrictions on SELLER's ability to assign its obligations and rights under this Contract to any third party.

18. **RISK OF LOSS**.  SELLER shall bear the risk of loss before closing unless possession of the Unit is

**A109**

delivered to BUYER before closing, and in the latter event, the risk of loss shall be borne by BUYER as of the date of delivery of possession.

19. **INSULATION RIDER**. The BUYER shall be entitled to have the energy efficiency rating of the property determined.

Information regarding the type, thickness, R-value and location of insulation which is specified to be installed in each part of the Unit or surrounding the same is shown in the following table. Since this building is not constructed, the following information provided is based on the construction specifications only and not on the insulation actually installed. All R-values described are based upon information received from the manufacturer of the insulation materials and do not constitute representations or warranties of the SELLER. SELLER reserves the right to substitute a different type of thickness of insulation from that hereafter disclosed. However, in no event would the R-value for each respective use be less than that disclosed below. Should SELLER substitute a different type or thickness of insulation, the new disclosures concerning the substituted material will be supplied to BUYER as soon as the same is available.

TABLE OF INSULATION DATA

R-38 Blown over ceilings of living area.
R-4.1 Fi-foil installed in exterior furred walls.
R-13 Unface installed in wall between garage and living area.
R-13 Unface installed in interior sound walls per plans.
Polycel around doors, windows, and penetrations.

20. **RADON GAS**. F.S. Section 404.056(6) requires that the following notification be provided to BUYERS of real property located in the State of Florida: "Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

21. **BROKERS**. BUYER represents that BUYER has not dealt with any real estate broker or agent other than SELLER's representatives and: N/A

| | |
|---|---|
| NAME: MIA CHENG- NIZZ REALTY INC | |
| ADDRESS: 2414 NW 138TH DR, SUNRISE FL  33323 | |
| EMAIL: ▓▓▓▓▓▓@GMAIL.COM | |
| PHONE: ▓▓▓▓▓▓ | |

BUYER agrees to indemnify and hold SELLER harmless from: (a) the claim of any real estate broker or sales agent other than the above named broker(s) and (b) the claims of any real estate broker, including the above named broker(s), and in the event of BUYER's default hereunder, BUYER's indemnification obligations shall survive the closing of this transaction. Broker to receive a 3 % commission based on the purchase price upon closing of this transaction. Obligations of SELLER to pay real estate commission to broker will apply only if said broker is an "Active Licensee" under the provisions of the Department of Business and Professional Regulation at the time of contract execution. There will be no commission paid to any cooperating broker if not indicated herewith.

22. **SALES PROMOTION**. For the Purpose of completing the sales promotion of this Home until the sale of all Units in the community, SELLER is hereby given full right and authority to maintain or establish at the Property all models, sales office, and advertising signs and banners if any, and lighting in the connection

**A110**

DocuSign Envelope ID: 9BA74AB9-CAB6-43A6-8A46-EDA8AC6871FB

Case 4:23-cv-00208-AW-MAF   Document 21-2   Filed 06/06/23   Page 14 of 18
USCA11 Case: 23-12737   Document: 39-1   Date Filed: 10/02/2023   Page: 115 of 162

therewith, together with the right of ingress and egress and transient parking through the Property.  This clause shall survive the closing contemplated herein and delivery of the deed to the BUYER.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals on the date(s) indicated below.

**BUYER(S):**

| | |
|---|---|
| Signature:  *YIFAN SHEN*<br>ADAC2B1ABCB5423... | Signature: |
| Name:   YIFAN SHEN | Name: |
| Social Security No: | Social Security No: |
| Date of Execution:   4/14/2023 | Date of Execution: |

**NEW EARTH PROPERTIES LLLP, a Florida Corporation:**

| |
|---|
| Signature:  *Max Sabeti*<br>96DA5C2367214B7... |
| Title:   General Partner |
| Date of Execution:   4/12/2023 |

**DISCLOSURE SUMMARY FOR BLUE DIAMOND**

**IF THE DISCLOSURE SUMMARY REQUIRED BY CHAPTER 720, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BE DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO**

**CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.**

**BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THIS DISCLOSURE.**

1. As a Purchaser of property in this Community, you will be obligated to be a member of a Homeowners' Association.

2. There have been recorded Restrictive Covenants governing the use and occupancy of properties in this Community, namely the Declaration of Covenants, Conditions & Restrictions for Blue Diamond, Bylaws of Blue Diamond Owners Association, and Articles of Incorporation of Blue Diamond Owners Association, copies of which have been provided to BUYER, as acknowledged by the signature below.

3. You will be obligated to pay assessments to the Association. Assessments may be subject to periodic change. If applicable, the current amount is $600 per YEAR. You will also be obligated to pay any special assessments imposed by the Association.

3. You will be obligated to pay Assessments to the Association. You will be obligated to pay Special Assessments to the respective Municipality, County or Special District. All Assessments are subject to periodic change.

4. Your failure to pay Special Assessments or Assessments levied by a mandatory Homeowners' Association could result in a lien on your property.

5. There is not an obligation to pay rent or Land Use fees for recreational or other commonly used facilities as an obligation of membership in the Homeowners' Association.

6. The Restrictive Covenants cannot be amended without the approval of the Association Membership.

7. The statements contained in this Disclosure form are only summary in nature, and, as a prospective Purchaser, you should refer to the Covenants and the Association Governing Documents before purchasing property.

8. These documents are or will be matters of public record and can be obtained from the record office in the county where the property is located.

9. The lake at Blue Diamond is for aesthetic benefits only. No recreational uses are available or allowed.

4/14/2023

DocuSigned by:

*YIFAN SHEN*

ADAC2B1ABCB5423

| Date: | | Purchaser: | |
|---|---|---|---|
| Date: | | Purchaser: | |

Addendum "A"

PURCHASER(s): YIFAN SHEN

| SUBDIVISION: | BLUE DIAMOND | MODEL: | SOLITAIRE | A |
|---|---|---|---|---|

**A112**

DocuSign Envelope ID: 9BA74AB9-CAB6-43A6-8A46-EDA8AC6871FB

| ELEVATION: | A | LOT: | ■ |

Options, or changes order charges, are not to be refunded under any circumstances after start of construction.

**COLOR SELECTIONS**.   SELLER allows BUYER to maker color selections based upon materials available.  BUYER agrees to make selections within 7 days of being notified to do so.  Buyer acknowledges that construction delays will occur if selections are not made in a timely manner.   If any material should prove not available, BUYER will be notified to make another selection.  There will be no charge in this event.

| Item | Cost |
|------|------|
| | |
| SELLER WILL PAY A TOTAL OF $5000 TOWARD THE TOTAL CLOSING COSTS | |
| | |
| LOT PREMIUM | $5,000 |
| | |
| | |
| | |
| | |
| | |

| | |
|---|---|
| BASE PRICE: | $479,900 |
| TOTAL OPTIONS: | $5,000 |
| TOTAL PURCHASE PRICE: | $484,900 |

AGREED TO:

4/14/2023

Purchaser:          Date:

Purchaser:          Date:

**A113**

DocuSign Envelope ID: 9BA7A4B9-CABC-4040-8A16-EDA6933697FB

# STANDARD LUXURY FEATURES



## GOURMET KITCHEN

- Pantry Per Plan
- Icemaker Line
- Double Bowl Sink with Sprayer
- Stainless Steel Self-Cleaning Range w/ Glass Cook Top
- Stainless Steel Multi-Cycle Dishwasher
- Stainless Steel Microwave Oven
- Food Waste Disposal System
- Ceramic Tile (your choice of colors)
- Granite Countertops
- 42" Solid Wood Designer Cabinets

## LUXURY BATHROOMS

- Full Vanity Mirrors
- Elongated Toilets
- Ceramic Tile Flooring in All Bathrooms
- Water-Saving Showerheads
- Quality Plumbing Fixtures
- Double Bowl in Master Bath
- Ceramic Tile Walls/Shower
- Granite Countertops

## SAFETY & ENERGY EFFICIENCY

- R-38 Ceiling Insulation
- 40-Gallon Quick Recovery Hot Water Heater
- Energy Efficient A/C w/ Heat Pump
- Maintenance Free Vented Aluminum Soffits
- Energy Efficient Roof Vents
- Energy Saving Fiberglass Paneled Entry Doors
- Protective Smoke Detectors

## OUTSTANDING INTERIOR

- Ceramic Tile Floor in Foyer
- 10' High Ceilings on 1st Floor
- 3 1/4 inch Colonial Base Molding
- Raised Paneled Interior Doors
- Designer Light Fixture Package
- Pre-Wired for four Phone Jacks
- Pre-Wired for four Cable TV Outlets
- Pre-Wired for Fans in Family Room and Master Bedroom
- Your Choice of Stain Resistant Carpet
- Electric Smoke Detector/Door Chimes
- Garage Door Opener w/ Two Controls

## QUALITY CONSTRUCTION

- Concrete Block Structure
- Architectural Shingle Roofs
- White Aluminum Window Frames
- Professionally Engineered Roof Trusses w/ Hurricane Clips for Wind Protection
- 10-Year Structural Warranty
- 1-Year Builder Warranty

## SPECIAL FEATURES

- Professionally Landscaped Community
- Fully Sodded Yard w/ Irrigation System
- Air Filtration Prevention Sealing
- Underground Utilities

A114

DocuSign Envelope ID: 9BA7AFB9-DAB6-43A0-8A4C-EDA8AC6987FB

# VS2 SERIES
## -45' WIDE LOTS-



*A solitaire diamond is the only gem a ring or necklace needs. Likewise, this home is sufficient to meet all your needs, with its two master suites, great room, and bedroom on the first floor.*

## The Solitaire





3  3  2  1,982






A115

Tab 21-3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

YIFAN SHEN, an individual,
ZHIMING XU, an individual, XINXI
WANG, an individual, YONGXIN
LIU, an individual, and MULTI-
CHOICE REALTY LLC, a limited
liability corporation,

       *Plaintiffs*,

v.

ASHLEY MOODY, in her official
capacity as Attorney General of the
State of Florida, WILTON SIMPSON,
in his official capacity as
Commissioner of Agriculture for the
Florida Department of Agriculture and
Consumer Affairs, MEREDITH IVEY,
in her official capacity as Acting
Secretary of the Florida Department of
Economic Opportunity, PATRICIA
FITZGERALD, in her official capacity
as Chair of the Florida Real Estate
Commission, R.J. LARIZZA, in his
official capacity as State Attorney for
the 7th Judicial Circuit, MONIQUE
WORRELL, in her official capacity as
State Attorney for the 9th Judicial
Circuit, KATHERINE RUNDLE, in her
official capacity as State Attorney for
the 11th Judicial Circuit,

       *Defendants*.

Case No. 4:23-cv-208-AW-MAF

**A117**

## DECLARATION OF ZHIMING XU

I, Zhiming Xu, hereby declare as follows:

1.      I am a plaintiff in the above-captioned action, and I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

### A.      Personal Background

2.      I am a 41-year-old man of Asian descent and Chinese ethnicity.

3.      I am a native-born citizen of the People's Republic of China.

4.      I am neither a member of the Chinese government nor a member of the Chinese Communist Party.

5.      I have lived in the United States and Florida since January 2019.

6.      I am neither a United States citizen nor a permanent resident of the United States.

7.      I initially entered the United States on a tourist visa and subsequently I applied for political asylum. Before coming to the United States, I was persecuted by the Chinese government and I had to flee to the United States. I am now waiting for the U.S. government to issue a decision on my political asylum application, and currently I am legally allowed to stay and live in the United States.

8.      I have a bachelor's degree obtained in China.

9.      I have not visited China since I moved to the United States in January 2019. I do not have any plans to ever return to China. At this time, my hope is that I will be able to obtain permanent status in the United States through the political asylum process. I have no intentions of ever going back to China because of my persecution by the Chinese government.

10.      I own a short-term rental property management company with my

**A118**

wife in the Orlando area. My company caters to short-term rental property owners in the local area. My work consists of both managing properties and doing repairs and maintenance. Due to the volume of my company's work, I am proud to say that my company is also a local employer. Over the years, my company has created job opportunities in the local community and has hired local workers.

### B.   Property Interests in Florida

11.   I am a homeowner; I own my current residence in Winter Garden, Florida, where I have lived for about one and half years. My wife, who has also applied for political asylum and is waiting on the U.S. government to issue a decision on the application, is a co-owner of the property.

12.   In early 2023, my wife and I signed a contract to buy a second residential property in Winter Garden, Florida, which we intend to be an investment property. Its nearest intersection is Egret Pointe Way and Parable Way, Winter Garden. I have placed a deposit on the purchase in the amount of $31,250. The estimated closing date is September 2023. A true copy of the contract with private information redacted is attached as Exhibit 1.

### C.   Irreparable Harm Caused by Florida's New Alien Land Law

13.   I learned about the new Florida law, which is the subject of this lawsuit, from people I know, as well as from news and media reports. I have read the new law, read articles about it, and discussed it with others to try to understand what it means.

14.   Based on my understanding, two independent provisions of Florida's New Alien Land Law require me to register my current property with the Florida Department of Economic Opportunity because I am Chinese. One provision requires me to register because I own real estate in Florida and am from China. A second provision, which applies to people from China and six other countries, requires me to register because my property appears to be located within ten miles of a critical infrastructure facility.

15.     These registration requirements are burdensome, discriminatory, and stigmatizing to me. I am very worried that this registration will be used to target me, discriminate against me, monitor me, and generally harass me as a Chinese homeowner.

16.     I feel that as a Chinese person, I have been singled out and targeted by the law simply because of where I came from, my ancestry, and my alienage status. The law stigmatizes me and wrongly treats me as suspicious because I am Chinese, which is extremely distressing to me.

17.     I believe the new law will decrease the value of my existing property. If I decide to sell, potential buyers will likely look at it with suspicion and worry about the additional burdens or risks caused by the new law.

18.     Moreover, based on my understanding, this new Florida law prohibits me from acquiring the second property that my wife and I are in contract to purchase. One provision forbids the purchase because we are Chinese and because our closing date is after July 1, 2023. Since we already own property in Florida and because of our current status in the United State, we are not eligible for the law's narrow exception. A second provision, which applies to people from China and six other countries, independently prohibits us from acquiring this property because it appears to be located within ten miles of a critical infrastructure facility. For both these reasons, I will be forced to cancel my contract for the purchase of my investment property, and I stand to lose all or part of my $31,250 deposit upon cancelling my contract.

19.     I am extremely distressed at the prospect of not being able to acquire the second property and losing my deposit, which would be a major financial burden.

