No. 23-12737

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

YIFAN SHEN, et al.,

*Plaintiffs–Appellants,*

v.

WILTON SIMPSON, in his official capacity as
Florida Commissioner of Agriculture, et al.,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:23-cv-208 (Winsor, A.)

## APPENDIX TO PLAINTIFFS–APPELLANTS' PRINCIPAL BRIEF,
## VOLUME II

Ashley Gorski
Patrick Toomey
Shaiba Rather
Omar Jadwat
Sidra Mahfooz
Noor Zafar
**AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org

Keliang (Clay) Zhu
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Derek L. Shaffer
**QUINN EMANUEL URQUHART &
    SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Counsel list continued on the
following page.*

Cody Wofsy
**AMERICAN CIVIL LIBERTIES**
  **UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
cwofsy@aclu.org

Daniel B. Tilley
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Bethany Y. Li
Elizabeth Koo
Razeen Zaman
**ASIAN AMERICAN LEGAL**
  **DEFENSE AND EDUCATION**
  **FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org

Nicholas L.V. Warren
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

*Attorneys for Plaintiffs–Appellants*

**No. 23-12737**
*Shen, et al. v. Simpson, et al.*
**United States Court of Appeals for the Eleventh Circuit**

**TABLE OF CONTENTS**

**APPENDIX VOL. I**

| Docket/ Tab No. | Document Title | Page(s) |
|---|---|---|
| A | Docket Sheet, U.S. District Court for the Northern District of Florida, Case No. 4:23-cv-00208-AW-MAF | A1 |
| 1 | Plaintiffs' Complaint (May 22, 2023) | A10 |
| 17 | Plaintiffs' First Amended Complaint (June 5, 2023) | A52 |
| 21-2 | Declaration of Plaintiff Yifan Shen (June 6, 2023) | A97 |
| 21-3 | Declaration of Plaintiff Zhiming Xu (June 6, 2023) | A116 |
| 21-4 | Declaration of Plaintiff Xinxi Wang (June 6, 2023) | A141 |
| 21-5 | Declaration of Plaintiff Yongxin Liu (June 6, 2023) | A147 |
| 21-6 | Declaration of Jian Song, Owner of Plaintiff Multi-Choice Realty, LLC (June 6, 2023) | A153 |

**APPENDIX VOL. II**

| | | |
|---|---|---|
| 21-7[1] | Declaration of Keliang Zhu, Counsel of Record for Plaintiffs, Attorney at DeHeng Law Offices PC (June 6, 2023), Exhibit Nos. 1, 8, 18, 21, 32, 36, 38, 41 | A159 |

---

[1] Includes an abridged selection of the exhibits originally attached to the declaration.

| 54 | Statement of Interest of the United States in Support of Plaintiffs' Motion for Preliminary Injunction (June 27, 2023) | A285 |
|----|---|---|
| 65-1 | Supplemental Declaration of Jian Song, Owner of Plaintiff Multi-Choice Realty, LLC (July 11, 2023) | A308 |
| 69 | U.S. District Court for the Northern District of Florida, District Court Order Denying Plaintiffs' Emergency Motion for a Preliminary Injunction (Aug 17, 2023) | A321 |
| 72 | U.S. District Court for the Northern District of Florida, District Court Order Denying Plaintiffs' Emergency Motion for an Injunction Pending Appeal (Aug 23, 2023) | A373 |

Tab 21-7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, *et al.*,

          *Plaintiffs*,

v.

WILTON SIMPSON, *etc., et al.*,

          *Defendants*.

Case No. 4:23-cv-208

## <u>DECLARATION OF KELIANG ZHU</u>

I, Keliang Zhu, hereby declare as follows:

1.      I am an attorney, duly licensed to practice law in the State of California and my motion for *pro hac vice* admission is pending before this Court. I am an attorney at DeHeng Law Offices PC, counsel of record for Plaintiffs in the above-captioned action. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify thereto.

### <u>Statements to the Press & Via Social Media</u>

2.      The following materials relate to statements made on or about September 22, 2022:

      a.      **<u>Exhibit 1</u>**: A true and correct copy of a press release, dated

**A160**

September 22, 2022, titled "Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida through New Action," available at https://www.flgov.com/2022/09/22/governor-ron-desantis-counteracts-malign-influence-by-china-and-other-hostile-nations-in-florida-through-new-action/.

b.    **Exhibit 2**: A true and correct copy of an announcement, released on September 22, 2022, titled "Stop CCP Influence," available at https://www.flgov.com/wp-content/uploads/2022/09/9.22-Stop-CCP-Influence.pdf.

c.    **Exhibit 3**: A transcript of portions of a video recording of remarks made by Florida Governor Ron DeSantis at press conference on September 22, 2022, titled "Governor's Press Conference on Restrictions Against Foreign Countries." The complete video recording is available at https://thefloridachannel.org/videos/9-22-22-governors-press-conference-on-restrictions-against-foreign-countries/. The transcript is of the following portions of the video recording, which are identified herein by their timestamps: 06:29 to 06:58, 11:16 to 12:39, 12:48 to 13:11, and 13:27 to 14:01.

3.    The following materials relate to statements made on or about December 9, 2022:

a.     **Exhibit 4**: A true and correct copy of a press release, dated December 9, 2022, titled "Senator Jay Collins Teams Up With Agriculture Commissioner-Elect Wilton Simpson and Rep. David Borrero to Restrict Foreign Control of Florida Agriculture Land and Land Surrounding Military Bases," available at https://www.flsenate.gov/Media/PressRelease/Show/4378.

b.     **Exhibit 5**: A true and correct copy of a news article published by Florida's Voice, dated December 9, 2022, titled "Agriculture Commissioner-Elect Wilton Simpson Announces Plan to Ban Foreign Control of Florida Land," available at https://flvoicenews.com/wilton-simpson-foreign/.

c.     **Exhibit 6**: A true and correct copy of a news article, published by Fox 13 News, dated December 9, 2022, titled "Florida's new agricultural commissioner wants to ban foreign agricultural land sales," available at https://www.fox13news.com/news/floridas-new-agriculture-commissioner-wants-to-ban-foreign-ag-land-sales. The news article quotes statements made by Florida Commissioner Wilton Simpson which were also recorded on video; the video recording corresponding to the news article is available on the foregoing webpage.

d.     **Exhibit 7**: A true and correct copy of a statement made by

**A162**

Florida Senator Jay Collins via his verified Twitter account, @JayCollinsFL,

on   December   9,   2022   at   2:29   p.m.,   available   at

https://twitter.com/JayCollinsFL/status/1601313013772210178.

4.     The following materials relate to statements on or about January 10,

2023:

a.     **Exhibit 8**: A transcript of portions of a video recording of

remarks by Florida Governor Ron DeSantis at a press conference on January

10, 2023, titled "Governor's Press Conference on Conservation." The

complete video recording of the press conference is available at

https://thefloridachannel.org/videos/1-10-23-governors-press-

conference-on-conservation/. The transcript is of the following portions of

the video recording, which are identified herein by their timestamps:  38:55

to 40:17.

5.     The following materials relate to statements made on or about

February 7, 2023:

a.     **Exhibit 9**: A true and correct copy of a news article published

by   Florida's   Voice,   dated   February   7,   2022,   titled   "Agriculture

commissioner's agenda includes protecting farmland, defending Second

Amendment,"   available   at   https://flvoicenews.com/agriculture-

commissioner-agenda-includes-protecting-farmland-defending-second-

amendment/.

6.     The following materials relate to statements on or about March 3, 2023:

    a.     **Exhibit 10**: A true and correct copy of a statement made by Florida Senator Jay Collins via his verified Twitter account, @JayCollinsFL, on March 3, 2023 at 1:53 p.m., available at https://twitter.com/JayCollinsFL/status/1631744564485652484.

    b.     **Exhibit 11**: A true and correct copy of a statement made by Florida Commissioner of Agriculture Wilton Simpson via his verified Twitter account, @WiltonSimpson, on March 3, 2023 at 3:55 p.m., available at https://twitter.com/WiltonSimpson/status/1631775058241699842.

7.     The following materials relate to statements made on or about March 7, 2023:

    a.     A video recording of the joint legislative session of the Florida Senate and Florida House of Representatives for Florida Governor Ron DeSantis's "State of the State Address" is available at https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8536.

    b.     **Exhibit 12**: A true and correct copy of a press release, dated March 7, 2023, titled "Governor Ron DeSantis Delivers State of the State Address," available at https://www.flgov.com/2023/03/07/governor-ron-

desantis-delivers-state-of-the-state-address/.

c.      **Exhibit 13**: A true and correct copy of a statement made by Florida Senator Jay Collins via his verified Twitter account, @JayCollinsFL, on March 7, 2023 at 12:20 p.m., available at https://twitter.com/JayCollinsFL/status/1633170801607188487.

8.      The following materials relate to statements made on or about March 7, 2023:

a.      **Exhibit 14**: A true and correct copy of a statement made by Florida Commissioner of Agriculture Wilton Simpson via his verified Twitter account, @WiltonSimpson, on March 15, 2023 at 10:22 a.m., available at https://twitter.com/WiltonSimpson/status/1636025075622182912.

9.      The following materials relate to statements on or about April 11, 2023:

a.      **Exhibit 15**: A true and correct copy of a statement made by Florida Senator Jay Collins via his verified Twitter account, @JayCollinsFL, on April 11, 2023 at 4:41 p.m., available at https://twitter.com/JayCollinsFL/status/1645904817515290625.

b.      **Exhibit 16**: A true and correct copy of a statement made by Florida Commissioner of Agriculture Wilton Simpson via his verified

**A165**

Twitter account, @WiltonSimpson, on April 11, 2023 at 6:30 p.m., which is available                                                                                    at https://twitter.com/WiltonSimpson/status/1645932382577467392.

     c.    **Exhibit 17**: A transcript of portions of a video recording of an interview by Fox Business News on April 11, 2023 of Florida Senator Jay Collins    by    reporter    Jackie    DeAngelis,    available    at https://www.foxbusiness.com/video/6324622889112.

10.    The    following    materials    relate    to    statements    on    or    about April 12, 2023:

     a.    **Exhibit 18**: A true and correct copy of a statement made by Florida Senator Jay Collins via his verified Twitter account, @JayCollinsFL, on    April    12,    2023    at    8:19    a.m.,    available    at https://twitter.com/JayCollinsFL/status/1646140972672090118.

11.    The following materials relate to statements on or about May 5, 2023:

     a.    **Exhibit 19**: A true and correct copy of a press release dated May 5, 2023, titled "Governor Ron DeSantis Celebrates Historic Success During the 2023 Legislative Session," available on the Florida Governor's website at    https://www.flgov.com/2023/05/05/governor-ron-desantis-celebrates-historic-success-during-the-2023-legislative-session/.

12.    The following materials relate to statements on or about May 5, 2023:

**A166**

a.   **Exhibit 20**: A true and correct copy of a statement made by Florida Governor via his verified Twitter account, @GovRonDeSantis, on May 6, 2023 at 9:00 a.m., available at https://twitter.com/GovRonDeSantis/status/1654848502378422273?cxt=H HwWgoDT1b78mfctAAAA.

13.   The following materials relate to statements on or about May 8, 2023:

a.   **Exhibit 21**: A true and correct copy of a press release dated May 8, 2023, titled "Governor Ron DeSantis Cracks Down on Communist China," available on the Florida Governor's website at https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.

d.   **Exhibit 22**: A true and correct copy of an announcement released on May 8, 2023, titled "Stop CCP Influence," which is available on the Florida Governor's website at https://www.flgov.com/wp-content/uploads/2023/05/Stop-CCP-Influence-2023.pdf.

e.   **Exhibit 23**: A transcript of portions of a video recording of remarks by Florida Governor Ron DeSantis, Florida Commissioner of Agriculture Wilton Simpson, Florida Senator Jay Collins, Florida House Representative David Borrero, and others at a press conference on May 8, 2023, titled "Signing of Foreign Entities Legislation." The full video

- 8 -

**A167**

recording of press conference is available on the website of the Florida government-access channel at https://thefloridachannel.org/videos/5-8-23-signing-of-foreign-entities-legislation/. The transcript is of the following portions of the video recording: 07:13 to 07:24, 09:02 to 09:53, 10:43 to 12:04, 15:27 to 15:39, 17:08 to 17:52, 24:04 to 25:31, 31:28 to 31:50, 32:09 to 34:01, and 37:58 to 39:09.

f.      **Exhibit 24**: A true and correct copy of a statement made by Florida Governor via his verified Twitter account, @GovRonDeSantis, on May 8, 2023 at 10:18 a.m., available at https://twitter.com/GovRonDeSantis/status/1655593116806569984?cxt=H HwWgICzveDK7PktAAAA.

g.      **Exhibit 25**: A true and correct copy of a statement made by Florida Governor via his verified Twitter account, @GovRonDeSantis, on May 8, 2023 at 11:00 a.m., available at https://twitter.com/GovRonDeSantis/status/1655603599102078976?cxt=H HwWgMCz1fOs8fktAAAA.

h.      **Exhibit 26**: A true and correct copy of a statement made by Florida Commissioner of Agriculture Wilton Simpson via his verified Twitter account, @WiltonSimpson, on May 8, 2023 at 12:56 p.m., available at

**A168**

https://twitter.com/WiltonSimpson/status/1655632709929033738?cxt=HH

wWlICznbDL_vktAAAA.

        i.     **Exhibit 27**: A true and correct copy of a statement made by

Florida Governor via his verified Twitter account, @GovRonDeSantis, on

May      8,      2023      at      4:31      p.m.,      available      at

https://twitter.com/GovRonDeSantis/status/1655686919588659200?cxt=H

HwWgIC-1eWel_otAAAA.

        j.     **Exhibit 28**: A true and correct copy of a statement by Florida

House Representative David Borrero, made via his verified Twitter account,

@DavidBorreroFL, on May 8, 2023 at 6:01 p.m., available at

https://twitter.com/DavidBorreroFL/status/1655709438152417282?cxt=HH

wWhICxhca9ofotAAAA.

14.    The following materials relate to statements on or about May 9, 2023:

        a.     **Exhibit 29**: A true and correct copy of a statement by Florida

Senator Jay Collins, made via his verified Twitter account, @JayCollinsFL,

on      May      9,      2023      at      4:23      p.m.,      available      at

https://twitter.com/JayCollinsFL/status/1656047213204652056?cxt=HHw

WsIC2pdKKu_stAAAA.

## **Legislative Materials**

15.    **Exhibit 30** is a true and correct copy of a summary of the Bill History

of   Senate   Bill   264   ("SB   264"),   available   at
https://www.flsenate.gov/Session/Bill/2023/264/ByCategory/?Tab=BillHistory.

16.   The following materials relate to legislative activities on or about
March 2, 2023:

a.   **Exhibit 31** is a true and correct copy of the Original Filed
version of SB 264, which was filed on or about March 2, 2023, available at
https://flsenate.gov/Session/Bill/2023/264/BillText/Filed/PDF.

17.   The following materials relate to legislative activities on or about
March 13, 2023:

a.   **Exhibit 32**: A true and correct copy of a pre-meeting document,
dated March 13, 2023, prepared by the Judiciary Committee of the Florida
Senate, titled "Bill Analysis and Fiscal Impact Statement," available at
https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.pre.j
u.PDF.

b.   **Exhibit 33**: A true and correct copy of proposed amendments
to SB 264, number 606852, filed on March 13, 2023, available at
https://www.flsenate.gov/Session/Bill/2023/264/Amendment/606852/PDF.

c.   **Exhibit 34**: A true and correct copy of proposed amendments
to SB 264, number 647298, filed on March 13, 2023, available at
https://www.flsenate.gov/Session/Bill/2023/264/Amendment/647298/PDF.

**A170**

18.     The following materials relate to legislative activities on or about March 14, 2023:

a.      A video recording of the meeting of the Judiciary Committee of the Florida Senate that took place on March 14, 2023 is available at https://www.flsenate.gov/media/videoplayer?EventID=1_zc8d1g0v-202303141600&Redirect=true.

b.      **Exhibit 35**: A true and correct copy of meeting document, dated March 14, 2023, titled "Committee Vote Record," available at https://www.flsenate.gov/Session/Bill/2023/264/Vote/2023-03-14%200400PM~S00264%20Vote%20Record.PDF.

c.      **Exhibit 36**: A true and correct copy of a post-meeting document, dated March 14, 2023, prepared by the Judiciary Committee of the Florida, Senate,  titled "Bill Analysis and Fiscal Impact Statement," available                                                                          at https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.ju.PDF.

19.     The following materials relate to legislative activities on or about March 15, 2023:

a.      **Exhibit 37**: A true and correct copy of the First Committee Substitute of Senate Bill 264 ("CS/SB 264"), which replaced the prior

version of SB 264 on or about March 15, 2023, available at https://flsenate.gov/Session/Bill/2023/264/BillText/c1/PDF.

20.    The following materials relate to legislative activities on or about March 21, 2023:

    a.    **Exhibit 38**: A true and correct copy of a pre-meeting document prepared by the Rules Committee of the Florida Senate, titled "Bill Analysis and Fiscal Impact Statement," dated March, 21, 2023, available on Florida Senate                                        website                                        at https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.pre.rc.PDF.

    b.    **Exhibit 39**: A true and correct copy of proposed amendments to CS/SB 264, number 833514, filed on March 21, 2023, available at https://www.flsenate.gov/Session/Bill/2023/264/Amendment/833514/PDF.

21.    The following materials relate to legislative activities on or about March 22, 2023:

    a.    A video recording of the meeting of the Rules Committee of the Florida Senate that took place on March 22, 2023 is available at https://www.flsenate.gov/media/videoplayer?EventID=1_nty0d3lq-202303220830&Redirect=true.

    b.    **Exhibit 40**: A true and correct copy of meeting document, dated

March 22, 2023, titled "Committee Vote Record," available at

https://www.flsenate.gov/Session/Bill/2023/264/Vote/2023-03-

22%200830AM~S00264%20Vote%20Record.PDF.

c.     **Exhibit 41**: A true and correct copy of a post-meeting

document, dated March 22, 2023, prepared by the Rules Committee of the

Florida Senate, titled "Bill Analysis and Fiscal Impact Statement," available

at

https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.rc.P

DF.

22.     The following materials relate to legislative activities on or about

March 23, 2023:

a.     **Exhibit 42**: A true and correct copy of the Second Committee

Substitute of Senate Bill 264 ("CS/CS/SB 264"), which replaced the prior

version of CS/SB 264 on or about March 23, 2023, available at

https://flsenate.gov/Session/Bill/2023/264/BillText/c2/PDF.

23.     The following materials relate to legislative activities on or about April

10, 2023:

a.     **Exhibit 43**: A true and correct copy of proposed amendments

to CS/CS/SB 264, number 708856, filed on April 10, 2023, available at

https://www.flsenate.gov/Session/Bill/2023/264/Amendment/708856/PDF.

b.   **Exhibit 44**: A true and correct copy of proposed amendments to CS/CS/SB 264, number 415792, filed on April 10, 2023, available at https://www.flsenate.gov/Session/Bill/2023/264/Amendment/415792/PDF.

24.   The following materials relate to legislative activities on or about April 11, 2023:

a.   A video recording of the Florida Senate legislative session that took place on April 11, 2023 is available at https://thefloridachannel.org/videos/4-11-23-senate-session/.

b.   **Exhibit 45**: A true and correct copy of a document from the Florida Senate's legislative session on April 11, 2023, titled "CS/CS/SB 264 Third Reading," available at https://www.flsenate.gov/Session/Bill/2023/264/Vote/SenateVote_s00264c2010.PDF.

c.   **Exhibit 46**: A true and correct copy of the First Engrossed version of Senate Bill 264 ("CS/CS/SB 264 1st Eng."), which replaced the prior version CS/CS/SB 264 on April 11, 2023 and is available at https://flsenate.gov/Session/Bill/2023/264/BillText/e1/PDF.

25.   The following materials relate to legislative activities on or about April 27, 2023:

a.   **Exhibit 47**: A true and correct copy of proposed amendments

to CS/CS/SB 264 1st Eng., number 510709, filed on or about April 27, 2023,

available                                                                                      at

https://www.flsenate.gov/Session/Bill/2023/264/Amendment/510709/PDF.

26.    The following materials relate to legislative activities on or about April

30, 2023:

a.    **Exhibit 48**: A true and correct copy of proposed amendments

to amendment number 510709 to CS/CS/SB 264 1st Eng., number 353175,

filed    on    or    about    April    30,    2023,    available    at

https://www.flsenate.gov/Session/Bill/2023/264/Amendment/353175/PDF.

27.    The following materials relate to legislative activities on or about

May 1, 2023:

a.    A video recording of the Florida House of Representatives

legislative session that took place on May 1, 2023 is available at

https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8946.

b.    **Exhibit 49**: A true and correct copy of proposed amendments

to CS/CS/SB 264 1st Eng., number 639273, filed on or about May 1, 2023,

available                                                                                      at

https://www.flsenate.gov/Session/Bill/2023/264/Amendment/639273/PDF.

28.    The following materials relate to legislative activities on or about

May 2, 2023:

a. A video recording of the Florida House of Representatives legislative session that took place on May 2, 2023 is available at https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8951.

b. **Exhibit 50**: A true and correct copy of proposed amendments to CS/CS/SB 264 1st Eng., number 048607, filed on or about May 2, 2023, available at https://www.flsenate.gov/Session/Bill/2023/264/Amendment/048607/PDF.

c. **Exhibit 51**: A true and correct copy of a message from the Florida Senate to the Florida House of Representatives, dated May 2, 2023, available at https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.hms .ju.PDF.

29. The following materials relate to legislative activities on or about May 3, 2023:

a. A video recording of the Florida House of Representatives legislative session that took place on May 3, 2023 is available at https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8955.

b. **Exhibit 52**: A true and correct copy of a document from the Florida House of Representatives' legislative session on May 3, 2023, titled "CS/CS/SB 264 1st Eng. Passage Third Reading," available at

- 17 -

**A176**

https://www.flsenate.gov/Session/Bill/2023/264/Vote/HouseVote_s00264e
1440.PDF.

30.    The following materials relate to legislative activities on or about
May 4, 2023:

a.    A video recording of the Florida Senate legislative session that
took place on May 4, 2023 is available at
https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-
202305041000&Redirect=true.

b.    A video recording of the Florida House of Representative
session that took place on May 4, 2023 is available at
https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8960.

c.    **Exhibit 53**: A true and correct copy of proposed amendments
to amendment number 048607 to CS/CS/SB 264 1st Eng., number 790990,
filed on or about May 4, 2023, available at
https://www.flsenate.gov/Session/Bill/2023/264/Amendment/790990/PDF.

d.    **Exhibit 54**: A true and correct copy of a document from the
Florida Senate's legislative session on May 4, 2023, titled "CS/CS/SB 264
Returning Messages," available at
https://www.flsenate.gov/Session/Bill/2023/264/Vote/SenateVote_s00264e
1056.PDF.

e.    **Exhibit 55**: A true and correct copy of a document from the Florida House of Representatives' legislative session on May 4, 2023, titled "CS/CS/SB 264 1st Eng. Passage," available at https://www.flsenate.gov/Session/Bill/2023/264/Vote/HouseVote_s00264e 1498.PDF.

f.    **Exhibit 56**: A true and correct copy the Second Engrossed version of CS/CS/SB 264 1st Eng. ("CS/CS/SB 264 2nd Eng"), which replaced the prior version CS/CS/SB 264 1st Eng. on May 4, 2023 and is available at https://www.flsenate.gov/Session/Bill/2023/264/BillText/e2/PDF.

g.    **Exhibit 57**: A true and correct copy of the Enrolled version of CS/CS/SB 264 2nd Eng. ("CS/CS/SB 264 Enrolled"), which replaced the prior version CS/CS/SB 264 2nd Eng. on May 4, 2023 and is available at https://www.flsenate.gov/Session/Bill/2023/264/BillText/er/PDF.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this 6th day of June, 2023.

/s/ *Keliang Zhu*
Keliang Zhu

- 19 -

**A178**

**A179**



EXHIBIT 1

6/1/23, 9:20 PM
Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida through New Action
Case 4:23-cv-00208-AW-MAF Document 21-8 Filed 06/06/23 Page 2 of 5
USCA11 Case: 23-12737 Document: 39-2 Date Filed: 10/02/2023 Page: 27 of 221

Donate to the Florida Disaster Fund to Aid Hurricane Ian Relief Effort



# Ron DeSantis
## 46th Governor of Florida



- Home
  Governor DeSantis
  First Lady DeSantis
  Lt. Gov. Nuñez
  Media
  Info Center
  Judicial
  Contact
  Español

Governor Ron DeSantis Announces Two Appointments to Florida's Judicial Qualifications Commission  Governor Ron DeSantis Awards $1.9 Million to Expand Entrepreneurship Education and Training

# Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida through New Action

*On September 22, 2022, in* News Releases, *by Staff*



**MIAMI —** Today, Governor Ron DeSantis announced executive action and legislative proposals to address threats posed by the Communist Party of China and other hostile foreign powers in cyberspace, real estate, and academia. These measures will curtail the nefarious intentions of all seven countries on Florida's list of countries of concern, making it more difficult for China, Cuba, Russia, Iran, North Korea, Syria, or Venezuela to engage in espionage or influence operations within Florida's borders and preventing purchases of agricultural land and lands surrounding military bases by those governments or their agents. Details on today's announcement can be found here.

"From server farms to farmland, the Communist Party of China has been worming its way into our nation's data storage systems and buying up tracts of land near sensitive national security sites," said **Governor Ron DeSantis**. "By prohibiting the purchase of lands, state contracts with Chinese technology firms, and the infiltration of CCP-affiliated groups such as Confucius Institutes, Florida is leading the way to protect our nation from international foes."

"The Chinese Communist Party cheats on trade, steals our intellectual property, and produces deadly drugs like fentanyl that are pouring into our southern border," said **Lieutenant Governor Jeanette Nuñez**. "Governor DeSantis' announcements today are not only critical to protecting American interests and Florida farmlands but also to maintaining our national security. Florida will never kowtow to the oppressive regime of China."

"With today's Executive Order, Governor DeSantis takes decisive action to defend the State of Florida and all Floridians from the cyber threats posed by foreign countries of concern and associated groups," said **Department of Management Services Secretary Pedro Allende**. "The Governor's direction to develop cybersecurity and procurement rules and standards will make it harder for bad actors to gain a foothold on state infrastructure, will protect Floridians' personal information and intellectual property, and will further secure key information systems and the critical infrastructure that our state and its citizens rely on each day."

"Thanks to Governor DeSantis, Florida will not allow foreign adversaries and Communist dictatorships to have insights into some of the most sensitive data and cutting-edge research taking place in U.S. academia," said **Commissioner of Education Manny Diaz,**

A181

6/1/23, 9:20 PM
Case 4:23-cv-00283-AW-MAF Document 21-8 Filed 06/06/23 Page 3 of 5
Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida through New Action

Jr. "As radical Americans I know know communist countries attempt to infiltrate schools and universities to steal intellectual property and indoctrinate young people with their dangerous and radical ideology. By removing this influence and focusing on the importance of American ideals and citizenship through civics education, Florida is again leading the way for the nation to follow."

## Cybersecurity

Effective immediately, Governor DeSantis has signed Executive Order 22-216 to prohibit government entities from procuring technology products and services from companies owned by, controlled by, or domiciled in foreign countries of concern. The executive order directs the Department of Management Services (DMS) to promulgate rules and take any additional action necessary to ensure commodities and services used by state and local governments are not susceptible to exploitation by foreign countries of concern. This prohibits government entities from procuring or utilizing technology services that:

- Have been determined by DMS to pose a risk to the safety and security of Florida due to the company's connections to or use by a foreign country of concern;

- A federal agency has prohibited due to a national security concern; and

- Are designed, developed, manufactured, or supplied by companies or affiliated companies determined by federal or state government agencies to be owned, controlled, or domiciled in a foreign country of concern.

This will help prevent the exposure of government information and technology services and systems in Florida to other state and non-state actors affiliated with a foreign country of concern. The full executive order can be found here.

Governor DeSantis also proposed legislative action to prohibit government entities from contracting with companies owned by, controlled by, or domiciled in foreign countries of concern if the contract would provide access to Floridians' personal information. This prohibition would include the bidding, submitting a proposal for, or entering into or renewing a contract with a government entity if the contract would provide the company with access to an individual's name in combination with a Social Security number, driver's license, financial account numbers, medical history, insurance policy numbers, etc.

## Purchases of Agricultural Land and Land Surrounding Military Bases

Governor DeSantis has proposed legislative action to prohibit purchases of agricultural land and land surrounding military bases by foreign countries of concern. There have already been instances of Chinese Communist Party-affiliated companies purchasing land near military bases in other states, including Grand Forks Air Force Base in North Dakota. Florida is home to 21 military bases from every branch of the armed forces, and while the state has allocated money to purchase land nearest to some of these bases to increase security perimeters, more needs to be done to protect our domestic national security assets.

As of 2019, foreign investors held an interest in 5.8% of Florida's privately held agricultural land. This ranks Florida as the state with the fifth highest percentage of reported foreign-owned land. Thirty-one states have regulations in place for foreign ownership of agricultural land by law. In Iowa and Minnesota, no alien is allowed to acquire any interest in agricultural land.

## Prohibiting Foreign Funds for Universities

Last year, Governor DeSantis signed HB 7017 to require the disclosure of foreign donations to state educational institutions in excess of $50,000. This "naming and shaming" approach was intended to expose the influence of groups such as CCP-funded Confucius Institutes, with further punitive measures for non-disclosure. But even sub-$50,000 donations from individuals and groups pushing the agendas of hostile foreign powers on college campuses can undercut academic integrity, warp the perspectives of many students, and sway the research and writing of many professors to align with the interests and values of the sources of that funding.

That is why Governor DeSantis has proposed legislative action to amend Florida statutes relating to reporting requirements of foreign gifts to prohibit any gift to a higher education institution in Florida from any individual residing in or entity domiciled in a foreign country of concern or from any governmental entity within a foreign country of concern. A general bill on this topic could also impose additional restrictions, screening requirements, or pre-conditions on researchers from foreign countries of concern.

###



Comments are closed.











**Contact Governor DeSantis**

Executive Office of Governor Ron DeSantis
400 S Monroe St
Tallahassee, FL 32399
(850) 488-7146

Email Governor DeSantis

Email First Lady DeSantis

Email Lt. Governor Nuñez

Information Center

Scheduling Requests



**A183**

6/1/23, 9:20 PM                    Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida Through New Action

Case 4:23-cv-00283-AW-MAF   Document 21-8   Filed 06/06/23   Page 5 of 5
USCA11 Case: 23-12737      Document: 29-2      Date Filed: 10/02/2023      Page: 30 of 221





Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing. Copyright © 2012 State of Florida | Privacy Policy

Go To Top »

| Home | Governor DeSantis | First Lady | Lt. Governor | Media Center | Info Center | Judicial | Contact Governor | Español |

EXHIBIT 8

## **TRANSCRIPT**

**Press Conference on January 10, 2023, titled at "Governor's Press Conference on Conservation"**

https://thefloridachannel.org/videos/1-10-23-governors-press-conference-on-conservation/

***Remarks by Florida Governor Ron DeSantis***

38:55 to 40:17

So my view on the, our economy is, in Florida, is, we don't want to have holdings by hostile nations. And so, if you look at the Chinese Communist Party, they've been very active in throughout the Western Hemisphere in gobbling up land and investing in different things. And, you know, when they have interests that are opposed to ours, and you see how they've wielded their authority, and especially with President Xi, who's taken a much more Marxist/Leninist turn since he's been ruling China. That is not in the best interest of Florida to have the Chinese Communist Party owning farmland, owning land close to military bases. But you know, my view is, I think there's a broad agreement in those two, but my view is, okay, yeah, no farmland, but why would you want them buying residential developments or things like that? I don't want them owning subdivisions and things like that. I think that the issue's just going to be, I think people agree with that, the issue's going to be, yeah, obviously, if someone comes in and buys, it's not the CCP that's signing that, these are holding companies and all that. So you've got to structure in a way that will effectively police it, but yes, we do not need to have CCP influence in Florida's economy.

1

**A186**

EXHIBIT 18



EXHIBIT 21

**A189**



Donate to the Florida Disaster Fund to Aid Hurricane Ian Relief Effort

Home
Governor DeSantis
First Lady DeSantis
Lt. Gov. Nuñez
Media
Info Center
Judicial
Contact
Español

Governor DeSantis Receives Three Bills from the Florida Legislature   Flags at Half-Staff in Honor of the Victims of the Tragedy in Allen, Texas

# Governor Ron DeSantis Cracks Down on Communist China

*On May 8, 2023, in* News Releases, *by Staff*

**BROOKSVILLE, Fla. —** Today, Governor DeSantis signed three bills to counteract the malign influence of the Chinese Communist Party in the state of Florida. Last year, Governor DeSantis called on the Legislature to build upon the efforts he led two years ago to combat corporate espionage and higher education subterfuge carried out by the CCP and its agents. With the legislation signed today to limit Chinese purchases of agriculture land and land near military bases and critical infrastructure, to protect digital data from Chinese spies, and to root out Chinese influence in Florida's education system, Florida has once again taken the lead in protecting American interests from foreign threats and has provided a blueprint for other states to do the same. More information on today's announcement is available here.



"Florida is taking action to stand against the United States' greatest geopolitical threat — the Chinese Communist Party," **said Governor Ron DeSantis.** "I'm proud to sign this legislation to stop the purchase of our farmland and land near our military bases and critical infrastructure by Chinese agents, to stop sensitive digital data from being stored in China, and to stop CCP influence in our education system from grade school to grad school. We are following through on our commitment to crack down on Communist China."

"Food security is national security, and we have a responsibility to ensure Floridians have access to a safe, affordable, and abundant food supply," **said Commissioner Wilton Simpson.** "China and other hostile foreign nations control hundreds of thousands of acres of critical agricultural lands in the U.S., leaving our food supply and our national security interests at risk. Restricting China and other hostile foreign nations from controlling Florida's agricultural land and lands near critical infrastructure facilities protects our state, provides long-term stability, and preserves our economic freedom. This bill is long overdue, and I thank Governor Ron DeSantis, Senate President Kathleen Passidomo, House Speaker Paul Renner, Senator Jay Collins, and Representative David Borrero for their leadership on this issue and their commitment to protecting Florida and our security interests."

SB 264, Interests of Foreign Countries, restricts governmental entities from contracting with foreign countries and entities of concern and restricts conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that health records are physically stored in the continental U.S., U.S. territories, or Canada.

Case 4:23-cv-00208-AW-MAF   Document 21-28   Filed 06/06/23   Page 3 of 4
USCA11 Case: 23-11787   Document: 39-2   Date Filed: 10/03/2023   Page: 37 of 221

SB 846, Assignments of Education Partnership with Foreign Countries, prohibits state colleges and universities, their employees and representatives from soliciting or accepting any gift in their official capacities from a college or university based in a foreign country of concern. It also prohibits state colleges and universities from accepting any grant from or participating in any agreement or partnership with any college or university based in a foreign country of concern. A state college or university may only participate in a partnership or agreement with a college or university based in a foreign country of concern if authorized by the Board of Governors or the State Board of Education. The bill also prohibits the ownership or operation of any private school participating in the state's school choice scholarship program by a person or entity domiciled in, owned by, or in any way controlled by a foreign country of concern.

SB 258 requires the Department of Management Services to create a list of prohibited applications owned by a foreign principal or foreign countries of concern, including China, which present a cybersecurity and data privacy risk. The bill requires government and educational institution to block access to prohibited applications on all government servers and devices in Florida and requires public employers to retain the ability to remotely wipe and uninstall these dangerous applications from government issued devices.

For more information about Governor DeSantis' executive action taken against the Chinese Communist Party, click here. For more information about Governor DeSantis' previous legislative accomplishments targeting the Chinese Communist Party, click here.

### 



Comments are closed.











**Contact Governor DeSantis**

Executive Office of Governor Ron DeSantis
400 S Monroe St
Tallahassee, FL 32399
(850) 488-7146

Email Governor DeSantis

Email First Lady DeSantis

Email Lt. Governor Nuñez

Information Center

Scheduling Requests







Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing. Copyright © 2012 State of Florida | Privacy Policy

Go To Top »

| Home | Governor DeSantis | First Lady | Lt. Governor | Media Center | Info Center | Judicial | Contact Governor | Español |

A192



EXHIBIT 32

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

Prepared By: The Professional Staff of the Committee on Judiciary

| | | | |
|---|---|---|---|
| BILL: | SB 264 | | |
| INTRODUCER: | Senator Collins | | |
| SUBJECT: | Interests of Foreign Countries | | |
| DATE: | March 13, 2023 | REVISED: | |

| | ANALYST | STAFF DIRECTOR | REFERENCE | | ACTION |
|---|---|---|---|---|---|
| 1. | Collazo | Cibula | JU | | **Pre-meeting** |
| 2. | | | RC | | |

## I.  Summary:

SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

Specifically, with respect to governmental entity contracting, the bill creates statutes that prohibit governmental entities from:

- Contracting with entities of foreign countries of concern.
- Entering into contracts for an economic incentive with a foreign entity.

And with respect to conveyances of agricultural lands, the bill creates statutes that:

- Prohibit a foreign principal from owning or acquiring agricultural land in the state.
- Prohibit a foreign principal from owning or acquiring any interest in real property within 20 miles of any military installation or critical infrastructure in the state.
- Prohibit China, Chinese Communist Party or other Chinese political party officials or members, Chinese business organizations, and persons domiciled in China, but who are not U.S. citizens, from purchasing or acquiring any interest in real property in the state.

