No. 23-12737

# In the United States Court of Appeals for the Eleventh Circuit

YIFAN SHEN, ET AL.,
*Plaintiffs-Appellants,*

v.

COMMISSIONER, FLORIDA DEPARTMENT OF
AGRICULTURE, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:23-cv-00208-AW-MAF

### APPELLEES' ANSWER BRIEF

November 1, 2023

DANIEL E. NORDBY
Shutts & Bowen LLP
215 South Monroe Street, Suite 804
Tallahassee, FL 32301
(850) 241-1725
*dnordby@shutts.com*

ASHLEY MOODY
*Attorney General of Florida*

HENRY C. WHITAKER
*Solicitor General*
DANIEL W. BELL
*Chief Deputy Solicitor General*
NATHAN A. FORRESTER
*Senior Deputy Solicitor General*
DAVID M. COSTELLO
*Deputy Solicitor General*
ROBERT S. SCHENCK
*Assistant Solicitor General*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Defendants-Appellees*

*Shen v. Commissioner*
*Eleventh Circuit Case No. 23-12737*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendants certify that, to the best of their knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1.  American Civil Liberties Union Foundation,

2.  American Civil Liberties Union Foundation of Florida,

3.  Anti-Racism Center of LMU Loyola Law School,

4.  Aoki Center for Critical Race and Nation Studies at UC Davis School of Law,

5.  Arkansas, State of,

6.  Asian Americans Advancing Justice – Asian Law Caucus,

7.  Asian Americans Advancing Justice – Atlanta,

8.  Asian American Legal Defense & Education Fund,

9.  Asian American Women's Political Initiative,

10. Asian Law Alliance,

11. Asian Pacific American Bar Association of Tampa Bay,

12. Bailey, Andrew,

13. Bell, Daniel W.,

14. Boston University Center for Antiracist Research,

*Shen v. Commissioner*
*Eleventh Circuit Case No. 23-12737*

15.    Butler, Steve,

16.    Carr, Christopher M.,

17.    Center for Civil Rights and Racial Justice at the University of Pittsburgh

School of Law,

18.    Center for Immigration Law, Policy and Justice at Rutgers Law School,

19.    Center on Race, Inequality, and the Law at New York University School

of Law,

20.    Chang, Robert Seungchul,

21.    Chin, Gabriel J.,

22.    Chinese for Affirmative Action,

23.    Clarke, Kristen,

24.    Conference of Asian Pacific American Law Faculty,

25.    Coody, Jason R.,

26.    Costello, David M.,

27.    Cuison-Villazor, Rose,

28.    DeHeng Law Group, PC,

29.    Fitch, Lynn,

30.    Fitzgerald, Patricia,

31.    Fitzpatrick, Martin A.,

*Shen v. Commissioner*
*Eleventh Circuit Case No. 23-12737*

32.    Florida Office of the Attorney General,

33.    Formella, John M.,

34.    Forrester, Nathan A.,

35.    Fred T. Korematsu Center for Law and Equality at Seattle University School of Law,

36.    Georgia, State of,

37.    Gorski, Ashley Marie,

38.    Griffin, Tim,

39.    Handberg, Roger B.,

40.    Harwell, Jr., Lacy R.,

41.    Hispanic National Bar Association,

42.    Idaho, State of,

43.    Indiana, State of,

44.    Jackley, Marty J.,

45.    Jacobs, Arthur, I.,

46.    Jadwat, Omar,

47.    Japanese American Citizens League,

48.    Jarwala, Alisha,

49.    Kelly, J. Alex,

*Shen v. Commissioner*
*Eleventh Circuit Case No. 23-12737*

50.   Knudsen, Austin,

51.   Koo, Elizabeth L.,

52.   Labrador, Raúl R.,

53.   LaPointe, Markenzy,

54.   Larizza, R.J.,

55.   Latino Justice PRLDEF,

56.   Lee, Dexter,

57.   Li, Bethany Yue-Ping,

58.   Liu, Yongxin,

59.   Longfield, Timothy J.,

60.   Maurer, Michael S.,

61.   Mahfooz, Sidra,

62.   Mississippi, State of,

63.   Missouri, State of,

64.   Montana, State of,

65.   Moody, Ashley,

66.   Multi-Choice Realty, LLC,

67.   National Asian Pacific American Bar Association,

68.   New Hampshire, State of,

69.  Nordby, Daniel E.,

70.  North Dakota, State of,

71.  Pagnucco, Carrie,

72.  Quinn Emanuel Urquhart & Sullivan, LLP,

73.  Rather, Shaiba,

74.  Reyes, Sean,

75.  Rodriguez, Madeleine Kristine,

76.  Rokita, Theodore E.,

77.  Rundle, Katherine Fernandez,

78.  Sayler, Erik Louis,

79.  Schenck, Robert S.,

80.  Shaffer, Derek Lawrence,

81.  Shen, Yifan,

82.  Shutts & Bowen, LLP,

83.  Simpson, Wilton,

84.  Song, Jian,

85.  South Asian Bar Association of North America,

86.  South Carolina, State of,

87.  South Dakota, State of,

*Shen v. Commissioner*
*Eleventh Circuit Case No. 23-12737*

88.  Taitz, Sarah Michelle,

89.  Tang, Haiyan,

90.  Tilley, Daniel Boaz,

91.  Toomey, Patrick Christopher,

92.  Turner, Joshua Nathaniel,

93.  U.S. Department of Justice,

94.  Utah, State of,

95.  Wang, Xinxi,

96.  Warren, Nicholas,

97.  Whitaker, Henry C.,

98.  Wilson, Alan,

99.  Winsor, Honorable Allen C.,

100.  Wofsy, Cody H.,

101.  Wold, Theodore, J.,

102.  Worrell, Monique,

103.  Wrigley, Drew H.,

104.  Xu, Zhiming,

105.  Zafar, Noor,

106.  Zaman, Razeen J.,

*Shen v. Commissioner*
*Eleventh Circuit Case No. 23-12737*

107.   Zhu, Keliang

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## ORAL ARGUMENT STATEMENT

Defendants respectfully request oral argument and agree with Plaintiffs that oral argument will help the Court decide the important legal issues raised by this case.

# TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT ..............................................................i

TABLE OF CONTENTS .........................................................................ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION .......................................................... 1

ISSUES PRESENTED ............................................................................ 2

INTRODUCTION.................................................................................... 3

BACKGROUND..................................................................................... 4

    A.    Florida's Efforts to Combat the Influence of Pernicious Foreign Governments.................................................................... 4

    B.    Plaintiffs................................................................................... 9

    C.    Procedural History ................................................................... 9

STANDARD OF REVIEW.................................................................... 10

SUMMARY OF ARGUMENT .............................................................. 11

ARGUMENT ....................................................................................... 15

I.    Plaintiffs are unlikely to succeed on the merits of their claims against SB 264........................................................................... 15

    A.    SB 264 does not violate the Equal Protection Clause. ........................... 15

        1.    SB 264 does not trigger heightened scrutiny under the Equal Protection Clause. ........................................... 16

        2.    SB 264 was not motivated by racial or national-origin-based animus.......................................................... 21

    B.    SB 264 is not vague. ...................................................... 26

    C.    SB 264 is not preempted by the FHA. ........................................ 28

    D.    SB 264 is not preempted by the CFIUS regime. ...................................... 30

E.    Plaintiffs are also unlikely to succeed because they lack standing........................................................................................... 41

    1.    The individual Plaintiffs are Florida domiciliaries and therefore not subject to SB 264. ...................................... 42

    2.    Multi-Choice's client does not have injuries traceable to SB 264, because his contract is exempted from the law's purchase restrictions, like Shen's and Xu's contracts. ........................................................................... 44

II.    The remaining equitable factors also do not support an injunction.................. 45

III.    Any injunction should be carefully tailored. ........................................... 46

CONCLUSION .............................................................................................. 47

CERTIFICATE OF COMPLIANCE .............................................................. 49

CERTIFICATE OF SERVICE ....................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Accardo v. Brown,*
   139 So. 3d 848 (Fla. 2014) .................................................................. 44, 45

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
   557 F.3d 1177 (11th Cir. 2009) ................................................................ 11

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
   57 F.4th 791 (11th Cir. 2022) ................................................................... 21

*Alabama v. U.S. Army Corps of Eng'rs,*
   424 F.3d 1117 (11th Cir. 2005) ................................................................ 45

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003) .................................................................................. 40

*Armstrong v. Exceptional Child Ctr.,*
   575 U.S. 320 (2015) ............................................................................ 28, 31

*Barber v. Gov. of Ala.,*
   73 F.4th 1306 (11th Cir. 2023) ................................................................ 11

*Barclays Bank PLC v. Franchise Tax Bd.,*
   512 U.S. 298 (1994) ............................................................................ 39, 40

*Blythe v. Hinckley,*
   180 U.S. 333 (1901) .................................................................................. 37

*Bray v. Alexandria Women's Health Clinic,*
   506 U.S. 263 (1993) ......................................................................23, 24, 25

*Brnovich v. Democratic Nat'l Comm.,*
   141 S. Ct. 2321 (2021) .............................................................................. 24

*Cabell v. Chavez-Salido,*
   454 U.S. 432 (1982) .................................................................................. 20

*Chamber of Com. of the U.S. v. Whiting,*
   563 U.S. 582 (2011) ......................................................................13, 33, 36

*City of Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005) ................................................................................................. 28

*Clark v. Allen,*
    331 U.S. 503 (1947) ......................................................................................... 36, 41

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) .......................................................................... 14, 33, 37, 38

*Dean v. Warren,*
    12 F.4th 1248 (11th Cir. 2021) .............................................................................. 24

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ........................................................................................... 21

*Espinoza v. Farah Mfg. Co.,*
    414 U.S. 86 (1973) ................................................................................................. 29

*Estrada v. Becker,*
    917 F.3d 1298 (11th Cir. 2019) ............................................................................. 19

*Fac. Senate of Fla. Int'l Univ. v. Winn,*
    616 F.3d 1206 (11th Cir. 2010) ....................................................................... 35, 37

*Fla. Highway Patrol v. Jackson,*
    288 So. 3d 1179 (Fla. 2020) .................................................................................. 42

*Fla. Ins. Guar. Ass'n v. Devon Neighborhood Ass'n,*
    67 So. 3d 187 (Fla. 2011) ...................................................................................... 45

*Foley v. Connelie,*
    435 U.S. 291 (1978) ............................................................................................... 18

*Frick v. Webb,*
    263 U.S. 326 (1923) ............................................................................................... 16

*Georgia v. President of the U.S.,*
    46 F.4th 1283 (11th Cir. 2022) ......................................................................... 15, 46

*Graham v. Richardson,*
    403 U.S. 365 ........................................................................................................... 16

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) ................................................................ 24, 25, 26

*Guinn v. United States*,
238 U.S. 347 (1915) ................................................................................ 22, 23

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) ........................................................................................ 31

*Hunter v. Underwood*,
471 U.S. 222 (1985) ........................................................................................ 25

*In re Wild*,
994 F.3d 1244 (11th Cir. 2021) ............................................................... 28, 31

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019) ......................................................................... 30

