FOR PUBLICATION

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 23-12737

———————————————

YIFAN SHEN,
ZHIMING XU,
  individuals,
XINXI WANG,
YONGXIN LIU,
  an individual,
MULTI-CHOICE REALTY LLC,
  a Limited Liability Corporation,

*Plaintiffs-Appellants,*

*versus*

COMMISSIONER, FLORIDA DEPARTMENT OF
AGRICULTURE AND CONSUMER SERVICES,
SECRETARY, FLORIDA DEPARTMENT OF ECONOMIC
OPPORTUNITY,
CHAIR, FLORIDA REAL ESTATE COMMISSION,
STATE ATTORNEY, 7TH JUDICIAL CIRCUIT,
STATE ATTORNEY, 9TH JUDICIAL CIRCUIT, et al.,

2                    Opinion of the Court                    23-12737

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:23-cv-00208-AW-MAF

_____

Before LUCK, LAGOA, and WILSON, Circuit Judges.

LUCK, Circuit Judge:

In May 2023, the Florida Legislature enacted Senate Bill 264, titled Interests of Foreign Countries. *See* Ch. 2023–33, Laws of Fla. SB 264 made seven significant changes to state law.

First, the new law prohibited the state government from contracting with entities owned or controlled by the People's Republic of China, if, as a result, the entity would gain "access to an individual's personal identifying information." Fla. Stat. § 287.138(2). Second, SB 264 prevented the state government from entering into agreements that give "an economic incentive" to entities owned or controlled by China. *Id.* § 288.0071(2). Third, the statute restricted medical records from being stored outside of the United States or Canada. *Id.* § 408.051(3). Fourth, the new law made it a first-degree felony to threaten or extort a person in Florida on behalf of China. *Id.* § 836.05(2). Fifth, SB 264 prohibited persons who are domiciled in China, and who are not citizens or lawful permanent residents of the United States, from purchasing Florida real property. *See id.* § 692.204(1)(a). Sixth, the statute required persons who are domiciled in China, and who are not

citizens or lawful permanent residents, to register real property they already own. *See id.* § 692.204(4)(a). And seventh, the new law made it so any person who purchases real property in Florida must sign an affidavit swearing that she has complied with SB 264. *See id.* § 692.204(6)(a).

This appeal involves the last three significant changes made by SB 264. In the district court, the plaintiffs—four Chinese citizens and a real estate brokerage firm—sought to enjoin the purchase restriction, the registration requirement, and the affidavit requirement because they violated the Equal Protection Clause, the Fair Housing Act, the Due Process Clause, and federal law regulating foreign investment in the United States. The district court denied the plaintiffs' motion for preliminary injunction because, although the plaintiffs had standing to challenge the three provisions, they were not substantially likely to succeed on the merits of their claims.

After careful review, and with the benefit of oral argument, we affirm the denial of the plaintiffs' preliminary injunction motion as to the registration and affidavit requirements. But we reverse and remand for the district court to deny the preliminary injunction motion without prejudice as to the purchase restriction because none of the plaintiffs have shown they have standing to challenge that provision of SB 264.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  THE THREE PROVISIONS OF SB 264

We begin by describing the three provisions of SB 264 that the plaintiffs sought to enjoin—the purchase restriction, the registration requirement, and the affidavit requirement.  Starting with the purchase restriction, it prohibits a person from purchasing or owning "any interest, except a de minimus indirect interest, in real property" in Florida if (1) the person is domiciled in China, (2) the person is not a citizen or lawful permanent resident of the United States, and (3) the person did not own "any interest" in the real property before July 1, 2023.  *Id.* § 692.204(1)(a)(4), (3).  There's an exception.  A natural person—that is, not a business association or other entity—may "purchase one residential real property that is up to [two] acres" as long as the residence isn't located "on or within [five] miles of any military installation," and the purchaser is in the United States on a non-tourist visa or has been granted asylum.  *See id.* § 692.204(2).

Next, the registration requirement directs property owners to register their names and the addresses, parcel numbers, and legal descriptions of any real property in which they owned "more than a de minimus indirect interest," but only if they are domiciled in China and are not United States citizens or lawful permanent residents.  *Id.* § 692.204(4)(a).  A person domiciled in China also must register her property if she (1) is not a United States citizen or lawful permanent resident, (2) owned or acquired more than a de minimus indirect interest in the real property before July 1, 2023, and,

(3) the property is within ten miles of any "military installation" or "critical infrastructure facility." *Id.* § 692.203(3)(a).

Finally, the affidavit requirement mandates that all purchasers of real property in Florida sign an affidavit stating that any purchase made after July 1, 2023 complies with SB 264. *Id.* § 692.204(6)(a). SB 264 makes it a crime to violate any of those three provisions. *See id.* § 692.204(8); *see also id.* § 692.203(8).

## B. THIS CASE

Yifan Shen, Yongxin Liu, Zhiming Xu, and Xinxi Wang are four Chinese citizens living in Florida without permanent immigration status. Shen and Liu have H1-B work visas. Xu first arrived in the United States under a tourist visa and is currently seeking political asylum. And Wang is here on a student visa.

Shortly after SB 264 was enacted, Shen, Liu, Xu, Wang and Multi-Choice Realty LLC—a real estate broker "that primarily serves Chinese-speaking clients in the United States, China, and Canada"—sued six Florida officials charged with enforcing the new law—the Commissioner of Agriculture, the Secretary of the Department of Economic Opportunity, the Chairperson of the Florida Real Estate Commission, and the State Attorneys for Florida's Seventh (Daytona Beach), Ninth (Orlando), and Eleventh (Miami) Judicial Circuits—in their official capacities. Together, the plaintiffs brought four claims to enjoin the enforcement of the purchase restriction, the registration requirement, and the affidavit requirement.

In their first claim, the plaintiffs alleged that the three provisions violated the Equal Protection Clause because the purchase restriction, the registration requirement, and the affidavit requirement unconstitutionally discriminated against "Chinese persons" based on "race, ethnicity, color, alienage, and national origin." In their second claim, the plaintiffs alleged that the purchase restriction, the registration requirement, and the affidavit requirement violated the Fair Housing Act by discriminating against them based on their race and national origin. According to the plaintiffs, the Act invalidated the three provisions as discriminatory housing practices.

The plaintiffs' third claim alleged that the purchase restriction, the registration requirement, and the affidavit requirement were unconstitutionally vague under the Due Process Clause because they did not "provide sufficient notice about which property and persons [were] subject" to the three provisions. And, in their fourth claim, the plaintiffs alleged that the "federal regimes governing foreign affairs, foreign investment, and national security, including [the Committee on Foreign Investment in the United States] and [the Office of Foreign Assets Control]," preempted the purchase restriction, the registration requirement, and the affidavit requirement.

The plaintiffs also moved for a preliminary injunction. After a hearing, the district court concluded that the plaintiffs had standing because at least one of them intended to engage in conduct "arguably affected with a constitutional interest but proscribed by" the

three provisions.  But the district court denied the preliminary injunction motion because the plaintiffs failed to show a substantial likelihood of success on the merits of their claims.

The plaintiffs appeal the denial of their preliminary injunction motion.

## II.  STANDARD OF REVIEW

"We review standing determinations *de novo*."  *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023) (quoting *BBX Cap. v. Fed. Deposit Ins. Corp.*, 956 F.3d 1304, 1312 (11th Cir. 2020)).  And we review for an abuse of discretion a district court's denial of a preliminary injunction.  *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).  In so doing, we review the court's legal conclusions de novo but its findings of fact for clear error.  *Scott v. Roberts*, 612 F.3d 1279, 1289–90 (11th Cir. 2010) (citing *This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga.*, 285 F.3d 1319, 1321 (11th Cir. 2002)).

## III.  DISCUSSION

"Because standing is a necessary component of our jurisdiction," we address it first.  *ACLU of Fla.*, 557 F.3d at 1190.  Then, we consider whether the district court abused its discretion in denying the preliminary injunction motion.

### A.  STANDING

"Under Article III of the Constitution, federal courts may exercise jurisdiction only over 'Cases' and 'Controversies.'"  *Dream Defs.*, 57 F.4th at 886 (quoting U.S. Const. art. III, § 2).  "To satisfy

the case-or-controversy requirement, a plaintiff must have standing to sue," *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1083 (11th Cir. 2019), which she has if she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It is "the 'independent obligation' of federal courts to ensure a case or controversy exists as to each challenged provision even in a case where the plaintiffs established harm under one provision of the statute." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (citation omitted).

In other words, "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A plaintiff "must demonstrate standing for each claim that [she] press[es] and for each form of relief that [she] seek[s]." *Id.* (citations omitted). In a multi-plaintiff case like this one, "[s]o long as one party has standing, other parties may remain in the suit without a standing injury." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) (citing *Clinton v. City of New York*, 524 U.S. 417, 434–36 (1998)).

### 1. *Injury in Fact*

We start with the first standing element—injury in fact. Article III requires that a plaintiff's injury "be concrete and particularized and actual or imminent, rather than conjectural or hypothetical." *Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024).

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). "An injury is concrete if it actually exists—that is, if it is 'real, and not abstract.'" *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242 (11th Cir. 2022) (en banc) (quoting *Spokeo*, 578 U.S. at 340). "The most obvious concrete harm is a physical injury or financial loss." *Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023) (en banc) (quoting *Hunstein*, 48 F.4th at 1243). But "intangible harms can satisfy Article III's concreteness requirement, too." *Id.* (citing *Hunstein*, 48 F.4th at 1243).

For an injury to be "actual or imminent," it must have already occurred, be certainly impending, or have substantial risk of occurring. *Baughcum*, 92 F.4th at 1031 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). When, as here, a plaintiff brings a pre-enforcement lawsuit, "[w]e apply a two-part test to determine whether an injury is sufficiently imminent to permit pre-enforcement review." *Dream Defs.*, 57 F.4th at 887. "First, the plaintiff must have 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.'" *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). "Second, there must 'exist a credible threat of prosecution.'" *Id.* (alteration adopted) (quoting *Susan B. Anthony List*, 573 U.S. at 159).

That means, here, because the plaintiffs brought a pre-enforcement challenge to the purchase restriction, the registration requirement, and the affidavit requirement, they can satisfy the pre-enforcement imminence test only if (1) at least one of them intends to engage in conduct each provision arguably proscribes, and

(2) that plaintiff faces a credible threat of prosecution as to each provision. *See Susan B. Anthony List*, 573 U.S. at 159. Beginning with the second part of the test—a credible threat of prosecution—it's satisfied here as to the three provisions.

"[W]hen a plaintiff challenge[s] [a] law soon after it was enacted and the state 'vigorously defend[s]' the law in court," we can infer a credible threat of prosecution exists. *Dream Defs.*, 57 F.4th at 887 (quoting *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc)). That's what happened here. The plaintiffs filed their lawsuit soon after the three provisions were enacted, and the state officials have vigorously defended the provisions before the district court and now this Court. That leaves the first part of the pre-enforcement imminence test.

### a. Injury in Fact as to the Purchase Restriction

We'll start with the purchase restriction. As we've already explained, the purchase restriction prohibits a person from purchasing or owning "any interest, except a de minimus indirect interest, in [Florida] real property" if: (1) the person is domiciled in China; (2) the person is not a United States citizen or lawful permanent resident; (3) the person did not own "any interest" in the property before July 1, 2023; and (4) the real property does not fall within the exception that allows a natural person to own a home. *Id.* § 692.204(1)(a)(4), (2)–(3). As explained below, because no plaintiff intends to engage in conduct the purchase restriction arguably proscribes, the plaintiffs have not shown an imminent injury, and thus, they do not have standing to challenge this provision.

### i. Yifan Shen

Beginning with plaintiff Shen, she does not intend to engage in conduct the purchase restriction arguably proscribes because (1) she is not domiciled in China, and (2) she owned an interest in her home before July 1, 2023 and does not intend to purchase another real property after the effective date. Shen confirmed in her affidavit that she was a native-born citizen of China in the United States under an H-1B nonimmigrant work visa. She has lived in the United States since 2016 and in Florida since 2019. While Shen hasn't applied for permanent residency yet, her "employer has begun the process of permanent labor certification and [she] plan[s] to apply for permanent residency in the United States." In April 2023, Shen signed a contract to buy a home in Orlando that she "intend[s]" to use as her "primary residence."

Shen is not domiciled in China because, under well-established principles of Florida law, her affidavit confirms she's domiciled in Florida, and a person can have only one domicile. *Meisman v. Hernandez*, 353 So. 3d 669, 672 (Fla. 2d DCA 2022) (citing *Walker v. Harris*, 398 So. 2d 955, 958 (Fla. 4th DCA 1981)). Florida law is clear about where a person's domicile is—it's the place the person has "presence plus [an] intent to make [the place] one's home permanently or for an indefinite period." *Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964) (emphasis omitted). Put another way, a person is domiciled in Florida if she "lives at a place (in Florida) with no present intention of removing therefrom." *See Nicolas v.*

*Nicolas*, 444 So. 2d 1118, 1120 (Fla. 3d DCA 1984) (quotation and citations omitted).

This is true even if the person does not have permanent immigration status. *See Perez*, 164 So. 2d at 564. As with anyone else, when a person without permanent immigration status is present in Florida and forms the intent to make Florida her permanent or indefinite home, she's acquired domicile in Florida. *See id.* The result does not change under Florida law merely because the person is "given permission to reside for a limited period but is liable to deportation" or "[s]he is given permission to reside for a limited period which can be extended at the discretion of the authorities of the country." *Id.* (quotation omitted). Even where a "deportation order has been made against [her,] [s]he only loses [her domicile] when [s]he is actually deported." *Id.* (quotation omitted).