20.     I am also very worried about my future ability to make another property purchase in Florida. Even though the new law contains an exception allowing certain people to purchase one residential property up to two acres in

- 4 -                                                    **A120**

size and not within five miles of a military installation, that exception does not apply to me as someone who currently owns real estate in Florida—and it is unclear if it would apply even if I were to sell my existing property. In addition, even if I become eligible for the exception after selling my current property, the new law is very unclear about the areas where I can legally purchase a home in Florida without risking criminal prosecution. It is extremely difficult to understand where I can safely purchase a property in the state because the definitions of "critical infrastructure" and "military installation" are ambiguous and very broad. I am very fearful that I could inadvertently purchase a home that violates the law and could be arrested and charged with a felony. If I were convicted, I could face up to five years in prison and a fine of $5,000, plus immigration consequences. On top of that, the property could be forfeited.

21.    Relatedly, I am also very worried that I will be discriminated against by future sellers and real estate agents if I wanted to purchase another home because of their fear of the risk of violating the law and because I am Chinese. I believe that my search for real estate will be more costly, time-consuming, and burdensome under the new law because I am Chinese. The new law will cast a cloud of suspicion over me as a Chinese person.

22.    The potential criminal consequences for violating Florida's new restrictions on purchasing and selling property, as well as the new registration requirements, are severe in themselves and could also trigger immigration consequences. As someone who is seeking political asylum in the United States, I am especially terrified of the risk of being deported back to China.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this ___6th___ day of June, 2023.

_____
Zhiming Xu



EXHIBIT 1

**LENNAR HOMES LLC**
6675 Westwood Blvd., 5th Floor
Orlando, FL 32821
407-586-4000

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (together with the Riders and Addenda attached hereto and incorporated by reference herein, this "**Agreement**") is made and entered into as of the fifteenth day of APRIL, 2023 by and between LENNAR HOMES LLC ("**Seller**"), and Buyer(s) named below ("**Buyer**"):

| | Check Applicable: |
|---|---|
| BUYER(S):<br>1. Zhiming Xu<br>2. Tao Li<br>3.<br>4.<br>No Buyer Name Changes Will Be Permitted Unless Seller and Buyer Validly Execute an Amendment to Change Party. | Married [X] Single [ ]<br>Married [X] Single [ ]<br>Married [ ] Single [ ]<br>Married [ ] Single [ ] |

| Buyer Address: ▮▮▮▮▮▮▮▮▮▮ | | |
|---|---|---|
| City: Winter Garden | State / Country: FL / US | Zip: 34787 |

By providing your telephone numbers and your email address, you hereby consent to receiving telephonic and email communications, including advertisements, made or sent by or on behalf of Seller and/or its affiliates.

Home Telephone: _____

Business Telephone: _____

Cellular Telephone: ▮▮▮▮▮▮▮_____

E-mail Address: ▮▮▮▮@gmail.com

1. **Purchase and Sale**. Buyer agrees to buy and Seller agrees to sell to Buyer (on the terms and conditions set forth below) Model Simmitano constructed or to be constructed on the following described property:

Lot ▮▮▮ of Block _____ of Storey Grove Subdivision/Plat, in ORANGE County (the "**County**"), Florida.

The residence and improvements (the "**Home**") constructed or to be constructed on the above described property (the "**Homesite**"), and all appurtenances thereto are collectively referred to in this Agreement as the "**Property.**" The Property is located within the community known as Storey Grove 50 (the "**Community**").

2. **Purchase Price and Payments**. The total purchase price ("**Total Purchase Price**") for the Home, exclusive of any Closing Costs as described in Rider B and the Purchase Price and Payment Addendum, is **$613,500.00**. Buyer (and not a third party) has made an earnest money deposit upon the signing of this Agreement (the "**Initial Deposit**") of **$30,675.00**. Buyer shall make further payments to Seller, including but not limited to any "**Additional Deposit**" or "**Advanced Payment**" (consisting of non-refundable deposit(s) for options, extras, and upgrades) as set forth in the Purchase Price and Payment Addendum attached hereto and made a part hereof. The term "**Deposit**" shall include the Initial Deposit, Additional Deposit and Advanced Payment.

3. **Builder's Fee**. Buyer acknowledges and agrees that in connection with the purchase of the Property, Buyer shall pay to Seller a builder's fee, equal to **1.00%** of the Total Purchase Price (the "**Builder's Fee**"). The Builder's Fee is imposed in connection with all home sales in the Community, regardless of whether Buyer finances the purchase of a home. Notwithstanding the foregoing, Buyer acknowledges that the Builder's Fee may not be imposed on all home sales in the Community, and Seller reserves the right to change or withdraw the Builder's Fee on subsequent home sales in the Community at any time prior to Seller's completion of construction of all homes in the Community. The Builder's Fee represents additional revenue and is intended to compensate Seller for various internal costs and expenses associated with the sales, promotion and/or development of the Community. This fee is due at Closing. The Builder's Fee is separate from any and all Closing Costs (defined herein below). While the Builder's Fee is payable, along with various other fees, costs and amounts at Closing, the Builder's Fee is not a settlement fee associated with any loan that you may obtain to finance the purchase of the Property.

4. **Legally Binding Agreement**. THIS AGREEMENT IS A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, PLEASE SEEK COMPETENT LEGAL ADVICE. NO WARRANTIES OR REPRESENTATIONS, OTHER THAN THOSE SPECIFIED IN THIS AGREEMENT, ARE EXPRESSED OR IMPLIED. ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER. FOR CORRECT WARRANTIES AND REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT, INCLUDING THE RIDERS AND ADDENDA ATTACHED HERETO, AND THE "DOCUMENTS" (AS SUCH TERM IS DEFINED IN RIDER B) PROVIDED TO BUYER, IF ANY.

5. **Financing**.

[ ] **CASH TRANSACTION**. If this box is checked, this is a cash transaction and not contingent on financing. Buyer agrees to provide within five (5) calendar days from the Buyer's execution of this Agreement financial statements or other written verification of Buyer's ability to purchase the Property with cash. If Buyer does not (in Seller's sole judgment, based on the documentation provided by Buyer to Seller) have the financial ability to purchase the Property with cash, then Seller may terminate this Agreement by refunding to Buyer any paid Deposit.

**☒    MORTGAGE TRANSACTION**.  If this box is checked, Buyer desires to obtain a loan commitment (the "**Commitment**") within the Mortgage Period (as such term is defined in Rider B attached hereto) for a first mortgage loan from Lennar Mortgage, LLC (an affiliate of Seller), or another qualified institutional mortgage lender of Buyer's choice ("**Lender**"), with interest and service charges at current market rates at time of Closing (as defined below) for a borrower of Buyer's credit qualifications and with a loan term of at least thirty (30) years.  Buyer agrees to apply within five (5) calendar days from the execution of this Agreement for a loan at the then prevailing interest rate.  In the event Buyer chooses to obtain financing through a Lender other than Lennar Mortgage, LLC, Buyer agrees to provide Seller within five (5) calendar days with the name, address and phone number of such Lender, the loan officer and the loan processor.  Buyer shall furnish promptly and accurately to Lender all information and documents requested by Lender in connection with such application.  If Buyer provides Lender's written disapproval of loan within the Mortgage Period (and Buyer has not cancelled or withdrawn his/her loan application), Seller shall refund the Deposit to Buyer.  If Buyer fails to provide Seller within the Mortgage Period with (i) a copy of the written Commitment reasonably satisfactory to Seller, or (ii) Lender's written disapproval of Buyer for such loan, Buyer shall be in default and Seller shall be entitled to retain the Deposit as liquidated damages for taking the Property off of the market and that the amount of liquidated damages is fixed and agreed to by the parties as a reasonable estimate of the damages that Seller shall suffer and is not in the nature of a penalty. If this Agreement provides for a VA guaranteed or FHA insured loan, Buyer's obligation to complete the purchase contemplated under this Agreement is subject to the VA/FHA Addendum attached hereto and incorporated herein.

The following shall apply only if Buyer desires to apply for a loan, as indicated above:

     5.1    <u>Prequalification</u>. Buyer may have obtained a "prequalification" from Lennar Mortgage, LLC for the purpose of determining Buyer's ability to purchase the Property. BUYER UNDERSTANDS AND ACKNOWLEDGES THAT BUYER IS NOT OBLIGATED TO USE LENNAR MORTGAGE, LLC TO OBTAIN FINANCING TO PURCHASE THE PROPERTY.

     5.2    <u>Application</u>.  Buyer understands that any loan application required under this Agreement must be fully completed in order to obtain the mortgage loan, and Buyer will make a good faith attempt to qualify for the mortgage loan.  If Buyer has a spouse who does not constitute a Buyer under this Agreement, Buyer agrees to have his/her spouse sign the mortgage documents as required by Lender.  BUYER AGREES TO INCUR NO DEBT SUBSEQUENT TO THE EFFECTIVE DATE WHICH MIGHT JEOPARDIZE APPROVAL OF BUYER'S MORTGAGE LOAN.  IF THE PROPERTY IS BEING PURCHASED BY A CORPORATION, PARTNERSHIP, OR OTHER ENTITY, BUYER AGREES TO (1) OBTAIN ANY PERSONAL ENDORSEMENTS OR GUARANTEES REQUIRED BY LENDER AND (2) PROVIDE TO LENDER AND/OR THE TITLE INSURER PROMPTLY UPON REQUEST SUCH CERTIFICATES, RESOLUTIONS OR OTHER CORPORATE, PARTNERSHIP OR OTHER ORGANIZATIONAL DOCUMENTS AS MAY BE REQUIRED.  Except as provided in this Agreement, Buyer agrees to pay all loan fees and closing costs charged by Lender in connection with the mortgage loan.  Buyer will pay any prepaid interest due on the mortgage loan at the time of Closing and any amount Lender may require to be put into escrow toward the payment of property taxes and insurance on the Property.  Buyer will also pay any mortgage insurance premiums (prepaid or otherwise), if required by Lender.

     5.3    <u>Commitment</u>.  Any lender selected by Buyer shall not require the issuance of a certificate of occupancy and the appraiser's final inspection prior to the release of loan documents for Closing. Buyer understands that the rate of interest on the mortgage is established by Lender and not by Seller and that any predictions or representations of present or future interest rate that may have been contained in any advertising or promotion by Seller are not binding.  If Buyer obtains a written mortgage loan Commitment and the mortgage loan Commitment is subsequently withdrawn through no fault of Seller including, but not limited to, any condition to such loan Commitment not being satisfied for any reason, this Agreement shall remain in full force and effect and Buyer shall be conclusively presumed to have agreed to purchase the Property as a cash transaction. If the mortgage loan Commitment is withdrawn following the expiration of the Mortgage Period, Buyer shall notify Seller, in writing, of such fact within five (5) calendar days. Buyer shall also provide financial statements or other written verification of Buyer's ability to purchase the Property with cash within five (5) calendar days of withdrawal of the Commitment. If Buyer does not (in Seller's sole judgment, based on the documentation provided by Buyer to Seller) have the financial ability to purchase the Property with cash, then Seller may terminate this Agreement by written notice and refunding to Buyer any paid Deposit. Once Buyer selects a Lender and obtains a Commitment acceptable to Seller, Buyer may change to another Lender at Buyer's discretion up to thirty (30) days prior to Estimated Completion Date provided Buyer notifies Seller in writing of such change and provides another Commitment (if there is a change in Lender) to Seller not later than thirty (30) days before the Estimated Completion Date. Buyer agrees that it will make no changes to its mortgage financing arrangement, including change of Lender, within the last thirty (30) days before Estimated Completion Date.

     5.4    <u>Appraisal</u>.  If the Lender's appraiser appraises the value of the Property for less than the Total Purchase Price, Buyer shall notify Seller, in writing, of such fact within three (3) calendar days from the receipt of the written appraisal. Seller shall then have the option, but not the obligation, in Seller's sole and absolute discretion, to: (i) lower the Total Purchase Price to the appraised value and Buyer shall proceed to Closing; or (ii) allow Buyer to pay the difference between the mortgage loan proceeds and the amounts required to close the transaction contemplated by this Agreement and proceed to Closing (the "**Additional Cash to Close Funds**").  Under no circumstances shall Buyer be excused from performance under this Agreement as a result of Lender's appraisal.  Notwithstanding the foregoing, if this Agreement provides for a VA guaranteed or FHA insured loan, the applicable appraisal requirements are set forth in the FHA/VA Addendum attached hereto and incorporated herein.

     5.5    <u>Sale of Other Residence</u>.  Notwithstanding any condition in the loan Commitment to the contrary, and unless Seller agrees otherwise in writing, Buyer represents and warrants that this Agreement is not and will not be subject to or contingent upon Buyer's selling and/or closing on the sale of Buyer's present residence or other property.  Failure to close on the purchase of the Property will constitute a default by Buyer and the remedies available to Seller for Buyer's default under this Agreement shall apply.

6.  **Funds**.  Buyer shall remit to Seller the Initial Deposit, Additional Deposit or Advance Payments by check, cashier's check or wire transfer.  Buyer acknowledges that Seller shall have the right to deposit such check for the Initial Deposit without such action being deemed acceptance of this Agreement.  If any such check is not paid by the bank after acceptance of this Agreement, Seller shall have the option to cancel this Agreement and declare Buyer in default.  If Buyer provides any check for a Deposit in the form of Canadian currency (a "**C$ check**"), Seller's depository bank will convert such C$ into a U.S. dollar amount using its currency procedures

and exchange rate then in effect two (2) business days following the date of processing (the "**Conversion Date**") and the amount of the Deposit to be applied toward the Total Purchase Price shall be equal to the amount received by Seller from the depository bank on the Conversion Date. Seller reserves the right to charge or pass through any currency conversion-related fees or costs to the Buyer at Closing (as hereafter defined). Notwithstanding the foregoing or anything contained in this Agreement to the contrary, the balance of the Total Purchase Price plus all applicable Closing Costs (the "**Closing Proceeds**") shall be paid to Seller at Closing. Any funds paid by Buyer under the terms of this Agreement to Seller, including funds paid through a check or cashier's check are accepted by Seller subject to collection.