The bill also amends:

- The Florida Electronic Health Records Act, to require that the offsite storage of certain personal medical information be physically maintained in the continental U.S.
- The Health Care Licensing Procedures Act, to require licensees to sign affidavits attesting that all patient information stored by them is being physically maintained in the continental U.S.

Case 4:23-cv-00208-AW-MAF   Document 21-39   Filed 06/06/23   Page 3 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 41 of 221

BILL: SB 264
Page 2

- The statute criminalizing threats and extortion, to provide that a person who commits a violation of the statute, and at the time is acting as a foreign agent with the intent of benefitting a foreign country of concern, commits a first degree felony.

The bill takes effect July 1, 2023.

## II.    Present Situation:

### Foreign Ownership of U.S. Agricultural Land

Foreign ownership and investment in U.S. agricultural land has generated significant interest in recent years.[1] Several high-profile incidents have prompted lawmakers to focus their attention on evaluating and responding to the potential impacts of foreign ownership and investment on national security, trade, and food security.[2]

A significant example occurred last year. Fufeng Group Limited, a Chinese food manufacturer, acquired 300 acres of land near the Grand Forks Air Force Base in North Dakota in order to build a wet corn milling and biofermentation plant.[3] The Air Force base, which is only about 12 miles away from the site, is believed to be the home of some of the country's most sophisticated, "top secret" military drone technology.[4] The location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns.[5]

In January, Andrew P. Hunter, Assistant Secretary of the Air Force for Acquisition, Technology and Logistics,[6] sent U.S. Senator John Hoeven a letter providing the Air Force's official position on the project. It confirmed that "Grand Forks Air Force Base is the center of military activities related to both air and space operations" and that the department's position is "unambiguous: the proposed project presents a significant threat to national security with both near- and long-term

---

[1] Aleks Phillips, *What the U.S. Is Doing to Curtail Chinese Land Ownership*, NEWSWEEK, Feb. 13, 2023, https://www.newsweek.com/chinese-land-ownership-investment-us-military-bases-1780886.
[2] *See* Letter from Congressmen Glenn "GT" Thompson & James Comer to Gene L. Dodaro, Comptroller General of the U.S. Government Accountability Office (Oct. 1, 2022), *available at* https://oversight.house.gov/wp-content/uploads/2022/10/20221001_GAO_foreignlandownership.pdf (requesting that the office conduct a review of foreign investment in U.S. farmland and its impact on national security, trade, and food security).
[3] Congressional Research Service (CRS), *Foreign Ownership and Holdings of U.S. Agricultural Land* (version 4, updated Jan. 24, 2023), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11977.
[4] Ariel Zilber, *Chinese firm bought North Dakota farm near U.S. Air Force drone base: report,* NEW YORK POST, Jul. 1, 2022, https://nypost.com/2022/07/01/chinese-firm-bought-farm-near-us-air-force-drone-base-report/; *see also* Letter from Thompson & Comer, *supra* note 2 (describing the technology as "top secret"); *see also* Lauren Greenwood, U.S.-China Economic and Security Review Commission, *China's Interests in U.S. Agriculture: Augmenting Food Security through Investment Abroad* (May 26, 2022), 11, *available at* https://www.uscc.gov/sites/default/files/2022-05/Chinas_Interests_in_U.S._Agriculture.pdf (noting that the Grand Forks Air Force Base "houses some of the United States' top intelligence, surveillance, and reconnaissance capabilities").
[5] Greenwood, *supra* note 4.
[6] U.S. Air Force, *Andrew P. Hunter* (Sept. 2022), https://www.af.mil/About-Us/Biographies/Display/Article/3154079/andrew-p-hunter/.

**A195**

risks of significant impacts to our operations in the area."[7] About a week after the department issued its letter, the Grand Forks City Council abandoned the project.[8]

In addition to national security concerns, federal officials are also concerned about potential food security impacts. A recent letter from 130 lawmakers to the U.S. Government Accountability Office expressed concern that "foreign investment in U.S. farmland could result in foreign control of available U.S. farmland, especially prime agricultural lands, and possibly lead to foreign control over food production and food prices."[9] In a separate interview, one of the lawmakers noted that "food security is national security," explaining that Russia was able to exercise undue influence over Europe because it supplied Europe with a significant amount of natural gas, and that China might similarly try to control food supplies in South America, Southeast Asia, and even North America, in order to exert greater coercive power around the globe.[10]

Other recent incidents, while not involving the acquisition of U.S. farmland, suggest that China is working aggressively to undermine U.S. interests in other ways, both at home and abroad:

- Confucius Institutes, which offer Chinese language and cultural programs, first began appearing on U.S. university campuses in 2005. Some Members of Congress and others have alleged that they may play a role in China's efforts to influence public opinion abroad, recruit "influence agents" on U.S. campuses, and engage in cyber espionage and intellectual property theft.[11]

- In November of last year, FBI Director Christopher Wray testified at a U.S. Senate Homeland Security and Governmental Affairs Committee hearing about the existence of certain unauthorized 'police stations' established by China in major U.S. cities, noting that the U.S. has made a number of indictments involving the Chinese government harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping.[12]

- Last month, the U.S. shot down a Chinese spy balloon after it had traversed over a large swath of North America. The Biden Administration alleged it was part of a larger Chinese surveillance-balloon program that had violated the sovereignty of nations all over the word.[13]

[7] Letter from Andrew P. Hunter, Office of the Assistant Secretary, to U.S. Senator John Hoeven (Jan. 27, 2023), *available at* https://www.hoeven.senate.gov/imo/media/doc/USAIRFORCE-FUFENG-LETTER-HOEVEN.pdf.

[8] Meghan Arbegast, *Year-long Fufeng debate comes to an end after Grand Forks council members vote to stop project,* GRAND FORKS HERALD, Feb. 6, 2023, https://www.grandforksherald.com/news/local/year-long-fufeng-debate-comes-to-an-end-after-grand-forks-council-members-vote-to-stop-project.

[9] Letter from Thompson & Comer, *supra* note 2.

[10] NPR, *China is buying up more U.S. farmland. Some lawmakers consider that a security threat* (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160297853/china-farmland-purchases-house-hearing-competition.

[11] CRS, *Confucius Institutes in the United States: Selected Issues* (version 12, updated May 20, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11180.

[12] Michael Martina & Ted Hesson, *FBI director 'very concerned' by Chinese 'police stations' in U.S.,* REUTERS, Nov. 17, 2022, https://www.reuters.com/world/us/fbi-director-very-concerned-by-chinese-police-stations-us-2022-11-17/.

[13] Isaac Chotiner, *What's Behind the Chinese Spy Balloon,* THE NEW YORKER, Feb. 18, 2023, https://www.newyorker.com/news/q-and-a/whats-behind-the-chinese-spy-balloon.

Case 4:23-cv-00208-AW-MAF   Document 21-39   Filed 06/06/23   Page 5 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 43 of 221

BILL: SB 264
Page 4

- This month, the U.S. (and Canada) issued orders banning the use of TikTok, a Chinese-owned video sharing app, on government-issued mobile devices amid growing privacy and cybersecurity concerns.[14]
- Also this month, U.S. defense and national security officials have raised the possibility that certain Chinese-made giant cargo cranes are being used for espionage.[15]

### Ownership Statistics

Foreign persons and entities held an interest in 40.8 million acres of U.S. agricultural land in 2021, accounting for 3.1% of total privately owned land.[16] These data cover agricultural land and nonagricultural land (e.g. associated homesteads, roads, etc.). In 2021, forestland accounted for 47% of all foreign-owned land, cropland accounted for 29%, and pasture and other agricultural land for 22%. Nonagricultural land (such as homesteads and roads) accounted for 2%. Foreign land holdings have increased by an average of 2.2 million acres per year since 2015.[17]

With respect to China specifically, not including the Fufeng Group Limited's purchase in 2022, the U.S. Department of Agriculture reports that China accounted for 383,935 acres, or 0.9% of total foreign-owned U.S. agricultural land as of year-end 2021.[18] The department also reports that 85 Chinese investors own 275 parcels of agricultural land totaling 194,772 acres worth $1,868,577.[19]

| Country | Total | Foreign Entities | U.S. Entities w/ Foreign Shares | % of U.S. Private Land |
|---|---|---|---|---|
| | (million acres) | | | (percent) |
| Canada | 12.8 | 9.7 | 3.2 | 1.0% |
| Netherlands | 4.9 | 4.4 | 0.5 | 0.4% |
| Italy | 2.7 | 2.6 | 0.1 | 0.2% |
| United Kingdom | 2.5 | 1.5 | 1.0 | 0.2% |
| Germany | 2.3 | 1.4 | 0.9 | 0.2% |
| **Subtotal** | 25.2 | 19.6 | 5.7 | 2.0% |
| Other Countries | 12.4 | 7.1 | 5.3 | 1.0% |
| Not Listed | 3.2 | 2.4 | 0.8 | 0.3% |
| **Total** | 40.8 | 29.1 | 11.7 | 3.1% |



*Foreign Holdings of Agricultural Land, 2021[20]*

As of year-end 2021, the states with the most foreign-owned agricultural acreage were Texas (5.3 million acres), Maine (3.6 million acres), Colorado (1.9 million acres), Alabama (1.8 million

---

[14] CBS News, *TikTok banned on U.S. government devices, and the U.S. is not alone. Here's where the app is restricted* (Mar. 1, 2023), https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.

[15] Kent Masing, *U.S. Concerned China-Made Cranes In American Ports Used To Spy On Military: Report,* INTERNATIONAL BUSINESS TIMES, Mar. 6, 2023, https://www.ibtimes.com/us-concerned-china-made-cranes-american-ports-used-spy-military-report-3673964.

[16] CRS, *supra* note 3, at 2.

[17] *Id.*

[18] *Id.;* Farm Service Agency, U.S. Department of Agriculture, *Foreign Holdings of U.S. Agricultural Land* (through Dec. 31, 2021), 4, *available at* https://www.fsa.usda.gov/programs-and-services/economic-and-policy-analysis/afida/annual-reports/index.

[19] Farm Service Agency, *supra* note 18, at 229.

[20] *Id.* at Table 1 and Figure 2 (internal citations omitted).

acres), and Oklahoma (1.7 million acres). Other states with more than 1 million foreign-owned acres were Arkansas, California, Florida, Georgia, Kansas, Louisiana, Michigan, New Mexico, Oregon, and Washington.[21]

According to the U.S. Department of Agriculture, of the 21,849,568 acres of privately held agricultural land in Florida, 1,382,284 acres (6.3%) are held by foreigners, which is among the highest proportions in the U.S.[22] It is unclear how much of that land is owned by China, although the department does report that it owns 96,975 acres in the "South Region," which includes Florida.[23]

### Existing Federal and State Laws

Federal law currently imposes no restrictions on the amount of private U.S. agricultural land that can be foreign-owned.[24] However, the Agricultural Foreign Investment Disclosure Act of 1978 established a nationwide system for collecting information pertaining to the foreign ownership of U.S. agricultural land,[25] including land used for agricultural, forestry, or timber production purposes.[26] For purposes of the act, foreign persons include any individual, corporation, company, association, partnership, society, joint stock company, trust, estate, or any other legal entity (including any foreign government) under the laws of a foreign government or having a principal place of business outside of the U.S.[27]

The act's regulations require foreign persons who buy, sell, or gain interest in U.S. agricultural land to disclose their holdings and transactions to the U.S. Department of Agriculture directly or to the Farm Service Agency county office where the land is located.[28] Failure to disclose this information may result in penalties and fines.[29] After the original disclosure, each subsequent change of ownership or use must be reported.[30] It should be noted that some have expressed concern that U.S. Department of Agriculture figures developed under the act may actually underestimate foreign ownership due to unreliable data collection and the definitions used by the department.[31]

The Committee on Foreign Investment in the U.S. is an interagency committee authorized to review certain transactions involving foreign investment in the U.S. and real estate transactions by foreign persons, in order to determine the effect of such transactions on national security.[32] Notwithstanding recent expansions to the committee's jurisdictional authority and review

---

[21] *Id.*

[22] *See* Farm Service Agency, *supra* note 18, at 4, 17.

[23] *Id.* at 238.

[24] CRS, *supra* note 3, at 1.

[25] Pub. L. No. 95-460, 92 Stat. 1263 (1978); 7 U.S.C. ss. 3501-3508.

[26] 7 U.S.C. s. 3508(1); 7 C.F.R. s. 781.2(b).

[27] 7 U.S.C. s. 3508(3); 7 C.F.R. s. 781.2(g).

[28] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(a).

[29] 7 U.S.C. s. 3502; 7 C.F.R. ss. 781.4., 781.5.

[30] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(b).

[31] Texas Farm Bureau, *Lawmakers ask for review of foreign ownership of U.S. farmland,* https://texasfarmbureau.org/lawmakers-ask-for-review-of-foreign-ownership-of-u-s-farmland/ (last visited Mar. 7, 2023).

[32] U.S. Department of the Treasury, *The Committee on Foreign Investment in the United States,* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius (last visited Mar. 6, 2023).

considerations,[33] there appear to be significant gaps. For example, the committee recently determined that Fufeng Group Limited's purchase near Grand Forks Air Force Base was outside of its jurisdiction and that it would therefore take no further action.[34]

Some U.S. states and localities have instituted restrictions on the foreign ownership of farmland.[35] Although no state has instituted an absolute prohibition on all foreign ownership, some states have limited or proposed to prohibit certain foreign persons and entities from acquiring or owning an interest in agricultural land within their states, and several states have separate disclosure requirements within their states.[36]



*Overview of Selected State Laws Related to Foreign Ownership of U.S. Agricultural Land[37]*

There is no single uniform approach under state laws to addressing foreign ownership.[38] Some general categories include:

- Restrictions on the amount of land that can be owned or the duration of ownership.
- Distinctions involving private versus public land or how agricultural land is defined.
- Distinctions involving resident and nonresident aliens.
- Inheritance considerations involving land ownership.
- Restrictions on ownership by foreign corporations (e.g. corporate farming laws or requirements corporations are subject to in order to obtain license or register).
- Differences related to enforcement and penalties.[39]

Currently, in Florida, foreign persons and entities have the same rights in real property as do citizens of the U.S. Foreign corporations, upon qualifying to do business in the state, have the same rights in real property as do domestic corporations. Foreign ownership of a domestic corporation has no effect on that corporation's rights in real property. No disclosure is required by any person or corporation when acquiring, holding or transferring rights in real property.[40]

---

[33] *See id.* (discussing Executive Order 14083, the Foreign Investment Risk Review Modernization Act of 2018, and associated regulations).
[34] T.J. Nelson, KVVR Local News, *Fufeng USA Looking to Move Ahead with Grand Forks Project After Federal Agency Review Suddenly Ends* (Dec. 13, 2022), https://www.kvrr.com/2022/12/13/fufeng-usa-looking-to-move-ahead-with-grand-forks-project-after-federal-agency-review-suddenly-ends/.
[35] CRS *supra* note 3, at 1.
[36] *Id.*
[37] *Id.* at Figure 1 (internal citation omitted).
[38] *Id.* at 1.
[39] *Id.*
[40] *See* 2 INTERNATIONAL BUSINESS TRANSACTIONS s. 29:26 (3d ed., updated Nov. 2022).

**Florida Electronic Health Records Act**

The Florida Electronic Health Records Act[41] authorizes health care providers to release or access an identifiable health record of a patient without the patient's consent for use in the treatment of that patient for an emergency medical condition, when consent cannot be obtained from the patient or the patient representative due to the patient's condition or the nature of the situation requiring immediate medical attention.[42] It provides immunity from civil liability whenever a health care provider accesses or releases the identifiable health record in good faith under the statute. It also directs the Agency for Health Care Administration to develop a form to document patient authorization for the use or release of an identifiable health record.[43] The act includes definitions for the following terms: "electronic health record," "qualified electronic health record," "certified electronic health record technology," "health record," "identifiable health record," "patient," and "patient representative."[44]

**Health Care Licensing Procedures Act**

The Health Care Licensing Procedures Act[45] provides a streamlined and consistent set of basic licensing requirements for health care providers.[46] The act is intended to minimize confusion, standardize terminology, and include issues that are not otherwise addressed in state law pertaining to specific providers.[47] Among other things, it provides certain minimum licensure requirements, with which applicants and licensees must comply in order to obtain and maintain a license.[48]

**Statute Criminalizing Threats and Extortion**

State law criminalizes threats and extortion. One commits the crime if he or she, either verbally or by a written or printed communication:

> maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will[.][49]

---

[41] Section 408.051, F.S.
[42] Section 408.051(3), F.S.
[43] Section 408.051(4), F.S.
[44] Section 408.051(2), F.S.
[45] Chapter 408, Part II, F.S.; *see also* s. 408.801(1), F.S. (providing a short title).
[46] Section 408.801(2), F.S.
[47] *Id.*
[48] *See generally* s. 408.810, F.S.
[49] Section 836.05, F.S.

The crime is a second degree felony, punishable by a term of imprisonment not exceeding 15 years[50] and a $10,000 fine,[51] or possibly more under the habitual offender statute.[52]

## III.    Effect of Proposed Changes:

SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

### Prohibition on Governmental Entity Contracting with Entities of Foreign Countries of Concern

**Section 1** of the bill creates s. 287.138, F.S., within chapter 287, part I, F.S., which governs commodities, insurance, and contractual services, to prohibit contracting between governmental entities and entities of foreign countries of concern.

The bill defines the following terms for purposes of the new statute:
- "Controlling interest" means possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract, or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company or is entitled to 25 percent or more of its profits is presumed to possess a controlling interest in that company.
- "Department" means the Department of Management Services.
- "Foreign country of concern" means:
  - The People's Republic of China.
  - The Russian Federation.
  - The Islamic Republic of Iran.
  - The Democratic People's Republic of Korea.
  - The Republic of Cuba.
  - The Venezuelan regime of Nicolás Maduro.
  - The Syrian Arab Republic.
  - Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Governmental entity" means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law including, but not limited to, the Commission on Ethics, the Public Service Commission, the Office of Public Counsel, and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that governmental entities may not knowingly enter into a contract with an entity which would give access to an individual's personal identifying information if:

---

[50] Section 775.082(3)(d), F.S.
[51] Section 775.083(1)(b), F.S.
[52] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

Case 4:23-cv-00208-AW-MAF   Document 21-39   Filed 06/06/23   Page 10 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 48 of 221
BILL: SB 264

Page 9

- The entity is owned by the government of a foreign country of concern;
- The government of a foreign country of concern has a controlling interest in the entity; or
- The entity is organized under the laws of or has its principal place of business in a foreign country of concern.

Additionally, the bill provides that:
- Beginning January 1, 2024, a governmental entity may not accept a bid on, a proposal for, or a reply to, or enter into, a contract with an entity which would grant the entity access to an individual's personal identifying information unless the entity provides the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.
- Beginning July 1, 2025:
  - A governmental entity may not extend or renew a contract with one of the entities listed above if the contract would give such entity access to an individual's personal identifying information.
  - When an entity extends or renews a contract with a governmental entity which would grant the entity access to an individual's personal identifying information, the entity must provide the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.

The bill authorizes the Attorney General to bring a civil action in any court of competent jurisdiction against an entity that violates the statute. Violations of the statute may result in:
- A civil penalty equal to twice the amount of the contract for which the entity submitted a bid or proposal for, replied to, or entered into.
- Ineligibility to enter into, renew, or extend any contract, including any grant agreements, with any governmental entity for up to 5 years.
- Ineligibility to receive or renew any license, certification, or credential issued by a governmental entity for up to 5 years.
- Placement on the suspended vendor list.[53]

Any penalties collected from entities that violate the statute must be deposited into the General Revenue Fund.

The bill also authorizes the department to adopt rules to implement the statute, including rules establishing the form for the affidavit required under the statute.

**Prohibition on Contracting for an Economic Incentive with a Foreign Entity**

**Section 2** of the bill creates s. 288.007, F.S., to prohibit governmental entities from entering into contracts for an economic incentive with a foreign entity.

The bill defines the following terms for purposes of the new statute:
- "Controlled by" means having possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract,

---

[53] *See* s. 287.1351, F.S. (providing for the suspension of certain vendors).

or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company, or that is entitled to 25 percent or more of its profits, is presumed to control the foreign entity.

- "Economic incentive" means all programs administered by, or for which an applicant for the program must seek certification, approval, or other action by, the department under chapter 288, F.S. (governing commercial development and capital improvements), chapter 212, F.S. (governing tax on sales, use, and other transactions), or chapter 220, F.S. (the income tax code), and all local economic development programs, grants, or financial benefits administered by a political subdivision or an agent thereof.
- "Foreign country of concern" has the same meaning as defined later in the bill.[54]
- "Foreign entity" means an entity that is:
  - o Owned or controlled by the government of a foreign country of concern; or
  - o A partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern.
- "Government entity" means a state agency, a political subdivision, or any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that a government entity may not knowingly enter into an agreement or contract for an economic incentive with a foreign entity. Before providing any economic incentive, a government entity must require the recipient or applicant to provide the government entity with an affidavit signed under penalty of perjury attesting that the recipient or applicant is not a foreign entity.

The bill also requires the department to adopt rules to administer the new statute, including rules establishing the form for the required affidavit.

**Prohibition of Conveyances to Foreign Entities**

**Section 3** of the bill directs the Division of Law Revision to create part III of chapter 692, F.S., consisting of ss. 692.201, 692.202, 692.203, and 692.204, F.S., to be entitled "Conveyances to Foreign Entities."

*Definitions*

**Section 4** of the bill creates s. 692.201, F.S., which defines the following terms for purposes of part III of chapter 692, F.S.:

- "Agricultural land" means land classified as agricultural under state law.[55]
- "Critical infrastructure facility" means any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons:
  - o A chemical manufacturing facility.
  - o A refinery.

---

[54] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[55] *See* s. 193.461, F.S. (providing the agricultural land classification process).

- An electrical power plant, including a substation, switching station, electrical control center, or electric transmission or distribution facility.[56]
- A water intake structure, water treatment facility, wastewater treatment plant, or pump station.
- A natural gas transmission compressor station.
- A liquid natural gas terminal or storage facility.
- A telecommunications central switching office.
- An inland port or other facility or group of facilities serving as a point of intermodal transfer of freight in a specific area physically separated from a seaport.
- A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas.
- A seaport.[57]
- A spaceport territory.[58]
- "Foreign country of concern" means:
  - The People's Republic of China.
  - The Russian Federation.
  - The Islamic Republic of Iran.
  - The Democratic People's Republic of Korea.
  - The Republic of Cuba.
  - The Venezuelan regime of Nicolás Maduro.
  - The Syrian Arab Republic.
  - Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Foreign principal" means:
  - The government or any official of the government of a foreign country of concern;
  - A political party or member of a political party or any subdivision of a political party in a foreign country of concern;
  - A partnership, association, corporation, organization, or other combination of persons organized under the laws of, or having its principal place of business in, a foreign country of concern; or
  - Any person who is domiciled in a foreign country of concern and is not a citizen of the U.S.
- "Military installation" means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the secretary of a military department or the

---

[56] *See* s. 403.031(20), F.S. (defining "electrical power plant" as meaning any electrical generating facility that uses any process or fuel and that is owned or operated by an electric utility, as defined in s. 403.503(14), and includes any associated facility that directly supports the operation of the electrical power plant).

[57] *See* s. 311.09(1), F.S. (listing the ports of Jacksonville, Port Canaveral, Port Citrus, Fort Pierce, Palm Beach, Port Everglades, Miami, Port Manatee, St. Petersburg, Putnam County, Tampa, Port St. Joe, Panama City, Pensacola, Key West, and Fernandina).

[58] *See* s. 331.303(18), F.S. (defining "spaceport territory" as the geographical area designated in s. 331.304, F.S., and as amended or changed in accordance with s. 331.329, F.S.; it includes, but is not limited to, the real property located in Brevard County that is included within the 1998 boundaries of Patrick Space Force Base, formerly Patrick Air Force Base; Cape Canaveral Space Force Station, formerly Cape Canaveral Air Force Station; and the John F. Kennedy Space Center).

Secretary of Defense, without regard to the duration of operational control.[59] For purposes of the bill, military installations include armories.[60]

- "Real property" means land, buildings, fixtures, and all other improvements to land.

### *Purchase of Agricultural Land by Foreign Principals*

**Section 5** of the bill creates s. 692.202, F.S., to prohibit the purchase of agricultural land by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent agricultural land or any interest in such land in the state. This prohibition does not apply to a foreign principal that acquires agricultural land for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires agricultural land or any interest in such land in the state before July 1, 2023:

- May continue to own or hold such land or interest, but may not purchase or otherwise acquire by grant, devise, or descent any additional agricultural land or interest in such land in the state.
- Must register with the Department of Agriculture and Consumer Services by January 1, 2024. The department must establish a form for such registration, which, at minimum, must include all of the following:
  - o The name of the owner of the agricultural land or the owner of the interest in such land.
  - o The address of the agricultural land, the property appraiser's parcel identification number, and the property's legal description.
  - o The number of acres of the agricultural land.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered agricultural land for the unpaid balance of any penalties assessed under the new statute.

The bill provides that a foreign principal that acquires agricultural land on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts must sell, transfer, or otherwise divest itself of the agricultural land within 2 years after acquiring the agricultural land.

At the time of purchase, a buyer of agricultural land, or an interest in such land, must provide an affidavit signed under penalty of perjury attesting to compliance with this section. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the agricultural land. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

---

[59] 10 U.S.C. s. 2801(c)(4).
[60] *See* s. 250.01(5), F.S. (defining an "armory" as a building or group of buildings used primarily for housing and training troops or for storing military property, supplies, or records).

The bill provides that an agricultural land, or any interest in such land, that is owned or acquired in violation of the new statute may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Agriculture and Consumer Services may initiate a civil action in the circuit court of the county in which the property lies.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[61] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the agricultural land, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the agricultural land, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the agricultural land in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the agricultural land subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the agricultural land upon a showing that the defendant's control of the agricultural land constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:

- A foreign principal that purchases or acquires agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[62] and a $500 fine.[63]
- A person who knowingly sells agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[64] and a $500 fine.[65]

The bill also requires the Department of Agriculture and Consumer Services to adopt rules to implement the new statute.

### Purchase of Real Property around Military Installation and Critical Infrastructure Facilities by Foreign Principals

**Section 6** of the bill creates s. 692.203, F.S., to prohibit the purchase of real property around military installations and critical infrastructure facilities by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent any interest in real property within 20 miles of any military

---

[61] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[62] Section 775.082(4)(b), F.S.
[63] Section 775.083(1)(e), F.S.
[64] Section 775.082(4)(b), F.S.
[65] Section 775.083(1)(e), F.S.

installation or critical infrastructure facility in the state. This prohibition does not apply to a foreign principal that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires any interest in real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property within 20 miles of any military installation or critical infrastructure facility in the state.

The bill provides that a foreign principal that owns or acquires real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:

- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this provision.

The bill provides that a foreign principal that acquires real property, or any interest therein, which is within 20 miles of any military installation or critical infrastructure facility in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property.

At the time of purchase, a buyer of real property that is located within 20 miles of any military installation or critical infrastructure facility in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[66] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to

---

[66] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A foreign principal that purchases or acquires real property or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[67] and a $500 fine.[68]
- A person who knowingly sells real property or any interest therein in violation of this section commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[69] and a $500 fine.[70]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

### *Purchase or Acquisition of Real Property by the People's Republic of China*

**Section 7** of the bill creates s. 692.204, F.S., to prohibit the purchase or acquisition of real property by the People's Republic of China.

The bill prohibits the following persons or entities from directly or indirectly owning or acquiring by purchase, grant, devise, or descent any interest in real property in the state:
- The People's Republic of China, the Chinese Communist Party, or any official or member of the People's Republic of China or the Chinese Communist Party.
- Any other political party or member of a political party or a subdivision of a political party in the People's Republic of China.
- A partnership, an association, a corporation, an organization, or any other combination of persons organized under the laws of or having its principal place of business in the People's Republic of China.
- Any person who is domiciled in the People's Republic of China and who is not a citizen of the U.S.

---

[67] Section 775.082(4)(b), F.S.
[68] Section 775.083(1)(e), F.S.
[69] Section 775.082(4)(b), F.S.
[70] Section 775.083(1)(e), F.S.

This prohibition does not apply to a person or entity of the People's Republic of China that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

Any person or entity described above that directly or indirectly owns or acquires any interest in real property in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property in the state.

The bill provides that any person or entity described above that owns or acquires real property in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:

- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A person or entity that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this paragraph.

The bill provides that a person or entity that acquires real property in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property unless the person or entity acquired the real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

At the time of purchase, a buyer of real property in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this subsection, including rules establishing the form for the affidavit required under this subsection.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[71] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

---

[71] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

**A209**

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A violation of this section constitutes a felony of the third degree, punishable by a term of imprisonment not exceeding 5 years[72] and a $5,000 fine,[73] or possibly more under the habitual offender statute.[74]
- A person who sells real property or any interest therein in violation of the new statute commits a misdemeanor of the first degree, punishable by a term of imprisonment not exceeding 1 year[75] and a $1,000 fine.[76]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

**Amendments to the Florida Electronic Health Records Act**

**Section 8** of the bill amends s. 408.051, F.S., the Florida Electronic Health Records Exchange Act (Act), by adding two definitions and by requiring that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

First, for purposes of the Act, the bill incorporates the definition for "cloud computing" found in chapter 282, part I, F.S., which governs information technology management. That definition[77] provides that cloud computing has the same meaning as provided in Special Publication 800-145 issued by the National Institute of Standards and Technology, which reads as follows:

> Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or

---

[72] Section 775.082(3)(e), F.S.
[73] Section 775.083(1)(c), F.S.
[74] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).
[75] Section 775.082(4)(a), F.S.
[76] Section 775.083(1)(d), F.S.
[77] Section 282.0041(5), F.S.

service provider interaction. This cloud model is composed of five essential characteristics, three service models, and four deployment models.[78]

Second, for purposes of the Act, the bill defines the term "health care provider" as including all of the following:

- Any provider as defined in the Health Care Licensing Procedures Act;[79]
- Any health care practitioner as defined in chapter 456, F.S., which governs health professions and occupations;[80]
- Any health care professional certified under the Radiological Personnel Certification Act;[81]
- Any home health aide as defined in the Home Health Services Act;[82]
- Any service provider as defined in the Florida Mental Health Act,[83] and the service provider's clinical and nonclinical staff who provide inpatient or outpatient services;
- Any licensed continuing care facility;[84] and
- Any pharmacy permitted under the Florida Pharmacy Act.[85]

Third, the bill amends the Act to provide that in addition to complying with certain federal standards regulating the privacy of individually identifiable health information,[86] a health care provider that utilizes certified electronic health record technology must ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted computing facility or an entity providing cloud computing services, is physically maintained in the continental U.S. The bill applies this provision to all qualified electronic health records that are stored using any technology that can allow information to be electronically retrieved, accessed, or transmitted.

---

[78] U.S. Department of Commerce, National Institute of Standards and Technology, *Special Publication 800-145 (The NIST Definition of Cloud Computing)* (Sept. 2011), *available at* https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication 800-145.pdf (also identifying the referenced five essential characteristics, three service models, and four deployment models) (footnotes omitted).
[79] *See* s. 408.803(12), F.S. (defining "provider" as any activity, service, agency, or facility regulated by Agency for Health Care Administration and listed in s. 408.802, F.S.).
[80] *See* s. 456.001(4), F.S. (defining "health care practitioner" as any person licensed under one of the listed statutes).
[81] Chapter 468, part IV, F.S.
[82] *See* s. 400.462, F.S. (defining "home health aide" as a person who is trained or qualified, as provided by rule, and who provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in ambulation or exercises, assists in administering medications as permitted in rule and for which the person has received training established by the agency under part III (regulating home health services), or performs tasks delegated to him or her under ch. 464, F.S. (regulating nursing)).
[83] *See* s. 394.455(45), F.S. (defining "service provider" as a receiving facility, a facility licensed under ch. 397, F.S. (governing substance abuse services), a treatment facility, an entity under contract with the department to provide mental health or substance abuse services, a community mental health center or clinic, a psychologist, a clinical social worker, a marriage and family therapist, a mental health counselor, a physician, a psychiatrist, an advanced practice registered nurse, a psychiatric nurse, or a qualified professional as defined in s. 39.01, F.S. (referencing licensed physicians, physician assistants, psychiatrists, psychologists, and psychiatric nurses))).
[84] *See* ch. 651, F.S. (governing continuing care contracts).
[85] Chapter 465, F.S.
[86] 45 C.F.R. pts. 160 and 164 (subparts A and C).

**Amendments to the Health Care Licensing Procedures Act**

**Section 9** of the bill amends s. 408.810, F.S., which provides certain minimum licensure requirements for health care providers.[87]

The bill provides that a licensee must sign an affidavit at the time of his or her initial application for a license, and on any renewal applications thereafter, that attests under penalty of perjury that he or she is in compliance with the bill, specifically the requirement in the bill that health care providers using certified electronic health record technology ensure that all patient information stored in an offsite physical or virtual environment is physically maintained in the continental U.S. The licensee must remain in compliance with this requirement or be subject to disciplinary action by the agency.

The licensee must also ensure that a person or entity who possesses a controlling interest in the licensee does not also hold, either directly or indirectly, regardless of ownership structure, an interest in an entity that has a business relationship with a foreign country of concern or that is subject to the statute prohibiting contracting with scrutinized companies.[88]

For purposes of this provision, the bill defines the following terms:
- "Business relationship" means engaging in commerce in any form, including, but not limited to, acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, military equipment, or any other apparatus of business or commence.
- "Foreign country of concern" has the same meaning as provided earlier in the bill.[89]
- Having an "interest" in an entity means having any direct or indirect investment in or loan to the entity valued at 5 percent or more of the entity's net worth, or any form of direct or indirect control exerting similar or greater influence on the governance of the entity.[90]

**Amendments to the Statute Criminalizing Threats and Extortion**

**Section 10** of the bill amends s. 836.05, F.S., which criminalizes threats and extortion, to provide that a person who commits a violation of the statute and at the time of the violation is acting as a foreign agent as defined in state law,[91] with the intent of benefitting a foreign country of concern as defined earlier in the bill,[92] commits a felony of the first degree, punishable by a term of imprisonment of not exceeding 30 years[93] and a $10,000 fine,[94] or possibly more under the habitual offender statute.[95]

---

[87] *See supra* note 79 (defining providers); *see also* s. 408.802, F.S. (listing regulated providers).
[88] Section 287.135, F.S.
[89] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[90] *See* s. 286.101(1), F.S. (defining "interest").
[91] *See* s. 812.081(1)(b), F.S. (defining "foreign agent" as any officer, employee, proxy, servant, delegate, or representative of a foreign government).
[92] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[93] Section 775.082(3)(b)1., F.S.
[94] Section 775.083(1)(b), F.S.
[95] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

**Effective Date**

The bill takes effect on July 1, 2023.

## IV.   Constitutional Issues:

A.   Municipality/County Mandates Restrictions:

None.

B.   Public Records/Open Meetings Issues:

None.

C.   Trust Funds Restrictions:

None.

D.   State Tax or Fee Increases:

None.

E.   Other Constitutional Issues:

A state's power to apply its law exclusively to its alien inhabitants as a class is confined to narrow limits. However, each state, in the absence of any treaty provision to the contrary, may deny to aliens the right to own land within its border.[96]

## V.   Fiscal Impact Statement:

A.   Tax/Fee Issues:

None.

B.   Private Sector Impact:

Under the bill, governmental entities are prohibited from knowingly entering into contracts for an economic incentive with a foreign entity. Accordingly, foreign entities (as defined in the bill) will no longer be able to avail themselves of such economic incentives in connection with their projects.

The bill provides that foreign principals who acquired agricultural land or land within 20 miles of a military installation or critical infrastructure facility before July 1, 2023 may

---

[96] *See Graham v. Ramani,* 383 So. 2d 634, 635 (Fla. 1980) (recognizing that the U.S. Supreme Court has upheld statutes denying aliens the right to acquire land and citing in support *Terrace v. Thompson,* 263 U.S. 197 (1923); *Terrace* upheld a state of Washington statute prohibiting the ownership of land within the state by nondeclarant aliens, finding that the "privilege of owning or controlling agricultural land within the state" and the "allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself" (*id.* at 221)).

continue to own those lands, but may not expand upon their ownership after that date. Similarly, Chinese businesses, and persons who are domiciled in China and not U.S. citizens, who acquired real property before July 1, 2023 may continue to own those lands, but may not expand upon their ownership after that date. To the extent any of these foreign principals, businesses, or persons' business plans assumed future expansions of land ownership, those plans will be negatively impacted by the bill.

The bill requires health care providers that use certified electronic health care technology to ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted facility or an entity providing cloud computing services, is maintained in the continental U.S. To the extent such patient information is not already maintained in the continental U.S., health care providers will incur costs moving that information into the continental U.S.

C.      Government Sector Impact:

Under the bill, governmental entities may not contract with entities of foreign countries of concern. To the extent contracting with entities of foreign countries of concern might have resulted in more favorable contractual terms than contracting with other entities, governmental entities will be negatively impacted by the bill.

The bill authorizes the Attorney General, Department of Agriculture and Consumer Services, and the Department of Economic Opportunity to enforce certain affidavit preparation and property forfeiture provisions in the bill. Additionally, the bill requires the Department of Management Services, the Florida Real Estate Commission, and the Department of Economic Opportunity to adopt rules to implement various provisions of the bill. Although these state agencies will incur costs associated with these efforts, it is anticipated that they will be minimal and absorbed by their existing budget allocations.

## VI.   Technical Deficiencies:

None.

## VII.  Related Issues:

None.

## VIII. Statutes Affected:

This bill creates the following sections of the Florida Statutes: 287.138, 288.007, 692.201, 692.202, 692.203, and 692.204.