*Jackson v. Okaloosa Cnty.*,
21 F.3d 1531 (11th Cir. 1994) ....................................................................... 29

*Keveloh v. Carter*,
699 So. 2d 285 (Fla. 5th DCA 1997) ............................................................. 42

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
32 F.4th 1363 (11th Cir. 2022) ...................................................................... 24

*LeClerc v. Webb*,
419 F.3d 405 (5th Cir. 2005) .................................................................... 12, 18

*Louisiana ex rel. Gremillion v. NAACP*,
366 U.S. 293 (1961) ................................................................................. 27, 28

*LULAC v. Bredesen*,
500 F.3d 523 (6th Cir. 2007) .................................................................... 18, 19

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023) ........................................................................................ 17

*Maryland v. King*,
567 U.S. 1301 (2012) ...................................................................................... 46

vi

*Mazariegos v. Off. of U.S. Att'y Gen.*,
    241 F.3d 1320 (11th Cir. 2001) ....................................................................... 42

*McDonald's Corp. v. Robertson*,
    147 F.3d 1301 (11th Cir. 1998) ....................................................................... 11

*Moore v. Bryant*,
    853 F.3d 245 (5th Cir. 2017) ........................................................................... 42

*Nagaraja v. Comm'r of Revenue*,
    352 N.W.2d 373 (Minn. 1984) ........................................................................ 43

*Nat'l Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999) .............................................................................. 38

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
    928 F.3d 639 (7th Cir. 2019) ........................................................................... 32

*Nevett v. Sides*,
    571 F.2d 209 (5th Cir. 1978) ........................................................................... 23

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................ 10

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ...........................................................14, 35, 40

*Oyama v. California*,
    332 U.S. 633 (1948) ........................................................................................ 16

*Perez v. Perez*,
    164 So. 2d 561 (Fla. 3d DCA 1964) ............................................................... 43

*Plyler v. Doe*,
    457 U.S. 202 (1982) ..................................................................................18, 43

*Porterfield v. Webb*,
    263 U.S. 225 (1923) ........................................................................................ 16

*Resendiz v. Exxon Mobil Corp.*,
    72 F.4th 623 (4th Cir. 2023) ........................................................................... 23

vii

*Rice v. Cayetano,*
    528 U.S. 495 (2000) ................................................................................ 22

*Rollins v. TechSouth, Inc.,*
    833 F.2d 1525 (11th Cir. 1987) ............................................................. 25

*Russello v. United States,*
    464 U.S. 16 (1983) .................................................................................. 36

*Sackett v. EPA,*
    598 U.S. 651 (2023) ................................................................................ 31

*SEC v. Big Apple Consulting USA, Inc.,*
    783 F.3d 786 (11th Cir. 2015) ............................................................. 30

*Shames v. Nebraska,*
    323 F. Supp. 1321 (D. Neb. 1971) ................................................. 37, 40

*Shaw v. Reno,*
    509 U.S. 630 (1993) ................................................................................ 23

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ............................................................. 10

*SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.,*
    40 F.4th 1320 (11th Cir. 2022) ........................................................ 13, 26

*Smith v. Zaner,*
    4 Ala. 99 (1842) ...................................................................................... 20

*Solymar Invs., Ltd. v. Banco Santander S.A.,*
    672 F.3d 981 (11th Cir. 2012) ............................................................. 17

*State v. Boston, Concord & Montreal R.R.,*
    25 Vt. 433 (1853) .................................................................................... 20

*State v. Burch,*
    545 So. 2d 279 (Fla. 4th DCA 1989) ................................................. 26

*State v. Giorgetti,*
    868 So. 2d 512 (Fla. 2004) ..................................................................... 27

*Support Working Animals, Inc. v. Gov. of Fla.*,
    8 F.4th 1198 (11th Cir. 2021) ............................................................ 41

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)........................................................................... 41

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020).......................................................... 46

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948)........................................................................... 17

*Terrace v. Thompson*,
    263 U.S. 197 (1923)....................................................12, 16, 17, 19, 33

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.* ("*ICP*"),
    576 U.S. 519 (2015).....................................................................29, 30

*Toop v. Ulysses Land Co.*,
    237 U.S. 580 (1915)........................................................................... 16

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ..................................................................41, 43

*Trojan Techs., Inc. v. Pennsylvania*,
    916 F.2d 903 (3d Cir. 1990) .............................................................. 40

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012)..................................................32, 38, 39

*United States v. Apollo Energies, Inc.*,
    611 F.3d 679 (10th Cir. 2010) ........................................................... 27

*United States v. Heaton*,
    59 F.4th 1226 (11th Cir. 2023) .......................................................... 27

*United States v. Hedges*,
    912 F.2d 1397 (11th Cir. 1990)........................................................... 27

*United States v. Osorto*,
    995 F.3d 801 (11th Cir. 2021)........................................................21, 22

*United States v. Pink,*
    315 U.S. 203 (1942) ............................................................................ 39

*United States v. Williams,*
    553 U.S. 285 (2008) ............................................................................ 27

*Vill. of Arlington Heights v. Metro. Hous. Dev.,*
    429 U.S. 252 (1977) ............................................................................ 22

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.,*
    455 U.S. 489 (1982) ............................................................................ 27

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................ 42

*Webb v. O'Brien,*
    263 U.S. 313 (1923) ............................................................................ 16

*Weber v. Weber,*
    929 So. 2d 1165 (Fla. 2d DCA 2006) ............................................... 27

*Dandamudi v. Tisch,*
    686 F.3d 66 (2d Cir. 2012) ........................................................ 18, 43

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................. 31, 33, 35

*Zschernig v. Miller,*
    389 U.S. 429 (1968) ..................................................................... 40, 41

## Statutes and Constitutional Provisions

8 U.S.C. § 1101 ......................................................................................... 43

8 U.S.C. § 1182 ......................................................................................... 43

42 U.S.C. § 1983 .................................................................................. 28, 31

42 U.S.C. § 3613 .................................................................................. 28, 29

42 U.S.C. § 3614 ....................................................................................... 47

42 U.S.C. § 3615 ................................................................................ 29

48 U.S.C. §§ 1501–1507 ................................................................... 32

50 U.S.C. § 4552 ............................................................................... 31

50 U.S.C. § 4565 ........................................................................ 31, 34

50 U.S.C. § 4842 ............................................................................... 35

Ala. Const. of 1875, art. I, § 36 ...................................................... 19

Ark. Const. of 1868, art. I, § 20 ..................................................... 19

Cal. Const. of 1879, art. I, § 17 ...................................................... 20

Colo. Const. of 1876, art. II, § 27 ................................................... 19

Fla. Const. of 1868, art. I, § 17 ...................................................... 19

Fla. Stat. § 692.201 ........................................................ 4, 7, 16, 26, 42

Fla. Stat. § 692.203 ............................................................... 7, 8, 9, 16

Fla. Stat. § 692.204 ........................................................ 7, 8, 26, 44, 45

Fla. Stat. § 692.205 ............................................................................. 8

Iowa Const. of 1857, art. I, § 22 ..................................................... 19

Kan. Const. of 1859, Bill of Rights § 17 ........................................ 19

Mich. Const. of 1850, art. XVIII, § 13 ............................................ 19

Miss. Const. of 1890, art. IV, § 84 .................................................. 20

Mont. Const. of 1889, art. III, § 25 ................................................. 20

Neb. Const. of 1866–1867, art. I, § 14 ............................................ 19

Nev. Const. of 1864, art. I, § 16 ...................................................... 19

Okla. Const. of 1907, art. XXII ....................................................... 20

Or. Const. of 1857, art. I, § 31 ................................................................ 19

S.C. Const. of 1895, art. III, § 35 ........................................................... 20

S.D. Const. of 1889, art. VI, § 14 ........................................................... 20

W. Va. Const. of 1872, art. II, § 5 .......................................................... 19

Wash. Const. of 1889, art. II, § 33 .......................................................... 20

Wis. Const. of 1848, art. I, § 15 ............................................................. 19

Wyo. Const. of 1889, art. I, § 29 ............................................................ 20

**Rules**

Fed. R. Civ. P. 52(a) ............................................................................ 11

**Regulations**

8 C.F.R. § 214.1 .................................................................................. 43

28 C.F.R. § 0.20(c) .............................................................................. 38

Fla. Admin. Reg. 73C-60.002 ............................................................ 8, 45

**Other Authorities**

1 James M. Matthews, *Digest of the Laws of Virginia, of a Civil Nature and of a Permanent Character and General Operation* (J.W. Randolph ed., 1856) ........................................... 19

1 John Sayles & Henry Sayles, *Sayles' Annotated Civil Statutes of the State of Texas* (1898) ........................................................ 20

1 Seymour D. Thompson & Thomas M. Steger, *A Compilation of the Statute Laws of the State of Tennessee* (3d ed. 1873) ................................... 19

3 *The Revised Statutes of the State of New York* (Montgomery H. Throop ed., 7th ed. 1882) ................................ 19

A.F. Denny, *The General Statutes of the State of Missouri* (1866) ........................................ 19

A.V.D. Honeyman, *An Abridgment Revised Statutes of New Jersey, and of the Amended Constitution* (1878) ............................................................................... 19

Allison Brownell Tirres, *Property Outliers: Non-Citizens, Property Rights and State Power*, 27 Geo. Immigr. L.J. 77 (2012) ............................................. 20

*Brief for the United States as Amicus Curiae, Wallace v. Calogero*, Nos. 05-1645, 06-11 (U.S. May 23, 2007), 2007 WL 1520968 ................................ 19

CFIUS, Annual Report to Congress—Report Period: CY 2021 (Aug. 2, 2022) .......... 34

Charles H. Sullivan, *Alien Land Laws: A Re-Evaluation*, 36 Temp. L.Q. 15 (1962) ....................................................................................... 20

David M. Golove, *Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power*, 98 Mich. L. Rev. 1075 (2000) ...................... 32

Fla. Laws ch. 2023-173, § 10 (May 31, 2023) ....................................................... 8

Frederick C. Brightly, *Annual Digest of the Laws of Pennsylvania for the Years 1862 to 1870* (1870) ..................................................................................... 20

*Governor Ron DeSantis Cracks Down on Communist China*, Governor Ron DeSantis (May 8, 2023) ................................................................................. 4, 5

James Frechter, *Alien Landownership in the United States: A Matter of State Control*, 14 Brook. J. Int'l L. 147 (1988) ................................................... 32

Polly J. Price, *Alien Land Restrictions in the American Common Law: Exploring the Relative Autonomy Paradigm*, 43 Am. J. Legal Hist. 152 (1999) ...................... 20

Pub. L. No. 64-301, 39 Stat. 874 (Feb. 3, 1917) ................................................ 17

Pub. L. No. 115-232, sec. 1703, 132 Stat. 2177–79 (2018) .............................. 34

Pub. L. No. 115-232, sec. 1773(c), 132 Stat. 1635, 2237 (2018) ..................... 35

Senate Bill Analysis and Fiscal Impact Statement, CS/CS/SB 264 (2023) ............ 5, 6, 7

*The General Statutes of the Commonwealth of Kentucky* (Edward I. Bullock & William Johnson eds., 1873) .......................................................... 19

xiii

*The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut* (1875) ........................ 19

*The Public Statutes of the State of Minnesota (1849–1858)* (Moses Sherburne & William Hollinshead comps., 1859) ............................................. 20

*The Revised Statutes of the State of Illinois, Embracing All Laws of a General Nature in Force July 1, 1887* (George W. Cothran ed., 6th rev. ed. 1887) ............................................. 20

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, Alb.-U.S., Jan. 11, 1995, T.I.A.S. No. 98-104 ................................................. 32

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, Mozam.-U.S., Dec. 1, 1998, T.I.A.S. No. 13006 ........................................... 32

Treaty of Amity and Commerce, Fr.-U.S., Feb. 6, 1778, 8 Stat. 12 .............................. 32

Treaty of Friendship, Commerce and Navigation, U.S.-Ire., Jan. 21, 1950, 1 U.S.T. 788 ....................................................................... 32

William Blackstone, *Commentaries on the Laws of England* ................................... 20

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

The State of Florida enacted SB 264 to shield its citizens from nefarious foreign-government influence by barring hostile foreign governments and their potential agents from certain real-estate purchases in Florida. The district court denied a preliminary injunction after it found that Plaintiffs were unlikely to succeed in their claims. The issues on appeal are:

1.    Whether the district court correctly concluded that Plaintiffs are unlikely to show that SB 264 (i) unconstitutionally discriminates based on alienage, race, or national origin under the Equal Protection Clause; (ii) is void for vagueness under the Due Process Clause; (iii) is preempted by the Fair Housing Act; or (iv) is preempted by the foreign-investment statute administered by the Committee on Foreign Investment in the United States.