According to Shen, she has lived in the United States since 2016 and in Florida since 2019, her employer is trying to obtain a permanent labor certification for her, she "plan[s] to apply for permanent residency in the United States," and she intends for the Orlando home to be her primary residence. Shen, therefore, is present in Florida and intends to remain indefinitely. *See Perez*, 164 So. 2d at 562. The fact that Shen hasn't obtained permanent immigration status doesn't change the domicile analysis, because Florida law allows noncitizens subject to removal to establish Florida as their domicile. *Id.* at 564. "[N]on-permanent immigration status in this country does not constitute in itself an absolute . . . bar" to

establishing Florida as Shen's domicile.  *See Nicolas*, 444 So. 2d at 1120.

Pushing back, Shen, citing two cases, argues that noncitizens without permanent immigration status cannot form the required intent to establish domicile under Florida law.  *See Juarrero v. McNayr*, 157 So. 2d 79, 81 (Fla. 1963); *Matter of Cooke*, 412 So. 2d 340, 343 (Fla. 1982).  But neither case is relevant to the domicile question.  In both *Juarrero* and *Cooke*, the Florida Supreme Court held that noncitizens without permanent visas could not form the intent required to make Florida their "permanent" homes to get the benefit of the Florida Constitution's homestead exemption.  *See Juarrero*, 157 So. 2d at 81; *Cooke*, 412 So. 2d at 343; *see also* Fla. Const. art. VII, § 6(a).  But as the state intermediate appellate court explained in *Perez*, while the homestead exemption issue "turned on" the fact that the homeowner intended to remain in Florida permanently rather than indefinitely, *Perez*, 164 So. 2d at 564, Florida law does not require an intent to remain permanently to establish domicile, *id*. at 562.  For domicile, an intent to remain indefinitely is enough, even when [a noncitizen's] permission to remain is for a limited period which may or may not be renewed upon its expiration."  *Id*. at 264  Because Shen intends to remain indefinitely in Florida, she is domiciled in the state, which means the purchase restriction does not proscribe her from buying real property.

Apart from her Florida domicile, the purchase restriction does not arguably proscribe the purchase of her Orlando home because Shen owned a property interest in the home before the

effective date of the provision on July 1, 2023. An "interest" is "all or part of a legal or *equitable claim* to or right in property." *Interest*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Under Florida law, a deed contract "wherein the seller agrees to convey title to land after the buyer pays all installments of the purchase price is merely a security device and is an alternative or substitute to [the] immediate conveyance of the title to the buyer with a purchase money mortgage back to the seller." *Klein v. Meza*, 4 So. 3d 51, 52 n.1 (Fla. 3d DCA 2009) (quoting *White v. Brousseau*, 566 So. 2d 832, 835 (Fla. 5th DCA 1990)). Once the parties have executed a land sale contract, "the buyer immediately receives and holds the equitable title and the seller holds the bare legal title only as security for the unpaid purchase price." *Id.* (quoting *White*, 566 So. 2d at 835). This is important, the Florida Supreme Court has explained, because equitable title is an "ownership interest" in real property. *See Accardo v. Brown*, 139 So. 3d 848, 856 (Fla. 2014) (discussing equitable ownership in the context of ad valorem taxation).

This rule of Florida property law matters to Shen because she executed the contract to buy her Orlando home in April 2023. Once Shen executed the land sale contract, she had equitable title to the Orlando home, *see Klein*, 4 So. 3d at 52 n.1, and therefore acquired an "interest" in it, *see Accardo*, 139 So. 3d at 856. This occurred before the purchase restriction's July 1, 2023 effective date, a fact Shen all but concedes. *See* Fla. Stat. § 692.204(3).

Shen hasn't averred that she intends to purchase another interest in Florida real property after July 1, 2023. While Shen's

concerned about her "future ability to purchase a home in Florida," she has no specific plans to buy another home. For that reason, Shen has not shown she intends to engage in conduct the purchase restriction arguably proscribes—she only imagines she might want to do so in the future, which isn't enough to establish an imminent injury. *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."); *Susan B. Anthony List*, 573 U.S. at 159; *ACLU of Fla.*, 557 F.3d at 1197 ("[S]tanding requires specification, not imagination.").

Because Shen is not domiciled in China, and she already owns an interest in her Orlando home, she falls outside the purchase restriction's scope, and it does not arguably proscribe her from completing her property purchase. Shen has not shown an imminent injury, and she, therefore, lacks standing to challenge the purchase restriction. We next turn to plaintiff Xu.

### ii. Zhiming Xu

Like Shen, Xu does not intend to engage in conduct the purchase restriction arguably proscribes because (1) he is not domiciled in China, and (2) he owned interests in both of his Florida real properties before July 1, 2023 and does not intend to purchase more after that date. Xu swore that he was a native-born citizen of China who entered the United States in 2019 under a tourist visa and has a pending application for political asylum. He "ha[s] not visited China since" arriving in the United States, has "no

intentions" or "plans to ever return to China," and "hope[s] . . . to obtain permanent status in the United States." Xu already owns one home in Winter Garden, and in April 2023, he entered a contract to buy a second property.

Like Shen, Xu is domiciled in Florida, not China. Xu has lived in Florida since 2019 and does not intend to return to China. Since Xu moved to Florida in 2019, he has already purchased one home and entered a contract to buy another. These actions demonstrate Xu intends to remain in Florida indefinitely, which, paired with his presence in Florida, means he's established Florida as his domicile. *See Perez*, 164 So. 2d at 562–64. That Xu's asylum application is still pending doesn't change the domicile analysis. *See id.* at 564 (explaining that even if a person is "liable to be deported" but "forms the necessary intention [to remain indefinitely]," he then nonetheless "acquires a domicile of choice").

Also like Shen, Xu owned interests in his two real properties before July 1, 2023, and he has not indicated any plans to buy more real property after that date. Like Shen, Xu entered the contract to buy his second Florida property in April 2023. As a result, he acquired equitable title—an interest in the property—before the purchase restriction's effective date of July 1, 2023. And Xu has not said that he intends to buy more Florida real property after July 1, 2023.

Because Xu isn't domiciled in China, and he already owned an interest in his home before the purchase restriction's effective date, the purchase restriction does not arguably proscribe him from

purchasing his second home.  Xu, therefore, has not established an imminent injury satisfying the first part of the test as to the purchase restriction, and thus lacks standing to challenge it.  We next consider plaintiff Liu.

### iii. Yongxin Liu

Liu does not intend to engage in conduct the purchase restriction arguably proscribes because, like Shen and Xu, he is domiciled in Florida, not China.  Liu attested that he is a native-born citizen of China who is present in the United States under an H1-B work visa, and other than a temporary nine-month stay elsewhere in the United States, he has lived in Florida since 2018.  Liu has not applied for permanent residency, but he "plan[s] to do so and [his] hope is to remain in the United States."  He currently owns a residence in Daytona Beach and "plan[s] to purchase a second property in Pelican Bay, Florida as an investment property and vacation home," though he hasn't yet found a specific property to buy.

Like Shen, Liu has lived in Florida for years, plans to apply for permanent residency, and hopes to remain in the United States. In fact, Liu has more ties to Florida than Shen; he already owns one home in Florida and intends to buy a second.  And like Shen and Xu, because Liu is present in Florida and has demonstrated an intent to remain in the state indefinitely, he's established it as his domicile.  *See Perez*, 164 So. 2d at 562.

Because Liu is domiciled in Florida, his intent to purchase a home in Pelican Bay is not arguably proscribed by the purchase restriction.  Like the other plaintiffs, Liu also has not established an

imminent injury, and he, therefore, lacks standing to challenge the purchase restriction. We now consider the final individual plaintiff, Wang.

### iv. Xinxi Wang

Wang does not intend to engage in conduct the purchase restriction arguably proscribes because she owned her home before July 1, 2023, and she has no plans to buy more real property in Florida. Wang explained in her affidavit that she was an international student from China currently studying in Florida under an F-1 visa. She has lived in Florida since 2017 and owns a home in Miami but has not yet applied for permanent residency. Wang is also "very worried about [her] future ability to make another property purchase."

Unlike the other individual plaintiffs, Wang is at least arguably domiciled in China. She averred that she is from China and is a Chinese citizen. While Wang currently lives in Florida and owns a home there, she has only a temporary student visa and, unlike the other individual plaintiffs, she has not expressed an intention to remain indefinitely in Florida. That means Wang is still arguably domiciled in China. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired." (citations omitted)).

But Wang owned her home before July 1, 2023, so the purchase restriction doesn't impair that ownership. *See* Fla. Stat. § 692.204(3). And Wang has not expressed an intent to purchase

another property in Florida. She's only "worried about [her] future ability to make another property purchase" if she eventually decides to buy more property or move within Florida. But like Shen and Xu, such some-day intentions are not enough to show that she intends to engage in conduct the purchase restriction arguably proscribes. *See Lujan*, 504 U.S. at 564; *Susan B. Anthony List*, 573 U.S. at 159; *ACLU of Fla.*, 557 F.3d at 1197. So Wang has not established an imminent injury as to the purchase restriction, and therefore lacks standing to challenge it. The plaintiffs can only challenge the purchase restriction, then, if Multi-Choice has standing.

### v. Multi-Choice

Multi-Choice argues it has been injured because the purchase restriction will "harm[] . . . [its] business" as "existing and potential" customers "are now prohibited from acquiring property in Florida." In support, Jian Song—one of Multi-Choice's owners—explained in his initial affidavit that Multi-Choice is a real estate broker that "primarily serves Chinese-speaking clients in the United States, China, and Canada," and some of his clients are not United States citizens or lawful permanent residents. Song argues that Multi-Choice "stands to lose an estimated [twenty-five] percent of its business" because the purchase restriction might prohibit Multi-Choice's existing and potential customers from buying Florida property and limit those to whom its existing customers can sell property.

Song supplemented his initial affidavit with a second one. In the second affidavit, Song identified a specific transaction he says the purchase restriction prohibits. Song attested that Multi-Choice client Qing Zhou—who was domiciled in China and was not a United States citizen or lawful permanent resident—signed a contract to purchase Florida real property in 2019. Zhou, Song avers, cannot finalize the transaction because two mortgage lenders have now refused to issue loans to any Chinese citizen in response to the purchase restriction.

Song's affidavits do not establish that any Multi-Choice client will engage in conduct that the purchase restriction prohibits. Song's first affidavit never says that any of his customers are domiciled in China, so there's no indication that the purchase restriction applies to them or their properties. At most, Song's first affidavit establishes that some of his clients are "Chinese" and "neither citizens nor permanent residents of the United States." But the purchase restriction applies only if Multi-Choice's customers are domiciled in China and intend to buy Florida real property after July 1, 2023. So, like the individual plaintiffs, Song's first affidavit does not establish that Multi-Choice clients will engage in conduct the purchase restriction arguably proscribes. *See* Fla. Stat. § 692.204(1)(a)(4).

Song's second affidavit, which specifically mentions Multi-Choice customer Zhou, doesn't move the needle. While Zhou was domiciled in China and was not a United States citizen or lawful permanent resident, he owned an interest in his property before

July 1, 2023. Song's affidavit makes clear that Zhou signed the con-
tract to buy the property in 2019, so he—like Shen and Xu—gained
equitable title to the property before July 1, 2023. Because Zhou
acquired an interest in his property before the purchase re-
striction's effective date of July 1, 2023, the purchase restriction
does not limit his ability to complete the transaction. *See id.*
§ 692.204(3).

     In the end, none of the plaintiffs has established that they
intend to engage in conduct that the purchase restriction arguably
proscribes. That means no plaintiff has established an imminent
injury in fact as to the purchase restriction, so no plaintiff has stand-
ing to challenge it.[1]

---

[1] "It seems odd" to the dissenting opinion that Shen and Liu are not domiciled
in China since they self-identify as Chinese domiciliaries and they declared as
part of their H1-B visas that they would leave the United States when their
visas expired. But the dissenting opinion's "skeptic[ism]" and "doubts" are not
the facts and they are not the law. The facts show that Shen and Liu do not
self-identify as Chinese domiciliaries. Their declarations say no such thing.
And Florida law is clear that it is presence plus the intent to remain for an
indefinite period or an unlimited time—and not federal immigration status—
that controls one's domicile in the state. *See Nicolas*, 444 So. 2d at 1120 ("[A]n
alien's foreign citizenship or non-permanent immigration status in this coun-
try does not constitute in itself an absolute residency bar . . . ."). Shen and Liu
are present in Florida and intend to remain in the state for an indefinite period.
Shen's employer has begun the process for a permanent labor certification and
she plans to apply for permanent residency. And Liu plans to apply for per-
manent residency and hopes to remain in the United States.

     In any event, Shen has another imminency problem. Shen had an in-
terest in her home before the effective date of the purchase restriction and her

### b.  Injury in Fact as to the Registration Requirement

But the registration requirement is a different matter.  Recall that under the registration requirement, a property owner must register her property if she is: (1) domiciled in China; (2) not a United States citizen or lawful permanent resident; and (3) she owns more than an indirect de minimus interest in real property within Florida. Fla. Stat. § 692.204(4)(a).[2]

Wang has shown that she is likely subject to the registration requirement.  As we explained above, Wang is arguably domiciled in China, she is not a United States citizen or lawful permanent resident, and she owns a home in Miami within ten miles of a military installation or critical infrastructure facility.  Thus, Wang likely has to register her name and property under the registration requirement.  She therefore satisfies both parts of the "test to determine whether an injury is sufficiently imminent to permit pre-enforcement review." *See Dream Defs.*, 57 F.4th at 887.