UNLESS A WRITTEN REQUEST FOR PAYMENT BY CASHIER'S CHECK IS RECEIVED AND APPROVED BY SELLER NOT LESS THAN FIVE (5) BUSINESS DAYS PRIOR TO CLOSING, BUYER ACKNOWLEDGES AND AGREES THAT CLOSING PROCEEDS MUST BE BY FEDERAL WIRE TRANSFER IN IMMEDIATELY AVAILABLE FUNDS. BUYER IS RESPONSIBLE FOR ALL BANK OR WIRE TRANSFER CHARGES AND CURRENCY EXCHANGE FEES. WITHOUT LIMITING ANY OTHER PROVISIONS HEREIN, IF ANY DEPOSIT AND/OR CLOSING PROCEEDS ARE NOT TIMELY PAID, BUYER SHALL BE IN DEFAULT. Notwithstanding the foregoing, if Seller approves Buyer's written request to deliver a cashier's check and thereafter Buyer delivers all or any portion of the Closing Proceeds in the form of a cashier's check exceeding $25,000.00, then Buyer will not be entitled to possession of the Home until the cashier's check has cleared.

7. **Credit Information Authorization**. Buyer authorizes Lender to whom Buyer has applied or is in the process of applying for a mortgage loan in connection with this transaction to disclose to Seller the information contained in any loan application, verification of Deposit, income and employment, and credit reports or credit related documentation on Buyer. Buyer authorizes Seller to order one or more credit reports from a consumer reporting agency to be used in connection with this transaction. The cost of said report(s) is (are) to be paid by Buyer. Buyer authorizes Seller to forward all copies of all or any portion of such report(s) without interpretation to Lender who (at the request of Buyer) will evaluate a potential extension of credit to Buyer in connection with this transaction. Buyer authorizes Lender, and any credit bureau or other person or entity utilized or engaged by Lender, to obtain one or more consumer reports regarding Buyer and to investigate any information, reference, statement, or data, provided to Lender by Buyer or by any other person or entity, pertaining to Buyer's credit and financial status. Buyer shall indemnify, defend and hold harmless Seller, its officers, directors, shareholders, employees, agents, contractors, subcontractors and suppliers ("**Indemnified Parties**"), Lender, and any credit bureau or other person or entity utilized or engaged by Lender or Seller, from and against any deficiencies, losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, awards, suits, costs or disbursements of any kind or nature whatsoever, including attorneys' fees and expenses ("**Claims**") arising from an investigation of Buyer's credit and financial status.

8. **Closing**. Without limiting the terms of Section 9, Buyer acknowledges and agrees that Seller has the right in its sole discretion to schedule the date and place for the closing of the transaction contemplated by this Agreement ("**Closing**") and Buyer shall close on such Closing Date (the "**Closing Date**"). Upon Closing all contracted services to be performed under this Agreement by Seller (the "**Contracted Services**") shall be deemed completed and fully performed, and this Agreement shall be deemed completed, within the meaning of Florida Statutes § 95.11(3)(c). Contracted Services shall not include any corrections of defects or deficiencies in the Home, punch list work, or warranty work. Buyer will be given notice of the Closing Date by the "Closing Date Notice Period" (as such term is defined in Rider B attached hereto). Seller is authorized to postpone or advance the date of Closing at its discretion. Seller must, however, give Buyer reasonable notice of the new Closing Date. Any notice of Closing may be given verbally, by telephone, telegraph, telex, facsimile, mail, e-mail, or other means of communication at Seller's option. All notices of Closing will be given to Buyer at the address or by use of the telephone number(s) or e-mail address(es) specified in this Agreement unless Seller has received written notice from Buyer of any change therein prior to the date notice of Closing is given. Buyer's failure to receive the notice of Closing because Buyer has failed to advise Seller of any changes of address or phone number, or because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or for any other reason, shall not relieve Buyer of Buyer's obligation to close on the scheduled Closing Date, unless Seller otherwise agrees in writing to postpone the Closing Date. If Buyer fails, for any reason, to close on the date specified by Seller, Seller shall have the option to declare Buyer in default and seek the remedies stated in Section 15 below, or to charge Buyer Three Hundred Dollars ($300.00) per day for each day after the date of Closing specified by Seller until, and including, the actual Closing Date, and Seller may require that prorations be made as of the original Closing Date. This sum shall be due and payable in full at the time the extension is accepted by Seller. In addition, if Seller agrees to an extension of the date of Closing beyond the last day of the month for which Closing is originally set, an amount equal to One Percent (1%) of the Total Purchase Price shall also be payable to Seller. The sum for extending the date of Closing beyond the last day of the month shall be due and payable in full at the time the extension is accepted by Seller. Buyer agrees that the late charges are appropriate in order to cover Seller's administrative and other expenses resulting from a delay in Closing and that the amount of liquidated damages is fixed and agreed to by the parties as a reasonable estimate of the damages that Seller shall suffer and is not in the nature of a penalty. Seller is not required to agree to reschedule Closing, but Seller may reschedule Closing in Seller's sole discretion. It is a requirement that Buyer's Lender meet the Closing date and a delay by the Lender shall not be an excuse for Buyer's timely performance. The Closing date must be met even though the certificate of occupancy and final appraiser's inspection may not be received until after the day of Closing. The Lender may make the receipt of said items a "funding condition" prior to final disbursement but the receipt of these items shall not be a condition preventing the preparation and release of loan and closing documents for Closing. Notwithstanding the foregoing and subject to the provisions of Section 5.2 above, if the Mortgage Transaction box is checked above, Seller will agree to postpone Closing and not impose late charges to the extent such postponement is required in order for Buyer's Lender to meet any pre-closing waiting period required as the result of Buyer's Lender's issuance of revised closing disclosures under 12 C.F.R. § 1026.19(f)(2)(ii) of the Consumer Financial Protection Bureau's TILA-RESPA Integrated Disclosure Rule when such revisions directly result from a Seller action taken within six (6) calendar days of the Closing Date. However, in such event, Seller shall have no liability to the Buyer for failure to deliver the Property on the originally scheduled Closing Date.

9. **Completion Date**. It is expressly agreed by Buyer that notwithstanding anything to the contrary specified herein or verbally represented (including but not limited to Seller's sales representative), any scheduled completion date is a good faith estimate, and Seller makes no promises or representations concerning the date of completion. Buyer agrees that Buyer has not relied, and will not rely upon, any estimated completion date for any purpose whatsoever, including, without limitation, relocation of residence, storage of personal property, or lock-in financing, and Buyer agrees that Seller shall not be liable for any additional costs, expenses or damages whatsoever should the Home not be completed by an estimated completion date. Notwithstanding the foregoing, upon Closing all Contracted Services to be performed under this Agreement by Seller shall be deemed completed and fully performed, and this Agreement shall be deemed completed, within the meaning of Florida Statutes § 95.11(3)(c). Contracted Services shall not include any corrections of defects or deficiencies in the Home, punch list work, or warranty work. Notwithstanding the foregoing, Seller is required to complete and does agree that the construction of the Home shall be completed not later than two (2) years from the date of Buyer's execution of this Agreement. If construction is delayed by any event recognized by the law of the state in which the Home is located as a defense to a contract action for non-performance or a delay in performance, then the date of completion shall be extended

**A125**

DocuSign Envelope ID: 7072557D4A0-4E43-962E-298DD31B1789

Storey Grove ▇▇▇

by the delay period. It is the express intent of the parties that the parties' rights and obligations under this Agreement be construed in the manner necessary to exempt this Agreement and the sale of the Property from registration under the Interstate Land Sales Full Disclosure Act, and both Buyer and Seller hereby expressly waive any right or provision of this Agreement that would otherwise preclude such exemption.

10. **Casualty Before Closing**. If the Property is damaged by fire, vandalism, act of terrorism or other casualty before Closing and the cost of restoration does not exceed three percent (3%) of the Total Purchase Price and repairs will not substantially delay Closing, Seller shall repair the damage and Closing shall proceed pursuant to the terms of this Agreement. If the cost of restoration exceeds three percent (3%) of the Total Purchase Price or the repairs would substantially delay Closing, Buyer shall have the option to: (1) terminate this Agreement and receive a refund of the Deposit made by Buyer to Seller, in which event both parties shall be released from all obligations under this Agreement, or (2) have Seller repair the damage as soon as reasonably possible, and Closing shall be extended until such repair or rebuilding is complete.

Notwithstanding the foregoing, if all or a portion of the Property is damaged by fire, vandalism, act of terrorism or other casualty or condition and the repair or reconstruction of the Property substantially in accordance with the plans and specifications is rendered impossible by any cause recognized by the law of the state in which the Property is located as a defense to a contract action for non-performance, then Seller shall have the right to terminate this Agreement and Buyer shall receive a refund of the Deposit made by Buyer to Seller in which event both parties shall be released from all obligations under this Agreement.

11. **Deed**. Seller shall convey title to Buyer at Closing by delivery to Buyer of a Special Warranty Deed (the "**Deed**") describing the Property, which Deed shall convey title to Buyer subject to all matters described in Sections 12.1, 17 and 18 of this Agreement. Any such matters omitted from the Deed shall nevertheless be deemed to be included in the Deed. Upon Closing, within the meaning of Florida Statutes § 95.11(3)(c): (1) Buyer shall have actual possession of the Property, (2) all Contracted Services to be performed under this Agreement by Seller shall be deemed completed and fully performed, and (3) this Agreement shall be deemed completed. Contracted Services shall not include any corrections of defects or deficiencies in the Home, punch list work, or warranty work.

12. **Closing and Title Matters**. Title to the Property to be delivered to Buyer at Closing will be marketable and insurable, subject only to the following matters:

    12.1 Title to the Property shall be subject to the following: (1) zoning, building codes, bulkhead laws, ordinances, regulations, rights or interests vested in the United States of America or the state in which the Community is located; (2) real estate taxes and other taxes for the year of conveyance and subsequent years including taxes or assessments of any special taxing or community development district (including assessments relating to capital improvements and bonds); (3) the general printed exceptions contained in an owner's title insurance policy; (4) utility easements, sewer agreements, telephone agreements, cable agreements, telecommunications agreements, monitoring agreements, restrictions and reservations common to any plat affecting title to the Property; (5) matters that would be disclosed by an accurate survey or inspection of the Property; (6) the Documents; (7) any laws and restrictions, covenants, conditions, limitations, reservations, agreements or easements recorded in the public records for the County (for example, use limitations and obligations, easements (right-of-way) and agreements relating to telephone, gas or electric lines, water and sewer lines and drainage, provided they do not prevent use of the Property for single family residential purposes); (8) minor encroachments on easements that do not substantially interfere with an easement holder's interest in the Property; (9) acts done or suffered by Buyer and any mortgage or deed of trust obtained by Buyer for the purchase of the Property; and (10) any deed restrictions reflected in the Deed which specifically incorporate Chapter 558 of the Florida Statutes and the mediation, arbitration and litigation provisions set forth in this Agreement. It is Buyer's responsibility to review and become familiar with each of the foregoing title matters, some of which are covenants running with the land. If any title defects are discovered by Buyer after Closing, Buyer's sole remedy shall be to make a claim to Buyer's title insurer.

    12.2 Seller shall provide an affidavit complying with the Foreign Investment in Real Property Tax Act of 1980, as amended, upon written request of Buyer.

    12.3 Seller may not own title to the Property as of the date of this Agreement or at Closing. However, Seller shall obtain title to the Property on or before the Closing Date or effect the necessary transfer of title on or before the date when Seller causes title to be transferred to Buyer.

    12.4 If Seller cannot provide marketable and insurable title as described above, such failure shall not be an event of default and Seller will have a reasonable period of time (at least one hundred twenty (120) days from the date of the scheduled Closing Date) to attempt to correct any defects in title; provided, however, Seller shall not be obligated to incur any expense, nor institute any litigation, to clear title to the Property. If Seller cannot or elects not to correct the title defects, Seller shall so notify Buyer within such period, and Buyer may thereafter elect (by written notice from Buyer to Seller) one of the following two (2) options: (1) to accept title in the condition offered (with defects) and pay the balance of the Total Purchase Price for the Property (without set off or deduction therefor), thereby waiving any claim with respect to such title defects and Buyer will not make any claims against Seller because of the title defects; or (2) to terminate this Agreement and receive a full refund of the Deposit deposited hereunder. If all such amounts are refunded, Buyer agrees to accept it as full payment of Seller's liability hereunder, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder. Buyer shall not thereafter have any rights to make any additional claims against Seller. In the event Buyer does not notify Seller in writing within five (5) calendar days from the receipt of Seller's notice (time being strictly of the essence) as to which option Buyer elects, Buyer shall be conclusively presumed to have elected option (1) set forth above in this subsection.

    12.5 Title to the Property will be deemed marketable if an owner's policy is issued with standard exceptions.

    12.6 The acceptance of the Deed by Buyer shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement. UPON SELLER'S DELIVERY, AND BUYER'S ACCEPTANCE, OF THE DEED ON THE CLOSING DATE, ALL CONTRACTED SERVICES TO BE PERFORMED UNDER THIS AGREEMENT BY SELLER SHALL BE DEEMED COMPLETED AND FULLY PERFORMED, AND THIS AGREEMENT SHALL BE DEEMED COMPLETED, WITHIN THE MEANING OF FLORIDA STATUTES § 95.11(3)(c). CONTRACTED SERVICES SHALL NOT INCLUDE ANY CORRECTIONS OF DEFECTS OR DEFICIENCIES IN THE HOME, PUNCH LIST WORK, OR WARRANTY WORK.

DocuSign Envelope ID: 7872357D-974C-4E45-882E-239DD31B1159

Storey Grove

13.  **Closing Costs**.  The respective responsibilities of Buyer and Seller for all costs, prorations and fees payable at Closing (the "**Closing Costs**") are shown in Rider B attached hereto.

14.  **Site and Substitutions**.  The materials, equipment and fixtures included in and to be used in constructing the Home will be substantially the same as or similar in quality to those described in the applicable plans and specifications (except as to extras, options and/or upgrades).

    14.1  Changes to Plans and Specifications.

        14.1.1  Industry Practice.  It is widely observed construction industry practice for pre-construction plans and specifications for any home or building to be changed and adjusted from time to time in order to accommodate on-going site conditions and in the field construction factors.  These changes and adjustments are essential in order to permit all components of the Home to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Based on the foregoing, Buyer acknowledges that such changes and adjustments may occur and agrees that it is reasonable and to Buyer's benefit to allow Seller the flexibility to make such changes and adjustments to the Home.