This bill substantially amends the following sections of the Florida Statutes: 408.051, 408.810, and 836.05.

**A214**

BILL: SB 264                                                                 Page 22

**IX.   Additional Information:**

**A.   Committee Substitute – Statement of Changes:**
(Summarizing differences between the Committee Substitute and the prior version of the bill.)

None.

**B.   Amendments:**

None.

---

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.

---

**A215**



EXHIBIT 36

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

Prepared By: The Professional Staff of the Committee on Judiciary

BILL:            CS/SB 264

INTRODUCER:      Judiciary Committee and Senators Collins and Avila

SUBJECT:         Interests of Foreign Countries

DATE:            March 14, 2023        REVISED:         _____   _____   _____   _____

| | ANALYST | STAFF DIRECTOR | REFERENCE | ACTION |
|---|---|---|---|---|
| 1. | Collazo | Cibula | JU | **Fav/CS** |
| 2. | | | RC | |

---

> ## Please see Section IX. for Additional Information:
>
> COMMITTEE SUBSTITUTE - Substantial Changes

---

## I.    Summary:

CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

Specifically, with respect to governmental entity contracting, the bill creates statutes that prohibit governmental entities from:
- Contracting with entities of foreign countries of concern.
- Entering into contracts for an economic incentive with a foreign entity.

And with respect to conveyances of agricultural lands, the bill creates statutes that:
- Prohibit a foreign principal from owning or acquiring agricultural land in the state.
- Prohibit a foreign principal from owning or acquiring any interest in real property within 20 miles of any military installation or critical infrastructure in the state.
- Prohibit China, Chinese Communist Party or other Chinese political party officials or members, Chinese business organizations, and persons domiciled in China, but who are not U.S. citizens, from purchasing or acquiring any interest in real property in the state.

The bill also amends:
- The Florida Electronic Health Records Act, to require that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

**A217**

- The Health Care Licensing Procedures Act, to require licensees to sign affidavits attesting that all patient information stored by them is being physically maintained in the continental U.S.
- The statute criminalizing threats and extortion, to provide that a person who commits a violation of the statute, and at the time is acting as a foreign agent with the intent of benefitting a foreign country of concern, commits a first degree felony.

The bill takes effect July 1, 2023.

## II.    Present Situation:

### Foreign Ownership of U.S. Agricultural Land

Foreign ownership and investment in U.S. agricultural land has generated significant interest in recent years.[1] Several high-profile incidents have prompted lawmakers to focus their attention on evaluating and responding to the potential impacts of foreign ownership and investment on national security, trade, and food security.[2]

A significant example occurred last year. Fufeng Group Limited, a Chinese food manufacturer, acquired 300 acres of land near the Grand Forks Air Force Base in North Dakota in order to build a wet corn milling and biofermentation plant.[3] The Air Force base, which is only about 12 miles away from the site, is believed to be the home of some of the country's most sophisticated, "top secret" military drone technology.[4] The location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns.[5]

In January, Andrew P. Hunter, Assistant Secretary of the Air Force for Acquisition, Technology and Logistics,[6] sent U.S. Senator John Hoeven a letter providing the Air Force's official position on the project. It confirmed that "Grand Forks Air Force Base is the center of military activities related to both air and space operations" and that the department's position is "unambiguous: the proposed project presents a significant threat to national security with both near- and long-term

[1] Aleks Phillips, *What the U.S. Is Doing to Curtail Chinese Land Ownership,* NEWSWEEK, Feb. 13, 2023, https://www.newsweek.com/chinese-land-ownership-investment-us-military-bases-1780886.
[2] *See* Letter from Congressmen Glenn "GT" Thompson & James Comer to Gene L. Dodaro, Comptroller General of the U.S. Government Accountability Office (Oct. 1, 2022), *available at* https://oversight.house.gov/wp-content/uploads/2022/10/20221001_GAO_foreignlandownership.pdf (requesting that the office conduct a review of foreign investment in U.S. farmland and its impact on national security, trade, and food security).
[3] Congressional Research Service (CRS), *Foreign Ownership and Holdings of U.S. Agricultural Land* (version 4, updated Jan. 24, 2023), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11977.
[4] Ariel Zilber, *Chinese firm bought North Dakota farm near U.S. Air Force drone base: report,* NEW YORK POST, Jul. 1, 2022, https://nypost.com/2022/07/01/chinese-firm-bought-farm-near-us-air-force-drone-base-report/; *see also* Letter from Thompson & Comer, *supra* note 2 (describing the technology as "top secret"); *see also* Lauren Greenwood, U.S.-China Economic and Security Review Commission, *China's Interests in U.S. Agriculture: Augmenting Food Security through Investment Abroad* (May 26, 2022), 11, *available at* https://www.uscc.gov/sites/default/files/2022-05/Chinas_Interests_in_U.S._Agriculture.pdf (noting that the Grand Forks Air Force Base "houses some of the United States' top intelligence, surveillance, and reconnaissance capabilities").
[5] Greenwood, *supra* note 4.
[6] U.S. Air Force, *Andrew P. Hunter* (Sept. 2022), https://www.af.mil/About-Us/Biographies/Display/Article/3154079/andrew-p-hunter/.

risks of significant impacts to our operations in the area."[7] About a week after the department issued its letter, the Grand Forks City Council abandoned the project.[8]

In addition to national security concerns, federal officials are also concerned about potential food security impacts. A recent letter from 130 lawmakers to the U.S. Government Accountability Office expressed concern that "foreign investment in U.S. farmland could result in foreign control of available U.S. farmland, especially prime agricultural lands, and possibly lead to foreign control over food production and food prices."[9] In a separate interview, one of the lawmakers noted that "food security is national security," explaining that Russia was able to exercise undue influence over Europe because it supplied Europe with a significant amount of natural gas, and that China might similarly try to control food supplies in South America, Southeast Asia, and even North America, in order to exert greater coercive power around the globe.[10]

Other recent incidents, while not involving the acquisition of U.S. farmland, suggest that China is working aggressively to undermine U.S. interests in other ways, both at home and abroad:

- Confucius Institutes, which offer Chinese language and cultural programs, first began appearing on U.S. university campuses in 2005. Some Members of Congress and others have alleged that they may play a role in China's efforts to influence public opinion abroad, recruit "influence agents" on U.S. campuses, and engage in cyber espionage and intellectual property theft.[11]

- In November of last year, FBI Director Christopher Wray testified at a U.S. Senate Homeland Security and Governmental Affairs Committee hearing about the existence of certain unauthorized 'police stations' established by China in major U.S. cities, noting that the U.S. has made a number of indictments involving the Chinese government harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping.[12]

- Last month, the U.S. shot down a Chinese spy balloon after it had traversed over a large swath of North America. The Biden Administration alleged it was part of a larger Chinese surveillance-balloon program that had violated the sovereignty of nations all over the word.[13]

---

[7] Letter from Andrew P. Hunter, Office of the Assistant Secretary, to U.S. Senator John Hoeven (Jan. 27, 2023), *available at* https://www.hoeven.senate.gov/imo/media/doc/USAIRFORCE-FUFENG-LETTER-HOEVEN.pdf.

[8] Meghan Arbegast, *Year-long Fufeng debate comes to an end after Grand Forks council members vote to stop project,* GRAND FORKS HERALD, Feb. 6, 2023, https://www.grandforksherald.com/news/local/year-long-fufeng-debate-comes-to-an-end-after-grand-forks-council-members-vote-to-stop-project.

[9] Letter from Thompson & Comer, *supra* note 2.

[10] NPR, *China is buying up more U.S. farmland. Some lawmakers consider that a security threat* (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160297853/china-farmland-purchases-house-hearing-competition.

[11] CRS, *Confucius Institutes in the United States: Selected Issues* (version 12, updated May 20, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11180.

[12] Michael Martina & Ted Hesson, *FBI director 'very concerned' by Chinese 'police stations' in U.S.,* REUTERS, Nov. 17, 2022, https://www.reuters.com/world/us/fbi-director-very-concerned-by-chinese-police-stations-us-2022-11-17/.

[13] Isaac Chotiner, *What's Behind the Chinese Spy Balloon,* THE NEW YORKER, Feb. 18, 2023, https://www.newyorker.com/news/q-and-a/whats-behind-the-chinese-spy-balloon.

Case 4:23-cv-00208-AW-MAF   Document 21-43   Filed 06/06/23   Page 5 of 23
USCA11 Case: 23-12737      Document: 39-2      Date Filed: 10/02/2023      Page: 66 of 221

BILL: CS/SB 264

Page 4

- This month, the U.S. (and Canada) issued orders banning the use of TikTok, a Chinese-owned video sharing app, on government-issued mobile devices amid growing privacy and cybersecurity concerns.[14]
- Also this month, U.S. defense and national security officials have raised the possibility that certain Chinese-made giant cargo cranes are being used for espionage.[15]

### Ownership Statistics

Foreign persons and entities held an interest in 40.8 million acres of U.S. agricultural land in 2021, accounting for 3.1% of total privately owned land.[16] These data cover agricultural land and nonagricultural land (e.g. associated homesteads, roads, etc.). In 2021, forestland accounted for 47% of all foreign-owned land, cropland accounted for 29%, and pasture and other agricultural land for 22%. Nonagricultural land (such as homesteads and roads) accounted for 2%. Foreign land holdings have increased by an average of 2.2 million acres per year since 2015.[17]

With respect to China specifically, not including the Fufeng Group Limited's purchase in 2022, the U.S. Department of Agriculture reports that China accounted for 383,935 acres, or 0.9% of total foreign-owned U.S. agricultural land as of year-end 2021.[18] The department also reports that 85 Chinese investors own 275 parcels of agricultural land totaling 194,772 acres worth $1,868,577.[19]

| Country | Total | Foreign Entities | U.S. Entities w/ Foreign Shares | % of U.S. Private Land |
|---|---|---|---|---|
| | | (million acres) | | (percent) |
| Canada | 12.8 | 9.7 | 3.2 | 1.0% |
| Netherlands | 4.9 | 4.4 | 0.5 | 0.4% |
| Italy | 2.7 | 2.6 | 0.1 | 0.2% |
| United Kingdom | 2.5 | 1.5 | 1.0 | 0.2% |
| Germany | 2.3 | 1.4 | 0.9 | 0.2% |
| **Subtotal** | 25.2 | 19.6 | 5.7 | 2.0% |
| Other Countries | 12.4 | 7.1 | 5.3 | 1.0% |
| Not Listed | 3.2 | 2.4 | 0.8 | 0.3% |
| **Total** | 40.8 | 29.1 | 11.7 | 3.1% |



*Foreign Holdings of Agricultural Land, 2021[20]*

As of year-end 2021, the states with the most foreign-owned agricultural acreage were Texas (5.3 million acres), Maine (3.6 million acres), Colorado (1.9 million acres), Alabama (1.8 million

---

[14] CBS News, *TikTok banned on U.S. government devices, and the U.S. is not alone. Here's where the app is restricted* (Mar. 1, 2023), https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.

[15] Kent Masing, *U.S. Concerned China-Made Cranes In American Ports Used To Spy On Military: Report,* INTERNATIONAL BUSINESS TIMES, Mar. 6, 2023, https://www.ibtimes.com/us-concerned-china-made-cranes-american-ports-used-spy-military-report-3673964.

[16] CRS, *supra* note 3, at 2.

[17] *Id.*

[18] *Id.;* Farm Service Agency, U.S. Department of Agriculture, *Foreign Holdings of U.S. Agricultural Land* (through Dec. 31, 2021), 4, *available at* https://www.fsa.usda.gov/programs-and-services/economic-and-policy-analysis/afida/annual-reports/index.

[19] Farm Service Agency, *supra* note 18, at 229.

[20] *Id.* at Table 1 and Figure 2 (internal citations omitted).

acres), and Oklahoma (1.7 million acres). Other states with more than 1 million foreign-owned acres were Arkansas, California, Florida, Georgia, Kansas, Louisiana, Michigan, New Mexico, Oregon, and Washington.[21]

According to the U.S. Department of Agriculture, of the 21,849,568 acres of privately held agricultural land in Florida, 1,382,284 acres (6.3%) are held by foreigners, which is among the highest proportions in the U.S.[22] It is unclear how much of that land is owned by China, although the department does report that it owns 96,975 acres in the "South Region," which includes Florida.[23]

### Existing Federal and State Laws

Federal law currently imposes no restrictions on the amount of private U.S. agricultural land that can be foreign-owned.[24] However, the Agricultural Foreign Investment Disclosure Act of 1978 established a nationwide system for collecting information pertaining to the foreign ownership of U.S. agricultural land,[25] including land used for agricultural, forestry, or timber production purposes.[26] For purposes of the act, foreign persons include any individual, corporation, company, association, partnership, society, joint stock company, trust, estate, or any other legal entity (including any foreign government) under the laws of a foreign government or having a principal place of business outside of the U.S.[27]

The act's regulations require foreign persons who buy, sell, or gain interest in U.S. agricultural land to disclose their holdings and transactions to the U.S. Department of Agriculture directly or to the Farm Service Agency county office where the land is located.[28] Failure to disclose this information may result in penalties and fines.[29] After the original disclosure, each subsequent change of ownership or use must be reported.[30] It should be noted that some have expressed concern that U.S. Department of Agriculture figures developed under the act may actually underestimate foreign ownership due to unreliable data collection and the definitions used by the department.[31]

The Committee on Foreign Investment in the U.S. is an interagency committee authorized to review certain transactions involving foreign investment in the U.S. and real estate transactions by foreign persons, in order to determine the effect of such transactions on national security.[32] Notwithstanding recent expansions to the committee's jurisdictional authority and review

---

[21] *Id.*

[22] *See* Farm Service Agency, *supra* note 18, at 4, 17.

[23] *Id.* at 238.

[24] CRS, *supra* note 3, at 1.

[25] Pub. L. No. 95-460, 92 Stat. 1263 (1978); 7 U.S.C. ss. 3501-3508.

[26] 7 U.S.C. s. 3508(1); 7 C.F.R. s. 781.2(b).

[27] 7 U.S.C. s. 3508(3); 7 C.F.R. s. 781.2(g).

[28] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(a).

[29] 7 U.S.C. s. 3502; 7 C.F.R. ss. 781.4., 781.5.

[30] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(b).

[31] Texas Farm Bureau, *Lawmakers ask for review of foreign ownership of U.S. farmland,* https://texasfarmbureau.org/lawmakers-ask-for-review-of-foreign-ownership-of-u-s-farmland/ (last visited Mar. 7, 2023).

[32] U.S. Department of the Treasury, *The Committee on Foreign Investment in the United States,* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius (last visited Mar. 6, 2023).

considerations,[33] there appear to be significant gaps. For example, the committee recently determined that Fufeng Group Limited's purchase near Grand Forks Air Force Base was outside of its jurisdiction and that it would therefore take no further action.[34]

Some U.S. states and localities have instituted restrictions on the foreign ownership of farmland.[35] Although no state has instituted an absolute prohibition on all foreign ownership, some states have limited or proposed to prohibit certain foreign persons and entities from acquiring or owning an interest in agricultural land within their states, and several states have separate disclosure requirements within their states.[36]



*Overview of Selected State Laws Related to Foreign Ownership of U.S. Agricultural Land*[37]

There is no single uniform approach under state laws to addressing foreign ownership.[38] Some general categories include:

- Restrictions on the amount of land that can be owned or the duration of ownership.
- Distinctions involving private versus public land or how agricultural land is defined.
- Distinctions involving resident and nonresident aliens.
- Inheritance considerations involving land ownership.
- Restrictions on ownership by foreign corporations (e.g. corporate farming laws or requirements corporations are subject to in order to obtain license or register).
- Differences related to enforcement and penalties.[39]

Currently, in Florida, foreign persons and entities have the same rights in real property as do citizens of the U.S. Foreign corporations, upon qualifying to do business in the state, have the same rights in real property as do domestic corporations. Foreign ownership of a domestic corporation has no effect on that corporation's rights in real property. No disclosure is required by any person or corporation when acquiring, holding or transferring rights in real property.[40]

---

[33] *See id.* (discussing Executive Order 14083, the Foreign Investment Risk Review Modernization Act of 2018, and associated regulations).

[34] T.J. Nelson, KVVR Local News, *Fufeng USA Looking to Move Ahead with Grand Forks Project After Federal Agency Review Suddenly Ends* (Dec. 13, 2022), https://www.kvrr.com/2022/12/13/fufeng-usa-looking-to-move-ahead-with-grand-forks-project-after-federal-agency-review-suddenly-ends/.

[35] CRS *supra* note 3, at 1.

[36] *Id.*

[37] *Id.* at Figure 1 (internal citation omitted).

[38] *Id.* at 1.

[39] *Id.*

[40] *See* 2 INTERNATIONAL BUSINESS TRANSACTIONS s. 29:26 (3d ed., updated Nov. 2022).

**Florida Electronic Health Records Act**

The Florida Electronic Health Records Act[41] authorizes health care providers to release or access an identifiable health record of a patient without the patient's consent for use in the treatment of that patient for an emergency medical condition, when consent cannot be obtained from the patient or the patient representative due to the patient's condition or the nature of the situation requiring immediate medical attention.[42] It provides immunity from civil liability whenever a health care provider accesses or releases the identifiable health record in good faith under the statute. It also directs the Agency for Health Care Administration to develop a form to document patient authorization for the use or release of an identifiable health record.[43] The act includes definitions for the following terms: "electronic health record," "qualified electronic health record," "certified electronic health record technology," "health record," "identifiable health record," "patient," and "patient representative."[44]

**Health Care Licensing Procedures Act**

The Health Care Licensing Procedures Act[45] provides a streamlined and consistent set of basic licensing requirements for health care providers.[46] The act is intended to minimize confusion, standardize terminology, and include issues that are not otherwise addressed in state law pertaining to specific providers.[47] Among other things, it provides certain minimum licensure requirements, with which applicants and licensees must comply in order to obtain and maintain a license.[48]

**Statute Criminalizing Threats and Extortion**

State law criminalizes threats and extortion. One commits the crime if he or she, either verbally or by a written or printed communication:

> maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will[.][49]

---

[41] Section 408.051, F.S.
[42] Section 408.051(3), F.S.
[43] Section 408.051(4), F.S.
[44] Section 408.051(2), F.S.
[45] Chapter 408, Part II, F.S.; *see also* s. 408.801(1), F.S. (providing a short title).
[46] Section 408.801(2), F.S.
[47] *Id.*
[48] *See generally* s. 408.810, F.S.
[49] Section 836.05, F.S.

**A223**

Case 4:23-cv-00208-AW-MAF   Document 21-43   Filed 06/06/23   Page 9 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 70 of 221
BILL: CS/SB 264

Page 8

The crime is a second degree felony, punishable by a term of imprisonment not exceeding 15 years[50] and a $10,000 fine,[51] or possibly more under the habitual offender statute.[52]

## III.   Effect of Proposed Changes:

CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

**Prohibition on Governmental Entity Contracting with Entities of Foreign Countries of Concern**

**Section 1** of the bill creates s. 287.138, F.S., within chapter 287, part I, F.S., which governs commodities, insurance, and contractual services, to prohibit contracting between governmental entities and entities of foreign countries of concern.

The bill defines the following terms for purposes of the new statute:
- "Controlling interest" means possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract, or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company or is entitled to 25 percent or more of its profits is presumed to possess a controlling interest in that company.
- "Department" means the Department of Management Services.
- "Foreign country of concern" means:
  - The People's Republic of China.
  - The Russian Federation.
  - The Islamic Republic of Iran.
  - The Democratic People's Republic of Korea.
  - The Republic of Cuba.
  - The Venezuelan regime of Nicolás Maduro.
  - The Syrian Arab Republic.
  - Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Governmental entity" means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law including, but not limited to, the Commission on Ethics, the Public Service Commission, the Office of Public Counsel, and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that governmental entities may not knowingly enter into a contract with an entity which would give access to an individual's personal identifying information if:

---

[50] Section 775.082(3)(d), F.S.
[51] Section 775.083(1)(b), F.S.
[52] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

Case 4:23-cv-00208-AW-MAF   Document 21-43   Filed 06/06/23   Page 10 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 71 of 221
BILL: CS/SB 264

Page 9

- The entity is owned by the government of a foreign country of concern;
- The government of a foreign country of concern has a controlling interest in the entity; or
- The entity is organized under the laws of or has its principal place of business in a foreign country of concern.

Additionally, the bill provides that:
- Beginning January 1, 2024, a governmental entity may not accept a bid on, a proposal for, or a reply to, or enter into, a contract with an entity which would grant the entity access to an individual's personal identifying information unless the entity provides the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.
- Beginning July 1, 2025:
  - A governmental entity may not extend or renew a contract with one of the entities listed above if the contract would give such entity access to an individual's personal identifying information.
  - When an entity extends or renews a contract with a governmental entity which would grant the entity access to an individual's personal identifying information, the entity must provide the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.

The bill authorizes the Attorney General to bring a civil action in any court of competent jurisdiction against an entity that violates the statute. Violations of the statute may result in:
- A civil penalty equal to twice the amount of the contract for which the entity submitted a bid or proposal for, replied to, or entered into.
- Ineligibility to enter into, renew, or extend any contract, including any grant agreements, with any governmental entity for up to 5 years.
- Ineligibility to receive or renew any license, certification, or credential issued by a governmental entity for up to 5 years.
- Placement on the suspended vendor list.[53]

Any penalties collected from entities that violate the statute must be deposited into the General Revenue Fund.

The bill also authorizes the department to adopt rules to implement the statute, including rules establishing the form for the affidavit required under the statute.

**Prohibition on Contracting for an Economic Incentive with a Foreign Entity**

**Section 2** of the bill creates s. 288.007, F.S., to prohibit governmental entities from entering into contracts for an economic incentive with a foreign entity.

The bill defines the following terms for purposes of the new statute:
- "Controlled by" means having possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract,

---

[53] *See* s. 287.1351, F.S. (providing for the suspension of certain vendors).

or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company, or that is entitled to 25 percent or more of its profits, is presumed to control the foreign entity.

- "Economic incentive" means all programs administered by, or for which an applicant for the program must seek certification, approval, or other action by, the department under chapter 288, F.S. (governing commercial development and capital improvements), chapter 212, F.S. (governing tax on sales, use, and other transactions), or chapter 220, F.S. (the income tax code), and all local economic development programs, grants, or financial benefits administered by a political subdivision or an agent thereof.
- "Foreign country of concern" has the same meaning as defined later in the bill.[54]
- "Foreign entity" means an entity that is:
  o Owned or controlled by the government of a foreign country of concern; or
  o A partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity.
- "Government entity" means a state agency, a political subdivision, or any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that a government entity may not knowingly enter into an agreement or contract for an economic incentive with a foreign entity. Before providing any economic incentive, a government entity must require the recipient or applicant to provide the government entity with an affidavit signed under penalty of perjury attesting that the recipient or applicant is not a foreign entity.

The bill also requires the department to adopt rules to administer the new statute, including rules establishing the form for the required affidavit.

**Prohibition of Conveyances to Foreign Entities**

**Section 3** of the bill directs the Division of Law Revision to create part III of chapter 692, F.S., consisting of ss. 692.201, 692.202, 692.203, and 692.204, F.S., to be entitled "Conveyances to Foreign Entities."

*Definitions*

**Section 4** of the bill creates s. 692.201, F.S., which defines the following terms for purposes of part III of chapter 692, F.S.:

- "Agricultural land" means land classified as agricultural under state law.[55]
- "Critical infrastructure facility" means any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons:
  o A chemical manufacturing facility.
  o A refinery.

---

[54] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[55] *See* s. 193.461, F.S. (providing the agricultural land classification process).

- o An electrical power plant, including a substation, switching station, electrical control center, or electric transmission or distribution facility.[56]
  - o A water intake structure, water treatment facility, wastewater treatment plant, or pump station.
  - o A natural gas transmission compressor station.
  - o A liquid natural gas terminal or storage facility.
  - o A telecommunications central switching office.
  - o An inland port or other facility or group of facilities serving as a point of intermodal transfer of freight in a specific area physically separated from a seaport.
  - o A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas.
  - o A seaport.[57]
  - o A spaceport territory.[58]
- "Foreign country of concern" means:
  - o The People's Republic of China.
  - o The Russian Federation.
  - o The Islamic Republic of Iran.
  - o The Democratic People's Republic of Korea.
  - o The Republic of Cuba.
  - o The Venezuelan regime of Nicolás Maduro.
  - o The Syrian Arab Republic.
  - o Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Foreign principal" means:
  - o The government or any official of the government of a foreign country of concern;
  - o A political party or member of a political party or any subdivision of a political party in a foreign country of concern;
  - o A partnership, association, corporation, organization, or other combination of persons organized under the laws of, or having its principal place of business in, a foreign country of concern, or a subsidiary of such entity; or
  - o Any person who is domiciled in a foreign country of concern and is not a citizen of the U.S.
- "Military installation" means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the secretary of a military department or the

---

[56] *See* s. 403.031(20), F.S. (defining "electrical power plant" as meaning any electrical generating facility that uses any process or fuel and that is owned or operated by an electric utility, as defined in s. 403.503(14), and includes any associated facility that directly supports the operation of the electrical power plant).

[57] *See* s. 311.09(1), F.S. (listing the ports of Jacksonville, Port Canaveral, Port Citrus, Fort Pierce, Palm Beach, Port Everglades, Miami, Port Manatee, St. Petersburg, Putnam County, Tampa, Port St. Joe, Panama City, Pensacola, Key West, and Fernandina).

[58] *See* s. 331.303(18), F.S. (defining "spaceport territory" as the geographical area designated in s. 331.304, F.S., and as amended or changed in accordance with s. 331.329, F.S.; it includes, but is not limited to, the real property located in Brevard County that is included within the 1998 boundaries of Patrick Space Force Base, formerly Patrick Air Force Base; Cape Canaveral Space Force Station, formerly Cape Canaveral Air Force Station; and the John F. Kennedy Space Center).

Secretary of Defense, without regard to the duration of operational control.[59] For purposes of the bill, military installations include armories.[60]

- "Real property" means land, buildings, fixtures, and all other improvements to land.

### *Purchase of Agricultural Land by Foreign Principals*

**Section 5** of the bill creates s. 692.202, F.S., to prohibit the purchase of agricultural land by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent agricultural land or any interest in such land in the state. This prohibition does not apply to a foreign principal that acquires agricultural land for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires agricultural land or any interest in such land in the state before July 1, 2023:

- May continue to own or hold such land or interest, but may not purchase or otherwise acquire by grant, devise, or descent any additional agricultural land or interest in such land in the state.
- Must register with the Department of Agriculture and Consumer Services by January 1, 2024. The department must establish a form for such registration, which, at minimum, must include all of the following:
  - The name of the owner of the agricultural land or the owner of the interest in such land.
  - The address of the agricultural land, the property appraiser's parcel identification number, and the property's legal description.
  - The number of acres of the agricultural land.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered agricultural land for the unpaid balance of any penalties assessed under the new statute.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire agricultural land on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of the agricultural land within 2 years after acquiring the agricultural land.

At the time of purchase, a buyer of agricultural land, or an interest in such land, must provide an affidavit signed under penalty of perjury attesting to compliance with this section. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the agricultural land. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

---

[59] 10 U.S.C. s. 2801(c)(4).

[60] *See* s. 250.01(5), F.S. (defining an "armory" as a building or group of buildings used primarily for housing and training troops or for storing military property, supplies, or records).

The bill provides that an agricultural land, or any interest in such land, that is owned or acquired in violation of the new statute may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Agriculture and Consumer Services may initiate a civil action in the circuit court of the county in which the property lies.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[61] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the agricultural land, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the agricultural land, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the agricultural land in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the agricultural land subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the agricultural land upon a showing that the defendant's control of the agricultural land constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:

- A foreign principal that purchases or acquires agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[62] and a $500 fine.[63]
- A person who knowingly sells agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[64] and a $500 fine.[65]

The bill also requires the Department of Agriculture and Consumer Services to adopt rules to implement the new statute.

### *Purchase of Real Property around Military Installation and Critical Infrastructure Facilities by Foreign Principals*

**Section 6** of the bill creates s. 692.203, F.S., to prohibit the purchase of real property around military installations and critical infrastructure facilities by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent any interest in real property within 20 miles of any military

---

[61] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[62] Section 775.082(4)(b), F.S.
[63] Section 775.083(1)(e), F.S.
[64] Section 775.082(4)(b), F.S.
[65] Section 775.083(1)(e), F.S.

installation or critical infrastructure facility in the state. This prohibition does not apply to a foreign principal that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires any interest in real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property within 20 miles of any military installation or critical infrastructure facility in the state.

The bill provides that a foreign principal that owns or acquires real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this provision.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire real property, or any interest therein, which is within 20 miles of any military installation or critical infrastructure facility in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property.

At the time of purchase, a buyer of real property that is located within 20 miles of any military installation or critical infrastructure facility in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:
- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[66] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to

---

[66] See s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:

- A foreign principal that purchases or acquires real property or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[67] and a $500 fine.[68]
- A person who knowingly sells real property or any interest therein in violation of this section commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[69] and a $500 fine.[70]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

### *Purchase or Acquisition of Real Property by the People's Republic of China*

**Section 7** of the bill creates s. 692.204, F.S., to prohibit the purchase or acquisition of real property by the People's Republic of China.

The bill prohibits the following persons or entities from directly or indirectly owning or acquiring by purchase, grant, devise, or descent any interest in real property in the state:

- The People's Republic of China, the Chinese Communist Party, or any official or member of the People's Republic of China or the Chinese Communist Party.
- Any other political party or member of a political party or a subdivision of a political party in the People's Republic of China.
- A partnership, an association, a corporation, an organization, or any other combination of persons organized under the laws of or having its principal place of business in the People's Republic of China, or a subsidiary of such entity.
- Any person who is domiciled in the People's Republic of China and who is not a citizen of the U.S.

---

[67] Section 775.082(4)(b), F.S.
[68] Section 775.083(1)(e), F.S.
[69] Section 775.082(4)(b), F.S.
[70] Section 775.083(1)(e), F.S.

This prohibition does not apply to a person or entity of the People's Republic of China that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

Any person or entity described above that directly or indirectly owns or acquires any interest in real property in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property in the state.

The bill provides that any person or entity described above that owns or acquires real property in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A person or entity that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this paragraph.

The bill clarifies that notwithstanding the general prohibition in the bill, a Chinese person or entity can still acquire real property in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property unless the person or entity acquired the real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

At the time of purchase, a buyer of real property in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this subsection, including rules establishing the form for the affidavit required under this subsection.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:
- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[71] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

---

[71] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A violation of this section constitutes a felony of the third degree, punishable by a term of imprisonment not exceeding 5 years[72] and a $5,000 fine,[73] or possibly more under the habitual offender statute.[74]
- A person who sells real property or any interest therein in violation of the new statute commits a misdemeanor of the first degree, punishable by a term of imprisonment not exceeding 1 year[75] and a $1,000 fine.[76]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

**Amendments to the Florida Electronic Health Records Act**

**Section 8** of the bill amends s. 408.051, F.S., the Florida Electronic Health Records Exchange Act (Act), by adding two definitions and by requiring that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

First, for purposes of the Act, the bill incorporates the definition for "cloud computing" found in chapter 282, part I, F.S., which governs information technology management. That definition[77] provides that cloud computing has the same meaning as provided in Special Publication 800-145 issued by the National Institute of Standards and Technology, which reads as follows:

> Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or

---

[72] Section 775.082(3)(e), F.S.
[73] Section 775.083(1)(c), F.S.
[74] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).
[75] Section 775.082(4)(a), F.S.
[76] Section 775.083(1)(d), F.S.
[77] Section 282.0041(5), F.S.

service provider interaction. This cloud model is composed of five essential characteristics, three service models, and four deployment models.[78]

Second, for purposes of the Act, the bill defines the term "health care provider" as including all of the following:

- Any provider as defined in the Health Care Licensing Procedures Act;[79]
- Any health care practitioner as defined in chapter 456, F.S., which governs health professions and occupations;[80]
- Any health care professional certified under the Radiological Personnel Certification Act;[81]
- Any home health aide as defined in the Home Health Services Act;[82]
- Any service provider as defined in the Florida Mental Health Act,[83] and the service provider's clinical and nonclinical staff who provide inpatient or outpatient services;
- Any licensed continuing care facility;[84] and
- Any pharmacy permitted under the Florida Pharmacy Act.[85]

Third, the bill amends the Act to provide that in addition to complying with certain federal standards regulating the privacy of individually identifiable health information,[86] a health care provider that utilizes certified electronic health record technology must ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted computing facility or an entity providing cloud computing services, is physically maintained in the continental U.S. The bill applies this provision to all qualified electronic health records that are stored using any technology that can allow information to be electronically retrieved, accessed, or transmitted.

---

[78] U.S. Department of Commerce, National Institute of Standards and Technology, *Special Publication 800-145 (The NIST Definition of Cloud Computing)* (Sept. 2011), *available at* https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf (also identifying the referenced five essential characteristics, three service models, and four deployment models) (footnotes omitted).

[79] *See* s. 408.803(12), F.S. (defining "provider" as any activity, service, agency, or facility regulated by Agency for Health Care Administration and listed in s. 408.802, F.S.).

[80] *See* s. 456.001(4), F.S. (defining "health care practitioner" as any person licensed under one of the listed statutes).

[81] Chapter 468, part IV, F.S.

[82] *See* s. 400.462, F.S. (defining "home health aide" as a person who is trained or qualified, as provided by rule, and who provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in ambulation or exercises, assists in administering medications as permitted in rule and for which the person has received training established by the agency under part III (regulating home health services), or performs tasks delegated to him or her under ch. 464, F.S. (regulating nursing)).

[83] *See* s. 394.455(45), F.S. (defining "service provider" as a receiving facility, a facility licensed under ch. 397, F.S. (governing substance abuse services), a treatment facility, an entity under contract with the department to provide mental health or substance abuse services, a community mental health center or clinic, a psychologist, a clinical social worker, a marriage and family therapist, a mental health counselor, a physician, a psychiatrist, an advanced practice registered nurse, a psychiatric nurse, or a qualified professional as defined in s. 39.01, F.S. (referencing licensed physicians, physician assistants, psychiatrists, psychologists, and psychiatric nurses)).

[84] *See* ch. 651, F.S. (governing continuing care contracts).

[85] Chapter 465, F.S.

[86] 45 C.F.R. pts. 160 and 164 (subparts A and C).

**Amendments to the Health Care Licensing Procedures Act**

**Section 9** of the bill amends s. 408.810, F.S., which provides certain minimum licensure requirements for health care providers.[87]

The bill provides that a licensee must sign an affidavit at the time of his or her initial application for a license, and on any renewal applications thereafter, that attests under penalty of perjury that he or she is in compliance with the bill, specifically the requirement in the bill that health care providers using certified electronic health record technology ensure that all patient information stored in an offsite physical or virtual environment is physically maintained in the continental U.S. The licensee must remain in compliance with this requirement or be subject to disciplinary action by the agency.

The licensee must also ensure that a person or entity who possesses a controlling interest in the licensee does not also hold, either directly or indirectly, regardless of ownership structure, an interest in an entity that has a business relationship with a foreign country of concern or that is subject to the statute prohibiting contracting with scrutinized companies.[88]

For purposes of this provision, the bill defines the following terms:
- "Business relationship" means engaging in commerce in any form, including, but not limited to, acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, military equipment, or any other apparatus of business or commence.
- "Foreign country of concern" has the same meaning as provided earlier in the bill.[89]
- Having an "interest" in an entity means having any direct or indirect investment in or loan to the entity valued at 5 percent or more of the entity's net worth, or any form of direct or indirect control exerting similar or greater influence on the governance of the entity.[90]

**Amendments to the Statute Criminalizing Threats and Extortion**

**Section 10** of the bill amends s. 836.05, F.S., which criminalizes threats and extortion, to provide that a person who commits a violation of the statute and at the time of the violation is acting as a foreign agent as defined in state law,[91] with the intent of benefitting a foreign country of concern as defined earlier in the bill,[92] commits a felony of the first degree, punishable by a term of imprisonment of not exceeding 30 years[93] and a $10,000 fine,[94] or possibly more under the habitual offender statute.[95]

---

[87] *See supra* note 79 (defining providers); *see also* s. 408.802, F.S. (listing regulated providers).
[88] Section 287.135, F.S.
[89] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[90] *See* s. 286.101(1), F.S. (defining "interest").
[91] *See* s. 812.081(1)(b), F.S. (defining "foreign agent" as any officer, employee, proxy, servant, delegate, or representative of a foreign government).
[92] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[93] Section 775.082(3)(b)1., F.S.
[94] Section 775.083(1)(b), F.S.
[95] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

**Effective Date**

The bill takes effect on July 1, 2023.

## IV.   Constitutional Issues:

A.   Municipality/County Mandates Restrictions:

None.

B.   Public Records/Open Meetings Issues:

None.

C.   Trust Funds Restrictions:

None.

D.   State Tax or Fee Increases:

None.

E.   Other Constitutional Issues:

A state's power to apply its law exclusively to its alien inhabitants as a class is confined to narrow limits. However, each state, in the absence of any treaty provision to the contrary, may deny to aliens the right to own land within its border.[96]

## V.   Fiscal Impact Statement:

A.   Tax/Fee Issues:

None.

B.   Private Sector Impact:

Under the bill, governmental entities are prohibited from knowingly entering into contracts for an economic incentive with a foreign entity. Accordingly, foreign entities (as defined in the bill) will no longer be able to avail themselves of such economic incentives in connection with their projects.