2.    Whether Plaintiffs have clearly established irreparable harm from SB 264, that the balance of the equities favors an injunction, and that the public interest favors an injunction.

3.    Whether any injunction should be carefully tailored to remedy Plaintiffs' alleged injuries.

2

**INTRODUCTION**

At issue in this appeal is a Florida law that protects Floridians and the State itself by restricting the totalitarian governments of certain "foreign countries of concern"— China, Russia, Iran, North Korea, Cuba, Venezuela, and Syria—from purchasing land in Florida. *See* Fla. Laws ch. 2023-33 (May 8, 2023). To prevent circumvention, that legislation also limits land purchases by people domiciled in those nations, excluding U.S. citizens and lawful permanent residents (LPRs).

Plaintiffs challenge Senate Bill 264 (SB 264) as unconstitutionally vague, motivated by racist intent, and preempted by federal law. In a thoroughly reasoned 51-page order, the district court denied Plaintiffs a preliminary injunction, finding their claims unlikely to succeed on the merits. As the district court correctly concluded, SB 264 is well within the State's traditional sovereign authority to regulate the acquisition of its own land, and the State has done so in clear terms not based on race or national origin. SB 264 mitigates the influence of hostile foreign governments. The statute draws lines on that basis, not based on race or national origin. And nothing the federal government has done—including through the limited regulatory authority and scarce resources afforded to the Committee on Foreign Investment in the United States (CFIUS)—precludes Florida from exercising core state sovereign authority over its own land. Plaintiffs' arguments to the contrary would disable Florida from taking action to prevent threats the federal government has not addressed and has instead left to the states.

Plaintiffs have also failed to show that irreparable harm will befall them or that the balance of the equities favors them. The harms alleged are speculative, reparable, or otherwise rest on Plaintiffs' incorrect interpretation of SB 264. And the public interest and balance of the equities rest with the State because it has a strong interest in enforcing its laws and protecting its citizens.

This Court should affirm.

## BACKGROUND

### A.    Florida's Efforts to Combat the Influence of Pernicious Foreign Governments

**1.** In May 2023, the Governor signed into law three bills designed to protect Floridians from "the United States' greatest geopolitical threat—the Chinese Communist Party [(CCP)]," and against the communist or totalitarian governments of six other "foreign countries of concern," specifically, Iran, North Korea, Cuba, Venezuela, Syria, and Russia. *Governor Ron DeSantis Cracks Down on Communist China*, Governor Ron DeSantis (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china; Fla. Stat. § 692.201(3). SB 258 protects the security of data on state-issued devices by barring their access to "applications owned by a foreign principal or foreign countries of concern, including China, which present a cybersecurity and data privacy risk." *Id.* SB 846 likewise protects the Florida College System, including its research institutions, against "higher education subterfuge" by restricting state universities' partnerships with foreign countries of concern and prohibiting the

4

solicitation and acceptance of gifts from them. *Id.* And SB 264 advances similar privacy and security interests by prohibiting Florida agencies from contracting with foreign countries of concern and by "ensur[ing] that health records are physically stored in the continental U.S., U.S. territories, or Canada." *Id.*

The aspects of SB 264 challenged here advance the State's sovereign interest in protecting its soil from being captured by "China and other hostile foreign nations" and their principals. *Id.* Among other recent examples illustrating why those provisions were necessary, legislative staff pointed to efforts by a Chinese food manufacturer to purchase 300 acres of agricultural land just 12 miles from Grand Forks Air Force Base in North Dakota. *See* Senate Bill Analysis and Fiscal Impact Statement, CS/CS/SB 264, at 2 (2023), https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264. rc.PDF. Grand Forks was home to "some of the country's most sophisticated, 'top secret' military drone technology," and "[t]he location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns." *Id.* The Air Force thus believed that "the proposed project present[ed] a significant threat to national security with both near- and long-term risks of significant impacts to [Air Force] operations in the area." *Id.* at 3. But CFIUS—the federal government's "interagency committee authorized to review certain transactions involving foreign investment in the U.S."—determined that the proposed transaction "was outside of its jurisdiction and that it would therefore take no further

action." *Id.* at 5–6. The transaction fell through only because "the Grand Forks City Council abandoned the project." *Id.* at 3.

That near-miss came to a head in February 2023, just a month before Florida's 2023 Legislative Session began. The same month was marked by other noteworthy examples of CCP activity on U.S. soil, including the now well-know "surveillance balloon program," under which a balloon surveilled "a large swath of North America" before being shot down. *Id.* Around the same time, "U.S. defense and national security officials . . . raised the possibility that certain Chinese-made giant cargo cranes are being used for espionage." *Id.* at 4. Those concerns followed soon after the FBI's revelation of "the existence of unauthorized 'police stations' established by China in major U.S. cities" as bases of operation for "harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping." *Id.* at 3.

Legislative staff highlighted those incidents as well as widespread concern "about potential food security impacts" from foreign land purchases. *Id.* "A recent letter from 130 lawmakers to the U.S. Government Accountability Office [had] expressed concern that 'foreign investment in U.S. farmland could result in foreign control of available U.S. farmland, especially prime agricultural lands, and possibly lead to foreign control over food production and food prices.'" *Id.* Just as Russia had "exercise[d] undue influence in Europe because it supplied Europe with a significant amount of natural gas," "China might similarly try to control food supplies" and thus "exert greater coercive power around the globe." *Id.* Those concerns were especially serious because "[f]oreign

land holdings have increased by an average of 2.2 million acres per year since 2015," and as of 2021, "China [already] accounted for 383,935 acres" of "foreign-owned U.S. agricultural land." *Id.* at 4.

**2.** The provisions of SB 264 challenged here created a series of new Florida statutes that address "significant gaps" legislative staff identified in CFIUS's statutory jurisdiction. *Id.* at 5–6. Specifically, SB 264 prohibits certain land acquisitions by "foreign principals" of "foreign countries of concern," Fla. Stat. § 692.203(1), meaning China, Russia, Iran, North Korea, Cuba, Venezuela, and Syria, Fla. Stat. § 692.201(3). A "foreign principal" includes the government itself, a government official, a member of a political party in that country, and—as relevant here—"[a]ny person who is domiciled in" one of those countries "and is not a citizen or lawful permanent resident of the United States." Fla. Stat. § 692.201(4).

Effective July 1, 2023, "foreign principals" are prohibited from acquiring land within 10 miles of a "military installation" or "critical infrastructure facility" or, in the case of a foreign principal of China, anywhere in the State. Fla. Stat. §§ 692.203(1), 692.204(1). But all individuals may continue to own interests in property acquired prior to July 1. Fla. Stat. §§ 692.203(2), 692.204(3). Those who violate the purchase provisions are subject to civil and criminal penalties. *See* Fla. Stat. §§ 692.203(7)–(9).

The purchase restrictions are qualified by several exceptions. Foreign principals (including those from China) with a non-tourist visa or asylum may acquire up to two contiguous acres of residential property not within five miles of a military installation.

Fla. Stat. §§ 692.203(4), 692.204(2). The law also does not apply to land acquired by a foreign principal for a diplomatic purpose recognized, acknowledged, or allowed by the federal government. Fla. Stat. § 692.205. And the law specifies that a foreign principal who "directly or indirectly owns or acquires any interest in real property . . . before July 1, 2023, may continue to own or hold such real property." Fla. Stat. §§ 692.203(2), 692.204(3). In essence, this grandfather provision exempts real-estate contracts closing after July 1, 2023, from the purchase restrictions, as long as those contracts were executed before that date, as stated by the entity that administers SB 264: Florida's Department of Commerce. Fla. Stat. § 692.203(10); Fla. Admin. Reg. 73C-60.002, https://www.flrules.org/Gateway/View_notice.asp?id=27574595.[1] And finally, foreign principals who acquire real estate that would be subject to SB 264's purchase restrictions after July 1 "by devise or descent, through the enforcement of security interests, or through the collection of debts," are given three years to sell or dispose of the property. Fla. Stat. §§ 692.203(5), 692.204(5).

SB 264 imposes two additional requirements related to land. First, foreign principals must file a one-time registration statement by the end of 2023 if they owned land before July 1, 2023, that is now subject to SB 264. Fla. Stat. § 692.203(3). So if a foreign principal owns property within 10 miles of a military installation or critical infrastructure

---

[1] Fla. Laws ch. 2023-173, § 10 (May 31, 2023) (HB 5) (transferring the functions of the Department of Economic Opportunity to the newly formed Department of Commerce).

facility, or any land in the case of a foreign principal of China, the principal must register that property. Foreign principals purchasing land subject to SB 264 on or after July 1— such as through the two-acre residential property exception—also must register that property within 30 days of acquisition. Fla. Stat. § 692.203(3)(b). Second, all land-sale transactions in the state must be accompanied by an affidavit swearing compliance with SB 264 at the time of purchase. Fla. Stat. § 692.203(6).

### B.    Plaintiffs

Plaintiffs are four individuals and one LLC. The individual Plaintiffs are three Chinese citizens with nonimmigrant U.S. visas (Plaintiffs Shen, Liu, and Wang) and one Chinese-citizen asylum applicant (Plaintiff Xu). Plaintiff Wang is an international student with an F-1 visa, and Shen and Liu are workers with H-1B visas. App. 99, 143, 149. The individual Plaintiffs allege that SB 264 will either require them to register land they already own or prohibit them from purchasing land in the future. The LLC Plaintiff (Multi-Choice Realty) is a real-estate-brokerage firm that has "Chinese-speaking" clients. App. 155–57. The only specific harm Multi-Choice has identified is that one of its clients was denied financing by two lenders for a real-estate contract that was executed in 2019 and has been open since it was executed. App. 308–20.