Of course, Wang must still show that her imminent injury is both "concrete [and] particularized[.]" *Drazen*, 74 F.4th at 1342

---

declaration does not say that she has specific plans to buy another property in the future.  For that reason, too, Shen does not intend to engage in conduct that the purchase restriction arguably proscribes.

[2] A property owner must also register her property if she (1) is domiciled in China, (2) is not a United States citizen or legal permanent resident, (3) owned or acquired more than a de minimus indirect interest in real property before July 1, 2023, and (4) the property is within ten miles of any "military installation" or "critical infrastructure facility."  *See* Fla. Stat. § 692.203(3)(a).

(quoting *TransUnion*, 594 U.S. at 423). Paying money to comply with a state law may be a concrete and particularized injury. *See, e.g.*, *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1327–28 (11th Cir. 2014) (finding trade association had standing to bring pre-enforcement challenge to Georgia law amending state insurance code because "[the association's] members will be faced with the choice of complying with its requirements, which impose direct and indirect costs, or ignoring it, which will expose them to penalties") (quotation omitted)).[3] Losing time complying with a regulatory burden may be one too. *See, e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (finding standing where the harm was time wasted traveling to the county registrar's office); *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279–80 (11th Cir. 2017) (finding standing where plaintiff alleged she "lost time . . . attempting to resolve [her] credit [report] inaccuracies" stemming from defendant's inaccurate reporting of plaintiff's credit); *cf. Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251–53 (11th Cir. 2015) (finding a concrete injury based on occupation of plaintiff's phone line and fax machine during the one-minute transmission of an unwanted fax); *Drazen*, 74 F.4th at 1345–46 (holding the plaintiff's allegations based on single unwanted text were sufficient to satisfy concreteness requirement of Article III standing). Here,

---

[3] *See also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 293 (3d Cir. 2015) ("These requirements will in turn cause compliance costs for [plaintiff], a classic injury-in-fact." (citation omitted)).

Wang has alleged both. Wang's affidavit establishes that she owns real property in Florida, that she will likely be subject to the registration requirement, and that she'll incur additional burdens specific to her by complying with the registration requirement. Wang has therefore satisfied each of the necessary conditions to establish injury in fact as to the registration requirement.

### c. Injury in Fact as to the Affidavit Requirement

Finally, there's the affidavit requirement. Under the affidavit requirement, anyone who purchases an interest in real property in Florida after July 1, 2023 must sign an affidavit attesting that his purchase complies with SB 264. Fla. Stat. § 692.204(6)(a).

Plaintiff Liu has shown that he intends to engage in conduct that will arguably trigger the affidavit requirement. According to Liu's affidavit, he intends to purchase a second home in Pelican Bay after July 1, 2023. So Liu will arguably have to sign an affidavit saying that his purchase complies with SB 264. That meets the imminence test.

And for the same reasons we explained above, the costs and lost time in having to comply with the affidavit requirement are also concrete and particularized injuries under Article III. *See Am.'s Health Ins. Plans*, 742 F.3d at 1327–28; *Pedro*, 868 F.3d at 1280. Thus, Liu has satisfied each of the requirements to establish injury in fact as to the affidavit requirement.

*2. Traceability and Redressability*

No one disputes—and we agree—that the plaintiffs have satisfied their burden as to the remaining standing elements—traceability and redressability.  To establish traceability and redressability where a lawsuit seeks to enjoin a government official from enforcing a state law, a plaintiff must show "'that the official has the authority to enforce the particular provision [being] challenged, such that [the] injunction prohibiting enforcement would be effectual.'"  *Dream Defs.*, 57 F.4th at 888–89 (11th Cir. 2023) (quoting *Support Working Animals v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021)).

Here, the plaintiffs' lawsuit names state officials who are charged with implementing and enforcing the registration and affidavit requirements.  *See* Fla. Stat. § 692.204(4)(a), (6)(c), (7)–(10).  And if the plaintiffs prevailed in the lawsuit for a permanent injunction, the state officials would be enjoined from enforcing the registration and affidavit provisions, which would remedy their alleged injuries.  Thus, the plaintiffs have satisfied the traceability and redressability elements of Article III standing.

★ ★ ★

In the end, the plaintiffs do not have standing to challenge the purchase restriction.  But because at least one plaintiff has established standing to challenge the registration and affidavit requirements, we next address whether the district court abused its discretion in denying the preliminary injunction motion as to those provisions.

B.  DID THE DISTRICT COURT ABUSE ITS DISCRETION BY
DENYING THE PRELIMINARY INJUNCTION AS TO THE
REGISTRATION AND AFFIDAVIT REQUIREMENTS?

The district court may grant a preliminary injunction only if the plaintiffs show that:  (1) they "ha[d] a substantial likelihood of success on the merits" of their claims; (2) they would suffer "irreparable injury" if the injunction were not granted; (3) "the threatened injury to [them] outweigh[ed] whatever damage the proposed injunction may cause" the state officials; and (4) "the injunction [was] not [] adverse to the public interest."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citation omitted).  Their "[f]ailure to show any of the four factors is fatal."  *ACLU of Fla.*, 557 F.3d at 1198.

The district court denied the plaintiffs' preliminary injunction motion because they failed to show a substantial likelihood of success on any of their claims as to the registration and affidavit requirements.  We agree.

*1.  Likelihood of Success on the Plaintiffs' Equal Protection Claim*

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The plaintiffs press two theories for why the district court abused its discretion in concluding that they were not substantially likely to succeed in showing that the registration and affidavit requirements violated the Equal Protection Clause.  Under the first theory, the plaintiffs contend that the two provisions facially classify based on national origin and

alienage.  And the facial classifications, the plaintiffs argue, are subject to strict scrutiny—a standard the registration and affidavit requirements fail to meet because neither is narrowly tailored to further a compelling state interest.

The plaintiffs' second theory assumes both provisions are facially neutral.  But, they maintain, the registration and affidavit requirements are still subject to strict scrutiny because, under the Supreme Court's framework in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the provisions were enacted to discriminate intentionally based on national origin, alienage, race, and ethnicity.  *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("A facially neutral law . . . warrants strict scrutiny only if it can be proved that the law was motivated by a [discriminatory purpose]." (cleaned up)).  We address each theory below.

<u>a.</u>  <u>The Facial Classification Theory</u>

We'll begin by explaining why the district court did not abuse its discretion in concluding that plaintiffs' facial classification theory was not substantially likely to succeed.  We divide that discussion into two parts.  First, we discuss why neither the registration requirement nor the affidavit requirement facially classifies based on national origin.  Second, we address why, although the registration requirement facially classifies based on alienage, the plaintiffs still weren't substantially likely to succeed in showing the alienage classification violated the Equal Protection Clause.

i. National Origin

The registration and affidavit requirements do not facially classify based on national origin. "[N]ational origin" refers to "the particular country in which one was born*," see United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021) (interpreting the same phrase in the context of 28 U.S.C. section 994(d)), or "more broadly, the country from which his or her ancestors came," *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973). As the plaintiffs concede, the registration and affidavit requirements do not mention either. On its face, the registration requirement applies only to those who are domiciled in China. *See* Fla. Stat. § 692.204(1)(a)(4), (4)(a). And the affidavit requirement doesn't distinguish at all: everyone who buys Florida property has to submit the same affidavit. *Id*. § 692.204(6)(a).

The plaintiffs try to sidestep these provisions' facial neutrality as to national origin by latching on to the registration requirement's reference to Chinese domicile. Specifically, they argue that Chinese domicile as it is referenced in the registration requirement is a "fig lea[f]" for Chinese national origin. So, the plaintiffs contend, when the registration requirement applies to those domiciled in China, it's using Chinese domicile as a proxy to discriminate against those of Chinese national origin.

Even assuming a facial classification can be proven by proxy, the plaintiffs did not show a substantial likelihood of success on their proxy theory in the district court. To succeed on their proxy theory, the plaintiffs bore the burden of showing a sufficient "fit" between Chinese domicile and Chinese national origin. *See Pac.*

*Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (stating that proxy discrimination occurs when facially neutral criteria is "so closely associated with the disfavored group that discrimination on the basis of such criteria is . . . discrimination against the disfavored group").  But the plaintiffs offered no evidence to the district court about the fit between the two.  They simply assumed, without evidence, that Chinese domicile and Chinese national origin are the same thing and that the registration requirement therefore "expressly discriminate[d] on the basis of national origin[.]"  But without evidence, there was no basis for the district court to look beyond the facial neutrality of the registration and affidavit requirements to find that Chinese domicile is a proxy for Chinese national origin.[4]

---

[4] For the first time on appeal, the plaintiffs proffer evidence—United Nations statistics—purporting to show that most people who live in China were also born there.  But "[i]n deciding issues on appeal, we consider only evidence that was part of the record before the district court."  *Selman v. Cobb Cnty. Sch. Dist.*, 449 F.3d 1320, 1332 (11th Cir. 2006) (first citing *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1299 n.5 (11th Cir. 2000); then citing *Shahar v. Bowers*, 120 F.3d 211, 213 n.1 (11th Cir. 1997)).  The district court cannot abuse its discretion by failing to grant relief based on evidence the parties did not present.  Even if it could, the United Nations statistics appear to show only that many people of Chinese national origin also live in China.  But "'[d]omicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another."  *Mississippi Band*, 490 U.S. at 48 (internal citations omitted).  Thus, even with the new evidence, the plaintiffs have not shown the fit between Chinese domicile and Chinese national origin.

## ii. Alienage

Next, the plaintiffs argue that the registration and affidavit requirements facially discriminated based on alienage because they exempt United States citizens from having to comply with the requirements. The district court agreed, and the state officials do not contest that conclusion on appeal. We agree that the plaintiffs showed that the registration requirement facially classified based on alienage, but they haven't shown that the affidavit requirement does.

To reiterate, the affidavit requirement applies to every "buyer of real property" in Florida. It is not limited to noncitizens. Fla. Stat. § 692.204(6)(a). United States citizens also have to file an affidavit if they buy an interest in real property in Florida after July 1, 2023, the same as noncitizens. So the district court did not abuse its discretion in finding that the plaintiffs' facial classification theory as to the affidavit requirement wasn't substantially likely to succeed.

The registration requirement, on the other hand, does classify based on alienage. Alienage generally refers to whether a person is a United States citizen. *See Osorto*, 995 F.3d at 822. The registration requirement classifies based on a person's citizenship because, while it applies to people domiciled in China, the provision exempts "citizen[s] or lawful permanent resident[s] of the United States." Fla. Stat. § 692.204(1)(a), (4)(a). Thus, if two people are domiciled in China, and only one of them is a United States citizen or lawful permanent resident, the registration requirement makes

it so the citizen or lawful permanent resident does not have to register her property but the noncitizen and nonlawful permanent resident does. That's an alienage classification because the provision treats noncitizens differently than citizens—and the state officials agree. But the state officials do not agree the plaintiffs showed a substantial likelihood that the registration requirement's alienage classification violated the Equal Protection Clause. We now consider that question.

The plaintiffs argue that the alienage classification violates the Equal Protection Clause because strict scrutiny applies, and the classification is not narrowly tailored to further a compelling state interest. The state officials respond that strict scrutiny doesn't apply for two reasons. First, they point us to a series of cases—the *Terrace* cases—in which the Supreme Court upheld laws restricting noncitizens' ability to own land without applying strict scrutiny and argue the *Terrace* cases demonstrate that alienage classifications aren't subject to heightened scrutiny in the context of land-ownership. Second, the state officials contend that, while some alienage classifications are subject to strict scrutiny, state laws—like the registration requirement—that exempt United States citizens and lawful permanent residents are nonetheless subject to rational basis review. As explained below, we agree with both of the state officials' arguments and conclude that strict scrutiny is inapplicable to the registration requirement's alienage classification.

First, while it's true that we usually apply strict scrutiny to alienage classifications, *see, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 218–

19 (1984), in *Terrace v. Thompson*, the Supreme Court upheld a Washington law that prohibited some noncitizens from owning land without applying strict scrutiny. 263 U.S. 197, 220–21 (1923); *see also Sugarman v. Dougall*, 413 U.S. 634, 653 (1973) (Rehnquist, J., dissenting) (explaining that the *Terrace* cases applied rational basis review). There, a married couple from Washington—the Terraces—wanted to sell land to a Japanese noncitizen. *Terrace*, 263 U.S. at 211–12. But they were stopped by a Washington law that generally prohibited noncitizens from owning land unless they "in good faith ha[d] declared [an] intention to become citizens of the United States." *Id.* at 212–13.

The Washington law was a problem for the Terraces and their would-be buyer because, at the time, only "free white persons and persons of African nativity or descent" were eligible for citizenship. *See id.* at 220 ("Generally speaking, the natives of European countries are eligible [for citizenship]. Japanese, Chinese and Malays are not."). That meant an Asian noncitizen, like the would-be buyer, couldn't declare in good faith that he intended to become a citizen. *See id.* at 218–22. Thus, the Washington law effectively created "[t]wo classes of" noncitizens—"those who [could] and those who [could] not become citizens"—and largely prohibited the latter, which included Asian noncitizens, from owning property. *See id.* at 220.