        14.1.2  Seller's Absolute Right to Make Modifications to Plans and Specifications.  Seller has the absolute right to make modifications to the plans and specifications for the Home. Without limiting the generality of the foregoing, Buyer specifically agrees that changes in the dimensions of rooms and patios, entrances and terraces, if applicable, and changes in room size, in the locations of windows, doors, walls, partitions, utility lead-ins and outlets (including, but not limited to, electrical, cable television, and telephone), air-conditioning components, lighting fixtures and electrical panel boxes may be made by Seller in its sole discretion, provided however that changes in the layout and dimensions of the Home shall not substantially affect the value of the Home. Such changes may also include, but are not limited to, changes in the building location, setbacks and facing, the building's external configuration, its structural components, its finishes and the landscaping associated therewith.

        14.1.3  Buyer's Acceptance of Actual Floor Plan.  Buyer further understands and acknowledges that many of the Homes to be constructed within the Community require floor plans which are opposite (i.e. flipped) mirror images of the model floor plan and Buyer fully understands and accepts the floor plan configuration for the Home and improvements to be constructed within the Home.

        14.1.4  No Warranty for Plans and Specifications on File.  Buyer further acknowledges and agrees that (1) the plans and specifications of the Home and the Community on file with the applicable governmental authorities may not be identical in detail to Seller's plans and specifications, and (2) because of the day-to-day nature of the changes described in this Section 14, the plans and specifications on file with the applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). As a result of the foregoing, Buyer and Seller both acknowledge and agree that the Home and the Community may not be constructed in accordance with the plans and specifications on file with the applicable governmental authorities.  Without limiting the generality of the provisions of Rider B attached hereto, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications.  Seller has not given and Buyer has not relied on or bargained for any such warranties.  In furtherance of the foregoing, in the event of any conflict between the actual construction of the Home and/or the Community, and that which is set forth on the plans and specifications, Buyer agrees that the actual construction shall prevail and to accept the Home and Community as actually constructed (in lieu of what is set forth on the plans and specifications).

    14.2  Lot Change.  In the event that Seller, in its sole discretion, determines that the Model of the Home selected under this Agreement cannot reasonably be built on the Homesite, then Buyer and Seller hereby agree that they will negotiate in good faith to relocate the Home to another lot in the Community, provided however that there are lots available for sale.  If no replacement lot is available, then Buyer may terminate this Agreement and will be entitled to a refund of any paid Deposit.

    14.3  Decorative and Landscaping Items.

        14.3.1  Buyer understands and agrees that certain of the finishing items, such as tile, marble, carpet, cabinets, stone, brickwork, wood, paint, stain and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturers from those shown in the model, if any, or in illustrations or brochures or those included in the specifications. Furthermore, if circumstances arise that, in Seller's opinion, warrant changes of subcontractors, suppliers, manufacturers, brand names or items, Seller reserves the right to substitute equipment, materials, appliances, etc., which in Seller's opinion are considered to be of quality substantially similar or equal, or of better quality, subject to their availability. Buyer also understands that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor, if any.

        14.3.2  Lot grades, lot area, options, facades, shrubs, trees, trim, built-ins, wall treatments, window treatments, furniture, furnishings, fences, decks, locations of walks, driveways and other items in or about a model home area in the subdivision are for display purposes only and are not included in the Total Purchase Price unless otherwise expressly provided herein.  Seller has the right to remove any existing trees on the Property or on the surrounding area for any reason.  Buyer further understands and agrees that the following items (which may be seen in models or shown in illustrations) will also not be included with the sale of the Home: wall coverings, paint colors, accent light fixtures, wall ornaments, drapes, blinds, bedspreads, furniture, furnishings, wet bars, monitoring systems, certain built-in fixtures, special floor coverings, wood trim, upgraded items and/or any other items of this nature which may be added or deleted from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon models or shown in illustrations strictly for purposes of decoration and example only.

14.4   <u>Deed</u>.   By acceptance of the Deed, Buyer accepts all variations of the Home.

15.   **Buyer's Default**.   In the event of Buyer's default and to the extent allowed by law, Seller shall be entitled to terminate the Agreement and keep, as liquidated damages and not as a penalty, Buyer's Deposit not to exceed fifteen percent (15%) of the Total Purchase Price, except that Seller may, in addition, keep, as liquidated damages and not as a penalty, any and all Advanced Payments made by Buyer to Seller for options, extras or upgrades for which Seller has made contractual commitments or incurred liability by placing orders or otherwise.   Buyer agrees that actual damages in the event of breach by Buyer would be costly and difficult to calculate, and that such liquidated damages are a fair and reasonable remedy and shall not be considered a penalty.

16.   **Seller's Default**.   In the event of Seller's default and to the extent allowed by law, Buyer may recover actual damages but shall not be entitled to special, consequential or punitive damages.   Notwithstanding the foregoing, Buyer retains all remedies at law and in equity with respect to Seller's obligation to complete the Home within two (2) years pursuant to Section 9 above.

17.   **Mediation / Arbitration of Disputes**.

17.1   The parties to this Agreement specifically agree that this transaction involves interstate commerce and that any Dispute (as hereinafter defined) shall first be submitted to mediation and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) and not by or in a court of law or equity.   "**Disputes**" (whether contract, warranty, tort, statutory or otherwise), shall include, but are not limited to, any and all controversies, disputes or claims (1) arising under, or related to, this Agreement, the Property, the Community or any dealings between Buyer and Seller; (2) arising by virtue of any representations, promises or warranties alleged to have been made by Seller or Seller's representative; (3) relating to personal injury or property damage alleged to have been sustained by Buyer, Buyer's children or other occupants of the Property, or in the Community; or (4) issues of formation, validity or enforceability of this Section.   Buyer has executed this Agreement on behalf of his or her children and other occupants of the Property with the intent that all such parties be bound hereby.   Any Dispute shall be submitted for binding arbitration within a reasonable time after such Dispute has arisen.   Nothing herein shall extend the time period by which a claim or cause of action may be asserted under the applicable statute of limitations or statute of repose, and in no event shall the Dispute be submitted for arbitration after the date when institution of a legal or equitable proceeding based on the underlying claims in such Dispute would be barred by the applicable statute of limitations or statute of repose.

17.2   Any and all mediations commenced by any of the parties to this Agreement shall be filed with and administered by the American Arbitration Association or any successor thereto ("**AAA**") in accordance with the AAA's Home Construction Mediation Procedures in effect on the date of the request.   If there are no Home Construction Mediation Procedures currently in effect, then the AAA's Construction Industry Mediation Rules in effect on the date of such request shall be utilized.   Any party who will be relying upon an expert report or repair estimate at the mediation shall provide the mediator and the other parties with a copy of the reports.   If one or more issues directly or indirectly relate to alleged deficiencies in design, materials or construction, all parties and their experts shall be allowed to inspect, document (by photograph, videotape or otherwise) and test the alleged deficiencies prior to mediation.   Unless mutually waived in writing by the parties, submission to mediation is a condition precedent to either party taking further action with regard to any matter covered hereunder.

17.3   If the Dispute is not fully resolved by mediation, the Dispute shall be submitted to binding arbitration and administered by the AAA in accordance with the AAA's Home Construction Arbitration Rules in effect on the date of the request.   If there are no Home Construction Arbitration Rules currently in effect, then the AAA's Construction Industry Arbitration Rules in effect on the date of such request shall be utilized.   Any judgment upon the award rendered by the arbitrator may be entered in and enforced by any court having jurisdiction over such Dispute.   If the claimed amount exceeds $250,000.00 or includes a demand for punitive damages, the Dispute shall be heard and determined by three arbitrators; however, if mutually agreed to by the parties, then the Dispute shall be heard and determined by one arbitrator.   Arbitrators shall have expertise in the area(s) of Dispute, which may include legal expertise if legal issues are involved.   All decisions respecting the arbitrability of any Dispute shall be decided by the arbitrator(s).   At the request of any party, the award of the arbitrator(s) shall be accompanied by detailed written findings of fact and conclusions of law.   Except as may be required by law or for confirmation of an award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

17.4   The waiver or invalidity of any portion of this Section shall not affect the validity or enforceability of the remaining portions of this Section.   Buyer and Seller further agree (1) that any Dispute involving Seller's affiliates, directors, officers, employees and agents shall also be subject to mediation and arbitration as set forth herein, and shall not be pursued in a court of law or equity; (2) that Seller may, at its sole election, include Seller's contractors, subcontractors and suppliers, as well as any warranty company and insurer as parties in the mediation and arbitration; and (3) that the mediation and arbitration will be limited to the parties specified herein.

17.5   To the fullest extent permitted by applicable law, Buyer and Seller agree that no finding or stipulation of fact, no conclusion of law, and no arbitration award in any other arbitration, judicial, or similar proceeding shall be given preclusive or collateral estoppel effect in any arbitration hereunder unless there is mutuality of parties.   In addition, Buyer and Seller further agree that no finding or stipulation of fact, no conclusion of law, and no arbitration award in any arbitration hereunder shall be given preclusive or collateral estoppel effect in any other arbitration, judicial, or similar proceeding unless there is mutuality of parties.

17.6   Unless otherwise recoverable by law or statute, each party shall bear its own costs and expenses, including attorneys' fees and paraprofessional fees, for any mediation and arbitration.   Notwithstanding the foregoing, if a party unsuccessfully contests the validity or scope of arbitration in a court of law or equity, the noncontesting party shall be awarded reasonable attorneys' fees, paraprofessional fees and expenses incurred in defending such contest, including such fees and costs associated with any appellate proceedings.   In addition, if a party fails to abide by the terms of a mediation settlement or arbitration award, the other party shall be awarded reasonable attorneys' fees, paraprofessional fees and expenses incurred in enforcing such settlement or award.

17.7   Buyer may obtain additional information concerning the rules of the AAA by visiting its website at www.adr.org or by writing the AAA at 335 Madison Avenue, New York, New York 10017.

**A128**

DocuSign Envelope ID: F3723E7B-B14C-4E45-8826-239BD631B1A9

Storey Grove

17.8   Seller supports the principles set forth in the Consumer Due Process Protocol developed by the National Consumer Dispute Advisory Committee and agrees to the following:

17.8.1   Notwithstanding the requirements of arbitration stated in Section 17.3 of this Agreement, Buyer shall have the option, after pursuing mediation as provided herein, to seek relief in a small claims court for disputes or claims within the scope of the court's jurisdiction in lieu of proceeding to arbitration.  This option does not apply to any appeal from a decision by a small claims court.

17.8.2   Any mediator and associated administrative fees incurred shall be shared equally by Seller and Buyer; however, Seller and Buyer each agree to pay for their own attorneys' fees and costs.

17.8.3   The fees for any claim pursued via arbitration shall be apportioned as provided in the Home Construction Arbitration Rules of the AAA or other applicable rules.

17.9   Notwithstanding the foregoing, if either Seller or Buyer seeks injunctive relief, and not monetary damages, from a court because irreparable damage or harm would otherwise be suffered by either party before mediation or arbitration could be conducted, such actions shall not be interpreted to indicate that either party has waived the right to mediate or arbitrate. The right to mediate and arbitrate should also not be considered waived by the filing of a counterclaim by either party once a claim for injunctive relief had been filed with a court.

17.10   BUYER AND SELLER AGREE THAT THE PARTIES MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR COLLECTIVE PROCEEDING. THE ARBITRATOR(S) MAY NOT CONSOLIDATE OR JOIN CLAIMS REGARDING MORE THAN ONE PROPERTY AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR(S) MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S). ANY RELIEF AWARDED CANNOT BE AWARDED ON CLASS-WIDE OR MASS-PARTY BASIS OR OTHERWISE AFFECT PARTIES WHO ARE NOT A PARTY TO THE ARBITRATION. NOTHING IN THE FOREGOING PREVENTS SELLER FROM EXERCISING ITS RIGHT TO INCLUDE IN THE MEDIATION AND ARBITRATION THOSE PERSONS OR ENTITIES REFERRED TO IN SECTION 17.4 ABOVE.

18.   **Other Dispute Resolutions**.  Notwithstanding the parties' obligation to submit any Dispute to mediation and arbitration, in the event that a particular dispute is not subject to the mediation or the arbitration provisions of  Section 17, then the parties agree to the following provisions:  **BUYER ACKNOWLEDGES THAT JUSTICE WILL BEST BE SERVED IF ISSUES REGARDING THIS AGREEMENT ARE HEARD BY A JUDGE IN A COURT PROCEEDING, AND NOT A JURY.  BUYER AND SELLER AGREE THAT ANY DISPUTE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE HEARD BY A JUDGE IN A COURT PROCEEDING AND NOT A JURY.  BUYER AND SELLER HEREBY WAIVE THEIR RESPECTIVE RIGHT TO A JURY TRIAL.  SELLER HEREBY SUGGESTS THAT BUYER CONTACT AN ATTORNEY OF BUYER'S CHOICE IF BUYER DOES NOT UNDERSTAND THE LEGAL CONSEQUENCES OF EXECUTING THIS AGREEMENT.**

19.   **Deed Restriction**.  The provisions of Sections 17 and 18 shall be: (i) subject to the survival provisions of Section 31, (ii) covenants running with the land comprising the Property, (iii) set forth as exceptions in the Deed, and (iv) binding upon Buyer and its successors and assigns in title upon Seller's conveyance of the Property to Buyer and recording of the Deed.

20.   **Selling Agent, Cooperating Broker, and Seller's New Home Consultant**.  Unless the Purchase Price and Payment Addendum attached hereto indicates otherwise, Buyer represents to Seller that Buyer has not consulted, dealt or negotiated with a real estate broker, salesperson or agent other than Seller's sales personnel located at Seller's sales office.  Buyer agrees that Seller is not responsible for the payment of a commission to a real estate broker, salesperson or agent other than Seller's sales personnel.  Buyer shall indemnify, defend and hold harmless Indemnified Parties from and against any and all Claims resulting from or arising out of any representation or breach of a representation or warranty set forth in this Section.   In addition, Buyer acknowledges and understands that Seller's New Home Consultant ("**NHC**") and Internet New Home Consultant ("**INHC**") are employees of Seller, are acting solely for the Seller's interests, and are not acting in any representative capacity for Buyer.  Buyer should not disclose any information to Seller's NHC and/or INHC that Buyer considers to be confidential or otherwise does not want disclosed to Seller.