The bill provides that foreign principals who acquired agricultural land or land within 20 miles of a military installation or critical infrastructure facility before July 1, 2023 may

---

[96] *See Graham v. Ramani,* 383 So. 2d 634, 635 (Fla. 1980) (recognizing that the U.S. Supreme Court has upheld statutes denying aliens the right to acquire land and citing in support *Terrace v. Thompson,* 263 U.S. 197 (1923); *Terrace* upheld a state of Washington statute prohibiting the ownership of land within the state by nondeclarant aliens, finding that the "privilege of owning or controlling agricultural land within the state" and the "allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself" (*id.* at 221)).

continue to own those lands, but may not expand upon their ownership after that date. Similarly, Chinese businesses, and persons who are domiciled in China and not U.S. citizens, who acquired real property before July 1, 2023 may continue to own those lands, but may not expand upon their ownership after that date. To the extent any of these foreign principals, businesses, or persons' business plans assumed future expansions of land ownership, those plans will be negatively impacted by the bill.

The bill requires health care providers that use certified electronic health care technology to ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted facility or an entity providing cloud computing services, is maintained in the continental U.S. To the extent such patient information is not already maintained in the continental U.S., health care providers will incur costs moving that information into the continental U.S.

C.      Government Sector Impact:

Under the bill, governmental entities may not contract with entities of foreign countries of concern. To the extent contracting with entities of foreign countries of concern might have resulted in more favorable contractual terms than contracting with other entities, governmental entities will be negatively impacted by the bill.

The bill authorizes the Attorney General, Department of Agriculture and Consumer Services, and the Department of Economic Opportunity to enforce certain affidavit preparation and property forfeiture provisions in the bill. Additionally, the bill requires the Department of Management Services, the Florida Real Estate Commission, and the Department of Economic Opportunity to adopt rules to implement various provisions of the bill. Although these state agencies will incur costs associated with these efforts, it is anticipated that they will be minimal and absorbed by their existing budget allocations.

## VI.    Technical Deficiencies:

None.

## VII.   Related Issues:

None.

## VIII.  Statutes Affected:

This bill creates the following sections of the Florida Statutes: 287.138, 288.007, 692.201, 692.202, 692.203, and 692.204.

This bill substantially amends the following sections of the Florida Statutes: 408.051, 408.810, and 836.05.

**A237**

## IX.    Additional Information:

A.    Committee Substitute – Statement of Substantial Changes:
      (Summarizing differences between the Committee Substitute and the prior version of the bill.)

      **CS by Judiciary on March 14, 2023:**
      - Revises the definitions of "foreign entity" and "foreign principal," and the category of
        Chinese persons and entities that are prohibited from owning or acquiring protected
        lands in the state, to include the subsidiaries of those entities.
      - Clarifies that notwithstanding the general prohibitions in the bill, foreign principals
        and Chinese persons and entities may still acquire protected lands on or after the
        effective date, but must divest themselves of those lands within 2 years unless a
        diplomatic exemption applies.

B.    Amendments:

      None.

---

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.

---



EXHIBIT 38

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

| Prepared By: The Professional Staff of the Committee on Rules |
| --- |

BILL:        CS/SB 264

INTRODUCER:   Judiciary Committee and Senators Collins and Avila

SUBJECT:     Interests of Foreign Countries

DATE:        March 21, 2023        REVISED: _____  _____  _____  _____

| | ANALYST | STAFF DIRECTOR | REFERENCE | ACTION |
| --- | --- | --- | --- | --- |
| 1. | Collazo | Cibula | JU | **Fav/CS** |
| 2. | Collazo | Twogood | RC | **Pre-meeting** |

---

### Please see Section IX. for Additional Information:

COMMITTEE SUBSTITUTE - Substantial Changes

---

## I.    Summary:

CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

Specifically, with respect to governmental entity contracting, the bill creates statutes that prohibit governmental entities from:
- Contracting with entities of foreign countries of concern.
- Entering into contracts for an economic incentive with a foreign entity.

And with respect to conveyances of agricultural lands, the bill creates statutes that:
- Prohibit a foreign principal from owning or acquiring agricultural land in the state.
- Prohibit a foreign principal from owning or acquiring any interest in real property within 20 miles of any military installation or critical infrastructure in the state.
- Prohibit China, Chinese Communist Party or other Chinese political party officials or members, Chinese business organizations, and persons domiciled in China, but who are not U.S. citizens, from purchasing or acquiring any interest in real property in the state.

The bill also amends:
- The Florida Electronic Health Records Act, to require that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

- The Health Care Licensing Procedures Act, to require licensees to sign affidavits attesting that all patient information stored by them is being physically maintained in the continental U.S.
- The statute criminalizing threats and extortion, to provide that a person who commits a violation of the statute, and at the time is acting as a foreign agent with the intent of benefitting a foreign country of concern, commits a first degree felony.

The bill takes effect July 1, 2023.

## II.   Present Situation:

### Foreign Ownership of U.S. Agricultural Land

Foreign ownership and investment in U.S. agricultural land has generated significant interest in recent years.[1] Several high-profile incidents have prompted lawmakers to focus their attention on evaluating and responding to the potential impacts of foreign ownership and investment on national security, trade, and food security.[2]

A significant example occurred last year. Fufeng Group Limited, a Chinese food manufacturer, acquired 300 acres of land near the Grand Forks Air Force Base in North Dakota in order to build a wet corn milling and biofermentation plant.[3] The Air Force base, which is only about 12 miles away from the site, is believed to be the home of some of the country's most sophisticated, "top secret" military drone technology.[4] The location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns.[5]

In January, Andrew P. Hunter, Assistant Secretary of the Air Force for Acquisition, Technology and Logistics,[6] sent U.S. Senator John Hoeven a letter providing the Air Force's official position on the project. It confirmed that "Grand Forks Air Force Base is the center of military activities related to both air and space operations" and that the department's position is "unambiguous: the proposed project presents a significant threat to national security with both near- and long-term

---

[1] Aleks Phillips, *What the U.S. Is Doing to Curtail Chinese Land Ownership,* NEWSWEEK, Feb. 13, 2023, https://www.newsweek.com/chinese-land-ownership-investment-us-military-bases-1780886.

[2] *See* Letter from Congressmen Glenn "GT" Thompson & James Comer to Gene L. Dodaro, Comptroller General of the U.S. Government Accountability Office (Oct. 1, 2022), *available at* https://oversight.house.gov/wp-content/uploads/2022/10/20221001_GAO_foreignlandownership.pdf (requesting that the office conduct a review of foreign investment in U.S. farmland and its impact on national security, trade, and food security).

[3] Congressional Research Service (CRS), *Foreign Ownership and Holdings of U.S. Agricultural Land* (version 4, updated Jan. 24, 2023), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11977.

[4] Ariel Zilber, *Chinese firm bought North Dakota farm near U.S. Air Force drone base: report,* NEW YORK POST, Jul. 1, 2022, https://nypost.com/2022/07/01/chinese-firm-bought-farm-near-us-air-force-drone-base-report/; *see also* Letter from Thompson & Comer, *supra* note 2 (describing the technology as "top secret"); *see also* Lauren Greenwood, U.S.-China Economic and Security Review Commission, *China's Interests in U.S. Agriculture: Augmenting Food Security through Investment Abroad* (May 26, 2022), 11, *available at* https://www.uscc.gov/sites/default/files/2022-05/Chinas_Interests_in_U.S._Agriculture.pdf (noting that the Grand Forks Air Force Base "houses some of the United States' top intelligence, surveillance, and reconnaissance capabilities").

[5] Greenwood, *supra* note 4.

[6] U.S. Air Force, *Andrew P. Hunter* (Sept. 2022), https://www.af.mil/About-Us/Biographies/Display/Article/3154079/andrew-p-hunter/.

risks of significant impacts to our operations in the area."[7] About a week after the department issued its letter, the Grand Forks City Council abandoned the project.[8]

In addition to national security concerns, federal officials are also concerned about potential food security impacts. A recent letter from 130 lawmakers to the U.S. Government Accountability Office expressed concern that "foreign investment in U.S. farmland could result in foreign control of available U.S. farmland, especially prime agricultural lands, and possibly lead to foreign control over food production and food prices."[9] In a separate interview, one of the lawmakers noted that "food security is national security," explaining that Russia was able to exercise undue influence over Europe because it supplied Europe with a significant amount of natural gas, and that China might similarly try to control food supplies in South America, Southeast Asia, and even North America, in order to exert greater coercive power around the globe.[10]

Other recent incidents, while not involving the acquisition of U.S. farmland, suggest that China is working aggressively to undermine U.S. interests in other ways, both at home and abroad:

- Confucius Institutes, which offer Chinese language and cultural programs, first began appearing on U.S. university campuses in 2005. Some Members of Congress and others have alleged that they may play a role in China's efforts to influence public opinion abroad, recruit "influence agents" on U.S. campuses, and engage in cyber espionage and intellectual property theft.[11]
- In November of last year, FBI Director Christopher Wray testified at a U.S. Senate Homeland Security and Governmental Affairs Committee hearing about the existence of certain unauthorized 'police stations' established by China in major U.S. cities, noting that the U.S. has made a number of indictments involving the Chinese government harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping.[12]
- Last month, the U.S. shot down a Chinese spy balloon after it had traversed over a large swath of North America. The Biden Administration alleged it was part of a larger Chinese surveillance-balloon program that had violated the sovereignty of nations all over the word.[13]

---

[7] Letter from Andrew P. Hunter, Office of the Assistant Secretary, to U.S. Senator John Hoeven (Jan. 27, 2023), *available at* https://www.hoeven.senate.gov/imo/media/doc/USAIRFORCE-FUFENG-LETTER-HOEVEN.pdf.

[8] Meghan Arbegast, *Year-long Fufeng debate comes to an end after Grand Forks council members vote to stop project,* GRAND FORKS HERALD, Feb. 6, 2023, https://www.grandforksherald.com/news/local/year-long-fufeng-debate-comes-to-an-end-after-grand-forks-council-members-vote-to-stop-project.

[9] Letter from Thompson & Comer, *supra* note 2.

[10] NPR, *China is buying up more U.S. farmland. Some lawmakers consider that a security threat* (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160297853/china-farmland-purchases-house-hearing-competition.

[11] CRS, *Confucius Institutes in the United States: Selected Issues* (version 12, updated May 20, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11180.

[12] Michael Martina & Ted Hesson, *FBI director 'very concerned' by Chinese 'police stations' in U.S.,* REUTERS, Nov. 17, 2022, https://www.reuters.com/world/us/fbi-director-very-concerned-by-chinese-police-stations-us-2022-11-17/.

[13] Isaac Chotiner, *What's Behind the Chinese Spy Balloon,* THE NEW YORKER, Feb. 18, 2023, https://www.newyorker.com/news/q-and-a/whats-behind-the-chinese-spy-balloon.

- This month, the U.S. (and Canada) issued orders banning the use of TikTok, a Chinese-owned video sharing app, on government-issued mobile devices amid growing privacy and cybersecurity concerns.[14]
- Also this month, U.S. defense and national security officials have raised the possibility that certain Chinese-made giant cargo cranes are being used for espionage.[15]

### Ownership Statistics

Foreign persons and entities held an interest in 40.8 million acres of U.S. agricultural land in 2021, accounting for 3.1% of total privately owned land.[16] These data cover agricultural land and nonagricultural land (e.g. associated homesteads, roads, etc.). In 2021, forestland accounted for 47% of all foreign-owned land, cropland accounted for 29%, and pasture and other agricultural land for 22%. Nonagricultural land (such as homesteads and roads) accounted for 2%. Foreign land holdings have increased by an average of 2.2 million acres per year since 2015.[17]

With respect to China specifically, not including the Fufeng Group Limited's purchase in 2022, the U.S. Department of Agriculture reports that China accounted for 383,935 acres, or 0.9% of total foreign-owned U.S. agricultural land as of year-end 2021.[18] The department also reports that 85 Chinese investors own 275 parcels of agricultural land totaling 194,772 acres worth $1,868,577.[19]

| Country | Total | Foreign Entities | U.S. Entities w/ Foreign Shares | % of U.S. Private Land |
|---|---|---|---|---|
| | | (million acres) | | (percent) |
| Canada | 12.8 | 9.7 | 3.2 | 1.0% |
| Netherlands | 4.9 | 4.4 | 0.5 | 0.4% |
| Italy | 2.7 | 2.6 | 0.1 | 0.2% |
| United Kingdom | 2.5 | 1.5 | 1.0 | 0.2% |
| Germany | 2.3 | 1.4 | 0.9 | 0.2% |
| **Subtotal** | 25.2 | 19.6 | 5.7 | 2.0% |
| Other Countries | 12.4 | 7.1 | 5.3 | 1.0% |
| Not Listed | 3.2 | 2.4 | 0.8 | 0.3% |
| **Total** | 40.8 | 29.1 | 11.7 | 3.1% |



*Foreign Holdings of Agricultural Land, 2021[20]*

As of year-end 2021, the states with the most foreign-owned agricultural acreage were Texas (5.3 million acres), Maine (3.6 million acres), Colorado (1.9 million acres), Alabama (1.8 million

---

[14] CBS News, *TikTok banned on U.S. government devices, and the U.S. is not alone. Here's where the app is restricted* (Mar. 1, 2023), https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.

[15] Kent Masing, *U.S. Concerned China-Made Cranes In American Ports Used To Spy On Military: Report,* INTERNATIONAL BUSINESS TIMES, Mar. 6, 2023, https://www.ibtimes.com/us-concerned-china-made-cranes-american-ports-used-spy-military-report-3673964.

[16] CRS, *supra* note 3, at 2.

[17] *Id.*

[18] *Id.;* Farm Service Agency, U.S. Department of Agriculture, *Foreign Holdings of U.S. Agricultural Land* (through Dec. 31, 2021), 4, *available at* https://www.fsa.usda.gov/programs-and-services/economic-and-policy-analysis/afida/annual-reports/index.

[19] Farm Service Agency, *supra* note 18, at 229.

[20] *Id.* at Table 1 and Figure 2 (internal citations omitted).

acres), and Oklahoma (1.7 million acres). Other states with more than 1 million foreign-owned acres were Arkansas, California, Florida, Georgia, Kansas, Louisiana, Michigan, New Mexico, Oregon, and Washington.[21]

According to the U.S. Department of Agriculture, of the 21,849,568 acres of privately held agricultural land in Florida, 1,382,284 acres (6.3%) are held by foreigners, which is among the highest proportions in the U.S.[22] It is unclear how much of that land is owned by China, although the department does report that it owns 96,975 acres in the "South Region," which includes Florida.[23]

### Existing Federal and State Laws

Federal law currently imposes no restrictions on the amount of private U.S. agricultural land that can be foreign-owned.[24] However, the Agricultural Foreign Investment Disclosure Act of 1978 established a nationwide system for collecting information pertaining to the foreign ownership of U.S. agricultural land,[25] including land used for agricultural, forestry, or timber production purposes.[26] For purposes of the act, foreign persons include any individual, corporation, company, association, partnership, society, joint stock company, trust, estate, or any other legal entity (including any foreign government) under the laws of a foreign government or having a principal place of business outside of the U.S.[27]

The act's regulations require foreign persons who buy, sell, or gain interest in U.S. agricultural land to disclose their holdings and transactions to the U.S. Department of Agriculture directly or to the Farm Service Agency county office where the land is located.[28] Failure to disclose this information may result in penalties and fines.[29] After the original disclosure, each subsequent change of ownership or use must be reported.[30] It should be noted that some have expressed concern that U.S. Department of Agriculture figures developed under the act may actually underestimate foreign ownership due to unreliable data collection and the definitions used by the department.[31]

The Committee on Foreign Investment in the U.S. is an interagency committee authorized to review certain transactions involving foreign investment in the U.S. and real estate transactions by foreign persons, in order to determine the effect of such transactions on national security.[32] Notwithstanding recent expansions to the committee's jurisdictional authority and review

---

[21] Id.
[22] See Farm Service Agency, supra note 18, at 4, 17.
[23] Id. at 238.
[24] CRS, supra note 3, at 1.
[25] Pub. L. No. 95-460, 92 Stat. 1263 (1978); 7 U.S.C. ss. 3501-3508.
[26] 7 U.S.C. s. 3508(1); 7 C.F.R. s. 781.2(b).
[27] 7 U.S.C. s. 3508(3); 7 C.F.R. s. 781.2(g).
[28] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(a).
[29] 7 U.S.C. s. 3502; 7 C.F.R. ss. 781.4., 781.5.
[30] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(b).
[31] Texas Farm Bureau, Lawmakers ask for review of foreign ownership of U.S. farmland, https://texasfarmbureau.org/lawmakers-ask-for-review-of-foreign-ownership-of-u-s-farmland/ (last visited Mar. 7, 2023).
[32] U.S. Department of the Treasury, The Committee on Foreign Investment in the United States, https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius (last visited Mar. 6, 2023).

considerations,[33] there appear to be significant gaps. For example, the committee recently determined that Fufeng Group Limited's purchase near Grand Forks Air Force Base was outside of its jurisdiction and that it would therefore take no further action.[34]

Some U.S. states and localities have instituted restrictions on the foreign ownership of farmland.[35] Although no state has instituted an absolute prohibition on all foreign ownership, some states have limited or proposed to prohibit certain foreign persons and entities from acquiring or owning an interest in agricultural land within their states, and several states have separate disclosure requirements within their states.[36]



*Overview of Selected State Laws Related to Foreign Ownership of U.S. Agricultural Land*[37]

There is no single uniform approach under state laws to addressing foreign ownership.[38] Some general categories include:

- Restrictions on the amount of land that can be owned or the duration of ownership.
- Distinctions involving private versus public land or how agricultural land is defined.
- Distinctions involving resident and nonresident aliens.
- Inheritance considerations involving land ownership.
- Restrictions on ownership by foreign corporations (e.g. corporate farming laws or requirements corporations are subject to in order to obtain license or register).
- Differences related to enforcement and penalties.[39]

Currently, in Florida, foreign persons and entities have the same rights in real property as do citizens of the U.S. Foreign corporations, upon qualifying to do business in the state, have the same rights in real property as do domestic corporations. Foreign ownership of a domestic corporation has no effect on that corporation's rights in real property. No disclosure is required by any person or corporation when acquiring, holding or transferring rights in real property.[40]

---

[33] *See id.* (discussing Executive Order 14083, the Foreign Investment Risk Review Modernization Act of 2018, and associated regulations).
[34] T.J. Nelson, KVVR Local News, *Fufeng USA Looking to Move Ahead with Grand Forks Project After Federal Agency Review Suddenly Ends* (Dec. 13, 2022), https://www.kvrr.com/2022/12/13/fufeng-usa-looking-to-move-ahead-with-grand-forks-project-after-federal-agency-review-suddenly-ends/.
[35] CRS *supra* note 3, at 1.
[36] *Id.*
[37] *Id.* at Figure 1 (internal citation omitted).
[38] *Id.* at 1.
[39] *Id.*
[40] *See* 2 INTERNATIONAL BUSINESS TRANSACTIONS s. 29:26 (3d ed., updated Nov. 2022).

Case 4:23-cv-00208-AW-MAF   Document 21-45   Filed 06/06/23   Page 8 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 92 of 221
BILL: CS/SB 264

Page 7

**Florida Electronic Health Records Act**

The Florida Electronic Health Records Act[41] authorizes health care providers to release or access an identifiable health record of a patient without the patient's consent for use in the treatment of that patient for an emergency medical condition, when consent cannot be obtained from the patient or the patient representative due to the patient's condition or the nature of the situation requiring immediate medical attention.[42] It provides immunity from civil liability whenever a health care provider accesses or releases the identifiable health record in good faith under the statute. It also directs the Agency for Health Care Administration to develop a form to document patient authorization for the use or release of an identifiable health record.[43] The act includes definitions for the following terms: "electronic health record," "qualified electronic health record," "certified electronic health record technology," "health record," "identifiable health record," "patient," and "patient representative."[44]

**Health Care Licensing Procedures Act**

The Health Care Licensing Procedures Act[45] provides a streamlined and consistent set of basic licensing requirements for health care providers.[46] The act is intended to minimize confusion, standardize terminology, and include issues that are not otherwise addressed in state law pertaining to specific providers.[47] Among other things, it provides certain minimum licensure requirements, with which applicants and licensees must comply in order to obtain and maintain a license.[48]

**Statute Criminalizing Threats and Extortion**

State law criminalizes threats and extortion. One commits the crime if he or she, either verbally or by a written or printed communication:

> maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will[.]![49]

---

[41] Section 408.051, F.S.
[42] Section 408.051(3), F.S.
[43] Section 408.051(4), F.S.
[44] Section 408.051(2), F.S.
[45] Chapter 408, Part II, F.S.; *see also* s. 408.801(1), F.S. (providing a short title).
[46] Section 408.801(2), F.S.
[47] *Id.*
[48] *See generally* s. 408.810, F.S.
[49] Section 836.05, F.S.

The crime is a second degree felony, punishable by a term of imprisonment not exceeding 15 years[50] and a $10,000 fine,[51] or possibly more under the habitual offender statute.[52]

## III.   Effect of Proposed Changes:

CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

**Prohibition on Governmental Entity Contracting with Entities of Foreign Countries of Concern**

**Section 1** of the bill creates s. 287.138, F.S., within chapter 287, part I, F.S., which governs commodities, insurance, and contractual services, to prohibit contracting between governmental entities and entities of foreign countries of concern.

The bill defines the following terms for purposes of the new statute:
- "Controlling interest" means possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract, or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company or is entitled to 25 percent or more of its profits is presumed to possess a controlling interest in that company.
- "Department" means the Department of Management Services.
- "Foreign country of concern" means:
  - The People's Republic of China.
  - The Russian Federation.
  - The Islamic Republic of Iran.
  - The Democratic People's Republic of Korea.
  - The Republic of Cuba.
  - The Venezuelan regime of Nicolás Maduro.
  - The Syrian Arab Republic.
  - Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Governmental entity" means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law including, but not limited to, the Commission on Ethics, the Public Service Commission, the Office of Public Counsel, and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that governmental entities may not knowingly enter into a contract with an entity which would give access to an individual's personal identifying information if:

---

[50] Section 775.082(3)(d), F.S.
[51] Section 775.083(1)(b), F.S.
[52] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

Case 4:23-cv-00208-AW-MAF   Document 21-45   Filed 06/06/23   Page 10 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 94 of 221
BILL: CS/SB 264

Page 9

- The entity is owned by the government of a foreign country of concern;
- The government of a foreign country of concern has a controlling interest in the entity; or
- The entity is organized under the laws of or has its principal place of business in a foreign country of concern.

Additionally, the bill provides that:
- Beginning January 1, 2024, a governmental entity may not accept a bid on, a proposal for, or a reply to, or enter into, a contract with an entity which would grant the entity access to an individual's personal identifying information unless the entity provides the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.
- Beginning July 1, 2025:
  - A governmental entity may not extend or renew a contract with one of the entities listed above if the contract would give such entity access to an individual's personal identifying information.
  - When an entity extends or renews a contract with a governmental entity which would grant the entity access to an individual's personal identifying information, the entity must provide the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.

The bill authorizes the Attorney General to bring a civil action in any court of competent jurisdiction against an entity that violates the statute. Violations of the statute may result in:
- A civil penalty equal to twice the amount of the contract for which the entity submitted a bid or proposal for, replied to, or entered into.
- Ineligibility to enter into, renew, or extend any contract, including any grant agreements, with any governmental entity for up to 5 years.
- Ineligibility to receive or renew any license, certification, or credential issued by a governmental entity for up to 5 years.
- Placement on the suspended vendor list.[53]

Any penalties collected from entities that violate the statute must be deposited into the General Revenue Fund.

The bill also authorizes the department to adopt rules to implement the statute, including rules establishing the form for the affidavit required under the statute.

**Prohibition on Contracting for an Economic Incentive with a Foreign Entity**

**Section 2** of the bill creates s. 288.007, F.S., to prohibit governmental entities from entering into contracts for an economic incentive with a foreign entity.

The bill defines the following terms for purposes of the new statute:
- "Controlled by" means having possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract,

---

[53] *See* s. 287.1351, F.S. (providing for the suspension of certain vendors).

or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company, or that is entitled to 25 percent or more of its profits, is presumed to control the foreign entity.

- "Economic incentive" means all programs administered by, or for which an applicant for the program must seek certification, approval, or other action by, the department under chapter 288, F.S. (governing commercial development and capital improvements), chapter 212, F.S. (governing tax on sales, use, and other transactions), or chapter 220, F.S. (the income tax code), and all local economic development programs, grants, or financial benefits administered by a political subdivision or an agent thereof.
- "Foreign country of concern" has the same meaning as defined later in the bill.[54]
- "Foreign entity" means an entity that is:
  o Owned or controlled by the government of a foreign country of concern; or
  o A partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity.
- "Government entity" means a state agency, a political subdivision, or any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that a government entity may not knowingly enter into an agreement or contract for an economic incentive with a foreign entity. Before providing any economic incentive, a government entity must require the recipient or applicant to provide the government entity with an affidavit signed under penalty of perjury attesting that the recipient or applicant is not a foreign entity.

The bill also requires the department to adopt rules to administer the new statute, including rules establishing the form for the required affidavit.

**Prohibition of Conveyances to Foreign Entities**

**Section 3** of the bill directs the Division of Law Revision to create part III of chapter 692, F.S., consisting of ss. 692.201, 692.202, 692.203, and 692.204, F.S., to be entitled "Conveyances to Foreign Entities."

*Definitions*

**Section 4** of the bill creates s. 692.201, F.S., which defines the following terms for purposes of part III of chapter 692, F.S.:

- "Agricultural land" means land classified as agricultural under state law.[55]
- "Critical infrastructure facility" means any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons:
  o A chemical manufacturing facility.
  o A refinery.

---

[54] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[55] *See* s. 193.461, F.S. (providing the agricultural land classification process).

- o An electrical power plant, including a substation, switching station, electrical control center, or electric transmission or distribution facility.[56]
  - o A water intake structure, water treatment facility, wastewater treatment plant, or pump station.
  - o A natural gas transmission compressor station.
  - o A liquid natural gas terminal or storage facility.
  - o A telecommunications central switching office.
  - o An inland port or other facility or group of facilities serving as a point of intermodal transfer of freight in a specific area physically separated from a seaport.
  - o A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas.
  - o A seaport.[57]
  - o A spaceport territory.[58]
- "Foreign country of concern" means:
  - o The People's Republic of China.
  - o The Russian Federation.
  - o The Islamic Republic of Iran.
  - o The Democratic People's Republic of Korea.
  - o The Republic of Cuba.
  - o The Venezuelan regime of Nicolás Maduro.
  - o The Syrian Arab Republic.
  - o Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Foreign principal" means:
  - o The government or any official of the government of a foreign country of concern;
  - o A political party or member of a political party or any subdivision of a political party in a foreign country of concern;
  - o A partnership, association, corporation, organization, or other combination of persons organized under the laws of, or having its principal place of business in, a foreign country of concern, or a subsidiary of such entity; or
  - o Any person who is domiciled in a foreign country of concern and is not a citizen of the U.S.
- "Military installation" means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the secretary of a military department or the

---

[56] *See* s. 403.031(20), F.S. (defining "electrical power plant" as meaning any electrical generating facility that uses any process or fuel and that is owned or operated by an electric utility, as defined in s. 403.503(14), and includes any associated facility that directly supports the operation of the electrical power plant).

[57] *See* s. 311.09(1), F.S. (listing the ports of Jacksonville, Port Canaveral, Port Citrus, Fort Pierce, Palm Beach, Port Everglades, Miami, Port Manatee, St. Petersburg, Putnam County, Tampa, Port St. Joe, Panama City, Pensacola, Key West, and Fernandina).

[58] *See* s. 331.303(18), F.S. (defining "spaceport territory" as the geographical area designated in s. 331.304, F.S., and as amended or changed in accordance with s. 331.329, F.S.; it includes, but is not limited to, the real property located in Brevard County that is included within the 1998 boundaries of Patrick Space Force Base, formerly Patrick Air Force Base; Cape Canaveral Space Force Station, formerly Cape Canaveral Air Force Station; and the John F. Kennedy Space Center).

Secretary of Defense, without regard to the duration of operational control.[59] For purposes of the bill, military installations include armories.[60]
- "Real property" means land, buildings, fixtures, and all other improvements to land.

### Purchase of Agricultural Land by Foreign Principals

**Section 5** of the bill creates s. 692.202, F.S., to prohibit the purchase of agricultural land by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent agricultural land or any interest in such land in the state. This prohibition does not apply to a foreign principal that acquires agricultural land for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires agricultural land or any interest in such land in the state before July 1, 2023:
- May continue to own or hold such land or interest, but may not purchase or otherwise acquire by grant, devise, or descent any additional agricultural land or interest in such land in the state.
- Must register with the Department of Agriculture and Consumer Services by January 1, 2024. The department must establish a form for such registration, which, at minimum, must include all of the following:
  o The name of the owner of the agricultural land or the owner of the interest in such land.
  o The address of the agricultural land, the property appraiser's parcel identification number, and the property's legal description.
  o The number of acres of the agricultural land.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered agricultural land for the unpaid balance of any penalties assessed under the new statute.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire agricultural land on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of the agricultural land within 2 years after acquiring the agricultural land.

At the time of purchase, a buyer of agricultural land, or an interest in such land, must provide an affidavit signed under penalty of perjury attesting to compliance with this section. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the agricultural land. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

---

[59] 10 U.S.C. s. 2801(c)(4).
[60] *See* s. 250.01(5), F.S. (defining an "armory" as a building or group of buildings used primarily for housing and training troops or for storing military property, supplies, or records).

**A251**

The bill provides that an agricultural land, or any interest in such land, that is owned or acquired in violation of the new statute may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Agriculture and Consumer Services may initiate a civil action in the circuit court of the county in which the property lies.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[61] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the agricultural land, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the agricultural land, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the agricultural land in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the agricultural land subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the agricultural land upon a showing that the defendant's control of the agricultural land constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:

- A foreign principal that purchases or acquires agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[62] and a $500 fine.[63]
- A person who knowingly sells agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[64] and a $500 fine.[65]

The bill also requires the Department of Agriculture and Consumer Services to adopt rules to implement the new statute.

### Purchase of Real Property around Military Installation and Critical Infrastructure Facilities by Foreign Principals

**Section 6** of the bill creates s. 692.203, F.S., to prohibit the purchase of real property around military installations and critical infrastructure facilities by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent any interest in real property within 20 miles of any military

---

[61] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[62] Section 775.082(4)(b), F.S.
[63] Section 775.083(1)(e), F.S.
[64] Section 775.082(4)(b), F.S.
[65] Section 775.083(1)(e), F.S.

installation or critical infrastructure facility in the state. This prohibition does not apply to a foreign principal that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires any interest in real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property within 20 miles of any military installation or critical infrastructure facility in the state.

The bill provides that a foreign principal that owns or acquires real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this provision.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire real property, or any interest therein, which is within 20 miles of any military installation or critical infrastructure facility in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property.

At the time of purchase, a buyer of real property that is located within 20 miles of any military installation or critical infrastructure facility in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:
- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[66] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to

---

[66] See s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A foreign principal that purchases or acquires real property or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[67] and a $500 fine.[68]
- A person who knowingly sells real property or any interest therein in violation of this section commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[69] and a $500 fine.[70]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

### *Purchase or Acquisition of Real Property by the People's Republic of China*

**Section 7** of the bill creates s. 692.204, F.S., to prohibit the purchase or acquisition of real property by the People's Republic of China.

The bill prohibits the following persons or entities from directly or indirectly owning or acquiring by purchase, grant, devise, or descent any interest in real property in the state:
- The People's Republic of China, the Chinese Communist Party, or any official or member of the People's Republic of China or the Chinese Communist Party.
- Any other political party or member of a political party or a subdivision of a political party in the People's Republic of China.
- A partnership, an association, a corporation, an organization, or any other combination of persons organized under the laws of or having its principal place of business in the People's Republic of China, or a subsidiary of such entity.
- Any person who is domiciled in the People's Republic of China and who is not a citizen of the U.S.

---

[67] Section 775.082(4)(b), F.S.
[68] Section 775.083(1)(e), F.S.
[69] Section 775.082(4)(b), F.S.
[70] Section 775.083(1)(e), F.S.

**A254**

This prohibition does not apply to a person or entity of the People's Republic of China that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

Any person or entity described above that directly or indirectly owns or acquires any interest in real property in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property in the state.

The bill provides that any person or entity described above that owns or acquires real property in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A person or entity that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this paragraph.

The bill clarifies that notwithstanding the general prohibition in the bill, a Chinese person or entity can still acquire real property in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property unless the person or entity acquired the real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

At the time of purchase, a buyer of real property in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this subsection, including rules establishing the form for the affidavit required under this subsection.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:
- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[71] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

---

[71] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A violation of this section constitutes a felony of the third degree, punishable by a term of imprisonment not exceeding 5 years[72] and a $5,000 fine,[73] or possibly more under the habitual offender statute.[74]
- A person who sells real property or any interest therein in violation of the new statute commits a misdemeanor of the first degree, punishable by a term of imprisonment not exceeding 1 year[75] and a $1,000 fine.[76]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

**Amendments to the Florida Electronic Health Records Act**

**Section 8** of the bill amends s. 408.051, F.S., the Florida Electronic Health Records Exchange Act (Act), by adding two definitions and by requiring that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

First, for purposes of the Act, the bill incorporates the definition for "cloud computing" found in chapter 282, part I, F.S., which governs information technology management. That definition[77] provides that cloud computing has the same meaning as provided in Special Publication 800-145 issued by the National Institute of Standards and Technology, which reads as follows:

> Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or

---

[72] Section 775.082(3)(e), F.S.
[73] Section 775.083(1)(c), F.S.
[74] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).
[75] Section 775.082(4)(a), F.S.
[76] Section 775.083(1)(d), F.S.
[77] Section 282.0041(5), F.S.

Case 4:23-cv-00208-AW-MAF   Document 21-45   Filed 06/06/23   Page 19 of 23
USCA11 Case: 23-12737   Document: 39-2   Date Filed: 10/02/2023   Page: 103 of 221

BILL: CS/SB 264                                                              Page 18

service provider interaction. This cloud model is composed of five essential
characteristics, three service models, and four deployment models.[78]

Second, for purposes of the Act, the bill defines the term "health care provider" as including all
of the following:

- Any provider as defined in the Health Care Licensing Procedures Act;[79]
- Any health care practitioner as defined in chapter 456, F.S., which governs health professions
  and occupations;[80]
- Any health care professional certified under the Radiological Personnel Certification Act;[81]
- Any home health aide as defined in the Home Health Services Act;[82]
- Any service provider as defined in the Florida Mental Health Act,[83] and the service
  provider's clinical and nonclinical staff who provide inpatient or outpatient services;
- Any licensed continuing care facility;[84] and
- Any pharmacy permitted under the Florida Pharmacy Act.[85]

Third, the bill amends the Act to provide that in addition to complying with certain federal
standards regulating the privacy of individually identifiable health information,[86] a health care
provider that utilizes certified electronic health record technology must ensure that all patient
information stored in an offsite physical or virtual environment, including through a third-party
or subcontracted computing facility or an entity providing cloud computing services, is
physically maintained in the continental U.S. The bill applies this provision to all qualified
electronic health records that are stored using any technology that can allow information to be
electronically retrieved, accessed, or transmitted.

---

[78] U.S. Department of Commerce, National Institute of Standards and Technology, *Special Publication 800-145 (The NIST
Definition of Cloud Computing)* (Sept. 2011), *available at* https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication
800-145.pdf (also identifying the referenced five essential characteristics, three service models, and four deployment models)
(footnotes omitted).
[79] *See* s. 408.803(12), F.S. (defining "provider" as any activity, service, agency, or facility regulated by Agency for Health
Care Administration and listed in s. 408.802, F.S.).
[80] *See* s. 456.001(4), F.S. (defining "health care practitioner" as any person licensed under one of the listed statutes).
[81] Chapter 468, part IV, F.S.
[82] *See* s. 400.462, F.S. (defining "home health aide" as a person who is trained or qualified, as provided by rule, and who
provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in
ambulation or exercises, assists in administering medications as permitted in rule and for which the person has received
training established by the agency under part III (regulating home health services), or performs tasks delegated to him or her
under ch. 464, F.S. (regulating nursing)).
[83] *See* s. 394.455(45), F.S. (defining "service provider" as a receiving facility, a facility licensed under ch. 397, F.S.
(governing substance abuse services), a treatment facility, an entity under contract with the department to provide mental
health or substance abuse services, a community mental health center or clinic, a psychologist, a clinical social worker, a
marriage and family therapist, a mental health counselor, a physician, a psychiatrist, an advanced practice registered nurse, a
psychiatric nurse, or a qualified professional as defined in s. 39.01, F.S. (referencing licensed physicians, physician assistants,
psychiatrists, psychologists, and psychiatric nurses)).
[84] *See* ch. 651, F.S. (governing continuing care contracts).
[85] Chapter 465, F.S.
[86] 45 C.F.R. pts. 160 and 164 (subparts A and C).

**Amendments to the Health Care Licensing Procedures Act**

**Section 9** of the bill amends s. 408.810, F.S., which provides certain minimum licensure requirements for health care providers.[87]

The bill provides that a licensee must sign an affidavit at the time of his or her initial application for a license, and on any renewal applications thereafter, that attests under penalty of perjury that he or she is in compliance with the bill, specifically the requirement in the bill that health care providers using certified electronic health record technology ensure that all patient information stored in an offsite physical or virtual environment is physically maintained in the continental U.S. The licensee must remain in compliance with this requirement or be subject to disciplinary action by the agency.