### C.    Procedural History

On May 22, 2023, Plaintiffs sued to enjoin enforcement of SB 264. App. 11. The individual Plaintiffs asserted equal-protection and vagueness claims, as well as preemption claims under the Fair Housing Act (FHA) and the federal statute that authorizes

CFIUS to regulate foreign investment in the United States. Multi-Choice joined only the preemption claims. App. 82–91. All Plaintiffs moved for a preliminary injunction. App. 3–4. The United States filed a statement of interest, supporting Plaintiffs only in their argument that Florida's law violated equal protection and the FHA. App. 286–306. The United States did not support Plaintiffs' argument that the law was preempted by the CFIUS statute. *Id.*

After a hearing, App. 8, the district court denied the preliminary injunction, App. 374–75. Although the court found at least one individual Plaintiff had standing, it ruled that no Plaintiff was likely to succeed on the merits. App. 322–72. As a result, the district court denied the injunction without considering the other preliminary injunction factors. App. 372.

This appeal followed. The United States has not filed an amicus brief in support of Plaintiffs.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits; (2) a substantial risk of irreparable injury absent injunctive relief; (3) an injunction would not cause substantial harm to other interested persons; and (4) the public interest favors an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although the first two factors are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden

of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). As a result, "[f]ailure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

This Court reviews the denial of "a preliminary injunction for abuse of discretion," reviewing "findings of fact of the district court for clear error and legal conclusions *de novo.*" *Barber v. Gov. of Ala.*, 73 F.4th 1306, 1316 (11th Cir. 2023). This narrow and deferential standard of review "recognizes the range of possible conclusions the [district court] may reach, . . . so long as that choice does not constitute a clear error of judgment." *Id.* at 1317.[2]

## SUMMARY OF ARGUMENT

Plaintiffs challenge, as unconstitutional and preempted by federal law, Florida's attempt in SB 264 to protect its citizens and soil from land purchases by hostile foreign governments and their potential agents. But the district court correctly rejected those claims, recognizing that SB 264 falls comfortably within Florida's fundamental sovereign prerogative to regulate its own land. The district court's denial of injunctive relief is also supportable on several alternative grounds: Plaintiffs lack standing, have no cause

---

[2] To the extent Plaintiffs imply (at 9) that any legal error subjects the entire order (including factual findings) to "plenary review," that is incorrect. Even when reviewing a preliminary injunction, this Court applies clear-error review to factual findings. *Barber*, 73 F.4th at 1316; Fed. R. Civ. P. 52(a).

of action to enforce the FHA or the CFIUS statute, and cannot demonstrate any of the remaining equitable factors for obtaining a preliminary injunction.

The Court should affirm.

**I.** Plaintiffs are unlikely to succeed on the merits of their four claims.

**A.** On equal protection, the district court correctly held that SB 264 is subject to only rational-basis review despite Plaintiffs' claims of alienage, race, and national-origin discrimination. Though SB 264 bars some aliens from holding property, the Supreme Court has long blessed state restrictions on alien land ownership. *See, e.g.*, *Terrace v. Thompson*, 263 U.S. 197, 219–22 (1923). Those decisions have neither withered away nor are distinguishable from this case. On the contrary, they are firmly grounded in history. At common law, alien land restrictions were pervasive, as they were in states at the time of the ratification of the Fourteenth Amendment. SB 264's alienage classification also does not trigger heightened scrutiny, because it affects merely temporary aliens. Such scrutiny only applies to discrimination specifically against lawful permanent residents, or LPRs. *E.g.*, *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005).

The district court was also right to reject Plaintiffs' insistence that the statute discriminates based on race or national origin. The law is neutral on its face. It classifies based on domicile and alienage, not race or national origin. Plaintiffs contend otherwise through urging that "domicile" is merely a "proxy" for race and national origin, but no such discriminatory intent can be presumed from this rational tool to prevent circumvention of SB 264 by hostile totalitarian nations. Finally, Plaintiffs have otherwise failed

12

to present evidence of animus by the Florida Legislature to overcome the legislative presumption of good faith.

**B.** SB 264 is also not void for vagueness under the Due Process Clause. SB 264's terms plainly have a discernible "core" of meaning. *SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022).

**C.** The district court correctly rejected Plaintiffs' FHA preemption claim. Plaintiffs have no cause of action to preempt state law, and SB 264 was not motivated by race or national-origin discrimination. Nor have Plaintiffs shown a likelihood of success on a disparate-impact FHA theory based on SB 264's alleged discriminatory effects, which they pressed to the district court in a one-sentence footnote in their preliminary-injunction motion.

**D.** The district court correctly rejected Plaintiffs' claim of CFIUS preemption. Neither the CFIUS statute itself nor any traditional principle of equity affords Plaintiffs a cause of action, express or implied, to seek to enforce the national-security values CFIUS embodies. The CFIUS regime sensibly entrusts such enforcement to the President and his subordinates.

Plaintiffs have likewise failed to meet the "high threshold" necessary to show implied preemption. *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011). CFIUS did not upset the federal government's approval of alien land ownership restrictions, evidenced both by its similar restrictions for federal lands and by its longstanding practice of using treaties to override these restrictions on a country-by-

country basis. CFIUS's limited jurisdiction—including its wholly voluntary reporting system for real-estate transactions, and its resource and time constraints—reflects a cautious federal determination to examine certain red-flag transfers of control but otherwise leave to states the traditionally state-regulated field of real-estate transactions. That modest regime is not a comprehensive and exclusive national foreign-policy apparatus and does not represent a determination that all real-estate transactions nationwide exempted from CFIUS's jurisdiction never pose national-security risks.

Contrary to Plaintiffs' suggestions, much more is required than remote effects on foreign relations to overcome the presumption against preemption. In the modern international economy, nearly any state regulation of commerce will have some downstream international effect. *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268 (11th Cir. 2013), are simply inapposite, as those cases involved different laws and different historical backgrounds. Plaintiffs' CFIUS preemption claim therefore must fail.

**E.** Alternatively, this Court may also affirm on the ground that Plaintiffs lack standing. The individual Plaintiffs failed to establish that they are domiciled in China and thus subject to SB 264. And the only client that Multi-Choice identified is exempted from the purchase restrictions of SB 264, because his real-estate contract is exempted by the law's grandfather clause.

14

**II.** Plaintiffs also failed to demonstrate the remaining factors for equitable relief. No irreparable harm will befall Plaintiffs if the district court proceeds as normal. The pending real-estate contracts that Plaintiffs claim will fall through are also subject to SB 264's grandfather clause, and so they are not barred from closing those real-estate contracts. And the balance of the equities favors the State's ability to protect its citizens through its validly enacted legislation.

**III.** To the extent any injunctive relief is appropriate, it should be limited to any Plaintiffs who establish standing to sue and the specific provisions of the statute any such Plaintiffs challenge. *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1303–04 (11th Cir. 2022).

## ARGUMENT

### I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS AGAINST SB 264.

#### A. SB 264 does not violate the Equal Protection Clause.

Plaintiffs assert (at 23–30) that SB 264 violates the Equal Protection Clause because it discriminates on the basis of alienage, race, and national origin and is thus subject to strict scrutiny. But the district court correctly rejected that claim, instead finding that SB 264's land-purchase restrictions were a non-discriminatory and rational means of protecting Florida's soil. App. 335–55.

### 1.    SB 264 does not trigger heightened scrutiny under the Equal Protection Clause.

Principally, SB 264 limits hostile foreign governments and their agents from purchasing land. Fla. Stat. §§ 692.201(4), 692.203(1). To effectuate that prohibition, the law also limits those domiciled in—and likely subject to the influence of—those countries from purchasing land as well. Fla. Stat. § 692.201(4)(d). It exempts U.S. citizens and LPRs, no matter where domiciled, from its proscriptions. *Id.*

Plaintiffs first contend (at 24–28) that the district court erred in holding that this distinction between citizens and LPRs and other aliens did not warrant heightened scrutiny. That is wrong for at least three reasons.

First, the U.S. Supreme Court has long upheld restrictions on the purchase of land by aliens, *see, e.g.*, *Terrace*, 263 U.S. at 219–22; *Porterfield v. Webb*, 263 U.S. 225, 232–33 (1923); *Webb v. O'Brien*, 263 U.S. 313, 324–26 (1923); *Frick v. Webb*, 263 U.S. 326, 332–34 (1923), ruling that they do not violate "equal protection so long [as they are] not 'arbitrary or unreasonable,'" App. 341–42 (quoting *Porterfield*, 263 U.S. at 232–33). The Court has also dismissed as "frivolous" the contention that a "state statute forbidding the ownership of real property by aliens was repugnant to the 14th Amendment." *Toop v. Ulysses Land Co.*, 237 U.S. 580, 582–83 (1915).

Plaintiffs suggest (at 25–26) that these precedents have been eroded or discredited, but the cases they cite expressly assume the continued validity of them. *See Graham v. Richardson*, 403 U.S. 365, 373–74 & nn.8–9 (1971); *Oyama v. California*, 332 U.S. 633,

16

646–47 (1948); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 422 (1948). When a Supreme Court case "has direct application," lower courts must apply that precedent, despite alleged "tension with some other line of decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023). Put another way, absent "explicit language" overturning a prior precedent, both the district court and this Court's constitutional duty is to apply Supreme Court precedent faithfully. *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 n.9 (11th Cir. 2012).

Plaintiffs also claim (at 26–27) that these cases are distinguishable (and thus have no "direct application") because the land restrictions at issue applied to all aliens, not just citizens or domiciliaries of certain countries. That is not so. The Washington law in *Terrace* barred aliens from holding property if they were ineligible for citizenship under federal law or, if eligible, if they had failed to declare a good-faith intent to seek citizenship. 263 U.S. at 219–22. At that time, eligibility for citizenship turned in part on an alien's country of origin. *See id.* at 220; *see also* Pub. L. No. 64-301, § 3, 39 Stat. 874, 876 (Feb. 3, 1917) (barring individuals from certain countries, including China, from admission into the United States). The district court was correct that the statute in *Terrace* is indistinguishable from SB 264, even if it is different "in a literal sense" because that law focused on "eligibility for citizenship" and a declaration to seek citizenship rather than "domicile." App. 342–44.

Even apart from that binding precedent, SB 264 does not trigger heightened scrutiny because it exempts LPRs, an alternative holding of the district court that

Plaintiffs relegate to a single responsive paragraph in their brief. Initial Br. 28; App. 349–50. The Supreme Court has recognized that not "all limitations on aliens are suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). Illegal aliens, for instance, "cannot be treated as a suspect class." *Plyler v. Doe*, 457 U.S. 202, 223 (1982). On the other end of the spectrum are LPRs, discrimination against whom "the Supreme Court has reviewed with strict scrutiny," *LeClerc*, 419 F.3d at 415, because, as the Supreme Court itself said, such discrimination strikes "at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the[se] alien[s] to *permanent residence*." *Foley*, 435 U.S. at 295 (emphasis added). In fact, every Supreme Court case applying strict scrutiny to alienage classifications involved laws specifically "affecting permanent resident aliens." *LeClerc*, 419 F.3d at 415.