The Supreme Court held that the Washington law did not violate the Equal Protection Clause, explaining that "each state, in the absence of any treaty provision to the contrary, has [the] power

to deny to aliens the right to own land within its borders." *Id.* at 217 (citations omitted). As the Supreme Court went on to say, the Equal Protection Clause did "not forbid every distinction . . . between citizens and" noncitizens. *Id.* at 218. Far from it. "The rights, privileges and duties of" noncitizens "differ[ed] widely from those of citizens." *Id.* Even among noncitizens, the rights of those who had declared an intent to seek citizenship "differ[ed] substantially from those" who didn't. *Id.* So, the Supreme Court looked only to whether the Washington law was "arbitrary and capricious" to determine if it violated the Equal Protection Clause. *Id.* at 216–17.

The Washington law was not arbitrary and capricious, the Supreme Court concluded, because it relied on Congress's choice about those to whom it wished to extend citizenship, and Washington could "properly . . . assume that the considerations upon which Congress made [the] classification [were] substantial and reasonable." *Id.* at 220. "The rule established by Congress," in other words, "in and of itself[] furnishe[d] a reasonable basis" for the Washington law. *Id.* The Terraces, therefore, could not sell their land to the would-be buyer. *Id.* at 220–21. The same year as *Terrace*, the Supreme Court applied its holding that the state had the power to deny noncitizens the ability to buy land within its borders in a series of cases and upheld a similar California law. *See Porterfield v. Webb*, 263 U.S. 225, 232–33 (1923) (determining the law was not "arbitrary or unreasonable"); *Frick v. Webb*, 263 U.S. 326, 333–34 (1923); *Webb v. O'Brien*, 263 U.S. 313, 322–23 (1923).

If the *Terrace* cases are controlling here, the plaintiffs are not substantially likely to succeed in showing that the registration requirement violated the Equal Protection Clause. Under the *Terrace* cases, a state may deny landownership completely to noncitizens so long as the denial is not arbitrary, capricious, or unreasonable. *Terrace*, 263 U.S. at 216–18; *Porterfield*, 263 U.S. at 232–33. And if a state has the power to deny landownership to noncitizens, it has the lesser power to require noncitizens to register their ownership of real property without triggering heightened scrutiny. *Cf. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (recognizing that the power to admit and exclude noncitizens comes with the "concomitant . . . power to set the procedures to be followed in determining whether an alien should be admitted"). But the plaintiffs and the dissenting opinion contend that the Supreme Court's post-*Terrace* cases, which have often applied strict scrutiny to alienage classifications, effectively abrogated *Terrace*. *See, e.g.*, *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) (applying "close judicial scrutiny" (quotation omitted)); *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 599–602 (1976) (applying "strict judicial scrutiny"); *In re Griffiths*, 413 U.S. 717, 721–22 (1973) (applying "close judicial scrutiny" (quotation omitted)); *Graham v. Richardson*, 403 U.S. 365, 376 (1971) (applying "strict judicial scrutiny").

Although later Supreme Court precedent may have applied a different level of scrutiny than the *Terrace* cases to other alienage classifications, "[t]he Supreme Court has told us many times" that when one of its precedents has "direct application in a case, yet

appears to rest on reasons rejected in some other line of decisions," our duty is to "follow the case which directly controls." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012) (quotation omitted). It doesn't matter how "moth-eaten" the foundation of a decision is or how "dead" the decision appears to be. *Id.* "[T]he Supreme Court has insisted on reserving to itself the task of burying its own decisions," *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000), because it is the Supreme Court's "prerogative alone to overrule one of its precedents," *United States v. Hatter*, 532 U.S. 557, 567 (2001) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)). Until it does, we must apply its decision if the facts "line up closely with the facts before us." *Acker*, 210 F.3d at 1320.

Because this case and the *Terrace* cases address when a state can regulate noncitizens' ability to own real property, their facts "line up closely," which means we must apply the *Terrace* cases. *See id.* Whatever might be said about the sturdiness of the *Terrace* cases' foundation, the Supreme Court has not overruled them. *See Hatter*, 532 U.S. at 567. Indeed, the Supreme Court has repeatedly acknowledged or assumed the validity of the *Terrace* cases. *See, e.g., Sugarman*, 413 U.S. at 644–45 & n.11 (majority opinion) (distinguishing "special-public-interest" cases like the *Terrace* cases); *Oyama v. California*, 332 U.S. 633, 646 (1948) (finding it "unnecessary and therefore inappropriate to reexamine" the *Terrace* cases). For example, as the dissenting opinion explains, the Supreme "Court's approach to alienage restrictions began to change" with *Takahashi v. Fish & Game Commission*, 334 U.S. 410 (1948), "after the Second World War." Yet, even as its approach to reviewing alien

restrictions changed in *Takahashi*, the Court was careful not to overrule or set aside the *Terrace* cases. Instead, the *Takahashi* Court "[a]ssume[d] the continued validity of" the *Terrace* cases. *Id.* at 422 & nn.8–9. We must do the same. Absent the Supreme Court's explicit abrogation of the *Terrace* cases, we are bound to follow them. *See Acker*, 210 F.3d at 1320.

The dissenting opinion ends by explaining how selective history can be used to achieve a preferred outcome. Yes, it can. By selectively overlooking the Court's history of repeatedly refusing to overrule the *Terrace* cases—even as the Court set for itself a new approach to alien restrictions—and by selectively ignoring the Supreme Court's history of reserving to itself the prerogative to explicitly overrule its precedents, the dissenting opinion reaches the outcome it does. Someday soon, the Supreme Court may overrule the *Terrace* cases (as it did for *Korematsu*). But, as the dissenting opinion concedes, the Court has not explicitly done so. And because it has not explicitly done so, it is not for us, as an inferior court, to overrule the *Terrace* cases—especially where the Supreme Court has explicitly assumed their validity, found it unnecessary to reexamine them, and distinguished them from the Court's new approach to alien restrictions.

The plaintiffs and the dissenting opinion also assert that, even if the *Terrace* cases haven't been abrogated, they do not apply here because *Terrace* involved "a very different type of law" from the registration requirement. The Washington law in *Terrace*, they contend, applied to all noncitizens equally, whereas the

registration requirement here only applies to specific noncitizens—those domiciled in China.

We disagree. While a portion of the decision in *Terrace* described the Washington law as "applying alike and equally to all" noncitizens, *Terrace*, 263 U.S. at 218, the Supreme Court also recognized that the law in fact created "[t]wo classes of" noncitizens—those who could seek citizenship and those who couldn't—and that, because they couldn't seek citizenship at the time, Asian noncitizens were largely excluded from landownership, *see id.* at 220. So, just like the registration requirement, the law in *Terrace* distinguished between two classes of noncitizens.

Second, even if the *Terrace* cases have been abrogated, the registration requirement's alienage classification would still be subject to rational basis review—rather than strict scrutiny—because the provision does not apply to United States citizens and lawful permanent residents. "While the Supreme Court has said that 'classifications based on alienage are inherently suspect and subject to close judicial scrutiny,' it has never 'held that *all* limitations on aliens are suspect[.]'" *Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019) (cleaned up) (first quoting *Graham*, 403 U.S. at 372; then quoting *Foley v. Connelie*, 435 U.S. 291, 294 (1978)).

As the Fifth Circuit has explained, the Supreme Court has applied strict scrutiny to "invalidate state laws affecting 'resident aliens' or 'permanent resident aliens,'" but it "has never applied strict scrutiny review to a state law affecting any other alienage classifications." *LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005).

Applying strict scrutiny to laws that apply alienage classifications to lawful permanent residents is proper because lawful permanent residents are "virtual citizens." *See id*. at 417. Lawful permanent residents, for example, "may not be deported, are entitled to reside permanently in the United States, may serve, voluntarily or by conscription, in the military, are entitled to state aid benefits, and pay taxes on the same bases as citizens." *Id*. at 418 (footnotes omitted). But lawful permanent residents may not "participate in the political process," and this "lack of political capacity" justifies strict scrutiny with respect to laws that apply alienage classifications to them. *Id*. at 417.

Noncitizens who are not lawful permanent residents, by contrast, "are admitted to the United States only for the duration of their status," and "must depart at the discretion of the Attorney General." *Id*. at 418–19 (footnotes omitted). They, unlike lawful permanent residents, are subject to a variety of restrictions—like not being able to serve in the military. *See id*. at 419. And while they might also lack political capacity, that is solely "tied to their temporary connection to this country." *Id*. at 417. The Fifth Circuit therefore held in *LeClerc* that "nonimmigrant aliens"—noncitizens who aren't lawful permanent residents—"are [not] a suspect class entitled to have state legislative classifications concerning them subjected to strict scrutiny." *Id*. at 419. The Sixth Circuit, following *LeClerc*, has also held that strict scrutiny doesn't apply when a challenged law exempts citizens and lawful permanent residents. *See League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007).

So have we.  In *Estrada*, we reviewed a Georgia policy that banned noncitizens who "received deferred action pursuant to the Deferred Action for Childhood Arrivals memorandum" from attending Georgia's "three most selective colleges and universities." 917 F.3d at 1301.  Like the courts in *LeClerc* and *Bredesen*, we held that "the Supreme Court's decisions concerning resident aliens" did not extend "to different alien categories" and declined to extend strict scrutiny review to the Georgia policy affecting DACA recipients.  *Id.* at 1310 (quoting *LeClerc*, 419 F.3d at 419).  Instead, we applied rational basis review.  *Id.* at 1310–11.

Like the Georgia policy in *Estrada*, here the registration requirement only applies to noncitizens who are not lawful permanent residents.  *See id.*; *see also* Fla. Stat. § 692.204(1)(a)(4), (4)(a). And as in *Estrada*, rational basis review applies to this kind of distinction.  *See Estrada*, 917 F.3d at 1310–11.

Rational basis review requires "a rational relationship between" a statute's classification "and some legitimate governmental purpose."  *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993).  There is a presumption that the challenged law is constitutional, and plaintiffs can only overcome that presumption by "'negati[ng] every conceivable basis which might support' the classification." *See Estrada*, 917 F.3d at 1311 (quoting *Heller*, 509 U.S. at 320).  The challenged law must be upheld "if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification."  *Heller*, 509 U.S. at 320 (quotation and citations omitted).

Here, the plaintiffs have not shown a substantial likelihood that the registration requirement is arbitrary, capricious, or unreasonable.  As the state officials explained to the district court, the registration requirement was adopted to address food, individual, and national security concerns because China (and other countries of concern) started buying large chunks of land in the United States. *See, e.g.*, 15 C.F.R. § 791.4 (2024) (listing China as a foreign adversary).[5]  State officials, for example, submitted to the district court evidence showing the Chinese government and Chinese foreign-principal investors combined owned nearly 580,000 acres of agricultural land in the United States by the end of 2021.  And according to these reports, that rise in land ownership didn't happen in a vacuum—it occurred alongside concerns the Chinese government was "working aggressively to undermine U[nited States] interests" via traditional espionage, agricultural land acquisition, cyber espionage and information warfare, and harassment and blackmailing. The national security concerns underlying the registration requirement are thus a "reasonably conceivable" basis for this provision. *See Estrada*, 917 F.3d at 1310–11 (quoting *Heller*, 509 U.S. at 320); *see also Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (concluding that a presidential proclamation excluding foreign nationals of certain designated countries from entering the United States "surviv[ed] rational basis review" because of the government's "sufficient

_____

[5] Like Washington state in *Terrace*, Florida relied on the federal government's classification of China as a foreign adversary to support the registration requirement.

national security justification"); *Moving Phones P'ship L.P. v. F.C.C.*, 998 F.2d 1051, 1056 (D.C. Cir. 1993) (concluding that policy barring noncitizens from owning radio broadcast licenses survived rational basis review because the policy's national security justification was rationally related to the challenged alienage classification); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1333–34 (Fed. Cir. 2021) (concluding that presidential proclamation imposing additional duties on foreign steel imports survived the "undemanding rational-basis standard" because the government's national security justification for the classification was sufficient).

\* \* \*

In sum, as to the registration and affidavit requirements, the district court did not abuse its discretion in concluding that the plaintiffs were not substantially likely to succeed on their facial classification theory.

### b. Intentional Discrimination Under *Arlington Heights*

As an alternative to their facial classification theory, the plaintiffs point to *Arlington Heights* and argue that we should nonetheless apply strict scrutiny to the registration and affidavit requirements because the Florida Legislature enacted them to intentionally discriminate based on national origin, alienage, race, and ethnicity. In other words, the plaintiffs argue unlawful animus motivated the Florida Legislature to enact the two provisions. The district court, after reviewing the evidence, found that the plaintiffs had not shown a substantial likelihood that the registration and

affidavit requirements were intentionally discriminatory under the *Arlington Heights* factors. That finding was not clearly erroneous.

To prevail on an intentional discrimination claim under *Arlington Heights*, plaintiffs "must prove both that the law will have a discriminatory impact and that it was adopted with discriminatory intent." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023) (citing *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021)). They must, therefore, show that the challenged law was enacted "'because of,' and not merely 'in spite of' its adverse effects" on a particular group. *See Jean v. Nelson*, 711 F.2d 1455, 1485 (11th Cir. 1983) (quotation omitted). When determining whether a challenged law was enacted with discriminatory intent and will have discriminatory impact, "we rely on the guidance in [*Arlington Heights*]." *League of Women Voters*, 66 F.4th at 922. "*Arlington Heights* and [our] later caselaw require considering several factors" in determining whether a "law has both discriminatory intent and effect":

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.

*Id.* (alterations adopted) (quoting *Greater Birmingham Ministries*, 992 F.3d at 1321–22). When a district court applies these factors and determines that a challenged law was not enacted with

discriminatory intent, we review that finding for clear error.  *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687–88 (2021).