21.   **Construction Activities**.  ALL OWNERS, OCCUPANTS AND USERS OF THE COMMUNITY ARE HEREBY PLACED ON NOTICE THAT (1) SELLER AND/OR ITS AGENTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES AND OTHER DESIGNEES, AND/OR (2) ANY OTHER PARTIES, WILL BE, FROM TIME TO TIME, CONDUCTING BLASTING, EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR IN PROXIMITY TO THE COMMUNITY. BY THE ACCEPTANCE OF THEIR DEED OR OTHER CONVEYANCE OR MORTGAGE, LEASEHOLD, LICENSE OR OTHER INTEREST, AND BY USING ANY PORTION OF THE COMMUNITY, EACH SUCH OWNER, OCCUPANT AND USER AUTOMATICALLY ACKNOWLEDGES, STIPULATES AND AGREES (1) THAT NONE OF THE AFORESAID ACTIVITIES SHALL BE DEEMED NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, HEREUNDER OR AT LAW GENERALLY, (2) NOT TO ENTER UPON, OR ALLOW THEIR CHILDREN OR OTHER PERSONS UNDER THEIR CONTROL OR DIRECTION TO ENTER UPON (REGARDLESS OF WHETHER SUCH ENTRY IS A TRESPASS OR OTHERWISE) ANY PROPERTY WITHIN OR IN PROXIMITY TO THE AREA OF THE COMMUNITY WHERE SUCH ACTIVITY IS BEING CONDUCTED (EVEN IF NOT BEING ACTIVELY CONDUCTED AT THE TIME OF ENTRY, SUCH AS AT NIGHT OR OTHERWISE DURING NON-WORKING HOURS), (3) TO THE EXTENT PERMITTED OR NOT PROHIBITED UNDER APPLICABLE LAW, SELLER AND THE OTHER AFORESAID RELATED PARTIES SHALL NOT BE LIABLE FOR ANY AND ALL LOSSES, DAMAGES (COMPENSATORY, CONSEQUENTIAL, PUNITIVE OR OTHERWISE), INJURIES OR DEATHS ARISING FROM OR RELATING TO THE AFORESAID ACTIVITIES, EXCEPT RESULTING DIRECTLY FROM SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (4) ANY PURCHASE OR USE OF ANY PORTION OF THE COMMUNITY HAS BEEN AND WILL BE MADE WITH FULL KNOWLEDGE OF THE FOREGOING AND (5) THIS ACKNOWLEDGMENT AND AGREEMENT IS A MATERIAL INDUCEMENT TO SELL, CONVEY, AND/OR ALLOW THE

**A129**

DocuSign Envelope ID: 79723104-94AC-4E45-9828-336DD31B1739

Storey Grove

USE OF THE PROPERTY.

22.  **Dangerous Condition; Construction Work**.

22.1   Buyer understands and agrees that the Property is a construction site and that the Property and the improvements, equipment and supplies thereon constitute a danger to those who may enter on the Property. Buyer shall not enter onto the Property prior to Closing unless authorized and accompanied by Seller's representative. Any unauthorized, unaccompanied entry by Buyer shall constitute a breach of this Agreement by Buyer, at Seller's election. Moreover, any entry by Buyer onto the Property prior to Closing shall be done at Buyer's own risk and in compliance with all federal, state and local safety laws and regulations. To the extent permitted or not prohibited by applicable law, Buyer waives, releases and shall indemnify, defend and hold harmless Indemnified Parties from and against any Claims made by Buyer, Buyer's family members or guests, as a direct or indirect result of any such unauthorized, unaccompanied entry onto the Property.

22.2   Buyer agrees that supervision and direction of the working forces, including, without limitation, all contractors and subcontractors, is to be done exclusively by Seller, and Buyer agrees not to issue any instructions to the working forces or otherwise hinder construction or installation of improvements on the Property. Buyer shall not do or have any work done on the Property, nor may Buyer store any possessions thereon, prior to Closing and transfer of title to the Property to Buyer.

22.3   Buyer agrees that any and all controversies, disputes and claims arising under this Section shall be resolved through mediation or binding arbitration in accordance with the terms of this Agreement.

23.   **Natural Disasters**.  Seller builds homes to the building code in effect at the time the building permit is applied for Buyer's Home. Building code requirements do not guarantee a home can or will withstand the impacts of a natural disaster; including but not limited to earthquake, forest fire, tornado, hurricane, flood, and avalanche. Seller cannot guarantee the home, its structure or features will not be impacted by a natural disaster. Buyer should review their applicable homeowner's and/or flood insurance policy(s) and consult their insurance professional for additional information. Buyer is urged to follow the advice and direction from local emergency management officials regarding a natural disaster.

Buyer understands and agrees to accept the risks and conditions of natural disasters and to assume all liabilities associated with them. By executing and delivering this Agreement and Closing, Buyer shall be deemed to have released Seller and Seller's affiliates, and their respective officers, directors, managers, members, shareholders, employees, and agents, from any and all liability or claims resulting from all matters disclosed or disclaimed in this Paragraph, including, without limitation, any liability for incidental or consequential damages which may result from, without limitation, inconvenience, displacement, property damage, personal injury and/or death to or suffered by Buyer or any of its family members, occupants, guests, tenants, invitees and/or pets and any other person or pet.

24.   **Representation of Compliance with OFAC Regulations**.  Buyer represents and warrants that Buyer is not barred from doing business with U.S. entities pursuant to the U.S. Department of Treasury's Office of Foreign Asset Control ("**OFAC**"), including OFAC's Specially-Designated-Nationals ("**SDN**") list and lists of known or suspected terrorist organizations. If Seller identifies or is informed that Buyer is a valid match for OFAC's SDN list, then this Agreement is void, and Seller shall cancel and revoke this Agreement immediately. In the event of cancellation or revocation of this Agreement under this provision, Seller shall immediately contact OFAC to report the transaction and to determine whether deposit money provided by Buyer, if any, should be returned or blocked, consistent with OFAC regulations.

25.   **Agreement not to be Recorded**.  Buyer covenants that Buyer shall not record this Agreement (or any memorandum thereof) in the Public Records of the County. Buyer agrees, if Buyer records this Agreement, to pay all of Seller's attorneys' fees, paraprofessional fees and expenses incurred in removing the cloud in title caused by such recordation. Seller's rights under this Section shall be in addition to Seller's remedies for Buyer's default provided elsewhere in this Agreement.

26.   **Transfer, Assignment and Persons Bound**.  Buyer agrees that Buyer will not, and does not have the right to, assign, sell or transfer Buyer's interest in this Agreement (whether voluntarily or by operation of law or otherwise) without Seller's prior written consent. If Buyer is a corporation, other business entity, trustee or nominee, a transfer of any material equity or beneficial or principal interest shall constitute an assignment of this Agreement. If Buyer attempts to assign this Agreement in violation of this Section, Seller can declare Buyer in default and Seller shall be entitled to all remedies available under this Agreement. Buyer agrees that Seller may withhold its consent with or without any reason or condition in any manner it chooses (if it gives it at all) and may charge Buyer a reasonable amount to cover administrative costs incurred in considering whether or not to grant consent. If Buyer dies or in any way loses legal control of his/her affairs, this Agreement will bind his/her heirs and legal representatives. If Buyer has received Seller's permission to assign or transfer this Agreement, then Buyer's approved assignees shall be bound by the terms of this Agreement. If more than one person signs this Agreement as Buyer, each such person shall be jointly and severally liable for full performance of all of Buyer's duties and obligations hereunder.

27.   **Time of the Essence**.  Buyer acknowledges that time is of the essence in connection with the transactions contemplated under this Agreement.

28.   **Interpretation and Computation of Time**.  The use of the masculine gender in this Agreement shall be deemed to refer to the feminine or neuter gender, and the singular shall include the plural, and vice versa, whenever the context so requires. This Agreement reflects the negotiated agreement of the parties. Each party acknowledges that they have been afforded the opportunity to seek competent legal counsel, and each has made an informed choice as to whether or not to be represented by legal counsel. Accordingly, this Agreement shall be construed as if both parties jointly prepared it, and no presumption against one party or the other shall govern the interpretation or construction of any of the provisions of this Agreement. Any reference in this Agreement to the time periods of less than five (5) days shall, in the computation thereof, exclude Saturdays, Sundays and legal holidays. Any reference in this Agreement to time periods of five (5) days or more shall, in computation thereof, include Saturdays, Sundays and legal holidays. If the last day of any such period is a Saturday, Sunday or legal holiday, the period shall be extended to 5:00 p.m. on the next full business day. The section headings in this Agreement are for convenience only and shall not affect the meaning, interpretation or scope of the provisions which follow them.

29.   **Notice**.  Except as provided in the Closing Section of this Agreement with respect to notices of the scheduled Closing Date, any

**A130**

notice required or permitted to be given in connection with this Agreement shall be in writing and sent by United States certified mail with return receipt requested, overnight professional courier or electronic transmission (with confirmation and copy by (1) certified mail, if Buyer's address is within the United States or (2) overnight professional courier, if to a Buyer whose address is outside of the United States) to Buyer or Seller at the addresses on Page 2 of this Agreement (unless Seller has received written notice from Buyer of any change therein prior to the date such notice is given), and additionally to Seller by hand delivery at Seller's sales office. All notices shall only be effective upon receipt or refusal to accept receipt (by failure to accept delivery or otherwise).

30. **Waiver**. Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

31. **Survival**. Buyer and Seller specifically agree that notwithstanding anything to the contrary, the rights and obligations as set forth in all provisions and disclaimers in this Agreement shall survive (1) the Closing of the purchase of the Property; (2) the termination of this Agreement by either party; or (3) the default of this Agreement by either party, unless expressly stated otherwise. NOTWITHSTANDING THE FOREGOING, UPON CLOSING ALL CONTRACTED SERVICES TO BE PERFORMED UNDER THIS AGREEMENT BY SELLER SHALL BE DEEMED COMPLETED AND FULLY PERFORMED, AND THIS AGREEMENT SHALL BE DEEMED COMPLETED, WITHIN THE MEANING OF FLORIDA STATUTES § 95.11(3)(C). IN ADDITION, ALL PAYMENTS, INCLUDING, BUT NOT LIMITED TO, BUYER'S FINAL PAYMENT, TO SELLER FOR ALL CONTRACTED SERVICES ARE DUE ON OR BEFORE THE CLOSING DATE, AND CONTRACTED SERVICES SHALL NOT INCLUDE ANY CORRECTIONS OF DEFECTS OR DEFICIENCIES IN THE HOME, PUNCH LIST WORK, OR WARRANTY WORK.

32. **Incorporation and Severability**. The explanations and disclaimers set forth in the Documents are incorporated into this Agreement. In the event that any clause or provision of this Agreement shall be void or unenforceable, such clause or provision shall be deemed deleted so that the balance of this Agreement is enforceable.

33. **Governing Law**. Any disputes that develop under this Agreement or questions regarding the interpretation of this Agreement will be settled according to the law of the state where the Property is located to the extent federal law is not applicable.

34. **Entire Agreement**. BUYER CERTIFIES THAT BUYER HAS READ EVERY PROVISION OF THIS AGREEMENT, WHICH INCLUDES EACH RIDER AND ADDENDUM ATTACHED HERETO AND THAT THIS AGREEMENT, TOGETHER WITH EACH SUCH RIDER AND ADDENDUM, CONSTITUTES THE ENTIRE AGREEMENT BETWEEN BUYER AND SELLER. PRIOR AGREEMENTS, REPRESENTATIONS, UNDERSTANDINGS, AND ORAL STATEMENTS NOT REFLECTED IN THIS AGREEMENT HAVE NO EFFECT AND ARE NOT BINDING ON SELLER. BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED ON ANY REPRESENTATIONS, NEWSPAPERS, RADIO OR TELEVISION ADVERTISEMENTS, WARRANTIES, STATEMENTS, OR ESTIMATES OF ANY NATURE WHATSOEVER, WHETHER WRITTEN OR ORAL, MADE BY SELLER, SALES PERSONS, AGENTS, OFFICERS, EMPLOYEES, COOPERATING BROKERS (IF ANY) OR OTHERWISE EXCEPT AS HEREIN SPECIFICALLY REPRESENTED. BUYER HAS BASED HIS/HER/THEIR DECISION TO PURCHASE THE PROPERTY ON PERSONAL INVESTIGATION, OBSERVATION AND THE DOCUMENTS.

35. **Modification**. This Agreement is the entire agreement for the sale and purchase of the Property and once it is signed by both Buyer and an authorized representative of Seller, it can only be amended by a written agreement signed by both Buyer and Seller.

36. **Additional Changes**. Notwithstanding Section 35 of this Agreement, Buyer agrees that it may be necessary (at any time and from time to time) after Buyer executes this Agreement for Seller, and/or the developer or declarant under the Documents, to change the terms and provisions of this Agreement and/or the Documents to comply with and conform to the rules and regulations (as same may exist and as same may be promulgated from time to time) of any governmental agency, subdivision or authority or court of competent jurisdiction and Buyer consents to all such changes. Notwithstanding Section 35 of this Agreement, Seller, and/or the developer or declarant under the Documents, shall have the right to amend all Documents for development or other purposes, and Buyer consents to all such amendments.

37. **Inducement**. Buyer acknowledges that the sole inducement to close on the purchase of the Property is the Property itself and not (1) the common facilities comprising part of the Community, if any, or (2) any expectation that the Property will increase in value.

38. **Reservation of Easement**. For the purpose of completing the construction and servicing of the Property and Community, Seller hereby reserves an easement of ingress and egress for itself and its successors and assigns, and each of their respective agents, employees, materialmen and subcontractors, over, under and upon the Property for a period of one (1) year after Closing. Seller shall provide reasonable notice to Buyer before exercising easement rights granted herein.

DocuSign Envelope ID: 787253A484C4E4E45-8828-336D531B1789

Storey Grove ▆▆▆▆

39. **Riders and Addenda**. This Agreement consists of 12 pages and the following Riders and Addenda, which are attached hereto and by this reference made a part of this Agreement.

Check ([X]) all that apply:

| | |
|---|---|
| [x] Rider A (Florida) | [X] Disclosure Summary |
| [x] Rider B (Central Florida Division) | [ ] Community Development District Brochure |
| [x] Purchase Price and Payment Addendum | [X] Cooperating Broker Agreement |
| [x] Master Disclosure and Information Addendum | [ ] FHA/VA Addendum |
| [X] Affiliated Business Arrangement Disclosure Statement* | [ ] Out of State Non-Solicitation Addendum (Multi-State) |
| [x] Election Form Addendum | [ ] Out of State Non-Solicitation Addendum (New York) |
| [x] Insulation Addendum | [ ] Out of State Non-Solicitation Addendum (New Jersey) |
| [X] Indoor Environmental Quality Disclosure | [ ] Out of State Non-Solicitation Addendum (Puerto Rico) |
| [x] Addendum for Natural and Manmade Products | [X] Approved Lender Addendum [OPTIONAL] |
| [ ] Sales Incentive Addendum | [X] Privacy Policy Notice Addendum |
| [ ] HUD Receipt for Property Report [OPTIONAL] | [X] Stucco/Cementitious Finish to Exterior Walls Disclosure |
| [x] Change Order Addendum/Amendment or Option Summary | [X] N/A |

*On 04/15/2023 Seller provided to Buyer an Affiliated Business Arrangement Disclosure Statement ("**ABAD**") that sets forth Seller's business relationships with affiliated settlement service providers, including but not limited to, Lennar Mortgage, LLC, Lennar Title Inc. Lennar Insurance Agency, LLC and their respective types of charges and range of charges; Buyer acknowledges and confirms receipt of the previously delivered ABAD on 04/15/2023.