The licensee must also ensure that a person or entity who possesses a controlling interest in the licensee does not also hold, either directly or indirectly, regardless of ownership structure, an interest in an entity that has a business relationship with a foreign country of concern or that is subject to the statute prohibiting contracting with scrutinized companies.[88]

For purposes of this provision, the bill defines the following terms:
- "Business relationship" means engaging in commerce in any form, including, but not limited to, acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, military equipment, or any other apparatus of business or commence.
- "Foreign country of concern" has the same meaning as provided earlier in the bill.[89]
- Having an "interest" in an entity means having any direct or indirect investment in or loan to the entity valued at 5 percent or more of the entity's net worth, or any form of direct or indirect control exerting similar or greater influence on the governance of the entity.[90]

**Amendments to the Statute Criminalizing Threats and Extortion**

**Section 10** of the bill amends s. 836.05, F.S., which criminalizes threats and extortion, to provide that a person who commits a violation of the statute and at the time of the violation is acting as a foreign agent as defined in state law,[91] with the intent of benefitting a foreign country of concern as defined earlier in the bill,[92] commits a felony of the first degree, punishable by a term of imprisonment of not exceeding 30 years[93] and a $10,000 fine,[94] or possibly more under the habitual offender statute.[95]

---

[87] *See supra* note 79 (defining providers); *see also* s. 408.802, F.S. (listing regulated providers).
[88] Section 287.135, F.S.
[89] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[90] *See* s. 286.101(1), F.S. (defining "interest").
[91] *See* s. 812.081(1)(b), F.S. (defining "foreign agent" as any officer, employee, proxy, servant, delegate, or representative of a foreign government).
[92] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[93] Section 775.082(3)(b)1., F.S.
[94] Section 775.083(1)(b), F.S.
[95] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

**Effective Date**

The bill takes effect on July 1, 2023.

## IV.    Constitutional Issues:

A.    Municipality/County Mandates Restrictions:

None.

B.    Public Records/Open Meetings Issues:

None.

C.    Trust Funds Restrictions:

None.

D.    State Tax or Fee Increases:

None.

E.    Other Constitutional Issues:

A state's power to apply its law exclusively to its alien inhabitants as a class is confined
to narrow limits. However, each state, in the absence of any treaty provision to the
contrary, may deny to aliens the right to own land within its border.[96]

## V.    Fiscal Impact Statement:

A.    Tax/Fee Issues:

None.

B.    Private Sector Impact:

Under the bill, governmental entities are prohibited from knowingly entering into
contracts for an economic incentive with a foreign entity. Accordingly, foreign entities
(as defined in the bill) will no longer be able to avail themselves of such economic
incentives in connection with their projects.

The bill provides that foreign principals who acquired agricultural land or land within 20
miles of a military installation or critical infrastructure facility before July 1, 2023 may

---

[96] *See Graham v. Ramani,* 383 So. 2d 634, 635 (Fla. 1980) (recognizing that the U.S. Supreme Court has upheld statutes
denying aliens the right to acquire land and citing in support *Terrace v. Thompson,* 263 U.S. 197 (1923); *Terrace* upheld a
state of Washington statute prohibiting the ownership of land within the state by nondeclarant aliens, finding that the
"privilege of owning or controlling agricultural land within the state" and the "allegiance of those who own, occupy and use
the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself" (*id.* at
221)).

continue to own those lands, but may not expand upon their ownership after that date. Similarly, Chinese businesses, and persons who are domiciled in China and not U.S. citizens, who acquired real property before July 1, 2023 may continue to own those lands, but may not expand upon their ownership after that date. To the extent any of these foreign principals, businesses, or persons' business plans assumed future expansions of land ownership, those plans will be negatively impacted by the bill.

The bill requires health care providers that use certified electronic health care technology to ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted facility or an entity providing cloud computing services, is maintained in the continental U.S. To the extent such patient information is not already maintained in the continental U.S., health care providers will incur costs moving that information into the continental U.S.

C.      Government Sector Impact:

Under the bill, governmental entities may not contract with entities of foreign countries of concern. To the extent contracting with entities of foreign countries of concern might have resulted in more favorable contractual terms than contracting with other entities, governmental entities will be negatively impacted by the bill.

The bill authorizes the Attorney General, Department of Agriculture and Consumer Services, and the Department of Economic Opportunity to enforce certain affidavit preparation and property forfeiture provisions in the bill. Additionally, the bill requires the Department of Management Services, the Florida Real Estate Commission, and the Department of Economic Opportunity to adopt rules to implement various provisions of the bill. Although these state agencies will incur costs associated with these efforts, it is anticipated that they will be minimal and absorbed by their existing budget allocations.

## VI.   Technical Deficiencies:

None.

## VII.   Related Issues:

None.

## VIII.   Statutes Affected:

This bill creates the following sections of the Florida Statutes: 287.138, 288.007, 692.201, 692.202, 692.203, and 692.204.

This bill substantially amends the following sections of the Florida Statutes: 408.051, 408.810, and 836.05.

**A260**

## IX.   Additional Information:

A.   Committee Substitute – Statement of Substantial Changes:
(Summarizing differences between the Committee Substitute and the prior version of the bill.)

**CS by Judiciary on March 14, 2023:**
- Revises the definitions of "foreign entity" and "foreign principal," and the category of Chinese persons and entities that are prohibited from owning or acquiring protected lands in the state, to include the subsidiaries of those entities.
- Clarifies that notwithstanding the general prohibitions in the bill, foreign principals and Chinese persons and entities may still acquire protected lands on or after the effective date, but must divest themselves of those lands within 2 years unless a diplomatic exemption applies.

B.   Amendments:

None.

---

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.

**A261**



EXHIBIT 41

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

---

Prepared By: The Professional Staff of the Committee on Rules

---

BILL:   CS/CS/SB 264

INTRODUCER:   Rules Committee; Judiciary Committee; and Senators Collins and Avila

SUBJECT:   Interests of Foreign Countries

DATE:   March 22, 2023   REVISED: _____ _____ _____ _____

| | ANALYST | STAFF DIRECTOR | REFERENCE | ACTION |
|---|---|---|---|---|
| 1. | Collazo | Cibula | JU | **Fav/CS** |
| 2. | Collazo | Twogood | RC | **Fav/CS** |

---

> ### Please see Section IX. for Additional Information:
>
> COMMITTEE SUBSTITUTE - Substantial Changes

---

## I.   Summary:

CS/CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., U.S. territories, or Canada.

Specifically, with respect to governmental entity contracting, the bill creates statutes that prohibit governmental entities from:
- Contracting with entities of foreign countries of concern.
- Entering into contracts for an economic incentive with a foreign entity.

And with respect to conveyances of agricultural lands, the bill creates statutes that:
- Prohibit a foreign principal from owning or acquiring agricultural land in the state.
- Prohibit a foreign principal from owning or acquiring any interest in real property within 20 miles of any military installation or critical infrastructure in the state.
- Prohibit China, Chinese Communist Party or other Chinese political party officials or members, Chinese business organizations, and persons domiciled in China, but who are not citizens or lawful permanent residents of the U.S., from purchasing or acquiring any interest in real property in the state.

The bill also amends:

**A263**

- The Florida Electronic Health Records Act, to require that the offsite storage of certain personal medical information be physically maintained in the continental U.S., U.S. territories, or Canada.
- The Health Care Licensing Procedures Act, to require licensees to sign affidavits attesting that all patient information stored by them is being physically maintained in the continental U.S., U.S. territories, or Canada.
- The statute criminalizing threats and extortion, to provide that a person who commits a violation of the statute, and at the time is acting as a foreign agent with the intent of benefitting a foreign country of concern, commits a first degree felony.

The bill takes effect July 1, 2023.

## II.  Present Situation:

### Foreign Ownership of U.S. Agricultural Land

Foreign ownership and investment in U.S. agricultural land has generated significant interest in recent years.[1] Several high-profile incidents have prompted lawmakers to focus their attention on evaluating and responding to the potential impacts of foreign ownership and investment on national security, trade, and food security.[2]

A significant example occurred last year. Fufeng Group Limited, a Chinese food manufacturer, acquired 300 acres of land near the Grand Forks Air Force Base in North Dakota in order to build a wet corn milling and biofermentation plant.[3] The Air Force base, which is only about 12 miles away from the site, is believed to be the home of some of the country's most sophisticated, "top secret" military drone technology.[4] The location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns.[5]

In January, Andrew P. Hunter, Assistant Secretary of the Air Force for Acquisition, Technology and Logistics,[6] sent U.S. Senator John Hoeven a letter providing the Air Force's official position

---

[1] Aleks Phillips, *What the U.S. Is Doing to Curtail Chinese Land Ownership,* NEWSWEEK, Feb. 13, 2023, https://www.newsweek.com/chinese-land-ownership-investment-us-military-bases-1780886.

[2] *See* Letter from Congressmen Glenn "GT" Thompson & James Comer to Gene L. Dodaro, Comptroller General of the U.S. Government Accountability Office (Oct. 1, 2022), *available at* https://oversight.house.gov/wp-content/uploads/2022/10/20221001_GAO_foreignlandownership.pdf (requesting that the office conduct a review of foreign investment in U.S. farmland and its impact on national security, trade, and food security).

[3] Congressional Research Service (CRS), *Foreign Ownership and Holdings of U.S. Agricultural Land* (version 4, updated Jan. 24, 2023), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11977.

[4] Ariel Zilber, *Chinese firm bought North Dakota farm near U.S. Air Force drone base: report,* NEW YORK POST, Jul. 1, 2022, https://nypost.com/2022/07/01/chinese-firm-bought-farm-near-us-air-force-drone-base-report/; *see also* Letter from Thompson & Comer, *supra* note 2 (describing the technology as "top secret"); *see also* Lauren Greenwood, U.S.-China Economic and Security Review Commission, *China's Interests in U.S. Agriculture: Augmenting Food Security through Investment Abroad* (May 26, 2022), 11, *available at* https://www.uscc.gov/sites/default/files/2022-05/Chinas_Interests_in_U.S._Agriculture.pdf (noting that the Grand Forks Air Force Base "houses some of the United States' top intelligence, surveillance, and reconnaissance capabilities").

[5] Greenwood, *supra* note 4.

[6] U.S. Air Force, *Andrew P. Hunter* (Sept. 2022), https://www.af.mil/About-Us/Biographies/Display/Article/3154079/andrew-p-hunter/.

on the project. It confirmed that "Grand Forks Air Force Base is the center of military activities related to both air and space operations" and that the department's position is "unambiguous: the proposed project presents a significant threat to national security with both near- and long-term risks of significant impacts to our operations in the area."[7] About a week after the department issued its letter, the Grand Forks City Council abandoned the project.[8]

In addition to national security concerns, federal officials are also concerned about potential food security impacts. A recent letter from 130 lawmakers to the U.S. Government Accountability Office expressed concern that "foreign investment in U.S. farmland could result in foreign control of available U.S. farmland, especially prime agricultural lands, and possibly lead to foreign control over food production and food prices."[9] In a separate interview, one of the lawmakers noted that "food security is national security," explaining that Russia was able to exercise undue influence over Europe because it supplied Europe with a significant amount of natural gas, and that China might similarly try to control food supplies in South America, Southeast Asia, and even North America, in order to exert greater coercive power around the globe.[10]

Other recent incidents, while not involving the acquisition of U.S. farmland, suggest that China is working aggressively to undermine U.S. interests in other ways, both at home and abroad:

- Confucius Institutes, which offer Chinese language and cultural programs, first began appearing on U.S. university campuses in 2005. Some Members of Congress and others have alleged that they may play a role in China's efforts to influence public opinion abroad, recruit "influence agents" on U.S. campuses, and engage in cyber espionage and intellectual property theft.[11]
- In November of last year, FBI Director Christopher Wray testified at a U.S. Senate Homeland Security and Governmental Affairs Committee hearing about the existence of certain unauthorized 'police stations' established by China in major U.S. cities, noting that the U.S. has made a number of indictments involving the Chinese government harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping.[12]
- Last month, the U.S. shot down a Chinese spy balloon after it had traversed over a large swath of North America. The Biden Administration alleged it was part of a larger Chinese surveillance-balloon program that had violated the sovereignty of nations all over the word.[13]

[7] Letter from Andrew P. Hunter, Office of the Assistant Secretary, to U.S. Senator John Hoeven (Jan. 27, 2023), *available at* https://www.hoeven.senate.gov/imo/media/doc/USAIRFORCE-FUFENG-LETTER-HOEVEN.pdf.
[8] Meghan Arbegast, *Year-long Fufeng debate comes to an end after Grand Forks council members vote to stop project,* GRAND FORKS HERALD, Feb. 6, 2023, https://www.grandforksherald.com/news/local/year-long-fufeng-debate-comes-to-an-end-after-grand-forks-council-members-vote-to-stop-project.
[9] Letter from Thompson & Comer, *supra* note 2.
[10] NPR, *China is buying up more U.S. farmland. Some lawmakers consider that a security threat* (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160297853/china-farmland-purchases-house-hearing-competition.
[11] CRS, *Confucius Institutes in the United States: Selected Issues* (version 12, updated May 20, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11180.
[12] Michael Martina & Ted Hesson, *FBI director 'very concerned' by Chinese 'police stations' in U.S.,* REUTERS, Nov. 17, 2022, https://www.reuters.com/world/us/fbi-director-very-concerned-by-chinese-police-stations-us-2022-11-17/.
[13] Isaac Chotiner, *What's Behind the Chinese Spy Balloon,* THE NEW YORKER, Feb. 18, 2023, https://www.newyorker.com/news/q-and-a/whats-behind-the-chinese-spy-balloon.

- This month, the U.S. (and Canada) issued orders banning the use of TikTok, a Chinese-owned video sharing app, on government-issued mobile devices amid growing privacy and cybersecurity concerns.[14]
- Also this month, U.S. defense and national security officials have raised the possibility that certain Chinese-made giant cargo cranes are being used for espionage.[15]

### Ownership Statistics

Foreign persons and entities held an interest in 40.8 million acres of U.S. agricultural land in 2021, accounting for 3.1% of total privately owned land.[16] These data cover agricultural land and nonagricultural land (e.g. associated homesteads, roads, etc.). In 2021, forestland accounted for 47% of all foreign-owned land, cropland accounted for 29%, and pasture and other agricultural land for 22%. Nonagricultural land (such as homesteads and roads) accounted for 2%. Foreign land holdings have increased by an average of 2.2 million acres per year since 2015.[17]

With respect to China specifically, not including the Fufeng Group Limited's purchase in 2022, the U.S. Department of Agriculture reports that China accounted for 383,935 acres, or 0.9% of total foreign-owned U.S. agricultural land as of year-end 2021.[18] The department also reports that 85 Chinese investors own 275 parcels of agricultural land totaling 194,772 acres worth $1,868,577.[19]

| Country | Total | Foreign Entities | U.S. Entities w/ Foreign Shares | % of U.S. Private Land |
|---|---|---|---|---|
| | | (million acres) | | (percent) |
| Canada | 12.8 | 9.7 | 3.2 | 1.0% |
| Netherlands | 4.9 | 4.4 | 0.5 | 0.4% |
| Italy | 2.7 | 2.6 | 0.1 | 0.2% |
| United Kingdom | 2.5 | 1.5 | 1.0 | 0.2% |
| Germany | 2.3 | 1.4 | 0.9 | 0.2% |
| **Subtotal** | 25.2 | 19.6 | 5.7 | 2.0% |
| Other Countries | 12.4 | 7.1 | 5.3 | 1.0% |
| Not Listed | 3.2 | 2.4 | 0.8 | 0.3% |
| **Total** | 40.8 | 29.1 | 11.7 | 3.1% |



*Foreign Holdings of Agricultural Land, 2021[20]*

As of year-end 2021, the states with the most foreign-owned agricultural acreage were Texas (5.3 million acres), Maine (3.6 million acres), Colorado (1.9 million acres), Alabama (1.8 million

---

[14] CBS News, *TikTok banned on U.S. government devices, and the U.S. is not alone. Here's where the app is restricted* (Mar. 1, 2023), https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.

[15] Kent Masing, *U.S. Concerned China-Made Cranes In American Ports Used To Spy On Military: Report,* INTERNATIONAL BUSINESS TIMES, Mar. 6, 2023, https://www.ibtimes.com/us-concerned-china-made-cranes-american-ports-used-spy-military-report-3673964.

[16] CRS, *supra* note 3, at 2.

[17] *Id.*

[18] *Id.;* Farm Service Agency, U.S. Department of Agriculture, *Foreign Holdings of U.S. Agricultural Land* (through Dec. 31, 2021), 4, *available at* https://www.fsa.usda.gov/programs-and-services/economic-and-policy-analysis/afida/annual-reports/index.

[19] Farm Service Agency, *supra* note 18, at 229.

[20] *Id.* at Table 1 and Figure 2 (internal citations omitted).

acres), and Oklahoma (1.7 million acres). Other states with more than 1 million foreign-owned acres were Arkansas, California, Florida, Georgia, Kansas, Louisiana, Michigan, New Mexico, Oregon, and Washington.[21]

According to the U.S. Department of Agriculture, of the 21,849,568 acres of privately held agricultural land in Florida, 1,382,284 acres (6.3%) are held by foreigners, which is among the highest proportions in the U.S.[22] It is unclear how much of that land is owned by China, although the department does report that it owns 96,975 acres in the "South Region," which includes Florida.[23]

### Existing Federal and State Laws

Federal law currently imposes no restrictions on the amount of private U.S. agricultural land that can be foreign-owned.[24] However, the Agricultural Foreign Investment Disclosure Act of 1978 established a nationwide system for collecting information pertaining to the foreign ownership of U.S. agricultural land,[25] including land used for agricultural, forestry, or timber production purposes.[26] For purposes of the act, foreign persons include any individual, corporation, company, association, partnership, society, joint stock company, trust, estate, or any other legal entity (including any foreign government) under the laws of a foreign government or having a principal place of business outside of the U.S.[27]

The act's regulations require foreign persons who buy, sell, or gain interest in U.S. agricultural land to disclose their holdings and transactions to the U.S. Department of Agriculture directly or to the Farm Service Agency county office where the land is located.[28] Failure to disclose this information may result in penalties and fines.[29] After the original disclosure, each subsequent change of ownership or use must be reported.[30] It should be noted that some have expressed concern that U.S. Department of Agriculture figures developed under the act may actually underestimate foreign ownership due to unreliable data collection and the definitions used by the department.[31]

The Committee on Foreign Investment in the U.S. is an interagency committee authorized to review certain transactions involving foreign investment in the U.S. and real estate transactions by foreign persons, in order to determine the effect of such transactions on national security.[32] Notwithstanding recent expansions to the committee's jurisdictional authority and review

---

[21] *Id.*
[22] *See* Farm Service Agency, *supra* note 18, at 4, 17.
[23] *Id.* at 238.
[24] CRS, *supra* note 3, at 1.
[25] Pub. L. No. 95-460, 92 Stat. 1263 (1978); 7 U.S.C. ss. 3501-3508.
[26] 7 U.S.C. s. 3508(1); 7 C.F.R. s. 781.2(b).
[27] 7 U.S.C. s. 3508(3); 7 C.F.R. s. 781.2(g).
[28] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(a).
[29] 7 U.S.C. s. 3502; 7 C.F.R. ss. 781.4., 781.5.
[30] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(b).
[31] Texas Farm Bureau, *Lawmakers ask for review of foreign ownership of U.S. farmland,* https://texasfarmbureau.org/lawmakers-ask-for-review-of-foreign-ownership-of-u-s-farmland/ (last visited Mar. 7, 2023).
[32] U.S. Department of the Treasury, *The Committee on Foreign Investment in the United States,* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius (last visited Mar. 6, 2023).

considerations,[33] there appear to be significant gaps. For example, the committee recently determined that Fufeng Group Limited's purchase near Grand Forks Air Force Base was outside of its jurisdiction and that it would therefore take no further action.[34]

Some U.S. states and localities have instituted restrictions on the foreign ownership of farmland.[35] Although no state has instituted an absolute prohibition on all foreign ownership, some states have limited or proposed to prohibit certain foreign persons and entities from acquiring or owning an interest in agricultural land within their states, and several states have separate disclosure requirements within their states.[36]



*Overview of Selected State Laws Related to Foreign Ownership of U.S. Agricultural Land*[37]

There is no single uniform approach under state laws to addressing foreign ownership.[38] Some general categories include:

- Restrictions on the amount of land that can be owned or the duration of ownership.
- Distinctions involving private versus public land or how agricultural land is defined.
- Distinctions involving resident and nonresident aliens.
- Inheritance considerations involving land ownership.
- Restrictions on ownership by foreign corporations (e.g. corporate farming laws or requirements corporations are subject to in order to obtain license or register).
- Differences related to enforcement and penalties.[39]

Currently, in Florida, foreign persons and entities have the same rights in real property as do citizens of the U.S. Foreign corporations, upon qualifying to do business in the state, have the same rights in real property as do domestic corporations. Foreign ownership of a domestic corporation has no effect on that corporation's rights in real property. No disclosure is required by any person or corporation when acquiring, holding or transferring rights in real property.[40]

---

[33] *See id.* (discussing Executive Order 14083, the Foreign Investment Risk Review Modernization Act of 2018, and associated regulations).
[34] T.J. Nelson, KVVR Local News, *Fufeng USA Looking to Move Ahead with Grand Forks Project After Federal Agency Review Suddenly Ends* (Dec. 13, 2022), https://www.kvrr.com/2022/12/13/fufeng-usa-looking-to-move-ahead-with-grand-forks-project-after-federal-agency-review-suddenly-ends/.
[35] CRS *supra* note 3, at 1.
[36] *Id.*
[37] *Id.* at Figure 1 (internal citation omitted).
[38] *Id.* at 1.
[39] *Id.*
[40] *See* 2 INTERNATIONAL BUSINESS TRANSACTIONS s. 29:26 (3d ed., updated Nov. 2022).

**Florida Electronic Health Records Act**

The Florida Electronic Health Records Act[41] authorizes health care providers to release or access an identifiable health record of a patient without the patient's consent for use in the treatment of that patient for an emergency medical condition, when consent cannot be obtained from the patient or the patient representative due to the patient's condition or the nature of the situation requiring immediate medical attention.[42] It provides immunity from civil liability whenever a health care provider accesses or releases the identifiable health record in good faith under the statute. It also directs the Agency for Health Care Administration to develop a form to document patient authorization for the use or release of an identifiable health record.[43] The act includes definitions for the following terms: "electronic health record," "qualified electronic health record," "certified electronic health record technology," "health record," "identifiable health record," "patient," and "patient representative."[44]

**Health Care Licensing Procedures Act**

The Health Care Licensing Procedures Act[45] provides a streamlined and consistent set of basic licensing requirements for health care providers.[46] The act is intended to minimize confusion, standardize terminology, and include issues that are not otherwise addressed in state law pertaining to specific providers.[47] Among other things, it provides certain minimum licensure requirements, with which applicants and licensees must comply in order to obtain and maintain a license.[48]

**Statute Criminalizing Threats and Extortion**

State law criminalizes threats and extortion. One commits the crime if he or she, either verbally or by a written or printed communication:

> maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will[.][49]

---

[41] Section 408.051, F.S.
[42] Section 408.051(3), F.S.
[43] Section 408.051(4), F.S.
[44] Section 408.051(2), F.S.
[45] Chapter 408, Part II, F.S.; *see also* s. 408.801(1), F.S. (providing a short title).
[46] Section 408.801(2), F.S.
[47] *Id.*
[48] *See generally* s. 408.810, F.S.
[49] Section 836.05, F.S.

The crime is a second degree felony, punishable by a term of imprisonment not exceeding 15 years[50] and a $10,000 fine,[51] or possibly more under the habitual offender statute.[52]

## III.   Effect of Proposed Changes:

CS/CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., U.S. territories, or Canada.

**Prohibition on Governmental Entity Contracting with Entities of Foreign Countries of Concern**

**Section 1** of the bill creates s. 287.138, F.S., within chapter 287, part I, F.S., which governs commodities, insurance, and contractual services, to prohibit contracting between governmental entities and entities of foreign countries of concern.

The bill defines the following terms for purposes of the new statute:
- "Controlling interest" means possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract, or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company or is entitled to 25 percent or more of its profits is presumed to possess a controlling interest in that company.
- "Department" means the Department of Management Services.
- "Foreign country of concern" means:
  - The People's Republic of China.
  - The Russian Federation.
  - The Islamic Republic of Iran.
  - The Democratic People's Republic of Korea.
  - The Republic of Cuba.
  - The Venezuelan regime of Nicolás Maduro.
  - The Syrian Arab Republic.
  - Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Governmental entity" means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law including, but not limited to, the Commission on Ethics, the Public Service Commission, the Office of Public Counsel, and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that governmental entities may not knowingly enter into a contract with an entity which would give access to an individual's personal identifying information if:

---

[50] Section 775.082(3)(d), F.S.
[51] Section 775.083(1)(b), F.S.
[52] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

- The entity is owned by the government of a foreign country of concern;
- The government of a foreign country of concern has a controlling interest in the entity; or
- The entity is organized under the laws of or has its principal place of business in a foreign country of concern.

Additionally, the bill provides that:
- Beginning January 1, 2024, a governmental entity may not accept a bid on, a proposal for, or a reply to, or enter into, a contract with an entity which would grant the entity access to an individual's personal identifying information unless the entity provides the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.
- Beginning July 1, 2025:
  - A governmental entity may not extend or renew a contract with one of the entities listed above if the contract would give such entity access to an individual's personal identifying information.
  - When an entity extends or renews a contract with a governmental entity which would grant the entity access to an individual's personal identifying information, the entity must provide the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.

The bill authorizes the Attorney General to bring a civil action in any court of competent jurisdiction against an entity that violates the statute. Violations of the statute may result in:
- A civil penalty equal to twice the amount of the contract for which the entity submitted a bid or proposal for, replied to, or entered into.
- Ineligibility to enter into, renew, or extend any contract, including any grant agreements, with any governmental entity for up to 5 years.
- Ineligibility to receive or renew any license, certification, or credential issued by a governmental entity for up to 5 years.
- Placement on the suspended vendor list.[53]

Any penalties collected from entities that violate the statute must be deposited into the General Revenue Fund.

The bill also authorizes the department to adopt rules to implement the statute, including rules establishing the form for the affidavit required under the statute.

**Prohibition on Contracting for an Economic Incentive with a Foreign Entity**

**Section 2** of the bill creates s. 288.007, F.S., to prohibit governmental entities from entering into contracts for an economic incentive with a foreign entity.

The bill defines the following terms for purposes of the new statute:
- "Controlled by" means having possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract,

---

[53] *See* s. 287.1351, F.S. (providing for the suspension of certain vendors).

or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company, or that is entitled to 25 percent or more of its profits, is presumed to control the foreign entity.

- "Economic incentive" means all programs administered by, or for which an applicant for the program must seek certification, approval, or other action by, the department under chapter 288, F.S. (governing commercial development and capital improvements), chapter 212, F.S. (governing tax on sales, use, and other transactions), or chapter 220, F.S. (the income tax code), and all local economic development programs, grants, or financial benefits administered by a political subdivision or an agent thereof.
- "Foreign country of concern" has the same meaning as defined later in the bill.[54]
- "Foreign entity" means an entity that is:
  - Owned or controlled by the government of a foreign country of concern; or
  - A partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity.
- "Government entity" means a state agency, a political subdivision, or any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that a government entity may not knowingly enter into an agreement or contract for an economic incentive with a foreign entity. Before providing any economic incentive, a government entity must require the recipient or applicant to provide the government entity with an affidavit signed under penalty of perjury attesting that the recipient or applicant is not a foreign entity.

The bill also requires the department to adopt rules to administer the new statute, including rules establishing the form for the required affidavit.

**Prohibition of Conveyances to Foreign Entities**

**Section 3** of the bill directs the Division of Law Revision to create part III of chapter 692, F.S., consisting of ss. 692.201, 692.202, 692.203, and 692.204, F.S., to be entitled "Conveyances to Foreign Entities."

*Definitions*

**Section 4** of the bill creates s. 692.201, F.S., which defines the following terms for purposes of part III of chapter 692, F.S.:
- "Agricultural land" means land classified as agricultural under state law.[55]
- "Critical infrastructure facility" means any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons:
  - A chemical manufacturing facility.
  - A refinery.

---

[54] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[55] *See* s. 193.461, F.S. (providing the agricultural land classification process).

- o An electrical power plant, including a substation, switching station, electrical control center, or electric transmission or distribution facility.[56]
  - o A water intake structure, water treatment facility, wastewater treatment plant, or pump station.
  - o A natural gas transmission compressor station.
  - o A liquid natural gas terminal or storage facility.
  - o A telecommunications central switching office.
  - o An inland port or other facility or group of facilities serving as a point of intermodal transfer of freight in a specific area physically separated from a seaport.
  - o A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas.
  - o A seaport.[57]
  - o A spaceport territory.[58]
- "Foreign country of concern" means:
  - o The People's Republic of China.
  - o The Russian Federation.
  - o The Islamic Republic of Iran.
  - o The Democratic People's Republic of Korea.
  - o The Republic of Cuba.
  - o The Venezuelan regime of Nicolás Maduro.
  - o The Syrian Arab Republic.
  - o Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Foreign principal" means:
  - o The government or any official of the government of a foreign country of concern;
  - o A political party or member of a political party or any subdivision of a political party in a foreign country of concern;
  - o A partnership, association, corporation, organization, or other combination of persons organized under the laws of, or having its principal place of business in, a foreign country of concern, or a subsidiary of such entity; or
  - o Any person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the U.S.
- "Military installation" means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the secretary of a military department or the

---

[56] *See* s. 403.031(20), F.S. (defining "electrical power plant" as meaning any electrical generating facility that uses any process or fuel and that is owned or operated by an electric utility, as defined in s. 403.503(14), and includes any associated facility that directly supports the operation of the electrical power plant).

[57] *See* s. 311.09(1), F.S. (listing the ports of Jacksonville, Port Canaveral, Port Citrus, Fort Pierce, Palm Beach, Port Everglades, Miami, Port Manatee, St. Petersburg, Putnam County, Tampa, Port St. Joe, Panama City, Pensacola, Key West, and Fernandina).

[58] *See* s. 331.303(18), F.S. (defining "spaceport territory" as the geographical area designated in s. 331.304, F.S., and as amended or changed in accordance with s. 331.329, F.S.; it includes, but is not limited to, the real property located in Brevard County that is included within the 1998 boundaries of Patrick Space Force Base, formerly Patrick Air Force Base; Cape Canaveral Space Force Station, formerly Cape Canaveral Air Force Station; and the John F. Kennedy Space Center).

Secretary of Defense, without regard to the duration of operational control.[59] For purposes of the bill, military installations include armories.[60]

- "Real property" means land, buildings, fixtures, and all other improvements to land.

### Purchase of Agricultural Land by Foreign Principals

**Section 5** of the bill creates s. 692.202, F.S., to prohibit the purchase of agricultural land by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent agricultural land or any interest in such land in the state. This prohibition does not apply to a foreign principal that acquires agricultural land for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires agricultural land or any interest in such land in the state before July 1, 2023:

- May continue to own or hold such land or interest, but may not purchase or otherwise acquire by grant, devise, or descent any additional agricultural land or interest in such land in the state.
- Must register with the Department of Agriculture and Consumer Services by January 1, 2024. The department must establish a form for such registration, which, at minimum, must include all of the following:
  - The name of the owner of the agricultural land or the owner of the interest in such land.
  - The address of the agricultural land, the property appraiser's parcel identification number, and the property's legal description.
  - The number of acres of the agricultural land.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered agricultural land for the unpaid balance of any penalties assessed under the new statute.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire agricultural land on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of the agricultural land within 2 years after acquiring the agricultural land.

At the time of purchase, a buyer of agricultural land, or an interest in such land, must provide an affidavit signed under penalty of perjury attesting that the buyer is not a foreign principal and is in compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the agricultural land or subject the closing agent to civil or criminal liability, except for liability under the law criminalizing perjury, unless the closing agent has actual knowledge that the transaction will result in a violation of the new statute. The

---

[59] 10 U.S.C. s. 2801(c)(4).
[60] *See* s. 250.01(5), F.S. (defining an "armory" as a building or group of buildings used primarily for housing and training troops or for storing military property, supplies, or records).

Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

The bill provides that an agricultural land, or any interest in such land, that is owned or acquired in violation of the new statute may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Agriculture and Consumer Services may initiate a civil action in the circuit court of the county in which the property lies.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[61] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the agricultural land, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the agricultural land, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the agricultural land in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the agricultural land subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the agricultural land upon a showing that the defendant's control of the agricultural land constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:

- A foreign principal that purchases or acquires agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[62] and a $500 fine.[63]
- A person who knowingly sells agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[64] and a $500 fine.[65]

The bill also requires the Department of Agriculture and Consumer Services to adopt rules to implement the new statute.

### *Purchase of Real Property around Military Installation and Critical Infrastructure Facilities by Foreign Principals*

**Section 6** of the bill creates s. 692.203, F.S., to prohibit the purchase of real property around military installations and critical infrastructure facilities by foreign principals.

---

[61] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[62] Section 775.082(4)(b), F.S.
[63] Section 775.083(1)(e), F.S.
[64] Section 775.082(4)(b), F.S.
[65] Section 775.083(1)(e), F.S.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent any interest in real property within 20 miles of any military installation or critical infrastructure facility in the state. This prohibition does not apply to a foreign principal that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires any interest in real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional property within 20 miles of any military installation or critical infrastructure facility in the state.

The bill provides that a foreign principal that owns or acquires real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:

- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this provision.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire real property, or any interest therein, which is within 20 miles of any military installation or critical infrastructure facility in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property.

At the time of purchase, a buyer of real property that is located within 20 miles of any military installation or critical infrastructure facility in the state must provide an affidavit signed under penalty of perjury attesting that the buyer is not a foreign principal and is in compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property or subject the closing agent to civil or criminal liability, except for liability under the law criminalizing perjury, unless the closing agent has actual knowledge that the transaction will result in a violation of the new statute. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.

- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[66] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the real property, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A foreign principal that purchases or acquires real property or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[67] and a $500 fine.[68]
- A person who knowingly sells real property or any interest therein in violation of this section commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[69] and a $500 fine.[70]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

### *Purchase or Acquisition of Real Property by the People's Republic of China*

**Section 7** of the bill creates s. 692.204, F.S., to prohibit the purchase or acquisition of real property by the People's Republic of China.

The bill prohibits the following persons or entities from directly or indirectly owning or acquiring by purchase, grant, devise, or descent any interest in real property in the state:
- The People's Republic of China, the Chinese Communist Party, or any official or member of the People's Republic of China or the Chinese Communist Party.
- Any other political party or member of a political party or a subdivision of a political party in the People's Republic of China.

---

[66] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[67] Section 775.082(4)(b), F.S.
[68] Section 775.083(1)(e), F.S.
[69] Section 775.082(4)(b), F.S.
[70] Section 775.083(1)(e), F.S.

- A partnership, an association, a corporation, an organization, or any other combination of persons organized under the laws of or having its principal place of business in the People's Republic of China, or a subsidiary of such entity.
- Any person who is domiciled in the People's Republic of China and who is not a citizen or lawful permanent resident of the U.S.

This prohibition does not apply to a person or entity of the People's Republic of China that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

Any person or entity described above that directly or indirectly owns or acquires any interest in real property in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property in the state.

The bill provides that any person or entity described above that owns or acquires real property in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A person or entity that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this paragraph.

The bill clarifies that notwithstanding the general prohibition in the bill, a Chinese person or entity can still acquire real property in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property unless the person or entity acquired the real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

At the time of purchase, a buyer of real property in the state must provide an affidavit signed under penalty of perjury attesting that the buyer is not one of the Chinese entities or persons prohibited from owning or acquiring any interest in real property in the state and is in compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property or subject the closing agent to civil or criminal liability, except for liability under the law criminalizing perjury, unless the closing agent has actual knowledge that the transaction will result in a violation of the new statute. The Florida Real Estate Commission must adopt rules to implement this subsection, including rules establishing the form for the affidavit required under this subsection.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:

**A278**

- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[71] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the real property, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A violation of this section constitutes a felony of the third degree, punishable by a term of imprisonment not exceeding 5 years[72] and a $5,000 fine,[73] or possibly more under the habitual offender statute.[74]
- A person who sells real property or any interest therein in violation of the new statute commits a misdemeanor of the first degree, punishable by a term of imprisonment not exceeding 1 year[75] and a $1,000 fine.[76]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

**Amendments to the Florida Electronic Health Records Act**

**Section 8** of the bill amends s. 408.051, F.S., the Florida Electronic Health Records Exchange Act (Act), by adding two definitions and by requiring that the offsite storage of certain personal medical information be physically maintained in the continental U.S., U.S. territories, or Canada.

First, for purposes of the Act, the bill incorporates the definition for "cloud computing" found in chapter 282, part I, F.S., which governs information technology management. That definition[77]

---

[71] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[72] Section 775.082(3)(e), F.S.
[73] Section 775.083(1)(c), F.S.
[74] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).
[75] Section 775.082(4)(a), F.S.
[76] Section 775.083(1)(d), F.S.
[77] Section 282.0041(5), F.S.

provides that cloud computing has the same meaning as provided in Special Publication 800-145 issued by the National Institute of Standards and Technology, which reads as follows:

> Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction. This cloud model is composed of five essential characteristics, three service models, and four deployment models.[78]

Second, for purposes of the Act, the bill defines the term "health care provider" as including all of the following:

- Any provider as defined in the Health Care Licensing Procedures Act;[79]
- Any health care practitioner as defined in chapter 456, F.S., which governs health professions and occupations;[80]
- Any health care professional certified under the Radiological Personnel Certification Act;[81]
- Any home health aide as defined in the Home Health Services Act;[82]
- Any service provider as defined in the Florida Mental Health Act,[83] and the service provider's clinical and nonclinical staff who provide inpatient or outpatient services;
- Any licensed continuing care facility;[84] and
- Any pharmacy permitted under the Florida Pharmacy Act.[85]

Third, the bill amends the Act to provide that in addition to complying with certain federal standards regulating the privacy of individually identifiable health information,[86] a health care provider that utilizes certified electronic health record technology must ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted computing facility or an entity providing cloud computing services, is

---

[78] U.S. Department of Commerce, National Institute of Standards and Technology, *Special Publication 800-145 (The NIST Definition of Cloud Computing)* (Sept. 2011), *available at* https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf (also identifying the referenced five essential characteristics, three service models, and four deployment models) (footnotes omitted).