That leaves a middle ground of temporary aliens, to whom the Fifth and Sixth Circuits have refused to extend heightened scrutiny. *Id.* at 419; *LULAC v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007).[3] As the United States then argued in opposition to certiorari in *LeClerc*, the Supreme Court's holding "that alienage classifications are subject to strict scrutiny cannot be divorced from the context in which it appeared," because nonimmigrant aliens "are present only temporarily and subject to restrictions, and they

---

[3] While the Second Circuit rejected this reasoning in *Dandamudi v. Tisch*, that case involved a New York law that precluded all nonimmigrants from obtaining a pharmacist's license, even if they were domiciled in the United States. *See* 686 F.3d 66, 71–72, 77 (2d Cir. 2012). SB 264 does not sweep so broadly, and exempts nonimmigrants domiciled anywhere else in the world other than foreign countries of concern.

do not ordinarily have the same ties to this country as permanent residents." *Brief for the United States as Amicus Curiae* at 16–17, *Wallace v. Calogero*, Nos. 05-1645, 06-11 (U.S. May 23, 2007), 2007 WL 1520968, at *16–17. What is more, this Court approvingly cited *LeClerc* in "declin[ing] to extend the Supreme Court's decisions concerning resident aliens to different alien categories," namely DACA recipients. *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019). And SB 264 is even more modest than the classifications upheld in *LeClerc* and *LULAC*, exempting both LPRs and nonimmigrant aliens domiciled in America.

Finally, the original meaning of the Fourteenth Amendment and the modern "political function" doctrine also support the district court's conclusion. At the time of the ratification of the Fourteenth Amendment, state restrictions on alien land ownership were ubiquitous. *See Terrace*, 263 U.S. at 217.[4] Those who adopted the Fourteenth

---

[4] Many states' property laws distinguished between classes of aliens. *See, e.g.*, Wis. Const. of 1848, art. I, § 15; 1 James M. Matthews, *Digest of the Laws of Virginia, of a Civil Nature and of a Permanent Character and General Operation* 76 (J.W. Randolph ed., 1856); Mich. Const. of 1850, art. XVIII, § 13; Iowa Const. of 1857, art. I, § 22; Or. Const. of 1857, art. I, § 31; Kan. Const. of 1859, Bill of Rights § 17; Nev. Const. of 1864, art. I, § 16; A.F. Denny, *The General Statutes of the State of Missouri* 448 (1866); Neb. Const. of 1866–1867, art. I, § 14; 1 Seymour D. Thompson & Thomas M. Steger, *A Compilation of the Statute Laws of the State of Tennessee* 932 (3d ed. 1873); Fla. Const. of 1868, art. I, § 17; Ark. Const. of 1868, art. I, § 20; W. Va. Const. of 1872, art. II, § 5; *The General Statutes of the Commonwealth of Kentucky* 191–92 (Edward I. Bullock & William Johnson eds., 1873); Ala. Const. of 1875, art. I, § 36; *The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut* 4–5 (1875); Colo. Const. of 1876, art. II, § 27; A.V.D. Honeyman, *An Abridgment Revised Statutes of New Jersey, and of the Amended Constitution* 21 (1878); 3 *The Revised*

Amendment would not have failed to appreciate the "wide discretion" that state legislatures traditionally wielded to restrict alien land ownership, App. 341, which derived from a nearly millennium-old common-law tradition, Allison Brownell Tirres, *Property Outliers: Non-Citizens, Property Rights and State Power*, 27 Geo. Immigr. L.J. 77, 92 (2012); William Blackstone, *Commentaries on the Laws of England* \*367–72.

Alternatively, "the State's broad power to define its political community" likewise justifies alien land restrictions under the "sovereign" or "political function" doctrine. *Cabell v. Chavez-Salido*, 454 U.S. 432, 438–40 (1982). That doctrine recognizes that the Equal Protection Clause does not "obliterate all the distinctions between citizens and aliens," because that would "depreciate the historic value of citizenship," which has long been tied to the ability to hold land. *Id.* at 439.

---

*Statutes of the State of New York* 2163–65 (Montgomery H. Throop ed., 7th ed. 1882); *The Revised Statutes of the State of Illinois, Embracing All Laws of a General Nature in Force July 1, 1887* 95 (George W. Cothran ed., 6th rev. ed. 1887); Mont. Const. of 1889, art. III, § 25; Wyo. Const. of 1889, art. I, § 29; Wash. Const. of 1889, art. II, § 33; S.D. Const. of 1889, art. VI, § 14; Miss. Const. of 1890, art. IV, § 84; Cal. Const. of 1879, art. I, § 17 (as amended in 1894); S.C. Const. of 1895, art. III, § 35; 1 John Sayles & Henry Sayles, *Sayles' Annotated Civil Statutes of the State of Texas* 5–6 (1898); Okla. Const. of 1907, art. XXII; *see also* Polly J. Price, *Alien Land Restrictions in the American Common Law: Exploring the Relative Autonomy Paradigm*, 43 Am. J. Legal Hist. 152, 168–74 (1999); Charles H. Sullivan, *Alien Land Laws: A Re-Evaluation*, 36 Temp. L.Q. 15, 18–31, 31 n.68 (1962). Those statutes were in addition to the cases interpreting state law to incorporate the common-law rule. *See e.g.*, *State v. Boston, Concord & Montreal R.R.*, 25 Vt. 433, 436 (1853); *Smith v. Zaner*, 4 Ala. 99, 106 (1842). A few states chose to exercise their authority to remove distinctions between alien and citizen. *See* Frederick C. Brightly, *Annual Digest of the Laws of Pennsylvania for the Years 1862 to 1870* 1383 (1870); *The Public Statutes of the State of Minnesota (1849–1858)* 411 (Moses Sherburne & William Hollinshead comps., 1859).

## 2. SB 264 was not motivated by racial or national-origin-based animus.

The district court also rejected Plaintiffs' argument that SB 264's classifications, on their face, are based on race or national origin, concluding that the law instead classifies by domicile and immigration status—which it expressly does. App. 338–39. In arguing otherwise, Plaintiffs elide the established distinction between alienage classifications, on the one hand, and national-origin classifications, on the other hand. *See United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021) (holding that "alienage . . . differs from national origin," even though the bulk of nationals of a country are from that country). Just as a bathroom policy based on biological sex "does not facially discriminate on the basis of transgender status," Florida's "policy divides [people] into two groups, both of which include [Chinese people]," such that there is "a 'lack of identity' between the policy and [race or national origin]." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808–09 (11th Cir. 2022) (en banc); *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (laws restricting abortion apply only to women, yet do not create a facial classification).

Plaintiffs attempt to skirt this "textual reality," App. 339, by claiming that domicile is a "proxy" for race or national origin. Initial Br. 15–17. But as the district court observed, "residency and birthplace do not clearly overlap to the point where they are

practically indistinguishable." App. 339.[5] Overlap establishes at most a disparate impact, which the Supreme Court held in *Village of Arlington Heights v. Metropolitan Housing Development Co.*, 429 U.S. 252 (1977), is not enough for an equal-protection claim. *Id.* at 265–66. Equal-protection plaintiffs must also establish animus, either by demonstrating a facial classification—which they cannot do because "alienage . . . differs from national origin" in this Court's equal-protection jurisprudence, *see Osorto*, 995 F.3d at 822, or through the multi-factor evidentiary analysis laid out in *Arlington Heights*—which Plaintiffs have failed to do, as discussed more fully below.

Plaintiffs are wrong that the Court can presume that domicile is a "proxy" for national-origin or racial animus. They point to *Rice v. Cayetano*, 528 U.S. 495, 514, 515–17 (2000), and *Guinn v. United States*, 238 U.S. 347, 364–65 (1915). But the law in *Rice* on its face restricted voting to "descendant[s] of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778." 528 U.S. at 510. That law thus "single[d] out identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics." *Id.* at 515 (citation omitted). *Guinn* likewise involved a voter-literacy

---

[5] Plaintiffs request, for the first time on appeal, judicial notice of a U.N. webpage purportedly showing that 99.9% of China's population is of Chinese national origin. Initial Br. 14 & n.7, 29 & n.11. This evidence should have been submitted to the district court so that the parties could contest, and the factfinder could evaluate, the methodology used to arrive at the figures on that page. In any event, the webpage is at best ambiguous and incomplete. Among other things, it does not explain how to read the "international migrant stock" numbers or how it was compiled, and it expressly excludes data from Hong Kong and Macau. But even if these facts were true, Plaintiffs claims still fail for the reasons set out below.

requirement with an exception for individuals with a particular bloodline—the "descendant[s]" of those who could vote prior to the enactment of the Fifteenth Amendment. 238 U.S. at 364. In both cases, the challenged law not only classified people based on bloodline, but the "necessary motivation [of the Legislature] was painfully apparent" on the face of the law. *Nevett v. Sides*, 571 F.2d 209, 220 (5th Cir. 1978). Put differently, the restrictions "could not be explained on grounds *other* than race." *Shaw v. Reno*, 509 U.S. 630, 644 (1993) (emphasis added) (describing *Guinn*); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *Resendiz v. Exxon Mobil Corp.*, 72 F.4th 623, 628 & n.6 (4th Cir. 2023) (noting that, even under a "proxy" theory, irrationality is required because "[d]isparate impact alone is not enough to prove intent"). Here, nothing like that is true. Foreign domicile is a rational way to identify individuals more likely subject to foreign government influence, just as requiring permanent work authorization is a rational way to choose employees. *See Resendiz*, 72 F.4th at 628–29.[6] Animus cannot be presumed when plainly non-discriminatory reasons exist for relying on a

---

[6] For the same reason, Plaintiffs fail in their argument—presented for the first time on appeal—that "[t]he State has provided no justification for" its law and that SB 264 thus lacks even a rational basis. Mot. for Inj. Pending Appeal at 14; Initial Br. 27–28. Under rational-basis review, it is Plaintiffs' burden to "negate every conceivable basis that might justify the law." App. 35. The State below demonstrated many justifications for SB 264—public safety, national and state security, avoiding landlord absenteeism, negating totalitarian foreign influence in America, preserving scarce resources for voters (i.e., citizens) and LPRs, and encouraging individuals to become domiciled in the United States. *Id.*; *see also* DE60 at 26. SB 264 thus easily withstands rational-basis review.

particular criterion. *See Dean v. Warren*, 12 F.4th 1248, 1260–61 (11th Cir. 2021) (citing *Bray*, 506 U.S. at 270) (finding, in the context of a civil-rights conspiracy claim, that animus could not be inferred because patriotism was among the "common and respectable" reasons for opposing protest-by-kneeling).

Turning to the *Arlington Heights* analysis, Plaintiffs had the burden of proving racial or national-origin-based animus through the following non-exhaustive sources of evidence: "(1) disproportionate impact, (2) historical background, (3) departures from usual procedure, (4) substantive departures, and (5) legislative history, including decisionmakers' statements," as well as "(6) foreseeability of the impact; (7) knowledge of that impact, and (8) availability of less discriminatory alternatives." App. 351–52 (citing *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021)). As the district court correctly found, Plaintiffs put forth no such evidence sufficient to overcome "the presumption of legislative good faith" that attends any inquiry into legislative intent. App. 353–54 (citing *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022)). That finding is subject only to this Court's review for clear error, *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348–49 (2021) (legislative animus is a factual finding subject to clear error review, and will be upheld if "plausible in light of the entire record"), and it was plainly correct.