The plaintiffs rely on six of the *Arlington Heights* factors to argue that the district court clearly erred in finding that the plaintiffs hadn't shown a substantial likelihood that discriminatory animus motivated the Florida Legislature to enact the registration and affidavit requirements:  the impact of the challenged law; the historical background of the provisions; the contemporary statements and actions of key legislators; the foreseeability of the disparate impact; the knowledge of that impact; and the availability of less discriminatory alternatives.

### i. Impact of the Challenged Law (Factor One)

The plaintiffs first argue that the registration and affidavit requirements show disparate impact on people of Asian descent and on those of Chinese national origin.  As support, the plaintiffs contend their affidavits demonstrated the "far-reaching" effects both provisions are having on those of Asian descent or Chinese national origin.  But the affidavits do not address how the registration and affidavit requirements will disproportionately harm people of Asian descent and Chinese national origin as a community or group. *Cf. Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006) ("[T]he appropriate inquiry is into the impact

on the total group to which a policy or decision applies." (citation omitted)).[6]

If anything, the plaintiffs' affidavits establish that the two provisions will not have a far-reaching effect on those of Asian descent and Chinese national origin. They show, for example, that the registration requirement does not apply to three-fourths of the individual plaintiffs—Shen, Xu, and Lui—because they are not domiciled in China. And the affidavit requirement applies to every Florida real-estate purchaser, and not only those of Asian descent or Chinese national original.

ii. Historical Background and Contemporary Statements and Actions of Key Legislators (Factors Two and Five)

Next, the plaintiffs argue that the historical background of the registration and affidavit requirements, including contemporaneous statements from elected officials made when the provisions were enacted, indicate they were enacted with discriminatory intent. In support, the plaintiffs rely on statements from Florida's Governor and a state senator who sponsored SB 264. These

---

[6] For the first time on appeal, the plaintiffs cite a webpage from the Central Intelligence Agency that they contend shows that "China is populated almost entirely by people who are Asian." But because the plaintiffs did not present this evidence in the district court, we cannot consider it now to find that the district court clearly erred. *See Selman*, 449 F.3d at 1332 ("In deciding issues on appeal, we consider only evidence that was part of the record before the district court." (citations omitted)). The district court cannot clearly err in making a finding based on evidence it did not have

statements from the Governor and one of SB 264's sponsors in the Legislature, the plaintiffs argue, demonstrate a historical background that "include[d] increased geopolitical tension between the United States and China" in which "politicians [sought] to foment and capitalize on anti-China sentiment." And these statements, the plaintiffs conclude, show the registration and affidavit requirements were enacted to discriminate against persons of Chinese national origin.

As the district court explained, these statements were insufficient to show the registration and affidavit requirements were enacted with discriminatory intent. First, the statements cited by the plaintiffs show that national, individual, land, and food security concerns motivated SB 264's enactment. There's nothing in these statements that show any animus toward Asian people or those of Chinese national origin. These groups aren't even referenced.

Second, the plaintiffs rely on the statement of a single state senator to impute discriminatory intent to the entire Legislature. But we have cautioned that "the explanatory value of an isolated statement" made by a single legislator is "limited," because "[w]hat motivates one legislator" to speak about a statute "is not necessarily what motivates scores of others to enact it." *See League of Women Voters*, 66 F.4th at 932 (quotation omitted). The statements of a single member of the Florida Legislature—which cast 31 votes in the Florida Senate and 95 votes in the Florida House of Representatives in favor of the registration and affidavit requirements— is unhelpful in determining the intent of an entire body because

"[o]ne senator does not speak for all the supporters of [a law]." *See id.*; *see also SB 264: Vote History*, Fla. Senate, https://www.flsenate.gov/Session/Bill/2023/264/?Tab=Vote-History [perma.cc/S6M6-EGXV] (last accessed June 4, 2024). That's true even when one of the bill's sponsors made the statement. *See League of Women Voters*, 66 F.4th at 932 ("That the statement was made by the sponsor adds little to its significance."); *Greater Birmingham Ministries*, 992 F.3d at 1324 ("It is also questionable whether the sponsor speaks for all legislators. The vote of a sponsor is only one vote[.]").

### iii. Foreseeability of a Disparate Impact and Knowledge of that Impact (Factors Six and Seven)

The plaintiffs next argue that a disparate impact on Asian people and those of Chinese national origin was both foreseeable and known to the Florida Legislature when it enacted the registration and affidavits requirements. In support, the plaintiffs look to a Florida Senate report that says some provisions, like the registration requirement, would apply to those domiciled in China.

But as we explained in discussing the first *Arlington Heights* factor, the plaintiffs have not shown that the registration and affidavit requirements will have a disparate impact on Asian people and those of Chinese national origin. Because the plaintiffs haven't established a disparate impact, "we are skeptical that the Legislature could have foreseen a disparate impact." *See League of Women Voters*, 66 F.4th at 938.

And the evidence the plaintiffs cite doesn't dispel our skepticism. While the Senate report concludes that the registration requirement would apply to people domiciled in China, this conclusion doesn't tell us the likelihood the provisions will have a foreseeable impact on Asian people or those of Chinese national origin. The plaintiffs assume that any impact on those domiciled in China must also impact those of Chinese national origin, but they have not offered any evidence to back up that assumption, and "[s]peculation is no substitute for evidence." *See Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1327 (11th Cir. 2022) (citation omitted); *see also OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1249 (11th Cir. 2022) (quotation omitted) (same); *Deal v. Tugalo Gas Co.*, 991 F.3d 1313, 1321 (11th Cir. 2021) (same); *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1055 (11th Cir. 2020) (quotation omitted) (same).[7]

iv. Availability of Less Discriminatory Alternatives (Factor Eight)

Finally, the plaintiffs contend that there were "narrower alternatives" available to the Florida Legislature when enacting the registration and affidavit requirements. But they identify only one: they argue that the Florida Legislature "easily could have limited

---

[7] The amicus brief argues that statements from SB 264's opponents show the Legislature was on notice of the foreseeably discriminatory impact on Asian people and those of Chinese national origin. But the amicus brief does not explain how the views of SB 264's opponents tell us anything about what the Legislature foresaw in enacting the bill. As we have explained, "the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters*, 66 F.4th at 940 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 n.24 (1976)).

the law to foreign powers and their agents." The fact that the Legislature did not, the plaintiffs maintain, is evidence that it passed the registration and affidavit requirements with discriminatory intent.

We disagree. First, the affidavit requirement is not discriminatory—it applies to everyone who purchases an interest in Florida real property after July 1, 2023. *See* Fla. Stat. § 692.204(6)(a). And second, the fact that the Legislature "did not include the alternative options that [the] [p]laintiffs would have preferred is not evidence of discriminatory intent." *League of Women Voters*, 66 F.4th at 940 (cleaned up) (citing *Greater Birmingham*, 992 F.3d at 1327). "'The legislative branch,'" we've emphasized, "'is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it." *Id.*

That's particularly true here, where the Legislature considered and adopted alternatives that significantly narrowed the scope of the registration requirement. For example, as originally drafted, the registration requirement also applied to lawful permanent residents; only United States citizens would have been exempt from registering real property. *See SB 264*, §§ 4, 6–7, https://www.flsenate.gov/Session/Bill/2023/264/BillText/Filed/HTML [perma.cc/2FJ7-BE32] (last accessed June 4, 2024). The final version of the registration requirement, though, exempted citizens *and* lawful permanent residents. So, the Florida Legislature clearly "adopted some alternatives" to the original version of the registration requirement in an

effort to minimize the bill's impact. *See League of Women Voters*, 66 F.4th at 941. The fact that the Legislature didn't "accept all of them" does not indicate the district court's discriminatory intent finding was clear error. *See id.*[8]

\* \* \*

Considering the factors together, as we must, the plaintiffs have not shown that the district court clearly erred in finding no discriminatory intent as to the registration and affidavit requirements under their *Arlington Heights* intentional discrimination theory. Because the plaintiffs did not establish they were substantially likely to succeed under either their facial classification theory or their *Arlington Heights* intentional discrimination theory challenging the registration and affidavit requirements, the district court did not abuse its discretion in denying the preliminary injunction motion as to their equal protection claim.

---

[8] The plaintiffs ask us to consider another factor in the *Arlington Heights* analysis, arguing that the text of the registration and affidavit requirements was also "direct evidence of legislative intent to disproportionately impact" people of Chinese national origin. They argue that "domiciled in China" "overwhelmingly, if not exclusively," refers to people of Chinese national origin. But the affidavit requirement doesn't mention Chinese domicile, so that provision can't be direct evidence of discriminatory intent. And the plaintiffs' argument as to the registration requirement repackages the same proxy theory that we've already rejected. As we explained earlier, the plaintiffs' assumption that Chinese domicile is the same as Chinese national origin is not evidence, and the plaintiffs didn't offer any evidence in the district court showing the fit between the two. *See Coleman*, 41 F.4th at 1327.

2.  *Likelihood of Success on the Plaintiffs' Fair Housing Act Claim*

Section 3604(a) of the Fair Housing Act—the only provision of the Act the plaintiffs relied on in their preliminary injunction motion—makes it an unlawful discriminatory housing practice "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Section 3615 of the Act provides that any state law "that purports to require or permit any action that would be a discriminatory housing practice under [the Act] shall to that extent be invalid." *Id.* § 3615. In other words, section 3604(a) prohibits a "discriminatory housing practice," and section 3615 "invalid[ates]" any state law requiring or permitting the practice. *Id.* §§ 3602(f), 3615.

In their second claim, the plaintiffs contend that the registration and affidavit requirements violate the Act in three ways. They argue the provisions: (1) facially discriminate based on national origin; (2) were enacted to intentionally discriminate based on national origin; and (3) have a disparate impact on Asian people and those of Chinese national origin. The district court abused its discretion, they argue, when it concluded the plaintiffs weren't substantially likely to succeed under those theories.

But the district court did not abuse its discretion because the registration and affidavit requirements are not discriminatory housing practices under section 3604(a). The registration requirement directs that property owners who are domiciled in China

register their interests in Florida real estate; it does not restrict anyone from owning property, and it does not require or permit a person to refuse to sell to, rent to, or negotiate with anyone.  *See* Fla. Stat. § 692.204(4)(a).  And the same is true of the affidavit requirement.  It mandates that every purchaser of Florida real property sign an affidavit saying their purchase complies with SB 264.  *See id.* § 692.204(6)(a).  We thus fail to see—and the plaintiffs fail to argue—how these provisions require or permit what section 3604(a) prohibits.  Without any violation of the Act, the registration and affidavit requirements are not substantially likely to be invalidated by it.

### 3. *Likelihood of Success on the Plaintiffs' Due Process/Vagueness Claim*

"Void for vagueness 'means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'"  *United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32–33 (1963)).  When a vagueness challenge "does not involve the First Amendment, the analysis must be as applied to the facts of the case."  *Id.* (citations omitted).

A criminal statute is unconstitutionally vague when it does not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" or is so vague that it "encourage[s] arbitrary and discriminatory enforcement."  *United States v. Awan*, 966 F.2d 1415, 1424 (11th Cir. 1992) (quoting *Kolander v. Lawson*, 461 U.S. 352, 357 (1983)).  "[T]here is a strong presumption supporting the constitutionality of

legislation," *Duran*, 596 F.3d at 1290, and "[t]he touchstone of the inquiry" at all times remains "the meaning of the statute in light of common understanding and practice," *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008) (citation omitted).  If "the plain text of the statute sets forth clearly perceived boundaries, our inquiry" ends.  *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010).  Thus, a statute is not vague because of "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved."  *United States v. Williams*, 553 U.S. 285, 306 (2008).  Instead, a statute is vague only if it's unclear what constitutes an incriminating fact.  *Id.*

The plaintiffs argue that three terms in the registration and affidavit requirements are vague:  "military installation," "critical infrastructure facility," and "domiciled."  These three terms, the plaintiffs contend, are too vague to provide notice of what the registration and affidavit requirements prohibit.  We agree with the district court's conclusion that the plaintiffs did not show a substantial likelihood of success in proving the provisions were unconstitutionally vague.

Here, the registration and affidavit requirements "set[] forth clearly perceived boundaries" for the terms "military installation" and "critical infrastructure facility" by defining them in detail, so our inquiry as to them quickly ends.  Fla. Stat. § 692.201(2), (5); *see also Wayerski*, 624 F.3d at 1347.[9]  While the provisions do not

---

[9] "[M]ilitary installation" is defined as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of

specifically define "domiciled," it's a standard legal term of art with a meaning that is easily discernable from common understanding and practice. *See Hunt*, 526 F.3d at 743. As we've already explained, a person's domicile under Florida law is the place a person has both a physical presence and an intent to remain permanently or indefinitely. *See Perez*, 164 So. 2d at 562. So, because the statute is clear as to what constitutes an incriminating fact, *Williams*, 553 U.S. at 306, the plaintiffs have not established a substantial likelihood of succeeding on their vagueness claim.