40. **Offer to Purchase/Effective Date**. This Agreement, when executed by Buyer and delivered to Seller, together with the Initial Deposit specified hereunder, shall constitute an offer by Buyer to purchase the Property in accordance with the terms and conditions provided herein, and shall not be binding upon Seller until such time as an authorized representative of Seller has executed this Agreement. The date of such acceptance is the "**Effective Date**" of this Agreement. In the event Buyer's offer is not accepted by Seller, all paid Deposits made by Buyer to Seller to date shall be returned to Buyer, and Buyer's offer shall be deemed withdrawn.

41. **Counterparts and Signatures**. This Agreement may be executed in any number of counterparts, a complete set of which shall be deemed to be an original and a complete set of which shall comprise but a single instrument. Signatures may be given via electronic transmission and shall be deemed given as of the date and time of the transmission of this Agreement to the other party.

42. **DISTRICT**. Pursuant to Section 190.048 of Florida Statutes, Seller provides the following notice. **THE N/A COMMUNITY DEVELOPMENT DISTRICT MAY IMPOSE AND LEVY TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION, AND MAINTENANCE COSTS OF CERTAIN PUBLIC FACILITIES AND SERVICES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT. THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND OTHER LOCAL GOVERNMENTAL TAXES AND ASSESSMENTS AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED FOR BY LAW.**

**THE INITIAL DEPOSIT HAS BEEN RECEIVED BY SELLER SUBJECT TO CLEARANCE.**

SELLER: LENNAR HOMES LLC

*Fang Cook*
New Home Consultant                   Fang Cook
Date: _____ 4/19/2023

Buyer - *Zhiming Xu*
Date _____ 4/15/2023

Buyer - *Tao Li*
Date _____ 4/15/2023

Buyer - _____
Date _____

**THIS AGREEMENT IS NOT BINDING ON SELLER UNTIL ACCEPTED BELOW BY AN AUTHORIZED REPRESENTATIVE OF SELLER.**

SELLER:
LENNAR HOMES LLC
a _____

By *Fang Cook*
Title: Authorized Representative     Fang Cook
Date Signed by Seller: _____ 4/19/2023

Buyer - _____
Date _____

## PRIVACY POLICY NOTICE ADDENDUM

**THIS PRIVACY POLICY NOTICE ADDENDUM** (this "**Addendum**") is, by this reference, made part of the Purchase and Sale Agreement (the "**Agreement**") dated as of the fifteenth day of April, 2023 between Zhiming Xu, Tao Li (collectively, "**Buyer**") and Seller, as defined in the Agreement, respecting Lot 5400 of Block _____ of Storey Grove Subdivision/Plat/Condominium in the community known as Storey Grove 50 (the "**Community**").

1.   **Defined Terms**.  All initially capitalized terms not defined herein shall have the meanings set forth in the Agreement, and all references in this Addendum to the Agreement shall be deemed to include references to this Addendum and to any other addenda and riders attached to the Agreement, which are hereby incorporated by this reference.  Notwithstanding the foregoing or anything contained in the Agreement to the contrary, for the exclusive purpose of this Addendum, "**Lennar Affiliate(s)**" shall have the meaning set forth in the Privacy Policy Summary attached hereto as Exhibit "A" ("**Privacy Policy Summary**").

2.   **Explanation**.  Buyer may need a mortgage, homeowners' insurance, title insurance and/or settlement services in connection with the purchase of the Home.  While Buyer is not required to use a Lennar Affiliate to purchase such services, they are available to assist with obtaining these services in connection with the purchase of the home.  This Addendum provides Buyer with the option of electing to receive marketing materials, including price quotes, for services that may be necessary in connection with the purchase of the new Home.  It is entirely Buyer's choice whether to receive any such information, and there is no obligation to use any Lennar Affiliate.

3.   **Privacy Summary**.  Buyer acknowledges that Buyer has received and reviewed Seller's Privacy Policy Summary and has been given the opportunity to review Seller's complete Privacy Policy at https://www.lennar.com/privacypolicy, or on request. Buyer hereby accepts the Privacy Policy and acknowledges that the Privacy Policy is subject to future amendment.

4.   **Privacy Selections**.  Please choose the "Yes" or "No" options below to indicate whether Buyer wishes to share information with Lennar Affiliates (such as those involved in the home purchasing process, e.g., Lennar Mortgage, LLC, Lennar Title, Inc., CalAtlantic Title, LLC and Lennar Insurance Agency, LLC).  If there is more than one Buyer, the choices selected on the Addendum will apply to all Buyers who have executed the Addendum.



| YES | NO | |
|---|---|---|
| _____ | __X__ | **Affiliate Information Sharing**: Agreeing to this option will allow the Lennar Affiliates to provide Buyer with offers and information about products and services that may be necessary in connection with the home-buying process by accessing and using Buyer's personal information.  These services include providing the Buyer with home financing information and quotes for title insurance, closing services and homeowner's insurance. |

Buyer may change the above selections (i.e., opt-out if Buyer has previously selected "YES", or opt-in, if Buyer has previously selected "NO") at any time by visiting www.lennar.com/contact/communicationpreferences  and making the appropriate selections in the manner prescribed in the form, or as otherwise described in the current Privacy Policy.

5.   **Counterparts**.  This Addendum shall be validly executed when signed in counterpart; a complete set of which shall form a single document. Signatures may be given via electronic transmission and shall be deemed original and given as of the date and time of the transmission of this Addendum electronically to the other party.

6.   **Conflicts**.  In the event of any conflict between this Addendum and the Agreement, this Addendum shall control.  In all other respects, the Agreement shall remain in full force and effect.

DocuSign Envelope ID: 7923570-9740-4E45-8826-339DD31B1159

Storey Grove

7. **Entire Agreement**. The Agreement, together with this Addendum and any other addenda and riders to the Agreement, contains the entire agreement between Buyer and Seller concerning the matters set forth herein. No addition or modification of this Addendum or the Agreement shall be effective unless set forth in writing and signed by Buyer and an authorized representative of Seller.

Buyer - Zhiming Xu

Date _____4/15/2023_____

Buyer - Tao Li

Date _____4/15/2023_____

Buyer - _____

Date _____

Buyer - _____

Date _____

SELLER:
LENNAR HOMES LLC
a _____

By: _____

Title: Authorized Representative     Fang Cook

Date Signed by Seller: _____4/19/2023_____

DocuSign Envelope ID: 787233/6-974C-4E45-862E-239D331B1189

Storey Grove

**EXHIBIT "A"**

*PRIVACY POLICY SUMMARY*

This Privacy Policy Summary summarizes certain terms of the Privacy Policy of Lennar Corporation ("Privacy Policy") and our affiliated companies (collectively, "Lennar," "we," "us," "our") collect, use and disclose personal information about visitors to our websites, users of our mobile applications, people we meet in person or by phone, our customers and prospective customers, and others whose personal information we collect and retain ("you," "your," or "our"). Please review the full text of our Privacy Policy at https://www.lennar.com/privacypolicy, or contact us as explained below.

Lennar Affiliates include (among others) Lennar Corporation and all affiliated companies, including but not limited to: the Quarterra Multifamily Communities, LLC, Lennar Commercial, Lennar International, LLC, CalAtlantic Group, LLC, Lennar Mortgage, LLC, CalAtlantic Mortgage, Inc., Lennar Sales Corp., North American Title Insurance Company, LLC, Lennar Title, Inc., Lennar Title, LLC, Lennar Title Group, LLC, Lennar Closing Services, CalAtlantic Title, LLC, CalAtlantic National Title Solutions, LLC, Five Point Communities, WCI Communities, LLC, and Lennar Insurance Agency, LLC (collectively "Lennar Affiliates").

You consent to the terms of our Privacy Policy when you use our online services or provide your personal information to us after receiving this Privacy Policy Summary and an opportunity to review our complete Privacy Policy.

"Personal information" refers to information that identifies you or relates to you as an identifiable individual (such as your name, email address, government-issued identification numbers, Internet Protocol address); consumer information (e.g., telephone number, credit card and bank account numbers); commercial activity records (e.g., credit reports, purchasing history, other Lennar transactions); internet browsing history and other online usage; and geolocation data. Personal information may also include information that does not identify you directly if it is combined with other information in a way that enables you to be identified (such as age, gender, profession, zip code, IP address, mobile device ID, and geolocation data).

Lennar Affiliates use Personal Information for the business and commercial purposes summarized below, but our use of your information is subject to the terms of the Privacy Policy; any specific terms applicable to the services or products you request; your instructions to us that limit the use of certain information when you exercise an "opt-in" or "opt-out" or "unsubscribe" option we provide; and/or the requirements of applicable law. Subject to those limitations, Lennar may use your personal information in the following ways:

1.    Establish, maintain, and service customer accounts; provide customer service; provide financing, title, insurance or other home-purchase related services through Lennar Affiliates, engage in advertising, marketing, and online analytic services.

2.    Process payment information for transactions with Lennar (although we will not retain your credit card information).

3.    Requesting feedback on the customer's experience and offering products and services in the future.

4.    Maintain records of our customers' needs, preferences and interests so that we may assist customers to identify properties and services provided by Lennar and letting them know about services or promotions that may be of interest to them (which may in some cases be provided by Lennar Affiliates or Business Associates), including by email, mail, telephone, or SMS text message. These are marketing messages and you are able to control whether you receive them. To learn how you can choose to stop receiving some or all of these messages, see the section titled "Opt-In/Opt-Out Procedures."

5.    Undertake activities to maintain the quality of Lennar products and services and to improve, upgrade, and enhance those products and services.

6.    Manage our online services to maintain functionality, improve service, detect and prevent malicious activity.

7.    Develop demographic information for statistical and market research and other strategic marketing purposes.

8.    Permit third party advertisers and ad servers to deliver Lennar advertisements to you on other websites you visit as explained herein. This includes, for example, verifying positioning and quality of ad impressions, and auditing compliance with marketing specifications and standards. If you prefer not to receive this form of advertising, see "How We Use and How You Can Limit Use of Cookies and Interest-Based Advertising."

9.    Market our products and services through our websites,  e-mail messaging, online advertising, and offline means.

10.    Manage our contractual relations, protect our business interests, enforce our terms and conditions (https://www.lennar.com/termsandconditions).

11.   Comply with applicable law and legal process.

12.   Undertake a major business transaction subject to appropriate confidentiality protections.

We share or permit access to personal information to our "Service Providers" and "Business Associates" (collectively, "Third Parties"). Service Providers assist us with administrative, technology, data storage, e-mail

DocuSign Envelope ID: 7672357D-974C-4E45-8626-239DD31B1789

Storey Grove ▇▇▇▇▇

services, marketing, and other business operations and may not sell or use personal information from these services for their own purposes. Business Associates are unaffiliated companies we may collaborate with in the homebuilding process or who offer products and services for the home or Community. Business Associates may use personal information for their own commercial purposes, such as marketing products and services related to your new home and may provide monetary or other consideration for access to personal information. When information is sold or exchanged for value, the Third Parties may use the personal information for their own direct marketing or other commercial purposes.

The chart below shows the categories of personal information Lennar disclosed for a business purpose to Service Providers or sold/exchanged with Third Parties during the past 12 months.

| Categories of Personal Information Collected in Past 12 Months | Sources | Availability to Lennar Affiliates; Sale/Exchange with Business Associates; Your Opt-In or Opt-out Rights* |
|---|---|---|
| Contact information: name, postal address, email address, and telephone number | o Your request for information (online or offline)<br>o Your application for home purchase, mortgage, insurance, or other transaction<br>o Lennar Affiliate<br>o Business Associates<br>o Marketing research services | Lennar Affiliates* with prior affirmative consent to use for customer lead generation, direct marketing; market research services;<br><br>Business Associates for customer lead generation, direct marketing; market research services** |
| Personal identifiers: Social security number, government-issued identification number, driver's license and passport number | o Your application for home purchase, mortgage, insurance, or other transaction information | Not shared with Lennar Affiliates or any Third Parties |
| Consumer information: Credit/debit card and bank or other financial account numbers | You (as necessary to complete a transaction) | Not shared with Lennar Affiliates or any Third Parties |
| Commercial information:<br>o Credit reports, purchasing history, public real estate and lien records<br>o Lennar Affiliate transaction history, transaction contract and closing document information. | o Credit reporting agencies<br>o Public records<br>o Lennar Affiliates | o Shared with Lennar Affiliates* with your consent;<br>o Not shared with Business Associates |

7020364v24        04/15/2023 09:18 PM        NATIONAL STANDARD (12-AUG-22)

**A136**

DocuSign Envelope ID: 70723570-97AC-4E45-8B28-336DD31B1769

Storey Grove ████

| Other financial information: income, assets, liabilities, salary and employer information. | o Your application for home purchase, mortgage, insurance, or other transaction<br>o Lennar Affiliate | o Shared with Lennar Affiliates* with your consent<br>o Not shared with Business Associates |
|---|---|---|
| Internet and other electronic network activity:<br>o Internet protocol address, mobile device identifier<br>o Browsing history<br>o Interactions with our websites (such as photos and comments you post) | o Cookies and other internet tracking technologies used on our websites and myLennar Account<br>o E-mail messages | Website analytics and online advertising services that collect website data*** |
| Geolocation data | o Your IP address and mobile device identifier<br>o Specific location data you provide | Business Associates for lead generation, direct marketing and market research services |
| Interested Buyer or Home-Buyer Profile: name, email and/or street address, new home and location interests and preferences; new street address, Lennar community, gender, family members, details about your home purchase, and anticipated closing date; blog comments; photos | o You<br>o Your social media accounts if you provide access** | May be shared with Lennar Affiliates and Business Associates for lead generation, direct marketing and market research services<br>**Opt-out at:** https://www.lennar.com/contact/CommunicationPreferences or by e-mail at privacyinfo@lennar.com |

*You may change your selection at any time at https://www.lennar.com/contact/CommunicationPreferences or by contacting us as explained below. You cannot opt-out of disclosures to Service Providers because they perform business services on behalf of Lennar Affiliates and do not use personal information for their own commercial purposes.