[79] *See* s. 408.803(12), F.S. (defining "provider" as any activity, service, agency, or facility regulated by Agency for Health Care Administration and listed in s. 408.802, F.S.).

[80] *See* s. 456.001(4), F.S. (defining "health care practitioner" as any person licensed under one of the listed statutes).

[81] Chapter 468, part IV, F.S.

[82] *See* s. 400.462, F.S. (defining "home health aide" as a person who is trained or qualified, as provided by rule, and who provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in ambulation or exercises, assists in administering medications as permitted in rule and for which the person has received training established by the agency under part III (regulating home health services), or performs tasks delegated to him or her under ch. 464, F.S. (regulating nursing)).

[83] *See* s. 394.455(45), F.S. (defining "service provider" as a receiving facility, a facility licensed under ch. 397, F.S. (governing substance abuse services), a treatment facility, an entity under contract with the department to provide mental health or substance abuse services, a community mental health center or clinic, a psychologist, a clinical social worker, a marriage and family therapist, a mental health counselor, a physician, a psychiatrist, an advanced practice registered nurse, a psychiatric nurse, or a qualified professional as defined in s. 39.01, F.S. (referencing licensed physicians, physician assistants, psychiatrists, psychologists, and psychiatric nurses))).

[84] *See* ch. 651, F.S. (governing continuing care contracts).

[85] Chapter 465, F.S.

[86] 45 C.F.R. pts. 160 and 164 (subparts A and C).

physically maintained in the continental U.S., U.S. territories, or Canada. The bill applies this provision to all qualified electronic health records that are stored using any technology that can allow information to be electronically retrieved, accessed, or transmitted.

**Amendments to the Health Care Licensing Procedures Act**

**Section 9** of the bill amends s. 408.810, F.S., which provides certain minimum licensure requirements for health care providers.[87]

The bill provides that a licensee must sign an affidavit at the time of his or her initial application for a license, and on any renewal applications thereafter, that attests under penalty of perjury that he or she is in compliance with the bill, specifically the requirement in the bill that health care providers using certified electronic health record technology ensure that all patient information stored in an offsite physical or virtual environment is physically maintained in the continental U.S., U.S. territories, or Canada. The licensee must remain in compliance with this requirement or be subject to disciplinary action by the agency.

The licensee must also ensure that a person or entity who possesses a controlling interest in the licensee does not also hold, either directly or indirectly, regardless of ownership structure, an interest in an entity that has a business relationship with a foreign country of concern or that is subject to the statute prohibiting contracting with scrutinized companies.[88]

For purposes of this provision, the bill defines the following terms:
- "Business relationship" means engaging in commerce in any form, including, but not limited to, acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, military equipment, or any other apparatus of business or commence.
- "Foreign country of concern" has the same meaning as provided earlier in the bill.[89]
- Having an "interest" in an entity means having any direct or indirect investment in or loan to the entity valued at 5 percent or more of the entity's net worth, or any form of direct or indirect control exerting similar or greater influence on the governance of the entity.[90]

**Amendments to the Statute Criminalizing Threats and Extortion**

**Section 10** of the bill amends s. 836.05, F.S., which criminalizes threats and extortion, to provide that a person who commits a violation of the statute and at the time of the violation is acting as a foreign agent as defined in state law,[91] with the intent of benefitting a foreign country of concern as defined earlier in the bill,[92] commits a felony of the first degree, punishable by a term of

---

[87] *See supra* note 79 (defining providers); *see also* s. 408.802, F.S. (listing regulated providers).
[88] Section 287.135, F.S.
[89] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[90] *See* s. 286.101(1), F.S. (defining "interest").
[91] *See* s. 812.081(1)(b), F.S. (defining "foreign agent" as any officer, employee, proxy, servant, delegate, or representative of a foreign government).
[92] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").

imprisonment of not exceeding 30 years[93] and a $10,000 fine,[94] or possibly more under the habitual offender statute.[95]

**Effective Date**

The bill takes effect on July 1, 2023.

**IV.    Constitutional Issues:**

A.      Municipality/County Mandates Restrictions:

None.

B.      Public Records/Open Meetings Issues:

None.

C.      Trust Funds Restrictions:

None.

D.      State Tax or Fee Increases:

None.

E.      Other Constitutional Issues:

A state's power to apply its law exclusively to its alien inhabitants as a class is confined to narrow limits. However, each state, in the absence of any treaty provision to the contrary, may deny to aliens the right to own land within its border.[96]

**V.     Fiscal Impact Statement:**

A.      Tax/Fee Issues:

None.

B.      Private Sector Impact:

Under the bill, governmental entities are prohibited from knowingly entering into contracts for an economic incentive with a foreign entity. Accordingly, foreign entities

---

[93] Section 775.082(3)(b)1., F.S.
[94] Section 775.083(1)(b), F.S.
[95] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).
[96] *See Graham v. Ramani,* 383 So. 2d 634, 635 (Fla. 1980) (recognizing that the U.S. Supreme Court has upheld statutes denying aliens the right to acquire land and citing in support *Terrace v. Thompson,* 263 U.S. 197 (1923); *Terrace* upheld a state of Washington statute prohibiting the ownership of land within the state by nondeclarant aliens, finding that the "privilege of owning or controlling agricultural land within the state" and the "allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself" (*id.* at 221)).

(as defined in the bill) will no longer be able to avail themselves of such economic incentives in connection with their projects.

The bill provides that foreign principals who acquired agricultural land or land within 20 miles of a military installation or critical infrastructure facility before July 1, 2023 may continue to own those lands, but may not expand upon their ownership after that date. Similarly, Chinese businesses, and persons who are domiciled in China and not citizens or lawful permanent residents of the U.S., who acquired real property before July 1, 2023 may continue to own those lands, but may not expand upon their ownership after that date. To the extent any of these foreign principals, businesses, or persons' business plans assumed future expansions of land ownership, those plans will be negatively impacted by the bill.

The bill requires health care providers that use certified electronic health care technology to ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted facility or an entity providing cloud computing services, is maintained in the continental U.S., U.S. territories, or Canada. To the extent such patient information is not already maintained in one of those locations, health care providers will incur costs moving that information into one of them.

C.    Government Sector Impact:

Under the bill, governmental entities may not contract with entities of foreign countries of concern. To the extent contracting with entities of foreign countries of concern might have resulted in more favorable contractual terms than contracting with other entities, governmental entities will be negatively impacted by the bill.

The bill authorizes the Attorney General, Department of Agriculture and Consumer Services, and the Department of Economic Opportunity to enforce certain affidavit preparation and property forfeiture provisions in the bill. Additionally, the bill requires the Department of Management Services, the Florida Real Estate Commission, and the Department of Economic Opportunity to adopt rules to implement various provisions of the bill. Although these state agencies will incur costs associated with these efforts, it is anticipated that they will be minimal and absorbed by their existing budget allocations.

## VI.    Technical Deficiencies:

None.

## VII.    Related Issues:

None.

## VIII.    Statutes Affected:

This bill creates the following sections of the Florida Statutes: 287.138, 288.007, 692.201, 692.202, 692.203, and 692.204.

This bill substantially amends the following sections of the Florida Statutes: 408.051, 408.810, and 836.05.

## IX.     Additional Information:

A.     Committee Substitute – Statement of Substantial Changes:
(Summarizing differences between the Committee Substitute and the prior version of the bill.)

**CS/CS by Rules on March 22, 2023:**
- Revises the definition of "foreign principal," and the category of Chinese persons and entities that are prohibited from owning or acquiring protected lands in the state, to exclude any persons who are lawful permanent residents of the U.S.
- Revises the requirement that health care providers store offsite patient information only within the continental U.S., by expanding it to also allow for such storage within U.S. territories and Canada.
- Clarifies that it is the buyer who must attest in the affidavit to not being a foreign principal and to otherwise comply with the new statute.
- Provides that the failure to obtain or maintain the affidavit does not subject the closing agent to civil or criminal liability, except for liability under the law criminalizing perjury, unless the closing agent has actual knowledge that the transaction will result in a violation of the new statute.

**CS by Judiciary on March 14, 2023:**
- Revises the definitions of "foreign entity" and "foreign principal," and the category of Chinese persons and entities that are prohibited from owning or acquiring protected lands in the state, to include the subsidiaries of those entities.
- Clarifies that notwithstanding the general prohibitions in the bill, foreign principals and Chinese persons and entities may still acquire protected lands on or after the effective date, but must divest themselves of those lands within 2 years unless a diplomatic exemption applies.

B.     Amendments:

None.

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.

**A284**

Tab 54

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | | |
|---|---|---|
| YIFAN SHEN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-208-AW-MAF |
| | ) | |
| WILTON SIMPSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## STATEMENT OF INTEREST OF THE UNITED STATES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The State of Florida recently enacted a statute that imposes new prohibitions on owning or purchasing land in the State. Among other provisions, Senate Bill 264 ("SB 264") prohibits individuals who are not U.S. citizens or permanent residents and whose "domicile" is in China, or other so-called "foreign countries of concern," from owning or purchasing real property. The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517[1] to advise the Court of the United States' view that the provisions of SB 264 to be codified at Florida Statutes

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

§§ 692.201–.205[2] violate the Fair Housing Act ("FHA") and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. These unlawful provisions will cause serious harm to people simply because of their national origin, contravene federal civil rights laws, undermine constitutional rights, and will not advance the State's purported goal of increasing public safety. Plaintiffs are likely to succeed on the merits of these claims challenging the provisions of SB 264 that restrict and prohibit land ownership. Accordingly, the United States supports Plaintiffs' motion to enjoin Defendants from implementing and enforcing these provisions.

## INTEREST OF THE UNITED STATES

This case implicates important federal interests. The United States Department of Justice has enforcement authority under the FHA. 42 U.S.C. §§ 3613(e), 3614. The United States thus has a strong interest in eradicating housing discrimination and ensuring the correct interpretation and application of the FHA. *See, e.g.*, Statement of Interest of the United States, *Louis v. SafeRent Solutions, LLC*, No. 22-CV-10800 (D. Mass. Jan. 9, 2023). In addition, the United States has a strong interest in matters that raise challenges of public importance under the Fourteenth Amendment of the United States Constitution. *See, e.g.*, Statement of

---

[2] *See* 2023 Fla. Laws ch. 2023-33, §§ 3-8, at 5–15 (to be codified at Fla. Stat. §§ 692.201–.205). These are the provisions of the bill that Plaintiffs seek to preliminarily enjoin. *See* Pls.' Corr. Emergency Mot. for Prelim. Inj., ECF No. 23, at 13 n.2.

Interest of the United States, *Poe v. Drummond*, No. 23-CV-00177 (N.D. Okla. June 9, 2023); United States' Statement of Interest, *Arnold v. Barber's Hill Indep. Sch. Dist.*, No. 4:20-CV-01802 (S.D. Tex. July 23, 2021).

## BACKGROUND

On May 8, 2023, Florida's Governor signed SB 264 into law. SB 264 imposes new restrictions on persons and entities from "foreign countries of concern," defined as China, Russia, Iran, North Korea, Cuba, Venezuela[3], and Syria. SB 264 prohibits governmental entities in Florida from contracting with entities of these countries or entering into any agreement that would grant economic incentives to these countries; and, relevant to this lawsuit, creates two new sets of restrictions on land ownership in Florida. *See* 2023 Fla. Laws ch. 2023-33 (to be codified at Fla. Stat. §§ 287.138, 408.810, 692.201–.205, and 836.05).[4]

The first set of land ownership restrictions prohibits "foreign principals" from owning or acquiring agricultural land or real property within ten miles of any "military installation" or "critical infrastructure facility" in Florida. *See id.* §§ 692.202, .203(1). "Foreign principals" include individuals whose "domicile[]" is in

---

[3] Specifically, the bill refers to "the Venezuelan regime of Nicolás Maduro." *See* Fla. Stat. § 287.138(1)(c). It does not define any criteria by which an individual is considered to be connected with that regime. *See generally id.*

[4] Citations to provisions of SB 264 are to the statutory sections where it is to be codified. Other citations to Florida laws are to the 2022 Florida Statutes.

**A288**

a "foreign country of concern" and who are not U.S. citizens or lawful permanent residents. *See id.* §§ 287.138(1)(c), 692.201(4)(d). An exception permits foreign principals who are "natural person[s]" with a valid non-tourist visa or who have been granted asylum to purchase one residential real property if the property is less than two acres in size and not within five miles of a military installation. *Id.* § 692.203(4). Existing owners and new purchasers who fall within the bill's definition of "foreign principal" are required to register real property on or within ten miles of any military installation or critical infrastructure facility with Florida's Department of Economic Opportunity. *Id.* §§ 692.202(3)(a), .203(3)(a).

The second set of restrictions specifically prohibits the "[p]urchase or acquisition of real property by the People's Republic of China." *Id.* § 692.204. In addition to Chinese political and corporate entities, *see id.* §§ 692.204(1)(a)(1)–(3), (5), "[a]ny person who is domiciled in the People's Republic of China and who is not a citizen or lawful permanent resident of the United States" is prohibited from purchasing or owning any real property in the State, *id.* § 692.204(1)(a)(4). This prohibition has the same narrow two-acre residential property exception described above for "natural person[s]" with a valid non-tourist visa or who have been granted asylum, and the same requirement to register property with the State. *See id.* §§ 692.204(2), (4).

SB 264 imposes both civil and criminal penalties for violations of the land ownership provisions. Failure to comply with the restrictions and registration requirements may result in civil penalties, including a fine of $1,000 for each day that registration is delayed and forfeiture of any real property owned or acquired in violation of the statute. *Id.* §§ 692.202(3)(b), .202(6), .203(3)(b), .203(7), .204(4)(b), .204(7). Foreign principals or property sellers who violate the first set of restrictions may be charged with a second-degree misdemeanor, *id.* §§ 692.202(7)–(8), .203(8)–(9), punishable by up to 60 days' imprisonment and a $500 fine, *id.* §§ 775.082(4)(b), .083(1)(e). The Chinese-specific prohibitions impose more severe criminal sanctions: A person who "knowingly sells real property" to Chinese persons or entities in violation of the law commits a misdemeanor of the first degree, *id.* § 692.204(9), punishable by up to one year of imprisonment and a $1,000 fine, *id.* §§ 775.082(4)(a), .083(1)(d). Chinese purchasers of land in violation of the law commit a third-degree felony, *id.* § 692.204(8), punishable by up to five years in prison and a $5,000 fine, *id.* §§ 775.082(3)(e), .083(1)(c). If it is not enjoined, the law will go into effect on July 1, 2023.

On May 22, 2023, Plaintiffs Yifan Shen, Zhiming Xu, Xinxi Wang, Yongxin Liu, and Multi-Choice Realty, LLC filed a Complaint alleging claims under the FHA, the Fourteenth Amendment of the United States Constitution, and the

**A290**

Supremacy Clause of Article VI of the United States Constitution. Compl., ECF No. 1. On June 5, 2023, Plaintiffs filed their First Amended Complaint. First Am. Compl., ECF No. 17. On June 6, 2023, Plaintiffs moved to enjoin Defendants from implementing and enforcing the portions of SB 264 to be codified at Florida Statutes §§ 692.201–.205, which establish new restrictions and prohibitions on land ownership. Pls.' Emergency Mot. for Prelim. Inj., ECF No. 21. Plaintiffs filed a corrected version of their motion on June 7, 2023. Pls.' Corr. Emergency Mot. for Prelim. Inj., ECF No. 23 ("Pls.' Mot.").

## ARGUMENT

A plaintiff seeking a preliminary injunction must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Because Plaintiffs are likely to succeed on the merits of their Fair Housing Act and Equal Protection Clause claims, the Court should enjoin the portions of SB 264 establishing restrictions and prohibitions on land ownership, *see* Fla. Stat. §§ 692.201–.205.[5]

---

[5] This Statement of Interest focuses only on the merits of Plaintiffs' Fair Housing Act and equal protection claims. The United States does not take a position at this time on the merits of any claims not addressed in this Statement of Interest.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FAIR HOUSING ACT CLAIMS

"[T]he Fair Housing Act of 1968 . . . broadly prohibits discrimination in housing throughout the Nation." *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 93 (1979); *see* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."). The FHA prohibits housing discrimination on the basis of race, color, religion, sex, familial status, disability, and national origin. 42 U.S.C. §§ 3604, 3605, 3606, 3617. The FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling[6] to any person" because of national origin. *Id.* § 3604(a). The FHA also prohibits discriminating "against any person in making available [residential real estate-related transactions], or in the terms or conditions of such a transaction" because of national origin, including "[t]he selling, brokering, or appraising of residential real property." *Id.* § 3605(a), (b)(2).

---

[6] The FHA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b). SB 264 restricts and prohibits the purchase of "real property," defined as "land, buildings, fixtures, and all other improvements to land," Fla. Stat. § 692.201(6). The United States' FHA analysis applies to the subset of "real property" that falls within the FHA's definition of "dwelling," *i.e.*, buildings, structures, and land "designed or intended for occupancy as . . . a residence," 42 U.S.C. § 3602(b).

**A292**

The FHA's provisions cover a wide range of discriminatory housing practices, including discrimination in the "terms, conditions, or privileges" of a sale or rental, *see* 42 U.S.C. § 3604(b), and discriminatory advertising, *see id.* § 3604(c); *see also, e.g.*, *Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 631–32 (11th Cir. 2019) ("the language of the FHA is broad and inclusive, prohibits a wide range of conduct, has a broad remedial purpose, and is written in decidedly far-reaching terms" (citation and internal quotation marks omitted)). The FHA also declares that "any law of a State . . . that purports to require or permit any action that would be a discriminatory housing practice under [the FHA] shall to that extent be invalid." 42 U.S.C. § 3615.

As addressed below, SB 264 violates Sections 3604 and 3605 of the FHA.[7] Moreover, because SB 264 is a state law that "require[s]" actions constituting "discriminatory housing practice[s]," the law is invalid under Section 3615 of the FHA.

### A. SB 264 violates Section 3604 and Section 3605 of the FHA.

The language of SB 264 facially discriminates on the basis of national origin. National origin "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah*

---

[7] To the extent Plaintiffs' First Amended Complaint alleges additional violations of the FHA, the United States takes no position on the those claims in this statement, except to note that enactment of SB 264 may lead to additional FHA violations in the future. *See* note 10, *infra*.

*Mfg. Co.*, 414 U.S. 86, 88 (1973) (interpreting Title VII); *see also United States v. Kras*, 409 U.S. 434, 446 (1973) (using the term "nationality" synonymously with national origin). "The issue in a national origin case is whether the defendant is willing to deal with people from some countries but not others." Robert G. Schwemm, *Housing Discrimination Law and Litigation* § 11A:1 (2022).

SB 264 imposes property ownership restrictions on individuals who are (1) not citizens or permanent residents of the United States and (2) whose "domicile" is in a specific subset of countries—China, Russia, Iran, North Korea, Cuba, Venezuela, and Syria—with the most severe prohibitions and penalties imposed on individuals from China. *See* Fla. Stat. §§ 692.202, .203, .204. While the bill does not clearly lay out which individuals from these seven countries will be subject to SB 264's restrictions, prohibitions, and property registration requirements, nonimmigrant visa holders from these seven countries are likely to be the most affected.[8] *See* First Am. Compl. ¶¶ 60–62.

---

[8] SB 264 refers to individuals who are "domiciled" in a "country of concern." Fla. Stat. §§ 692.201(4)(d), .204(1)(a)(4) (China). Neither SB 264 nor Florida statutes provide a general definition of "domicile." Black's Law Dictionary defines "domicile" as person's "fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." *Domicile*, Black's Law Dictionary (11th ed. 2019). As Plaintiffs allege, individuals lawfully present in the United States on a nonimmigrant visa from a "country of concern" are likely to be considered domiciled in that country, because nonimmigrant visas are not a mechanism to establish permanent residency in the United States. *See* First Am. Compl. ¶ 61. Nonimmigrant visas may include visas for "tourism, medical treatment, business, temporary work, study, or other similar reasons." U.S. Customs & Border Protection,

Florida is drawing distinctions based on a person's nationality: nonimmigrant visa holders from countries that Florida does not deem to be "countries of concern" will not be subject to any of SB 264's restrictions on purchasing or owning real property. As an illustration, an individual from China with a valid H-1B visa, like Plaintiff Yifan Shen, will be subject to SB 264's prohibitions on owning real property in Florida and the associated civil and criminal penalties for violations of the statute. *See* Decl. of Yifan Shen, ECF No. 21-2 ("Shen Decl."), ¶¶ 7, 12, 18–20. An individual from China with a valid F-1 student visa, like Plaintiff Xinxi Wang, will be required to register the home that she currently owns with the State. *See* Decl. of Xinxi Wang, ECF No. 21-4 ("Wang Decl."), ¶¶ 15–16. By contrast, an individual from Japan with an identical immigration status as Ms. Shen or Ms. Wang would be able to purchase and own property in Florida free of these restrictions or prohibitions.[9]

*Requirements for Immigrant and Nonimmigrant Visas*, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas (Jan. 3, 2018).

[9] SB 264 does not present a case of discrimination solely on the basis of citizenship status, which calls for a more nuanced analysis as to whether there may be a violation of the FHA. *See, e.g.*, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 432 (4th Cir. 2018) (the FHA prohibits discrimination on the basis of citizenship "when it has the purpose or unjustified effect of discriminating on the basis of national origin" (citation omitted)). Here, SB 264 does not affect all non-citizens, but rather singles out non-citizens from a small list of countries for less favorable treatment with regard to property-related transactions. In targeting individuals from a discrete list of countries, SB 264 discriminates on the basis of national origin.

The provisions of SB 264 that restrict land ownership by individuals domiciled in certain foreign nations violate sections 3604 and 3605 of the FHA. First, they violate Section 3604(a), which makes it unlawful to "refuse to sell . . . or otherwise make unavailable" a dwelling to any person based on national origin. SB 264's provisions prevent individuals from purchasing certain parcels of real property based only on their national origin, and they reduce the availability of housing for individuals from "foreign countries of concern." *See Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1542 n.17 (11th Cir. 1994) ("Courts have construed the phrase 'otherwise make unavailable or deny' in [42 U.S.C. § 3604(a)] to encompass actions by . . . government units that affected the availability of housing to minorities."). If SB 264 goes into effect, Plaintiffs Yifan Shen and Zhiming Xu will be prohibited from purchasing homes they have already signed contracts to acquire, solely based on their status as Chinese nationals. *See* Shen Decl. ¶¶ 18, 20; Decl. of Zhiming Xu, ECF No. 21-3 ("Xu Decl."), ¶ 18. Ms. Shen, who is Chinese and holds a valid H-1B visa, is prohibited by the Chinese-specific portions of SB 264 from purchasing her desired property because it appears to be within five miles of military sites. Shen Decl. ¶¶ 7, 18; *see* Fla. Stat. 692.204(2)(a). In addition, asylum seekers in Florida may be subject to SB 264's prohibitions, even though these non-U.S. citizens have expressed a clear intent not to return to their home country by requesting asylum in the United States. *See Juarrero v. McNayr*, 157

**A296**

So. 2d 79, 80 (Fla. 1963). Mr. Xu, who is Chinese and has applied for political asylum, arguably is prohibited by SB 264 from purchasing his desired property because he already owns property in Florida. Xu Decl. ¶¶ 7, 18; *see* Fla. Stat. 692.204(3).

In addition to preventing individuals from "foreign countries of concern" from buying specific homes, SB 264's restrictions will serve to generally reduce the availability of housing by making large parts of Florida—which happen to be near military installations and critical infrastructure facilities—essentially off-limits to individuals based on their nationality. *See* First Am. Compl. ¶ 76.

For similar reasons, SB 264 violates Section 3605(a) of the FHA, which prohibits discrimination in real-estate-related transactions, including the selling of residential real property. If SB 264 goes into effect, it would prohibit sellers of real property, including Plaintiff Multi-Choice Realty, LLC, from selling specific parcels of real property—*e.g.*, parcels over two acres in size, or parcels near military installations or critical infrastructure facilities—to individuals based on national origin.[10] *See* Decl. of Jian Song, ECF No. 21-6 ("Song Decl."), ¶¶ 11, 13–14.

---

[10] SB 264 is also likely to cause violations of Sections 3604(b), (c), and (d) of the FHA once the law goes into effect. These sections prohibit discrimination in the "terms, conditions, or privileges" of the sale of a dwelling, 42 U.S.C. § 3604(b); the publication of any notice or advertisement indicating a preference based on national origin, *see id.* § 3604(c); and false representations about the availability of a dwelling based on national origin,

The Eleventh Circuit has not weighed in on what test should be used to determine when facially discriminatory policies may be justified under the FHA. *See Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1277 (11th Cir. 2022) (discussing three tests adopted by other circuits).[11] But regardless of the test applied, Defendants would fail to meet their burden to show that SB 264's facial discrimination is valid. Each of the tests adopted by other circuits—"the Equal Protection Clause rational basis review test," "a means-ends tailoring test," or examining whether the restriction "responds to legitimate safety concerns," *id.* (citation and internal quotation marks omitted)—would require Defendants to put forth a legitimate interest to justify SB 264's land ownership restrictions and prohibitions on people from China and other "countries of concern." Defendants cannot do so.

---

*see id.* § 3604(d). Because SB 264 establishes restrictions on acquiring real property based on national origin, sellers and providers of housing—including lay persons not trained in the complexities of immigration law—may discriminate against buyers based on national origin in their attempts to comply with the law. In fact, SB 264 may also lead sellers and housing providers to engage in profiling and other discriminatory practices in their attempts to determine whether potential buyers are encompassed by the law's restrictions.

[11] In *Sailboat Bend*, the Court did not choose among the tests utilized by other circuits to assess whether a defendant is justified in enacting a facially discriminatory policy because, in affirming the district court, the Court concluded that the challenged ordinance treated the plaintiffs— individuals with disabilities—"better than it treats those without disabilities." 46 F.4th at 1277. Here, there is no question that by singling out people from particular countries for exclusion from property rights that all others enjoy, Florida is treating Plaintiffs far worse than others.

Florida has yet to identify any legitimate connection between protecting the State and prohibiting individuals who simply come from "foreign countries of concern" from purchasing or owning real property. *See also* Pls.' Mot. at 21 n.7 (noting that "[i]n 2022, Chinese buyers were involved in 0.1 percent of all residential real estate purchases in Florida"). In a press release on May 8, 2023, accompanying the passage of SB 264, Florida's Governor described it as a bill to "counteract the malign influence of the Chinese Communist Party in the state of Florida." *See* Decl. of Keliang Zhu Ex. 21, ECF No. 21-28 ("Governor's May 8, 2023 Press Release"). Similarly, Florida's Commissioner of Agriculture stated: "Restricting China and other hostile foreign nations from controlling Florida's agricultural land and lands near critical infrastructure facilities protects our state, provides long-term stability, and preserves our economic freedom." *Id.* But even assuming these are legitimate interests, *see* Part II.A, *infra*, neither statement explains how prohibiting Plaintiffs and other similarly situated individuals from purchasing or owning real estate in Florida achieves these aims. None of the Plaintiffs are members of the Chinese government or the Chinese Communist Party, or otherwise representatives of their country of origin. *See* Shen Decl. ¶ 4; Xu Decl. ¶ 4; Wang Decl. ¶ 4; Decl. of Yongxin Liu, ECF No. 21-5 ("Liu Decl"),

¶ 4. Consequently, SB 264 is a facially discriminatory policy that violates Sections 3604(a) and 3605(a) the FHA.[12]

### B. SB 264 is invalid under Section 3615 of the FHA.

Under Section 3615 of the FHA, "any law of a State . . . that purports to require or permit any action that would be a discriminatory housing practice . . . shall to that extent be invalid." 42 U.S.C. § 3615. Thus, "the language of the [FHA] itself manifests a clear congressional intent to vitiate the application of any state law that would permit discrimination[.]" *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 70 (1st Cir. 2010); *see Warren v. Delvista Towers Condo. Ass'n, Inc.*, 49 F. Supp. 3d 1082, 1089 (S.D. Fla. 2014) (striking down county ordinance which, if enforced, would "stand[] as an obstacle to the objectives of Congress in enacting the FHA" (citation and internal quotation marks omitted)). By its express terms, SB 264 requires discriminatory housing practices that violate Section 3604 and Section 3605 of the FHA. *See* Part I.A,

---

[12] The application of SB 264 may also lead to discrimination against Asian and Asian-American buyers based on their race, regardless of whether their national origin is Chinese. Thus, SB 264 will "make[] housing options significantly more restrictive for members of a protected group than for persons outside that group." *See Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1274 (11th Cir. 2019) (internal citation omitted); *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524 (2015); *Jackson*, 21 F.3d at 1543 (plaintiffs stated FHA claim based on race where challenged policy affected availability of housing for Black residents by excluding public housing from predominantly white census tracts); *Reyes*, 903 F.3d at 428 (plaintiffs stated FHA claim based on national origin where mobile home park required residents to provide documentation of legal status to renew lease).

*supra*. Additionally, the law will also require companies, such as Plaintiff Multi-Choice Realty, LLC, to violate the FHA because these companies will be required to refuse to conduct business with persons based on their national origin. *See* Song Decl. ¶¶ 11, 13–14. Consequently, SB 264 is invalid under Section 3615 of the FHA.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM

The Equal Protection Clause of the Fourteenth Amendment mandates that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A regulatory classification that "classifies by race, alienage, or national origin" is presumed invalid under the Equal Protection Clause. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). State laws employing such classifications, like SB 264, "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest."[13] *Id.* SB 264 violates the Equal Protection Clause because it discriminates on the basis of alienage and national origin and is not narrowly tailored such that it survives strict scrutiny.

---

[13] State laws employing classifications based on alienage are subject to strict scrutiny, but "federal laws drawing distinctions between U.S. citizens and aliens—particularly in the context of war and national security—are generally permissible so long as they are rationally related to a legitimate governmental interest." *Al Bahlul v. United States*, 767 F.3d 1, 75 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in part) (citing cases).

**A301**

## A. SB 264 discriminates on the basis of alienage and national origin.

A regulatory classification based on nationality amounts to both an "alienage" classification and a "national origin" classification. A law classifies persons based on "alienage" if it either draws distinctions between U.S. citizens and non-U.S. citizens or draws distinctions among different classes of non-U.S. citizens. *See, e.g.*, *Nyquist v. Mauclet*, 432 U.S. 1, 8–9 (1977) (holding that a statute employed an alienage classification because it distinguished among non-U.S. citizens based on whether they had applied for citizenship or stated an intent to apply for citizenship); *Graham v. Richardson*, 403 U.S. 365, 370–76 (1971) (analyzing a residency requirement for welfare benefits as an alienage classification even though non-U.S. citizens who met the residency requirement would qualify for benefits); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419–20 (1948) (describing a statute that applied differently to non-U.S. citizens eligible for citizenship and non-U.S. citizens ineligible for citizenship as employing an alienage classification). A law classifies persons based on "national origin" if it draws distinctions based on characteristics related to background or ancestry, including nationality. *See e.g.*, *Kras*, 409 U.S. at 446 (using "nationality" synonymously with national origin); *Graham*, 403 U.S. at 372 (same); *Jean v. Nelson*, 472 U.S. 846, 856 (1985) (discussing "national origin" in connection with "nationality-based criteria").

**A302**

The Equal Protection Clause imposes different restraints on the Federal

Government than it does on States with respect to classifications based on

nationality. The Supreme Court has explained that the federal government may, in

certain circumstances, draw classifications based on alienage or nationality for

purposes related to foreign policy or immigration policy. State governments,

however, are not free to draw such classifications on their own. As the Supreme

Court observed in *Plyler v. Doe*, 457 U.S. 202 (1982):

> With respect to the actions of the Federal Government, alienage
> classifications may be intimately related to the conduct of foreign
> policy, to the federal prerogative to control access to the United States,
> and to the plenary federal power to determine who has sufficiently
> manifested his allegiance to become a citizen of the Nation. No State
> may independently exercise a like power. But if the Federal
> Government has by uniform rule prescribed what it believes to be
> appropriate standards for the treatment of an alien subclass, the States
> may, of course, follow the federal direction.

*Id.* at 219 n.19 (citing *De Canas v. Bica*, 424 U.S. 351 (1976)).

The United States classifies individuals by nationality for various purposes,

such as in the refugee context, where the United States identifies refugees of

"special humanitarian concern" and subjects refugees of certain nationalities to

additional or different security screening protocols. *See* Refugee Act of 1980,

Pub. L. No. 96-212, § 101(b), 94 Stat. 102 (1980) (codified at 8 U.S.C. § 1521

note). But there is no federal policy that would justify the type of broad

discrimination imposed on persons subject to SB 264, which goes so far as to

**A303**

impose severe prohibitions on real property ownership on individuals such as

lawfully present students and employees, without any evidence that such persons

were operating on behalf of or even formally connected to the governments of any

purported foreign countries of concern. In fact, federal policy is just the opposite—

it mandates equal access to housing, regardless of national origin. *See* 42 U.S.C. §

3601 ("It is the policy of the United States to provide . . . for fair housing

throughout the United States."). Thus, State policies such as SB 264 that

discriminate on the basis of national origin or alienage with regard to real property

transactions cannot be viewed as consistent with any "federal direction." *Cf.*

*Plyler*, 457 U.S. at 225–26 (holding that a State policy denying public education to

undocumented students could not be justified based on federal disapproval of

undocumented students because the State policy did not "correspond[] to any

identifiable congressional policy" and did not "operate harmoniously within the

federal program").

  Accordingly, SB 264's restrictions and prohibitions on land ownership are

subject to strict scrutiny under the Fourteenth Amendment and are unlawful under

the Equal Protection Clause unless the State could show they were narrowly

tailored to serve a compelling government interest. *See, e.g.*, *Johnson v. California*,

543 U.S. 499, 505–506 (2005).

**B. SB 264 cannot survive strict scrutiny because it is not narrowly tailored to serve any compelling government interest.**

"Under strict scrutiny the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986) (plurality opinion). SB 264 bears little specific connection to public safety and as such does not serve any compelling government interest. Even were the Court to accept the State's assertion that this law somehow protects public safety by counteracting the Chinese Communist Party's influence, *see* Governor's May 8, 2023 Press Release, Florida has not shown that its decision to severely restrict the ability of individuals from China and other specified countries to purchase real property, or its requirements that these individuals register their properties with the state, are narrowly tailored ways to address that concern. *See, e.g.*, *Hassan v. City of New York*, 804 F.3d 277, 306 (3d Cir. 2015) ("No matter how tempting it might be to do otherwise, we must apply the same rigorous standards even where national security is at stake."). The law is clear that the classification at issue must "fit with great[] precision" the compelling interest it seeks to uphold. *Wygant*, 476 U.S. at 280 n.6 (citation and internal quotation marks omitted). Florida cannot show that restricting or prohibiting individuals, particularly those who may have no connection whatsoever with the Chinese government or the Chinese Communist Party, from purchasing real estate contributes to public safety.

## CONCLUSION

For the foregoing reasons, the provisions of SB 264 that restrict and prohibit

land ownership violate the Fair Housing Act and the Equal Protection Clause of the

Fourteenth Amendment, and Plaintiffs are likely to succeed on the merits of those

claims.

Dated: June 27, 2023

Respectfully submitted,

JASON R. COODY
United States Attorney
Northern District of Florida

STEVE BUTLER
Chief, Civil Division
United States Attorney's Office
Northern District of Florida

ROGER B. HANDBERG
United States Attorney
Middle District of Florida

LACY R. HARWELL, JR.
Chief, Civil Division
United States Attorney's Office
Middle District of Florida

MARKENZY LAPOINTE
United States Attorney
Southern District of Florida

DEXTER LEE
Chief, Civil Division
United States Attorney's Office
Southern District of Florida

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CARRIE PAGNUCCO
Acting Chief

/s/ Alisha Jarwala
MICHAEL S. MAURER
Deputy Chief
ALISHA JARWALA
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
150 M Street NE
Washington, DC 20530
Phone: (202) 538-1028
Fax: (202) 514-1116
Email: alisha.jarwala@usdoj.gov

*Attorneys for the United States of America*

**A306**

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system, which sent notification of such filing to all counsel of record.

/s/ Alisha Jarwala
Alisha Jarwala

**A307**

Tab 65-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, an individual,
ZHIMING XU, an individual, XINXI
WANG, an individual, YONGXIN
LIU, an individual, and MULTI-
CHOICE REALTY LLC, a limited
liability corporation,

       *Plaintiffs*,

v.

WILTON SIMPSON, in his official
capacity as Commissioner of
Agriculture for the Florida Department
of Agriculture and Consumer Affairs,
MEREDITH IVEY, in her official
capacity as Acting Secretary of the
Florida Department of Economic
Opportunity, PATRICIA
FITZGERALD, in her official capacity
as Chair of the Florida Real Estate
Commission, R.J. LARIZZA, in his
official capacity as State Attorney for
the 7th Judicial Circuit, MONIQUE
WORRELL, in her official capacity as
State Attorney for the 9th Judicial
Circuit, KATHERINE RUNDLE, in her
official capacity as State Attorney for
the 11th Judicial Circuit,

       *Defendants*.