Without mentioning the presumption of legislative good faith, Plaintiffs rehash their "proxy" theory by arguing (at 29) that the overlap between domicile and race or national origin proves animus. As discussed above, however, absent "a clear pattern,

24

unexplainable on grounds other than race" or national origin, evidence of impact alone is insufficient. *Greater Birmingham Ministries*, 992 F.3d at 1322. Any impact revealed by "the text of the statute itself" is not "direct evidence" of animus, as Plaintiffs contend (at 18), because a finding of discriminatory purpose requires "more than" impact or even "awareness of consequences"; the whole legislature must have acted "because of," rather than "in spite of" such effects. *Bray*, 506 U.S. at 271–72; *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (direct evidence is that "which if believed, proves [the] existence of [a] fact in issue without inference or presumption").

 The statements of legislators that Plaintiffs cite (at 19–21, 29–30) are not evidence of animus. The concern was about threats posed by hostile foreign nations, not individuals born there. App. 352–53. Florida officials wanted to prevent those nations from causing "upheaval" and "turmoil" in Florida. App. 353. At most, Plaintiffs' cherry-picked statements show an awareness of a possible disparate impact. *See Bray*, 506 U.S. at 271–72; App. 352–53. In any event, the district court correctly discounted these statements of individual legislators as "minimally probative," App. 353—because such statements "[are] not necessarily what motivates scores of others to enact" legislation, and relying on those statements to prove animus amounts to little more than judicial "guess-work." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

 Plaintiffs' further suggestion (at 20–21) that the Florida Legislature should have chosen "narrower alternatives"—such as limiting SB 264 to "foreign powers and their agents"—would have defeated the entire purpose of having the "domicile" provision

to prevent circumvention of the law by totalitarian governments. *Greater Birmingham Ministries*, 992 F.3d at 1327. Plaintiffs also overlook that the Legislature adopted mitigating measures—it allowed Chinese domiciliaries to purchase certain residential property, and it excluded U.S. citizens and LPRs from the restrictions, which undoubtedly include persons of Chinese national origin. *See* Fla. Stat. § 692.204(1)(a)(4), (2); *Greater Birmingham Ministries*, 992 F.3d at 1327 (deeming it immaterial that the "legislature did not include the alternative option that Plaintiffs would have preferred," when it adopted measures that softened the law's impact).

The district court did not clearly err in finding that Plaintiffs failed to show animus.

**B.    SB 264 is not vague.**

Plaintiffs argue (at 46–51) that three terms in SB 264 are vague: "domicile"; "critical infrastructure facility"; and "military installation." They also object to the method for determining the distance between a residential property and a critical infrastructure facility or military installation. Initial Br. 50–51. But as the district court correctly found, App. 359–62, those terms are not even close to being so "utterly devoid of a standard of conduct so that [they] simply ha[ve] no core," *SisterSong*, 40 F.4th at 1327. The statute defines "critical infrastructure facility" and "military installation" in considerable detail. Fla. Stat. § 692.201(2), (5). Florida law tells individuals how to calculate statutory distances. *State v. Burch*, 545 So. 2d 279, 281 (Fla. 4th DCA 1989). And "domicile" has a

well-established meaning under Florida common law. *Weber v. Weber*, 929 So. 2d 1165, 1168 (Fla. 2d DCA 2006). Nothing about any of that is vague.

Plaintiffs contend (at 48) that a heightened vagueness standard applies to strict-liability crimes. Even assuming the statute indeed establishes a strict-liability crime, *but see State v. Giorgetti*, 868 So. 2d 512, 519–20 (Fla. 2004), the courts have applied ordinary vagueness standards to crimes lacking a mens rea element, *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 500 (1982) (stating only that the Court applied the ordinary "criminal" vagueness standard); *United States v. Hedges*, 912 F.2d 1397, 1403 (11th Cir. 1990); *United States v. Apollo Energies, Inc.*, 611 F.3d 679, 688–89 (10th Cir. 2010).

Whatever the standard, though, the statute is not vague. A statute is "not required to define every factual situation that may arise." *United States v. Heaton*, 59 F.4th 1226, 1247 (11th Cir. 2023) (citation omitted). And while Plaintiffs say (at 50) that finding military installations or critical infrastructure facilities may require research, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact" is established, "but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).[7]

---

[7] SB 264's affidavit requirement is unlike the one in *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961), which required the NAACP to attest to the fact that no director or officer in the NAACP was a "member[] of Communist, Communist-front or subversive organizations." *Id.* at 294–95. SB 264, at most, requires an individual to

### C.    SB 264 is not preempted by the FHA.

Plaintiffs' claim that SB 264 is preempted by the FHA fails for two reasons. The FHA does not give Plaintiffs a cause of action to challenge preempted state laws. And even if it did, their claims fail on the merits because, as the district court concluded, Plaintiffs failed to demonstrate discriminatory treatment or disparate impact. App. 356–58.

**1.** As a threshold matter, "the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324–25 (2015) (citation omitted). Plaintiffs' preemption claim must therefore rest on either a statutory cause of action or an action rooted in equity. Neither is available under the FHA.

The FHA gives an "aggrieved person" the right to sue only for "an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). The express provision of this one cause of action forecloses any implied right of action for preemption under the FHA, under 42 U.S.C. § 1983, or in equity. *See Armstrong*, 575 U.S. at 328; *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005); *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc). Plaintiffs thus attempt to shoehorn their preemption claim into

---

attest to their domicile, which Florida law defines as the last place where that person was both physically present and intended to remain indefinitely or permanently. *See infra* 42. Unlike directors' and officers' political affiliations, which a large organization "cannot be expected to know," a person can be expected to know the facts underlying their own domicile. *Gremillion*, 366 U.S. at 295.

Section 3613(a)(1)(A) by characterizing SB 264 itself as a "discriminatory housing practice." But the FHA carefully distinguishes between a "law" that may be preempted and a "discriminatory housing practice" that is "require[d] or permit[ted]" by that law. 42 U.S.C. § 3615. The former cannot be the latter.

*Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994)—cited by Plaintiffs (at 17)—is not to the contrary. That case involved a classic "housing practice," a county's non-binding administrative guidelines for a particular housing development. *Id.* at 1535. *Jackson* thus was not a preemption case at all, because it did not involve a challenge to a law or regulation.

**2.** Even if Plaintiffs had a right to sue for preemption under the FHA, their claim would fail on the merits. The FHA allows two types of discrimination claims: disparate treatment (requiring a showing of discriminatory purpose) and disparate impact (requiring only a showing of discriminatory effect). *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.* ("*ICP*"), 576 U.S. 519, 524, 545 (2015). Plaintiffs failed to establish a likelihood of success under either approach.

As the district court explained, the anti-discrimination provision in the FHA "does not include alienage or citizenship as protected characteristics." App. 356–57. That refutes Plaintiffs' insistence (at 14–17) that alienage or domicile discrimination is somehow the same as national-origin or race discrimination under the FHA. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) (holding that Title VII proscribes discrimination based on race and national origin, but not based on citizenship or alienage).

29

Plaintiffs have failed to demonstrate facial or intentional discrimination based on race or national origin under the FHA for essentially the same reasons they failed to establish a likelihood of success on their equal-protection claim. *See supra* 16–26; App. 357.

Plaintiffs are no more likely to succeed on a disparate-impact theory. The district court did not abuse its discretion in refusing to consider the FHA disparate-impact claim Plaintiffs half-heartedly raised in a footnote. *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 811–12 (11th Cir. 2015). And in all events, Plaintiffs failed to show a "statistical disparity" in the law's effects or "robust causality" between the law and that disparity. *ICP*, 576 U.S. at 542–43; *see also Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 907–08 (5th Cir. 2019) (describing "robust causality" element). Plaintiffs also did not show that SB 264 would be an "artificial, arbitrary, and unnecessary barrier[]" because they can point to no "available alternative practice that has less disparate impact and serves the [State's] legitimate needs" in protecting against malign foreign-government influence. App. 358; *see ICP*, 576 U.S. at 533 (stating that it is a plaintiff's burden to demonstrate an effective, less discriminatory alternative).

### D.  SB 264 is not preempted by the CFIUS regime.

Plaintiffs are equally wrong to claim that Florida's statute is preempted by the regulatory regime administered by CFIUS. Here again, the relevant statute does not grant Plaintiffs a cause of action for preemption. The district court also correctly found that the CFIUS regime does not preempt SB 264.

**1.** The CFIUS statute lacks the "rights-creating" language necessary to imply a cause of action for preemption, whether from the statute itself or under 42 U.S.C. § 1983. *See Wild*, 994 F.3d at 1255 n.11; *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183–84 (2023). It also precludes any equitable claim for preemption by (1) precluding judicial review of the actions of the President, 50 U.S.C. § 4565(e)(1); (2) providing the U.S. Attorney General a cause of action to enforce a presidential order, *id.* § 4565(d)(3); and (3) authorizing the President to sue "any person" (including a state) that takes "acts or practices which constitute or will constitute a violation of any provision of this chapter," *id.* §§ 4556(a), 4552(15). *See Armstrong*, 575 U.S. at 328 (when statute "implicitly precludes private enforcement," litigants "cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement"). Congress sensibly entrusted enforcement of the CFIUS regime to the President and his subordinates, the actors best positioned to protect the national-security values the CFIUS statute embodies, not to self-interested private plaintiffs.

**2.** Even if Plaintiffs had a private right of action to enforce the CFIUS regime, their claim would fail on the merits. Because regulation of real-estate transactions—even as to aliens—is a historic and traditional state power, *see Sackett v. EPA*, 598 U.S. 651, 680 (2023) (states have "primary authority over land and water use"); *supra* 19–20 & note 4, SB 264 must be afforded the strongest presumption against preemption. Plaintiffs have failed to show any "clear and manifest purpose of Congress" to overcome this presumption. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). For several reasons,

the district court correctly held that the CFIUS regime neither conflicts with SB 264 nor occupies the field of alien land ownership.