We briefly address the plaintiffs' counterarguments. First, they argue that "heightened due process standards" apply because, they say, this is a strict liability statute. We are not so sure. Florida law presumes that a criminal statute includes a knowledge requirement when it "contains no expression of any intent to remove knowledge as an element" of the offense. *State v. Giorgetti*, 868 So. 2d 512, 519 (Fla. 2004). The plaintiffs do not point to any such expression here, and we cannot find one. But whether the statute contains a mens rea requirement or not, the plaintiffs' argument fails for a more fundamental reason: we apply normal due process

---

the Department of Defense or its affiliates." Fla. Stat. § 692.201(5). And "critical infrastructure facility" is defined as any of the following facilities that "employ[] measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons"; "chemical manufacturing facility"; "refinery"; "electrical power plant"; "water treatment facility or wastewater treatment plant"; "liquid natural gas terminal"; "telecommunications central switching office"; "gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas"; "seaport"; "spaceport territory"; or "airport." *Id*. § 692.201(2).

principles even when a statute imposes strict liability. *See United States v. Hedges*, 912 F.2d 1397, 1403 (11th Cir. 1990); *see also Duran*, 596 F.3d at 1292 (describing *Hedges* as "finding [that a] strict liability offense requiring no scienter was not vague as judged by normal constitutional standard[s]"). So, either way, normal due process principles apply here.

Second, the plaintiffs contend that, even if the registration and affidavit requirements adequately define "military installation" and "critical infrastructure facility," the provisions are still vague because the plaintiffs find it difficult to determine which sites in Florida qualify as military installations or critical infrastructure facilities. But that argument misunderstands what's required for a due process vagueness challenge. What matters isn't whether it may be difficult to determine if a site qualifies as a military installation or critical infrastructure facility—it's whether the statute adequately defines the facts that must exist before a site qualifies. *See Williams*, 553 U.S. at 306. Because the registration and affidavit requirements do that, neither provision is unconstitutionally vague.

4. *Likelihood of Success on the Plaintiffs' Preemption Claim*

Under the Supremacy Clause, "[o]ur Constitution provides Congress with the power to preempt state law." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012) (citing U.S. Const. art. VI, cl. 2). "Although preemption law cannot always be neatly categorized, we generally recognize three classes of preemption." *Id.* The first, express preemption, "occurs when Congress 'enacts a statute containing an express preemption provision.'" *Odebrecht*

*Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013) (alteration adopted) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).  The second, field preemption, arises when "Congress, acting within its proper authority, has determined [a field] must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399 (citation omitted).  And third, there's conflict preemption. Conflict preemption generally "covers cases where compliance with both federal and state regulations is a physical impossibility." *Odebrecht*, 715 F.3d at 1274 (internal quotation marks omitted) (quoting *Arizona*, 567 U.S. at 399).

But there is another component to conflict and field preemption that applies here:  they also cover cases "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Arizona*, 567 U.S. at 399–400).  "In this broader form, the lines between conflict preemption and field preemption are admittedly blurry, as the Supreme Court has recognized." *Id.* (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79–80 n.5 (1990) (observing the three categories of preemption are not rigidly distinct and that "field pre-emption may be understood as a species of conflict pre-emption:  A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.").  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Odebrecht*, 715 F.3d at 1274 (quoting *Crosby*, 530 U.S. at 373).

Relying on this blurry component to conflict and field preemption, the plaintiffs contend that the federal foreign investment review regime preempts the registration and affidavit requirements. The plaintiffs specifically look to the Foreign Investment Risk Review Modernization Act, which grants the President national-security review and approval over purchases of real estate by "foreign persons" in the United States if the real estate is located near airports, seaports, military installations, and other sensitive facilities and therefore might subject a sensitive facility to national security threats. The Modernization Act, the plaintiffs argue, "strikes a balance" between "foreign policy" and "national security considerations." As the plaintiffs see it, the registration and affidavit requirements disrupt that balance by "sweep[ing] . . . aside" Congress's choice to allow the President to review purchases on a case-by-case basis and "usurp[s] the President's authority" to do so.

Within the blurry overlap between conflict and field preemption, both we and the Supreme Court have reviewed similar preemption claims where the plaintiffs have alleged that state laws conflicted with federal foreign policy. Reviewing Massachusetts's "Burma law," for example, which made it unlawful—with some exceptions—for Massachusetts state agencies to purchase goods and services from people and organizations doing business with Burma, the Supreme Court held the state law was preempted by Congress's sanctions in the Foreign Operations, Export Financing, and Related Programs Appropriations Act. *Crosby*, 530 U.S. at 388.

As the Supreme Court explained in *Crosby*, Congress "impose[d] . . . sanctions directly on Burma," "authorize[d] the President to impose further sanctions," and "direct[ed] the President to work to develop a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma." *Id.* at 368–69 (quotation omitted). Since the state's Burma law went further than "Congress's specific delegation" of "flexible discretion" to the President, "with [a] limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy," the state Burma law conflicted with the federal sanctions regime and was thus preempted by it. *See id.* at 388.

Following *Crosby*, we held, in *Faculty Senate of Florida International University v. Winn*, that Florida's Travel Act "prohibit[ing] the use, in connection with travel to state sponsors of terror, of funds made available by the State to state universities" was not preempted by federal laws "touch[ing] on many subjects," including "trade," "financial matters," and "travel." 616 F.3d 1206, 1207–09 (11th Cir. 2010). Although we acknowledged the Travel Act undoubtedly implicated foreign affairs to some degree, it did not, we said, "clash[] sharply with federal law or policy," and whatever "brush" it had was simply "too indirect, minor, incidental, and peripheral to trigger the Supremacy Clause[]." *Id.* at 1208. Distinguishing the Florida law from Massachusetts's Burma law in *Crosby*, we noted that the Travel Act: (1) did "not unilaterally select[] by name a foreign country on which it ha[d] declared, in effect, some kind of economic war"; (2) did not "prohibit . . . anyone

from traveling any place"; (3) "d[id] not penalize anyone for travel-ing any place"; (4) did "not attempt to prohibit, or even to obstruct, trading broadly by anyone with anyone"; and critically here, it (5) relied on the federal government's determinations concerning the countries that qualified as state sponsors of terrorism.  *Id.* at 1210.

In contrast, a few years later, in *Odebrecht*, we held that Flor-ida's "Cuba Amendment," which, "[b]roadly speaking[,] . . . pre-vent[ed] any company that [did] business in Cuba—or that [was] in any way related to a company that [did] business in Cuba—from bidding on state or local public contracts in the State of Florida," was preempted by the federal sanctions regime against Cuba.  715 F.3d at 1272, 1290.  Unlike the law in *Faculty Senate*, we said, Florida had singled out a specific country and effectively declared an eco-nomic war on it, despite Congress "remain[ing] active in legislating with respect to Cuba" and the President's "considerable authority and discretion in the field of Cuban sanctions."  *Id.* at 1276–78.

Seizing on *Odebrecht* and *Crosby*, the plaintiffs argue that the registration and affidavit requirements are preempted by the fed-eral foreign investment review regime.  Under that regime, foreign direct investment, business transactions, foreign takeovers of United States businesses, and qualifying real estate transactions are subject to national security review by the President acting with the advice of the Committee on Foreign Investment in the United States.  *See generally* 50 U.S.C. § 4565; 31 C.F.R. § 802.101–1108.  As to real estate, the Modernization Act gave the President authority

to review public and private real estate transactions "to determine the effects of the transaction on the national security of the United States." *See* 50 U.S.C. § 4565(a)(4)(B)–(C), (b)(1)(A)(i). And it expanded that authority to include real estate transactions involving a "foreign person" trying to purchase "private or public real estate that . . . is located in the United States." *See id.* § 4565(a)(4)(B)(ii). To qualify for review, the property must be "in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security," "reasonably provide the foreign person the ability to collect intelligence on activities being conducted at such an installation, facility, or property," or "otherwise expose national security activities at such an installation, facility, or property to the risk of foreign surveillance." *Id.* Purchases of a "single 'housing unit'"—as defined by the Census Bureau—and real estate in "urbanized areas"—again, also defined by the Census Bureau—however, are exempt from review. *Id.* § 4565(a)(4)(C)(i). After the committee submits a qualifying transaction for presidential review, the President may "suspend or prohibit" it. *Id.* § 4565(d)(1).

Consistent with *Crosby*, *Faculty Senate*, and *Odebrecht*, there is no substantial likelihood that the federal foreign investment review regime preempts the registration and affidavit requirements. The two provisions do not "stand[] as an obstacle to the accomplishment and execution of [Congress's] full purposes and objectives." *See Odebrecht*, 715 F.3d at 1274 (quoting *Crosby*, 530 U.S. at 373). First, the plaintiffs fail to explain how the registration and affidavit requirements conflict with the discretion the

Modernization Act affords the President to review and block real estate transactions, and we fail to see how they do. The registration and affidavit requirements impose property registration rules and require affidavits to accompany real-property purchases. Fla. Stat. § 692.204(4)(a), (6)(a). But they do not interfere with the Committee on Foreign Investment's or the President's review of covered transactions under the foreign investment review regime. At most, these provisions complement the federal foreign investment review regime since the information they require property purchasers and owners to report would assist the federal government's ability to "review [a] covered [real estate] transaction to determine the effects of the transaction on the national security of the United States." *See* 50 U.S.C. § 4565(a)(4)(B)–(C), (b)(1)(A)(i). So, unlike the state Burma law in *Crosby* or the Cuba Amendment in *Odebrecht*, these provisions do not conflict with the Act's "purpose and intended effects[.]" *See Crosby*, 530 U.S. at 373, 377; *Odebrecht*, 715 F.3d at 1286.

Second, the registration requirement and affidavit requirements did not prohibit any kind of transaction. Unlike the prohibitions at issue in *Odebrecht*, which placed affirmative restrictions barring companies that did business with Cuba from bidding on state or local contracts, the registration and affidavit requirements do not prohibit or otherwise restrict anyone from completing transactions that the federal foreign investment review regime would otherwise allow. *Odebrecht*, 715 F.3d at 1287. That puts an even greater distance between these provisions and the Cuba Amendment in *Odebrecht*, which, as we've emphasized, was

"absolutely. . . intended to 'prohibit' or 'obstruct'" trade that was not prohibited by Congress's own sanctions. *See id.* (quoting *Faculty Senate*, 616 F.3d at 1210).

Instead, the registration and affidavit requirements are more like the Travel Act in *Faculty Senate*. There, state law complemented the federal government's approach to state sponsors of terrorism by piggybacking on the federal government's own determinations of the countries qualifying as state sponsors of terrorism. *See Faculty Senate*, 616 F.3d at 1210. Even though we acknowledged the Travel Act implicated foreign affairs to some degree, we concluded it did not "clash[] sharply with federal law or policy." *Id.* at 1208. Whatever "brush" state law had with federal law was simply "too indirect, minor, incidental, and peripheral to trigger the Supremacy Clause[]." *Id.* The same is true here.

The plaintiffs resist this conclusion by arguing that the registration and affidavit requirements' specific identification of China and other countries "singles out particular countries and nationalities in a manner calculated to infringe on the federal government's foreign affairs powers." But each of the countries defined in SB 264 as "of concern," including China, is already "of concern" under federal law. *See, e.g.*, 15 C.F.R. § 791.4 (2024) (listing China, Cuba, Iran, North Korea, Russia and Venezuela's Maduro Regime as foreign adversaries); 48 C.F.R. § 252.225-7050(a)(5)(i) (2024) (listing Iran, North Korea and Syria as state sponsors of terrorism). As in *Faculty Senate*, although the registration and affidavit requirements may implicate foreign affairs to some degree, the two provisions

piggyback on the federal government's own determinations of countries of concern and do not "clash[] sharply with federal law or policy." *See Faculty Senate*, 616 F.3d at 1208–10.  And second, as discussed above, neither provision interferes with or otherwise alters the federal government's review of real estate purchases by foreign persons in any way.  If anything, the information real-property purchasers and owners must report under the two provisions will better assist the federal government's ability to "review a covered [real estate] transaction to determine the effects of the transaction on the national security of the United States." *See* 50 U.S.C. § 4565(a)(4)(B)–(C), (b)(1)(A)(i).

For its part, the dissenting opinion concludes that SB 264 is preempted by the federal foreign investment review regime because the Florida law "regulates single home purchases that are excluded from" the federal regime and "blanketly bans all transactions which fall under its ambit."  But the dissenting opinion's focus is on the purchase restriction, which the plaintiffs have not shown they have standing to challenge.  The registration and affidavit requirements do not regulate single home purchases and do not ban all transactions.  And the dissenting opinion does not explain how the registration and affidavit requirements conflict with the federal foreign investment review regime.  We don't see how they do.[10]

---

[10] The dissenting opinion also says, as part of its preemption discussion, that the registration and affidavit requirements lack a mens rea element.  But, as we've already explained, Florida law presumes a criminal statute includes a

For those reasons, we agree with the district court that the plaintiffs aren't substantially likely to succeed on their preemption claim.

## IV.  CONCLUSION

Because we conclude that the plaintiffs have not shown they have standing to challenge the purchase restriction, we reverse that part of the district court's order and remand for the district court to deny the preliminary injunction motion without prejudice as to the purchase restriction.  As to the registration and affidavit requirements, we conclude that the district court did not abuse its discretion in denying the plaintiffs' preliminary injunction motion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

knowledge requirement when it "contains no expression of any intent to remove knowledge as an element" of the offense.  *Giorgetti*, 868 So. 2d at 519.

23-12737                    WILSON, J., Dissenting                    1

WILSON, Circuit Judge, dissenting:

Under the guise of safeguarding national security, the Florida Legislature restricted the ability of citizens of six "countries of concern"[1] from purchasing property in certain locations and, with very narrow exceptions, prohibited Chinese citizens from purchasing any property in the state. Fla. Stat. §§ 692.202–.204. Senate Bill 264 is part of a modern resurgence of "alien land laws,"[2] which were prevalent in the early part of last century but fell out of favor around the same time as other laws restricting property ownership based on race or ancestry. Governor Ron DeSantis described the Bill as "the strongest legislation in the nation to date to counteract the influence of the United States' greatest economic, strategic, and security threat—the Chinese Communist Party."[3]

---

[1] Defined as "the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolás Maduro, [and] the Syrian Arab Republic." Fla. Stat. § 692.201(3).