**Business Associates and social media sites are responsible for their own privacy practices, which should be described in their privacy policies and accessible from their marketing communications, websites, or mobile applications.

***You can restrict the automated collection of your online usage data and receipt of personalized ads by managing the preference settings on your browser or device.

*Other reasons for sharing personal information.*
Except as otherwise provided in this Privacy Policy, we may share or disclose personal information to other third parties for the following reasons:

    o To third parties to whom you or authorize us to disclose your personal information.
    o To enforce our contracts and the Terms and Conditions applicable to the use of the Websites.
    o To fulfill your requests including connecting with your social media accounts.
    o To comply with laws or valid legal process and in response to appropriate governmental requests.
    o As we deem reasonably necessary to investigate, prevent or take other action in connection with potential illegal or fraudulent activities or potential risk to the personal safety of any individual or the security of your personal information.
    o As we deem reasonably necessary to in connection with a major business transaction subject to appropriate confidentiality protections.

*Information Sharing with Lennar Affiliates - Your Privacy Rights Under the Fair Credit Reporting Act*

Under Federal law, we are permitted to share information about our own transactions and experiences with you with Lennar Affiliates. However, federal law gives you the right to limit our ability to share information about your

creditworthiness or for marketing purposes with Lennar Affiliates.

<u>Notice of Your Ability to Limit Sharing of Creditworthiness Information with Lennar Affiliates</u>. Information about your creditworthiness includes, for example, your income, assets, and other liabilities that you provide to us or that we obtain from a consumer credit report. We will not share your information about your creditworthiness with Lennar Affiliates.

<u>Notice of Your Choice to Limit Marketing by Lennar Affiliates</u>. You may limit Lennar Affiliates, such as our mortgage lender or broker and insurance companies, from marketing their products or services to you based on personal information that we collect from you and share with them. The types of information we might share with Lennar Affiliates for their marketing purposes include your income, account history, and credit history. You can limit marketing offers from Lennar Affiliates, by visiting https://www.lennar.com/contact/CommunicationPreferences or contacting us by e-mail at privacyinfo@lennar.com. You may change your selections at any time by visiting that webpage.

**Opt-In / Opt-Out Procedures**

In the process of purchasing a Lennar home, you may be interested in receiving information about a variety of related products and services including, but not limited to, home loan, title and homeowner's insurance, security services, and community resource such as telecommunications services and local merchants. When you provide us with your contact information, you will be asked to consent to authorize us to share your personal information with Lennar Affiliates and/or Business Associates to market services relating to the purchase of a home to you. You may change your selection at any time by visiting:  https://www.lennar.com/contact/CommunicationPreferences.

 (Note that you cannot opt-out of disclosures to Service Providers because they perform business services on behalf of Lennar and do not use personal information for their own commercial purposes). If you would like to restrict the automated collection of your personal information while using our websites, mobile apps, and other online services "Online Services"), see the section titled, "How We Use and How You Can Limit Cookies and Interest-Based."

**How We Use and How You Can Limit Cookies and Interest-Based Advertising**

We use cookies and similar technologies on our Online Services all as more particularly provided in the Privacy Policy. We may engage third parties, such as Google Analytics, to collect activity and usage data. To learn more about how Google collects and processes data and the choices Google may offer to control these activities, you may visit:  http://www.google.com/intl/en/policies/privacy/partners/. We may use third-party advertising companies to serve ads when you visit our Online Services all as provided in the Privacy Policy.

**Protecting and Retention of Personal Information**

Lennar maintains administrative, technical and physical safeguards to protect the security, confidentiality, and integrity of your personal information appropriate to the nature of the personal information we collect. While the measures we implement are intended to reduce the likelihood of security problems, we cannot guarantee that these measures will prevent unauthorized access to your personal information. We retain personal information for as long as we reasonably require it for legal or business purposes.

**Rights of California Residents** - This section applies only to residents of the State of California.
California Consumers have the rights described at: https://www.lennar.com/privacypolicy/#ForCaliforniaConsumers. The rights of California consumers include (among others):

> o  To direct Lennar Affiliates not to sell their personal information to others ("Right to Opt-Out");
> o  To know what personal information Lennar Affiliates collected, sold, or disclosed about the consumer or the consumer's household during the last twelve (12) months; and
> o  To request that Lennar delete personal information that Lennar has collected, subject to a range of exclusions permitted by law.

<u>Right to Opt-Out.</u> California consumers have the right to direct a business not to sell their personal information to others ("Right to Opt-Out"). You can exercise your Right to Opt-Out by submitting the webform: https://www.lennar.com/contact/CommunicationPreferences. You may also exercise your Right to Opt-Out by contacting us as described below. Our webform provides several options. You may opt-out of all sales of your personal information regardless of the purpose or category of third party involved. Or, you may opt-in to allow only sales to Lennar Affiliates and/or Business Associates to permit them to market their products or services to you.

**Nevada residents may opt-out** of the sale of personal information by contacting us as explained below.

**Contact us** with your questions about this Privacy Policy or our privacy practices or to change opt-in or opt-out preferences:

| | |
|---|---|
| By email: | privacyinfo@lennar.com |
| By phone: | 1-800-532-6993 |
| Online Preferences webform: | https://www.lennar.com/contact/CommunicationPreferences |
| By postal mail: | 5505 Blue Lagoon Drive, Miami, FL 33126 (Attn:  Privacy Compliance Dept.) |

DocuSign Envelope ID: 7972357E-974C-4E43-8826-238DD31B1199

Storey Grove ████

## PURCHASE PRICE AND PAYMENT ADDENDUM

Buyer(s) Name: Zhiming Xu, Tao Li
Date of Agreement: 04/15/2023
Community: Storey Grove 50     Lot/Block: ████ /
Address: ████████ Winter Garden FL 34787
Plan/Elevation: Simmitano / J     Garage Orientation Preference: Left ☐ Right [X]
Phase/Section:     Job#/Unit Type/Model#: 7116725400
Started (Y/N): Y     Stage: 02
Estimated Start Date: 04/06/2023
NHC: Fang Cook     ISC:
Agreement Type: [X] Primary ☐ Secondary ☐ Investment
Select One: [X] New Agreement ☐ Transfer ☐ Revised Agreement -- Revision #:

### BUYER(S) INFORMATION

Buyer #1: Zhiming Xu     (check one): Married [X] Single ☐
Buyer #1 Existing Address: ████████ Winter Garden FL / US 34787
Home Phone:     Office Phone:     Cellular Phone: ████
Email: ████@gmail.com

Buyer #2: Tao Li     (check one): Married [X] Single ☐
Buyer #2 Existing Address: ████████ Winter Garden FL / US 34787
Home Phone:     Office Phone:     Cellular Phone: ████
Email: ████@gmail.com

Buyer #3:     (check one): Married ☐ Single ☐
Buyer #3 Existing Address:
Home Phone:     Office Phone:     Cellular Phone:
Email:

Buyer #4:     (check one): Married ☐ Single ☐
Buyer #4 Existing Address:
Home Phone:     Office Phone:     Cellular Phone:
Email:

### PURCHASE PRICE AND PAYMENTS

#### PURCHASE PRICE:

| | | |
|---|---|---|
| Base Purchase Price | $ | 582,490.00 |
| Add: Homesite Premium | $ | 16,000.00 |
| Add: Options, Upgrades and Extras per Change Order Summary: | $ | 15,010.00 |
| **Total Purchase Price** | $ | 613,500.00 |

#### PAYMENTS:

| | | | | |
|---|---|---|---|---|
| Initial Deposit | | Check# | $ | 30,675.00 |

Additional Deposit

| | | | | |
|---|---|---|---|---|
| Due | Received | Check# | $ | .00 |
| Due | Received | Check# | $ | .00 |
| Due | Received | Check# | $ | .00 |
| Due | Received | Check# | $ | .00 |

Advanced Payment for Options, Extras and/or Upgrades

| | | | | |
|---|---|---|---|---|
| Due | Received | Check# | $ | .00 |
| Due | Received | Check# | $ | .00 |

| | | |
|---|---|---|
| **Total Payments:** | $ | 30,675.00 |
| **Amount to be financed or paid by wire transfer of immediately available funds at closing (approximate)** | $ | 582,825.00 |

(Total Purchase Price less total payments does not include FHA Funding Fee, VA Funding Fee, MIP, PMI, closing costs, pre-paids, homeowner insurance, prorated expenses, Builder's Fee, homeowners association fees and other fees).

#### CLOSING COSTS, PRE-PAIDS AND OTHER FEES:

| | | |
|---|---|---|
| Seller Assistance toward Settlement (subject to contribution limits and Lender approval, as applicable): | $ | 15,000.00 |

Buyer's closing costs, pre-paids and other fees associated with the purchase of the Home are described in the Rider B. If Buyer obtains financing for the Home, Buyer's closing costs, pre-paids and other fees associated with the financing of the Home are described in the Loan Estimate provided by the Lender.

### WARRANTY INFORMATION

LEN 210 5/2/12
*Or other comparable warranty

Page: 1 of 2

6572629v12     04/15/2023 09:18 PM     Orlando, Florida (06-JAN-22)

**A139**

DocuSign Envelope ID: 7672357D-974C-4E4S-8626-239DD31B1159

Storey Grove

## FINANCING AND BROKER INFORMATION

Select One: ☐ Cash   ☒ Conventional   ☐ FHA   ☐ VA   ☐ OTHER:

Lender: HomeTown Lenders                              Phone #: 407-508-0973
**Address: 1000 Legion PL, Suite 800, Orlando, FL 32801**      Fax #:
Agent Name: Rose Gibb                                 Cellular #:
Email Address: ████@htlenders.com

Broker Participation? ☒ Yes   ☐ No
Agent/Company: Tao Li / TOPSKY REALTY INC
Street Address: 7901 4th Street North, Suite 300
City, State Zip: St. Petersburg, FL 33702
Phone #: ████                     Email Address: ████@gmail.com
Fax #:
Sales Associate License No.: 3524036
Broker Tax ID#: 92-1748957          Broker Commission: $.00 or 3.00 % of Total Purchase Price less Seller
                                    Assistance if any.
Additional Broker Bonus/Incentive: $.00

**Defined Terms.** All initially capitalized terms not defined herein shall have the meanings set forth in the Purchase and Sale Agreement between Buyer and Seller dated as of the fifteenth day of April, 2023 (the "**Agreement**"), and all references in this Addendum to the Agreement shall be deemed to include references to this Addendum and to any other addenda and riders attached to the Agreement, which are hereby incorporated by this reference.

**Counterparts.** This Addendum shall be validly executed when signed in counterpart; a complete set of which shall form a single document. Signatures may be given via electronic transmission and shall be deemed original and given as of the date and time of the transmission of this Addendum electronically to the other party.

**Conflicts.** In the event of any conflict between this Addendum and the Agreement, this Addendum shall control. In all other respects, the Agreement shall remain in full force and effect.

**Defined Terms.** All initially capitalized terms not defined herein shall have the meanings set forth in the Purchase and Sale Agreement between Buyer and Seller dated as of the fifteenth day of April, 2023 (the "**Agreement**"), and all references in this Addendum to the Agreement shall be deemed to include references to this Addendum and to any other addenda and riders attached to the Agreement, which are hereby incorporated by this reference.

**Counterparts.** This Addendum shall be validly executed when signed in counterpart; a complete set of which shall form a single document. Signatures may be given via electronic transmission and shall be deemed original and given as of the date and time of the transmission of this Addendum electronically to the other party.

**Conflicts.** In the event of any conflict between this Addendum and the Agreement, this Addendum shall control. In all other respects, the Agreement shall remain in full force and effect.

**Entire Agreement.** The Agreement, together with this Addendum and any other addenda and riders to the Agreement, contains the entire agreement between Buyer and Seller concerning the matters set forth herein. No addition or modification of this Addendum or the Agreement shall be effective unless set forth in writing and signed by Buyer and an authorized Seller.

DocuSigned by:
*Zhiming Xu*
CAC02890A091D4B8...
Buyer - Zhiming  Xu
Date    4/15/2023

DocuSigned by:
*Tao Li*
11401E832A194E7...
Buyer - Tao Li
Date    4/15/2023

Buyer -                                      Buyer -
Date                                         Date

SELLER:
LENNAR HOMES LLC
a

DocuSigned by:
*Fang Cook*
282B0883B2207487...
By
Title: Authorized Representative      Fang Cook
Date Signed by Seller:    4/19/2023

6572629v12               04/15/2023 09:18 PM

**A140**

# Tab 21-4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

YIFAN SHEN, an individual,
ZHIMING XU, an individual, XINXI
WANG, an individual, YONGXIN
LIU, an individual, and MULTI-
CHOICE REALTY LLC, a limited
liability corporation,

       *Plaintiffs*,

v.

ASHLEY MOODY, in her official
capacity as Attorney General of the
State of Florida, WILTON SIMPSON,
in his official capacity as
Commissioner of Agriculture for the
Florida Department of Agriculture and
Consumer Affairs, MEREDITH IVEY,
in her official capacity as Acting
Secretary of the Florida Department of
Economic Opportunity, PATRICIA
FITZGERALD, in her official capacity
as Chair of the Florida Real Estate
Commission, R.J. LARIZZA, in his
official capacity as State Attorney for
the 7th Judicial Circuit, MONIQUE
WORRELL, in her official capacity as
State Attorney for the 9th Judicial
Circuit, KATHERINE RUNDLE, in her
official capacity as State Attorney for
the 11th Judicial Circuit,

       *Defendants*.

Case No. 4:23-cv-208-AW-MAF

- 1 -

**A142**

## <u>DECLARATION OF XINXI WANG</u>

I, Xinxi Wang, hereby declare as follows:

1.     I am a plaintiff in the above-captioned action, and I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

### A.     Personal Background

2.     I am a 29-year-old woman of Asian descent and Chinese ethnicity.

3.     I am a citizen of the People's Republic of China.

4.     I am neither a member of the Chinese government nor a member of the Chinese Communist Party.

5.     I have lived in the United States since August 2017.

6.     I am neither a United States citizen nor a permanent resident of the United States.

7.     I currently have permission to stay and live in the United States as a holder of a valid F-1 visa, which is a nonimmigrant visa for international students.