Case No. 4:23-cv-208-AW-MAF

**A309**

## SUPPLEMENTAL DECLARATION OF JIAN SONG

I, Jian Song, hereby declare as follows:

1.     I am authorized on behalf of Multi-Choice Realty, LLC ("Multi-Choice Realty"), a plaintiff in the above-captioned action, to make this supplemental declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

2.     Multi-Choice Realty's customers—which include Chinese people who live in China and are neither citizens nor legal permanent residents of the United States; and Chinese people who reside in the United States on a variety of non-immigrant visas and are at substantial risk of being deemed "domiciled" in China—are already being harmed by SB 264.

3.     In addition to the harms described in my earlier declaration, mortgage lenders are now refusing to originate loans in the state of Florida for Chinese citizens, including a Multi-Choice Realty customer.

4.     Attached hereto as Exhibit 1 is a true and correct copy of email correspondence sent from mortgage broker Liu Han of Leader Funding to me, at my email address mymultichoice@gmail.com, dated July 6, 2023. The email contains forwarded correspondence from Jason Sheridan of Acra Lending to Ms. Han, dated July 5, 2023.

5.     In the forwarded correspondence, Acra Lending states that it "can not proceed with the new loan" for a Multi-Choice Realty client, Qing Zhou, who is seeking to purchase a residential property in Florida. It continues: "The original loan would have needed to fund on 6/30/23. Due to recent changes in Florida law, Acra is not able to originate new loans in Florida for Chinese citizens."

6.     Specifically, because of SB 264, Acra Lending is refusing to provide a mortgage to Qing Zhou, who is a Chinese citizen, ethnically Chinese, and

domiciled in China. Mr. Zhou is neither a citizen nor legal permanent resident of the United States; he has a tourist visa to enter the United States and is seeking to purchase property in Florida with the assistance of Multi-Choice Realty.

7.      Attached hereto as Exhibit 2 is a true and correct copy of email correspondence sent from Ms. Han of Leader Funding to me, at my email address mymultichoice@gmail.com, dated July 6, 2023. The email contains forwarded email correspondence from Oliver Burik of AD Mortgage to Ms. Han, dated July 6, 2023.

8.      In the forwarded correspondence, AD Mortgage states that it "won't be able to originate . . . any loans really in the state of Florida for Chinese citizens."

9.      Specifically, because of SB 264, AD Mortgage is refusing to provide a mortgage to Qing Zhou, the same Multi-Choice Realty client described above.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this 11th day of July, 2023.

/s/ *Jian Song*

Jian Song

**A311**

# EXHIBIT 1

---------- Forwarded message ---------
From: **Liu Han** <liu.han@leaderfunding.com>
Date: Thu, Jul 6, 2023 at 11:05 PM
Subject: Fwd: Appraisal transfer
To: <mymultichoice@gmail.com>


Fyi


*****************************
HAN, Liu, CPA
韩柳
President, Principal Loan Consultant
Leader Funding, Inc.
15200 Shady Grove RD, STE308, Rockville, MD20850
O: 301-660-3399        Fax: 301-769-6658
C: 703-655-6161
liu.han@leaderfunding.com
Wechat ID: Willow6621
NMLS # 208136
*****************************

Begin forwarded message:

> **From:** Jason Sheridan <jason.sheridan@acralending.com>
> **Date:** July 5, 2023 at 11:15:46 AM EDT
> **To:** Liu Han <liu.han@leaderfunding.com>
> **Cc:** Lynn Liu <lynn@leaderfunding.com>
> **Subject: RE: Appraisal transfer**


Good Morning,


I have reviewed the transaction and unfortunately we can not proceed with the new loan. The original loan would have needed to fund on 6/30/23.


Due to recent changes in Florida law, Acra is not able to originate new loans in Florida for Chinese citizens.


See note from my system regarding the program.


Please reach out with any questions.

1

**A313**

| ▽ | 06/01/2023 7:27 AM | | < Lisa LC Curry : 6/01/2023 7:27 AM CDT > Approval u is no longer available in the state of Florida. Existing a be directed to Trisa Nelson or Lisa Curry Updated App |

Thank You,


**Jason Sheridan**

**Vice President, Area Sales Manager**



**The Leader in Today's Non-QM Programs**


☎ (949) 900-6630 ext. 111

☎ (951) 840-7959 cell

✉ Jason.Sheridan@acralending.com


3 Ada Parkway, STE 200A

Irvine, CA 92618


**FIX N FLIP / FIX N KEEP, BRIDGE LOANS QUOTE REQUEST**




2

**A314**

**Mortgagee Clause**

Citadel Servicing Corporation DBA Acra Lending

ISAOA/ATIMA

3 Ada Parkway, STE 200A

Irvine, CA 92618

Review our Privacy Policies at www.acralending.com/privacy-policy

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect. **NMLS ID #144549**

**From:** Liu Han <liu.han@leaderfunding.com>
**Sent:** Monday, July 3, 2023 3:23 PM
**To:** Jason Sheridan <jason.sheridan@acralending.com>
**Cc:** Lynn Liu <lynn@leaderfunding.com>
**Subject:** Appraisal transfer

⚠ **External:** Please proceed with caution.

Jason,

For appraisal report as attached, can you please advise whether Acra Lending, the wholesale lender, or Financial Triangle, the mortgage broker, should provide the appraisal transfer letter to another wholesale lender. Thanks!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HAN, Liu, CPA

韩柳

President, Principal Loan Consultant

Leader Funding, Inc.

15200 Shady Grove RD, STE308, Rockville, MD20850

O: 301-660-3399      Fax: 301-769-6658

C: 703-655-6161

liu.han@leaderfunding.com

Wechat ID: Willow6621

NMLS # 208136

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


--


James Song(宋俭)
Broker/Founder of
Multi Choice Realty, LLC
1536 Sunrise Plaza Dr. Suite 102. Clermont FL 34714
www.mymultichoice.com
Cell: 1-407-405-3140
Wechat ID: js4074053140

**A316**

# EXHIBIT 2

From: **Liu Han** <liu.han@leaderfunding.com>

Date: Thu, Jul 6, 2023 at 11:04 PM
Subject: Fwd: Zhou, Qing - FL - Chinese foreign national - contract
To: <mymultichoice@gmail.com>

Fyi

****************************
HAN, Liu, CPA
韩柳
President, Principal Loan Consultant
Leader Funding, Inc.
15200 Shady Grove RD, STE308, Rockville, MD20850
O: 301-660-3399    Fax: 301-769-6658
C: 703-655-6161
liu.han@leaderfunding.com
Wechat ID: Willow6621
NMLS # 208136
****************************

Begin forwarded message:

> **From:** Oliver Burik <oliver.burik@admortage.com>
> **Date:** July 6, 2023 at 8:15:50 AM EDT
> **To:** Liu Han <liu.han@leaderfunding.com>
> **Subject: Re: Zhou    ing   FL   Chinese foreign national    contract

Good morning Liu,

I'm afraid we must comply with that new law.
We won't be able to originate that loan if the borrower is a citizen of China, or any loans really in the state of Florida for Chinese citizens.

Let me know if you have something else, I can help you with.
Best regards,

**From:** Oliver Burik <oliver.burik@admortage.com>
**Sent:** Wednesday, July 5, 2023 5:20 PM
**To:** Liu Han <liu.han@leaderfunding.com>
**Subject:** Re: Zhou, Qing - FL - Chinese foreign national - contract

Hi Liu,

I sent an email to our Legal department regarding that question. I should receive an answer shortly.

**A318**

**AD Mortgage**

**Oliver Burik**
Wholesale Account Executive

Modify Lock

Our programs

Quick Pricer

**D:** 646.362.3044
**O:** 305.760.7000 ext.8424
oliver.burik@admortgage.com



A&D Mortgage, LLC is an Equal Housing Lender. NMLS ID #958660 (www.nmlsconsumeraccess.org).

---

**From:** Liu Han <liu.han@leaderfunding.com>
**Date:** Wednesday, 5. July 2023 at 23:45
**To:** Oliver Burik <oliver.burik@admortgage.com>
**Subject:** Re: Zhou, Qing - FL - Chinese foreign national - contract

on ADM Sender

Oliver,


You know Florida just passed a law which does not allow China citizens to purchase properties in Florida since 7/1/23. But this contract was signed in 2019. Can you please ask your legal department if your company can do this foreign national's DSCR loan   Thanks!



*****************************

HAN, Liu, CPA

韩柳

President, Principal Loan Consultant

Leader Funding, Inc.

15200 Shady Grove RD, STE308, Rockville, MD20850

O: 301-660-3399      Fax: 301-769-6658

C: 703-655-6161

**A319**

liu.han@leaderfunding.com

Wechat ID: Willow6621

NMLS # 208136

****************************



--


James Song(宋俭)
Broker/Founder of
Multi Choice Realty, LLC
1536 Sunrise Plaza Dr. Suite 102. Clermont FL 34714
www.mymultichoice.com
Cell: 1-407-405-3140
Wechat ID: js4074053140

**A320**

# Tab 69

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**YIFAN SHEN, ZHIMING XU, et al.,**

     **Plaintiffs,**

**v.**                                                                  **Case No. 4:23-cv-208-AW-MAF**

**WILTON SIMPSON, in his official
capacity as Florida Commissioner of
Agriculture, MEREDITH IVEY, in her
official capacity as Acting Florida
Secretary of Economic Opportunity, et
al.,**

     **Defendants.**

_____/

## ORDER DENYING PRELIMINARY INJUNCTION MOTION

A new Florida law limits landownership rights of certain noncitizens

domiciled in China or other specific countries. *See* Fla. Stat. §§ 692.201-.204. Four

Chinese citizens living in Florida, along with a brokerage that does business with

Chinese citizens, sued to challenge that new law. They contend it violates the

Fourteenth Amendment's Equal Protection and Due Process Clauses, the Fair

Housing Act, and the Supremacy Clause. ECF No. 17 (Am. Compl.). They seek

declaratory relief and an injunction precluding the law's enforcement.

Defendants are Florida's Agriculture Commissioner, Economic Opportunity

Secretary, and Real Estate Commission Chair (collectively the State Defendants),

along with the State Attorneys for Florida's Seventh, Ninth, and Eleventh Judicial Circuits. Am. Compl. at 1.[1]

Plaintiffs moved for a preliminary injunction. ECF No. 23 (MPI). The State Defendants responded in opposition, ECF No. 60 (Resp.), and Plaintiffs replied, ECF No. 65 (Reply). The United States of America filed a brief supporting Plaintiffs' motion, and other amici weighed in too. ECF Nos. 43, 54, 64.[2]

After a nonevidentiary hearing, and having carefully considered the evidence and the parties' arguments, I now deny the motion.

## I.    BACKGROUND

### A.    The Challenged Law

The challenged law, codified at Florida Statutes § 692.201-.204, became effective July 1. It restricts land purchases by any "[f]oreign principal," which it defines to include anyone "who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States." Fla. Stat.

---

[1] All citations are to CM/ECF-assigned page numbers.

[2] Several advocacy organizations filed an amicus brief supporting Plaintiffs, ECF No. 43, and twelve States filed an amicus brief supporting the State, ECF No. 64. The Defendant State Attorneys, for their part, have taken no position on the motion or the law's validity. They instead stipulated they would comply with any injunction entered against the State Defendants. ECF No. 55. They did not otherwise respond to the preliminary injunction motion, and they did not appear at the hearing.

§ 692.201(4)(d). It specifies the countries "of concern" are China, Russia, Iran, North Korea, and others. *Id.* § 692.201(3).

Section 692.203 provides that, subject to certain exceptions, "[a] foreign principal may not directly or indirectly own . . . any interest . . . in real property on or within 10 miles of any military installation or critical infrastructure facility." *Id.* § 692.203(1).[3] (The statute defines the terms "military installation" and "critical infrastructure facility," *id.* § 692.201(2), (5), and this order's references to those terms are to the statutory definitions.) Anyone purchasing real property within that protected zone must sign an affidavit attesting that he is not a foreign principal. *Id.* § 692.203(6).

Section 692.203 includes a grandfather provision for foreign principals who owned covered property before the law took effect. Those foreign principals can keep the grandfathered property but cannot acquire any new covered property. *Id.* § 692.203(2). They also must register their property with the Department of Economic Opportunity. *Id.* § 692.203(3)(a). Foreign principals who do not timely register face civil penalties, *id.* § 692.203(3)(b), and those who acquire land in violation of the provision commit a misdemeanor, *id.* § 692.203(8).

---

[3] One exception provides that "a foreign principal who is a natural person may purchase one residential real property that is up to 2 acres in size" if certain conditions are met. *Id.* § 692.203(4); *see also id.* § 692.204(2).

A324

Section 692.204 imposes additional restrictions, but it applies only to foreign principals domiciled in China—not in other countries "of concern." *Id.* § 692.204(1)(a)(4). Subject to certain exceptions, foreign principals domiciled in China cannot "directly or indirectly own . . . any interest . . . in real property," regardless of its proximity to military installations or critical infrastructure. *Id.* Florida real estate purchasers must sign affidavits attesting that they are not principals of China. *Id.* § 692.204(6)(a); *see also id.* § 692.204(6)(c) (directing the Florida Real Estate Commission to adopt rules regarding the affidavit).

Section 692.204 includes a grandfather provision and registration requirement like those in § 692.203. *Id.* § 692.204(3), (4)(a). It likewise provides for civil penalties for failing to register, *id.* § 692.204(4)(b), and it provides that those who acquire land in violation of the provision commit a third-degree felony, *id.* § 692.204(8).[4]

## B.   Facts

The facts come from the parties' affidavits. No party requested an evidentiary hearing, and the relevant facts are not in dispute.

---

[4] Plaintiffs' complaint also attacks a similar provision that restricts purchase of agricultural land. *See* Am. Compl. at 1-2; *see also* Fla. Stat. § 692.202. But at least for purposes of preliminary injunctive relief, Plaintiffs have abandoned that challenge, Reply at 9 n.1, presumably because no Plaintiff has shown any intent to purchase agricultural land.

**A325**

Multi-Choice Realty is a Florida real estate brokerage that often transacts business with Chinese clients. ECF No. 21-6 ¶¶ 3-5. Plaintiffs Yifan Shen, Zhiming Xu, Xinxi Wang, and Yongxin Liu are native-born citizens of China living in Florida. ECF No. 21-2 ¶¶ 3, 9; ECF No. 21-3 ¶¶ 3, 5; ECF No. 21-4 ¶¶ 3, 9; ECF No. 21-5 ¶¶ 3, 9. They own Florida real estate, plan to buy some, or both. ECF No. 21-2 ¶¶ 12-16, 18; *id.* at 6-18; ECF No. 21-3 ¶¶ 11-12, 18; *id.* at 6-24; ECF No. 21-4 ¶¶ 12-13; ECF No. 21-5 ¶¶ 12-13, 18. Each is lawfully present in the United States, but none has lawful-permanent-resident status. ECF No. 21-2 ¶¶ 6-7; ECF No. 21-3 ¶¶ 6-7; ECF No. 21-4 ¶¶ 6-7; ECF No. 21-5 ¶¶ 6-7. Shen, Liu, and Wang are present on nonimmigrant H-1B or F-1 visas, ECF No. 21-2 ¶ 7; ECF No. 21-4 ¶ 7; ECF No. 21-5 ¶ 7, and Xu has a pending political asylee application, ECF No. 21-3 ¶ 7.

Fearing that the challenged law will restrict their right to own Florida real estate (as to Shen, Xu, Liu, and Wang) or cause lost business (as to Multi-Choice), Plaintiffs initiated this preenforcement lawsuit.

## II.   PRELIMINARY INJUNCTION STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)); *see also Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) ("[W]e must remember that granting a

preliminary injunction is the exception rather than the rule."). It is available only when the party seeking it "clearly establishe[s]" entitlement. *Siegel*, 234 F.3d at 1176 (quoting *McDonald's Corp.*, 147 F.3d at 1306).

To succeed, Plaintiffs must clearly establish four factors: (1) that they have "a substantial likelihood of success on the merits"; (2) that they will suffer irreparable injury without an injunction; (3) that they face a threatened injury that "outweighs whatever damage the proposed injunction may cause" Defendants; and (4) that "the injunction would not be adverse to the public interest." *Id.* Plaintiffs must clearly establish all four factors; failing as to any one is "fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Movants most commonly fail on the first factor—substantial likelihood of success, *id.*—which is also generally the "most important," *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). As explained below, that is where Plaintiffs fall short.

### III. PLAINTIFFS HAVE NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Plaintiffs Have Shown a Substantial Likelihood That They Have Standing.

Before turning to the merits, the court must address standing, an "indispensable" part of every plaintiff's case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). If Plaintiffs cannot establish standing, they cannot invoke the court's jurisdiction, and they cannot succeed.

To have standing, a plaintiff must first have suffered an "injury in fact," which is the "invasion of a legally protected interest," in a manner that is "concrete and particularized" and not "conjectural" or "hypothetical." *Id.* at 560. Second, there must be a "causal connection" between the injury and the alleged misconduct such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Third, it must be "likely"—and not speculative—"that the injury will be redressed by a favorable decision." *Id.* at 561 (marks and citation omitted).

A plaintiff must show each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At this stage, where Plaintiffs must show a likelihood of success on the merits, they must show a likelihood that they will ultimately prove standing. *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Moreover, because "standing is not dispensed in gross, . . . plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citations omitted). If at least one plaintiff has standing to raise each claim, though, the court

**A328**

need not consider the other plaintiffs' standing. *Hispanic Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1244 n.6, 1250 (11th Cir. 2012).

The State Defendants argue that Plaintiffs cannot demonstrate standing. Resp. at 22-28. More specifically, they argue that none has shown any concrete harm. *Id.* at 23. But at least one Plaintiff has shown a likelihood that he will be able to prove sufficient injury.

The law has not been enforced against any Plaintiff, but that is not a requirement for standing. "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (marks omitted) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Allegations of future harm are not enough, though, when they rest on a "speculative chain" of future contingencies. *Clapper*, 568 U.S. at 414. A two-part test distinguishes "substantial risks" from merely speculative ones. *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023). First, the plaintiff must intend to engage in "conduct arguably affected with a constitutional interest, but proscribed by a statute." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). Second, he must show a "credible threat of prosecution." *Id.*

The individual Plaintiffs have shown they likely face a substantial risk of future harm. Each engages in or intends to engage in conduct "arguably affected

**A329**

with a constitutional interest, but proscribed by" the new law. *Id.* For starters, at least Shen, Xu, and Liu have shown they are likely subject to the law's affidavit requirements. The challenged law requires any "buyer of real property in this state"—notwithstanding domicile—to sign an affidavit attesting that he is not a principal of China. Fla. Stat. § 692.204(6)(a); *see also id.* § 692.203(6)(a) (same requirement for buyers of land near military installations and critical infrastructure). These three Plaintiffs have shown concrete plans to be "buyer[s] of real property" in Florida, including near military installations and critical infrastructure. ECF No. 21-2 ¶¶ 12-16, 18; *id.* at 6-18; ECF No. 21-3 ¶¶ 12, 18; *id.* at 6-24; ECF No. 21-5 ¶¶ 13, 18. That is enough to show that the law will govern their conduct and that they will face harm sufficient to confer standing to challenge the affidavit requirements.

Whether Plaintiffs have standing to challenge the property-acquisition restrictions and registration requirements is a separate question. Again, there must be a plaintiff with standing as to each provision challenged. And while the affidavit requirements apply notwithstanding domicile, the property-acquisition restrictions and registration requirements apply only to certain noncitizens with certain domiciles. The State Defendants argue that Plaintiffs have not shown they are "domiciled" in China and therefore have not shown the law applies to them. Resp. at 22-26. But the record shows that at least Shen and Liu would arguably violate the law by carrying out their plans to buy new property. And it shows that the law likely

9

requires Wang and Liu to register the property they currently own. Indeed, the State Defendants almost concede that as to Wang. *Id.* at 26 & n.2.

As relevant here, three criteria determine whether a person is a "foreign principal" subject to § 692.203's restrictions: that person must be (1) a noncitizen (2) lacking federal lawful-permanent-resident status and (3) "domiciled" in a "country of concern." Fla. Stat. § 692.201(4)(d). Section 692.204 requires the same except that it only applies to those domiciled in China.

The State Defendants do not dispute the fact that the individual Plaintiffs are all native-born citizens of China who lack lawful-permanent-resident status here. ECF No. 21-2 ¶¶ 3, 6-7; ECF No. 21-3 ¶¶ 3, 6-7; ECF No. 21-4 ¶¶ 3, 6-7; ECF No. 21-5 ¶¶ 3, 6-7. Thus §§ 692.203 and 692.204 restrict Plaintiffs' property ownership if they are "domiciled" in China. The State Defendants argue that as a matter of Florida law, none is domiciled in China because each intends to reside in Florida indefinitely. Resp. at 22-26.

The relevant issue, though, is whether Plaintiffs' conduct is "arguably . . . proscribed by" the new law. *Susan B. Anthony List*, 573 U.S. at 162 (citation omitted). And Shen, Wang, and Liu have shown that they are arguably domiciled in China and risk violating §§ 692.203 and 692.204. The new law, which does not

independently define "domicile,"[5] "sweeps broadly," *Susan B. Anthony List*, 573 U.S. at 162, and arguably applies to Plaintiffs.

The State Defendants do not dispute the fact that these Plaintiffs were once domiciled in China. ECF No. 21-2 ¶ 3; ECF No. 21-4 ¶ 3; ECF No. 21-5 ¶ 3. Plaintiffs' domicile there is "presumed to continue" absent proof of abandonment. *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997) (citations omitted). Shen, Wang, and Liu have shown it at least arguable that they did not intend to abandon that domicile.

First, each is in the United States on a federally time-limited, nonimmigrant visa. ECF No. 21-2 ¶ 7 (H-1B worker visa); ECF No. 21-4 ¶ 7 (F-1 student visa); ECF No. 21-5 ¶ 7 (H-1B); *cf.* 8 U.S.C. § 1184(g)(4) (prescribing finite time limit for H-1B visas); *id.* § 1101(15)(F)(i) (same for F-1s); *see also* ECF No. 68 (Hearing Transcript) at 5:16-20. They can apply to change their temporary status (by, for example, applying for lawful-permanent-resident status), but they have not. ECF No. 21-2 ¶ 8; ECF No. 21-4 ¶ 8; ECF No. 21-5 ¶ 8. And to obtain their visas, they

---

[5] Under Florida law, a person's domicile is not always where he physically resides. *Minick v. Minick*, 149 So. 483, 487-88 (Fla. 1933). It is where he has a good-faith intent to establish his home permanently or indefinitely. *See id.*; *Perez v. Perez*, 164 So. 2d 561, 562-63 (Fla. 3d DCA 1964) (citations omitted). A person can only have one domicile at a time, *Weiler v. Weiler*, 861 So. 2d 472, 477 (Fla. 5th DCA 2003) (citing *Keveloh v. Carter*, 699 So. 2d 285 (Fla. 5th DCA 1997)), and does not acquire a new domicile—even if temporarily absent—without intending to abandon his prior one, *Meisman v. Hernandez*, 353 So. 3d 669, 672-73 (Fla. 2d DCA 2022).

had to declare that they did not intend to remain permanently or indefinitely in the United States. *See* 8 C.F.R. § 214.1(a)(3)(ii); 8 U.S.C. § 1101(15)(F)(i). Although that fact may not be dispositive as to their domicile, it is significant in determining whether the law arguably applies to them. Indeed, often "[t]he best proof of domicile is where the individual says it is." *Weiler v. Weiler*, 861 So. 2d 472, 477 (Fla. 5th DCA 2003) (citation omitted)).

To the extent Plaintiffs' affidavits suggested they do not want to return to China, that reflects their hope to stay in Florida if future contingencies go their way—namely applying for and obtaining lawful-permanent-resident status. *See* ECF No. 21-2 ¶¶ 6-8; ECF No. 21-4 ¶¶ 6-8; ECF No. 21-5 ¶¶ 6-8; *cf. Dandamudi v. Tisch*, 686 F.3d 66, 70 (2d Cir. 2012) (describing the "dual intention" often held by nonimmigrant visa holders). Those hopes perhaps reflect an intent to make Florida "a home in the future." *Keveloh*, 699 So. 2d at 288. But it is at least arguable that they are not intentions to make it "home at the moment," which is necessary for a Florida domicile. *Id.* (citing *Campbell v. Campbell*, 57 So. 2d 34 (Fla. 1952)).

The State Defendants' contrary arguments are unpersuasive. They cite *Perez v. Perez*, in which a Florida court found a Cuban political *refugee* was domiciled in Florida. 164 So. 2d 561 (Fla. 3d DCA 1964); *see also* Resp. at 25; Hearing Trans. at 38-39. Based on that status, the court assumed he intended to remain in Florida indefinitely. *Perez*, 164 So. 2d at 562 (citing "the uncertainty as to when, if ever, the

contingencies necessary to end that period will occur in Cuba"). That case has little value here, because although Xu is an asylum applicant conceivably present in Florida indefinitely, ECF No. 21-3 ¶¶ 7-9, Shen, Wang, and Liu are not.

The State Defendants also cite *Nicolas v. Nicolas*, which affirmed a trial court's finding that a noncitizen was domiciled in Florida notwithstanding his lack of lawful-permanent-resident status. Hearing Trans. at 39 (citing 444 So. 2d 1118 (Fla. 3d DCA 1984)). But the facts surrounding Plaintiffs here are different. Moreover, *Nicolas* makes no mention of whether the alien there was present in the United States on a time-limited visa or, say, illegally.

Turing to the second prong, Plaintiffs have shown a credible threat of prosecution. This standard is "quite forgiving," even at the preliminary injunction stage and outside the First Amendment context. *See Robinson v. Attorney General*, 957 F.3d 1171, 1177 (11th Cir. 2020) (citation omitted). At least one individual Plaintiff here will likely satisfy that forgiving standard as to each claim because Plaintiffs have shown more than a "sequence of uncertain contingencies." *Dream Defs.*, 57 F.4th at 888. They either own property in Florida, including near critical infrastructure or military installations, or have concrete plans to buy it. Their fears are not merely imaginative or speculative.[6]

---

[6] At the hearing, Plaintiffs' counsel indicated that they were willing to enter into a stipulation with State Defendants that the law did not apply to any individual

At least one Plaintiff, then, has the likelihood of a future concrete harm as to each claim. Plaintiffs have also shown traceability and redressability (which the State Defendants do not contest), because the State Defendants (along with the State Attorney Defendants) enforce the law.[7] *See Dream Defs.*, 57 F.4th at 889; *see also Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual."). Given that at least one Plaintiff likely has standing to pursue each claim, I will proceed to the merits.

## B.   Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Equal Protection Claim.

Plaintiffs' first claim is that the law violates the Fourteenth Amendment's equal protection guarantee. That guarantee "is essentially a direction that all persons

---

Plaintiffs but that no such agreement was reached. Hearing Trans. at 6. This is not dispositive, but it does relate to the threat-of-enforcement inquiry. *Cf. Dream Defs.*, 57 F.4th at 887 ("We have inferred the existence of a credible threat of prosecution when a plaintiff challenged the law soon after it was enacted and the state 'vigorously defended' the law in court." (quoting *Wollschlaeger v. Governor, State of Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc))).

[7] The one exception is the Agriculture Commissioner, whose enforcement authority appears to relate only to the provisions addressing agricultural lands—provisions Plaintiffs do not now challenge, Reply at 9 n.1. This would provide an independent reason to deny relief against Commissioner Simpson.

A335

similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). It applies to both citizens and noncitizens.[8] *Yick Wo v. Hopkins*, 118 U.S. 356, 368-69 (1886); *see also Plyler*, 457 U.S. at 210.

The Equal Protection Clause does not prohibit all classifications, of course. *Estrada v. Becker*, 917 F.3d 1298, 1308 (11th Cir. 2019) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Generally, state legislation is presumed valid and will be upheld if it is "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440 (citations omitted). But that presumption sometimes gives way to strict judicial scrutiny. Certain laws classifying people to be treated differently, or facially neutral laws motivated by a discriminatory purpose, are subject to strict scrutiny. *Miller v. Johnson*, 515 U.S. 900, 920 (1995); *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971); *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). When strict scrutiny applies, a challenged law is valid only if "narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920 (citation omitted).

When a statute classifies persons "by race, alienage, or national origin," strict judicial scrutiny usually applies. *City of Cleburne*, 473 U.S. at 440. Race relates to ethnic or ancestry characteristics. *Students for Fair Admissions, Inc. v. President &*

---

[8] At least to noncitizens physically present in the United States. *See De Tenorio v. McGowan*, 510 F.2d 92, 101 (5th Cir. 1975).

A336

*Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2162-63 (2023) (citing *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). "Alienage" refers to "not being a citizen of the United States." *United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021) (citations omitted). And "national origin" in the equal protection context means "the particular country in which one was born," which is distinct from citizenship. *Id.*

The Supreme Court's "cases generally reflect a close scrutiny of restraints imposed by States on aliens," but the Court has "never suggested" that *all* state alienage classifications are "inherently invalid" or "suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978) (citing *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973)). As to "matters firmly within a State's constitutional prerogatives," the Court's scrutiny has not been "so demanding." *Id.* at 296 (quoting *Dougall*, 413 U.S. at 648); *see also id.* at 295 (noting that applying strict scrutiny to "every statutory exclusion of aliens" would "depreciate the historic values of citizenship" (quoting *Nyquist v. Mauclet*, 432 U.S. 1, 14 (1977) (Burger, C.J., dissenting))).

So, for example, the Court has applied rational-basis review when states disqualified aliens from holding government positions. *Bernal v. Fainter*, 467 U.S. 216, 220-21 (1984) (citing cases). It has rejected the idea that "illegal aliens" are a suspect class. *Plyler*, 457 U.S. at 219 n.19. And, most relevant here, the Court has held that states could deny aliens ownership interests in land within their respective borders absent an arbitrary or unreasonable basis. *Terrace v. Thompson*, 263 U.S.

16

**A337**

197, 216-22 (1923); *Porterfield v. Webb*, 263 U.S. 225, 232-33 (1923); *Webb v. O'Brien*, 263 U.S. 313, 324-26 (1923); *Frick v. Webb*, 263 U.S. 326, 332-34 (1923) (collectively, the *Terrace* Cases).

The parties dispute which level of scrutiny applies here. Plaintiffs maintain that strict scrutiny governs, arguing the law facially classifies people based on race, national origin, and alienage. Am. Compl. ¶¶ 89-98; MPI at 18-21, 24-25. Alternatively, they contend the law's enactment was motivated by discrimination against those classes. MPI at 22-23. The State Defendants, on the other hand, argue that the law satisfies equal protection principles under the *Terrace* Cases as to aliens and that it was not motivated by any unlawful animus. Resp. at 30-41.

The standard of review is critical. The State Defendants make no effort to meet the burden they would face if strict scrutiny applied, so if strict scrutiny applied, Plaintiffs would easily meet their burden of showing a substantial likelihood of success on the merits. But under rational basis, Plaintiffs have a substantial burden that they have not come close to meeting. Therefore, Plaintiffs' equal protection claim essentially stands or falls on the applicable level of scrutiny.

As explained below, Plaintiffs are unlikely to show that strict scrutiny applies.

i.    *Plaintiffs Have Not Shown a Substantial Likelihood that Heightened Scrutiny Applies.*

To begin, the challenged law classifies based on where an alien is domiciled, Fla. Stat. § 692.201(4)(d), as Plaintiffs themselves recognize, *see* MPI at 19-20. It

17

**A338**

does not facially discriminate against noncitizens based on race or ancestry. It does not discriminate against noncitizens based on "the particular country in which one was born." *Osorto*, 995 F.3d at 822. So contrary to Plaintiffs' arguments, the challenged law is facially neutral as to race and national origin. It would apply to a person of Chinese descent domiciled in China the same way it would apply to a person *not* of Chinese descent domiciled in China. And its application would never turn on a person's race.

To evade this textual reality, Plaintiffs rely on a "proxy" theory. They essentially argue that the law "singles out" noncitizens residing in China and therefore necessarily singles out people born there. Reply at 13-14; *see also* Hearing Trans. at 13. But residency and birthplace do not clearly overlap to the point where they are practically indistinguishable, and Plaintiffs cite no authority for the proposition that classifications based on aliens' residency should nonetheless be treated as birthplace classifications. Nor do they provide evidence supporting the conclusion that the law's "foreign principal" definition, specifically, is effectively a birthplace classification.[9]

---

[9] When the Court reasoned that an ancestry-based definition was in effect a racial definition in *Rice v. Cayetano*, it did not conclude that in the abstract. 528 U.S. at 514-15. The Court relied on "the historical and legislative context of the particular classification at issue, not on the categorical principle that all ancestral classifications are racial classifications." *Davis v. Guam*, 932 F.3d 822, 834 (9th Cir. 2019).

The challenged law does, though, facially classify by alienage. The State Defendants do not contend otherwise, *see* Resp. at 36, and they hardly could: the law applies only to one who is "*not a citizen* or lawful permanent resident of the United States." Fla. Stat. § 692.201(4)(d) (emphasis added). A United States citizen domiciled in a country of concern is not covered; a noncitizen (who is not a lawful permanent resident) with the same domicile *is* covered. That the law exempts some noncitizens—those not domiciled in countries of concerns—does not make the law neutral as to alienage. *See Nyquist*, 432 U.S. at 7-9; *Graham*, 403 U.S. at 367, 370-76.

The question is whether the alienage classification warrants strict scrutiny. Binding Supreme Court precedent controls this issue. The Court held in *Terrace v. Thompson* that the Fourteenth Amendment did not divest states of the "power to deny to aliens the right to own land within [their] borders." 263 U.S. at 217 (citing *Hauenstein v. Lynham*, 100 U.S. 483, 484, 488 (1879); *Blythe v. Hinckley*, 180 U.S. 333, 340 (1901)); *see also Hauenstein*, 100 U.S. at 484 ("The law of nations recognizes the liberty of every government to give to foreigners only such rights, touching immovable property within its territory, as it may see fit to concede. In our country, this authority is primarily in the States where the property is situated." (citation omitted)); *Blythe*, 180 U.S. at 340-41 ("This [C]ourt has held from the earliest times, in cases where there was no treaty, that the laws of the state where the

real property was situated . . . were conclusive in regard thereto."). The Court recognized that in exercising that power, derived from common-law restrictions on alien landownership, states possess "wide discretion." *Terrace*, 263 U.S. at 218 (quoting *Truax v. Corrigan*, 257 U.S. 312, 337 (1921)); *see also id.* at 217. Thus state laws restricting aliens' right to acquire real property satisfy equal protection so long as they are rational. *See id.* at 216-21; *see also Dougall*, 413 U.S. at 653 (Rehnquist, J., dissenting) (noting that the Court applied rational-basis review in the *Terrace* Cases).

Applying those principles, *Terrace* upheld a Washington law that barred most aliens from acquiring land interests. *See* 263 U.S. at 212-13. The law, which included criminal penalties, did not apply to aliens who declared a good-faith intent to seek United States citizenship. *Id.* Applying *Terrace* in three other cases decided right after it, the Court held that a similar California statute restricting landownership by ineligible aliens satisfied equal protection. *Porterfield*, 263 U.S. at 232-33 (rejecting that the classification "was arbitrary or unreasonable"); *O'Brien*, 263 U.S. at 324-26 ("No constitutional right of the alien is infringed."); *Frick*, 263 U.S. at 332-34 ("The state has power . . . to deny to ineligible aliens permission to own, lease, use, or have the benefit of lands within its [borders] for agricultural purposes." (citation omitted)). Each time, the Court reaffirmed that states must be afforded wide discretion when classifying aliens, *Porterfield*, 263 U.S. at 233; *Frick*, 263 U.S. at

333-34, because the "quality and allegiance of those who own, occupy and use" a state's lands "are matters of highest importance and affect the safety and power of the state itself," *Terrace*, 263 U.S. at 221; *see also O'Brien*, 263 U.S. at 324 (citing *Terrace*, 263 U.S. at 221).

The law challenged here is entitled to like deference. Like the statutes at issue in the *Terrace* Cases, Florida enacted the challenged law pursuant to states' long-recognized "power to deny to aliens the right to own land within [their] borders." *Terrace*, 263 U.S. at 217; *cf. Hauenstein*, 100 U.S. at 484. That means it satisfies equal protection so long its classification is not "arbitrary or unreasonable." *Porterfield*, 263 U.S. at 232-33.

In their opening brief, Plaintiffs made no real attempt to distinguish the *Terrace* Cases. *See* MPI at 24. But in their reply, Reply at 15-16, and at the hearing, they argued that the *Terrace* rule only permits "even-handed" discrimination against noncitizens at large. *See id.*; *see also Frick*, 263 U.S. at 333 (noting the statute "limit[ed] the privileges of all ineligible aliens"). In other words, they suggest that even if state laws applying to *all* noncitizens are valid under *Terrace*, state laws applying only to citizens of specific countries are not. But even accepting this premise (for argument's sake), it would not help Plaintiffs. The law here does not

**A342**

treat aliens differently based on their country of foreign citizenship.[10] Instead, the law applies to *any* noncitizen *domiciled* in one of the specified countries.

Moreover, although the law necessarily restricts land ownership by some aliens (foreign principals) but not others, that does not mean the law lacks general application or escapes the *Terrace* Cases' holdings. *Terrace* itself upheld a law that allowed some aliens (those intending to become citizens) to own land but not others. Nonetheless, "[t]he inclusion of good faith declarants in the same class with citizens d[id] not unjustly discriminate against aliens who [we]re ineligible or against eligible aliens who have failed to declare." *Terrace*, 263 U.S. at 219-20; *cf. id.* at 218 (concluding law complied with due process because it "appl[ied] alike and equally to all aliens"). Nor did California's classification, which allowed some aliens (those eligible for citizenship) to own land but not others. *See Frick*, 263 U.S. at 333 ("The state has power . . . to deny to ineligible aliens permission to own, lease, use, or have the benefit of lands . . . .").