First, it is implausible that Congress meant for CFIUS review to occupy the field of real-estate transactions involving aliens. *See United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). Not only is field preemption "rare," it also arises only if a federal statute manifests an intent to displace all state regulation in a defined area. *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 651–52 (7th Cir. 2019) (the absence of any language to occupy the field "weighs heavily" against field preemption). Far from indicating any such intent, Congress has acquiesced in the centuries-long history of alien land restrictions by the states by imposing such restrictions itself in localities subject to its authority. *See* 48 U.S.C. §§ 1501–1507 (territories and public lands); *id.* § 1508 (District of Columbia). The President and the Senate have also long used treaties as the device for displacing state-law restrictions on alien land ownership,[8] reflecting their

---

[8] Some treaties expressly displace alien land laws. *See, e.g.*, David M. Golove, *Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power*, 98 Mich. L. Rev. 1075, 1104–10 (2000); Treaty of Amity and Commerce, Fr.-U.S., Feb. 6, 1778, art. XI, 8 Stat. 12, 18 (providing that subjects of France would be able to devise and inherit real property in the United States); Treaty Concerning the Encouragement and Reciprocal Protection of Investment, Alb.-U.S., Jan. 11, 1995, arts. I(1)(d)(iv), II(1), T.I.A.S. No. 98-104, at 2–4; *see also id.* art. XV(1)(a), at 12 (applying treaty requirements to all political subdivisions, including state and local governments); Treaty Concerning the Encouragement and Reciprocal Protection of Investment, Mozam.-U.S., Dec. 1, 1998, arts. I(d)(iv), II(1), T.I.A.S. No. 13006, at 2–4. Others make specific point to exempt them. *See, e.g.*, James Frechter, *Alien Landownership in the United States: A Matter of State Control*, 14 Brook. J. Int'l L. 147, 168–71 (1988); Treaty of Friendship, Commerce and Navigation, U.S.-Ire., Jan. 21, 1950, art. VII(3), 1 U.S.T. 788, 792.

understanding that federal law otherwise leaves in place this longstanding state practice. *Cf. Wyeth*, 555 U.S. at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."); App. 370–71.

SB 264 thus faces a different historical landscape than did the Massachusetts Burma law struck down in *Crosby*. In *Crosby*, Massachusetts had identified just one federal sanctions statute with an express preemption provision and no other state regimes similar to Massachusetts' where the Supreme Court had rejected, much less considered, a preemption challenge. 530 U.S. at 387–88. In contrast, the President and the Senate have a long history of deliberate, country-by-country determinations whether to leave state alien land laws intact in friendship treaties. *See supra* note 8. And the Supreme Court has even upheld alien land laws against preemption claims. *See, e.g.*, *Terrace*, 263 U.S. at 217 (rejecting preemption challenge to state alien land law under treaty with Japan). It is therefore eminently reasonable to conclude that the "failure to enact express preemption" in the CFIUS statute or elsewhere "implies approval" of these state laws. *Id.*

Second, Plaintiffs have not met the "high threshold" of showing that SB 264 obstructs Congress's purposes in authorizing that regime. *Whiting*, 563 U.S. at 607. Far from conflicting, SB 264 and CFIUS comfortably co-exist. The scope of CFIUS review is limited. CFIUS reviews only "covered transactions" within a short statutory time frame, using eleven statutory factors to determine whether a "covered transaction"

poses a "national security" threat. 50 U.S.C. § 4565(b)(1)(A), (b)(1)(F), (b)(2), (f). If CFIUS identifies a threat and wishes to block a transaction, it refers the matter to the President, who makes the final call via executive order. 50 U.S.C. § 4565(d), (*l*)(2). Real estate is a microscopic part of this system. Only in 2018 did CFIUS receive authorization to review *any* real-estate transactions. Pub. L. No. 115-232, sec. 1703, § 721(a)(4), 132 Stat. 2177–79 (2018) (codified at 50 U.S.C. § 4565(a)(4)); App. 370. Now, CFIUS reviews proposed real-estate transactions by foreign nationals or companies only when the property lies (1) within an air or maritime port; or (2) close to a military installation or sensitive federal government property. 50 U.S.C. § 4565(a)(4)(B)(ii). This definition excludes "single housing unit[s]," "urbanized areas," and property near privately owned sensitive infrastructure. *See* 50 U.S.C. § 4565(a)(4)(B)(ii), (a)(4)(C). CFIUS also has narrow ways to identify a "covered transaction." The primary means is an investor's written notice, which is mostly voluntary, 50 U.S.C. § 4565(b)(1)(C)(i)(I), and is never mandatory for real-estate transactions.

Given CFIUS's limited review and resources, this regime reflects Congress's judgment that the federal government's role in alien land ownership should be limited. That system, which in 2021 reviewed a grand total of 6 real-estate transactions nationwide,[9] hardly evinces a "clear and manifest" congressional determination that any real-

---

[9] *See* CFIUS, Annual Report to Congress—Report Period: CY 2021 at 15, 23 (Aug. 2, 2022), https://home.treasury.gov/system/files/206/CFIUS-PublicAnnualReporttoCongressCY2021.pdf

estate transaction not blocked by the President is free of national-security concern and must therefore be allowed. *Wyeth*, 555 U.S. at 565. For this same reason, state laws barring transactions beyond CFIUS's authority or capacity to review do not interfere with federal foreign policy. SB 264 is a permissible exercise of Florida's sovereign prerogative to protect its own land and citizens. *See Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1210–11 (11th Cir. 2010); *see also* App. 369. The courts in *Crosby* and *Odebrecht* were faced with completely different federal statutes and considerations, and so their logic does not "squarely" map onto SB 264, as Plaintiffs contend. Initial Br. 35. CFIUS's inability to review a given real-estate transaction, which largely stems from its jurisdictional and resource limitations, reflects no congressional purpose that a law like Florida's would disrupt.

Other evidence confirms the conclusion that Congress intended a limited intervention in the federal-state balance of regulating real-property. The 2018 amendments that added real-estate transactions to CFIUS's jurisdiction, for instance, contained an express preemption provision in a nearby section in the same title of the Act. *See* Pub. L. No. 115-232, sec. 1773(c), 132 Stat. 2237 (2018) (codified at 50 U.S.C. § 4842(c)). In that neighboring provision, Congress prohibited private boycotts of countries that are friendly to the United States and that are not themselves the object of any boycott under federal law. *See* 50 U.S.C. § 4842(a)(1). Along with that prohibition, Congress expressly preempted state laws pertaining to boycotts against countries friendly to the United States. 50 U.S.C. § 4842(c). "Where Congress includes particular language in one section

of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). So while Congress indeed struck "a balance among a variety of interests when it enacted" the CFIUS statute, "[p]art of that balance" was "allocating authority between the Federal Government and the States." *Whiting*, 563 U.S. at 606–08. Plaintiffs have not shown a "clear and manifest" intention to radically reshape the existing balance of authority by stripping states of their longstanding power to enact real-estate legislation as to aliens for the protection of its own citizens and land.

Nor is SB 264 preempted merely because it affects "foreign nationals." Initial Br. 34–35. Plaintiffs' argument flouts *Whiting*, where the Supreme Court upheld a state law against a preemption claim under a federal statute that regulated employment and work authorization of aliens. 563 U.S. at 587. The state law stripped the business licenses of companies that knowingly or intentionally employed illegal immigrants. 563 U.S. at 591. The Court held that "[r]egulating in-state businesses through licensing laws has never been considered such an area of dominant federal concern." *Id.* at 604. The same is true of regulating alien ownership of land.

Similarly, in *Clark v. Allen*, the Supreme Court upheld a state law that barred aliens from inheriting property, unless their home country had reciprocal rights to inheritance for American citizens. 331 U.S. 503, 506–07 & n.1, 517 (1947). The Court rejected a similar foreign-affairs argument as "far fetched," *id.* at 517, relying on *Blythe*

*v. Hinckley*, in which the Court had similarly characterized as "extraordinary" a claim that "in the absence of any treaty whatever upon the subject, the State had no right to pass a law in regard to the inheritance of property within its borders by an alien." 180 U.S. 333, 340 (1901). It is of no consequence that the state law upheld in *Clark* applied even-handedly to all aliens from countries whose laws did not qualify for reciprocity. If anything, the reciprocity provision made the state law more intrusive into foreign affairs. *See Shames v. Nebraska*, 323 F. Supp. 1321, 1326–27 (D. Neb. 1971) (three-judge district court).

Plaintiffs also assert (at 38) that Florida is waging an "economic war" with China and point to legislators' expressions of concern (at 37–38) about security threats posed by China. But as the district court found, that evidence at most reflects a permissible aim of protecting Floridians. App. 369. Plaintiffs also claim (at 37–38) that Florida cannot "single[] out particular countries and nationalities." This Court, however, held otherwise in rejecting a preemption challenge to a Florida law that limited travel by state employees to particular countries that support terrorism. *See Winn*, 616 F.3d at 1210–11. This Court concluded it permissible for Florida to prevent its resources from funding terrorism through identifying countries that appeared on the federal government's list of state sponsors of terrorism. *See id.* at 1210. SB 264 similarly reflects Florida's legitimate goal of protecting its citizens. App. 367–69. Plaintiffs point to the fact that the Chinese Embassy has issued informal statements criticizing SB 264, but that is a far cry from the formal diplomatic protests found to be of concern in *Crosby* and *Odebrecht*.

37

Initial Br. 37 & n.13; *see Crosby*, 530 U.S. at 382–83 (noting that foreign governments had "filed formal protests with the National Government" and "lodg[ed] formal complaints against the United States in the World Trade Organization"). A hostile foreign country cannot contribute to triggering federal preemption by issuing a press release.

More telling is that the federal government, which below filed a statement of interest opposing Florida's law on other grounds, did not contend that Florida's law was preempted by the CFIUS regime or by any other facet of its foreign-affairs authority. Plaintiffs claim (at 45 n.16) that no inference can be drawn from that silence, because the United States waited until the Supreme Court proceedings in *Crosby* to weigh in on foreign-affairs issues. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 54 n.9 (1st Cir. 1999) (noting that the "Executive Branch ha[d] not taken an official position" at the First Circuit), *aff'd*, *Crosby*, 530 U.S. 363 (2000). But here, the United States has already participated—unusually—at the district-court level, making its silence on the CFIUS preemption claim even more deafening. Notably, the U.S. Solicitor General does not seem to have authorized the United States to support Plaintiffs on appeal in any respect. *See* 28 C.F.R. § 0.20(c) (establishing that the Solicitor General needs to approve amicus briefs in the courts of appeals, but not mentioning statements of interest in district court).

For these same reasons, this Court should reject Plaintiffs' assertion that a presumption against preemption does not apply here. Initial Br. 41 n.14 (citing *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012)). *Alabama* involved an "extraordinary

and unprecedented" contract law that barred the enforcement of contracts with illegal aliens, "the thrust of" which was "to impinge on an area of core federal concern" of alien removal and was merely a "a thinly veiled attempt to regulate immigration under the guise of contract law." 691 F.3d at 1293, 1296. Unlike a law to which "[n]o other purpose could credibly be ascribed" than to impinge on a core area of federal concern, *id.* at 1296, the district court properly determined that the "thrust of" Florida's law is to preserve state security, App. 368–69. SB 264 thus regulates the "area of traditional state concern" of real property in a way that states have done for centuries. *Alabama*, 691 F.3d at 1296; *see supra* 19–20 & note 4.