[2] More than thirty states have introduced similar legislation restricting Chinese property ownership. For example, Louisiana has approved bills that prohibit Chinese citizens from acquiring property within the state or leasing property within fifty miles of military sites. *See* Emily Behzadi Cárdenas, *National Security or National Origin? The Implications of Florida's Alien Land Law Under the Federal Fair Housing Act*, 75 S.C. L. Rev. 195, 204–05 (2023); *see also* Jonaki Mehta, Ashley Brown, Ailsa Chang, *Slew of New Landownership Bills are Reminiscent of Anti-Asian Alien Land Laws*, NPR (Aug. 28, 2023, 5:08 PM), https://perma.cc/GVU2-JF6F.

[3] Press Release, Exec. Off. of the Governor, Governor Ron DeSantis Cracks Down on Communist China (May 8, 2023), https://perma.cc/XY5W-3UXP.

SB 264 restricts the purchase and ownership of real property by persons domiciled in China. Specifically, "[a]ny person who is domiciled in the People's Republic of China and who is not a citizen or lawful permanent resident of the United States," cannot "directly or indirectly own . . . or acquire . . . any interest . . . in real property," regardless of the land's proximity to military installations or critical infrastructure. Fla. Stat. § 692.204(1)(a). Individuals with a valid non-tourist visa, or those who have been granted asylum, may purchase one residential property up to two acres so long as it is not within five miles of any military installation.[4] *Id.* § 692.204(2). Chinese people and entities who acquire land in violation of the provision commit a third-degree felony. *Id.* § 692.204(8). Anyone who knowingly sells to them commits a misdemeanor of the first degree. *Id.* § 692.204(9).

In addition to the restrictions on purchase and ownership, persons domiciled in China who are not citizens or lawful permanent residents of the United States must register their names and the addresses, parcel numbers, and legal descriptions of any real property in which they own "more than a de minimus indirect

---

[4] There are approximately twenty military bases in Florida, with one in almost every highly populated city, and numerous other sites that qualify as military installations. *See* University of South Florida, *Florida Military Bases*, https://perma.cc/9DC6-8UJK. Florida has not provided a map of land that reflects where individuals can move to comply with the restriction. At oral argument, it could not identify how many square miles throughout the state are *not* within five miles of a military installation. *See* Oral Argument at 36:50, *Shen v. Comm'r*, No. 23-12737 (11th Cir. Apr. 19, 2024).

interest." *Id.* § 692.204(4)(a). Citizens of any of the seven "countries of concern" must register any real property within ten miles of any "military installation" or "critical infrastructure facility." *Id.* § 692.203(3)(a). Finally, buyers of real property in Florida must attest in an affidavit under penalty of perjury that their purchase complies with SB 264. *Id.* § 692.204(6)(a).

Weeks after SB 264 was signed into law, four Chinese citizens lawfully residing in Florida and one real estate business entity (collectively, Plaintiffs) moved to enjoin its enforcement. They assert that SB 264 violates the Equal Protection Clause and the Fair Housing Act (FHA), is unconstitutionally vague, and is preempted by the Committee for Foreign Investment in the United States (CFIUS). Denying their motion, the district court found that while at least one Plaintiff had established standing to pursue each claim, no Plaintiff was likely to succeed on the merits.

Now, the majority rejects all of Plaintiffs' claims. First, the majority finds that all Plaintiffs lack standing to challenge the purchase and ownership restriction because they have abandoned China as their domicile, they do not imminently intend to purchase more property in Florida, or both. Then, evaluating only the requirements to register property and submit an affidavit to the state, the majority finds that Plaintiffs are not likely to succeed on the merits of any of their claims and that the district court did not abuse its discretion in denying a preliminary injunction.

While I have doubts about the majority's analysis regarding Plaintiffs' standing to challenge SB 264's purchase restriction,[5] I

---

[5] I am skeptical of the majority's conclusion that no Plaintiff has standing to challenge the purchase restriction in part because Plaintiffs are domiciled not in China but rather in Florida. Yifan Shen and Yongxin Liu have H-1B nonimmigrant work visas, which are temporary. *See* 8 U.S.C. § 1184(g)(4) (prescribing a six-year time limit). It seems odd to me that Plaintiffs can form the requisite present intent to make Florida their home indefinitely when, to obtain the H-1B visas, they had to declare that they will leave the United States when their visas expire. *See* 8 C.F.R. § 214.1(a)(3)(ii). True, Florida law recognizes that, "in absence of a federal announcement to the contrary," a political refugee permitted and intending to stay in the United States indefinitely may establish domicile in the United States. *Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964). But due to the temporary nature of their H-1B visas, Plaintiffs are not permitted under federal law to remain in the United States permanently or indefinitely. *See* 8 U.S.C. § 1184(g)(4). Making Florida or anywhere else in the U.S. their permanent home would require these Plaintiffs to apply for and obtain lawful permanent resident status. Neither has occurred, so while their current residence is Florida, their domicile may still be China. This court is not tasked with definitively determining Plaintiffs' domicile to confer standing. The fact that Plaintiffs self-identify as Chinese domiciliaries, *see Weiler v. Weiler*, 861 So. 2d 472, 477 (Fla. Dist. Ct. App. 2003), and that the district court classified them as Chinese domiciliaries is enough for present purposes. And since the inquiry is whether Plaintiffs' conduct is "arguably proscribed by the statute," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (citation modified), it follows that at least two Plaintiffs are subject to SB 264 and face a substantial risk of future harm. *See id.* at 158.

The majority also explains that several Plaintiffs, including Shen, have signed a contract for property before the effective date of SB 264—July 2023. As a result, Plaintiffs have an interest in the property via equitable title. I won't argue with the majority's reasoning there. But Liu has not entered a contract for property. Rather, he is "currently planning to purchase a second property in Pelican Bay, Florida as an investment property and vacation home for [himself] and [his] parents." Liu's intention to purchase a property after July 2023

dissent to address the majority's dubious equal protection and preemption analyses.

## I.

The Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The equal protection guarantee extends to citizens and noncitizens alike. *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948). And when a state treats people differently under the law based on their status as a citizen or noncitizen (in other words, based on alienage), that classification is "inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971); *see also Bernal v. Fainter*, 467 U.S. 216, 219, 227–28 (1984) (applying strict scrutiny to alienage classification); *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 602 (1976) (same).

---

shows that he would be subject to the purchase restrictions of SB 264 and thus has standing to challenge that provision. *See Susan B. Anthony List*, 573 U.S. at 159 ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." (internal quotation marks omitted)).

Unlike the majority, I would have affirmed the district court's decision finding at least one Plaintiff has standing to sue under the purchase restriction of SB 264.

We apply this more searching scrutiny because noncitizens are just "the type of 'discrete and insular' minorities who have no political voice" and so cannot use the political process to protect their interests. *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)); *Foley v. Connelie*, 435 U.S. 291, 294 (1978). Of course, there are some exceptions to this rule that make a more forgiving form of judicial review operable. *See, e.g.*, *Ambach v. Norwick*, 441 U.S. 68, 75 (1979) (government function exception); *Plyler v. Doe*, 457 U.S. 202, 223–26 (1982) ("undocumented status" exception). But, as none apply here, I would follow more than a half-century of post-Civil Rights era precedent and review SB 264 under strict scrutiny.

Ignoring that precedent, the majority instead resurrects case law consigned to the dustbins of history to justify upholding Florida's law. Over one hundred years ago, the Supreme Court held that "each state, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders." *Terrace v. Thompson*, 263 U.S. 197, 217 (1923); *see also Porterfield v. Webb*, 263 U.S. 225, 232–33 (1923); *Webb v. O'Brien*, 263 U.S. 313, 324–26 (1923); *Frick v. Webb*, 263 U.S. 326, 332–34 (1923) (collectively, the *Terrace* cases). The Court explained that the state law restricting noncitizens from purchasing and owning property was reasonably based on the state's interest in its own "safety and power" as well as federal naturalization law, which delineated who could seek American citizenship. *Terrace*, 263 U.S. at 220–21.

("[T]he natives of European countries are eligible. Japanese, Chinese and Malays are not.").[6]

---

[6] In 1923, the year the *Terrace* cases were decided, Asian people were largely ineligible to become citizens in the first place. Naturalization was limited to "free white persons," native Africans and "persons of African descent." *See United States v. Bhagat Singh Thind*, 261 U.S. 204, 207 (1923). In fact, the Chinese Exclusion Act, in effect from 1882 until 1943, specifically barred Chinese people from seeking citizenship in the United States. Chinese Exclusion Act, ch. 126, 22 Stat. 58, repealed by Magnuson Act, ch. 344, 57 Stat. 600. Strikingly, it included its own "registration requirement," requiring Chinese immigrants to register and obtain a certificate of residence. *Id.*; *see also* National Archives, *Chinese Exclusion Act (1882)* (2023), https://perma.cc/C4T4-98FN.

During the 1923 Term, the Supreme Court also decided that a Sikh Indian World War I veteran was not eligible for naturalized citizenship in the United States because he did not meet a "common" definition of white. *Bhagat Singh Thind*, 261 U.S. at 209 ("It may be true that the blond Scandinavian and the brown Hindu have a common ancestor in the dim reaches of antiquity, but the average man knows perfectly well that there are unmistakable and profound differences between them to-day . . . ."); *see also Takao Ozawa v. United States*, 260 U.S. 178, 190, 198 (1922) (denying citizenship to man born in Japan, because he was "clearly of a race which is not Caucasian").

Four years later, the Supreme Court held that it was "within the discretion of the state" to prohibit American-born citizens of Chinese immigrants from attending "white schools." *Gong Lum v. Rice*, 275 U.S. 78, 86–87 (1927) (citing *Plessy v. Ferguson*, 163 U.S. 537, 544, 545 (1896)) (reasoning that "the establishment of separate schools for white and colored children . . . have been held to be a valid exercise of the legislative power").

The Court's approach to alienage restrictions began to change after the Second World War. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420–21 (1948). But it was not until 1952 that Congress abolished the category from U.S. immigration law, which in practice applied only to people of Asian

Nowadays, we recognize that "[t]he distinction between citizens and [noncitizens]" is "ordinarily irrelevant to private activity." *Ambach*, 441 U.S. at 75. Primarily only when the distinction is "fundamental to the definition and government of a State" do we evaluate alienage classifications by states under a more limited rational relationship test. *Id*. at 75, 80; *see also Foley*, 435 U.S. at 299–300 (reviewing citizenship requirement for state police officers for a rational relationship); *Cabell v. Chavez-Salido*, 454 U.S. 432, 447 (1982) (upholding state law imposing citizenship requirement for "peace officers" as applied to probation officers); *but see Bernal*, 467 U.S. at 221 (declining to apply exception to citizenship requirement for Texas public notaries); *In re Griffiths*, 413 U.S. 717, 719–22 (1973) (subjecting state statute that prohibited noncitizens from becoming members of the State Bar to strict scrutiny). We engage in more limited review in these circumstances because we recognize that "a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community." *Bernal*, 467 U.S. at 221. Because SB 264 targets noncitizens who are in the country legally and restricts private activity, not functions at the "heart of representative government," none of these exceptions apply. *See id.*

While the Supreme Court has not explicitly overruled the *Terrace* cases, the Court has questioned their continued validity. In *Graham*, the Supreme Court recognized that in the past it had

---

descent. *See* Immigration and Nationality Act of 1952, Pub. L. 82–414, 66 Stat. 163 (codified at 8 U.S.C. ch. 12).

"upheld statutes that . . . deny to [noncitizens] the right to acquire and own land," based on a state's 'special public interests' in favoring its own citizens when distributing limited resources. 403 U.S. at 372–73. But its subsequent decision in *Takahashi* "cast doubt on the continuing validity of the special public-interest doctrine" underpinning those decisions "in all contexts." *Id.* at 373–74 (citing 334 U.S. 410). Later, in *Ambach*, the Court recognized that its "decisions gradually have restricted the activities from which States are free to exclude [noncitizens]" and its "more recent decisions have departed substantially from the public-interest doctrine." 441 U.S. at 73. And since that time, "[t]he Court has tended to affirm state classifications regarding political or democratic rights afforded to [noncitizens] and has tended to invalidate those classifications that limited the distribution of economic benefits or regulated commercial opportunities." *Korab v. Fink*, 797 F.3d 572, 592 (9th Cir. 2014) (Byebee, J., concurring).

The evolution of the equal protection jurisprudence compels courts to be discerning in applying it. Recognizing the shift, I find the majority's reliance on the *Terrace* cases to be misplaced. It is unclear why the majority is satisfied not only to rest on their "increasingly wobbly, moth-eaten foundations" but also to build upon them with rust-corroded beams. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). The foundation in question was laid during the height of our nation's problematic history with Asian immigrants. But our tolerance for this discrimination has waned since the era where Asian people were barred from becoming U.S. citizens and the Supreme Court sanctioned segregated schools. Now, the premises on

which the *Terrace* cases rest—deference to states' generalizations about its own "power" and the need for "safety" from outsiders to support discriminatory policies—have been "overruled in the court of history" *cf. Trump v. Hawaii*, 585 U.S. 667, 710 (2018). Like other "shameful precedent," *id.* at 754 (Sotomayor, J., dissenting), the Court has set those notions aside in favor of meticulous scrutiny of discriminatory classifications based on where someone is from. Regrettably, the majority ignores the fortifications made to our precedent and yet again exemplifies how "selective history unmoored from [the] present-day . . . can be wielded to achieve judges' preferred outcomes." *NRA v. Comm'r*, 133 F.4th 1108, 1162 (11th Cir. 2025) (en banc) (Wilson, J., concurring).