8.     I have not applied for permanent residency status in the United States.

9.     I have lived in Florida since August 2017. Except for some recreational travel, I have continuously lived in Florida for the past five years.

10.     In Florida, I live with my one-year daughter, who is a U.S. Citizen.

11.     I am currently pursuing my Ph.D. degree in earth systems science at a university in Miami. My studies are focused on improving the ability to forecast hazardous weather formed from the ocean. In particular, the goal of my academic work is to help residents of coastal regions, especially people in Florida, survive coastal hazards, such as the landfalling of hurricanes, flooding, and extreme winds that can otherwise threaten the lives and health of coastal communities and habitats.

## B.      Property Interests in Florida

12.    I am a homeowner; I own my current residence in Miami, Florida, where I have lived for more than five years.

13.    The driving distance between my home and my lab at the university is only about ten minutes, which is one of the things I love about my current home.

## C.      Irreparable Harm Caused by Florida's New Alien Land Law

14.    I learned about the new Florida law, which is the subject of this lawsuit, from people I know, as well as from news and media reports. I have read the new law, read articles about it, and discussed it with others to try to understand what it means.

15.    Based on my understanding, two independent provisions of Florida's New Alien Land Law require me to register my current property with the Florida Department of Economic Opportunity because I am Chinese. One provision requires me to register because I own real estate in Florida and am from China. A second provision, which applies to people from China and six other countries, requires me to register because my property appears to be located within ten miles of a critical infrastructure facility.

16.    These registration requirements are burdensome, discriminatory, and stigmatizing to me. I am very worried that this registration will be used to target me, discriminate against me, monitor me, and generally harass me as a Chinese homeowner.

17.    I came to the United States to pursue education and opportunity offered in this country, but now I feel I am being targeted by the law simply because where I came from, my ancestry, and my alienage status. The law stigmatizes me and wrongly treats me as suspicious because I am Chinese, which is extremely distressing to me.

18.    Before the new Florida law was passed, I had already experienced incidents of racial discrimination in Florida against me just because I am Chinese.

I am very fearful that my daughter and I will be subject to worsening racial hatred in Florida because the new law singles out Chinese people.

19.    I am also very worried about my future ability to make another property purchase in Florida, even to move within the state by selling my current home and buying a new home in Florida. Even though the new law contains an exception allowing certain people to purchase one residential property up to two acres in size and not within five miles of a military installation, that exception does not apply to me as someone who currently owns real estate in Florida—and it is unclear if it would apply even if I were to sell my existing property. In addition, even if I become eligible for the exception after selling my current property, the new law is very unclear about the areas where I can legally purchase a home in Florida without risking criminal prosecution. It is extremely difficult to understand where I can safely purchase a property in the state because the definitions of "critical infrastructure" and "military installation" are ambiguous and very broad. I am very fearful that I could inadvertently purchase a home that violates the law and could be arrested and charged with a felony. If I were convicted, I could face up to five years in prison and a fine of $5,000, plus immigration consequences.  On top of that, the property could be forfeited.

20.    Relatedly, I am also very worried that I will be discriminated against by future sellers and real estate agents if I sell my current property and seek to purchase another home, because of their fear of the risk of violating the law and because I am Chinese. I believe that my search for real estate will be more costly, time-consuming, and burdensome under the new law because I am Chinese. The new law will cast a cloud of suspicion over me as a Chinese person.

21.    With respect to the possible criminal sanctions for violating the law, even inadvertently, I am very worried about the impact that being incarcerated could have on my life. Not only would being incarcerated deprive me of my freedom and basic liberties, but it would interrupt my income, derail my academic

studies, and would certainly harm my family, especially, my daughter, who is only one-year old. I am also worried about the immigration consequences if I am criminally convicted and jailed.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this  fourth  day of June, 2023.

Xinxi Wang

Tab 21-5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| YIFAN SHEN, an individual, ZHIMING XU, an individual, XINXI WANG, an individual, YONGXIN LIU, an individual, and MULTI-CHOICE REALTY LLC, a limited liability corporation, | |
| *Plaintiffs*, | |
| v. | Case No. 4:23-cv-208-AW-MAF |
| ASHLEY MOODY, in her official capacity as Attorney General of the State of Florida, WILTON SIMPSON, in his official capacity as Commissioner of Agriculture for the Florida Department of Agriculture and Consumer Affairs, MEREDITH IVEY, in her official capacity as Acting Secretary of the Florida Department of Economic Opportunity, PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission, R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit, KATHERINE RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit, | |
| *Defendants*. | |

**A148**

## DECLARATION OF YONGXIN LIU

I, Yongxin Liu, hereby declare as follows:

1.      I am a plaintiff in the above-captioned action, and I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

### A.      Personal Background

2.      I am a 34-year-old man of Asian descent and Chinese ethnicity.

3.      I am a native-born citizen of the People's Republic of China.

4.      I am neither a member of the Chinese government nor a member of the Chinese Communist Party.

5.      I have lived in the United States since August 2018.

6.      I am neither a United States citizen nor a permanent resident of the United States.

7.      I currently have permission to stay and live in the United States as a holder of a valid H-1B visa, which is a nonimmigrant worker visa.

8.      I have not yet applied for permanent residency status in the United States, but I plan to do so and my hope is to remain in the United States.

9.      I have lived in Florida since August 2018. Except for a nine-month period of time from August 2021 to May 2022, I have continuously lived in Florida for the past year and for a period of three years prior to that.

10.      I am an assistant professor at a Florida university in the field of data science. I teach both undergraduate and graduate-level science courses, as well as courses on cybersecurity. I also conduct research, with the majority of my work focusing on fundamental technologies of interconnected domain of artificial intelligence and information security.

11.      I am also part of the Institute of Electrical and Electronics Engineers

(IEEE), which is a prestigious global technical professional organization dedicated to advancing technology for the benefit of humanity. IEEE has chapters in Florida, and I am an active senior member.

### B.     Property Interests in Florida

12.     I am a homeowner; I own my current residence in Daytona Beach, Florida, where I have lived for about nine months.

13.     I am currently planning to purchase a second property in Pelican Bay, Florida as an investment property and vacation home for myself and my parents.

### C.     Irreparable Harm to Me Caused by Florida's New Alien Land Law

14.     I am aware that Senate Bill 264 (hereinafter, "Florida's New Alien Land Law") was recently passed in Florida and signed into law on May 8, 2023, which is the subject of this lawsuit. I learned about the new law from people I know, as well as from news and media reports. I have read the new law, read articles about it, and discussed it with others to try to understand what it means.

15.     Based on my understanding, two independent provisions of Florida's New Alien Land Law require me to register my current property with the Florida Department of Economic Opportunity because I am Chinese. One provision requires me to register because I own real estate in Florida and am from China. A second provision, which applies to people from China and six other countries, requires me to register because my property appears to be located within ten miles of a critical infrastructure facility.

16.     These registration requirements are burdensome, discriminatory, and stigmatizing to me. I am very worried that this registration will be used to target me, discriminate against me, monitor me, and generally harass me as a Chinese homeowner.

17.     I feel that as a Chinese person, I have been singled out and targeted by the law simply because of where I came from, my ancestry, and my alienage

status. The law stigmatizes me and wrongly treats me as suspicious because I am Chinese, which is extremely distressing to me.

18.     Based on my understanding, Florida's New Alien Land Law will also prohibit me from purchasing the second property in Pelican Bay, Florida, that I planned to use as an investment property and vacation home for myself and my parents because I am Chinese. Because I currently own real estate in Florida and am from China, the law prohibits me from purchasing any additional property in the state after July 1, 2023, so I will be forced to abandon my planned purchase. I am extremely distressed at the prospect of never being able to purchase additional property in Florida.

19.     In recent years, Chinese immigrants and Asian Americans in general have become targets of racial hatred and violence because of the rising tension between the United States and China. In the academic field, numerous Chinese American professors and scientists have been subject to unfair investigations and prosecutions by the federal government because of unfounded suspicion of illegitimate ties with the Chinese government. I fear that the new law in Florida will fan the flames of racial hatred against Chinese immigrants and Asian Americans in general.

20.     I am also very worried about my future ability to make another property purchase in Florida, even to move within the state by selling my current home and buying a new home in Florida. Even though the new law contains an exception allowing certain people to purchase one residential property up to two acres in size and not within five miles of a military installation, that exception does not apply to me as someone who currently owns real estate in Florida—and it is unclear if it would apply even if I were to sell my existing property. In addition, even if I become eligible for the exception after selling my current property, the new law is very unclear about the areas where I can legally purchase a home in Florida without risking criminal prosecution. It is extremely difficult to

understand where I can safely purchase a property in the state because the definitions of "critical infrastructure" and "military installation" are ambiguous and very broad. I am very fearful that I could inadvertently purchase a home that violates the law and could be arrested and charged with a felony. If I were convicted, I could face up to five years in prison and a fine of $5,000, plus immigration consequences.  On top of that, the property could be forfeited.

21.    Relatedly, I am also very worried that I will be discriminated against by future sellers and real estate agents if I sell my property and seek to purchase another home, because of their fear of the risk of violating the law and because I am Chinese. I believe that my search for real estate will be more costly, time-consuming, and burdensome under the new law because I am Chinese. The new law will cast a cloud of suspicion over me as a Chinese person.

22.    With respect to the possible criminal sanctions for violating the law, even inadvertently, I am very worried about the impact that being incarcerated could have on my life. Not only would being incarcerated deprive me of my freedom and basic liberties, but it would interrupt my income and destroy my career in academia.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this ___5th___ day of June, 2023.

_____
Yongxin Liu

- 5 -                                                                              **A152**

# Tab 21-6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| YIFAN SHEN, an individual, ZHIMING XU, an individual, XINXI WANG, an individual, YONGXIN LIU, an individual, and MULTI-CHOICE REALTY LLC, a limited liability corporation, | |
| *Plaintiffs*, | |
| v. | Case No. 4:23-cv-208-AW-MAF |
| ASHLEY MOODY, in her official capacity as Attorney General of the State of Florida, WILTON SIMPSON, in his official capacity as Commissioner of Agriculture for the Florida Department of Agriculture and Consumer Affairs, MEREDITH IVEY, in her official capacity as Acting Secretary of the Florida Department of Economic Opportunity, PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission, R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit, KATHERINE RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit, | |
| *Defendants*. | |

**A154**

## DECLARATION OF JIAN SONG

I, Jian Song, hereby declare as follows:

1.     I am authorized on behalf of Multi-Choice Realty, LLC ("Multi-Choice Realty"), a plaintiff in the above-captioned action, to make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

2.     I am a naturalized citizen of the United States and have lived in Florida for the past 11 years with my wife and two children.

3.     Multi-Choice Realty is a limited liability company organized under the laws of the State of Florida with its principal place of business in Clermont, Florida. It was first registered in Florida in 2009.

4.     Multi-Choice Realty is a privately held company owned by my wife and me. I am also the manager of Multi-Choice Realty.

5.     Multi-Choice Realty is licensed real estate brokerage firm that primarily serves Chinese-speaking clients in the United States, China, and Canada.

6.     Multi-Choice Realty has approximately 14 employees, including real estate agents, on its payroll. I am very proud of being a small business owner in Florida and creating local jobs in my community.

7.     Multi-Choice Realty is not owned or controlled by the Chinese government or the Chinese Communist Party.

8.     I am neither a member of the Chinese government nor a member of the Chinese Communist Party.

9.     In 2022, Multi-Choice Realty was involved in 74 real estate acquisitions. The majority of these acquisitions were for clients who were Chinese or Chinese American.

10.    I am aware that Senate Bill 264 was recently passed in Florida and signed into law on May 8, 2023. SB 264 contains a new law, which is the subject of this lawsuit (hereinafter, "Florida's New Alien Land Law"). I learned about the new law from people I know, as well as from news and media reports. I have read the new law, read articles about it, and discussed it with others to try to understand what it means.

11.    Based on my understanding, Florida's New Alien Land Law will directly impact Multi-Choice Realty's existing customers, as well as many of its potential clients. In particular, it will impact Multi-Choice Realty's Chinese customers who are neither citizens nor permanent residents of the United States.

12.    As to those customers who already own real estate in Florida, the new law will require them to register their properties with the Florida Department of Economic Opportunity, and it will prohibit them from purchasing additional property. In addition, if any of those customers are interested in selling their properties, the new law will impose restrictions on who can and cannot buy that property in Florida. If any of those customers were to sell to someone in violation of the new law, they could be arrested and charged with a misdemeanor. If convicted, they could face up to one year in prison and a fine of $1,000, plus immigration consequences. Likewise, my company could be exposed to the same criminal culpability for facilitating, that is, "aiding and abetting" such a sale, which could implicate not only my wife and me as co-owners, but also the real estate agents on our payroll.

13.    With respect to Multi-Choice Realty's potential Chinese customers who are neither citizens nor permanent residents of the United States, but who are interested in purchasing real estate in Florida, the new law will severely restrict them from making such a purchase after July 1, 2023. Even though the new law contains an exception allowing certain people to purchase one residential property

up to two acres in size and not within five miles of a military installation, that exception is very narrow. In addition, even for customers who may be eligible for the exception, the new law is unclear about the areas where they can legally purchase a home in Florida without risking criminal prosecution. It is extremely difficult to understand where Multi-Choice Realty's clients can safely purchase a property in the state because the definitions of "critical infrastructure" and "military installation" are ambiguous and very broad. I am very fearful that one of our clients could inadvertently purchase a home that violates the law and could be arrested and charged with a felony. If they were convicted, they could face up to five years in prison and a fine of $5,000, plus immigration consequences. On top of that, the property could be forfeited. In addition, my company could be exposed to the same criminal liability for "aiding and abetting" such a purchase, which could implicate not only my wife and me as co-owners, but the people on our payroll. With respect to the possible criminal sanctions for violating the law, even inadvertently, I am very worried about the potential impact on my business.

14.    Ultimately, as a result of the new law, Multi-Choice Realty stands to lose an estimated 25 percent of its business. These losses will reflect the fact that Multi-Choice Realty will not be able to facilitate real estate transactions that would close after July 1, 2023, for some of its existing customers who are searching for properties to purchase, and will not be able to represent new customers in future transactions that are now barred under Florida's New Alien Land Law.

15.    If the law goes into effect, I expect that Multi-Choice Realty will immediately lose prospective customers and income. In the time since the new law was signed by Governor DeSantis on May 8, 2023, the number of inquiries from prospective buyers have decreased substantially, as compared to this time last year.

**A157**

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this __5th__ day of June, 2023.

*/s/ Jian Song*

Jian Song

**A158**