To be sure, the law's classification does differ from the classifications at issue in the *Terrace* Cases in a literal sense: Washington and California classified based on noncitizens' eligibility for citizenship, and Florida's law classifies based on the

---

[10] The statute at issue in *De Tenorio*, 510 F.2d at 101, by contrast, did: "Nonresident aliens *who are citizens of Syria or the Lebanese Republic*" may inherit land in Mississippi, but all other nonresident aliens cannot. Miss. Code § 89-1-23.

A343

noncitizens' domicile. This, though, does not make *Terrace* inapplicable. The Court recognized in *Porterfield* that a state can tailor an alienage classification (as it relates to property ownership) to meet "its own problems, depending on circumstances existing there." 263 U.S. at 233 ("We cannot say that the failure of the California Legislature to extend the prohibited class [to the same extent as Washington] . . . was arbitrary or unreasonable."). After all, "[i]t is not always practical or desirable that legislation shall be the same in different states," and states are not bound by the alienage classifications adopted by others. *Id.*

The *Terrace* Cases cannot be meaningfully distinguished here. And to their credit, Plaintiffs acknowledge the obstacle those cases pose to their alienage-based equal protection claim.[11] *See* MPI at 24. They therefore argue that the *Terrace* Cases are no longer good law, that "those cases do not govern here" because later Supreme Court decisions "supersede[]" them. *Id.* But this argument, too, falls short.

The *Terrace* Cases are directly on point for the issue here—to what extent may Florida restrict aliens' landownership. *See Terrace*, 263 U.S. at 217. Those cases reaffirmed—in no uncertain terms—that states may "deny to aliens the right to own land within [their] borders" absent an arbitrary reason. *Id.* at 216-17 (citations omitted); *see also Porterfield*, 263 U.S. at 233. Moreover, the facts surrounding the

---

[11] The United States, on the other hand, ignores the *Terrace* Cases altogether in presenting its equal protection argument.

A344

new law's classification "line up closely" with the *Terrace* Cases' facts. *Jefferson County v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). Florida's law, like the Washington and California laws, restrict alien landownership and impose criminal penalties for violations.

Because the *Terrace* Cases are on-point Supreme Court precedent, they bind this court. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *see also Acker*, 210 F.3d at 1320. Lower courts "have a constitutional obligation to follow a precedent of [the Supreme] Court unless and until it is overruled by [that] Court." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring) (citation omitted). That the Court has overruled a precedent must be explicit—it "does not normally overturn, or so dramatically limit, earlier authority *sub silentio.*" *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000); *see also Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 n.9 (11th Cir. 2012) ("[T]he Supreme Court has never explicitly overruled its holding . . . and we will not assume a case has been overturned in the absence of such explicit language . . . ." (citations omitted)); *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1182 (11th Cir. 2021) ("[T]he Supreme Court is certainly capable of saying what it means . . . .").

The Plaintiffs—and others—have argued that the Supreme Court would not decide the *Terrace* Cases today the way it did in 1923. And perhaps they are right. But it is up to the United States Supreme Court to decide whether to overturn its own

24

**A345**

precedents. Unless or until it does, lower courts must follow those precedents. *Rodriguez de Quijas v. Shearson/Am. Exp. Inc.*, 490 U.S. 477, 484 (1989); *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023) (reasoning state court erred by concluding intervening case law "implicitly overruled" Supreme Court precedent); *Acker*, 210 F.3d at 1320 ("[T]he Supreme Court has insisted on reserving to itself the task of burying its own decisions."); *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012); *United States v. Greer*, 440 F.3d 1267, 1275-76 (11th Cir. 2006); *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996). The *Terrace* decision thus binds this court even if its rule "cannot be squared with" the Court's later cases. *Evans*, 699 F.3d at 1264 (quoting *Agostini v. Felton*, 521 U.S. 203, 208-09 (1997)). This is so even if the decision has "increasingly wobbly, moth-eaten foundations." *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)). Or even if it has been "cut . . . back so far that it will not survive." *Brisentine v. Stone & Webster Eng'g Corp.*, 117 F.3d 519, 525-26 (11th Cir. 1997).

Plaintiffs have not suggested that the Court has overruled the *Terrace* Cases by name. In fact, the Court has repeatedly and expressly declined to reexamine those decisions. When the Court held in *Oyama v. California* that California's "Alien Land Law" violated a U.S. citizen's equal protection right as applied, the Court "deem[ed] it unnecessary and therefore inappropriate to reexamine" the *Terrace* Cases. 332

A346

U.S. 633, 646-47 (1948).[12] The Court also deemed it unnecessary in *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 422 (1948) ("[a]ssuming the continued validity of" the *Terrace* Cases), and *Graham v. Richardson*, 403 U.S. at 374 (declining to resolve "the contemporary vitality" of special public-interest cases such as *Terrace*)—two cases where the Court held state laws violated aliens' equal protection rights. Each time, the Court—at most—merely distinguished the *Terrace* rule. *See Takahashi*, 334 U.S. at 422 (noting *Terrace* "rested solely upon the power of states to control the devolution and ownership of land within their borders").

*Oyama*, on which Plaintiffs heavily rely (as well as state-court decisions interpreting it), involved an entirely different issue than the *Terrace* Cases and this one. *See* Am. Compl. ¶¶ 6-7; MPI at 24; Reply at 15-16. *Oyama* concerned only "the right of *American citizens* to own land," *Oyama*, 332 U.S. at 647 (emphasis added), and held California's statute discriminated against a *citizen* based on his parents' national origin, *see id.* at 640; *cf. Osorto*, 995 F.3d at 822. *Oyama* plainly did not overrule the *Terrace* Cases by outcome or otherwise. *See Oyama*, 332 U.S. at 647 ("[W]e do not reach [whether] the Alien Land Law denies ineligible aliens the equal protection of the laws.").

---

[12] The petitioners in *Oyama* challenged a different provision of the same statute that was at issue in *Porterfield*, *O'Brien*, and *Frick*. *See Oyama*, 332 U.S. at 641-42.

Unable to rely on any express overruling, Plaintiffs essentially argue *Takahashi* and the alienage cases that followed it have implicitly overruled the *Terrace* Cases. They rely heavily on the fact that the *Terrace* Cases predated the Court's modern two-tiered equal protection analysis, *see* MPI at 24, which generally treats aliens as a "discrete and insular" class for which strict scrutiny is appropriate, *Graham*, 403 U.S. at 372 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).

Plaintiffs are correct that, "[o]ver time, the Court's decisions gradually have restricted the activities from which States are free to exclude aliens." *Ambach v. Norwick*, 441 U.S. 68, 73 (1979). Besides *Takahashi* (exclusion from commercial fishing) and *Graham* (exclusion from welfare benefits), the Court has held states cannot discriminate against aliens seeking law licenses, *In re Griffiths*, 413 U.S. 717, 718 (1973), engineering licenses, *Examining Bd. of Eng'rs v. Flores de Otero*, 426 U.S. 572, 599-606 (1976), financial education assistance, *Nyquist*, 432 U.S. at 12, or certain public employment, *Dougall*, 413 U.S. at 646-49. But reconciling these later cases with the *Terrace* Cases is not difficult—none involved an equal protection challenge to states' power "to control the devolution and ownership of land within their borders, a power long exercised and supported on reasons peculiar to real property." *Takahashi*, 334 U.S. at 422; *see also Hauenstein*, 100 U.S. at 484; *Blythe*, 180 U.S. at 340-41; *cf. Chirac v. Chirac's Lessee*, 15 U.S. (2 Wheat) 259, 272 (1817)

A348

(reasoning that, absent a federal treaty to the contrary, whether noncitizen could inherit land in Maryland "depend[ed] on the law of Maryland"). *Terrace*, *Porterfield*, *O'Brien*, and *Frick* did, as does this case. That the newer cases can be reconciled, though, is almost beside the point. Either way, I am bound to apply the on-point *Terrace* precedent.

At the end of the day, because the Supreme Court itself has not overruled the *Terrace* Cases, this court must apply them. This court has no power to declare the *Terrace* Cases "implicitly overruled" or superseded. *Mallory*, 143 S. Ct. at 2038; *see also Fla. League of Prof'l Lobbyists, Inc.*, 87 F.3d at 462. And applying the *Terrace* Cases, I conclude Plaintiffs have not shown it likely that heightened scrutiny would apply to the alienage classification.

There is also one additional, independent reason why I conclude Plaintiffs have not shown heightened scrutiny applies: the law exempts noncitizens who are lawful permanent residents. Fla. Stat. § 692.201(4)(d). Even in its more recent decisions, the Supreme Court has applied strict scrutiny only to laws affecting lawful permanent aliens. *See LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005); *see also League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 532-34 (6th Cir. 2007) ("There are abundant good reasons, both legal and pragmatic, why lawful permanent residents are the only subclass of aliens who have been treated as a

**A349**

suspect class."). Thus, even putting the *Terrace* Cases aside, I would conclude that Plaintiffs have not shown a likelihood that heightened scrutiny would apply.

>    ii.   *Plaintiffs Are Unlikely to Show Strict Scrutiny Applies Under* Arlington Heights*.*

Plaintiffs alternatively claim that intentional racial, national-origin, and alienage discrimination motivated the new law. MPI at 21-23. Laws motivated by such discrimination can be subjected to heightened scrutiny. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977); *Hunt*, 526 U.S. at 546; *see also Jean v. Nelson*, 711 F.2d 1455, 1483-1502 (11th Cir. 1983) (applying *Arlington Heights* in equal protection case concerning race, national origin, and alienage), *on reh'g*, 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985). But Plaintiffs have not shown a substantial likelihood that unlawful animus motivated the Legislature.[13]

---

[13] For purposes of the *Arlington Heights* analysis alone, I will proceed as though the new law were facially neutral as to alienage. Cases discussing *Arlington Heights* suggest its application is limited to "facially neutral law[s]." *E.g.*, *Hunt*, 526 U.S. at 546; *cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995) (noting challenge to statute explicitly classifying based on race "present[ed] none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose" (citing *Arlington Heights*)). Plaintiffs cited no cases in which a court found intentional discrimination against a class under *Arlington Heights* after concluding the statute, on its face, lawfully treated that class differently. *See* Hearing Trans. at 93:2-16. And it is unclear how a facial alienage classification subject to rational-basis review under *Terrace* could nonetheless be subject to strict scrutiny under *Arlington Heights* because it was motivated by *citizenship-based* discrimination. Of

To succeed on this alternative claim, Plaintiffs have to prove discriminatory animus; impact alone is not enough. *Arlington Heights*, 429 U.S. at 264-65 (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Plaintiffs must prove, in other words, that the Legislature enacted the new law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Discerning legislative purpose is not always easy. It "is an inherently complex endeavor" that demands a "sensitive inquiry." *Hunt*, 516 U.S. at 546 (quoting *Arlington Heights*, 426 U.S. at 266). And in undertaking this sensitive inquiry, courts must presume the Legislature acted in good faith. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)).

Direct evidence is rarely available to rebut that presumption, and Plaintiffs offered none here. Instead, Plaintiffs look to rely on objective, circumstantial indicators of intent—the so-called *Arlington Heights* factors: (1) disproportionate impact, (2) historical background, (3) departures from usual procedure, (4) substantive departures, and (5) legislative history, including decisionmakers' statements. 429 U.S. at 264-68. The Eleventh Circuit has supplemented this

course, this is not an issue as to Plaintiffs' intentional race- and origin-discrimination claims—the law is clearly facially neutral in those respects.

**A351**

nonexhaustive list with three other factors: (6) foreseeability of the impact; (7) knowledge of that impact, and (8) availability of less discriminatory alternatives. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) (citing *Jean*, 711 F.2d at 1486).

Having considered those factors, I conclude Plaintiffs have not shown a substantial likelihood that the Florida Legislature enacted the law "because of," rather than merely "in spite of," foreign principals' protected characteristics. Plaintiffs point to no procedural or substantive departures, or any less discriminatory alternatives that Florida did not consider, *cf.* MPI at 23 (stating in passing that "far less discriminatory alternatives were available" without identifying any).

Plaintiffs primarily rely only on two varieties of the *Arlington Heights* factors—those regarding the law's impact and Legislators' statements. As for impact, Plaintiffs argue "[t]he overwhelming number of people in Florida" subject to the law are Chinese. *Id.* at 23. They cite no evidence supporting that, and they cite no evidence about the number of those subject to the law who are *not* of Chinese descent. Nor do Plaintiffs cite any evidence that the law will disproportionately impact people born in China.

The most relevant impact-related evidence that Plaintiffs offer are legislative committee reports. *E.g.*, ECF No. 21-39 at 21-22. At best, however, these reports evince awareness of the consequences for aliens domiciled in China. *Cf. Feeney*, 442

U.S. at 279. "Discriminatory purpose" requires more than that. *Id.* And as to race and national origin, the reports do not even show any awareness of consequences for those of Chinese descent or those born in China.

As for the statements from the Governor or Legislators, none evinces racial animus or any intent to discriminate based on race or where someone was born. Nor do they show any intent to discriminate against Chinese citizens "because of" their Chinese citizenship. Instead, the statements are consistent with motivations independent of any protected traits. *See, e.g.*, ECF No. 21-11 at 3 (statement that "[w]ith political upheaval and economic turmoil taking place in many foreign countries, Florida must act to insulate our food supply and . . . make sure that foreign influences like China will not pose a threat to [it]"); ECF No. 21-12 at 3 (statement that the law would "fight . . . efforts" to cause a "food and water" crisis in Florida).

Plaintiffs have not shown that these statements indicate animus against any protected group. Without more, these are not statements that can be "fairly read to demonstrate discriminatory intent by the state legislature." *League of Women Voters of Fla., Inc.*, 32 F.4th at 1373. This is especially so when considering the presumption of legislative good faith, which this court must afford. *Id.* Even without any such presumption, though, Plaintiffs' evidence falls short.

Moreover, even if these few actors' statements reasonably reflected unlawful animus (which they do not), the statements would be minimally probative at best.

"The Supreme Court has repeatedly cautioned against overemphasizing statements from individual legislators, which are not necessarily 'what motivates scores of others' to act (or, in this case, not act)." *Fusilier v. Landry*, 963 F.3d 447, 466 (5th Cir. 2020) (first quoting *United States v. O'Brien*, 291 U.S. 367, 384 (1968); then citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). The question is not whether a Legislator or two had discriminatory animus; the question is about the motivation of the Legislature as a whole.

Plaintiffs have not met their burden of showing a substantial likelihood of success on the merits of their discriminatory-intent claim.

> v.   *Plaintiffs Are Unlikely to Show the Law Lacks Any Rational Basis.*

Having concluded that Plaintiffs have not shown a substantial likelihood that strict scrutiny applies, I now turn to Plaintiffs' fallback argument—presented for the first time at the hearing—that the law cannot survive even rational basis. Hearing Trans. at 22:24-23:1.

State laws satisfy rational-basis review so long as "there is *any* reasonably conceivable state of facts" supporting a legitimate state purpose. *Estrada*, 917 F.3d at 1310-11 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). With rational-basis review, statutes have "a strong presumption of validity," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993), so Plaintiffs face a formidable burden. They must "negative every conceivable basis which might support" the law. *Id.* at 315 (quoting

*Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)). Plaintiffs have not shown any likelihood that they can overcome that significant burden.

To the extent Plaintiffs contend the law is ill conceived or unlikely to provide Florida any real benefit, those arguments miss the point. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313. "Moreover, because [courts] never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315.

Although the state has no burden to justify its classification, the State has offered justifications that are consistent with those recognized as sufficient in the *Terrace* Cases. *See Terrace*, 263 U.S. at 221 (reasoning that "[t]he quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself"); *O'Brien*, 263 U.S. at 324; *see also von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 378 (8th Cir. 1997); *Shames v. Nebraska*, 323 F. Supp. 1321, 1333-36 (D. Neb. 1971) (three-judge court). Regardless, Plaintiffs have not shown a substantial likelihood that they will meet their burden and negate every conceivable basis that might justify the law.

\* \* \*

34

**A355**

In sum, Plaintiffs have not shown a substantial likelihood of success on their equal protection claim.

## C.   Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Fair Housing Act Claim.

Plaintiffs' next argument is that the law is preempted by—or otherwise violates—the Fair Housing Act. The FHA makes it unlawful to "refuse to sell . . . or to refuse to negotiate for the sale . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It also provides that any state law is invalid if it "purports to require or permit any action that would be a discriminatory housing practice." *Id.* § 3615. A "[d]iscriminatory housing practice" is "an act that is unlawful under section 3604" or certain other provisions. *Id.* § 3602(f).

The problem for Plaintiffs is that, as noted above, Florida's law does not make any classification based on "race, color, religion, sex, familial status, or national origin." It instead classifies based on alienage, citizenship, and lawful-permanent-resident status—none of which are covered by the FHA. *Cf. Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 95 (1973) (holding that Title VII—which forbids employment discrimination "because of . . . race, color, religion, sex, or national origin"—did not "make[] it illegal to discriminate on the basis of citizenship or alienage").

Plaintiffs correctly note that under the FHA, a state may not "facially single out [a protected class] and apply different rules to them." MPI at 26 (alterations in

35

**A356**

MPI) (quoting *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995)). But, again, the FHA does not include alienage or citizenship as protected characteristics. This is therefore unlike the cases Plaintiffs cite. In *Bangerter*, the claim was that a zoning decision violated the FHA because it discriminated against the intellectually disabled plaintiff, 46 F.3d at 1494-95, and the FHA explicitly forbids housing discrimination "because of a handicap." 42 U.S.C. § 3604(f). Similarly, in *Larkin v. State of Michigan Department of Social Services*, the challenged statutes, "[b]y their very terms . . . appl[ied] only to [adult foster care] facilities which will house the disabled, and not to other living arrangements." 89 F.3d 285, 290 (6th Cir. 1996) (cited in MPI at 26).

The Plaintiffs also argue that—text aside—the new law's *purpose* was to discriminate based on national origin and race. MPI at 26. This argument fails for the same reason as the related equal protection argument failed: Plaintiffs have not shown a likelihood that they can prove any impermissible intent or purpose.

Finally, Plaintiffs suggest in a footnote that they could show an FHA violation solely based on disparate impact. *Id.* at 26 n.10. I decline to address an independent argument raised in a footnote. But Plaintiffs have not shown a likelihood of success on such a claim anyway. They have shown no evidence of disparate impact, asking the court instead to assume one. Reply at 20. Even if I assume the disparity, though, that alone is not enough to support a claim. "[D]isparate-impact liability has always

been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA . . . if such liability were imposed based solely on a showing of a statistical disparity." *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015). Moreover, "[g]overnmental . . . policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" *Id.* at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)); *see also id.* at 533 (holding that before rejecting a government's policy justification, "a court must determine that a plaintiff has shown that there is an available alternative practice that has less disparate impact and serves the entity's legitimate needs" (cleaned up) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009))). Although Plaintiffs' footnote does include the conclusory statement that the law "creates an 'artificial, arbitrary, and unnecessary barrier[]' to housing that virtually exclusively affects Chinese people and people from other 'countries of concern,'" MPI at 26 n.10 (quoting *Inclusive Cmtys.*, 576 U.S. at 540), Plaintiffs have not shown arbitrariness, as discussed above.

**D.    Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Void-for-Vagueness Claim.**

Plaintiffs next contend that three of the new law's terms are unconstitutionally vague as applied: "critical infrastructure facility," "military installation," and "domicile." Am. Compl. ¶ 105; MPI at 28-36.

The Fourteenth Amendment's Due Process Clause "encompasses the concepts of notice and fair warning." *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011). A statute violates that Clause as impermissibly vague where it "is so unclear . . . that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1301 (11th Cir. 2013) (quoting *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000)).

Preenforcement vagueness challenges are cognizable only under limited circumstances, namely when the challenged statute chills the litigant "from engaging in constitutionally protected activity." *Bankshot Billiards, Inc.*, 634 F.3d at 1350; *see also Indigo Room, Inc.*, 710 F.3d at 1301; *Woodruff v. U.S. Dept. of Labor, Off. of Workers Comp. Program*, 954 F.2d 634, 643 (11th Cir. 1992) ("A rule that does not reach constitutionally protected conduct is void for vagueness only if it is impermissibly vague in all its applications." (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982))). There is no constitutionally protected activity here; Plaintiffs wish to engage in economic transactions. Nonetheless, the State Defendants do not contest Plaintiffs' ability to bring a preenforcement vagueness claim; they defend the vagueness challenge solely on the merits. Hearing Trans. at 43:25-44:7. Ultimately, the justiciability issue does not

matter, though, because I conclude Plaintiffs are unlikely to show that the challenged

provisions are unconstitutionally vague.[14]

First, the law defines "critical infrastructure facility" and "military

installation" in detail—giving fair notice of the specific facility types that qualify.[15]

Refineries, power plants, airports, military camps, and so forth are plainly not such

"broad, vague terms" so as to leave people guessing as to their meaning. MPI at 31.

Plaintiffs fault the Legislature for not cataloging every facility that would satisfy

these definitions—or including a "map" to that end. But through this argument, they

demand far more than the Due Process Clause requires. *See High Ol' Times, Inc. v.*

---

[14] Plaintiffs' motion says that at this stage, they present only an as-applied vagueness claim, not a facial one. MPI at 29-30. Plaintiffs provided insufficient facts, though, to support any as-applied vagueness claim. *See United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) ("If a vagueness challenge to a statute does not involve the First Amendment, the analysis must be as applied to the facts of the case." (citations omitted)). Their purported limitation of their challenge to "people (1) who reside in the United States but are not U.S. citizens or legal permanent residents; (2) whose country of origin is a 'country of concern' under SB 264; and (3) who own or seek to purchase real property in Florida," MPI at 30—is not much of a limitation at all. It certainly does not provide the court a concrete set of facts against which a proper vagueness challenge could apply.

[15] "Critical infrastructure facility means . . . , if it employs measures such as fences, barriers, or guard posts," chemical manufacturing facilities, refineries, electrical power plants, water treatment plants, natural gas terminals, telecommunications central switching offices, gas processing plans, seaports, spaceports, and airports. Fla. Stat. § 692.201(2). "Military installation[s]" are any "base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." *Id.* § 692.201(5).

A360

*Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982) (noting that "absolute precision in drafting laws is not demanded" (citations omitted)).

Second, as the State Defendants point out, "domicile" is a legal term that many jurisdictions' statutes commonly use. Resp. at 28. And it has a settled meaning in Florida case law. *See supra* Part III.A; *see also* Mitchell J. Waldman, *"Legal Residence" or "Domicile"; Permanent or Primary Residence*, 20 Fla. Jur. 2d Domicile & Residence § 1 (June 2023 update). Plaintiffs rely heavily on the fact that the statute does not independently define the term, MPI at 28, 33-35, but that does not render it "so unclear" as to violate due process, *Indigo Room, Inc.*, 710 F.3d at 1301 (citation omitted); *see also Rose v. Locke*, 423 U.S. 48, 49-50 (1975) ("Even trained lawyers may find it necessary to consult . . . judicial opinions before they may say with any certainty what some statutes may compel or forbid.").

Finally, to the extent Plaintiffs are unsure whether the property they seek to buy is covered, it is not from some ambiguity in the statute but from Plaintiffs' own uncertainty about the facts. They note, for example, that they would have to determine measurements and find out—perhaps with some difficulty—whether specific installations "encompass at least 10 contiguous acres." MPI at 31 (citing Fla. Stat. § 692.201(5)). This argument misunderstands the vagueness inquiry. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather

the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008); *cf. also id*. at 305-06 (rejecting claim "that the mere fact that close cases can be envisioned renders a statute vague" because "[c]lose cases can be imagined under virtually any statute").

At bottom, Plaintiffs have fallen well short of showing a substantial likelihood of success on their void-for-vagueness claim. They point to no authority finding void any terms like those they argue about here.

**E     Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their CFIUS Preemption Claim.**

Plaintiffs' final argument is that the law is preempted by federal law restricting certain transactions involving foreign nationals. MPI at 37-47. Plaintiffs contend that "[i]n a carefully crafted set of statutes, regulations, and executive actions, a federal regime already addresses potential national security concerns related to real estate purchases." *Id.* at 37. And, they contend, Florida's new law stands as an obstacle to the implementation of that federal law. This issue is closer than the others, but Plaintiffs have not met their burden here either.

"Under the Supremacy Clause, the Constitution and the laws of the United States 'shall be the supreme Law of the Land.' From this Clause we have the preemption doctrine, and any state law that 'interferes with, or is contrary to,' federal law is preempted." *Estrada*, 917 F.3d at 1302 (cleaned up) (first quoting U.S. Const. art. VI, cl. 2, then quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)).

"Although preemption law cannot always be neatly categorized, [courts] generally recognize three classes of preemption." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012) (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)). One category is express preemption, which arises when a statute explicitly states that it preempts state law. *Id.* The FHA, addressed above, provides an example of express preemption. *See* 42 U.S.C. § 3615 ("[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."). Plaintiffs' claim here, though, is not express preemption.

The second category is field preemption, which "occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'" *Alabama*, 691 F.3d at 1281 (quoting *Browning*, 522 F.3d at 1167). The third type is conflict preemption, which comes in two forms: There is conflict preemption "when it is physically impossible to comply with both the federal and the state laws." *Id.* (quoting *Browning*). And there is also conflict preemption "when the state law stands as an obstacle to the objective of the federal law." *Id.* (quoting *Browning*). Plaintiffs here claim the latter but not the former.

**A363**

When addressing any type of preemption, courts are guided by two principles. "First, the purpose of Congress is the ultimate touchstone in every preemption case," and that intent "primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021) (cleaned up) (first quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); then quoting *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017)). "Second, we assume that 'the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress.'" *Id.* at 1095 (quoting *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939-40 (11th Cir. 2013)). "This principle particularly applies in a case in which Congress has legislated in a field which the States have traditionally occupied." *Id.* (cleaned up) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

With those principles in mind, I turn to the two forms of preemption Plaintiffs argue.

     *i.*    *Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Obstacle Preemption Claim.*

Plaintiffs first argue that the law stands as an obstacle to existing federal law addressing noncitizens' land purchases. MPI at 37-38 (contending that "[t]he federal government has a detailed and carefully calibrated system for monitoring, mitigating, and blocking certain real estate purchases if they threaten national

security"). As the Supreme Court has made clear, this claim requires a substantial showing. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("Our precedents 'establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'" (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in judgment))).

To determine whether Florida's new law creates an unconstitutional obstacle to this federal law, the court must carefully analyze the federal laws at issue. *See Fresenius*, 704 F.3d at 939 ("We use our judgment to determine when state law creates an unconstitutional obstacle to federal law, and 'this judgment is informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" (quoting *Ga. Latino All. for Human Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263 (11th Cir. 2012))); *see also Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1254 (11th Cir. 2022) (inquiry requires "examin[ing] the statutory text, its regulatory framework, and, if necessary, the legislative history . . . to determine whether Congress made a deliberate choice to exclude").

The ultimate issue is Congress's intent; the analysis therefore "does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather

than the courts that pre-empts state law.'" *Whiting*, 563 U.S. at 607 (quoting *Gade*, 505 U.S. at 111 (Kennedy, J., concurring in part and concurring in judgment)).

The federal regime at issue has its origins in The Defense Production Act of 1950, which Congress enacted to advance national security. The Act's purpose was "to ensure the vitality of the domestic industrial base" so the United States is prepared for and can "respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States." 50 U.S.C. § 4502(a)(1), (2). Congress amended the Act several times. In a 1988 amendment, known as the Exon-Florio amendment, Congress added section 721, which gave the President authority to suspend or prohibit various transactions. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 302 (D.C. Cir. 2014) (describing the amendment). This codified the establishment of the Committee for Foreign Investment in the United States (CFIUS). *See id.* (explaining CFIUS background). Then, in 2018, through the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), Congress further revised section 721 to (among other things) authorize the President to suspend or prohibit certain real estate transactions. 50 U.S.C. § 4565(d)(4).

Under the federal regime, CFIUS makes an initial determination about whether certain real estate transactions threaten national security, and the President can then issue an order prohibiting those transactions. *Id.* §§ 4565(b); 4565(d)(4). The categories of transactions at issue include a foreign person's purchase of land

"in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security," as well as land that "could reasonably provide the foreign person the ability to collect intelligence on activities being conducted at such an installation, facility, or property," or that "could otherwise expose national security activities at such an installation, facility, or property to the risk of foreign surveillance." *Id.* § 4565(a)(4)(B)(ii)(I)-(II). Notwithstanding these general categories, Congress carved out certain real estate transactions. A foreign person, for example, may purchase a single "housing unit" or real estate in "urbanized areas." *Id.* § 4565(a)(4)(C)(i)(I), (II).

In arguing that Florida's law serves as an obstacle to this federal regime, Plaintiffs rely principally on *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268 (11th Cir. 2013). In each, the Court found that a state law designed to put economic pressure on foreign nations served as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 377 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *Odebrecht*, 715 F.3d at 1286 (quoting *Crosby* quoting *Hines*).

These cases offer little support for Plaintiffs' position. The relationship between the state laws and the federal regimes in those cases was quite different than

46

the relationship here. For one, the federal regimes in *Crosby* and *Odebrecht* dealt principally with international diplomacy. *Crosby*, 530 U.S. at 386; *Odebrecht*, 715 F.3d at 1285. Thus, as the Supreme Court later recognized, the law in *Crosby* involved a "uniquely federal area[] of regulation," namely the "foreign affairs power." *Whiting*, 563 U.S. at 604 (citing *Crosby*, among other cases). The Eleventh Circuit's *Odebrecht* decision—which tracked *Crosby*—recognized the same unique federal interest. And in both cases, the Courts found both that the state laws were themselves seeking to pressure the foreign governments and that their tactics stood as unmistakable obstacles to the federal government's diplomatic goals. *Crosby*, 530 U.S. at 386 (noting that "the state Act stands in the way of Congress's diplomatic objectives"); *Odebrecht*, 715 F.3d at 1285 ("It is hard to dispute that the Cuba Amendment undermines the President's capacity to fine-tune these sanctions and to direct diplomatic relations with Cuba."); *id.* at 1279 (finding that "the purpose of the Cuba Amendment is to use the lever of access to Florida's $8 billion-a-year public contracting market to exert additional economic pressure on the Cuban government and to influence American foreign policy").

The federal laws Plaintiffs point to here, on the other hand, address principally security issues. *See* 50 U.S.C. § 4502(a)(1), (2) (noting purpose "to ensure the vitality of the domestic industrial base" so the United States is prepared for and can "respond to military conflicts, natural or man-caused disasters, or acts of terrorism

within the United States"); 31 C.F.R. § 800.101(a) (explaining that 50 U.S.C. § 4565 "authorizes the Committee on Foreign Investment . . . to review any covered transaction, . . . , and to mitigate any risk to the national security of the United States that arises as a result of such transactions" and that the President can "suspend or prohibit" such transactions "when, in the President's judgment, there is credible evidence that . . . the foreign person engaging in a covered transaction might take action that threatens to impair the national security of the United States"). It is true, as Plaintiffs point out, Reply at 26, that in the comprehensive statutory list of factors the President may consider in determining whether to forbid a transaction, Congress included "the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology" to countries in certain categories. 50 U.S.C. § 4565(f)(4)(A)-(B). But the thrust of the federal regime is not to exert diplomatic pressure on foreign nations. And neither is that the purpose of the Florida law. *Cf. Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1210-11 (11th Cir. 2010) (upholding Florida law precluding funding for state-employee travel to certain countries, rejecting comparison to *Crosby*, and noting that funding statute no "more than incidentally invades the realm of federal control of foreign affairs").[16]

_____

[16] It is also noteworthy—and consistent with the diplomatic thrust—that *Crosby* and *Odebrecht* both relied on the fact that the United States received diplomatic objections to the state laws. *See Crosby*, 530 U.S. at 382-83; *Odebrecht*, 715 F.3d at 1285. These facts are "not controlling," *Fac. Senate of Fla. Int'l Univ.*,

Second, real estate transactions—or restrictions on real estate transactions—represent only one small part of the broader CFIUS regime. It covers commercial transactions—such as mergers, acquisitions, takeovers, or essentially any type of investment in a United States critical infrastructure business—as well as any sort of transaction designed to evade CFIUS review. 50 U.S.C. § 4565(a)(4) (defining "covered transaction"). In fact, as the State Defendants note, CFIUS's jurisdiction did not even reach standalone real estate sales until 2018. Resp. at 51 (citing Pub. L. No. 115-232, sec. 1703, § 721(a)(4)(B)(ii), 132 Stat. 2177 (codified at 50 U.S.C. § 4565(a)(4)(B)(ii))). The state laws in *Crosby* and *Odebrecht*, on the other hand, interfered directly with a primary purpose of the federal regime they affected. *See supra*.

Third, as noted above, there is a history of state regulation of alien landownership. There is no similar history of states using economic leverage to affect foreign policy. True, states' preexisting regulation in this area does not, alone, defeat the claim. *See Crosby*, 530 U.S. at 384-85 (invalidating Massachusetts law as providing an obstacle to subsequently enacted federal law). But longstanding state regulation of alien landownership counsels against a finding that Congress intended

---

616 F.3d at 1207, but it is worth noting that there are no similar complaints in this record. *Cf. id.* ("Nothing in the record suggests that the United States or any other government has complained about the Act to Florida or that some foreign government has complained to the federal government about the Act.").

A370

to usurp all state authority in that area without explicitly saying so. *Cf. Wyeth*, 555 U.S. at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history.").

In short, Plaintiffs have not met the "high threshold" necessary to show a likelihood that Florida's law is an obstacle to the federal regime. *Whiting*, 563 U.S. at 607.[17]

ii.   *Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Field Preemption Claim.*

As a fallback, Plaintiffs argue field preemption, which applies only when federal regulation is "so pervasive as to make the reasonable inference that Congress

---

[17] One additional note: The United States submitted a "Statement of Interest," arguing that Florida's law violates Equal Protection and the FHA. ECF No. 54. One would think that if Florida's law stood as a complete obstacle to the full implementation of federal law, the United States would have said so in that filing. But instead, the brief said the "United States does not take a position at this time on the merits of any claims not addressed in this Statement of Interest," including the obstacle-preemption claim. *Id.* at 6 n.5; *cf. Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 883 (2000) (considering federal agency view regarding preemption: "Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive. The agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements. . . . In these circumstances, the agency's own views should make a difference." (citations omitted)); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335 (2011) ("Finally, the Solicitor General tells us that DOT's regulation does not pre-empt this tort suit. As in *Geier*, 'the agency's own views should make a difference.'").

left no room for the states to supplement it." *Alabama*, 691 F.3d at 1281 (marks omitted) (quoting *Browning,* 522 F.3d at 1167). *See* MPI at 47. Plaintiffs do little to develop this argument, which spans only a half page. But just as Plaintiffs have not shown a likelihood that the Florida law stands as an obstacle to the implementation of federal law, they have not shown that the federal law at issue is so pervasive as to demonstrate that Congress left no room for state regulation. Indeed, the federal law Plaintiffs rely on is not pervasive at all. Plaintiffs have again not met their high burden.

## CONCLUSION

Plaintiffs have not shown a substantial likelihood of success on the merits. That failure precludes preliminary injunctive relief, *ACLU of Fla.,* 557 F.3d at 1198, so I do not consider the remaining preliminary injunction factors.

The amended preliminary injunction motion (ECF No. 23) is DENIED.

Within 21 days, the parties must confer and submit a joint report stating their positions on whether the stay should continue, *see* ECF No. 48. If they do not agree the stay should continue, the report must set out each side's position on an appropriate litigation schedule.

SO ORDERED on August 17, 2023.

s/ *Allen Winsor*                    
United States District Judge

**A372**

# Tab 72

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**YIFAN SHEN, ZHIMING XU, et al.,**

     **Plaintiffs,**

**v.**                                      **Case No. 4:23-cv-208-AW-MAF**

**WILTON SIMPSON, in his official
capacity as Florida Commissioner of
Agriculture, MEREDITH IVEY, in her
official capacity as Acting Florida
Secretary of Economic Opportunity, et
al.,**

     **Defendants.**

_____/

## ORDER DENYING MOTION FOR INJUNCTION PENDING APPEAL

The court denied Plaintiffs' motion for preliminary injunction, ECF No. 69, and Plaintiffs appealed, ECF No. 70. Plaintiffs now seek an injunction pending appeal. ECF No. 71.

"An injunction pending appeal is an extraordinary remedy." *State of Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021) (marks omitted) (quoting *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000) (en banc)). To obtain this extraordinary remedy, Plaintiffs must establish—among other things—"a substantial likelihood that [they] will prevail on the merits of the appeal." *Id.* In denying preliminary injunctive relief, I concluded Plaintiffs have not shown a substantial likelihood that they will succeed here. ECF No. 69. And in their

current motion, Plaintiffs have not presented anything showing otherwise. Indeed, "Plaintiffs recognize . . . that this Court is unlikely to grant [an injunction pending appeal], given that the four-factor test governing Plaintiffs' entitlement to an injunction pending appeal is essentially the same test that this Court applied in denying Plaintiffs' motion for a preliminary injunction." ECF No. 71 at 2.

Plaintiffs have not shown entitlement to an injunction pending appeal. Accordingly, the motion (ECF No. 71) is DENIED.

SO ORDERED on August 23, 2023.

s/ *Allen Winsor*
United States District Judge

**A375**