Plaintiffs' overreading of *Alabama* would bring that decision into conflict with the Supreme Court's general reluctance to reverse the presumption against preemption for state laws regulating property. In *United States v. Pink*, the Court declared that "even treaties . . . will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy." 315 U.S. 203, 230 (1942). These included treaties "relating to the power of an alien to dispose of property in this country." *Id.* And in *Barclays Bank PLC v. Franchise Tax Board*, the Court upheld a California law determining the amount of corporate franchise tax owed by multinational corporations, despite multiple "Executive Branch actions, press releases, letters, and *amicus* briefs," opposing California's method of calculation. 512 U.S. 298, 301–02, 329–30 (1994) (dormant foreign commerce challenge). The Court reasoned that "Executive Branch communications that express federal

39

policy but lack the force of law cannot render unconstitutional California's otherwise valid, *congressionally condoned*, use of worldwide combined reporting." *Id.* at 330 (emphasis added). The Court found it significant that "Congress implicitly ha[d] *permitted*" that law through historical acquiescence. *Id.* at 326. So too here.

Finally, Plaintiffs assert for the first time on appeal that SB 264 should be preempted just because it may have foreign policy "consequences," raising a dormant foreign affairs preemption theory that went unbriefed and unpresented below. Initial Br. 34–35; *see generally* DE23. In support they cite *Odebrecht* and *American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003), yet those cases found state laws to be preempted because they conflicted with foreign policies expressed in positive law. Initial Br. 39; *see Odebrecht*, 715 F.3d at 1287 n.7 (declining to consider "dormant foreign affairs" theory); *Garamendi*, 539 U.S. at 421–24. The oft-questioned ruling in *Zschernig v. Miller* remains the only instance in which the Supreme Court has applied this doctrine, and it is properly limited to statutes that require state officers or courts to launch "minute inquiries concerning the actual administration of foreign law." 389 U.S. 429, 435 (1968); *see also Shames*, 323 F. Supp. at 1326–32 (stating that alien land law without reciprocity provision did not intrude upon arena of foreign affairs because *Zschernig* concerned "judicial criticism of foreign governments"), *aff'd*, 408 U.S. 901 (1972); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 913 (3d Cir. 1990) (holding that, unlike in *Zschernig*, "Pennsylvania's statute provides no opportunity for state administrative officials or judges to comment on, let alone key their decisions to, the nature of foreign regimes").

40

SB 264 does not require Florida courts to do anything of this sort. It is far more like the state probate law upheld in *Clark* that barred foreign nationals from inheriting unless their home country had reciprocal rights for Americans. 331 U.S. at 516–17. As the Court stated there, "[r]ights of succession to property are determined by local law." *Id.* Without an express and "overriding federal policy," such as a treaty, state laws with only an "incidental or indirect effect" on foreign affairs are not facially preempted. *Id.*; *see also Zschernig*, 389 U.S. at 432 (refusing to overrule the holding in *Clark*). The effects of SB 264 are similarly "incidental or indirect" and are not preempted.

### E.    Plaintiffs are also unlikely to succeed because they lack standing.

In the alternative, this Court may affirm on the ground that Plaintiffs lack standing to challenge SB 264.

To have standing, Plaintiffs must show injury, traceability, and redressability. *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). They cannot rely on speculative or conjectural injuries. *Id.* Because "standing is not dispensed in gross," Plaintiffs must establish standing "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). And in a pre-enforcement challenge, they must "inten[d] to engage in a course of conduct . . . proscribed by a statute." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Plaintiffs fall short of that standard.

41

### 1.    The individual Plaintiffs are Florida domiciliaries and therefore not subject to SB 264.

SB 264 applies to those "domiciled" in China, Fla. Stat. § 692.201(4)(d), (e), but the individual Plaintiffs are domiciled in Florida.[10] The term "domicile" is well-defined in Florida's common law, and SB 264 "brings th[at] old soil with it." *Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1183 (Fla. 2020) (citation omitted). One is domiciled where he is physically present and intends to remain permanently or indefinitely. *See, e.g.*, *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997).

As their declarations show, the individual Plaintiffs are physically present in Florida and intend to stay in Florida, indefinitely if not permanently. *See id.* Shen and Liu (H-1B work visa holders) have each stated an intent to remain in the United States permanently. App. 99, 149. So has Xu, App. 118, who as an asylum applicant must be "unable or unwilling to return to" to the country of persecution. *Mazariegos v. Off. of U.S. Att'y Gen.*, 241 F.3d 1320, 1325 (11th Cir. 2001). Although Wang is an F-1 student visa

---

[10] Below, Plaintiffs argued that they have standing even if they are not domiciled in China, because every real-property transaction in Florida is subject to the law's requirement that sales be accompanied by an affidavit swearing to compliance with SB 264. DE65 at 2. But while they claim stigmatic harm, Plaintiffs are not "personally denied equal treatment" by the law—only foreign principals arguably are, which turns on domicile. *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017). Nor can they allege harm in the mere burden of being subject to this requirement because it does not arguably violate any legal rights they claim in this lawsuit. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975).

holder, her extensive ties with Florida still make her a domiciliary of the State. App. 143–44.

Contrary to the district court's reasoning (App. 332–34), these indicia of intent are not overcome by the fact that Shen, Liu, and Wang have temporary visas. They can always seek to extend their stays indefinitely—as Shen has started to do in seeking a permanent labor certification, App. 99—and then apply for permanent residency. *See* 8 C.F.R. § 214.1(a)(3)(ii) (temporary visa holder need only "agree to depart the United States at the expiration of his or her authorized period of admission *or extension of stay*" (emphasis added)); *Dandamudi v. Tisch*, 686 F.3d 66, 70 (2d Cir. 2012) (H-1B visa holder may intend to remain indefinitely). Wang's F-1 visa does require her to maintain a "residence in a foreign country which [s]he has no intention of abandoning," 8 U.S.C. § 1101(a)(15)(F)(i), but that does not control her intent for purposes of domicile. *See Nagaraja v. Comm'r of Revenue*, 352 N.W.2d 373, 377–78 & n.10 (Minn. 1984) (en banc) (holding that F-1 visa holder established state-law domicile). And if Shen, Liu, and Wang were to overstay their visas and become present illegally, they could remain domiciliaries of Florida. *See Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964) (alien domiciled in Florida who was paroled under 8 U.S.C. § 1182(d)); *see also Plyler*, 457 U.S. at 227 n.22 ("[I]llegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State.").

Even if this Court determines that Plaintiff Wang has standing by virtue of her temporary visa, because standing is not "dispensed in gross," *TransUnion*, 141 S. Ct. at

2208, that only establishes standing to challenge the registration provisions. Wang does not have concrete plans to purchase property, but only fears that SB 264 will "require [her] to register [her] current property." App. 143–45.

### 2. Multi-Choice's client does not have injuries traceable to SB 264, because his contract is exempted from the law's purchase restrictions, like Shen's and Xu's contracts.

Multi-Choice originally claimed standing based on a projected loss of 25% of its business from a roster of nameless "Chinese" or "Chinese-speaking" customers. *E.g.*, App. 155–57. It did not show that this conjectural loss was in any way traceable to SB 264. To shore up this weakness Florida had pointed out, Multi-Choice filed a supplemental declaration identifying one customer, with a pending real-estate contract executed in 2019, App. 308–20, like Shen and Xu who also have real-estate contracts executed in April 2023.

But these contracts are exempted by SB 264's grandfather clause and thus do not confer standing. That clause states that if an individual owned or acquired "any interest in real property" before July 1, 2023, that person may continue to "own or hold such real property." Fla. Stat. § 692.204(3). So Multi-Choice's customer, like Shen and Xu, became the "owner of [their] property" when they acquired "equitable title" through execution of their contracts, *Accardo v. Brown*, 139 So. 3d 848, 852–53, 856 (Fla. 2014), each of which occurred before the effective date of SB 264. App. 111, 134, 319. This reading is bolstered by the interpretive canon in Florida that laws should not be given retroactive effect without an express legislative statement, which would occur if SB 264

destroyed these vested property interests. *Fla. Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 194–96 (Fla. 2011). And that is consistent with proposed rulemaking by the Department of Commerce, which clarifies that contracts "executed . . . prior to July 1, 2023," are exempted from SB 264's purchase restrictions. Fla. Admin. Reg. 73C-60.002.

## II. THE REMAINING EQUITABLE FACTORS ALSO DO NOT SUPPORT AN INJUNCTION.

Though the district court did not consider the other equitable factors, they too disfavor equitable relief.

First, an injunction is not necessary "to preserve the court's power to render a meaningful decision after a trial on the merits." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005) (citation omitted). Plaintiffs' only asserted exigency was Plaintiff Xu's open contract, which they implied needed to close in September, or else it would vanish forever. Mot. for Inj. Pending Appeal at 2; Initial Br. 52. But September apparently passed without the sky falling; Plaintiffs' opening brief reveals that Xu's "contract has not yet been terminated." Initial Br. 52 (filed October 2).

That makes sense. As noted above, both Shen's and Xu's contracts are exempted by SB 264's grandfather clause. Fla. Stat. § 692.204(3). Plaintiff Xu became the "owner of [his] property" when he acquired "equitable title" through execution of the contract in April 2023. *Accardo*, 139 So. 3d at 852–53, 856. What is more, both Shen's and Xu's contracts provide that the builder-seller can select any date for closing in its discretion

up to and including April 2025. *See* App. 125–26, 134 (noting that the builder-seller has two years from the date of signing, in April 2023, to complete the building and "has the right in its sole discretion to schedule the date and place for the closing" within that timeframe); App. 106–08, 111 (similar).

Plaintiffs' alleged harms are either speculative, reparable, or based on the mistaken view that their conduct is proscribed. None of Plaintiffs' alleged harms would outweigh the harm that Florida and its citizens would suffer if SB 264 were enjoined pending a full determination on the merits. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). For that same reason, enjoining SB 264 would disserve the public interest. *See Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (per curiam) (balance-of-the-harms and public-interest factors "merge" when "the government is the [opposing] party").

## III.  ANY INJUNCTION SHOULD BE CAREFULLY TAILORED.

Should the Court believe an injunction is appropriate, it should direct the district court to limit any injunction to those Plaintiffs who have established standing to sue and those parts of SB 264 where the Court considers Plaintiffs to be likely to succeed. *See Georgia*, 46 F.4th at 1303–04 (opinion of Grant, J., joined by Anderson, J.) (equitable remedies should be limited to proven harms). Wang, for instance, claims no intent to purchase property and can challenge only SB 264's property-registration requirements;

any injunction in her favor should be limited to that provision. App. 143–45. And Multi-Choice should not be allowed an injunction for an unspecified universe of prospective clients, which would anoint Multi-Choice with far greater power under the FHA than possessed by even the U.S. Attorney General, who can enforce the FHA only in care-fully cabined circumstances. *See* 42 U.S.C. § 3614(a); *id.* § 3614(b)(1)(A). Finally, the FHA addresses only residential property, *id.* § 3602(b); so as Plaintiffs themselves acknowledge (at 3 n.2), any injunction the district court grants on that basis should be limited accordingly.

## CONCLUSION

The Court should affirm.

Dated: November 1, 2023

DANIEL E. NORDBY
Shutts & Bowen LLP
215 South Monroe Street, Suite 804
Tallahassee, FL 32301
(850) 241-1725
*dnordby@shutts.com*

*Counsel for Defendants-Appellees*

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
DAVID M. COSTELLO
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,300 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Henry C. Whitaker*
Solicitor General

49

**CERTIFICATE OF SERVICE**

I certify that on November 1, 2023, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ Henry C. Whitaker
Solicitor General