Even though I strongly doubt the continued validity of the *Terrace* cases, I would also find that the *Terrace* cases do not apply to the case before us. There are two distinctions that set this case outside the grasp of *Terrace,* and the majority have overlooked both.

First, as the majority points out, the Supreme Court's decision in *Terrace* focused on whether the Washington law was "arbitrary and capricious" to determine whether it violated the Equal Protection Clause. The Court concluded that it was not because the classification relied on by the Washington law was created by Congress, not by the state. 263 U.S. at 220. The backing of Congress provided the "reasonable basis" for the law. *Id.* No such basis is present here. The Court explained that Congress has the right to "grant or withhold the privilege of naturalization upon any

grounds or without any reason, as it sees fit" and the state "may assume" that these classifications are "substantial and reasonable." *Id*. The Washington state law used a blanket classification that primarily impacted Asian noncitizens. But here, the discriminatory classification that targets Chinese citizens is written directly into the statute. It finds no backing in Congress or any other federal classification. The majority has ignored a crucial step in applying *Terrace* reasoning. It is not simply that a "state may deny landownership completely to noncitizens." The denial itself must not be arbitrary, capricious, or unreasonable. The *Terrace* Court relied on a Congressional classification to support the Washington law over one hundred years ago. That classification no longer exists.[7] And the majority offers nothing in its place.

Second, the majority assumes that if a state can deny land ownership to all noncitizens, then it also has the lesser power of compelling registration for certain noncitizens without triggering strict scrutiny. As I have discussed, the law in *Terrace* applies "alike and equally to all" noncitizens. *Id*. at 218. It is this equal and broad application that renders it neither "capricious" nor "arbitrary." The majority suggests that if a broad denial to all noncitizens is valid, then a narrow denial falls under the same umbrella. But to narrow the scope is to lose its validity. In *Terrace*, the law was not arbitrary

---

[7] *See* Gabriel J. Chin & Paul Finkelman, *The "Free White Person" Clause of the Naturalization Act of 1790 as Super-Statute*, 65 WM. & Mary L. Rev. 1047, 1110 (Apr. 2024) (tracing Congress' elimination of racial restrictions on naturalization in the first half of the twentieth century).

or capricious *because* it was applied "alike and equally" to all noncit-izens.[8] In contrast, SB 264 explicitly discriminates against noncit-izens domiciled in China. Isolating certain groups increases the level of facial discrimination while undermining the reasonable basis that the Court scrounged up in *Terrace*. The *Terrace* cases give us no indication that a law any less broad or applied any less equally should be given the same treatment. And I find no reason to extend it today.

Therefore, Plaintiffs are likely to succeed on their equal pro-tection claim. Strict scrutiny should apply and, as the district court noted, Florida has not even tried to pass the test. For these reasons, I would reverse the district court's order denying the preliminary injunction.

## II.

The Supremacy Clause of the U.S. Constitution mandates that federal law—"the supreme Law of the Land"—takes prece-dence over "Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. The Supremacy Clause gives Congress the power to preempt "any state law that 'interferes with, or is contrary to,' federal law." *Estrada*, 917 F.3d at 1302 (alterations adopted) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). Federal law may preempt state law expressly, by "decid[ing] a field will be regulated

---

[8] And the noncitizen land law reviewed in *Porterfield v. Webb*, 263 U.S. 225 (1923), was more even-handed than the one in *Terrace*—it excluded all noncit-izens, even those eligible for naturalization. *Id.* at 233.

exclusively by the federal government," or "when the two conflict." *Id.* at 1303. Cases where federal and state laws conflict include "where compliance with both federal and state regulations is a physical impossibility, and . . . where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

In 1975, President Gerald Ford, articulating joint goals of ensuring "national security" while "promot[ing] economic growth, productivity, competitiveness, and job creation," established CFIUS, an interagency body tasked with assessing national security risks of foreign investments in the U.S. economy. Exec. Order No. 11,858, 40 Fed. Reg. 20,263 (May 9, 1975); 50 U.S.C. § 4565(k); 31 C.F.R. § 800.501. The United States is the world's largest recipient of foreign investment, and for nearly fifty years, CFIUS—chaired by the Secretary of the Treasury[9]—has investigated investments involving critical infrastructure, "remain[ing] responsive to an

---

[9] CFIUS is comprised of the Attorney General and Secretaries of Homeland Security, Defense, Commerce, State, and Energy. The Director of National Intelligence and the Secretary of Labor serve as non-voting members. 5 U.S.C. § 4565(k)(2)–(3).

14                    WILSON, J., Dissenting                    23-12737

evolving national security landscape and the nature of the investments that pose related risks."[10]

In 2018, Congress expanded CFIUS's authority when it enacted the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), Pub. L. 115–232, 132 Stat. 1636. FIRRMA broadened CFIUS's jurisdiction to include review of transactions by or to foreign persons or entities of real estate "in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security." 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(bb)(AA). FIRRMA excludes single family housing units from CFIUS review. *Id.* § 4565(a)(4)(C)(i)(I).

CFIUS utilizes a multi-step process for screening investments. The screening process begins when a party to a transaction files notice with CFIUS. 31 C.F.R. § 800.501. The filing triggers a forty-five day review period during which CFIUS conducts a "risk-based analysis," considering:

> (a) The *threat*, which is a function of the intent and capability of a foreign person to take action to impair the national security of the United States;

---

[10] Cathleen D. Cimino-Isaacs & Karen M. Sutter, Cong. Rsch. Serv., IF10177, *The Committee on Foreign Investment in the United States* 1 (2024) (quotation marks omitted), https://perma.cc/7AGM-BNU2.

(b) The *vulnerabilities*, which are the extent to which the nature of the U.S. business presents susceptibility to impairment of national security; and

(c) The *consequences to national security*, which are the potential effects on national security that could reasonably result from the exploitation of the vulnerabilities by the threat actor.

*Id.* §§ 800.102; 800.501–.506.

If risks are identified, CFIUS initiates an investigation to be completed within forty-five days. *Id.* §§ 800.505–.508. CFIUS may negotiate with parties to the transaction to mitigate national security risks. 50 U.S.C. § 4565(l)(3)(A)(i). In 2023, for example, "CFIUS adopted mitigation measures and conditions in 43 instances (approximately 18 percent of the total number of 2023 notices)."[11] But if CFIUS believes the national security risks cannot be addressed, it can recommend that the President block the transaction. *Id.* § 4565(l)(2). The President must act within fifteen days and may take any action he or she "considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." *Id.* § 4565(d)(1).

This case marks an early opportunity to consider the preemptive scope of CFIUS review,[12] but this is not the first time

---

[11] Comm. on Foreign Inv. in the U.S., Annual Report to Congress 30 (2023), https://perma.cc/E2KP-2RWC.

[12] While this is the first appeal regarding CFIUS preemption, SB 264 is not the first state law to potentially encroach on CFIUS's territory. In 2021, Texas

Florida has attempted to regulate foreign investments, nor is Florida the first state to impose on this federal terrain. In *Crosby*, the Supreme Court found that a Massachusetts law which restricted the "authority of [state] agencies to purchase goods or services from companies doing business with Burma" was invalid because it "frustrat[ed] federal statutory objectives." 530 U.S. at 366. A federal statute imposed mandatory and conditional sanctions on Burma, and the Court held that the state law was an "obstacle to the accomplishment of Congress's full objectives." *Id.* at 373–74. "Congress clearly intended the federal Act to provide the President with flexible and effective authority over economic sanctions against Burma," and the Massachusetts law would "impos[e] a

---

passed the Lone Star Infrastructure Protection Act, which prohibits companies from entering into agreements relating to critical infrastructure with entities that have certain ties to China, Iran, North Korea, or Russia. 2021 Tex. Gen. Laws 2535 (codified as amended at Tex. Bus. & Com. Code § 117.001–.003 and Tex. Gov't Code § 2275.0101–.0103). In July 2023, a Texas energy company that operates as a subsidiary of a Chinese investment group filed a complaint in the Western District of Texas, alleging, in relevant part, that LIPA is preempted by CFIUS. The district court granted a motion to dismiss, finding that the law is not preempted. This case has been appealed to the Fifth Circuit.

And in Arkansas, a federal district court has found that the CFIUS regime likely preempted Arkansas's land law prohibiting certain foreign parties, including citizens, residents, or entities from China and other foreign countries subject to the International Traffic in Arms Regulations, 22 C.F.R. § 126.1, from owning agricultural lands or interests in a digital asset mining business within the state. *Jones Eagle LLC v. Ward*, No. 24-CV-00990, 2024 WL 5112477 (E.D. Ark. Dec. 9, 2024). This case has been appealed to the Eighth Circuit.

different, state system of economic pressure against the Burmese political regime." *Id.* at 374, 376.

Then, in *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, this court applied conflict preemption principles from *Crosby* to strike down another Florida statute that prevented companies doing business in Cuba from bidding on public contracts. 715 F.3d 1268, 1274–90 (11th Cir. 2013). After examining the federal regime of sanctions against Cuba, including Congress's grant of broad power to the President to "regulate, license, and prohibit trade with foreign nations," we concluded that the Florida law conflicted with federal law in "(at least) three ways." *Id.* at 1275, 1281. First, it "swe[pt] more broadly than the federal regime . . . , punishing companies . . . that d[id] not run afoul of the federal Cuban sanctions and penalizing economic conduct that the federal law expressly permit[ted]." *Id.* at 1281. Second, it "ha[d] its own substantial penalties that [went] beyond the federal sanctions." *Id.* And finally, it "undermine[d] the substantial discretion Congress ha[d] afforded the President both to fine-tune economic sanctions and to pursue multilateral strategies with Cuba." *Id.* Ultimately, we held that the Florida law "reache[d] far beyond the federal law in numerous ways," and we affirmed the grant of a preliminary injunction prohibiting the enforcement of the statute. *Id.* at 1290.

Here, the district court made a point to distinguish the statutory landscape from those in *Crosby* and *Odebrecht*. It drew this distinction by emphasizing that the federal regimes there "dealt principally with international diplomacy" and involved the "foreign

affairs power," which is a "uniquely federal area of regulation." *Shen v. Simpson*, 687 F. Supp. 3d 1219, 1248–49 (N.D. Fla. 2023) (citation modified). The court explained that the state laws in *Crosby* and *Odebrecht* sought to exert pressure on foreign governments and stood "as unmistakable obstacles to the federal government's diplomatic goals," but here, "the thrust of the federal regime is not to exert diplomatic pressure on foreign nations." *Id.* at 1249.

Upon de novo review,[13] my understanding of *Crosby* and *Odebrecht* differs from the district court's and the majority's. The Supreme Court in *Crosby* and this court in *Odebrecht* made their respective preemption decisions largely because the state laws swept more broadly and were more punitive than their respective federal regimes, "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 376–77, 381; *Odebrecht*, 715 F.3d at 1285. The Supreme Court recognized that "President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." *Crosby*, 530 U.S. at 381. We should recognize the same here. If every state enacted its own restrictions on foreign property investment, they would weaken the President's ability to speak to foreign nations on behalf of the United States.

---

[13] *See Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010).

While both CFIUS and SB 264 are designed to protect against national security threats, *Crosby* makes clear that "conflicts are not rendered irrelevant" when the state and federal government "share the same goals." 530 U.S. at 379. "The fact of a common end hardly neutralizes conflicting means," *id.*, and the means by which CFIUS and SB 264 attempt to preserve national security conflict in several ways. First, SB 264 regulates single home purchases that are excluded from CFIUS review. *Compare* Fla. Stat. § 692.204 *with* 50 U.S.C. § 4565(a)(4)(C)(i)(I). This exemption reflects Congress's judgment that the purchase of an individual home is highly unlikely to pose national security concerns, but regulating every transaction would wreak major economic and foreign policy harms and invite discrimination. Additionally, SB 264 lacks a mens rea requirement, criminalizing any violation, while federal law imposes criminal liability only for intentionally misleading CFIUS through false statements or omissions. *Compare* Fla. Stat. § 692.204(8), (9) *with* 31 C.F.R. § 802.901; *see also Odebrecht*, 715 F.3d at 1281 (explaining that the Florida law was preempted in part because it imposed penalties that exceeded the federal sanctions).

In sum, the CFIUS process—informed by this nation's commerce, foreign policy, and national security experts—does not target identified countries or nationalities, conducts thorough risk review of individual transactions, and allows for negotiation with parties to mitigate risk while allowing safe transactions that strengthen our economy to proceed. *See* 50 U.S.C. § 4565(b), (l)(3)(A). Meanwhile, SB 264—informed by state representatives and a governor without national security expertise—targets

Chinese domiciliaries, blanketly bans all transactions which fall under its ambit, and fails to afford parties any flexibility, undermining national economic and diplomatic leverage. The power "to regulate foreign commerce" has long been understood as "an obvious and essential branch of the federal administration,"[14] yet here Florida flouts these principles of federalism.

Thus, I would have found Plaintiffs likely to succeed on their federal preemption claim and reversed the district court. But regrettably, this court fails to intercept Florida's improper claim of dominance in a quintessentially federal arena.

Because Plaintiffs were likely to succeed on their equal protection and federal preemption claims, I respectfully dissent.

---

[14] The Federalist No. 42 (James Madison).